**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.:

LAWRENCE HENRY SMALLEN AND
LAURA ANNE SMALLEN REVOCABLE
LIVING TRUST, Individually and on Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

THE WESTERN UNION COMPANY.,
HIKMET ERSEK, SCOTT T. SCHEIRMAN,
and RAJESH K. AGRAWAL,

      Defendants.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Lawrence Henry Smallen and Laura Anne Smallen Revocable Living Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding The Western Union Company ("Western Union" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Western Union securities between February 24, 2012 and January 19, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      The Western Union Company provides money movement and payment services worldwide. The company operates in three segments: Consumer-to-Consumer, Consumer-to-Business, and Business Solutions.

3.      The Company was founded in 1851 and is headquartered in Englewood, Colorado. Western Union's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WU."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Western Union's fraud prevention efforts did not comply with applicable laws; (ii) Western Union willfully failed to maintain an effective anti-money laundering program; (iii) Western Union aided and abetted wire fraud; (iv) for at least five years, Western Union knew of agents structuring transactions designed to avoid the reporting requirements of the Bank Secrecy Act; (v) Western Union was not compliant with its regulatory responsibilities; (vi) between 2004 and 2012, Western Union violated U.S. laws—the Bank Secrecy Act and anti-fraud statutes—by processing hundreds of thousands of transactions for Western Union agents and others involved

in an international consumer fraud scheme; (vii) Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions; (viii) between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044; and (ix) as a result of the foregoing, Western Union's public statements were materially false and misleading at all relevant times.

5.      On January 19, 2017, the U.S. Department of Justice and the Federal Trade Commission ("FTC") announced that Western Union had agreed to pay $586 million and admitted to "aiding and abetting wire fraud" by allowing scammers to process transactions even when the Company realized that its agents were disguising transactions to avoid detection.

6.      On this news, Western Union's share price fell $0.87, or 3.9%, over two trading days, to close at $20.98 on January 20, 2017.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act, 15 U.S.C. §78aa .

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as Western Union is headquartered within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Western Union securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Western Union is incorporated in Delaware. The Company's principal executive offices are located at 12500 East Belford Avenue, Englewood, Colorado 80112. Western Union's shares trade on the NYSE under the ticker symbol "WU."

14.     Defendant Hikmet Ersek ("Ersek") has served at all relevant times as the Company's Chief Executive Officer and President.

15.     Defendant Scott T. Scheirman ("Scheirman") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from September 2006 until December 31, 2013.

16.     Defendant Rajesh K. Agrawal ("Agrawal") has served as the Company's CFO since July 15, 2014 and as the Executive Vice President since November 2011.  Agrawal was the Company's Interim CFO from January 1, 2014 to July 15, 2014.

17.     The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein collectively as the "Individual Defendants."

18.     Defendant Western Union and Individual Defendants are sometimes referred to herein collectively as "Defendants."

4

## SUBSTANTIVE ALLEGATIONS

### Background

19.     The Western Union Company provides money movement and payment services worldwide. The company operates in three segments: Consumer-to-Consumer, Consumer-to-Business, and Business Solutions.

### Materially False and Misleading Statements Issued During the Class Period

20.     The Class Period begins on February 24, 2012, when Western Union filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K").

21.     In the 2011 10-K, the Company stated in pertinent part:

The remittance industry has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts are effective and comply with applicable law and best practices*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds or a change in laws or their interpretation could have an adverse effect on our business, financial condition and results of operations.

*** 

*We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices.* These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer network operates through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities.

***

5

These regulatory goals—the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy—may conflict, and the law in these areas is not consistent or settled. While ***we believe that Western Union is compliant with its regulatory responsibilities,*** the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

(Emphases added.)

22.     The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ersek and Scheirman, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

23.     On February 22, 2013, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").

24.     In the 2012 10-K, the Company stated, in relevant part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While ***we believe our fraud prevention efforts are effective and comply with applicable law***, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

*** 

***We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus***

6

***on compliance with anti-money laundering or fraud prevention requirements.***
These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance.

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While ***we believe that Western Union is compliant with its regulatory responsibilities***, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

(Emphases added.)

25.     The 2012 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On February 24, 2014, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").

27.     In the 2013 10-K, the Company stated, in relevant part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While ***we believe our fraud prevention efforts are effective and comply with applicable law***, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

\*\*\*

7

*We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.*

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While *we believe that Western Union is compliant with its regulatory responsibilities*, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

(Emphases added.)

28.     The 2013 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").

30.     In the 2014 10-K, the Company stated, in relevant part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which

they are enforced could have an adverse effect on our business, financial condition and results of operations.

\*\*\*

**We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.**

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

(Emphases added.)

31.    The 2014 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    On February 19, 2016, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").

33.    In the 2015 10-K, the Company stated, in relevant part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While we believe our fraud prevention efforts comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by

consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition, results of operations, and cash flows.

\*\*\*

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities in all material respects, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

The 2015 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     The statements referenced in ¶¶ 20-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Western Union's fraud prevention efforts did not comply with applicable laws; (ii) Western Union willfully failed to maintain an effective anti-money laundering program; (iii) Western Union aided and abetted wire fraud; (iv) for at least five years, Western Union knew of agents

structuring transactions designed to avoid the reporting requirements of the Bank Secrecy Act; (v) Western Union was not compliant with its regulatory responsibilities; (vi) between 2004 and 2012, Western Union violated U.S. laws—the Bank Secrecy Act and anti-fraud statutes—by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme; (vii) Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions; (viii) between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044; and (ix) as a result of the foregoing, Western Union's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

35.     On January 19, 2017, the U.S. Department of Justice issued a news release entitled "Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586 Million in Settlement with Justice Department and Federal Trade Commission," announcing that Western Union had agreed to pay $586 million and admitted to "aiding and abetting wire fraud" by allowing scammers to process transactions even when the Company realized that its agents were disguising transactions to avoid detection. The news release stated in pertinent part:

> ***The Western Union Company (Western Union), a global money services business headquartered in Englewood, Colorado, has agreed to forfeit $586 million and enter into agreements with the Justice Department, the Federal Trade Commission (FTC),*** and the U.S. Attorney's Offices for the Middle District of Pennsylvania, the Central District of California, the Eastern District of Pennsylvania and the Southern District of Florida***. In its agreement with the Justice Department, Western Union admits to criminal violations including willfully failing to maintain an effective anti-money laundering (AML) program and aiding and abetting wire fraud.***

***

"As this case shows, wiring money can be the fastest way to send it – directly into the pockets of criminals and scam artists," said Acting Assistant Attorney General Bitkower. "Western Union is now paying the price for placing profits ahead of its own customers. Together with our colleagues, the Criminal Division will both hold to account those who facilitate fraud and abuse of vulnerable populations, and also work to recoup losses and compensate victims."

"Western Union owes a responsibility to American consumers to guard against fraud, but instead the company looked the other way, and its system facilitated scammers and rip-offs," said [FTC] Chairwoman [Edith] Ramirez. "The agreements we are announcing today will ensure Western Union changes the way it conducts its business and provides more than a half billion dollars for refunds to consumers who were harmed by the company's unlawful behavior."

"The U.S. Attorney's Office for the Middle District of Pennsylvania has a long history of prosecuting corrupt Western Union Agents," said U.S. Attorney Brandler. ***"Since 2001, our office, in conjunction with the U.S. Postal Inspection Service, has charged and convicted 26 Western Union Agents in the United States and Canada who conspired with international fraudsters to defraud tens of thousands of U.S. residents via various forms of mass marketing schemes.*** I am gratified that the deferred prosecution agreement reached today with Western Union ensures that $586 million will be available to compensate the many victims of these frauds."

"Our investigation uncovered hundreds of millions of dollars being sent to China in structured transactions designed to avoid the reporting requirements of the Bank Secrecy Act, and much of the money was sent to China by illegal immigrants to pay their human smugglers," said U.S. Attorney Decker. "In a case being prosecuted by my office, a Western Union agent has pleaded guilty to federal charges of structuring transactions – ***illegal conduct the company knew about for at least five years***. Western Union documents indicate that its employees fought to keep this agent – as well as several other high-volume independent agents in New York City – working for Western Union because of the high volume of their activity. This action today will ensure that Western Union effectively controls its agents and prevents the use of its money transfer system for illegal purposes."

"Western Union's failure to comply with anti-money laundering laws provided fraudsters and other criminals with a means to transfer criminal proceeds and victimize innocent people," said Acting U.S. Attorney Lappen. ***"Western Union has agreed to forfeit $586 million, the largest forfeiture ever imposed on a money services business, and has agreed to take specific steps to ensure that it complies with the law in the future.*** This office will continue to vigorously enforce the anti-money laundering laws and regulations, which are necessary to prevent those engaged in fraud, terrorism, human trafficking, drug dealing and other crimes from using companies like Western Union to further their illegal activity."

12

*"Western Union, the largest money service business in the world, has admitted to a flawed corporate culture that failed to provide a checks and balances approach to combat criminal practices,"* said U.S. Attorney Ferrer. *"Western Union's failure to implement proper controls and discipline agents that violated compliances policies enabled the proliferation of illegal gambling, money laundering and fraud-related schemes.* Western Union's conduct resulted in the processing of hundreds of millions of dollars in prohibited transactions. Today's historic agreement, involving the largest financial forfeiture by a money service business, makes it clear that all corporations and their agents will be held accountable for conduct that circumvents compliance programs designed to prevent criminal conduct."

***

"Los Angeles-Defendant Wang's company was considered to be among the largest Western Union agents in the United States as over $310 million was sent to China in a span of five years, half of which was illegally structured and transmitted using false identification," said Assistant Director in Charge Fike. *"Rather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place.* This settlement should go a long way in thwarting the proceeds of illicit transactions being sent to China to fund human smuggling or drug trafficking, as well as to interrupt the ease with which scam artists flout U.S. banking regulations in schemes devised to defraud vulnerable Americans."

"As a major player in the money transmittal business, Western Union had an obligation to its customers to ensure they offered honest services, which include upholding the Bank Secrecy Act, as well as other U.S. laws," said [IRS-CI] Chief Weber. *"Western Union's blatant disregard of their anti-money laundering compliance responsibilities was criminal and significant.* IRS-CI special agents – working with their investigative agency partners – uncovered the massive AML compliance failures and is proud to be part of this historic criminal resolution."

"Today's announcement of this significant settlement highlights the positive result of HSI's collaboration with our partner agencies to *hold Western Union accountable for their failure to comply with bank secrecy laws that preserve the integrity of the financial system of the United States,"* said Special Agent in Charge Miller. "As a result of this settlement, Western Union now answers for these violations. I thank the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau for their partnership in this investigation."

*According to admissions contained in the deferred prosecution agreement (DPA) and the accompanying statement of facts, between 2004 and 2012, Western Union violated U.S. laws—the Bank Secrecy Act (BSA) and anti-fraud*

13

*statutes—by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme.*

As part of the scheme, fraudsters contacted victims in the U.S. and falsely posed as family members in need or promised prizes or job opportunities. The fraudsters directed the victims to send money through Western Union to help their relative or claim their prize. *Various Western Union agents were complicit in these fraud schemes, often processing the fraud payments for the fraudsters in return for a cut of the fraud proceeds.*

*Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions.* Beginning in at least 2004, Western Union recorded customer complaints about fraudulently induced payments in what are known as consumer fraud reports (CFRs). In 2004, Western Union's Corporate Security Department proposed global guidelines for discipline and suspension of Western Union agents that processed a materially elevated number of fraud transactions. In these guidelines, the Corporate Security Department effectively recommended automatically suspending any agent that paid 15 CFRs within 120 days. Had Western Union implemented these proposed guidelines, it could have prevented significant fraud losses to victims and would have resulted in corrective action against more than 2,000 agents worldwide between 2004 and 2012.

Court documents also show Western Union's BSA failures spanned eight years and involved, among other things, the acquisition of a significant agent that Western Union knew prior to the acquisition had an ineffective AML program and had contracted with other agents that were facilitating significant levels of consumer fraud. Despite this knowledge, Western Union moved forward with the acquisition and did not remedy the AML failures or terminate the high-fraud agents.

Similarly, Western Union failed to terminate or discipline agents who repeatedly violated the BSA and Western Union policy through their structuring activity in the Central District of California and the Eastern District of Pennsylvania. The BSA requires financial institutions, including money services businesses such as Western Union, to file currency transaction reports (CTRs) for transactions in currency greater than $10,000 in a single day. To evade the filing of a CTR and identification requirements, criminals will often structure their currency transactions so that no single transaction exceeds the $10,000 threshold. Financial institutions are required to report suspected structuring where the aggregate number of transactions by or on behalf of any person exceeds more than $10,000 during one business day. *Western Union knew that certain of its U.S. Agents were allowing or aiding and abetting structuring by their customers. Rather than taking corrective action to eliminate structuring at and by its agents, Western Union, among other things, allowed agents to continue sending transactions through Western Union's system and paid agents bonuses. Despite repeated compliance review identifying suspicious or illegal behavior by its*

14

*agents, Western Union almost never identified the suspicious activity those agents engaged in in its required reports to law enforcement.*

Finally, Western Union has been on notice since at least December 1997, that individuals use its money transfer system to send illegal gambling transactions from Florida to offshore sportsbooks. Western Union knew that gambling transactions presented a heightened risk of money laundering and that through at least 2012, certain procedures it implemented were not effective at limiting transactions with characteristics indicative of illegal gaming from the United States to other countries.

*** 

In a related case, Western Union agreed to settle charges by the FTC in a complaint filed today in the U.S. District Court for the Middle District of Pennsylvania, alleging that the company's conduct violated the FTC Act. The complaint charges that for many years, fraudsters around the world have used Western Union's money transfer system even though the company has long been aware of the problem, and that some Western Union agents have been complicit in fraud. The FTC's complaint alleges that Western Union declined to put in place effective anti-fraud policies and procedures and has failed to act promptly against problem agents. Western Union has identified many of the problem agents but has profited from their actions by not promptly suspending and terminating them.

In resolving the FTC charges, Western Union agreed to a monetary judgment of $586 million and to implement and maintain a comprehensive anti-fraud program with training for its agents and their front line associates, monitoring to detect and prevent fraud-induced money transfers, due diligence on all new and renewing company agents, and suspension or termination of noncompliant agents.

The FTC order prohibits Western Union from transmitting a money transfer that it knows or reasonably should know is fraud-induced, and requires it to:

• block money transfers sent to any person who is the subject of a fraud report;

• provide clear and conspicuous consumer fraud warnings on its paper and electronic money transfer forms;

• increase the availability of websites and telephone numbers that enable consumers to file fraud complaints; and

• refund a fraudulently induced money transfer if the company failed to comply with its anti-fraud procedures in connection with that transaction.

In addition, consistent with the telemarketing sales rule, Western Union must not process a money transfer that it knows or should know is payment for a telemarketing transaction. The company's compliance with the order will be monitored for three years by an independent compliance auditor.

Since 2001, the department has charged and convicted 29 owners or employees of Western Union agents for their roles in fraudulent and structured transactions. The U.S. Attorney's Office of the Middle District of Pennsylvania has charged and convicted 26 Western Union agent owners and employees for fraud-related violations; the U.S. Attorney's Office of the Central District of California has secured a guilty plea from one Western Union agent for BSA violations, and the U.S. Attorney's Office for the Eastern District of Pennsylvania has secured guilty pleas for BSA violations of two other individuals associated with Western Union agents for BSA violations.

(Emphases added.)

36.     On that same day, the FTC issued a release entitled "$586 million Western Union settlement: Be careful about the company your company keeps," stating that Western Union's in house data recorded numerous fraud complaints received between 2004 and 2015.  The release stated in pertinent part:

[B]etween 2004 and 2015, Western Union received 146,909 complaints about bogus online purchases, totaling at least $187 million in losses. Fraudulent lotteries accounted for another 75,543 complaints, totaling $86 million in losses. And those "Wire money to get me out of jail!" scams that target unsuspecting family members generated 41,897 complaints and at least $73 million in losses.

Of Western Union's total network of 515,000 agents, the FTC says a small number account for the vast majority of consumer complaints. You'll want to read the complaint for details, but here's just one example. In 2012, Mexico had 17,710 Western Union agent locations, but 137 – less than 1% of them – accounted for more than 80% of the reported fraud. And those are stats based on Western Union's own documents.

Sky-high consumer complaint rates were just the start. Thirty-nine Western Union agents have been charged in the U.S. and Canada for crimes like mail fraud, wire fraud, or money laundering, with more than 100 arrested by law enforcement agencies in other countries. Some were prosecuted for being in cahoots with con artists. Others were charged with setting up their own scams.

But even in the face of consumer complaints, criminal prosecutions, a 2005 settlement with AGs from 47 states and the District of Columbia, a 2009 FTC action against competitor MoneyGram, and warnings from the U.S. Secret Service and authorities in Canada, Japan, the U.K., Spain, and elsewhere, the FTC says it was business as usual for Western Union. In certain countries where Western Union was at a particularly high risk for use by criminals – Nigeria, for example – ***Western Union had rarely, if ever, terminated an agent for fraud as of October 2015.***

(Emphasis added.)

37.     On this news, Western Union's share price fell $0.87, or 3.9%, over two trading days, to close at $20.98 on January 20, 2017.

38.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Western Union securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Western Union securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Western Union or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Western Union;

- whether the Individual Defendants caused Western Union to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Western Union securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

45.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Western Union securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Western Union securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Western Union securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Western Union securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Western Union securities.  Such reports, filings, releases and statements

were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Western Union's finances and business prospects.

52.    By virtue of their positions at Western Union, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Western Union securities from their personal portfolios.

54.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Western Union, the Individual Defendants had knowledge of the details of Western Union's internal affairs.

55.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Western Union.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

Western Union's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Western Union securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Western Union's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Western Union securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Western Union securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Western Union securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Western Union securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Western Union securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

59.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     During the Class Period, the Individual Defendants participated in the operation and management of Western Union, and conducted and participated, directly and indirectly, in the conduct of Western Union's business affairs.  Because of their senior positions, they knew the adverse non-public information about Western Union's misstatement of income and expenses and false financial statements.

61.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Western Union's financial condition and results of operations, and to correct promptly any public statements issued by Western Union which had become materially false or misleading.

62.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Western Union disseminated in the marketplace during the Class Period concerning Western Union's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Western Union to engage

in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Western Union within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Western Union securities.

63.     Each of the Individual Defendants, therefore, acted as a controlling person of Western Union.  By reason of their senior management positions and/or being directors of Western Union, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Western Union to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Western Union and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Western Union.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.       Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 22, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (not admitted)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein (not admitted)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*