**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00474-KLM
      Consolidated with 1:17-cv-00648-KLM

LAWRENCE HENRY SMALLEN AND LAURA ANNE SMALLEN REVOCABLE LIVING
TRUST, individually and on behalf of all others similarly situated, and
UA LOCAL 13 PENSION FUND, individually and on behalf of all others similarly situated,

      Plaintiffs,

vs.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
RAJESH K. AGRAWAL,
BARRY KOCH, and
STEWART STOCKDALE

      Defendants.

---

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ..................................................................................1

II.  JURISDICTION AND VENUE .........................................................................9

III.  PARTIES ............................................................................................................9

IV.  SUBSTANTIVE ALLEGATIONS ...................................................................11

   A.  Western Union's Money Transfer Business ...........................................11

   B.  Western Union's Legal Obligations........................................................17

      a.  AML Regulations........................................................................19

      b.  Wire Fraud ..................................................................................22

      c.  Consumer Protection Rules.........................................................22

      d.  Western Union's Representations of Compliance With its Legal
         Obligations..................................................................................23

   C.  Prior to the Class Period, Western Union Repeatedly Failed to Comply with its
      AML and Anti-Fraud Obligations, Resulting in Several Significant Government
      Enforcement Actions ..............................................................................26

      a.  The Southwest Border Agreement..............................................26

      b.  Western Union's Compliance Deficiencies Were Discussed at Board
         Meetings that the Individual Defendants Attended ....................28

      c.  Joint Settlement Findings Prior to the Class Period....................31

      d.  Additional Government Enforcement Actions Prior to the Class Period ..35

   D.  WESTERN UNION CONTINUED TO FAIL TO COMPLY WITH ITS AML
      AND ANTI-FRAUD OBLIGATIONS DURING THE CLASS PERIOD ..........38

      a.  Western Union's Severely Deficient AML and Anti-Fraud Compliance
         Practices During the Class Period...............................................39

         (i)  The DOJ Agreement ........................................................40

         (ii)  The FTC Agreement ........................................................43

ii

(iii)    The FinCEN Agreement ....................................................45

(iv)    Western Union's Legal Violations.....................................46

(v)    Western Union's Remedial Measures Under the Joint
Settlement ........................................................................46

b.    Western Union's AML and Anti-Fraud Violations ..................................52

c.    Western Union Willfully Failed to Prevent Structuring ...........................62

d.    Sales Employees Actively Discouraged Disciplining Fraudulent Agents .65

e.    Western Union Chose Not to Implement Better Compliance Practices ....69

f.    Other Deficient Compliance Practices......................................................73

g.    Other Government Enforcement Actions Also Highlight Western Union's
Inadequate AML Compliance and Anti-Fraud Programs During the Class
Period ......................................................................................................75

h.    Western Union Failed to Comply with Its Earlier Agreements With
Government Regulators ...........................................................................76

i.    Western Union's Compliance Failures Were Discussed at the Company's
Highest Levels, Including by the Individual Defendants..........................77

j.    The Lengthy History of the Government Enforcement Actions that
Resulted in the January 2017 Settlements Show that Defendants Knew of
Severe Deficiencies in Western Union's Compliance Efforts for Years ...83

(i)    FTC Investigation ............................................................85

(ii)    DOJ Investigations...........................................................88

(a)    EDPA Investigation ..............................................88

(b)    CDCA Investigation...............................................88

(c)    MDPA Investigation ..............................................89

(d)    SDFL Investigation................................................89

(iii)    State Attorney General Investigations ..............................91

(iv)    Conclusion as to Government Investigations ...................91

k.      Defendant Ersek Was a Very Hands-On Manager Involved in the Company's Day-to-Day Affairs ................................................................92

l.      Defendants and Other Company Insiders Profited by Selling Shares While in Possession of Material Non-Public Information ...................................93

m.      Summary of Substantive Allegations ..........................................................95

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .........96

A.      False and Misleading Statements in 2012 ...............................................................97

B.      False and Misleading Statements in 2013 .............................................................112

C.      False and Misleading Statements in 2014 .............................................................126

D.      False and Misleading Statements in 2015 .............................................................135

E.      False and Misleading Statements in 2016 .............................................................143

VI.     THE TRUTH BEGINS TO EMERGE ..............................................................................151

VII.    ADDITIONAL SCIENTER ALLEGATIONS .................................................................161

VIII.   NO SAFE HARBOR .........................................................................................................166

IX.     CLASS ACTION ALLEGATIONS ..................................................................................167

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS ..................................................................169

XI.     COUNT I ...........................................................................................................................170

XII.    COUNT II ..........................................................................................................................173

XIII.   PRAYER FOR RELIEF ....................................................................................................175

XIV.    JURY TRIAL DEMAND ..................................................................................................175

Lead Plaintiff Lawrence Henry Smallen and Laura Anne Smallen Revocable Living Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding The Western Union Company ("Western Union" or the "Company"), federal and state regulatory and enforcement actions against the Company, prior civil actions involving the Company's compliance practices, analysts' reports and advisories about the Company, interviews with former Western Union employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Western Union securities between February 24, 2012 and May 2, 2017, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Western Union's money transfer business is particularly susceptible to illicit activity, including money laundering and consumer fraud.  On January 19, 2017, the Company

reached a settlement with several federal regulators in which it agreed to pay the astronomical sum of $586—the largest forfeiture ever imposed on a money services business—for the restitution of defrauded customers (the "Joint Settlement"). As part of this settlement, Western Union admitted to willfully failing to maintain an effective anti-money launder ("AML") program and to aiding and abetting wire fraud, including, among other things, because it knew that its agents were complicit in money laundering and defrauding the Company's customers out of at least hundreds of millions of dollars.

3.     Leading up to the Class Period, Western Union failed to maintain an adequate AML and anti-fraud compliance program, despite repeated warnings for years by federal, state, and international regulators. Although the Company ended up reaching agreements with several regulators prior to the Class Period in which it pledged to cure many of its compliance failures, it utterly failed to do so.

4.     Instead, Western Union allowed this criminal activity to continue so as not to interfere with the Company's business model, which was dependent on commissions from this high volume of illicit activity. The Company maintained such ineffective compliance practices throughout the Class Period that between January 1, 2012 and August 29, 2015, Western Union received complaints about fraud-induced money transfers totaling well over $100 million. In addition, the amount of fraud-induced money transfers that the Company processed far exceeded that amount because many other fraudulent transactions were either not reported to the Company or were not recorded properly by the Company.

5.     Western Union was also a haven for laundering proceeds of illicit activities such as human trafficking. Criminals relied on Western Union's unscrupulous agents to "structure"

2

an enormous amount of transactions to avoid the reporting requirements imposed by the AML laws, as well as to engage in other schemes to hide the profits of their criminal activity.

6.     To make matters worse, in addition to Western Union's systems being used for money laundering and fraud, the Company's own agents were complicit in these activities, often receiving a share of the ill-gotten gains in exchange for assisting the fraudsters in their schemes.

7.     Western Union's business model is based on its worldwide network of over 500,000 agents that the Company constantly touts as allowing its customers—typically migrants who are underserved by the banking industry—to conveniently and securely send money anywhere in the world.  The Company is therefore responsible for its agents' actions.  But the Company's responsibility here goes far beyond the bad acts of its agents.  Western Union failed to employ the most basic compliance controls that any money transfer business should have to prevent the type of illegal activity that took place during the Class Period.

8.     Among other things, Western Union has admitted to DOJ as part of the Joint Settlement that a) it willfully "fail[ed] to develop, implement, and maintain an effective anti-money laundering program"; b) it "knew that certain of its Agent locations were complicit in the scheme to defraud using Western Union's Money Transfer System"; c) it "willful[ly] fail[ed] to implement or execute effective global Agent disciplinary policies or to act on its employees' recommendations to discipline, suspend, or terminate" agents that were complicit in fraudulent schemes; and d) it willfully failed to prevent "structuring," which allowed hundreds of millions of dollars to be sent to China in violation of the AML laws.

9.     In addition, the Federal Trade Commission ("FTC") found that for many years, Western Union knew that it failed to implement effective anti-fraud and AML programs "to

adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system." The Company had knowledge of these inexcusable compliance deficiencies based on, among other things, "[i]nformation contained in Western Union's internal reports, communications, and other records demonstrate[ing] that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns."

10. Indeed, even when the Company's systems caught agents allowing money laundering or consumer fraud and compliance employees raised these issues within the Company, Western Union ignored this information and allowed these bad actors to continue their criminal activity. As Western Union has admitted, it knew that its agents "were complicit in wire fraud and money laundering schemes using Western Union's Money Transfer System," yet it "continued to process fraudulent transactions through these [agents]" and "fail[ed] to take effective corrective action in a timely fashion." For example, in October 2012, a Company employee responding to a complaint by a 74-year-old fraud victim told the customer that "she was 'wasting [her] time' reporting the fraud because 'there are thousands of these complaints laying on the desk and nothing gets done.'"

11. The Company did not want to discipline high-volume agents, who were very profitable for the Company. As the FTC found, Western Union often failed "to promptly suspend and terminate agent locations facilitating fraud. Instead, Western Union has continued to profit from the activities of these agents." Western Union also failed to terminate high volume agents that violated the AML laws because they too provided the Company with substantial revenue. For example, in 2012, a Western Union Compliance Director considered terminating a

particularly problematic agent that processed over $100,000 in money transfers per day, a substantial portion of which were sent to China in structured amounts that violated AML laws. This Compliance Director explained that he or she did not end up terminating the agent because the Sales Department had always "wanted this [Agent] saved and I don't think anything has changed in their minds around the importance of the [A]gent."

12.     Western Union's business focused on transferring money by wire throughout the world, with an overwhelming emphasis on its consumer-to-consumer business segment. AML and anti-fraud laws and regulations are thus the main types of legal rules governing the Company's core business. Defendants recognized the importance of its compliance responsibilities to its business. They spoke extensively about that topic on earnings conference calls, at industry conferences, and in SEC filings. But rather than acknowledge the deficient state of its compliance efforts, throughout the Class Period, Defendants consistently touted the Company's compliance capabilities as complying with applicable laws and being a "competitive advantage." In every annual filing with the SEC during the Class Period, Defendants stated that "we believe our fraud prevention efforts are effective and comply with applicable law" and that "that Western Union is compliant with its [AML and other] regulatory responsibilities." They also described the Company as fostering a "culture of compliance" and being an "industry leader" with better compliance capabilities than its competitors. At no time during the many instances that they discussed these topics did Defendants disclose that the Company lacked the most basic components of an effective AML or anti-fraud program, or that it did not discipline agents that knew engaged in rampant money laundering and consumer fraud.

13.     As the Class Period wore on, Western Union was forced to significantly increase the amount of its compliance expenditures in order to appease the various government regulators whose investigations resulted in the Joint Settlement, as well as to belatedly comply with a settlement that it had reached with the State of Arizona in 2010 concerning its compliance efforts in a narrow geographic area along the southwest border.  But the Company's delayed efforts did not cure the deep problems with its anti-fraud and AML compliance programs.  Defendants falsely portrayed the Company as establishing industry leading compliance standards in a constantly changing regulatory environment.  In reality, however, the Company was increasing its compliance costs because its compliance efforts did not satisfy even the most basic and clear-cut minimal compliance standards under long-established anti-fraud, consumer protection, and AML laws and regulations.  As the FTC found in January 2017, even though Western Union claimed to have begun improving its compliance efforts in 2012, the Company continued long past that time to fail "to promptly suspend and terminate agent locations facilitating fraud." Instead, the FTC found that well into the Class Period, Western Union "continued to profit from the activities of" agents that the Company failed to discipline even though these agents "appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures."

14.     In one particularly striking example, Western Union's own internal reports showed that the Company had received thousands of fraud complaints since 2007 related to the four agents that paid out the highest amounts of reported fraud in Jamaica.  In 2015 alone, the Company received hundreds of complaints about these agents, yet the Company chose to let them remain in operation.  On a broader scale, the FTC found that the Company's internal

reports and records showed that through October 2015 (which is the most recent time period for which the FTC incorporated Company data into its investigation), the Company "had rarely, if ever, terminated agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at agent locations."

15.    A key part of the Joint Settlement that Western Union reached on January 19, 2017, was its agreement to implement comprehensive remedial changes to its anti-fraud and AML compliance program.  As the FTC announced, Western Union is now required "to put a comprehensive A-to-Z anti-fraud program in place."  Western Union also agreed to implement enhanced compliance procedures under its agreement with DOJ, including steps that are necessary for the Company to have "reasonably designed anti-money laundering and anti-fraud programs, policies, procedures, and controls."

16.    The compliance steps that Western Union agreed to implement include, among other things, ensuring that the Company a) conducts adequate due diligence on its agents; b) adequately monitors agent activity for anti-fraud and AML violations; c) takes prompt disciplinary action against agents that pose an unacceptable risk of money laundering and fraudulent practices; d) reports suspicious or illegal activity by its agents as required by the AML laws; and e) establishes executive review and bonus structures that account for compliance with U.S. law.  The fact that all of these new remedial measures were still necessary in January 2017 for the various federal and state regulators to be comfortable that Western Union's AML and anti-fraud compliance programs would in the future meet legal requirements shows that even at that late stage, the Company still did not have effective AML and anti-fraud programs.

17.     In addition to Western Union's compliance failures that continued into the Class Period, Defendants failed to disclose the Company's prior compliance failures from before the Class Period and the substantial liability that the Company faced as a result of that misconduct. The Joint Settlement was the result of investigations into Western Union's compliance failures that took place during and before the Class Period by several regulators, including the Department of Justice, the FTC, and the Financial Crimes Enforcement Network ("FinCEN," the branch of the U.S. Treasury Department that enforces the BSA).   Shortly after the Joint Settlement was disclosed, it was announced that the Company also reached a settlement with the attorneys general of 49 states and the District of Columbia.

18.     Although Defendants disclosed the existence of various regulatory investigations against the Company, Defendants stated that the Company "strongly disagrees" with the regulators' claims and "intends to defend itself vigorously" against them, or that these investigations were too preliminary to predict their outcome.   At no point did Defendants disclose that the Company was sitting on knowledge of compliance failures dating back to 2004 and continuing through the Class Period that amounted to hundreds of millions, if not billions, of dollars' worth of transactions that—based on evidence that Defendants knew during the Class Period—exposed the Company to severe monetary penalties and the need to take comprehensive and costly remedial efforts.

19.     Western Union's deliberate compliance failures were slowly revealed over time. The Company first revealed, in late 2013, that it would have to substantially increase its compliance costs, thereby significantly cutting into its profit margins.   These expenditures were surprising in light of the Company's prior misrepresentations and misleading descriptions of its

compliance efforts.  The Company continued to reveal additional negative effects of its defective compliance practices during the Class Period, but failed to disclose the specific nature of these failures until the Joint Settlement and its after-effects were disclosed, beginning on January 19, 2017.  With these disclosures, investors learned for the first time the extent of the Company's blatant compliance failures during and before the Class Period, including that it had willfully failed to maintain an effective AML program and knowingly allowed fraudsters to steal from unsuspecting customers and launder the proceeds of serious criminal activity.  When the truth finally began to emerge through this series of disclosures, the Company's share price declined significantly, causing substantial damages to the Company's investors.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

22.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as Western Union is headquartered within this District.

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

24.     Plaintiff, as set forth in the Certification previously filed with the Court, acquired Western Union securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Defendant Western Union is incorporated in Delaware.  The Company's principal executive offices are located at 12500 East Belford Avenue, Englewood, Colorado 80112. Western Union's shares trade on the NYSE under the ticker symbol "WU."

26.     Defendant Hikmet Ersek ("Ersek") has served at all relevant times as the Company's Chief Executive Officer and President (both since September 2010), and a Member of its Board of Directors (since April 2010).  He joined the Company in 1999 and served in several senior management roles until he was appointed CEO.  He served as the Company's Chief Operating Officer, from January 2010 to August 2010.

27.     Defendant Scott T. Scheirman ("Scheirman") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from September 2006 until December 31, 2013.  He then served as a "Senior Advisor" until February 28, 2014.  Scheirman reported directly to Ersek and was responsible for internal audits at Western Union.  He was also responsible for Global Operations at the Company from January 2012 through November 2012. Scheirman was the Senior Vice President and CFO for Western Union from 1999 until September 2006, before the Company was spun off from First Data Corporation.

28.     Defendant Rajesh K. Agrawal ("Agrawal") has served as the Company's Chief Financial Officer since July 2014 and as Executive Vice President since November 2011. Agrawal was the Company's Interim CFO from January 2014 to July 2014.  Agrawal served as President of Western Union Business Solutions from August 2011 through December 2013.

10

Agrawal served in several other senior positions at the Company between 2006 and July 2011. Agrawal reported to Ersek during the Class Period.

29.     Defendant Barry Koch served as the Company's Chief Compliance Officer from May 2013 until a date in our around November 2015.   Koch reported to the Compliance Committee of the Board of Directors, which was created in July 2013.

30.     Defendant Stewart Stockdale was President, Global Consumer Financial Services and an Executive Vice President from April 2011 until then end of October 2012, when the Company announced without explanation that he had left the Company.   Before then, Stockdale was President of the Americas and Executive Vice President from November 2008 until April 2011.  Stockdale was also Executive Vice President for Global Cards and Global Key Accounts from January 2010 until April 2011.  He was President for the United States and Canada regions and an Executive Vice President from the time he joined the Company in June 2008 until November 2008.

31.     The Defendants referenced above in ¶¶ 26-30 are sometimes referred to herein collectively as the "Individual Defendants."

32.     Defendant Western Union and Individual Defendants are sometimes referred to herein collectively as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Western Union's Money Transfer Business

33.     Western Union is a money transfer service that was founded in 1851.   The Company provides money movement and payment services worldwide.   It operates in three

segments: consumer-to-consumer, consumer-to-business, and business solutions.  The Company also contains other, smaller business lines, including money order and prepaid services.

34.     The Company describes its consumer-to-consumer segment, which involves money transfers between individuals, as the "core" of its business.  This segment is the Company's largest business line, representing at least $4.3 billion in annual revenues and between 79% and 81% of the Company's total revenue in every year during the Class Period. The vast majority of that revenue came from transfer fees charged to customers for each money transfer and also included approximately $1 billion annually from foreign exchange transactions.

35.     Western Union is the largest provider of money transfer services in the United States and the world.  The Company represents that in 2014, over 150 million individuals used the Company's money transfer system to transfer more than $85 billion through 255 million transactions between consumers worldwide.

36.     Western Union describes its consumer-to-consumer money transfer service as "one interconnected global network where a money transfer can be sent from one location to another, around the world."  The Company offers this service primarily through its Western Union, Vigo, and Orlandi Valuta brands.  The Vigo and Orlandi Valuta brands operate extensively in Mexico and Latin America.

37.     The  substantial  majority  of  money  transfers  in  Western  Union's consumer-to-consumer segment occur through walk-in transactions in which the payment is collected in person by one of the Company's agent locations and is available for pick-up at another agent location, usually within minutes.  The Company also offers money transfer

services between consumers online (including through mobile devices) and over the phone through various types of accounts and credit and debit cards.

38.     Western Union's Consumer-to-Consumer business operates through a worldwide network of over 500,000 agent locations in more than 200 countries and territories, with approximately 90% of those locations outside the United States.  According to the Company, millions of customers rely on Western Union "to send money to loved ones near and far" on a daily basis.

39.      Western Union agents are the face of the Company.   They serve as the Company's representatives who interact directly with customers.  Western Union advertises that its locations "around every corner" are staffed by "knowledgeable agents" and that it offers "fast, convenient, and safe" money transfer services.   All Western Union agents must send every money transfer by wire through Western Union's money transfer system.

40.     Western Union agents sometimes operate multiple locations and in some cases outside of the United States and Canada do so through their own representatives called subagents.  Agents that operate their own networks of Western Union locations, in some cases (such as large retail chains) very large numbers of locations, are sometimes referred to as "network agents," "master agents," or "super-agents."  Employees of Western Union agents that interact directly with customers are often called "front line associates" or "FLAs."

41.     All Western Union agent locations accept cash to initiate a transaction.   The overwhelming majority of transfers are paid out on the receiving end in cash at agent locations.

42.     Western Union pays its agents commissions for the money transfers that the agents process.  The Company generally pays both the "send agent" (the agent that initiated the

transaction) and the "receive agent" (the agent that paid the transaction) a commission based on a percentage of revenue. Western Union may also pay agents bonuses and other compensation based on the size of their business.

43.     As Western Union has repeatedly acknowledged in Forms 10-K, filed with the SEC and signed by the Individual Defendants, state and federal regulators hold Western Union accountable for the conduct of the Company's agents and subagents. Western Union therefore faces criminal and civil liability and the threat that essential business licenses may be revoked if its agents violate the law using Western Union systems.

44.     Agents have a contractual relationship with Western Union under which Western Union can unilaterally suspend or terminate any agent or agent location anywhere in the world for a variety of reasons, including violating regulatory or compliance standards. The written agreements that Western Union requires its agents to sign typically require the agents to comply with all applicable laws, including laws for detecting and preventing fraud and money laundering. Western Union's agreements with its agents also allow Western Union to suspend or terminate its agents' subagents or any particular location at which an agent offer money transfer services.

45.     Agents are obligated to keep records for all transactions. They are also required to provide Western Union with any information that the Company requests and allow Western Union to conduct any review necessary to monitor the agents' compliance with applicable law and Western Union's internal policies.

46.     When sending a money transfer in-person from one of Western Union's agent locations, the sender must complete a form that requires identifying information for the sender

and recipient, including, typically, the sender's name, address and telephone number, and the name of the recipient and the city, state/province, and country to which the money transfer is being sent. Western Union provides senders of money transfers a unique tracking number called a Money Transfer Control Number ("MTCN"). Money transfers above a certain threshold (such as $1,000) require the sender to present identification and the agent locations must record the sender's information in Western Union's system.

47.     When customers are defrauded into sending money for false reasons, the fraud is conducted by the recipient rather than the sender of the funds. Before money transfers are paid out to a recipient at an agent location, Western Union generally requires the recipient to appear in person at the recipient agent location; fill out a receipt form with the recipient's name, address and phone number; present identification; provide the MTCN for the transaction; and provide the sender's name, location, and the expected transfer amount. Recipient agents are typically required to transmit this information to Western Union money transfer system via international or interstate wire.

48.     Western Union's consumer-to-consumer segment targets and is heavily dependent on money transfers from individuals who do not have accounts with, or are underserved by, traditional banking institutions. These customers include migrants who rely on the Company's services to send funds, known as remittances, back to family members and others in their home countries, who generally spend the money on essential living expenses, such as food, housing, and clothing. Fees from remittances sent by migrants in the United States to countries around the world account for a substantial portion of Western Union's revenue. According to Defendant Ersek, "Western Union is one of the companies who represent [migrants] as a global company

and worldwide service . . . to help them to send their families money, $600 billion moves worldwide. It's more than any foreign aid, it's more than anything that's happening worldwide, and goes direct to the families and help[s] the economy of not only receiving countries and also the economy actually of the sent countries."   Ersek has touted the Company's "culture of compliance" as being particularly important because of the life-changing benefits to customers that receive remittances.

49.   In recent years, Western Union has had higher operating margins and been more profitable than its primary competitors.  According to a 2012 Seeking *Alpha* article, *Dissecting The Sources of Western Union's Moat*, "Western Union collected a little more than 60% of the entire industry's profit in 2011, with only 18% market share."[1]

50.   Because of Western Union's dominant role in the money transfer industry, it is able to enter into exclusive arrangements with many of its agents and charge a substantial premium over its competitors.  The particular amount of fees that Western Union chooses to charge depends on many transaction-specific factors, such as size of the transfer, location of sender and recipient, method of payment, and speed of the transfer.

51.   Western Union has often maintained a higher dollar threshold at which customers are required to show identification, thus providing senders with a higher degree of anonymity than its competitors.  Western Union has therefore been able to charge customers a higher transaction fee in exchange this level of anonymity.

---

[1] Brett Horn, *Dissecting the Sources of Western Union's Moat*, Seeking Alpha  (Oct. 3, 2012), available at https://seekingalpha.com/article/902081-dissecting-the-sources-of-western-unions-moat.

52.     Western Union's profit margins are inversely affected by its compliance costs and efforts.  As the Company explained in its public filings throughout the Class Period, money that Western Union spends on compliance is a significant expense that reduces its profits.   In addition, increasing compliance steps has led to the Company losing customers that do not want to undergo those security measures.  As Western Union explained in its 10-K for 2016, filed on February 22, 2017, "[t]he changes in the Company's compliance program required by the [January 2017] Joint Settlement Agreements will have adverse effects on the Company's business, including additional costs and potential loss of business."

### B.     Western Union's Legal Obligations

53.     Because of the nature of Western Union's business as a cross-border money transfer service, the Company is subject to laws and regulations governing money transfers in the various jurisdictions in which it operates.

54.     Regulators have recognized for years the risk of money laundering that money transfer services such as Western Union pose.  For example, a 2005 "Money Laundering Threat Assessment" by a working group comprised of the United States Treasury Department, Department of Justice, Department of Homeland Security, and other federal bodies explained:

> Money transmitters remain a particularly attractive vehicle for money laundering due to several inherent characteristics of the industry:
>
> • Large money transmitters maintain agent offices in thousands of cities and scores of countries, allowing customers to move funds from nearly any location directly to any other location;
> • Money transmitters provide for rapid service, transmitting funds instantly or in days;
> • The sheer volume of legitimate cash transactions provides an excellent camouflage for money laundering activity in the placement stage; [and]

- Money transmitter services are relatively inexpensive as compared with other means utilized by money launderers, often charging 10-20 percent per transmission. . . .[2]

55.     In addition to being particularly susceptible to money laundering, money transfer services are one of the best options available to fraudsters seeking to get their victims to transfer illicit proceeds and evade detection.   As the FTC explained in its Complaint against Western Union in connection with the Joint Settlement:

> Over the years, money transfers have increasingly become the payment method of choice for scams that prey on consumers around the world.   Fraudulent telemarketers and con artists prefer to use money transfers to facilitate their scams because, among other reasons, they can pick up money transferred within minutes at multiple locations and, oftentimes, the perpetrators are afforded anonymity because the payments are untraceable.   For example, money transfers can be picked up at any location within a particular state or country; some money transfers can be picked up without presenting or having to record an ID; fake names, addresses, and IDs sometimes can be used. . .   Therefore, it is often difficult for consumers and law enforcement to identify and locate the recipients of fraud-induced money transfers.

56.     Because of the particular susceptibility of Western Union's business to money laundering and consumer fraud, federal, state, and international regulators have enacted several regulatory regimes—including AML, consumer protection, and other anti-fraud rules—aimed at preventing this improper conduct.   In the United States, Western Union is subject to federal and state AML laws, including the USA Patriot Act and the Bank Secrecy Act, as well as federal and state consumer protection laws designed to protect consumers from fraud.

57.     Western Union's failure to implement adequate AML and anti-fraud programs,[3] and its failure to discipline its agents that the Company knew were (or likely were) complicit in

---

[2] "U.S. Money Laundering Threat Assessment" (December 2005), available at https://www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/mlta.pdf.

and allowed violations of AML and anti-fraud rules and regulations to take place, violated the applicable federal, state, and international AML and consumer protection laws and regulations that are designed to detect and prevent this type of misconduct.

a.    ***AML Regulations***

58.    Congress enacted the Bank Secrecy Act, as amended by the USA Patriot Act in 2001 (31 U.S.C. § 5311, *et seq*.), and rules promulgated thereunder (collectively the "BSA") to address an increase in criminal money laundering activity utilizing financial institutions, including money services businesses.

59.    As then-U.S. Attorney General John Ashcroft explained in 2001, criminal money laundering "constitutes a serious threat to our communities, to the integrity of our financial institutions and to our national security.  For behind every dollar of dirty money in need of laundering is a trail of victims – victims of violent crimes committed to settle drug wars; victims of terrorism; women and children trafficked into dangerous, degrading labor; and honest businessmen and women driven to bankruptcy by front operations for organized crime."[4]

60.    Money transmitters like Western Union are therefore subject to government regulation designed to prevent money laundering.  Under the BSA and parallel state laws and regulations, Western Union is required to maintain an effective AML program.  These rules primarily require companies such as Western Union to establish internal policies, procedures,

---

[3] References throughout this amended complaint to Western Union's anti-fraud program include the Company's consumer protection program, which was the same as its anti-fraud program.

[4] Prepared Remarks of Attorney General John Ashcroft, *Organized Crime Conference*, Chicago, Illinois (Aug. 7, 2001), available at https://www.justice.gov/archive/ag/speeches/2001/0807organizedcrimerem.htm.

and controls to guard against money laundering by identifying potentially illegal transactions, notifying law enforcement of potential violations, and taking other responsive actions. Willfully violating the BSA is a crime.

61.     In particular, as explained in the Joint Settlement, the BSA requires Western Union to:

- Adopt a "risk based" approach to AML compliance that accounts for the heightened risk associated with transactions to or from certain geographies or with certain characteristics;

- Maintain certain records and file certain reports, including:

  o Customer identification and transaction information for any transfer of a certain amount, regardless of whether the activity appears suspicious. Federal law requires such recording for transfers of more than $3,000, while parallel state laws impose similar requirements, but typically at lower monetary thresholds.

  o File "Suspicious Activity Reports" ("SARs") for any transfer exceeding $2,000, when Western Union has reason to suspect that the transaction involves criminal proceeds, is intended to evade any AML law or regulation, or serves no business or lawful purpose.

  o File "Currency Transaction Reports" for any transfer exceeding $10,000, regardless of whether the activity appears suspicious.

- Adequately train employees on how to properly implement the Company's AML program; and

- Independently test the adequacy of its AML program.

62.     A "risk based" approach to AML compliance requires companies to establish compliance programs aimed at detecting the greatest risks of criminal activity, rather than merely reacting to instances of noncompliance after becoming aware of them.

63.     Pursuant to the BSA and parallel state laws and regulations, parties may not evade the law's recording and reporting requirements by breaking large transfers into multiple transactions at smaller amounts below the legal reporting threshold—a practice known as

"structuring."   Structuring is a crime and is the most prevalent and one of the strongest indications that a transaction involves illegal money laundering.  The BSA and parallel state laws therefore require AML compliance programs to effectively screen for structured transactions. Western Union must file a SAR if it suspects that structuring has taken place.

64.     In 2004, FinCEN, which administers the BSA, explained that money services businesses like Western Union that use foreign agents to move funds into or out of the United States "must take reasonable steps to guard against the flow of illicit funds, or the flow of funds from legitimate sources to persons seeking to use those funds for illicit purposes" through their foreign agents.  FinCEN laid out specific procedures that should be followed to comply with this requirement.   These steps include (a) "conducting reasonable risk-based due diligence on potential and existing foreign agents and counterparties to help ensure that such foreign agents and counterparties are not themselves complicit in illegal activity"; (b) "risk-based monitoring and review of transactions from, to, or through the United States that are conducted through foreign agents"; and (c) disciplining foreign agents that present unreasonable risks of money laundering.

65.     As Defendants acknowledged in the 10-Ks that the Company filed—and that the individual Defendants signed—throughout the Class Period and in DOJ's Statement of Facts that the Company agreed to as part of the Joint Settlement, these BSA requirements apply to Western Union, including the conduct of its agents and subagents.

66.     Defendants also represented in Western Union's 10-Ks throughout the Class Period that the Company is subject to similar or stricter regulations in the states and foreign jurisdictions.

67.     Money transmitters like Western Union that violate the BSA, such as by failing to (a) implement an effective, risk-based AML compliance program, (b) monitor or discipline agents for violations of the BSA, (c) verify and maintain customer information for transfers of a certain magnitude, or (d) file required reports, are subject to criminal prosecution and face serious monetary penalties.  Noncompliance, especially for repeat offenders, can also lead to the suspension or revocation of essential business licenses that are required for the company to operate.

b.     *__Wire Fraud__*

68.     Federal law also makes it illegal to engage in or aid and abet another party's wire fraud, pursuant to 18 U.S.C. §§ 2 and 1343.  Wire fraud under this statute entails using interstate wires to carry out a scheme to defraud individuals of money or property by false promises.

c.     *__Consumer Protection Rules__*

69.     Western Union is also subject to federal and state consumer protection rules designed to protect consumers from fraudulent and unfair practices.  For example, Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), prohibits "unfair" or "deceptive" commercial acts and practices that "cause or are likely to cause reasonably foreseeable injury."

70.     In addition, Congress directed the FTC to enact rules prohibiting abusive and deceptive telemarketing pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC, in turn, promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.  Under both the Telemarketing Act and the FTC Act, a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of the FTC Act.

71.     Under these rules, telemarketers are not allowed to request payment via a money transfer, such as through Western Union.

72.     The TSR also prohibits, among other things, telemarketers and certain other parties known as "sellers" from making a false or misleading statement to induce any person to pay for goods or services; and from requesting or receiving payment in advance of obtaining certain types of loans or other extensions of credit.

73.     It is also a violation of the TSR for any person to provide "substantial assistance or support" to any telemarketer or seller when that person "knows or consciously avoids knowing" that the telemarketer or seller is violating the provisions of the TSR described above.

74.     In addition to these federal rules, the states have passed consumer protection laws prohibiting unfair and deceptive trade practices, unfair competition, and unfair and deceptive telemarketing practices.

75.     Adding to the regulatory scheme, the Consumer Financial Protection Bureau, which was created by the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act (collectively, the "Dodd-Frank Act"), has created additional consumer protection obligations that Western Union must comply with.  These include a requirement to provide customers sending funds internationally from the United States enhanced written pre-transaction disclosures and an obligation to cancel non-completed transactions at a consumer's request.

        d.     ***Western Union's Representations of Compliance With its Legal Obligations***

76.     Throughout the Class Period, Western Union represented to investors that it complied with its AML and anti-fraud legal obligations.[5]  For example, in each 10-K that the Company filed during the Class Period, Defendants represented, with minor variations, that "we believe our fraud prevention efforts are effective and comply with applicable law" and that "that Western Union is compliant with its [AML and other] regulatory responsibilities."[6]

77.     Western Union also acknowledged in these annual filings that failing to comply with AML and anti-fraud laws and regulations posed one of the most significant risks that the Company faced.  In each of these filings, Defendants stated that "[o]ur business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations"—or made substantially similar statements to the same effect.

78.     Defendants also made many other statements during the Class Period touting the supposedly high level of compliance, separate from their legal obligations.  They characterized the Company's compliance capabilities as one of its main "competitive advantage[s]" and portrayed the Company as the industry leader and a company that has a "culture of compliance."

79.     As described further below, all of these statements describing the Company's compliance efforts were false and misleading because during the Class Period, Western Union actually had a severely deficient compliance program that prioritized the Company's profits over

---

[5] References to "anti-fraud" legal or regulatory obligations throughout this complaint include the consumer protection obligations that are discussed herein.

[6] Western Union's 10-Ks for 2014 and 2015 removed the words "are effective" from the first representation.

its legal duties. The Company's resulting compliance practices failed to meet its legal obligations under a straightforward reading of its most basic AML and anti-fraud responsibilities. Western Union's utterly deficient compliance structure and practices were therefore not a "competitive advantage" and did not reflect best practices in the industry or a culture of compliance.

80. In addition, despite all of their positive characterizations of the Company's compliance efforts, Defendants failed to disclose the blatant deficiencies in the Company's compliance program, such as the Company's knowingly failing to discipline agents that were complicit in massive amounts of consumer fraud and AML violations, or that the Company did not have proper policies and controls in place to review its agents or ensure that they complied with the Company's legal obligations.

81. To the extent that Defendants acknowledged that the Company was in the process of making changes to its compliance practices, they misleadingly described these efforts as responding to unclear and developing legal and regulatory requirements or being made in reaction to problems that were isolated to particular regions. Defendants described the Company's efforts as setting a new industry standard in response to these new obligations rather than as efforts that were needed because of the Company's utterly inadequate anti-fraud and AML compliance programs.

82. Defendants also failed to disclose its past compliance failures dating back to 2004 and the predictable consequences of the ongoing government investigations into those deficient practices. Throughout the Class Period, Defendants actively participated in investigations by several federal and state agencies. As part of these investigations, the Company produced many

25

documents and witnesses to the government.   This information formed the basis for the admissions that Western Union ultimately made to DOJ as part of the Joint Settlement, and the conclusions that the government reached in that settlement.   Despite knowing this information during the Class Period, Defendants failed to disclose that the Company was nearly certain to be subject to substantial monetary liability, comprehensive remedial measures, and substantially increased compliance costs as a result of the Company's extreme compliance failures that were plainly apparent in materials that the government reviewed.   Instead, Defendants claimed the Company "strongly disagrees" with the regulators' claims and "intends to defend itself vigorously" against them, or that these investigations were too preliminary to predict their outcome.

### C.   Prior to the Class Period, Western Union Repeatedly Failed to Comply with its AML and Anti-Fraud Obligations, Resulting in Several Significant Government Enforcement Actions

83.   Western Union was well-aware in the years leading up to the Class Period that it had serious deficiencies in its AML and anti-fraud programs.   During that time, multiple federal, state, and foreign law enforcement agencies reached agreements with the Company to resolve significant enforcement proceedings arising out of these issues.   These enforcement actions highlight the deficient state that Western Union's AML and anti-fraud compliance programs had been in for years leading up to the Class Period.   As will be described further below, unbeknownst to investors, these deficiencies continued unabated throughout the Class Period.

### a.   *The Southwest Border Agreement*

84.    In 2001, the state of Arizona began an investigation into Western Union's compliance practices based on allegations that the Company was not reporting suspicious activity by its agents as the Company was legally required to do.

85.    In March 2009, in the midst of the Arizona Attorney General's enforcement action, the then-Arizona Attorney General, Terry Goddard, identified Western Union, in testimony before the U.S. Senate Judiciary Committee, as "by far the largest provider of illicit money-movement services" and observed that "even though wire transfers are the coyotes' payment method of choice [for human smuggling], Western Union still refuses to comply with subpoenas for vital data."  Goddard warned that he would "use every legal means to force the compliance of money transmitters and stop Western Union and other money transmitters from doing business with these brutal criminals."[7]

86.    On February 11, 2010, this enforcement action resulted in a settlement agreement between Western Union and the state of Arizona in which Western Union agreed to pay $94 million, accept a court-appointed monitor, and take several remedial steps to improve its AML compliance in the Southwest Border region comprised of Arizona, New Mexico, Southern California, and Texas (the "Southwest Border Agreement").

87.    As part of this settlement, Western Union admitted to DOJ that from at least 2003 to 2007, the Company had information available to it that gave the Company reason to know that several of its agents in Arizona and outside the United States "while acting within the scope of

---

[7] Testimony of Terry Goddard, Arizona Attorney General, *Law Enforcement Responses to Mexican Drug Cartels*, Senate Judiciary Committee: Subcommittee on Crime and Drugs and Senate Caucus on International Narcotics Control, (Mar. 17, 2009), available at https://www.azag.gov/sites/default/files/GoddardTestimony%203.17.09.pdf.

their employment and motivated at least in part to benefit Western Union, were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona."

b.  ***Western Union's Compliance Deficiencies Were Discussed at Board Meetings that the Individual Defendants Attended***

88.  A derivative action relating to the Southwest Border Agreement that was before this Court discussed evidence from meetings of the Company's Board of Directors and its Committees, based on a review of the Company's books and records.[8] These documents show that the Individual Defendants had firsthand knowledge of the Company's substantial compliance deficiencies leading up to the Class Period.

89.  Defendant Ersek attended all of the Board and Committee meetings that are discussed in this amended complaint.

90.  Defendant Scheirman attended all of the Board meetings that are discussed in this amended complaint that took place through January 30, 2014, as well as most Audit Committee meetings and one Governance Committee meeting during that time.  In particular, Scheirman attended 17 of the 19 Audit Committee meetings held between January 28, 2010 and January 30, 2014.

91.  Defendants Agrawal attended most of the Board meetings that are discussed in this amended complaint that took place since December 9, 2011.

---

[8] *Lieblein, derivatively on behalf of The Western Union Company v. Ersek, et al.*, Verified Second Amended Consolidated Shareholder Derivative Complaint and Jury Demand, No. 14-cv-144-MSK-KLM (D. Co. Mar. 17, 2017).

92.     Defendant Koch attended the Compliance Committee meetings held on July 17, 2013 and September 9, 2013, and the Board meeting held on October 11, 2013, which are discussed below.

93.     Defendant Stockdale attended most Board meetings described in this amended complaint that took place before he suddenly left the Company at the end of October 2012.

94.     The discussions at these Board and Committee meetings were not limited to the Southwest Border Agreement.  As would be expected, Company management and the Board, including Defendants, discussed the Company's overall failure to comply with its AML and anti-fraud obligations.

95.     At a meeting of Western Union's Board of Directors on February 24-25, 2010, attended by Defendants Ersek, Scheirman, and likely Stockdale, the Board was informed that regulators were "increasingly expecting stronger and more sophisticated control over [Western Union's] business and consumer activity" and that "Western Union [wa]s increasingly being held responsible for the oversight (and misdeeds) of its Agents and sub-Agents."  This same warning was provided at Board meetings held on May 14 and July 15, 2010, also attended by Defendants Ersek and Scheirman.

96.     It was also discussed at this meeting that Western Union conducted a test of 1,014 of its U.S.-based agents that showed that 27% of the agents visited during the review failed to meet compliance requirements.  Based on these findings, Western Union retrained only 188 agents and did not take further steps to correct the issue outside of the sample that participated in the test.

29

97.     During a Board meeting on May 19-20, 2011, attended by Defendants Ersek, Scheirman, and likely Stockdale, management informed the Board that Western Union suffered from a "[l]ack of meaningful [AML] reporting," and the reporting that did exist was "[e]vent-based reporting, not risk-based" as was required by the BSA.  Management also stated at this meeting, as well as others, that the Company did not have sufficient compliance staff to meet regulatory requirements.

98.     At a September 14-16, 2011 Board meeting, attended by Defendants Ersek, Scheirman, and likely Stockdale, management told the Board that, of the 157 riskiest Western Union agents on the U.S. side of the Southwest Border, more than 84% of those agents had one or more findings of AML compliance deficiencies.

99.     At a December 9, 2011 Board meeting, attended by Defendants Ersek, Scheirman, and likely Agrawal and Stockdale, the Board was informed that a "[m]ulti-State exam report" into Western Union' Ohio, Texas, and Washington locations "issued . . . an unsatisfactory rating" to the Company's AML compliance in those areas, including "inaccurate completion of [currency transaction reports], failure by agents to post signage, incomplete information on Money Order logs completed by agents and inaccurate reporting of agents."  Rather than planning to correct these deficiencies, management decided to argue with the results of the examination and "ask[] for re-examination in March 2012."

100.     It was further explained at many Board meetings leading up to the Class Period, attended by Defendants Ersek, Scheirman, Stockdale, and Agrawal, that Western Union was failing to meet its obligations under the Southwest Border Agreement.  After a series of prior updates on the Company's slow compliance with the agreement, it was described at meetings of

the Governance Committee and full Board on February 23, 2012 (the day before the start of the Class Period), attended by Defendant Ersek and, in the case of the Board meeting, Defendants Scheirman and likely Agrawal as well, that only one of the Southwest Border Agreement Monitor's 91 compliance recommendations had been satisfied and an additional 19 were not even on "track," even though many requirements were due to be completed by June 30, 2012 (with the remainder due to be completed by July 2013).

101.    In addition to discussing the Company's failure to comply with the Southwest Border Agreement, these discussions at Board and Committee meetings informed Defendants Ersek, Scheirman, and Agrawal of how far off the Company's compliance program was from meeting the basic requirements of the Company's AML and anti-fraud legal obligations.

c.    *Joint Settlement Findings Prior to the Class Period*

102.    In addition to covering compliance failures during the Class Period, the Joint Settlement that was announced on January 19, 2017 spanned Western Union's conduct dating back to 2004.    These compliance failures continued into the Class Period.    As with the Company's compliance failures during the Class Period, the pre-Class Period misconduct that the government regulators found in the course of their investigations leading up to the Joint Settlement was not disclosed until the Joint Settlement was announced on January 19, 2017. Defendants thus failed to disclose during the Class Period severe compliance failures from before the Class Period that exposed the Company to substantial monetary penalties and costly remedial measures when the government concluded its investigation into those past compliance failures.

103.    In particular, Western Union admitted to DOJ that "[b]etween 2004 and 2012, Western Union's [consumer fraud reports] identified more than $500 million in reported consumer fraud transactions sent through Western Union Agent locations."  Western Union also admitted that "employees knew that the total amount of fraud was higher than reported fraud as a result of their analyses and internal reports regarding particular Agent locations throughout Western Union's operations."

104.    Similarly, the FTC found that "between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044."  In addition, the FTC determined (based on the reasons described in ¶ 156 below) that the amount of fraud that actually occurred during that time was far higher, and "it is likely that Western Union's money transfer system has been used to send billions of dollars in fraud-induced payments to telemarketers and con artists worldwide."

105.    The Joint Settlement revealed many ways that Western Union's basic compliance failures resulted in massive amounts of fraud and AML violations by Western Union's agents that the Company knowingly ignored and let go unchecked prior to the Class Period.

106.    For example, Western Union admitted to DOJ that in 2008, the Company owned approximately 25% of its then-largest master agent, which was a company called FEXCO.  At that time, FEXCO operated 10,000 agent locations worldwide, processed over $4 billion in transactions, and generated $353 million in gross revenue for Western Union.  Western Union decided to acquire the remainder of FEXCO in July 2008 even though "certain Western Union employees[,] including senior employees, knew that FEXCO's United Kingdom Agents had paid high levels of fraud transactions and engaged in suspicious activity since at least 2005."

107.    In particular, "[b]y July 2008, consumer fraud victims had filed 25,643 [consumer fraud reports], totaling more than $40 million in losses to victims, involving fraud paid by FEXCO Agents in the United Kingdom and Spain.. . . .  In advance of the FEXCO acquisition, high-level Western Union employees knew that FEXCO lowered its Agent due diligence [standards] in 2007 'because of competition they faced in the market' and that Western Union would acquire Agents 'with some of the largest fraud payouts in our network.' . . .   Western Union's then-Vice President for Compliance in Europe cautioned senior Compliance employees that after acquiring FEXCO, Western Union would need to 'create, almost from scratch an Agent Oversight policy and culture' at FEXCO Agents."   Western Union also admitted that it completed the acquisition of FEXCO in February 2009 for $157.1 million in cash even though the Company knew "that FEXCO had an ineffective AML/antifraud compliance program."

108.    Following Western Union's acquisition, FEXCO agents continued to pay millions of dollars' worth of transactions that were the subject of thousands of consumer fraud complaints identified in Western Union's internal records.  For example, the two UK agents (discussed in ¶¶ 169-72 and 200-01 below) that remained open into the Class Period, as well as the agents that ultimately led to the enforcement action by Spain's Anti-Money Laundering and Countering Financing of Terrorism Supervisory Authority during the Class Period (discussed in ¶¶ 173-74 below) were FEXCO agents.

109.    Western Union also admitted to DOJ that many victims of consumer fraud were defrauded by agents that had already paid transactions that were subject to 15 consumer fraud reports within 120 days before the victim at issue was defrauded.  These schemes often included telltale signs of fraud, such as elderly customers sending thousands of dollars that they were

defrauded into believing would help family members in trouble. Western Union's agents allowed these transactions to proceed.

110. Western Union's compliance failures also led to rampant structuring by its agents to evade AML laws prior to the Class Period.

111. As Western Union admitted to DOJ, "[b]etween 2004 and 2012, customers at certain China Corridor Agents structured hundreds of millions of dollars in Western Union transactions to China. These China Corridor Agents were highly profitable and sent transactions from the U.S. to China between 2003 and 2012. Had Western Union's AML program been effective, Western Union could have prevented these four Agent locations from allowing customers to structure at least $64 million of transactions beginning as early as April 2009."

112. For example, Western Union admitted that between 2005 and 2010, Shen Zhou, one of four particularly egregious agents that sent structured transactions to China, sent more than $310 million to China, approximately half of which were structured.

113. The Company also admitted that between 2003 and 2011, two agents in New York that were owned by the same party sent more than $1.6 billion, "almost all of those transactions were sent to China and approximately 25 to 30% of those transactions had characteristics indicative of structured transactions."

114. As with Western Union's compliance failures during the Class Period that are described further below, Western Union admitted to DOJ that it was aware of its pre-Class Period compliance failures based on its own internal reports, analyses, and communications. Similarly, the FTC determined that Western Union knew of its pre-Class Period failures based on several sources, including "the hundreds of thousands of complaints it has received from

consumers, its own internal records and reports, and years of warnings from government agencies throughout the world."  As the FTC found, "[s]ince at least 2005, Western Union has conducted reviews and investigations, and generated indices and reports, related to consumer fraud involving its money transfer system. Information contained in Western Union's internal reports, communications, and other records demonstrates that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns."

115.    Defendants failed to disclose these severe pre-Class Period compliance failures until the Joint Settlement was announced on January 19, 2017.

d.    ***Additional Government Enforcement Actions Prior to the Class Period***

116.    As the FTC described in its complaint filed against Western Union on January 19, 2017 as part of the Joint Settlement, in the years leading up to the Class Period, multiple government agencies took enforcement actions against Western Union, investigated the Company because its services were being used to defraud the Company's customers, and notified the Company of serious compliance concerns.  These actions identified the very same compliance failures that continued into the Class Period and ended up being the subject of the January 2017 Joint Settlement, including, among other things, Western Union's failure to discipline agents that were complicit in fraud and the Company's failure to maintain an effective compliance program.

117.    In or around 2002, multiple state Attorneys General issued subpoenas to Western Union in conjunction with their investigations of the use of Western Union's money transfer system by fraudulent telemarketers.  In correspondence dated October 1, 2002, the Vermont

Attorney General's Office informed Western Union about disturbing statistics regarding telemarketers in Quebec, Ontario, British Columbia, and Israel misusing Western Union's money transfer system for fraud.

118.    In or around November 2005, Western Union entered into an agreement with forty-seven states and the District of Columbia involving some of the main compliance failures that were found in the Joint Settlement, including the use of the Company's money transfer system by "fraudulent telemarketers in and outside the United States."   This 2005 agreement imposed a number of requirements upon Western Union, including closure of agents, development of a computerized system to identify likely fraud, increasing anti-fraud staff, warnings to consumers, and agent training.   For example, the 2005 agreement required that Western Union "terminate those of its agents, subagents[,] locations [or employees of agents], as the case may be, who are complicit in fraud-induced transfers or who knowingly ignore such fraud."

119.    Western Union's documents showed that in or around September 2010, the Japan Financial Services Agency expressed concerns about Japanese consumers sending fraud-induced money transfers to the UK and "suspicious viewing/surfing of transactions in the United Kingdom, resulting in either Paid in Error (PIE) or Non Payment Claims [i.e., complaints about money transfers being paid to the wrong person or not being paid]."   Western Union did not disclose these concerns of the Japan Financial Services Agency, which were finally disclosed in the Joint Settlement on January 19, 2017.

120.    Since at least June 2011—and continuing into the Class Period—the Minnesota Attorney General's Office has been warning Western Union in correspondence directed to Ersek

that "each year thousands of consumers are defrauded through use of your company's services," and that "[g]iven your firm's apparently continuing inability or unwillingness to detect and prevent such wire transfer fraud, it would seem appropriate to" issue refunds to consumers. This correspondence routinely described the consumer complaints the Minnesota Attorney General received from fraud victims.   In response, Western Union adhered to its general policy of refusing to issue any refunds to the victims after the funds were paid out to the recipient. Although Western Union disclosed as a general matter that certain state attorneys general were investigating the Company's consumer protection efforts, the Company failed to disclose the level of concern expressed by the Minnesota Attorney General and claimed that the Company could not predict the outcome of the various state attorney general investigations.

121.   On or about November 29, 2011, Western Union personnel met with the Korea Financial Supervisory Services to discuss the regulator's concerns about consumer fraud involving Western Union's money transfer system.   This regulator required Western Union to create a plan to alleviate consumer fraud.   Western Union did not disclose this enforcement action by the Korea Financial Supervisory Services that was finally disclosed in the Joint Settlement was announced on January 19, 2017.

122.   In addition to these prior enforcement actions noted by the FTC that focused on consumer fraud, between December 2002 and October 2008, Western Union entered into five consent agreements with four regulators, each of which included admissions that Western Union and its agents were willfully violating AML laws and regulations.   These included the following matters:

a.   **December 2002:** New York State regulators discovered that Western Union failed to properly aggregate transactions of more than $10,000 for recording

37

and reporting purposes when the transactions were structured across multiple agents, in violation of the BSA and New York law against structuring. New York State imposed an $8 million fine and Western Union admitted its affirmative legal obligation to implement an effective AML compliance program.

b. **March 2003:** FinCEN determined that Western Union was "willfully" failing to file SARs. "Western Union failed to establish SAR reporting procedures that would reasonably assure that it could identify and properly report structured transactions." To resolve this action, the Company paid a fine and promised that "by June 30, 2003, all its money services business products [would] be subject to an effective system of review for reporting suspicious transactions under the" BSA.

c. **August 2003:** California State regulators identified failures in Western Union's "monitoring and compliance program to ensure that it and its agents complied with the" BSA, including failures to timely file SARs and CTRs. Western Union promised again to develop an effective compliance program.

d. **August 2006:** Arizona State regulators found that "Western Union [] fail[ed] to adequately supervise" its agents and, as a result, agents "fail[ed] to keep and preserve records that enable the Superintendent to determine compliance with applicable laws." Western Union again promised to "implement and maintain" an AML compliance program.

e. **October 2008:** Arizona State conducted another investigation and determined that Western Union was still not adequately recording customer identities for transactions of $1,000 or more. For example, Arizona identified more than $78,000 in structured transfers sent by the same person from the same Western Union location on the same date at approximately the same time, which Western Union failed to aggregate and record. Arizona found that these violations could have supported revocation of Western Union's license to conduct business in Arizona.

123.    These multiple enforcement actions make clear that in the years prior to the Class Period, the Company was well aware of its significant failures to comply with basic requirements of both AML and anti-fraud laws. Although the Company agreed prior to the Class Period to remedy these compliance deficiencies, it utterly failed to do so.

**D.    WESTERN UNION CONTINUED TO FAIL TO COMPLY WITH ITS AML AND ANTI-FRAUD OBLIGATIONS DURING THE CLASS PERIOD**

124.  Western Union's failure to implement and enforce adequate AML and anti-fraud programs continued unabated during the Class Period.  In addition to there being no evidence that these deep structural problems were fixed by the start of the Class Period on February 24, 2012, Western Union and the Individual Defendants continued to have these severe deficiencies raised to their attention throughout the Class Period.

125.  Despite continuing to fail to comply with its AML and anti-fraud obligations, including by knowingly failing to discipline agents that were complicit in massive amounts of fraud and AML violations, Defendants touted Western Union's compliance efforts throughout the Class Period as satisfying the Company's legal duties, being one of the Company's "competitive advantages," making Western Union an industry leader in terms of compliance, and reflecting a "culture of compliance."

a.  *Western Union's Severely Deficient AML and Anti-Fraud Compliance Practices During the Class Period*

126.  On January 17, 2017, when the Joint Settlement was disclosed to the public, the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and the U.S. Attorney's Offices for the Middle District of Pennsylvania ("MDPA"), the Central District of California ("CDCA"), the Eastern District of Pennsylvania ("EDPA"), and the Southern District of Florida ("SDFL," collectively, "DOJ"), the FTC, and FinCEN each announced a joint settlement with Western Union that resulted from their years' long investigations into the Company's AML and anti-fraud practices.

127.  A settlement with the attorneys general of 49 states and the District of Columbia arising out of these same issues was announced shortly thereafter.

128.    Western Union agreed to pay $586 million—the largest forfeiture ever imposed

on a money services business—in connection with the Joint Settlement with federal regulators

and an additional $5 million in connection with the settlement with the states.

129.    As part of these settlements, Western Union agreed to undertake comprehensive

remedial measures to ensure future compliance with its legal obligations.

(i)      ***The DOJ Agreement***

130.    Western Union entered into a deferred prosecution agreement with DOJ in

connection with their part of the Joint Settlement.  Under this agreement, the Company admitted,

accepted, and acknowledged that the allegations described in DOJ's criminal Information and the

facts described in the accompanying Statement of Facts are true and accurate.  As part of these

admissions, the Company acknowledged that it is legally responsible for its agents' and

subagents' illegal acts that are described in these documents.

131.    DOJ's January 19, 2017 press release announcing this agreement, entitled

"Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586

Million in Settlement with Justice Department and Federal Trade Commission," stated, in

relevant part:

> In its agreement with the Justice Department, Western Union admits to criminal
> violations including willfully failing to maintain an effective anti-money
> laundering (AML) program and aiding and abetting wire fraud.
> 
> ***
> 
> Western Union is now paying the price for placing profits ahead of its own
> customers. Together with our colleagues, the Criminal Division will both hold to
> account those who facilitate fraud and abuse of vulnerable populations, and also
> work to recoup losses and compensate victims.
> 
> "Western Union owes a responsibility to American consumers to guard against
> fraud, but instead the company looked the other way, and its system facilitated
> scammers and rip-offs," said [FTC] Chairwoman [Edith] Ramirez. "The

agreements we are announcing today will ensure Western Union changes the way it conducts its business and provides than a half billion dollars for refunds to consumers who were harmed by the company's unlawful behavior."

***

"Our investigation uncovered hundreds of millions of dollars being sent to China in structured transactions designed to avoid the reporting requirements of the Bank Secrecy Act, and much of the money was sent to China by illegal immigrants to pay their human smugglers," said U.S. Attorney Decker [from CDCA].  "In a case being prosecuted by my office, a Western Union agent has pleaded guilty to federal charges of structuring transactions – illegal conduct the company knew about for at least five years. Western Union documents indicate that its employees fought to keep this agent – as well as several other high-volume independent agents in New York City – working for Western Union because of the high volume of their activity. This action today will ensure that Western Union effectively controls its agents and prevents the use of its money transfer system for illegal purposes."

***

"Western Union, the largest money service business in the world, has admitted to a flawed corporate culture that failed to provide a checks and balances approach to combat criminal practices," said U.S. Attorney Ferrer. "Western Union's failure to implement proper controls and discipline agents that violated compliances policies enabled the proliferation of illegal gambling, money laundering and fraud-related schemes. Western Union's conduct resulted in the processing of hundreds of millions of dollars in prohibited transactions. Today's historic agreement, involving the largest financial forfeiture by a money service business, makes it clear that all corporations and their agents will be held accountable for conduct that circumvents compliance programs designed to prevent criminal conduct."

***

Rather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place. This settlement should go a long way in thwarting the proceeds of illicit transactions being sent to China to fund human smuggling or drug trafficking, as well as to interrupt the ease with which scam artists flout U.S. banking regulations in schemes devised to defraud vulnerable Americans.

"As a major player in the money transmittal business, Western Union had an obligation to its customers to ensure they offered honest services, which include upholding the Bank Secrecy Act, as well as other U.S. laws," said [IRS-CI] Chief Weber. "Western Union's blatant disregard of their anti-money laundering compliance responsibilities was criminal and significant. IRS-CI special agents – working with their investigative agency partners – uncovered the massive AML compliance failures and is proud to be part of this historic criminal resolution."

41

"Today's announcement of this significant settlement highlights the positive result of HSI's collaboration with our partner agencies to hold Western Union accountable for their failure to comply with bank secrecy laws that preserve the integrity of the financial system of the United States," said Special Agent in Charge Miller. "As a result of this settlement, Western Union now answers for these violations. I thank the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau for their partnership in this investigation."

***

Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions.

***

Court documents also show Western Union's BSA failures spanned eight years and involved, among other things, the acquisition of a significant agent that Western Union knew prior to the acquisition had an ineffective AML program and had contracted with other agents that were facilitating significant levels of consumer fraud. Despite this knowledge, Western Union moved forward with the acquisition and did not remedy the AML failures or terminate the high-fraud agents.

***

Western Union knew that certain of its U.S. Agents were allowing or aiding and abetting structuring by their customers. Rather than taking corrective action to eliminate structuring at and by its agents, Western Union, among other things, allowed agents to continue sending transactions through Western Union's system and paid agents bonuses. Despite repeated compliance review identifying suspicious or illegal behavior by its agents, Western Union almost never identified the suspicious activity those agents engaged in in its required reports to law enforcement.

***

Western Union knew that gambling transactions presented a heightened risk of money laundering and that through at least 2012, certain procedures it implemented were not effective at limiting transactions with characteristics indicative of illegal gaming from the United States to other countries.

(Emphasis added.)

132.  Western Union admitted to DOJ that its willful illegal conduct included:

    a.  repeatedly identifying Western Union Agent locations that were complicit in or that facilitated fraud-related transactions but knowingly failing to take effective corrective action;

b. repeatedly identifying Western Union Agents that were involved in or facilitated unlawful structuring but knowingly failing to take effective corrective action;

c. failing to adequately develop, implement, and maintain effective policies, procedures, and internal controls to discipline, suspend, terminate or take effective corrective action against Western Union Agent locations that repeatedly violated the BSA or other laws prohibiting fraud, money laundering, and other offenses or the Company's AML or anti-fraud policies;

d. modifying compliance reviews or results so that Agents with severe compliance failures would not face disciplinary action such as suspension or termination as required by Western Union policies or practices;

e. failing to follow existing policies, procedures, or practices requiring that agent locations with severe compliance failures face certain disciplinary actions such as suspension or termination;

f. failing to take effective action to control transactions with characteristics indicative of illegal gaming; and

g. failing to file SARs identifying Western Union Agents as suspicious actors and to implement effective policies, procedures, or internal controls to file SARs.

133.   Western Union also admitted in the Statement of Facts that it "knew that the BSA required Western Union to monitor international Agents and take corrective action against Agents violating law or regulation.  As a result of Western Union's willful failure to implement or execute effective global Agent disciplinary policies or to act on its employees' recommendations to discipline, suspend, or terminate international Agent locations, Complicit Western Union Agent Locations remained open for years and processed additional fraud transactions."

(ii)   ***The FTC Agreement***

134.   The FTC summarized Western Union's inadequate consumer protection and anti-fraud efforts as follows, in relevant part, when announcing the Joint Settlement in a January

43

19, 2017 press release entitled "$586 million Western Union settlement: Be careful about the company your company keeps":

> "*For many years, Western Union's money transfer system has been used by fraudsters around the world to obtain money from their victims.*" That's how the FTC's complaint against Western Union opens – and it tells a compelling story of a corporation the FTC says knew that a massive fraud was afoot and had the ability to address it, but chose to look the other way. . . [E]ven in the face of obvious evidence that many of its own agents were complicit, Western Union ignored it while pocketing massive cash.
>
> ***
>
> [Based on Western Union's own internal data,] between 2004 and 2015, Western Union received 146,909 complaints about bogus online purchases, totaling at least $187 million in losses. Fraudulent lotteries accounted for another 75,543 complaints, totaling $86 million in losses. And those "Wire money to get me out of jail!" scams that target unsuspecting family members generated 41,897 complaints and at least $73 million in losses.
>
> Sky-high consumer complaint rates were just the start. Thirty-nine Western Union agents have been charged in the U.S. and Canada for crimes like mail fraud, wire fraud, or money laundering, with more than 100 arrested by law enforcement agencies in other countries. Some were prosecuted for being in cahoots with con artists. Others were charged with setting up their own scams.
>
> But even in the face of consumer complaints, criminal prosecutions, a 2005 settlement with AGs from 47 states and the District of Columbia, a 2009 FTC action against competitor MoneyGram, and warnings from the U.S. Secret Service and authorities in Canada, Japan, the U.K., Spain, and elsewhere, the FTC says it was business as usual for Western Union. In certain countries where Western Union was at a particularly high risk for use by criminals – Nigeria, for example – ***Western Union had rarely, if ever, terminated an agent for fraud as of October 2015.*** (Emphasis added).

135.   As the FTC explained in its Complaint against Western Union, the Company has failed to:

> h.   promptly investigate, suspend, and terminate potentially complicit agents and subagents, or agents and subagents that have failed to comply with Western Union's anti-fraud and/or AML policies and procedures that impact consumer fraud;

i.   conduct adequate due diligence on prospective and existing agents and subagents;

j.   effectively train, monitor, and review agents, subagents, and front line associates, who are responsible at the point of sale for processing money transfers at Western Union's agent locations ("FLAs"), with respect to consumer fraud;

k.   adequately collect, record, and report consumer fraud involving its money transfer system; and

l.   adopt other reasonable measures to prevent fraud-induced money transfers. In some cases Western Union has failed to adopt adequate and effective policies and procedures to detect and prevent fraud-induced money transfers, while in other cases it has failed to adhere to its own anti-fraud and AML programs, policies, and procedures.

136.   The FTC further determined that *Western Union was aware* that (a) its system was regularly used for fraud; (b) an identifiable subset of agents and subagents were subject to disproportionately high levels of fraud complaints; and (c) many of its agent locations that paid out high amounts of fraud payments (1) were complicit, or likely complicit, in the frauds; (2) violated Western Union's anti-fraud and/or AML policies and procedures; and (3) engaged in suspicious activities.

137.   Western Union's knowledge of these consumer fraud problems was demonstrated by, among other things, (a) the hundreds of thousands of complaints it has received from consumers (at least 550,928 complaints amounting to at least $632,721,044 in fraud-induced money transfers between January 1, 2004 and August 29, 2015—and over $100 million from 2012 through August 2015); (b) its own internal records, reports, and analyses; and (c) years of warnings from government agencies throughout the world.

(iii)   ***The FinCEN Agreement***

45

138.    Also on January 19, 2017, FinCEN announced that, in conjunction with DOJ and FTC, it assessed a $184 million civil penalty on Western Union's consumer-to-consumer business (Western Union Financial Services, Inc., "WUFSI") that was satisfied by Western Union's $586 million forfeiture.  WUFSI consented to FinCEN's determination that prior to 2012, WUFSI willfully violated the BSA's AML requirements by failing to implement and maintain an effective, risk-based AML program and by failing to file timely SARs.

(iv)    ***Western Union's Legal Violations***

139.    DOJ's and FTC's actions against Western Union were based on the Company's violations of the following AML and anti-fraud laws and regulations:

a.  Aiding and abetting wire fraud, pursuant to 18 U.S.C. §§ 2, 1343, from 2004 through December 2012 "by failing to suspend and/or terminate complicit Agents [including subagents] and by allowing them to continue to process fraud-induced monetary transactions."  Western Union admitted it was guilty of this charge.

b.  Willfully failing to maintain an effective program as required by the BSA, pursuant to 31 U.S.C. §§ 5318(g), 5322, and related regulations, from 2004 through December 2012.  Western Union admitted it was guilty of this charge.

c.  Engaging in unfair acts or practices in violation of Section 5 of the FTC Act by failing to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers through the Company's system.

d.  Engaging in deceptive telemarketing in violation of the Telemarketing Sales Rule by Western Union, its agents, or subagents providing substantial assistance or support to sellers or telemarketers who the Company or its agents or subagents knew or consciously avoided knowing (a) induced consumers to pay for goods and services through the use of false or misleading statements and (b) requested or received payment in advance of consumers obtaining a loan.

(v)    ***Western Union's Remedial Measures Under the Joint Settlement***

140.    Under all of the agreements that were announced as part of the Joint Settlement on January 19, 2017, Western Union vowed to undertake substantial remedial measures in order to implement effective AML and anti-fraud compliance programs.   As the FTC announced, Western Union is now required "to put a comprehensive A-to-Z anti-fraud program in place, complete with meaningful training and monitoring to protect consumers in the future."   Under the FTC Order, the Company is required to take several steps to ensure that it establishes, implements, and maintains "a comprehensive anti-fraud program that is reasonably designed to protect consumers by detecting and preventing fraud-induced money transfers worldwide and to avoid installing and doing business with Western Union agents who appear to be involved or complicit in processing fraud-induced money transfers or fail to comply with [the Company's] policies and procedures to detect and prevent fraud."   This anti-fraud program must include, among other things:

    a.  due diligence on prospective and renewing agents;

    b.  adequate agent education and training on consumer fraud;

    c.  adequate monitoring of agent activity;

    d.  prompt disciplinary action against agent locations;

    e.  adequate systematic controls to detect and prevent fraud-induced money transfers (including, among other things, identification and recordkeeping requirements by agents); and

    f.  periodic evaluation and adjustment of the Company's anti-fraud program.

141.    In addition, the FTC Order prohibits Western Union from transmitting a money transfer that it knows or reasonably should know is fraud-induced or is payment for a telemarketing transaction, and requires it to:

    a.   block money transfers sent to any person who is the subject of a fraud report;

    b.   provide clear and conspicuous consumer fraud warnings on its paper and electronic money transfer forms;

    c.   increase the availability of websites and telephone numbers that enable consumers to file fraud complaints; and

    d.   refund a fraudulently induced money transfer if the company failed to comply with its anti-fraud procedures in connection with that transaction.

142.    The Company's compliance with the FTC Order will be monitored for three years by an independent compliance auditor and the Company is required to submit compliance reports for 10 years.

143.    Western Union also agreed to implement enhanced compliance procedures under its agreement with DOJ, including the following steps that are necessary for the Company to have "reasonably designed" AML and anti-fraud programs, policies, procedures, and controls:

    a.   taking corrective action against agents that pose an unacceptable risk of money laundering or have demonstrated systemic, willful or repeated lapses in compliance;

    b.   ensuring that its agents around the world will adhere to U.S. regulatory and AML standards:

    c.   implementing a risk-based Know Your Agent program to ensure Western Union Agents throughout the world are complying with this policy;

    d.   ensuring that the Company will report suspicious or illegal activity by its agents or related to consumer fraud reports;

    e.   establishing executive review and bonus structures that account for compliance by the executive's business or department with U.S. law;

    f.   ensuring monitoring of all transactions to, from, or through the United States, regardless of the origin or destination, to identify potentially fraudulent transactions;

g.  assigning AML Compliance Officer(s) to oversee compliance for each country that the Company has designated as high risk for fraud or money laundering;

h.  reporting to DOJ every 90 days on consumer fraud complaints, SARs, corrective action taken or rejected against agents; and

i.  reporting to DOJ quarterly on steps taken to detect and prevent illegal gambling-related transactions.

144.  As the Class Period progressed and Western Union became further ensnared in the government investigations that led to the Joint Settlement, the Company claimed to have begun taking steps to improve its compliance practices.  The Statement of Facts that Western Union negotiated with DOJ to reach the Joint Settlement states that by September 2012—over six months after the Class Period began—Western Union began taking certain steps to improve its anti-fraud and AML compliance programs.  But these efforts were too little, too late.  As the DOJ Statement of Facts states, the Company did not significantly increase the number of compliance employees or its compliance budget until 2013 through 2015, well into the Class Period.  Other remedial measures referenced in the Statement of Facts are not given specific dates, but rather, are described as "continu[ing]" efforts.  Western Union also admitted to DOJ that it willfully failed to implement an effective AML program and that it aided and abetted wire fraud through December 2012.

145.  In addition, the Company's wholly broken compliance system could not be fixed overnight.  At best, the Company was only first beginning in late 2012 to change its utterly inadequate compliance program, its compliance efforts continued to lag far behind where they were legally required to be.

146.    Defendants also mispresented the nature of their compliance efforts during the Class Period.  They did not disclose that the Company undertook its new compliance steps in response to government investigations that found the Company's compliance practices to be utterly inadequate.  Instead, Defendants falsely portrayed the Company as an "industry leader" whose new compliance expenditures were made in response to unclear or new legal requirements, or to address isolated needs in particular areas such as the Southwest Border region.  In reality, however, the Company was just beginning to address the fact that its entire AML and anti-fraud compliance structure was completely broken and failed to meet basic legal, regulatory, and common-sense requirements.

147.    For example, as will be described further below, Western Union failed to discipline agents that it knew to be engaging, and even complicit, in defrauding the Company's customers and structuring transactions in violation of the BSA.  Western Union also maintained a system in which its Sales and other business employees, who were financially incentivized to allow these illegal activities to take place, could prevent profitable agents from being disciplined even after compliance employees recommended corrective action.  As for the Company's compliance policies and procedures, among other structural deficiencies that were identified in the Joint Settlement, Western Union failed to conduct adequate due diligence of its agents and failed to adequately monitor their activities.  These and the other basic failures that plagued Western Union's compliance efforts before and during the Class Period failed to meet any reasonable standard that would apply to even the most rudimentary compliance program.

148.    In addition, even if Western Union implemented certain compliance measures beginning in late 2012, those efforts failed to cure the most serious compliance deficiency that

the Company experienced.  The FTC determined that although Western Union improved certain aspects of its anti-fraud program since 2012 because of the FTC's ongoing investigation, the Company continued well past that time to fail "to promptly suspend and terminate agent locations facilitating fraud.  Instead, Western Union has continued to profit from the activities of these agents."  These failures extended to agent "locations that appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures."

149.    The FTC's findings are based on its extensive investigation of facts that extended through October 2015 and included a review of Western Union's internal database of consumer fraud complaints from January 1, 2004 through August 29, 2015.  In addition, the FTC did not find that Western Union's practices were any better after late 2015.  Rather, information from October 2015 appears to be the most recent factual data that the FTC was able to incorporate into its review.

150.    Furthermore, even in January 2017, Western Union was still required to undertake all of the new remedial measures described in ¶¶ 140-43 above as part of the Joint Settlement. The extent of these changes that the government regulators required shows that even at that late stage, the Company still did not have AML and anti-fraud programs that met minimal legal requirements.  As the FTC explained on January 19, 2017, with these new measures Western Union was finally agreeing to "create a real and strong anti-fraud program."  Similarly, DOJ announced that day that the Joint Settlement "will ensure Western Union changes the way it conducts its business" and that it "effectively controls its agents and prevents the use of its money transfer system for illegal purposes."

151.    Lastly, the $586 million that Western Union is forfeiting in connection with the Joint Settlement is being used to compensate fraud victims that sent money transfers with Western Union from before the start of the Class Period all the way until January 19, 2017.  This shows that Western Union's compliance practices were deficient at least until the Joint Settlement was announced.

b.    ***Western Union's AML and Anti-Fraud Violations***

152.    Western Union claims that its efforts to monitor and supervise its agents to prevent fraud and money laundering include both an anti-fraud program to prevent its customers from being defrauded (sometimes referred to as its consumer protection program) and an AML program to prevent the flow of illicit funds (including funds derived from fraud and other criminal activity).  The FTC found that "[a]s implemented by Western Union, for many years these interrelated programs failed to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system."  These programs cover overlapping spheres because fraudsters commonly engage in money laundering to hide their ill-gotten gains, and because wire fraud is one of the predicate acts of AML regulations.

153.    Western Union maintained a database of consumer fraud complaints, which it recorded in Consumer Fraud Reports ("CFRs") that are intended to contain detailed information about the victims, the transactions, and the Western Union agent locations that paid the transfers at issue.  Western Union relied on this database as a source of information for monitoring its agents.

154.    As noted above, based on its review of CFRs in Western Union's database that between January 1, 2004 and August 29, 2015, the FTC found that the Company received at least

550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044.  Over

80% of those complaints were from U.S. customers.

155.    Western Union admitted in the Statement of Facts that was part of its settlement

with DOJ that its employees knew that its analyses and internal reports show that the amount of

losses from fraudulent transactions sent through the Company was much higher than the amount

identified in the Company's CFR database, because not every victim reported fraud to the

Company.

156.    In addition, as the FTC found, fraud complaints in Western Union's database

represent only a small percentage of the actual fraud perpetrated through Western Union's

money transfer system because (a) as recognized by Western Union's own internal reports, the

vast majority of fraud victims do not complain directly to the Company; (b) Western Union has

failed to log in its complaint database all of the complaints and reports about fraud that it has

received or the particular money transfers related to the complaints; and (c) in many countries,

Western Union did not provide a fraud hotline or a toll-free phone number for victims to call to

report fraud.  Because of these multiple factors, the FTC determined that since 2004, Western

Union has likely been used to send billions of dollars in fraud-induced payments to telemarketers

and con artists worldwide.

157.    Based on the FTC's review of CFRs between January 1, 2004 and August 29,

2015, the FTC found the following patterns of scams (among others) that fraudsters commonly

used:

> a.  *False online or Internet purchases*:  Western Union received at least 146,909
>     complaints about this type of scam totaling at least $187,877,003 in losses;

     b.  *Lottery or prize scams*:  Western Union received at least 75,543 complaints about this type of scam totaling at least $86,138,055 in losses;

     c.  *Emergency scams, including grandparent scams:* Western Union received at least 41,897 complaints about this type of scam totaling at least $73,807,353 in losses;

     d.  *Advance-fee loan scams:*  Western Union received at least 71,296 complaints about this type of scam totaling at least $43,617,107 in losses; and

     e.  *Online dating or romance scams:*  Western Union received at least 44,588 complaints about this type of scam totaling at least $40,980,482 in losses.

158.    Fraudsters frequently collect the funds that customers send in connection with these scams from a corrupt or complicit Western Union agent, or from an agent that violates Western Union's anti-fraud and/or AML policies and procedures (such as by failing to properly collect and record the recipient's required information or by recording obviously false information).

159.    As Western Union has admitted to DOJ, complicit agents assisted fraudsters by knowingly entering false identifying information into the Western Union money transfer system in order to pay the fraudulently induced transfers to the fraudsters or retransfer the funds to other complicit agent locations.  Complicit agents received part of the transfer amount in exchange for aiding the fraudsters.

160.    Western Union should have detected and disciplined the agents processing fraudulent transactions because the Company's own internal reports and memoranda showed that discrete and easily identifiable subsets of agents and subagents in various locations were responsible for paying out the majority of fraud-induced money transfers.  In addition, the vast majority of Western Union agent locations worldwide could be ruled out because not a single fraud complaint was lodged as to money transfers conducted through them.

161.   A confidential witness (CW1) has explained that the complaints that Western Union received on its consumer fraud hotlines were then aggregated and distilled into reports reviewing the composite set of data.  CW1 stated that these reports reviewing the aggregate set of underlying fraud complaints were distributed to senior managers at the Company.  CW1 is a former Senior AML Compliance manager at Western Union, who held that position from July 2011 to May 2017 and reported to a Director who in turn reported to the Company's VP of Global AML Operations.

162.   The Company's admissions in the DOJ settlement confirm CW1's description of these reports.  As Western Union acknowledged, the Company had multiple types of internal reports that showed and analyzed the instances of fraud among its agents.  For example, Western Union created 60-Day Fraud Reports documenting agent locations that processed five or more transactions subject to CFRs within 60 days and a Fraud Risk Index Report, among other types of reports.  Western Union's internal reports even identified network agents that Western Union itself owns as being involved in high levels of consumer fraud.

163.   Instances of recurring fraud were even easier for Western Union to address because an even smaller, more easily identifiable and distinct subset of agents and subagents were the subject of five or more fraud complaints in a given year.  This targeted group of agents and subagents was responsible for paying out most of the fraud losses that were reported to the Company.

164.   For example:

   a.   For each year from 2012 to 2014 in Mexico and Nigeria, between approximately one and five percent of agent locations had at least five fraud complaints, but these agents were responsible for between 71% and 84% of the total fraud reported in both countries for each of those years.

55

     b.  From January 1, 2004 to August 29, 2015, 172 UK agents paid out over $44.3 million in reported fraud, with 34 of these agents paying out nearly half of that amount, most of which came from U.S. victims.

165.    In some countries, the agents most involved in fraudulent transactions worked for a country's main master agent that Western Union actually owned, such as FEXCO in the UK and Spain, as described above.

166.    The FTC also determined that Western Union's internal reports, communications, analyses, investigations, and other reviews and records "demonstrate serious problems and suspicious activities by particular Western Union agents and subagents, including, but not limited to" the following factors that should have enabled Western Union to identify the agents engaging in fraud:

    a.  high numbers and patterns of complaints;

    b.  spikes in the number of money transfers received;

    c.  money transfer amounts that far exceed the average transfer amount;

    d.  data integrity issues (issues relating to the recording of ID numbers, dates of birth, or other information about recipients);

    e.  payouts within minutes after the money transfers were sent;

    f.  flipping (shortly after receiving funds, a large portion of the money is sent to another recipient);

    g.  surfing (suspicious look-ups of money transfers in Western Union's system by FLAs);

    h.  substantial transfers to high-risk countries known for fraud; and

    i.  substantial increases in the number of fraud complaints associated with particular countries.

167.    Even so, Western Union consistently failed to adequately or timely discipline these derelict agents, if it did anything at all.  In many cases, Western Union even specifically reviewed the agent at issue, yet still failed to take proper corrective action.  For example:

    a.  In both June 2014 and February 2015, Western Union reviewed an agent location in Washington, D.C. that between July 2008 and March 2015 generated at least 116 fraud complaints totaling $187,356.  Even though the Company's reviews of the agent location found confirmed and potential fraud amounting to 84% and 55% of the money transfers that it paid, the agent was not terminated until August 2015, after it failed an AML compliance test conducted by an undercover compliance officer.

    b.  Between January 1, 2006 and January 14, 2013, Western Union received at least 1,421 fraud complaints about News Mark—one of the most corrupt agents in the UK and worldwide—totaling at least $2,150,892.  Despite Western Union identifying News Mark as a high-fraud agent in the Company's periodic 60-day reports at least 45 times between 2005 and 2010, and reviewing it for fraud and other suspicious activities at least 15 times between 2009 and 2012, Western Union suspended and reactivated the agent at least three different times and did not end up terminating it until 2014.

    c.  In Jamaica, the four agents that have paid out the highest amount of fraudulent transfers and have also engaged in other suspicious activity for several years have continued to operate even though they also continued to receive many fraud complaints, including hundreds in 2015.

    d.  In March 2012, a senior compliance analyst found that from December 1, 2011 to February 24, 2012, "nearly 85% of all emergency fund fraud complaints filed with Western Union" involved money transfers paid out by a single master agent in Mexico (Elektra), through 94 of its locations.  Since 2011, Mexico has consistently been in the list of top-three destination countries for reported fraud payouts from U.S. consumers, and the top destination for emergency scams.  The victims of these scams also tended to be 65 years or older, adding to their suspicious nature because fraudsters focus on targeting grandparents in connection with emergency scams related to their grandchildren.  Just 19 of Elektra's agents paid out over half of these transactions and one particularly egregious agent paid out over $14 million in reported fraud.  Notwithstanding this knowledge, and despite repeated reviews and investigations of agent locations in Mexico, as of October 2015, Western Union rarely, if ever, terminated agent locations in Mexico for consumer fraud, even where particular agent locations repeatedly appeared on fraud

reports, or had confirmed and potential fraud amounting to more than 25%, or even 50%, of their payouts.

    e.    An agent location in Detroit, Michigan paid out at least 194 money transfers totaling $379,031 in reported fraud since 2004 and remained open through the end of the FTC's review during the Class Period. This agent continued to receive fraud complaints after receiving multiple rounds of Western Union's fraud prevention training.

168.    In addition, Western Union has admitted to DOJ that it was aware from as far back as several years prior to the start of the Class Period of particular agents paying out a very high number of transactions, worth millions of dollars, that were subject to CFRs, yet the Company failed to discipline these agents well into the Class Period. These situations were discussed by very senior managers at the Company.

169.    For example, around May 2010, a Compliance Director told the Chief Compliance Officer and Deputy Chief Compliance Officer at the time about the six highest agents on the fraud report for the UK, two of which had been identified based on 60-Day Fraud Reports as processing "a materially excessive amount of transactions reported in CFRs" as far back as November 2005. Even so, the only consequence for these six agents after the Chief Compliance Officer was made aware of the situation in 2010 was that they were suspended from paying out transactions coming from the United States (but not elsewhere) for just three weeks. After the suspension was lifted, the rate of fraud quickly returned, with one of the two particularly egregious agents being identified on June 16, 2010 "as the number one paying Agent location of reported fraud in the world."

170.    Even after additional warnings about these two agents, they continued to operate well into the Class Period. The Company's Compliance Director warned the Deputy Chief Compliance Officer in November 2010 that one of these agents "had been reviewed at least ten

times without major disciplinary action demonstrating that 'somewhere along the line, someone is losing touch with risk and is willing to absorb it.'"

171.   In addition, the London Metropolitan Police inquired about these agents on February 2, 2011.

172.   Even with all of this longstanding evidence at hand, one of these agents remained open through the announcement of the Joint Settlement in January 2017 and the other one was not terminated until October 2012.

173.   Similarly, Western Union has admitted to DOJ as part of the Joint Settlement that it was aware since 2010 of specific agents in Spain that processed increasing numbers of transactions that were reported to be fraudulent.   Even so, the Company's Director of Global Consumer and Agent Protection Program did not agree to the remedial measures that the Compliance Director and Compliance Managers recommended on August 18, 2011 to address the rising fraud in Spain.

174.   Ultimately, Spain's law enforcement authorities had to step in during the Class Period because for years Western Union failed to address these known compliance failures on its own.   On October 9, 2012, SEPBLAC, Spain's Anti-Money Laundering and Countering Financing of Terrorism Supervisory Authority, informed Western Union that an audit that the regulator conducted since 2011 "reveals extremely serious facts."   As Western Union admitted to DOJ in the Joint Settlement:

> SEPBLAC noted that, for a percentage of certain Western Union Agent locations, Western Union "itself has reported in suspicious transaction reports … [that] there were clear signs that [certain Agent locations] carried out money laundering activities." . . .   Nevertheless, ***SEPBLAC concluded that Western Union's "money laundering and terrorism financing prevention systems [were] ineffective" and due diligence was deficient***.   In a report dated December 20,

2012, SEPBLAC concluded that . . . Western Union's response to the October 9 findings . . . minimized what was an **_"absolute lack of control over the [A]gents' activity which has made it possible for truly scandalous figures of fraud and money laundering related payments and remittances to be recorded."_ On _December 20, 2012, SEPBLAC found Western Union's AML system in Spain "totally ineffective in preventing money laundering, related to fraud and other offenses, which has taken place on a large scale."_** (Emphasis added).

175.    These are just several examples of information that the FTC and DOJ found readily available in Western Union's own internal reports, analyses, and records showing that during the Class Period, the Company was aware of very large and increasing numbers of fraud complaints associated with a small number of agents that also displayed other characteristics indicative of fraud.

176.    Indeed, Western Union admitted to DOJ in the Joint Settlement that it identified certain agent locations that it "suspected were complicit in the fraud scheme, but it took insufficient action to stop these Complicit Agent Locations from facilitating consumer fraud."  In most cases, the Company failed to suspend or terminate the agent locations at all.  In the rare instances in which Western Union did suspend or terminate these agent locations, it did so belatedly, after the Company knew for months or years that these agents were causing substantial injury to consumers.

177.    Even when the Company suspended high-fraud agents after being aware of their fraudulent practices for a few months rather than years, Western Union should have taken more prompt action because these agents tended to be immediately identifiable based on spikes in fraud complaints.

178.    The extent of Western Union's failure to discipline agents that it knew to be engaged in fraud is demonstrated by an instance in which a 74-year-old victim attempted to

report to Western Union that she was the victim of a fraud in October 2012.  As Western Union admitted to DOJ in the Joint Settlement, the employee that this customer communicated with "told her that she was 'wasting [her] time' reporting the fraud because 'there are thousands of these complaints laying on the desk and nothing gets done.'"

179.    In addition to evidence from customer complaints, Western Union knew of confirmed or potential fraud that constituted a large proportion of certain agents' activity because the Company's internal reports, analyses, and records showed the other suspicious circumstances described in ¶ 166 above that were indicative of fraud or money laundering.  As the Company has admitted, it "identified Complicit Western Union Agent Locations through various means, including CFRs, transaction monitoring, and regular reports generated by Western Union analysts reviewing transactions that highlighted Agent locations exhibiting transaction patterns or behavior that were indicative of fraud-complicity."

180.    Western Union has allowed these agents and subagents to continue operating without taking any corrective action or, at most, with only temporary suspensions.  The Company sometimes even went so far as to disregard recommendations from its employees to suspend or terminate certain agents or subagents that the employees found to exhibit patterns indicative of serious consumer fraud.

181.    In addition, rather than take decisive disciplinary action, the FTC found that Western Union would often just "escalate," or refer, such agents for further review or investigation.  But those follow-up investigations would typically end up being delayed for months or fail to resolve the problem.  In some cases, Western Union repeatedly escalated the

same agent for further investigation without suspending or terminating the agent, even as the agent continued to be the subject of fraud complaints.

182.    For example, in one pattern of fraud, complicit agent locations in Mexico received initial fraudulent transactions from victims in the United States.  Minutes later, after taking a commission, these agents would send the remaining money to agent locations in Canada and other destinations.  Western Union admitted to DOJ in the Joint Settlement that "[t]his two-step process was designed to conceal the ultimate destination of the fraud proceeds. Despite identifying certain Agent locations potentially involved in this activity as early as April 2011, Western Union allowed the Agent locations to remain open and the activity continued through 2012."

### c.    *Western Union Willfully Failed to Prevent Structuring*

183.    Western Union admitted to DOJ in the Joint Settlement that it "failed to terminate or discipline certain Agent locations who sent a high volume of transactions from the U.S. to China ('China Corridor Agents') and repeatedly violated the BSA and Western Union policy through their structuring activity."

184.    The China Corridor is particularly known as a means of making payments in connection with human trafficking.  This AML failure thus enabled one of the most severe crimes that AML regulations are intended to prevent.

185.    In particular, "Western Union, through various methods, recognized that four China Corridor Agents were engaged in violations of Western Union policies regarding structuring transactions."  Even though the Company knew that it filed over 31,000 SARs

showing potentially structured transactions through the China Corridor via four particular agents, the Company failed to discipline these agents.

186.   One of these agents, Hong Fai, sent over \$126 million in Western Union transactions from December 2007 through March 6, 2012.  This agent was not terminated until March 19, 2012 even though Western Union admitted to DOJ in the Joint Settlement that "[a]s early as June 2007, [the Company] was aware of 'significant' compliance failures at Hong Fai involving structured transactions and failure to file SARs for suspicious transactions."  This knowledge was based on over a dozen onsite or transaction reviews that Western Union conducted.  Western Union admitted that these reviews showed that the agent "repeatedly . . . violated certain elements of the BSA or certain aspects of Western Union policy."   Despite Hong Fai's known and repeated violations that should have resulted in disciplinary action under Western Union policy, Western Union did not terminate the agent until 2012, only after law enforcement and Hong Fai's bank continued to raise concerns about illegal transactions and Hong Fai's failure to file SARs. Western Union also did not file any SARs identifying Hong Fai as a suspicious subject until after it terminated Hong Fai in 2012.

187.   On March 29, 2009, one of Hong Fai's managers even told Western Union explicitly that he was "not willing to comply with the AML Laws and Policies."   And when Compliance conducted an onsite review of Hong Fai in July 2011, its employees advised customers on how to structure transactions, admitted to a Western Union employee that she would have structured a consumer's \$14,000 transaction if the Compliance employee had not been present because "good customer service was more important than compliance," and violated Western Union compliance policies in several other ways.  Hong Fai customers also told

the Compliance employee that they had been able to use false identification documents at Hong Fai in the past.

188.     Another one of these China Corridor agents that Western Union knew violated AML regulations was U.S. Shen Zhou International Company ("Shen Zhou").  The head of Shen Zhou was arrested in 2010 for his structuring activities and pled guilty in December 2013 to structuring international money transfers.  Before being arrested, Shen Zhou sent more than $310 million in Western Union transactions to China, approximately 50 percent of which were structured

189.     The other two China Corridor agents were owned by the same party and sent over $1.6 billion in Western Union transactions between 2003 and 2011, almost all to China and approximately 25% to 30% of which had indications of structuring.  These agents were not closed until December 2011, after the bank that held their accounts intervened by questioning Western Union about its compliance efforts related to agents that used such accounts.  Western Union did not provide the bank with the compliance information that it requested.  The owner of these two agents admitted to law enforcement authorities that he knew that individuals paid their debts to human smugglers in China through Western Union and that they would keep their transactions with him under $2,000 in order to avoid providing identification.  In addition, Western Union did not terminate these agents based on its own earlier compliance reviews, which had found multiple violations of the BSA and Western Union policy violations for years, but rather, only because an independent party began raising questions about the Company's compliance policies.

190.    Western Union admitted in the DOJ settlement that an Executive Vice President "noted that 'any negative action against [one of these two agents] will require prior notification' to Western Union's then-President for the Americas and then-Executive Vice President for Asia Pacific 'due to the heavy impact to our China business.'"  Defendant Stockdale was Western Union's Executive Vice President for the Americas from November 2008 until April 2011.

191.    In addition, when Western Union filed SARs on customers (which the Company did not always do when it was required to do so), the Company rarely identified its agents as suspicious actors or described the agent locations' role in the structuring conduct.  Western Union admitted to DOJ in the Joint Settlement that its "practice was not to identify Agent locations as 'subjects' of SARs unless Western Union found an Agent location 'complicit' and terminated the Agent location as a result of the finding.  Western Union typically only found Agent locations 'complicit' if the owner or employee of an Agent location was arrested or identified in a public source such as 'a news article that says the [Agent was] related to fraud, or [the Agent] was on … some sort of scam website' or if its own investigation determined that the Agent location was complicit."  But, as described above, Western Union's own investigations rarely made such a finding at all, much less within the timeframe required for SAR filings.

d.    ***Sales Employees Actively Discouraged Disciplining Fraudulent Agents***

192.    One of the reasons that Western Union failed to discipline agents that engaged in fraud and AML violations was that Sales employees discouraged the Company from taking steps that required disciplinary action.  Sales employees were compensated based on agent performance and were therefore financially incentivized to allow fraudulent agents to continue operating and defrauding customers.

193.    The Company as a whole had these same financial incentives because it made a lot of money from the high volume of transactions that these agents processed.   As the FTC found, throughout the Class Period, Western Union "has continued to profit from the activities of these agents" facilitating fraud.

194.    Even though Western Union knew that China Corridor agents facilitated hundreds of millions of dollars' worth of structured transactions, the Company admitted to DOJ in the Joint Settlement that Western Union employees "pressed Compliance employees to ensure that certain China Corridor Agent locations were not suspended or terminated."

195.    For example, Sales employees interfered with Compliance's disciplining Hong Fai, one of the agents involved in BSA violations discussed above.   In April 2009, Sales employees requested that Compliance delay a suspension because Hong Fai was a "very important Agent."   Within a few days of Hong Fai being suspended for violating the BSA, including structuring, Compliance lifted the suspension and placed the agent on probation and allowed the location to continue processing transactions.   After law enforcement contacted Western Union in 2010 about potentially illegal payments that Hong Fai sent, a Compliance analyst explained that Hong Fai's suspension had been changed to probation after Sales told Compliance that Hong Fai was the highest performing U.S.-to-China Agent in the Philadelphia region.   A Compliance Director has also admitted that although he considered terminating Hong Fai in 2012, Sales had always "wanted this [agent] saved and I don't think anything has changed in their minds around the importance of the [a]gent."

196.    Another one of these China Corridor agents discussed above, the owner of Shen Zhou, sent over $310 million in structured transactions—approximately half of which were

structured—from Monterey Park, California from 2005 until he was arrested in September 2010. After he was arrested, he told law enforcement authorities that a Western Union Sales employee told him that he could open another Western Union agent location in the same area. This Sales employee even advised the agent on how to get away with this by cautioning him to use a relative's name instead of his own name when opening the new location.

197.    Similarly, when a Compliance employee recommended an action that would have resulted in one of the agents discussed in ¶¶ 189-90 above being suspended, a Sales Director explained in November 2008 that Sales should "help compliance group understand how important those Chinese agents are – not to shut them down automatically. [One of the agents] is #2 agent in the region and we can't afford one week suspension." The agent's owner was also given a $250,000 bonus for renewing the agents' contracts with Western Union and was allowed to open a third agent location.

198.    Then, Western Union's Chief Compliance Officer was told on June 3, 2010 that the other agent owned by this owner should be suspended because the agent engaged in transactions with false data and the owner's sister admitting to accepting a bag of $80,000 in cash from a relative and making up false transactions. Sales employees, however, raised concerns with this suspension. Western Union has admitted that its *then-President of the Americas told Western Union's Chief Executive Officer*, "FYI. We are trying to save [New York Agent 1] (to [sic] agent NY to China)." Defendant Stockdale was the Company's President of the Americas at this time (and at all times from November 2008 until April 2011).

199.    Although Compliance ended up suspending this agent on June 3, 2010, the suspension was removed just 24 days later. Then, in January 2011, another suspension that

resulted from continued compliance failures was changed to putting the agent on an enhanced probation program after Compliance discussed the issue with the business team.   When an independent bank started asking Western Union about its compliance policies related to these agents, which ultimately led to the agents being closed in December 2011, a senior Sales executive told colleagues earlier that closing these agents "at this time will impact the US-China corridor BADLY. Please see if there is anything we can do (like verify [the agent] has done something 'not compliant' and we re-educate [the agent] to be compliant) and to re-open them in a few weeks to catch the Chinese New Year rush."

200.    Western Union also admitted to DOJ in the Joint Settlement that after the UK agents discussed in ¶¶ 189-90 and 197 above were brought to the attention of the Chief Compliance Officer (who was Joseph Cachey at that time), they were allowed to continue operating into the Class Period because Sales employees resisted these agents being suspended or terminated.

201.    When a UK Compliance director warned a UK senior Sales executive in November 2010 that "evidence of criminal or suspicious activities from these agents seem to be rather vivid," the Compliance director made sure to explain that he or she knew that "some of [these agents] are the top performance [sic].  I will keep you posted before any action is taken." After the London police asked about one of these agents on February 2, 2011, an employee told the Compliance Director that both this agent and the other particularly egregious one were "the same deal . . . very high volume [agent] that Sales always fights for. . . .  it was one of six locations suspended by the then-Compliance Director in May 2010 due to a high number of fraud complaints but reactivated based on negotiations with Sales."

202.     The FTC found that this scenario of agents being temporarily suspended due to consumer fraud only to then be reactivated shortly thereafter and continue to pay transfers subject to fraud complaints was a common pattern at Western Union.

e.     ***Western Union Chose Not to Implement Better Compliance Practices***

203.     Western Union admitted to DOJ in the Joint Settlement that employees have recommended specific steps the Company could take against potentially complicit agents, but Western Union failed to adopt those recommendations.  These included a) failing to implement recommended Global Guidelines that were proposed to govern disciplining agent locations; b) failing to discipline thousands of complicit agent locations that appeared on 60-day Fraud Reports multiple times with increasing numbers of fraudulent payments; c) failing to remove Sales employees from the process of disciplining agents, which would have avoided the conflict of interest that Sales employees faced because agent performance impacted their compensation; and d) the Chief Compliance Officer's failing to implement a Senior Vice President's recommendation that CFRs be analyzed using a risk-based approach to specifically identify and suspend complicit agents.  These recommendations were made prior to the Class Period and Western Union continued to fail to implement them throughout the Class Period.

204.     Western Union admitted that if it had implemented the recommendations described in the prior paragraph, it would have stopped agent locations from processing more than $174 million in reported fraud losses and additional amounts that were not reported.

205.     As another example of Western Union's failure to implement best practices, in October 2009, the FTC announced that it had reached a settlement with MoneyGram International, Inc. ("MoneyGram"), Western Union's main competitor, relating to charges that

the company had allowed its money transfer system to be used for fraud. The FTC publicly released copies of the complaint and order against MoneyGram, which required, among other things, the termination of any agent that "may be complicit in" fraud.

206. Following the FTC's settlement with MoneyGram, FTC staff sent a letter to Western Union in November 2009 expressing concern about the "huge volume of fraud that employs money transfer services," like that of Western Union.

207. In December 2009, the FTC met with Western Union regarding concerns about the Company's agents that paid reported fraud transactions. The FTC raised its recent settlement with Moneygram over similar issues. Western Union chose not to adopt the compliance standards that Moneygram had agreed to implement.

208. Western Union ultimately agreed with the FTC on a less-demanding compliance protocol. But, as Western Union has admitted, after discussions between Western Union's Compliance and Sales departments, the Company decided that it would not implement even that lesser protocol that it agreed to with the FTC. Instead, the Company decided that it would restrict certain UK agents from paying out transactions sent from the United States. On June 8, 2011, a Western Union employee told the UK Compliance Officer, "Problem is, we agreed in writing with the FTC on how to handle this stuff … Suspend pending was in the agreement. Also what I don't like about just blocking US to UK is that we aren't addressing potential bad Agents that way. People around the world are being defrauded but we only have data on the sends from the US though." Western Union did not tell the FTC about this failure to adhere to their agreement until the summer of 2012, well into the Class Period. Moreover, investors were never informed of this failure.

209.    Western Union's pattern of failing to adopt best practices continued.    In November 2012, the Department of Justice reached another settlement with Moneygram.  In this case, Moneygram admitted to criminally aiding and abetting wire fraud and failing to maintain an effective AML program, and agreed to pay $100 million.  Similar to Western Union here, "corrupt MoneyGram agents . . . defrauded tens of thousands of victims in the United States. MoneyGram also failed to maintain an effective anti-money laundering program in violation of the Bank Secrecy Act."[9]

210.    Moneygram agreed in this 2012 settlement to implement enhanced compliance obligations and structural changes that Western Union ended up agreeing to in the Joint Settlement here.    Western Union, however, chose not to adopt these best practices that Moneygram was required to follow as part of this 2012 settlement at that time.

211.    A confidential witness (CW2) has stated that Western Union chose not to implement the stronger AML protocol that Moneygram adopted as part of its 2012 agreement with DOJ.  CW2 is a former Western Union VP and senior Global Customer Care Operations manager, from December 2012 to January 2015, who reported to the Company's EVP of Global Operations and Chief Technology Officer, who in turn reported Defendant Ersek.  CW2 worked in other positions at the Company since May 2011,

212.    The FTC found that in some cases Western Union even installed agents or subagents that were previously suspended or terminated by MoneyGram for fraud, or that were

_____

[9] DOJ Press Release, *Moneygram International Inc. Admits Anti-Money Laundering and Wire Fraud Violations, Forfeits 100 Million in Deferred Prosecution* (Nov. 9, 2012).

concurrently operating as MoneyGram agents (in violation of Western Union's agent agreements).

213.    CW2 also noted that Western Union and Moneygram frequently shared agents.

214.    Western Union's failure to adopt the compliance protocols that Moneygram agreed to in 2012 was a conscious decision by the Individual Defendants.  At the December 3, 2012 Governance Committee meeting and the full Board meeting on December 6-7, attended by Defendant Ersek and, in the case of the Board meeting, Defendant Scheirman and likely Agrawal as well, management described "an increased focus by government agencies on the AML programs of financial services companies and the key features of a recent settlement reached between MoneyGram[, a major competitor,] and the U.S. Department of Justice."  Even so, Western Union decided not to improve its compliance practices based on the 2012 Moneygram settlement.

215.    As part of its 2012 agreement with DOJ, Moneygram agreed to several significant "enhanced compliance obligations and structural changes," including:

    a.  Creation of an independent compliance and ethics committee of the board of directors with direct oversight of the chief compliance officer and the compliance program;

    b.  Adoption of a worldwide anti-fraud and anti-money laundering standard to ensure all MoneyGram agents throughout the world will, at a minimum, be required to adhere to U.S. anti-fraud and anti-money laundering standards;

    c.  Adoption of a bonus system which rates all executives on success in meeting compliance obligations, with failure making the executive ineligible for any bonus for that year; and

    d.  Adoption of enhanced due diligence for agents deemed to be high risk or operating in a high-risk area.

216.    Steps (b)-(d) that Moneygram agreed to were all part of the remedial steps that Western Union agreed to implement as part of the Joint Settlement, showing that these were

compliance failures that still needed improvement in January 2017. In addition, Western Union did not establish its Compliance Committee until July 2013, over a year into the Class Period.

f.     ***Other Deficient Compliance Practices***

217.    Western Union also failed to meet its AML and anti-fraud obligations by failing to adopt other basic compliance practices given its business model.

218.    The FTC found that for many years, Western Union failed to conduct adequate due diligence or background checks on its agents and subagents, leading Western Union to use many agents with problematic histories.

219.    In addition, Western Union's AML program relies heavily upon its agents having their own AML programs. The FTC determined that Western Union's agents often failed to implement effective AML policies and procedures pertaining to consumer fraud.

220.    Western Union admitted to DOJ in the Joint Settlement that through the end of 2012, it knowingly failed to implement effective controls against illegal gambling transactions. Western Union knew that internet gambling transactions are a particularly attractive way of laundering money and financing illegal activity because of the volume, speed, and anonymity that they offer. Western Union also knew based on its internal reviews that it was being used for internet gambling transactions, particularly to Costa Rica, where many internet gambling businesses were based.

221.    Western Union also knew that that these gambling transactions violated the law because in 1997, Western Union had reached an agreement with the Florida Attorney General in which the Company agreed to advise certain agents that interstate wagers violated Florida law

73

and also agreed to implement procedures to target gambling transactions from Florida to offshore gambling organizations.

222. Despite all of this knowledge, Western Union failed to employ sufficient controls to prevent illegal gambling transactions.

223. Overall, the FTC found that Western Union's general practice was to attempt to rehabilitate agents with high levels of consumer fraud by requiring them to implement "action plans" to address the problems. This practice, however, was inadequate and ineffective for several reasons. First, the action plans often failed to effectively address consumer fraud even in theory. Second, this practice assumed agents were willing to improve and does not account for agents that are complicit in the fraud or money laundering. Third, Western Union or its agents sometimes failed to create any action plan or delayed doing so for extended periods of time. Fourth, agents have ignored or resisted the plans, or failed to implement them satisfactorily.

224. Yet another compliance practice that did not meet Western Union's legal obligations is that for many years, agent suspensions and terminations were typically limited to agents in the United States and Canada. The FTC found that even "as of October 2015, Western Union had rarely, if ever, terminated agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at agent locations."

225. The FTC also found the following additional deficiencies with Western Union's compliance program:

    a. The Company failed to effectively train its agents and subagents with respect to detecting and preventing consumer fraud;

b.  Agents failed to collect proper identifying information from recipients of money transfers, have recorded obviously incorrect or fictitious identifying information into Western Union's system, and have failed to record required information at all;

c.  Western Union's employees responsible for monitoring and reviewing agents were not provided with sufficient information or resources to adequately identify, review, and monitor that activity;

d.  Western Union failed to conduct adequate and routine onsite compliance reviews of its agent locations worldwide;

e.  For many years, consumer fraud was not routinely addressed in compliance reviews of agents;

f.  The incompleteness of the Company's consumer complaint database (as noted in ¶ 156 above) was problematic because Western Union used the information in the database to: (a) monitor and identify agents, subagents, and FLAs that may be complicit in frauds; (b) create automated rules regarding particular money transfer corridors; and (c) block victims or perpetrators of frauds from using Western Union's money transfer system. The Company's failure to keep accurate and complete records of fraud-induced money transfers in this database therefore impeded its efforts to detect and prevent consumer fraud. Even though employees have brought this deficiency to the Company's attention, it did not try to fix the problem.

g.  Western Union and its agents failed to provide adequate and effective written and verbal warnings to consumers about the fraud occurring through its money transfer system, even when consumers' money transfers have displayed obvious signs of fraud.

g.  ***Other Government Enforcement Actions Also Highlight Western Union's Inadequate AML Compliance and Anti-Fraud Programs During the Class Period***

226.  In addition to the Southwest Border Agreement and the enforcement actions that culminated in the January 2017 Joint Settlement, Western Union's deficient AML and anti-fraud compliance efforts were subject to other government enforcement actions and warnings during the Class Period.  As described in the FTC Complaint:

a.   In February 2012, in response to a survey sent to law enforcement by Western Union, a Special Agent for the U.S. Secret Service warned Western Union that *the Company "is a complete and almost total safe haven for the criminal element to freely launder illegal proceeds without detection"*; "a person in America can easily be robbed by someone in a foreign country and there is almost no possibility to recover that fraud loss"; its "services are widely used for online scams in the US"; and its services were "widely used by Nigerian scammers and other criminal elements overseas."

b.   According to Western Union's records, by the first quarter of 2012, the Serious Organised Crime Agency ("SOCA") in the United Kingdom (presently known as the National Crime Agency) disclosed to Western Union that in relation to an "investigation conducted on money remitters in Western England," SOCA had "surveyed Western Union customers and found that 81% of the transactions paid in Nigeria or Ghana were allegedly fraud related."

*c.*   In or around late May 2012, the Toronto Police Service sent Western Union a letter alerting the company that it "may have aided individuals with the criminal offense of laundering [the] proceeds of crime" from consumer frauds, and cautioning that it needed to take "the appropriate steps . . . to ensure that Western Union is not a party to this serious criminal offense, whether intentionally or willfully blind to its role." The Toronto Police Service also emailed Western Union specific information about many other fraud-induced money transfers, telling the Company to consider the emails a formal caution that allowing the fraudsters to collect future transfers could be considered "aiding the criminal offence of Laundering the Proceeds of Crime."

227.   Western Union did not publicly disclose any of these significant government enforcement actions or warnings during the Class Period.

h.   *Western Union Failed to Comply with Its Earlier Agreements With Government Regulators*

228.   The compliance failures described above demonstrate that Western Union did not adhere to the commitments it made in the various settlements that it reached with various regulators before and during the Class Period, as described in ¶¶ 116-23, 173-74, 205-08, and 226-27 above.

229.     For example, as Western Union admitted to DOJ in the Joint Settlement, its compliance failures demonstrate that Western Union did not implement or maintain effective policies or procedures to suspend or terminate international agents that processed fraud payments, as Western Union had committed to doing in its November 2005 agreement with the attorneys general of 47 states and the District of Columbia.

230.     Similarly, as the FTC determined, Western Union did not adequately address "the consumer fraud problem with its money transfer system . . . that law enforcement agencies in the United States and throughout the world ha[d] warned the company for many years."

        i.     ***Western Union's Compliance Failures Were Discussed at the Company's Highest Levels, Including by the Individual Defendants***

231.     During the Class Period, Western Union continued to fail to comply with the compliance recommendations of the monitor under the Southwest Border Agreement.  These recommendations that Western Union failed to meet were necessary for Western Union to bring its AML compliance program in line with its legal obligation under the BSA that it implement an effective risk-based AML program.

232.     In addition, the Company's failure to comply with the Southwest Border Agreement and its AML and anti-fraud obligations more generally was discussed at Board and Committee meetings during the Class Period.  As noted above, all of these meetings were attended by Defendant Ersek and many of them were attended by Defendants Scheirman, Stockdale, and Agrawal—showing that these issues were known by the Individual Defendants and were discussed at the highest levels of the Company.

233.    Updates showing how far behind the Company was in implementing the Southwest Border Agreement Monitor's recommendations continued during the Class Period, until the Company was forced to renegotiate the Southwest Border Agreement because it was not able to meet its obligations by the July 2013 deadline.  These included Board Meetings on May 23, 2012 and on September 13-14, 2012.

234.    For example, on July 19, 2012, at a meeting of the Audit Committee, attended by Defendant Ersek and likely Defendant Scheirman, management stated that the monitor "expressed issues" with several of the Company's AML controls, including "[v]arious deficiencies in the documentation of policies and procedures" for AML compliance.

235.    At the October 25, 2012 Audit Committee meeting, attended by Defendant Ersek and likely Defendant Scheirman, management stated that that Western Union received a "marginal" AML compliance rating from an examination by Texas, California, Ohio, and West Virginia.  Those states' concerns included basic areas of AML compliance, such as Western Union's "AML Risk Assessment; Foreign Agent/Subagent Due Diligence; Agent Oversight; [and] Independent Review of AML Program."  It was also announced at this meeting that the Company might not complete several key recommendations by the Southwest Border Agreement monitor's (the "SWB Monitor") July 2013 deadline, including "FLA [i.e., front line associates] controls," where the monitor had discovered new agent verification problems.  Finally, management told the Committee that Western Union still lacked and was "sourcing permanent AML leadership."

236.    On February 20, 2013, at a Governance Committee meeting, and a full Board meeting the following day, attended by Defendant Ersek and, in the case of the Board meeting,

Defendant Scheirman and likely Agrawal as well, management explained as to the monitor recommendations that were in a "critical" state that "FLA Controls / Authentication" was "at a standstill"; the "[s]cope of work" for resolving the beneficial sender/receiver information weakness was "still under evaluation;" and progress in fixing the Monitor's identified problems in Western Union's global due diligence of agents "remain[ed] slow."   Management also explained at these meetings that the "[o]verall Southwest Border [p]rogress" for "Internal Controls" was now 10% and Western Union's "[d]evelopment [e]fforts" per the monitorship agreement were still in the "very early stages" for (i) the "Partnership oversight program," (ii) the "Internal Controls program," (iii) the documentation of AML compliance "policies and procedures," and (iv) "agent oversight."

237.   Management also told the Governance Committee at this meeting that the prior monitor, who had resigned earlier in the year, "continue[d] to assert" through his resignation that Western Union's compliance function was "understaffed."   At this time, the Governance Committee finally considered for the first time—notwithstanding the Company's history of severe compliance deficiencies described above—forming a compliance committee of the Board, hiring key high-level compliance officers.

238.   At the March 28, 2013 Governance Committee meeting, attended by Defendant Ersek, it was announced that resolution on the monitor-identified global due diligence, beneficial sender/receiver information, and FLA-control weaknesses remained far off.

239.   A similar status remained at a Board meeting on May 29-30, 2013, attended by Defendants Ersek, Scheirman, and likely Agrawal, when management told the Board that "[m]ajor issues" were still "open includ[ing]/relat[ing] to . . . FLA Authentication; Beneficial

79

Sender and Receiver Information; Global Due Diligence and [know your Agent] (SWB and Latin America); [and] Risk Assessment."   It was also reported at this meeting that Deloitte Consulting LLP would report to the new SWB Monitor that several "key areas" of Western Union's AML compliance program still needed improvement, including: (i) "Fundamental Risk Assessment document must be completed"; (ii) "US Agent Oversight"; and (iii) "Regulatory Reporting – enhance Suspicious Activity Reporting documentation/decisions for all products and all business lines."

240.   At a July 17, 2013 Compliance Committee meeting, Defendant Koch, the newly appointed Chief Compliance Officer as of May 2013, described a draft risk assessment that would be the "foundation" for the risk-based AML compliance program of Western Union's core consumer-to-consumer money transfer business—a fundamental AML obligation imposed by the BSA that Western Union did not have in place at that time.   In addition to Defendant Koch, Defendant Ersek also attended this meeting.

241.   During the Board's July 2013 meeting, held on July 18-19, attended by Defendants Ersek, Scheirman, and likely Agrawal, management explained that, during a Q1 2013 spot check of 335 high-risk agents on the Southwest Border, 28 (or over 8%) had "confirmed instances of Human Smuggling."   Furthermore, management informed the Board that the risk assessment described in the prior paragraph was the "foundation upon which the AML program is built: a 'constitutional' document," and "intended to fulfill [Western Union's] obligation[s]" under the "Monitor Engagement Letter."   The Board was also told that "high" risk assessments for certain geographic regions were "likely inherent given the nature of [Western Union's consumer-to-consumer] business."

242. Because Western Union was unable to satisfy the monitor's compliance requirements by the July 2013 deadline, it was forced to enter into negotiations to modify its settlement agreement with the State of Arizona. During a September 9, 2013 Compliance Committee meeting, attended by Defendants Ersek and Koch, it was announced that on July 31, 2013, management first submitted a written action plan to the Monitor for his consideration, providing an agreed-to methodology for measuring and ensuring compliance with the Monitor's recommendations. A version of this action plan was subsequently included as part of the deal allowing Western Union to amend the Southwest Border Agreement. But even then, this plan was just a blueprint that Western Union still needed to implement because it had been utterly inept at doing so during the more-than three years that had elapsed the since reaching the initial Southwest Border Agreement.

243. At a Board meeting on October 11, 2013, Koch, the Company's Chief Compliance Officer, explained in a memorandum to the Board (using language that was also included in the risk assessment itself) that an "AML Risk Assessment is the foundational document upon which [a financial institution's] risk-based AML Compliance program is based. . . . Development and issuance of an AML Risk Assessment is also a regulatory expectation, evidenced in bank and [Money Services Businesses] examination manuals, and is implicitly required by the AML 'program requirement' of [the BSA]." According to Koch's memorandum, the "[i]nherent" "[g]eographic" risk for Western Union's consumer-to-consumer and business segments was "Very High." In addition to being attended by Defendant Koch, this meeting was also attended by Defendants Ersek, Scheirman, and likely Agrawal.

244.    The SWB Risk Assessment also explained that geographic areas with "Very High" risk levels required "[i]mmediate attention . . . to prevent and/or detect [money laundering/terrorist financing].  Failure to address this risk level could lead to [Western Union] facing imminent, significant regulatory violations. That would, in turn, materially impact the business model and its long-term viability, and expose the institution to reputation, legal, regulatory, and compliance risk."

245.    But the SWB Risk Assessment was expressly limited to Western Union's Southwest Border region, and did not apply to other "Very High" risk geographies.   The Southwest Border region was classified as "Very High" risk area because it was both a "high intensity drug trafficking" and "high intensity financial crime" area, as designated by FinCEN.

246.    According to FinCEN, there were several other "Very High" risk regions in the country during the Class Period, including, among other areas, northern California, Chicago, the New York area (including all of New York and New Jersey), southern Florida, and Puerto Rico.[10]  Even so, Western Union did not create a legally required risk assessment or otherwise implement an effective risk-based AML program—the most important requirements for an AML program under the BSA—for any other areas outside of the Southwest Border region.

247.    Defendant Koch, the Chief Compliance Officer that was appointed in May 2013, left the Company by November 2015, just two and a half years after starting as Chief Compliance Officer.  During his time at the Company, he regularly spoke at publicly advertised industry conferences, representing Western Union, where he portrayed Western Union as an industry leader in compliance by discussing best practices for compliance programs and

---

[10] *See* https://www.fincen.gov/hifca for FinCEN's current list of such regions.

combating human trafficking. For example, on April 24, 2014, Koch was one of three panelists on a publicly advertised webcast hosted by a law firm that addressed "[b]est practices for structuring and implementing compliance programs to identify and mitigate multiple financial crimes risk."   Koch also presented on best practices for detecting human trafficking at a conference hosted by the Council of Europe and Organization for Security and Cooperation in Europe on February 17, 2014, and at the 8th Annual European AML Financial Crime Conference, hosted by the Any Money Laundering Professionals Forum, on October 23, 2014.

j.   ***The Lengthy History of the Government Enforcement Actions that Resulted in the January 2017 Settlements Show that Defendants Knew of Severe Deficiencies in Western Union's Compliance Efforts for Years***

248.   The government began the investigations that led to the 2017 Joint Settlement in 2010—when Shen Zhou was arrested—if not earlier.

249.   A confidential witness (CW3) who participated in the government's investigation that led to the 2017 Joint Settlement has stated that DOJ built its case against Western Union over a period of more than seven years.   CW3 also stated that there was no way that Defendants Ersek, Scheirman, and Agrawal were not informed about the on-going investigations that resulted in the Joint Settlement because the Company made upper managers available to investigators and spent years cooperating with the investigation.   CW3 is a former senior Western Union AML Compliance employee who reported to the Company's Chief Compliance Officer.   CW3 held that position from June 2013 to November 2015 and worked in other AML positions at the Company from 2011 to June 2013.

250.   Indeed, at an Investor Day conference that the Company held on May 9, 2012, Mike Salop, Western Union's Senior Vice President of Investor Relations, specifically addressed

DOJ's investigation into Shen Zhou that the Company had announced in its 10-Q for the first quarter of 2012. He explained:

> We have been cooperating with the government in connection with this particular case for almost two years and assisted the government prior to the time the former agent was arrested, just as we cooperate on a daily basis with law enforcement departments throughout the U.S.

251. Defendants also discussed the government's investigations into Western Union and particular agents and at Board and Committee meetings during the Class Period, further showing that the Individual Defendants were aware of the progress of the investigations and related compliance violations at that time. For example, at a meeting of the Board's Governance Committee on September 22, 2010, attended by Defendant Ersek, it was discussed in reference to CDCA's investigation of Shen Zhou that a "large" Western Union agent in California was the subject of a criminal money-laundering investigation and that Western Union was "working with law enforcement to investigate the underlying activity."

252. Similarly, at a June 15, 2012 meeting of the Governance Committee, attended by Defendants Ersek, a presentation described the "[i]ncreased attention to US/China Agent base which continues to present challenge. [Southwest Border] Alliance confirms the US/China corridor is of significant interest to law enforcement."

253. The FTC concluded that Western Union had knowledge of the fraud here because at least 146 Western Union agents and subagents around the world—39 of whom have been charged in the United States—and at least two front-line associates have been charged with colluding in frauds that used Western Union to transfer funds. The charges against these agents have included conspiracy to commit mail fraud, wire fraud and/or money laundering.

254.    Western Union has also admitted that it knew that these agent locations were complicit in defrauding customers because those locations were prosecuted for their criminal activity.  DOJ began filing criminal cases against these 39 agents as far back as 2007.

255.    In addition, Western Union's descriptions in its quarterly and annual SEC filings, all of which were signed by Defendant Ersek and either Defendant Scheirman or Defendant Agrawal, of the government's investigations into its compliance practices make clear that the Company had detailed knowledge of each stage of these investigations as they progressed throughout the Class Period.

256.    In these SEC filings, Western Union described itself as having cooperated with these government investigations, including by producing extensive amounts of documents to and allowing its employees to be interviewed by the various government regulators conducting these investigations.   The Company consistently stated that it "provided and continues to provide information and documents to the government."  Defendants were therefore aware not just that a plethora of federal and state investigators were all closing in on the Company's deficient compliance practices; they were also aware of the specific information that they handed provided to these government regulators that ended up forming the basis for the government's conclusions, and the Company's admissions, in the Joint Settlement.

257.    Based on Western Union's SEC filings throughout the Class Period, the Individual Defendants were aware of the following status of the government's many investigations into Western Union's deficient AML and anti-fraud compliance practices:

(i)    ***FTC Investigation***

258.    By the end of the first quarter of 2013, the Company "had discussions with the [FTC] regarding the Company's consumer protection and anti-fraud programs.  On December 12, 2012, the Company received a Civil Investigative Demand ('CID') from the FTC requesting that the Company produce (i) all documents relating to communications with the monitor appointed pursuant to the agreement and settlement the Company entered into with the State of Arizona on February 11, 2010, including information the Company provided to the monitor and any reports prepared by the monitor, and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011."

259.    On February 21, 2014, while Western Union was in the process of challenging the FTC's ability to review the information that it sought in December 2012, the FTC sent the Company another civil investigative demand, now requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004.

260.    On October 22, 2014, the Company received another civil investigative demand from the FTC, this time requesting documents and information since January 1, 2004 relating to the Company's consumer fraud program; its policies and procedures governing agent termination, suspension, probation and reactivation; its efforts to comply with its 2005 agreement with 47 states and the District of Columbia regarding consumer fraud prevention; and complaints made to the Company by or on behalf of consumers concerning fraud-induced money transfers that were sent to or from the United States.  This new demand also sought various documents

concerning approximately 720 agents, including documents relating to the transactions they sent and paid and the Company's investigations of and communications with them.

261.    On July 31, 2015, the Company received another civil investigative demand from the FTC "requesting documents and information relating to the total number of agent and subagent locations in 13 countries annually since 2010, the average and median dollar values for money transfers sent anywhere in the world annually since 2010, copies of the Company's anti-fraud programs, know your agent policy, know your customer policy, representative agent contracts, transaction data, background investigation documents[,] fraud complaints associated with four [particular] agents . . . and consumer fraud reports not already produced to the FTC."

262.    In its 10-Q for the second quarter of 2016, filed on August 3, 2016, the Company disclosed that the FTC had "recently advised the Company of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales Rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers.  The Company is in discussions with the FTC and is seeking to reach an appropriate resolution of this matter."  Western Union also disclosed at that time that the "FTC staff has advised the Company that it has been directed to request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company. . . .  If the FTC files a complaint against the Company, the Company intends to defend itself vigorously."

263.    In its 10-Q for the third quarter of 2016, filed on November 1, 2016, Defendants disclosed that the FTC staff had now "advised the Company that it believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars

in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004." The Company's position in response to the FTC was that the Company "strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof, but has continued to engage in discussions with the FTC in an effort to reach an appropriate resolution of this matter." As before, the Company continued to take the position that "[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously."

(ii)     ***DOJ Investigations***

(a)     ***EDPA Investigation***

264.    In March 2012, EDPA served the Company was served with a federal grand jury seeking documents relating to Hong Fai (the agent described in ¶¶ 186-87 and 195 above). As the Class Period progressed, the Company received additional subpoenas from EDPA and the government interviewed several current Western Union employees as part of this investigation.

(b)     ***CDCA Investigation***

265.    On March 20, 2012, CDCA served the Company with a federal grand jury subpoena seeking documents relating to Shen Zhou (the agent described in ¶¶ 112, 188, 196, and 250-51 above). When CDCA served the Company with this subpoena, it informed Western Union that the Company itself was "a target of an ongoing investigation into structuring and money laundering."

266.    After the initial March 20, 2012 subpoena, the Company continued to receive additional subpoenas from CDCA seeking additional documents relating to Shen Zhou, other

current and former agents, and other materials relating to the Company's AML compliance policies and procedures.

267.     By the end of the first quarter of 2013, CDCA interviewed and served grand jury subpoenas seeking testimony from several current and former Western Union employees.

(c)     ***MDPA Investigation***

268.     On November 25, 2013, MDPA served the Company with a grand jury subpoena seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008.  When MDPA served the Company with this subpoena, it informed Western Union that the Company itself was the subject of this investigation.

269.     After that initial subpoena, the Company received additional subpoenas as part of this investigation, seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies.

270.      By the end of the second quarter of 2015, the government had interviewed and served grand jury subpoenas seeking testimony from several current and former Western Union employees in connection with this investigation.

271.     In its 10-K for 2015, signed by Defendants Ersek and Agrawal and filed on February 20, 2016, the Company disclosed that MDPA indicated "that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012."

(d)     ***SDFL Investigation***

89

272.   On March 6, 2014, SDFL served the Company with a federal grand jury subpoena covering the period of January 1, 2007 to November 27, 2013.  The subpoena sought a variety of AML compliance materials, including documents relating to the Company's AML, BSA, SAR, and Currency Transaction Report procedures, transaction monitoring protocols, BSA and AML training programs and publications, AML compliance investigation reports, compliance-related agent termination files, SARs, BSA audits, BSA and AML-related management reports and AML compliance staffing levels, Board meeting minutes, and organization charts.

273.   After that initial subpoena, the Company received additional subpoenas from SDFL and the Broward County, Florida Sheriff's Office relating to the investigation, including, among others, a federal grand jury subpoena from SDFL on March 14, 2014 seeking information about 33 agent locations in Costa Rica, SARs and AML compliance and BSA filings for the period January 1, 2008 to November 27, 2013.

274.   SDFL subsequently served the Company with seizure warrants requiring the Company to seize all money transfers sent from the United States to two agent locations located in Costa Rica for a 10-day period beginning in late March 2014.

275.   The Company disclosed in its 10-Q for the second quarter of 2014, filed on July 31, 2014, that the government had "notified the Company that it is a target of [this] investigation."

276.   By the end of the second quarter of 2015, SDFL had interviewed several current and former Western Union employees in connection with this investigation.

277.   In its 10-K for 2015, filed on February 20, 2016, Defendants disclosed that SDFL had recently served Western Union with a subpoena calling for information relating to particular

agents and transactions sent between particular locations during various dates in 2013 and 2014. The government also advised the Company that it was investigating concerns that the Company was aware of gaming transactions being sent to particular locations "and that the Company failed to take proper steps to stop the activity."

(iii)   ***State Attorney General Investigations***

278.   From 2011 through 2013, the Company received Civil Investigative Demands from certain state attorneys general who were investigating whether the Company took adequate steps to help prevent consumer fraud and "the adequacy of the Company's consumer protection efforts over the last several years."  These regulators sought documents relating to consumer fraud complaints, the Company's procedures to help identify and prevent fraudulent transfers, and money transfers sent from the United States to certain countries.

279.   For example, a subpoena issued by the Vermont Attorney General stated that it had "reason to believe that Western Union has provided substantial assistance to fraudulent telemarketers in the form of access to its money transfer system, despite knowing, or consciously avoiding knowing, of the fraud, in violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a)."

(iv)   ***Conclusion as to Government Investigations***

280.   While these disclosures show that Defendants had detailed knowledge of the status of the government's many parallel investigations into Western Union's deficient compliance practices, they did not reveal to the public the substance of the actual underlying compliance problems at Western Union.

281.    Until the final Joint Settlement was announced on January 19, 2017, Defendants "strongly disagree[d]" with the FTC's position that the Company had committed severe compliance violations and stated that the Company planned to "defend itself vigorously" against such claims.

282.    Similarly, even though multiple DOJ offices had already taken the position that Western Union committed serious compliance violations, even when Defendants disclosed in the Company's 10-Q for the third quarter of 2016, filed on November 1, 2016, that the Company "anticipate[d] entering into discussions with the United States Department of Justice to potentially resolve the four investigations" being conducted by the EDPA, CDCA, MDPA, and SDFL, Defendants continued to take the position that "[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters."

k.    *Defendant Ersek Was a Very Hands-On Manager Involved in the Company's Day-to-Day Affairs*

283.    Defendant Ersek was aware of the facts described above for the additional reason that, as multiple former Western Union employees have explained, he was a very hands-on chief executive whose practice it was to be involved in and informed of the progress of significant issues at the Company.

284.    For example, a confidential witness (CW4) who met with Defendant Ersek at least once a month (and usually multiple times per month) has described Ersek as a very involved executive.  CW4 is a former high-level officer in Western Union's Compliance Department from late 2011 until April 2013 who reported to the Company's EVP and General Counsel, who in turn reported to Defendant Ersek.  CW4 regularly briefed Ersek on relevant

compliance-related issues, including the status of the Southwest Border Agreement and system and compliance changes. More generally, this witness explained that anytime a regulator is reviewing anything related to Western Union or its agents, Ersek would continuously be briefed. This witness also noted that Ersek and the Company's General Counsel were always briefed on the discipline or shutdown of agents and any related investigations. CW4 was an SVP at the Company from September 2006 until late 2011, and from May 2013 until January 2014.

### l. *Defendants and Other Company Insiders Profited by Selling Shares While in Possession of Material Non-Public Information*

285. While in possession of material, non-public information regarding Western Union's deficient AML and anti-fraud compliance efforts, during the Class Period, Defendant Ersek sold approximately 600,000 shares of Western Union common stock at artificially inflated prices, for proceeds of more than $12 million.

286. Ersek's sales were timed to maximize profits from the Company's then artificially inflated stock price. As the Class Period wore on and the government was bearing down on Western Union's willful compliance failures, Ersek increased the size of his sales.

287. On October 28, 2013, just before the Company's October 29, 2013 announcement of results that were disappointing because of its increased compliance costs and that sent the Company's shares tumbling by over 12% (as explained in ¶¶ 500-02 below), Ersek sold approximately 48,000 shares pursuant to a 10b-5 trading plan adopted just two months prior for proceeds of over $900,000.

288. On May 5 and August 4, 2015, pursuant to 10b-5 trading plans adopted less than two months prior to each sale, Ersek sold a total of approximately 270,000 shares for proceeds of over $5.5 million.

289.    Then, as the Company continued to be actively investigated by federal and state regulators, and only a few months before the Joint Settlement was announced, Ersek sold over 275,000 shares on August 23 and 24, 2016, pursuant to a 10b-5 trading plan adopted on May 6, 2016, for proceeds of over $5.9 million.

290.    Defendant Agrawal also benefited from stock sales while in possession of non-public information shortly before the Company's settlement was announced.  On August 30, 2016, he sold over 9,000 shares, for proceeds of approximately $200,000.

291.    Other executives also sold shares in patterns that were disproportionately weighted toward the end of the Class Period, enabling them to offload shares and make sizable profits shortly before the Company's $586 million settlement for willful compliance failures was announced in January 2017.

292.    Jean Claude Farah, an EVP and President of Global Payment, sold a total of approximately 79,000 shares for proceeds of over $1.5 million during the Class Period.  Of these sales, over 71,000 shares were sold in March 2015 for proceeds of approximately $1.4 million.  A month prior, on February 13, 2015, Farah took the unusual step of modifying an earlier 10b-5 trading plan to effectuate these March 2015 sales.

293.    Diane Scott, an Executive Vice President, sold approximately 220,000 shares during the Class Period for total proceeds of over $4.5 million.  All of these shares were sold between February 2015 and February 2016.

294.    Amintore Schenkel, Western Union's Chief Accounting Officer, sold over 100,000 shares for proceeds of over $2 million during the Class Period.  All of these shares were sold between May 2015 and August 2016.

94

295.    David Thompson, the Company's Chief Investment Officer, sold over 110,000 shares during the Class Period for proceeds of over $2 million.  Over 86,000 of these shares, for proceeds of approximately $1.7 million, were sold between September and October 2015.

m.    ***Summary of Substantive Allegations***

296.    The many anti-fraud and AML compliance failures described above affected Western Union during the Class Period in several ways.

297.    First, throughout the Class Period, Western Union failed to discipline agents and agent locations that facilitated fraud and AML violations, including agents and agent locations that Defendants knew based on internal records, reports, and communications facilitated a large amount of those violations and/or were complicit in, or likely complicit, in those violations.

298.    Second, throughout the Class Period, Western Union failed to maintain or implement effective anti-fraud and AML programs, as demonstrated by a) the Joint Settlement (including the many deficient compliance practices that began to be revealed when the Joint Settlement was announced and the comprehensive remedial measures that the Company agreed to implement as part of the Joint Settlement); b) discussions at Board and Committee meetings during the Class Period; and c) the Company's failure to implement the remedial measures that Moneygram agreed to undertake in its 2012 settlement with the Department of Justice.

299.    In addition, Western Union admitted based on the many compliance failures that it acknowledged in the DOJ settlement that it willfully failed to implement an effective AML program and that it aided and abetted wire fraud through December 2012, nearly a year into the Class Period.  Moreover, until September 2012, Western Union failed to even begin to remediate its complete lack of adequate compliance measures.

95

300.    Third, Defendants failed to disclose compliance failures that occurred before the Class Period and that subjected the Company to substantial liability and the need to undertake comprehensive and costly remedial efforts.   In particular, Defendants failed to disclose the compliance failures and certain related government enforcement actions whose substance did not begin to be publicly revealed until the Joint Settlement was announced.   Defendants also failed to disclose the compliance failures that were discussed at Board and Committee meetings prior to the Class Period.

301.    Fourth, Defendants misrepresented the nature of the government investigations that were underway during the Class Period that resulted in the Joint Settlement.   Although Defendants disclosed the existence of these investigations, they failed to disclose that these actions were nearly certain—based on Defendants' knowledge of the Company's many compliance failures before and during the Class Period—to expose the Company to substantial liability and the need to take comprehensive and costly remedial actions.   Instead, Defendants represented that the Company "strongly disagrees" with the regulators' claims and "intends to defend itself vigorously" against them, or that these investigations were too preliminary to predict their outcome.

302.    Fifth, Defendants failed to disclose that the Company did not cure the compliance failures addressed in government enforcement actions that were revealed prior to the Class Period even though the Company agreed that it would do so when it resolved those actions.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

303.    During the Class Period, Defendants made statements that were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse

facts pertaining to Western Union's compliance policies, business, and operations: (i) Western Union's AML and anti-fraud efforts during the Class Period did not comply with applicable laws and regulations, including the BSA, the FTC Act, the TSR, the Telemarketing Act, the criminal wire fraud statute, the Dodd-Frank Act, and/or state or international AML or anti-fraud laws; (ii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with best practices and/or industry standard practices; (iii) during the Class Period, Western Union failed to discipline or take corrective action against its agents or subagents that Defendants knew violated (or likely violated), and in some cases were complicit (or likely complicit) in violating, the laws described in (i) above and/or Company anti-fraud or AML policies, including by processing vast amounts of transactions that defrauded (or likely defrauded) Western Union's customers and/or by structuring (or likely structuring) vast amounts of transactions; (iv) Defendants failed to disclose Western Union's AML and anti-fraud compliance failures and certain related government enforcement actions that took place prior to the Class Period; (v) government investigations and enforcement actions that were ongoing during the Class Period were nearly certain—based on Western Union's compliance failures before and during the Class Period—to result in severe monetary penalties and Western Union being required to undertake comprehensive and costly remedial actions; (vi) Western Union could not maintain its competitive premium pricing during the Class Period while implementing effective compliance policies; and (vii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with agreements that Western Union reached to resolve government investigations and enforcement actions that were disclosed prior to the Class Period.

A.      **False and Misleading Statements in 2012**

304.    On February 24, 2012, Western Union filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K").

305.    In the 2011 10-K, the Company stated in pertinent part:

The Western Union ® brand is globally recognized and represents speed, reliability, trust and convenience.

\*\*\*

*Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations. . . .*

The remittance industry has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts are effective and comply with applicable law and best practices*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds or a change in laws or their interpretation could have an adverse effect on our business, financial condition and results of operations.

\*\*\*

*We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices.* These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer network operates through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities.

\*\*\*

These regulatory goals—the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy—may conflict, and the law in these areas is not consistent or settled. While *we believe*

> ***that Western Union is compliant with its regulatory responsibilities,*** the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.
>
> ***
>
> ***Our agents' or subagents' failure to comply with federal and laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.***
>
> Any determination that our agents or subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or subagents to comply with laws which also could have an adverse effect on our business, financial condition and results of operations. . . .
>
> (Emphasis added.)

306.   In addition, in describing the "wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union," the 2011 10-K specifically noted "an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity" and described particular requirements of the BSA.  The Company also noted that "[m]any states impose similar and, in some cases, more stringent requirements" and that "[t]hese requirements also apply to our agents."

307.   Western Union also noted in the 2011 10-K that "[o]ver the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money laundering requirements and related consumer identification matters."  The Company stated that

99

"[t]hese agreements required us to pay civil penalties and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law."

308. The 2011 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes.

309. The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ersek and Scheirman, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

310. The statements referenced in ¶¶ 305-08 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

311. On March 13, 2012, defendant Scheirman attended the Credit Suisse Global Services Conference.  In response to a participant question about how the Company would maintain its pricing advantages in the face of competition from other companies offering similar services, Scheirman stated that Western Union's "compliance programs" were "really competitive strengths for us."

312. The statements referenced in ¶ 311 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (vi) above.

313. On March 29, 2012, at the Barclays Capital Emerging Payments Forum, Khalid Fellahi, a Western Union representative that had held several different positions at the Company over the course of 10 years, stated in describing the Company's strengths that "obviously, we

have an expertise in compliance and regulatory that is currently in 200 jurisdictions. So I don't think that many companies as well can claim that."  He also stated that "we have a compliance group, which allows us to make sure that we do business safely and in a compliant manner in 200 jurisdictions out there in the world as, obviously, any transaction is not only from an originating country, but it's also from a payout country perspective as well."  He then characterized the Company's "compliance capability" as one of its "competitive advantages" that the Company had "for many years, and we're actually leveraging them."

314.   The written presentation that went along with Fellahi's March 29, 2012 presentation described the Company's "[c]ompliance and regulatory capabilities" as one of the Company's main strengths and its "Global AML/compliance engine & expertise" as one of its competitive advantages.

315.   The statements referenced in ¶¶ 313-14 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

316.   On May 1, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the first quarter of 2012, which ended on March 31, 2012 (the "Q1 2012 10-Q").

317.   The Q1 2012 10-Q noted that "[o]ver the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money laundering requirements and related consumer identification matters."  The Company stated that "[t]hese agreements required us to pay civil penalties and to take certain measures to enhance our

compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law."

318. The Company also described in its Q1 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes.

319. The Q1 2012 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q1 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

320. The statements referenced in ¶¶ 317-18 above were materially false and/or misleading for the reasons set forth in ¶ 303 (iv)-(v) and (vii) above.

321. On May 9, 2012, Western Union hosted an Investor Day for analysts, media representatives and investors. Defendants Ersek and Scheirman made positive statements during their presentation about the Company's compliance and regulatory capabilities. For example, Defendant Ersek focused a portion of his prepared remarks on describing the supposed strengths of Western Union's compliance and regulatory capabilities. He stated:

> These strengths separate us from the competitors. I believe they are a huge competitive advantage. Our global network, our strong brand, our global organization and resources and our regulatory and anti-money laundering capabilities, there are not many companies worldwide which could show these capabilities to you. . . .
>
> Our fourth competitive advantage is our global anti-money launder and regulatory capabilities. The regulations around our business are really highly complex, and we have regulatory complexity in all our markets. We have to comply with various Acts and interdictions lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities.

It sounds complex, and indeed it is complex, but we see that as a competitive advantage, as we comply with various Act and interdictions lists around the world in 200 countries. . . .

To protect our customers, our brand, to comply with rules and regulations, globally we dedicate about 600 employees around the globe to these efforts, and we spend nearly about $60 million on anti-money laundering and regulatory environment.

322.     Later during this May 9, 2012 Investor Day conference, Defendant Ersek stated that Western Union had an advantage over technology companies because "it's important to remember Western Union is today market leader in money transfer business. We have built an incredible network over the years, now with 500,000 retail locations in 200 countries and territories. Our brand is well known and trusted around the globe. We have the regulatory and anti-money laundering capabilities to operate in all countries."  Ersek subsequently closed the conference by stating that the complexity of the business, including the "regulatory environment" was good because although "[i]t scares to death, the competitors to enter this market," Western Union has "the competencies" to address these issues.

323.     Also during this Investor Day conference, Defendant Scheirman stated in his prepared remarks that Western Union's "compliance and regulatory capabilities" were among its "strengths" that would allow the Company to "deliver strong returns" for shareholders in the coming years.

324.     Other representatives of the Company also touted Western Union's compliance efforts during this May 9, 2012 Investor Day conference.  For example, Defendant Agrawal characterized the Company's "compliance capability" as a "key asset" for global growth; Chetan Mehra, director of an Indian money transfer affiliate of the Company, Weizmann Forex Limited,

stated that Western Union's "high compliance standards" were one of the key factors that allowed it to capture the remittance market in India; and Diane Scott, Western Union's Chief Marketing Officer, noted the Company's "deep understanding" of "compliance and regulatory environments" worldwide.

325. In addition, at this May 9, 2012 Investor Day, Defendant Stockdale touted the quality of Western Union's agents. He stated that the Company's purchase of several large agents, including FEXCO (which, as described in ¶¶ 106-08 above, was known to facilitate fraud and lack adequate compliance policies) allowed Western Union to operate "as the master agent in Europe, and the results are very promising so far." Stockdale also stated that "[n]ow what is true about our business is that our agents love our business as much as we love them" and that "[o]bviously, we have a great relationship with our partners, and as I've gotten to take the new role on a global basis, I've really gotten to meet our agent partners on almost every corner of the world."

326. Also at the May 9, 2012 Investor Day conference, Mike Salop, Western Union's Senior Vice President of Investor Relations, specifically addressed DOJ's investigation into Shen Zhou—the agent in California that was arrested and late pled guilty to structuring transactions—that the Company had announced in its 10-Q for the first quarter of 2012 and that Western Union was a target of. He represented that "[w]e believe the company has robust compliance and anti-money laundering policies and processes in place, and we look forward to demonstrating that fact to the U.S. Attorney's office in Los Angeles." Salop went on to state that "[w]e are not aware of any evidence that suggests that the company or any of its employees knowingly engaged in any conduct with this former agent that would constitute a violation of the law."

Salop refused to take any questions about these issues during the Investor Day because he claimed to "have no further information about the government's investigation, [so] there is nothing more we can add at this time."

327.    The statements referenced in ¶¶ 321-26 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

328.    On May 16, 2012, Defendants Scheirman and Stockdale attended the J.P. Morgan Global Technology, Media and Telecom Conference.  In response to an analyst's questions as to how Western Union could compete with technology startups, Scheirman responded that "clearly just our compliance capabilities" were one of the Company's main advantages over other companies.

329.    Also at this May 16, 2012 J.P. Morgan Global Technology, Media and Telecom Conference, Defendant Stockdale stated that regulatory and compliance worldwide is something "that obviously – it's a huge competency for Western Union to deal with[]in 200 countries. So, regulations in Europe, in Australia, in Asia Pacific and across the world is something that we deal with across every single region and country."

330.    The statements referenced in ¶¶ 328-29 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

331.    On May 29, 2012, Western Union issued a press release warning consumers to be "[w]ary of [s]cammers with '[e]asy [m]oney' [o]ffers."  But rather than disclosing the Company's awareness of its agents' rampant complicity in those and other types of scams, the Company claimed that "Western Union provides a trusted and reliable way for people to send money to family members and friends."

332.    The statements referenced in ¶ 331 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

333.    On June 12, 2012, Western Union attended a William Blair & Co LLC Growth Stock Conference call for analysts, media representatives and investors.  During his opening remarks, Defendant Ersek continued to represent that the Company's compliance efforts were a competitive "strength."  He specifically touted the Company's AML program as a way of enabling customers to "trust" in the Company.  Ersek stated:

> Before I discuss about our future strategies, let me talk about the core strengths of Western Union . . . . And *the fourth one is the regulatory and anti-money laundering capabilities of Western Union. All this combination gives us a unique opportunity and unique fundamentals for Western Union* . . . .
>
> *One of our very strong competitive advantages is our regulatory environment, our regulatory and anti-money laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment.  And I always say, I know it's sometimes tough, but I always say it's good that the regulatory environment and we, as Western Union, have these capabilities to serve the customers and give the trust to the customers they believe at Western Union*. . . .
>
> It's not that easy to have a money license in Gabon and Brazil or other states I'm talking about, *so it's a competitive advantage for Western Union and we are very proud of that*.  (Emphasis added).

334.    Later during this June 12, 2012 conference call, when an analyst asked about competition for sending money cross-border from companies such as PayPal, Defendant Ersek responded by again claiming that the Company's regulatory compliance efforts provided it with a competitive advantage.  He stated, "You have to get the regulatory environment, somebody has to do that. It's not easy to do that. You have to build the anti-money laundering [program], somebody has to do that. . . .  So that has been definitely something we are very proud [that] we buil[t]."

335.    The statements referenced in ¶¶ 333-34 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

336.    On July 24, 2012, Western Union issued a press release announcing its financial results from the second quarter of 2012.  During the conference call that Western Union hosted that day after releasing these results, Defendant Ersek began his prepared remarks at the outset of the call by reiterating his message that the Company's "global compliance capabilities" gave it a "strong" foundation and "competitive strength."

337.    Later during the July 24, 2012 conference call, Defendant Scheirman described the effect of the Company's compliance efforts as part of the Southwest Border Agreement.  He stated that "[w]e expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity of requirements and sustainability around the globe continues to expand, but we view our ability to adapt to this environment as a long-term competitive advantage."

338.    In response to an analyst's question later during this July 24, 2012 conference call concerning compliance costs, Defendant Ersek responded that the Company was "very focused here and we are very serious" about "upgrading our compliance."  He continued: "[I]t's a competitive advantage, long term.  I think we are investing heavily here to be, really acting as an industry leader.  We are setting the tone here.  And I think we are very focused here and I see that there is definitely a competitive advantage."  Defendant Ersek subsequently repeated this message when he stated that "[a]s an industry leader, obviously, we are very active here upgrading, investing heavily" in order to address new regulatory and compliance issues.

339.   Also during this July 24, 2012 conference call, in response to an analyst's question about future compliance costs that are not reflected in the Company's financial figures, Defendant Scheirman explained that "on a macro basis, we think the compliance spend 2013 looks probably like 2012 just because of the broad global environment, but long term, we believe that will be a competitive advantages [sic] for us as we move forward. And our goal is always to comply with the letter and the spirit of the law and we'll continue to drive that direction."

340.   The statements referenced in ¶¶ 336-39 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (v)-(vii) above.

341.   On August 2, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the second quarter of 2012, which ended on June 30, 2012 (the "Q2 2012 10-Q").

342.   In the Q2 2012 10-Q, the Company stated, in relevant part:

Enhanced Regulatory Compliance

We regularly review our compliance programs. In connection with that review and growing global regulatory complexity, and as we dialogue with governmental and regulatory authorities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. We believe some of these changes will have an adverse effect on our business, financial condition and results of operations.

343.   The Q2 2012 10-Q also noted that "[o]ver the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the [BSA] and anti-money laundering

108

requirements and related consumer identification matters." The Company stated that "[t]hese agreements required us to pay civil penalties and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law."

344.    The Company also described in its Q2 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes.

345.    The Q2 2012 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

346.    The statements referenced in ¶¶ 342-44 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

347.    On September 18, 2012, Western Union issued a press release announcing that it was hosting the 7th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in Denver, Colorado, near its headquarters, on September 18-20. The Company described this conference as "one of the biggest events of its kind" with the purpose of "teaching best practices in identifying and preventing fraud and money laundering." Western Union's Chief Compliance Officer stated that "[o]ur conference started in 2006 and we had one goal at that time: educate Agents on [AML] best practices, regulations, and law-enforcement trends. It's now one of North America's largest [AML]/anti-fraud conferences that helps professionals from a wide variety of industries better identify and protect their organizations, and consumers, from fraud." The

Company also stated in its press release that it is "dedicated to fighting fraud and helps consumers protect themselves from scammers."

348.    The statements referenced in ¶ 347 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

349.    On October 16, 2012, Defendant Stockdale spoke on behalf of Western Union at the University of Denver's Voices of Experience program.  This speech was published online the following day, on October 17, 2012.  Stockdale stated:

> Western Union is uniquely positioned at going after that underserved 2-billion person market worldwide.  What makes us unique that allow[s] us to have these relationships and really our core competencies to reach consumers in 200 countries and territories is really these four pillars of our strategy . . . .  Three is the regulatory and AML capabilities of the Company in almost every jurisdiction around the world.
>
>                     ***
>
> What really is more difficult is to make sure that you're complying with all the laws around the world. And we spend a ton of money. And we have over 600 people on an ongoing basis monitoring the system on an ongoing basis. And you have to do that.  One of the core capabilities is to being able to work with governments not only the U.S. government but the governments of Vietnam, the governments of India, the governments of China to make sure that this cash movement which is in the billions of dollars is all being monitored on an ongoing basis.

Stockdale then stated, in the context of discussion the Dodd-Frank regulations, that "all regulation" "becomes a competitive advantage for us . . . because if you're in front and you have the resources to implement and do it well."[11]

350.    The statements referenced in ¶ 349 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

351.    On October 30, 2012, the Company held a conference call in connection with the release of its earnings for the third quarter of 2012.  During this call, Defendant Ersek stated

---

[11] This speech is available at https://www.youtube.com/watch?v=Fprh3jHhLjw.

during that conference call that "we are investing more in being an industry leader, putting some compliance requirements for our customers, which are tougher and higher than it was in the past. . . . We are the industry leader, we are leading that and I think we are protecting our customer." He also stated that "[w]e have made and will continue to make compliance-related enhancements and changes around the world to meet new and evolving requirements. . . . [W]e believe it is our responsibility to maintain our industry leadership by implementing rigorous compliance practices to protect our customers and agents around the world." Defendant Ersek also reassured investors by representing that the Company could maintain its price premium in part because of the advantage that its "great compliance" program gave it. Defendant Ersek also noted certain "compliances changes" limited to issues "related to our Southwest border agreement," and did not address the Company's more comprehensive compliance deficiencies that would not become known until January 19, 2017.

352.     The statements referenced in ¶ 351 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

353.     On November 6, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the third quarter of 2012, which ended on September 30, 2012 (the "Q3 2012 10-Q").

354.     The Q3 2012 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

355.     The Q3 2012 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q3 2012

10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

356. The statements referenced in ¶ 354 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

357. On November 7, 2012, at the Citi Financial Technology Conference, Defendant Ersek described Western Union's compliance efforts in response to the Southwest Border Agreement as going above and beyond the Company's minimum legal requirements. He characterized Western Union "as an industry leader[] in this sector," where the Company "set[s] the standards hopefully." Ersek also described the Company's compliance with the Southwest Border Agreement as meeting a "quite high" and "industry lead[ing]" standard. According to Ersek, the "southwest border issue is unique to Western Union. It's an agreement which has been signed in 2010 and we are implementing the actions and I am very confident that the team is doing the right thing. . . . [A]s an industry leader, in this sector, obviously we set the standards hopefully."

358. Also at this November 7, 2012 Citi Financial Technology Conference, Defendant Scheirman blamed the Company's compliance costs and issues on "glob[al]" trends, stating that "[w]e now spend over $100 million a year on compliance and just given how the compliance requirements are generally tightening around the globe, that's one spend we'll probably continue to increase as we move forward."

359. The statements referenced in ¶¶ 357-58 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iv) and (vii) above.

B.    **False and Misleading Statements in 2013**

360.    On February 12, 2013, Western Union issued a press release announcing its financial results for the fiscal year and fourth quarter of 2012.   On the Company's earnings conference call that was held the same day, an analyst asked "what gives you confidence that there is nothing in the compliance or something that stings you that you don't know about[?]   I mean I guess one of the ways to think about it I guess is there's probably – is there anything out there that can be as large as the situation that happened with [the Southwest Border Agreement] that can have that kind of an impact on price?"   In response, Defendant Ersek represented:

> The regulatory environment is challenging.  Obviously we are in very regulated market, but all our investments, about $100 million a year we invest in anti-money laundering and compliance, are really putting us as an industry standard. Being a market leader puts us in an industry standard, and we want to be a best-in-class and see that as a long-term as a competitive advantage. I think regulators are looking also at us, and we do have a duty to satisfy customer needs and we are working very hard on that.

361.    During this February 12, 2013 conference call, Defendants Ersek and Scheirman also continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the Southwest Border Agreement, rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements.

362.    The statements referenced in ¶¶ 360-61 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

363.    On February 14, 2013, 2012, at the Goldman Sachs Technology & Internet Conference, Defendant Ersek explained that the Company was well-positioned to build its digital platform because "we have the anti-money laundering system, we have everything there that we don't have to deal with so we are really building on our existing fundamentals and new channel on the send side called westernunion.com. That's the biggest advantage."   Ersek also continued

to describe the Company's efforts to "upgrade our compliance activities" as limited to the Southwest Border area and described these efforts as setting the "long term industry standard and a competitive advantage for us," rather than meeting minimum and basic legal requirements.

364.    The statements referenced in ¶ 363 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (vi) above.

365.    On February 22, 2013, the Company filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").

366.    In the 2012 10-K, the Company stated, in pertinent part:

> The Western Union ® brand is globally recognized and represents speed, reliability, trust and convenience.
>
> ***
>
> We believe the most significant competitive factors in Consumer-to-Consumer remittances relate to the overall consumer value proposition, including brand recognition, trust and reliability, distribution network and channel options, and consumer experience and price.
>
> ***
>
> Enhanced Regulatory Compliance
>
> We regularly review our compliance programs. In connection with that review, and in light of growing global regulatory complexity and heightened attention of and increased dialogue with governmental and regulatory authorities relating to our compliance activities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, and fraud and other illicit activity. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. Some of these changes have had, and we believe will continue to have, an adverse effect on our business, financial condition and results of operations.
>
> ***

114

*Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or their subagents to comply with those laws and regulations or their interpretation and increased costs or loss of business associated with compliance with those laws and regulations could have an adverse effect on our business, financial condition and results of operations. . . .*

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts are effective and comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

***

*We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.* These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer and payment service networks operate through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities.  In 2012, the Company spent over $100 million on its compliance and regulatory programs. . . .

***

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While *we believe that Western Union is compliant with its regulatory responsibilities*, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

***

115

> ***Our agents' or their subagents' failure to comply with federal and state laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.***
>
> Any determination that our agents or their subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or their subagents to comply with laws which also could have an adverse effect on our business, financial condition and results of operations. . . .

  (Emphasis added).

367.    In addition, in describing the "wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union," the Company specifically noted "an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity" and described particular requirements of the BSA.  The Company also noted that "[m]any states impose similar and, in some cases, more stringent requirements" and that "[t]hese requirements also apply to our agents."

368.    The 2012 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes.

369.    Western Union also noted in the 2012 10-K that "[o]ver the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money

116

laundering requirements and related consumer identification matters." The Company stated that "[t]hese agreements required us to make various payments and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law."

370.  The 2012 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

371.  The statements referenced in ¶¶ 366-69 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

372.  The written presentation that accompanied a March 20, 2013 Barclays Emerging Payments Forum discussion by Khalid Fellahi, SVP for the Company's digital business, described the Company's "Global AML/compliance engine & expertise" and "[r]isk mitigation, compliance" capabilities as key features that the Company already had that could be leveraged to expand the digital business.

373.  The statements referenced in ¶ 372 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

374.  On April 30, 2013, the Company held a conference call in connection with the release of its earnings for the first quarter of 2013. During this call, an analyst noted the fact that Ersek had mentioned a few times earlier in the call at a general level new compliance and regulatory actions in addition to the Southwest Border Agreement that the Company had not

disclosed previously and asked for more information about these activities.  Ersek responded by

explaining:

> It is no secret that the financial service[s] overall get more regulated and within that also we want to be best-in-class. We create this culture of compliance within our company. And we – so that's the environment we are in currently and we see that as a long-term competitive advantage.

Then, at Ersek's request, Scheirman followed-up by elaborating as follows:

> [A]s Hikmet said that we are committed to a strong culture of compliance and invest in compliance programs. And let me give you a flavor of maybe some things that have been ongoing not only in the first quarter, but prior quarters, too. We're doing things to really protect the customer and protect the business.  They might be things such as real-time risk assessment when the transaction happens at the point-of-sale, verification programs related to high principal transactions where we – whereby we call back the sender and make sure the transaction is appropriate. But, as Hikmet mentioned, we believe this will be a long-term competitive advantage for us.  Near term, there are some headwinds but it's the right investment to make in the business. We believe it'll be a competitive advantage and we continue to work towards that. . . .  ***But we will continue to comply with the letter and the spirit of the law and really see that as a competitive advantage long term.***  (Emphasis added).

Ersek then explained that the Company was working to adapt to the U.S. and global trend of

increasing regulations.   Scheirman added that the Company's efforts often went above and

beyond its technical legal requirements.   He represented that "***everything isn't necessar[ily]***

***black-and-white and a rule, but we work with regulators in countries around the world to try***

***to do the right thing for our business and for our customers***."  (Emphasis added).

375.   Later during this April 30, 2013 conference call, Defendant Scheirman explained

that "our goal is to comply with the letter and the spirit of the law, have best-in-class compliance

programs, and really protect our customers and protect our businesses."  Defendant Ersek added,

"I think the general financial service industry is getting more regulated and we are very focused

on that. I think we have a great compliance team in place and they are working hard. Generally, I see also being a market leader here as a competitive advantage."

376. The statements referenced in ¶¶ 374-75 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

377. On May 6, 2013, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the first quarter of 2013, which ended on March 31, 2013 (the "Q1 2013 10-Q").

378. The Q1 2013 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

379. The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

380. The statements referenced in ¶ 378 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

381. At a May 8, 2013 Jefferies Global Technology, Media and Telecom Conference, Defendant Ersek stated that the "regulatory environment" is "one of our biggest competenc[ies] here" as to the cross-border nature of the Company's business. The Jefferies analyst leading the discussion then picked up on these statements, as well as Defendants' consistent statements elsewhere that its compliance efforts are a "competitive advantage," and asked if the "worst is over" in terms of "compliance-related events." Ersek responded that "compliance culture is in our DNA[]. Meanwhile, I think, creating this culture of compliance is something that it's very

important" because of the life-changing benefits of remittances that customers receive through the Company.

382.    The statements referenced in ¶ 381 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

383.    At a May 16, 2013 JPMorgan Global Technology, Media and Telecom Conference, Defendant Scheirman stated that in the first quarter of the year, in "a few of the markets, we continued to enhance our compliance programs. And our goal is to be best-in-class with compliance. Live to the letter and the spirit of the law. And so, we're doing things around fraud prevention, real-time risk assessment at the point of sale, customer callbacks and high principal." Scheirman also stated that "the depth and extent of our compliance practices" allows the Company to succeed in the online market because "sometimes folks might underestimate" how important that is for cross-border money transfers "[b]ut we're very good at that."

384.    The statements referenced in ¶ 383 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

385.    At a June 13, 2013 William Blair & Company Growth Stock Conference, Defendant Scheirman stated:

> [W]e have a strong brand. Our brand resonates very well with our target customer. Again, it stands for speed, trust, convenience, reliability and value. . . . And we have robust compliance and regulatory capabilities. And any time you move money cross-border, you need to be very good at operations and very good at the compliance and the regulatory environment. So it's very complex and it's hard to do. And we've got those capabilities. . . .
>
> We very much can leverage our brand, our global operations and our compliance capabilities to [expand the online business]. . . .
>
> Western Union has strong foundational assets. A brand that is very much trusted by our customers around the globe and that trust is so important when you're

> dealing with financial services. . . .  And we talked about global operations and our regulatory and compliance capabilities. And any time you're moving money cross-border, in 200 countries, 16,000 corridors, 135 currencies, it is so important to have strong regulatory and compliance capabilities and operational abilities.

386.     Specifically addressing the regulatory environment, Scheirman stated at this June 13, 2013 William Blair conference that "the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth."

387.     The statements referenced in ¶¶ 385-86 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

388.     On July 30, 2013, the Company held a conference call in connection with the release of its earnings for the second quarter of 2013.  In response to a question about future compliance costs, Defendant Scheirman stated that compliance costs would likely increase as a result of the changing regulatory environment, rather than because of the Company's failure to meet current compliance requirements.  He stated that "that having a robust compliance program and a strong culture of compliance is very important to us. And so broadly as we think about the global landscape, the regulatory environment continues to move. So as I think about 2014 and 2015, right now I'd expect our compliance and regulatory costs to increase.   But what's important about that is that it protects the brand, it protects the customer, it protects our agents. And longer term we believe that's going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory."  Defendant Ersek then added that "I do see that as a competitive advantage. We have really the culture in our company. And the most importantly, it protects the consumer. . . .  We comply with all regulations world[wide] and try to be the best in class and leading our industry here."

389. Ersek subsequently stated on this July 30, 2013 earnings call, in response to a question about the Company's pricing, "[w]e, as Western Union, I believe deserve the premium pricing. Our brand is very valuable. Our compliance programs are very valuable. We are protecting the customers. The customers trust us." Toward the end of this call, Defendant Scheirman explained, in response to an analyst's question about a particular compliance practice, that "the important point is we very much have a culture of compliance and want to have best-in-class compliance programs, that's very important for our brand, protecting our customers, our agents and so forth."

390. The statements referenced in ¶¶ 388-89 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

391. On August 7, 2013, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the second quarter of 2013, which ended on June 30, 2013 (the "Q2 2013 10-Q").

392. The Q2 2013 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

393. The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

394. The statements referenced in ¶ 392 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

395.    On September 17, 2013, Western Union issued a press release announcing that it was hosting the 8th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in its hometown of Engelwood, Colorado on September 17-18.   The Company described this conference as "[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud who share best practices with some of Western Union's largest agents."   The Company's Chief Compliance Officer said in the press release that "[t]ogether with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud." Western Union also took this opportunity to advertise that it "invests millions each year to run compliance programs.   The company continues to increase its headcount of employees who are dedicated to compliance, fighting fraud and helping to protect and empower consumers around the globe.   This dedication expands to those who are on the frontlines at approximately 520,000 Agent locations around the globe."

396.    The statements referenced in ¶ 395 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

397.    On October 29, 2013, the Company reported its third quarter 2013 financial results.   A main topic on the Company's earnings conference call for the third quarter of 2013, held on that day was the Company's surprisingly high increase in compliance costs for 2014. Defendant Ersek stated:

> As you are aware, regulatory requirements and expectations around financial service companies are escalating around the world. Some banks have recently faced large fines, and some have announced billions of dollars of incremental investments in compliance areas. The environments continue to evolve. In the U.S., for example, we recently initiated agent procedures at our 50,000 agent locations to comply with the Dodd-Frank Remittance Transfer Rule. And I am

> pleased to report that the procedures were implemented in time for the October 28 deadline.  As we mentioned, earlier this year we have previously implemented new anti-money laundering and fraud prevention enhancements in countries such as Spain and UK.

Specifically addressing the Southwest Border Agreement, Ersek stated that "in the U.S., we are now working with our third monitor on the Southwest Border Agreement. As noted in an 8-K filed today, we have agreed to an additional short-term extension to this agreement to continue discussing amendments. We could not conclude discussions on a long-term expansion under the previous timeframe for reasons including the recent passing of Arizona's primary attorney on the matter."

398.    Defendant Ersek also stated on this October 29, 2013 call that "75% of our network [of agents] are banks and financial institutions," which "choose us because we have high standards on compliance."  He also stated that the Company's surprisingly high increase in compliance costs for the following year was "not specific to the Western Union."  Ersek stated that Western Union was "a market leader" setting the "industry standard."

399.    At the end of this October 29, 2013 conference all, an analyst stated that Defendants' comments earlier in the call "sound[ed] like what you guys are saying if you kind of roll up all this commentary is that, it's essentially going to cost you more than you previously thought to comply with regulations that you already knew about . . . as opposed to new regulations having just popped up in the last couple of months since the last earnings call."  After Defendant Ersek's equivocal response to this question, Michael Salop, the Company's Senior Vice President of Investor Relations, stated that "[a] lot of these things are not necessarily black and white or haven't been historically. So when we work with regulators around the world and around the states and you get clarification on what's needed and make agreement on what

programs you'll do, these things are kind of fluid. And so some of these are interpretations of older rules, some of these are new things, some of these are just clarifications with the regulators, some of them are own reviews, so there's a lot of different things going in here."

400.    The statements referenced in ¶¶ 397-99 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

401.    On November 4, 2013, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendant Ersek and Scheirman, announcing the Company's financial and operating results for the third quarter of 2013, which ended on September 30, 2013 (the "Q3 2013 10-Q").

402.    The Q3 2013 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

403.    The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Scheirman, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

404.    The statements referenced in ¶ 402 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

405.    On November 6, 2013, Western Union issues a press release announcing that it would be joining the Blue Campaign, an anti-human trafficking initiative spearheaded by the U.S. Department of Homeland Security.  This press release quoted Defendant Koch as stating that "[e]nding human trafficking is possible only if everyone steps in and plays a role.  We are committed to using the trust, reach and power of our brand along with our Agent network to

engage the public and arm them with awareness and the resources to spot the signs and report suspect activity."

406.    This November 6, 2013 press release also quoted the Acting Secretary of Homeland Security as being "grateful to have the participation of Western Union in this important effort, which will help save lives, protect innocent victims, and prevent this form of modern day slavery."  Lastly, this press release touted that "[i]n addition to proactively working with local and federal law enforcement agencies, Western Union and the Western Union Foundation, as a separate 501(c)(3) non-profit charity, have respectively worked and supported several U.S. global organizations to combat human trafficking."

407.    The statements referenced in ¶¶ 405-06 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

C.    **False and Misleading Statements in 2014**

408.    On Western Union's earnings conference call for the fourth quarter and full year of 2013, held on February 11, 2014, Defendant Ersek continued to represent that "we are very much focused on our compliance activities. We are the industry leader; we are focused on that; we are driving it."  He also stated that "the regulator[y] environment is very changing very fast, evolving and we are on – I believe as a industry leader, we are setting your best practices. We are driving it. We have the great Compliance Officer. He hired very great people. We do invest – our CIO, David Thompson, is very focused on the also on the technology, how we can involve – activate the technology to be more effective on the compliance making. The most focus is on the know your agent and know your customer. And so there is some diligence activities and I believe, as we gave – we were anticipating that in Q3."  Ersek later explained that the increased

126

compliance costs were "mainly also know your agent and know your customer activities. We have to do more questions on your customers, ask the customer, register the customers, doing diligence on the customers. But, also on the agent side with the frontline associates, we are doing more diligence, understanding who is serving our customers. They trust us and they want to trust also to the front-line associates. We do some diligences there. And I think that's the main investment will going to continue to happen in the future."

409.    The statements referenced in ¶ 408 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

410.    On February 24, 2014, the Company filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").

411.    In the 2013 10-K, the Company stated, in pertinent part:

> The Western Union ® brand is globally recognized and represents speed, reliability, trust and convenience.
>
> ***
>
> We believe the most significant competitive factors in Consumer-to-Consumer remittances relate to the overall consumer value proposition, including brand recognition, trust and reliability, consumer experience and price, and distribution network and channel options.
>
> ***
>
> Enhanced Regulatory Compliance
>
> The financial services industry, including money services businesses, continues to be subject to increasingly strict legal and regulatory requirements, and we regularly review our compliance programs. In connection with these reviews, and in light of growing and rapidly evolving regulatory complexity and heightened attention of, and increased dialogue with, governmental and regulatory authorities related to our compliance activities, we have made, and continue to make enhancements to our processes and systems designed to deter and prevent money laundering, terrorist financing, and fraud and other illicit activity, along with enhancements to improve consumer protection related to the Dodd- Frank Act and other matters. In coming periods we expect these enhancements will continue to

result in changes to certain of our business practices and increased costs. Some of these changes have had, and we believe will continue to have, an adverse effect on our business, financial condition and results of operations.

***

***Our business is subject to a wide range of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition and results of operations. . . .***

[The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While ***we believe our fraud prevention efforts are effective and comply with applicable law***, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

Further, any determination that our agents or their subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or their subagents to comply with laws which also could have an adverse effect on our business, financial condition and results of operations.

***

***We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements***. These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money

128

transfer and payment service networks operate through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities. In 2013, the Company spent over $150 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona. . . .

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

*If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected. . . .*

(Emphasis added.)

412.    In addition, in describing the "wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union," the Company specifically noted "an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity" and described particular requirements of the BSA.  The Company also noted that "[m]any states impose similar and, in some cases, more stringent requirements" and that "[t]hese requirements also apply to our agents and their subagents."

413.    The 2013 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes.

414.    Western Union also noted in the 2013 10-K that "[o]ver the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money laundering requirements and related consumer identification matters."  The Company stated that "[t]hese agreements required us to make various payments and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law."

415.    The 2013 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

416.    The statements referenced in ¶¶ 411-14 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

417.    In the Company's earnings conference call for the first quarter of 2014, held on May 1, 2014, Defendant Ersek stated as to the Company's ongoing compliance costs that "from today's points of view, I think, the team is doing a great job putting the teams right in place, that we have the compliance programs that it's competitive, even a competitive advantage.  And I can see that part of that competitive advantage already in some countries like Mexico. . . .   And it's

all over actually . . . and I think, we have a good program that we covered world with that investment. . . . We did put programs, compliance programs, agent programs into place [in Mexico]. They're working." Then, in response to an analyst's question about MDPA's investigation into Western Union's compliance efforts, which the Company disclosed in its 2013 10-K, Defendant Agrawal represented that "[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers. So, that's about all we can say right now and we're working through that."

418.    The statements referenced in ¶ 417 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

419.    On May 1, 2014, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2013, which ended on March 31, 2014 (the "Q1 2014 10-Q").

420.    The Q1 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

421.    The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

422.    The statements referenced in ¶ 420 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

423. At the Jefferies Global Technology, Media & Telecom Conference on May 7, 2014, Defendant Ersek stated that the Western Union's recent substantial compliance costs were now "a competitive advantage . . . [because] law enforcement are really looking up to us [and] saying that, hey, it will be great as the leader, you are leading the market and be [sic] the best practice."

424. The statements referenced in ¶ 423 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (v)-(vii) above.

425. At a June 11, 2014 William Blair Growth Stock Conference, Defendant Agrawal stated that "[w]e also have compliance and regularity capabilities that are strong and continue to get even better in this increasingly complex global environment." Toward the end of his prepared remarks, he then stated that "in summary, we have very strong foundational assets in place. Our global brand, our global operational and compliance capabilities and our presence in 200 countries and territories around the world gives us a strong position from which to operate."

426. A June 11, 2014 presentation by Defendant Agrawal stated that one of the five reasons that Western Union was "well positioned" to strengthen its consumer money transfer business was because of its "[c]ompliance and regulatory capabilities."

427. The statements referenced in ¶¶ 425-26 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

428. On July 31, 2014, the Company filed its quarterly Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2013, which ended on June 30, 2014 (the "Q2 2014 10-Q").

429. The Q2 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

430. The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

431. The statements referenced in ¶ 429 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

432. At a September 11, 2014 Deutsche Bank dbAccess Technology Conference, Defendant Agrawal stated:

> We believe that compliance can be a competitive advantage for us. It already is a competitive advantage, and I believe it can be a bigger competitive advantage for us as we operate because it's very difficult for most other organizations to spend at the level that we are, and we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time. . . .

> [W]e've been making a tremendous amount of progress [with complying with the amended Southwest Border Agreement]. The state has assigned a monitor to be able to monitor the activities and to assess progress around our progress in making these changes. And we've been making great progress.

In response to a question about competition from other companies, including Apple's announcement that it was moving into the payments business, Defendant Agrawal promoted Western Union's compliance capabilities as giving it an advantage over other companies:

> And so, I think, we're really well-positioned . . . . And it's about the global compliance capability that we have, that's not easy to replicate, the global operational capabilities. So we have a lot of advantages that will keep us well-positioned I believe. . . . So I really believe that we are extremely well positioned. Nobody else has the global compliance capabilities that we have, the global

operational capabilities. We operate in every country of the world and that's not an easy infrastructure to replicate. And so that's why I feel good about where we are.

433.   The statements referenced in ¶ 432 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (v)-(vii) above.

434.   In the conference call for earnings from the third quarter of 2014, held on October 30, 2014, Defendant Agrawal stated that "[w]e've been able to accomplish our key objectives on the compliance side, and we've also done it more efficiently."   In addition, Defendant Ersek stated that the Company had an advantage over smaller competitors who were "having more trouble to compete in the market because they can't comply with the anti-money laundering requirements."   Defendant Ersek then stated that although the Company did not give guidance for the following year, he was "excited about compliance investments, and that gives us a long-term competitive advantage and that helps us."

435.   The statements referenced in ¶ 434 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (vi) above.

436.   On September 17, 2014, Western Union issued a press release announcing its 9th Annual Consumer Protection Compliance Conference.  The Company described this conference as "[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud and human trafficking to share best practices with some of Western Union's largest Agents."   Defendant Ersek delivered a keynote address at this conference "emphasizing the importance of compliance."   The Company's Chief Compliance Officer said in the press release that "Western Union is committed to helping protect its

customers against fraud and other financial crimes.  It's the right thing to do for our customers and for our business."

437.    The statements referenced in ¶ 436 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

438.    On October 30, 2014, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the third quarter of 2013, which ended on September 30, 2014 (the "Q3 2014 10-Q").

439.    The Q3 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

440.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

441.    The statements referenced in ¶ 439 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

D.    **False and Misleading Statements in 2015**

442.    On January 21, 2015, Western Union hosted the European Business Forum and Compliance Conference in Brussels for the second time.  As was publicly reported, including by Western Union and major news publications, over 200 financial industry and regulatory experts attended this conference to discuss "how to enable innovation in the payments industry to better meet consumer and business financial service needs in Europe, while meeting regulatory compliance."  The Company stated that this conference "reflects the company's commitment as a

leader in the payments industry to ensure customer needs are understood, while meeting regulatory compliance."  The forum was "followed by a compliance conference attended by Western Union agents and partners from across Europe to focus on best practice in anti-money laundering measures and fraud protection."  Ersek stated in connection with this conference that "[i]t's vital that consumers and businesses are protected when using financial services, especially payments and remittances, and that's why Western Union is committed to regulation to prevent financial crime. To meet this commitment, we continue to focus on our compliance efforts as a priority for our business."

443.    The statements referenced in ¶ 442 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

444.    In its presentation from its February 10, 2015 earnings call for the fourth quarter and fiscal year 2014, the Defendant Ersek represented that one of Western Union's four "key results" that it delivered in 2014 was "[e]nhanced global compliance programs."

445.    The statements referenced in ¶ 444 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

446.    On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").

447.    In the 2014 10-K, the Company stated, in pertinent part:

The Western Union ® brand is globally recognized and represents speed, reliability, trust and convenience.
                                        ***
We believe the most significant competitive factors in Consumer-to-Consumer remittances relate to the overall consumer value proposition, including brand

recognition, trust, reliability, consumer experience, price, speed of delivery, distribution network and channel options.

***

Enhanced Regulatory Compliance

The financial services industry, including money services businesses, continues to be subject to increasingly strict legal and regulatory requirements, and we regularly review our compliance programs. In connection with these reviews, and in light of growing and rapidly evolving regulatory complexity and heightened attention of, and increased dialogue with, governmental and regulatory authorities related to our compliance activities, we have made, and continue to make enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, and fraud and other illicit activity, along with enhancements to improve consumer protection related to the Dodd-Frank Wall Street Reform and Consumer Protection Act and similar regulations outside the United States, and other matters. In coming periods we expect these enhancements will continue to result in changes to certain of our business practices and increased costs. Some of these changes have had, and we believe will continue to have, an adverse effect on our business, financial condition and results of operations.

***

***Our business is subject to a wide range and increasing number of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition and results of operations. . . .***

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While ***we believe our fraud prevention efforts comply with applicable law***, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

137

Further, any determination that our agents or their subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or their subagents to comply with laws which also could have an adverse effect on our business, financial condition and results of operations.

***

Our business is subject to a wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union. These include an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity. These also include laws and regulations regarding: financial services, consumer disclosure and consumer protection, currency controls, money transfer and payment instrument licensing, payment services, credit and debit cards, electronic payments, foreign exchange hedging services and the sale of spot, forward and option currency contracts, unclaimed property, the regulation of competition, consumer privacy, data protection and information security. Failure by Western Union, our agents, or their subagents (agents and subagents are third parties, over whom Western Union has limited legal and practical control) to comply with any of these requirements or their interpretation could result in the suspension or revocation of a license or registration required to provide money transfer services and/or payment services or foreign exchange products, the limitation, suspension or termination of services, loss of consumer confidence, private class action litigation, the seizure of our assets, and/or the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services.

***We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.*** As of December 31, 2014, these programs included approximately 1,900 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer and payment service networks operate through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities. In 2014 , the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona. . . .

138

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While *we believe that Western Union is compliant with its regulatory responsibilities*, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

*If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected. . . .*

(Emphasis added.)

448.    In addition, in describing the "wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union," the Company specifically noted "an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity" and described particular requirements of the BSA.  The Company also noted that "[m]any states impose similar and, in some cases, more stringent requirements" and that "[t]hese requirements also apply to our agents and their subagents."

449.    The 2014 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes.

139

450.    The 2014 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

451.    The statements referenced in ¶¶ 447-49 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

452.    On April 30, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2015, which ended on March 31, 2015 (the "Q1 2015 10-Q").

453.    The Q1 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

454.    The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

455.    The statements referenced in ¶ 453 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

456.    At a May 19, 2015 JPMorgan Global Technology, Media and Telecom Conference, Defendant Ersek stated that even though the Company had to lower prices in Mexico, "overall, I will say that our brand, our locations, our compliance programs, our trust does deserve a premium and the customers pay for that. So, they are happy with that."  Ersek also stated that "our investment in the technology over the last three years, and our investment in

compliance, . . . it's good to invest in the compliance, it's a competitive advantage. Being regulated in 200 countries, it's a tough environment, it's good. We are investing there, it's a competitive advantage. We know how to do that, and that is also kind of a barrier for many to come and to operate in that corridor. . . . Being an industry leader, we are doing the first attempt, and you are always setting the standards, but long-term, it will be done."

457. Addressing consumer fraud in particular, Ersek represented at this May 19, 2015 conference that "[o]n the fraud side, I believe that we have programs that we know who is sending money . . . and whom we are paying out the money. We have put investments on the fraud programs with our compliance programs that paid back. We have people calling on a certain amount calling – make call backs and saying that are you sure it's that your grandfather you want to send money? Are you sure you did check that twice? And it's sometimes a convincing job, but it works pretty well. We made a huge advancement there and I think I am quite satisfied, or you are never there, but its direction is right what we are doing with the fraud programs."

458. The statements referenced in ¶¶ 456-57 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (vi) above.

459. At a June 9, 2015 William Blair Growth Stock Conference, Defendant Agrawal stated:

> Our cross-border platform is really what sits at the center of our global money transfer business and I really believe that's unrivalled in its capabilities . . . . Our strong regulatory and compliance capabilities: we've been investing in this area for quite some time and we continue to strengthen our capabilities here, and we believe it's going to be a long-term competitive advantage for us in this global and complex environment that we're operating in. . . .

So the significant investment we've made in the compliance area is helping us stand apart from the rest of the market. And I believe that will be more and more the case. . . .

And nobody really has the great technology and compliance engine in the middle that I talked about.  That's very, very difficult to replicate for anybody. Very few players in the market have that kind of capability.

460.     The statements referenced in ¶ 459 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) and (v)-(vii) above.

461.     On July 30, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the second quarter of 2015, which ended on June 30, 2015 (the "Q2 2015 10-Q").

462.     The Q2 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

463.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

464.     The statements referenced in ¶ 462 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

465.     On the earnings call for the third quarter of 2015, held on October 29, 2015, Defendant Ersek stated:

> We do see in some markets that competitors are finding it difficult to operate in the market because the regulatory environment is quite – asking a lot of questions and a lot of demands for them. And as you recall, we invested – started to invest about three years ago heavily into compliance. And obviously, we do see that pay back. And this year, investments will be about – it's currently running about 3.7% of our revenue.

But it's kind of a competency now for us, running the transaction through our compliance programs in a way that's like an engine makes us definitely in way – a big competitive advantage. It means also that this regulatory environment will be in 200 countries. The compliance regulatory challenges won't be less in the future, that will continue. And we are committed to be in 200 countries where we operate and comply with the regulators. And it means also that we will be there, and that could be long-term a competitive advantage.

466.    The statements referenced in ¶ 465 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(vii) above.

467.    On October 29, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2015, which ended on September 30, 2015 (the "Q3 2015 10-Q").

468.    The Q3 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above.

469.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

470.    The statements referenced in ¶ 468 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

E.    **False and Misleading Statements in 2016**

471.    On the earnings conference call for the fourth quarter and fiscal year 2015, held on February 9, 2016, Defendant Ersek stated that Western Union's money transfer system "is unique" and its success "is that it works in 200 countries, it can pay out in 121 currencies, it can adapt to regulatory systems of 200 countries and make anti-money laundering, and process 22

transactions . . . per second." He later explained that "most of the agents are choosing the exclusivity because they know they have a quite stable partner, financially stable, good, anti-money laundering system, good settlement system, long run capability, great brand and they can drop money in 200 countries immediately."

472. The statements referenced in ¶ 471 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(iii) above.

473. On February 19, 2016, the Company filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").

474. In the 2015 10-K, the Company stated, in pertinent part:

> The Western Union ® brand is globally recognized and represents speed, reliability, trust and convenience.
>
> ***
>
> We believe the most significant competitive factors in Consumer-to-Consumer remittances relate to the overall consumer value proposition, including brand recognition, trust, reliability, consumer experience, price, speed of delivery, distribution network, variety of payment methods, and channel options.
>
> ***
>
> Enhanced Regulatory Compliance
>
> The financial services industry, including money services businesses, continues to be subject to increasingly strict legal and regulatory requirements, and we regularly review our compliance programs. In connection with these reviews, and in light of growing and rapidly evolving regulatory complexity and heightened attention of, and increased dialogue with, governmental and regulatory authorities related to our compliance activities, we have made, and continue to make enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, and fraud and other illicit activity, along with enhancements to improve consumer protection related to the Dodd-Frank Wall Street Reform and Consumer Protection Act and similar regulations outside the United States, and other matters. In coming periods we expect these enhancements will continue to result in changes to certain of our business practices and increased costs. Some of these changes have had, and we believe

will continue to have, an adverse effect on our business, financial condition and results of operations.

\*\*\*

***Our business is subject to a wide range and increasing number of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to protect consumers, or detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition, results of operations, and cash flows. . . .***

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While we believe our fraud prevention efforts comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition, results of operations, and cash flows.

Further, any determination that our agents or their subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or their subagents to comply with laws which also could have an adverse effect on our business, financial condition, results of operations, and cash flows.

\*\*\*

***We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.*** As of December 31, 2015, these programs included approximately 2,200 dedicated compliance personnel, training and monitoring programs, suspicious

activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer and payment service networks operate through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities. In 2015 , we spent approximately $200 million on our compliance and regulatory programs. . . .

\*\*\*

These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities in all material respects, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

*If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition, results of operations, and cash flows would be adversely affected. . . .*

(Emphasis added.)

475.     In addition, in describing the "wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union," the Company specifically noted "an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity" and described particular requirements of the BSA.   The Company also noted that "[m]any other countries and states impose similar and, in some cases, more stringent requirements" and that "[t]hese requirements also apply to our agents and their subagents."

146

476.    The 2015 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators.  Although the 2015 10-K disclosed that MDPA "indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012," the Company continued to claim that all of these investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes.

477.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

478.    The statements referenced in ¶¶ 474-76 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

479.    At a March 10, 2016 Investor Day conference, Defendant Ersek stated that "I think we are very good in compliance."  He explained that as part of its compliance efforts, Western Union "ask[s] some questions when the customer wants to make a transaction. And we are very proud of that because I only want to move good money. I don't want to move bad money. And the good money should drive my shareholder value and that's why we are investing and continue to invest in compliance."

480.    Also at this March 10, 2016 Investor Day Conference, David Thompson, Western Union's Chief Technology Officer, stated:

> [W]e now have a state-of-the-art compliance platform both based on technology and people or compliance professionals. . . .  And we built this technology to

prevent fraud in our network, protect our customers. . . . And this is a very powerful capability for us in monitoring the suspicious activity and monitoring aggregation rules for our customers.

These rules also prevent and help us detect human trafficking, terrorist financing, child exploitation, and other activities that may not be allowed, like Internet gambling and associated activities. These rules are also in place to allow us to screen against government sanctions lists, and politically exposed lists provided by various governments. Now these are our proprietary tools that we've created that are a long-term competitive advantage for Western Union, and are very powerful capabilities that we provide to our partners and our customers.

So, in summary, at Western Union, we've created new technologies and platforms and processes to serve our customers. And we're now really at a state where we've transformed our capabilities. . . . And it's exciting to be a part of this transformation at Western Union and deliver technologies that move money for better.

481. The statements referenced in ¶¶ 479-80 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

482. On May 3, 2016, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2016, which ended on March 31, 2016 (the "Q1 2016 10-Q").

483. In addition to containing substantially the same representations described in the Company's Q2 2012 10-Q, referenced in ¶¶ 341-44 above, the Q1 2016 10-Q disclosed that MDPA "indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012." The Company, however, continued to claim that all of its ongoing government investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes.

484.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

485.    The statements referenced in ¶ 483 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

486.    At a May 25, 2016 J.P. Morgan Global Technology Media and Telecom Conference, Defendant Ersek stated:

> We came forward and made a big announcement that we're going to upgrade our, significantly we were always very focused on compliance, but significantly upgrade our compliance environment because the world was changing. . . .
>
> Western Union is, especially with the environment, helping the law enforcement governments to move good money. That's why we invested in the compliance.  I think we don't want that money because the good money supports people, supports governments, supports law enforcement, helps law enforcement in a way that run that in a very efficient way. Money will move anyway, but it should move in a regulated way.

487.    The statements referenced in ¶ 486 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

488.    On August 3, 2016, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the second quarter of 2016, which ended on June 30, 2016 (the "Q2 2016 10-Q").

489.    In addition to containing substantially the same representations described in the Company's Q1 2016 10-Q, referenced in ¶¶ 482-83 above, the Q2 2016 10-Q disclosed that MDPA "indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions

sent from the United States to various countries from at least 2008 to 2012," and that the "FTC staff has advised the Company that it has been directed to request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company."   The Company, however, continued to claim that all of these investigations—including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes.   The Company also contested the FTC's position by taking the strong position that "[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously."

490.   The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

491.   The statements referenced in ¶ 489 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

492.   On November 1, 2016, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2016, which ended on September 30, 2016 (the "Q3 2016 10-Q").

493.   In addition to containing substantially the same representations described in the Company's Q2 2016 10-Q, referenced in ¶¶ 488-89 above, the Q3 2016 10-Q disclosed that the FTC advised the Company "of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers" and

that the FTC staff "believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004." The Company continued, however, to claim that all of these investigations—including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by declaring that "[t]he Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof" and that "[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously."

494. The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

495. The statements referenced in ¶ 493 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.

## VI.    THE TRUTH BEGINS TO EMERGE

496. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

497. Throughout the Class Period, the price of the Western Union's securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

498.    The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses.

499.    Western Union's failure to disclose the fraudulent activity artificially inflated the value of Western Union's shares and/or maintained those shares at an artificially high level, and the revelation and/or materialization of this information and/or the risks concealed by Western Union's fraud resulted in substantial losses to the Class.

500.    On October 29, 2013, the Company reported its third quarter 2013 financial results and downgraded its fiscal 2014 financial guidance. The Company said that it did not expect any operating income growth in fiscal 2014 because compliance costs would rise to up to 4.5% of revenue in fiscal 2014. Specifically, Western Union stated, in pertinent part, as follows.

> While the Company has increased its investments in compliance considerably in recent years, significant additional investment in 2014 is now anticipated in light of the current environment and our internal reviews of the increasingly complex and demanding global regulatory requirements. . . .

> Western Union expects its compliance related expenses to increase from approximately 2.5% of revenue in 2013 to a range of approximately 3.5% to 4.5% of revenue in 2014, based on preliminary reviews of the programs. Although the Company is in the early stages of its 2014 budgeting process, it still expects revenue growth in 2014, but no longer expects growth in operating profit due to both these incremental costs as well as potential business impact from new compliance procedures.

501.    In addition, Western Union reported operating income of $869 million in the first nine months of 2013, down 17% from the same period the prior year.  Compared with the third quarter of 2012, operating profit for the third quarter of 20 13 was down 19%.

502.    On these partial disclosures, the price of the Western Union stock declined, falling $2.39 per share—more than 12%—on October 30, 2013, to close at $16.85 on unusually high trading volume.

503.    The reason for the market's negative reaction was because of the Company's substantial increase in compliance costs, and corresponding decrease in projected profits that resulted directly from those costs.  As Bloomberg reported on October 30, "Western Union Plunges 19% as Compliance Costs Rise."   Indeed, Moody's Investors Service downgraded the rating of Western Union's senior unsecured debt on November 18, 2013 because of the Company's "unexpected increase in compliance related costs" and the Company's projection that it would not have any operating profit in 2014 as a result of those compliance costs.

504.    These increased compliance costs were a direct result of the Company's compliance failures discussed above.  Although the Company did not disclose it at this time, it took these steps as a result of the ongoing government compliance failures and investigations that resulted in the Joint Settlement.

505.    The Company's stock price, however, remained artificially inflated at this time— and for the remainder of the Class Period—because the Company continued to misrepresent the quality of its compliance efforts and the reasons for these increased compliance costs.  For example, the Company failed to disclose its knowing and admittedly willful failure to prevent money laundering and consumer fraud, as described above.

506.    On November 14, 2013, Western Union announced that Defendant Scheirman was resigning from the Company, effective February 28, 2013.

507.    The next day, on November 15, 2013, Western Union's stock fell 75 cents per share, or 4.3%, to close at $16.70 per share on unusually high trading volume.

508.    This drop in stock price was a result of Defendant Scheirman's resignation.  As the Associated Press reported after the market closed on November 14, 2013, "[t]he company did not say why Scheirman is departing, but in a press release Scheirman said it was the right time for a change."  But Bloomberg reported on November 15, 2013 that a Jefferies analyst believed that the change in CFO might "lower the bar" for the Company's 2014 financial results "given uncertainty about when a permanent CFO will be named."  This Jefferies analyst also noted the negative impact of compliance costs on the Company's results.

509.    In the Company's 10-K for 2013, which it filed on February 24, 2013, the Company disclosed that on February 21, 2014, the FTC sent the Company a new civil investigative demand, requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004.  The Company also disclosed in this annual filing that MDPA served it with a grand jury subpoena seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008, and that the Company that it was the subject of this investigation.  The Company also disclosed that after that initial subpoena, the Company then received additional subpoenas as part of this investigation, seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies.

510.     Multiple media outlets, including Reuters and Bloomberg, noted these government enforcement activities that the Company disclosed for the first time on February 24, 2014.

511.     As Reuters wrote on February 25, 2014, Western Union "is being probed by the [FTC] and a U.S. district court [sic] over fraud-induced money transfers, the company said in a regulatory filing."   In addition, as Reuters noted in this February 25, 2014 article, the Company "reported a 27 percent drop in fourth-quarter profit, largely due [to] higher costs linked to tightened regulations to prevent money laundering."

512.     On February 25, 2014, based on this news disclosed the prior day, Western Union's stock price fell $0.23—or approximately 1.41%—to close at $16.12 per share.

513.     On July 31, 2014, the Company reported its second quarter 2014 financial results. The Company reported that its net income declined by two percent as compared to the second quarter of the prior year.   The main factor that the Company's press release mentioned in discussing its operating profit margins was that "Compliance related expenses are expected to total approximately 3.5% to 4.0% of revenue in 2014."

514.     In response to this earnings release, analysts discussed the Company's continued compliance costs.   As Evercore wrote in the subheading for a report published on August 1, 2014, titled "Substantial Challenges Remain," "[r]ising compliance costs" were "likely to persist."   This report went on to note that "we see persistent margin pressure from the continued likely long-term increase in compliance costs as government authorities increase pressure on money transfer providers to eliminate illegal money flows."

515.     Similarly, in an August 1, 2014 report, SunTrust Robinson Humphrey wrote that "our Street-low revenue estimates are materially unchanged as Western Union continues facing adverse compliance-induced mix shifts and likely lower long-term pricing."  SunTrust went on to note that the main challenges affecting the Company included "structurally higher compliance spending . . . *we believe the deck remains stacked against Western Union given its premium prices, high-cost agent network and compliance challenges*."   In summarizing its investment thesis, SunTrust concluded that the Company faced limited upside because "greater regulatory scrutiny and higher compliance costs" would make it very difficult to achieve financial growth and could also lead to "higher [agent] commissions, adversely affecting gross margin."

516.     Western Union's pricing challenges that SunTrust discussed were also a result of its compliance failures.  As explained above, Defendants stated during the Class Period that the Company would maintain its pricing advantages in the face of competition from other companies because Western Union's "compliance programs" were "really competitive strengths for us." (*See* ¶¶ 311 and 389 above).  Because the Company was now forced to substantially increase its compliance expenditures because of its severely deficient compliance program, it could no longer justify its premium pricing.

517.     In addition, in the Company's 10-Q for this quarter, also filed on July 31, 2014, the Company disclosed the investigations of two different U.S. Attorneys Offices (EDPA and SDFL) into the Company's and its agents' AML practices, one of which the Company stated it was a target of, as discussed above.

518.     On this news, the Company's stock price decreased $0.69 per share—or 3.95%—on August 1, 2014, to close at $16.78 per share on unusually high trading volume.

519.   On May 3, 2016, Western Union reported disappointing results for the first quarter of 2016 that were again negatively affected by surprisingly high compliance costs.  The Company reported that 2016 EPS fell below analysts' expectations and that revenues and operating margins had also declined for the quarter after the Company continued to spend substantial sums on compliance. A Compass Point research analyst commented that "[b]ears say . . . compliance costs will permanently impair margins."

520.   These disclosures continued to reveal the negative impact that the Company's deficient compliance practices and accompanying government investigations had on the Company's performance.  On these partial disclosures, shares of Western Union fell $0.82 per share—or 4.14%—on May 4, 2016, and $0.99 per share (or nearly 5%) over two trading days, to close at $18.84 per share on May 5, 2016 on unusually high trading volume.

521.   On January 19, 2017, DOJ, FTC, and FinCEN announced the Joint Settlement. As DOJ announced, "Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586 Million in Settlement with Justice Department and Federal Trade Commission."   The U.S. Attorney for the Southern District of Florida stated that Western Union's actions were the result of "a flawed corporate culture" that allowed criminal conduct to take place.  And as the FTC announced, it found that the Company "knew that massive fraud was afoot and had the ability to address it, but chose to look the other way. . . . [E]ven in the face of obvious evidence that many of its own agents were complicit, Western Union ignored it while pocketing massive cash."  These announcements were the first time that the public became aware of the extent and specific nature of the deficiencies in Western Union's compliance efforts, including that Western Union knew that its agents were complicit in AML violations, consumer

fraud schemes, and other illegal activity.  These announcements also informed the public of the many other instances of Western Union's compliance failures, as well as of certain government investigations, before and during the Class Period that had not been disclosed previously.  For example, it was first disclosed on January 19, 2017 that Western Union admitted that it committed criminal violations related to these practices, including willfully failing to maintain an effective AML program and aiding and abetting wire fraud.  These disclosures also announced that Western Union agreed to pay $586 million to compensate victims of fraud, and acknowledged that its own reports, among other information, showed that the actual amount of money list by fraud victims as a result of its violations was actually far higher.

522.    Also on January 19, 2017, Senator Susan Collins, Chairman of the United States Senate's Special Committee on Aging, described Western Union's $586 million settlement with the government as "an encouraging development for America's seniors and individuals across the country who have been negatively impacted by Western Union's longstanding failure to protect consumers with proper anti-money laundering and wire fraud programs."[12]

523.    On this news, Western Union's share price fell $0.72—or 3.3%—on unusually high trading volume, to close at $21.13 on January 19, 2017.  Western Union's share price fell another $0.15 the following day, resulting in an $0.87—or 3.9%—decline over two trading days, to close at $20.98 on January 20, 2017.

---

[12] U.S. Senate, Special Committee on Aging, *Aging Committee Chair Collins and Ranking Member Casey Applaud FTC and Justice Department Announcement of Settlement with Western Union on Consumer Fraud Charges* (Jan. 19, 2017), available at https://www.aging.senate.gov/press-releases/aging-committee-chair-collins-and-ranking-member-casey-applaud-ftc-and-justice-department-announcement-of-settlement-with-western-union-on-consumer-fraud-charges.

524.    As new information was released and the market continued to digest the severity of Western Union's misconduct and the impact it would have on the Company, the Company's stock price declined even further in the days following this January 19, 2017 announcement.

525.    As Bloomberg reported on January 26, 2017, "[n]ews sentiment about Western Union Co. deteriorated to most negative from negative in the past day" based on an evaluation of news stories being published about the Company.

526.    On January 31, 2017, it was announced that 49 states and the District of Columbia had settled with the Company for an additional $5 million to resolve their investigations into how fraudsters used Western Union's money transfer services to defraud customers.  The Attorney General of Colorado announced on this day that "[f]or too long Western Union has not done enough to prevent these frauds, and in some cases Western Union employees have actually been in on the scam. I am glad that this settlement will help to put in place protections for consumers."

527.    Based on the market's reaction to this information, the price of Western Union shares fell to close at $19.54 per share on February 1, 2017.  This amounted to a total decline of $2.31 per share—or 10.57%—from the closing price of the Company's stock on January 18, 2017.

528.    On February 9, 2017, Western Union announced its financial results for the fourth quarter and full fiscal year of 2016.  The Company disclosed the full financial impact of the Joint Settlement with federal regulators and the settlement with the state attorneys general, including the cost of the required independent compliance auditor for the following three years.  The Company's EPS was $0.51—$1.11 lower than the prior year—as a result of the settlement

charge.  The Company's operating profit margin and cash flow that it projected for 2017 were also negatively impacted by the compliance expenses and the settlement charge, respectively.

529.    Compass Point issued a sell rating based on the Company's announcement, noting "Structural Margin Challenges Confirmed, Expect Pricing Compression Next; Sell."  The first factor that Compass Point cited was "(1) Ongoing regulatory/compliance costs will have a permanent negative impact on WU's margins, driving estimates/expectations lower near-term and on an ongoing basis."

530.    Similarly, SunTrust Robinson Humphrey explained based on this announcement that "rising service and compliance costs - and resulting margin pressure - likely cap the shares' valuation."  SunTrust also noted that although the settlement with federal and state regulators ended those particular inquiries, it "could create a more protracted regulatory construct" and "greater regulatory scrutiny," thereby "call[ing] into question the efficacy of Western Union's [past] compliance spend," leading to "ongoing compliance costs dig[ging] at margins."  This analyst also noted that "lower compliance-related volume could pressure the company to pay agents higher commissions, adversely affecting gross margin."

531.    Based on the Company's February 9, 2017 announcement, the Company's stock price fell $0.64 per share—or 3.14%—on February 10, 2017, to close at $19.74 on unusually high trading volume.

532.    The Company's stock price fell another $0.21 per share on February 13, 2017 (the following trading day), to close at $19.53 on February 13, for a total decline of 4.17% from the closing price on February 9, 2017.

533. On May 2, 2017, Western Union announced its financial results for the first quarter of 2017. The Company disclosed that its compliance expense was 3.7% of revenue for this first quarter and was expected to be in the higher end of the 3.5% to 4% range for the full year.

534. In addition, the Company disclosed in its 10-Q for the first quarter of 2017, which the Company filed that same day, that on March 31, 2017, the Company received a request for the production of documents from the New York Department of Financial Services related to two former agents that were identified in the deferred prosecution agreement with DOJ that was part of the Joint Settlement.

535. On this news, the Company's stock price fell $0.87—or 4.32%—to close at $19.26 on May 3, 2017, on unusually high trading volume.

536. In assessing these results, Susquehanna Financial Group noted that "compliance costs rise" and "higher compliance cost pressures margin in FY17."

537. In addition, Compass Point and SunTrust Robinson Humphrey reiterated their conclusions described in ¶ 530 above because the Company continued to face challenges resulting from its ongoing substantial compliance and regulatory costs.

538. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

539. Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described

in ¶ 303 above for the reasons described in the Substantive Allegations section of this amended complaint.

540.    The Individual Defendants' actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which certified that the SEC filings "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  Before vouching for the accuracy of the statements made in Western Union's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of Western Union described therein.

541.    Defendants' scienter is further established because Western Union admitted to DOJ in the Joint Settlement that it willfully failed to implement an effective AML program in violation of the BSA and that it aided and abetted wire fraud in violation of the federal wire fraud, both criminal violations.

542.    Western Union further admitted in the Joint Settlement many underlying facts— including those contained in the Company's own internal records, analyses, and reports— showing that that it "knew that certain of its Agent locations were complicit in the scheme to defraud using Western Union's Money Transfer System," that it knew that certain agents "were potentially structuring or aiding consumers in structuring transactions in violation of the BSA," and that it otherwise knew the Company was willfully violating the BSA and that it was aiding and abetting others in violating the criminal wire fraud statute.

543.    Defendants knowledge or reckless disregard of the deficiencies in Western Union's compliance program that contradicted their public statements is further supported by their knowledge, as disclosed in the Company's periodic SEC filings throughout the Class Period, of the several federal and state government investigations, including by EDPA, MDPA, CDCA, SDFL, the FTC, and state attorneys general, that ultimately resulted in the Joint Settlement and the settlement with the state attorneys general that were announced in January 2017.  As part of these investigations, Western Union produced many documents and witnesses to these regulatory authorities and claimed to have cooperated in these investigations.  These investigations provided the basis for DOJ's and FTC's findings that Western Union's own internal reports, analyses and communications showed that the Company failed to maintain an effective compliance program, that it knew its agents were complicit in money laundering and consumer fraud, and that it failed to discipline its agents for those violations.  These investigations also found that agents' rampant involvement in money laundering and consumer fraud were discussed by senior managers within the Company.  Defendants thus had knowledge of the Company's compliance violations based on both a) the mass of underlying information showing those deficiencies as they occurred (including the Company's own internal reports, analyses, and communications) and b) that information having been reviewed in the course of the Company's producing it during the various lengthy government investigations that led to the Joint Settlement.

544.    In addition, Defendants knew of or recklessly disregarded the Company's compliance deficiencies based on the many government enforcement actions, investigations, and communications that took place during and before the Class Period that were separate from those

that resulted in the Joint Settlement.  These investigations identified many severe compliance deficiencies that the Company promised to, but did not, cure.

545.    Defendants scienter is further supported by the FTC's conclusion that Western Union was aware of the facts that formed the basis of the FTC's conclusions that resulted in the Joint Settlement.  In particular, the FTC determined, based on its review of information through October 2015, that Western Union was "aware that its system has regularly been used for fraud and that it has an identifiable subset of agents and subagents with high levels of fraud complaints. It also has been aware that many of its agent locations with high-fraud payouts have: (1) violated Western Union's anti-fraud and/or AML policies and procedures; (2) engaged in suspicious activities; and/or (3) been complicit, or likely complicit, in the frauds. Western Union's awareness of the consumer fraud problem is demonstrated by, among other things, [a] the hundreds of thousands of complaints it has received from consumers, [b] its own internal records and reports, [c] and years of warnings from government agencies throughout the world."

546.    The FTC identified many categories of internal records and reports that highlighted Western Union's severe compliance deficiencies.  Western Union "conducted reviews and investigations, and generated indices and reports, related to consumer fraud involving its money transfer system. Information contained in Western Union's internal reports, communications, and other records demonstrates that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns."

547.    The Individual Defendants also knew of or recklessly disregarded the Company's compliance failures because these individuals specifically learned of the Company's compliance

deficiencies during Board and Committee meetings that they attended where those issues were discussed.  As noted above, Defendant Ersek attended all of these meetings discussed in this amended complaint and the other Individual Defendants attended these meetings as described above.

548.   Defendants' scienter is further confirmed by the statements of confidential witnesses.  CW3 stated that there was no way that Defendants Ersek, Scheirman, and Agrawal were not informed about the on-going investigations that spanned over seven years and resulted in the Joint Settlement because the Company made upper managers available to investigators and spent years cooperating with the investigation.

549.   In addition, CW4 attested to Defendant Ersek's hand-on management style and his regular involvement in compliance-related issues, including the status of the Southwest Border Agreement, regulatory reviews of agent activity, tracking of customer complaints, and other significant agent-related issues.

550.   Defendant Stockdale's scienter is further shown by his involvement in conversations concerning particular agents that engaged in structuring massive amounts of transactions to China that were not disciplined because of the impact that would have on the Company's business.

551.   Defendants' scienter is further established because several of the Individual Defendants and other senior Company officers and employees profited from the sale of Western Union stock during the Class Period while in possession of material, non-public information regarding Western Union's deficient AML and anti-fraud compliance efforts.

552.    The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned the Company's compliance efforts, which are a core operation of a money transfer business such as Western Union.   The Individual Defendants acknowledged the essential nature of the Company's compliance efforts when they noted in the Company's periodic SEC filings that the Company is subject to a wide range of federal, state, and international laws government AML, fraud, and consumer protection, and that the failure by the Company, its agents, or subagents to comply with those laws could have an adverse effect on the Company's business, financial condition and results of operations. Defendants, by virtue of their roles in senior management and involvement the Company's core operations, would have had knowledge of the status of the Company's compliance efforts.   In addition, Defendants had access to reports and communications describing these efforts.

553.    Western Union had scienter as to the false and misleading nature of statements concerning the Company's compliance efforts based on the knowledge of the Individual Defendants, all of whom were among the Company's most senior executives and part of the Company's management team.   In addition, because the Company's AML and anti-fraud compliance practices are so essential to the Company's business, the Company's scienter can be inferred because the false and misleading statements concerning the Company's compliance efforts would have been approved by corporate officials that knew they were false or misleading.

## VIII.   NO SAFE HARBOR

554.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## IX.   CLASS ACTION ALLEGATIONS

555.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Western Union securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and/or the materialization of the risk that Defendants concealed. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

556.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Western Union securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Western Union or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

557.   Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

558.   Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiff has no interests antagonistic to or in conflict with those of the Class.

559.   Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Western Union;

- whether the Individual Defendants caused Western Union to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Western Union securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

560.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

561.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Western Union securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Western Union securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

562.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

563.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

564.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

565.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

566.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

Western Union securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Western Union securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

567.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Western Union securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Western Union's compliance efforts.

568.     By virtue of their positions at Western Union, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

569.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Western Union securities from their personal portfolios.

570.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Western Union, the Individual Defendants had knowledge of the details of Western Union's internal affairs.

571.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Western Union. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Western Union's compliance failures. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Western Union securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Western Union's compliance efforts which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Western Union securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

572.    During the Class Period, Western Union securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Western Union securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Western Union securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Western Union securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

573.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

574.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented information concerning Western Union's compliance efforts to the investing public.

## XII.    COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

575.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

576.     During the Class Period, the Individual Defendants participated in the operation and management of Western Union, and conducted and participated, directly and indirectly, in the conduct of Western Union's business affairs. Because of their senior positions, they knew the adverse non-public information about Western Union's compliance failures.

577.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Western Union's compliance failures, and to correct promptly any public statements issued by Western Union which had become materially false or misleading.

578.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Western Union disseminated in the marketplace during the Class Period concerning Western Union's compliance failures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Western Union to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Western Union within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Western Union securities.

579.     Each of the Individual Defendants, therefore, acted as a controlling person of Western Union. By reason of their senior management positions and/or being directors of Western Union, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Western Union to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general

operations of Western Union and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

580.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Western Union.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and postjudgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XIV.   JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 6, 2017                    Respectfully submitted,


                    */s/Jeremy A. Lieberman*
                    **POMERANTZ LLP**
                    Jeremy A. Lieberman
                    Michael Grunfeld
                    600 Third Avenue, 20th Floor
                    New York, NY  10016

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:  jalieberman@pomlaw.com
          mgrunfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (not admitted)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff and the
Putative Class*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email: peretz@bgandg.com

*Additional counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2017, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by other means to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.


_____
/s/ *Jeremy A. Lieberman*
Jeremy A. Lieberman