## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:17-cv-00474-KLM
    Consolidated with 1:17-cv-00648-KLM

LAWRENCE HENRY SMALLEN AND LAURA ANNE SMALLEN REVOCABLE LIVING
TRUST, individually and on behalf of all others similarly situated, and
UA LOCAL 13 PENSION FUND, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
RAJESH K. AGRAWAL, and
BARRY KOCH,

    Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS THE WESTERN UNION COMPANY,
HIKMET ERSEK, SCOTT T. SCHEIRMAN, AND RAJESH K. AGRAWAL'S MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ..................................................................................... 1

FACTUAL BACKGROUND ....................................................................... 7

      A.    Western Union's Global Business ............................................... 7

      B.    The Individual Defendants ......................................................... 8

      C.    Pre-Class Period Regulatory Actions And Settlements ............... 9

      D.    U.S. Regulatory Investigations During The Class Period ......... 12

      E.    The DPA And The FTC Complaint .......................................... 16

      F.    The Complaint .......................................................................... 23

ARGUMENT ........................................................................................... 25

    I.    The Applicable Legal Standards ................................................. 25

    II.    Count I Should Be Dismissed Because Plaintiff Has Not
          Sufficiently Alleged With Factual Particularity That
          Defendants Made Any False Or Misleading Statements. ........... 28

      A.    Statements Of Opinion Regarding Anti-Fraud And
            AML Compliance In The Company's Forms 10-K .................. 28

          1.    The Legal Standards For Falsity Of  Opinion Statements ............ 30

          2.    Plaintiff Fails To Allege Any Particularized Facts Showing
               That The Statements Of Opinion Regarding Compliance
               Were Not Believed ......................................................... 33

          3.    Plaintiff Distorts The Board Of Director Materials,
               Which Also Fail To Provide Particularized Facts
               In Support Of Plaintiff's Allegations. ............................. 47

      B.    Statements Regarding Western Union's Compliance
            Programs Being A "Long-Term Competitive Advantage"
            Or A "Competitive Strength" .................................................... 51

C.   Statements Regarding The Company's Inability To
     Predict The Outcomes Of The Various Governmental
     Investigations Underway During The Class Period ...................................54

D.   Statements Regarding The Company's Investments
     In And Increased Costs From Compliance Expenditures .........................60

E.   Statements Regarding Premium Pricing .....................................................63

F.   Remaining Statements Regarding Compliance .........................................66

III.   Count I Also Should Be Dismissed Because Plaintiff Has
       Failed To Allege Facts Giving Rise To A Strong Inference
       of Scienter. .........................................................................................................71

A.   The Allegations With Respect to Mr. Ersek Are
     Insufficient To Create A Strong Inference Of His
     Scienter In Making The Statements Attributed To Him. ...........................74

     1.   The Allegations Regarding Mr. Ersek's Stock
          Sales Fail To Create A Strong Inference Of His
          Scienter. .........................................................................................74

     2.   Plaintiff's "Additional" Scienter Allegations
          Fail To Support A Strong Inference Of Scienter
          With Respect To Mr. Ersek. .........................................................80

B.   The Allegations Regarding Mr. Agrawal Are Insufficient
     To Create A Strong Inference Of Scienter In Making
     The Statements Attributed To Him. ............................................................86

C.   The Allegations Regarding Mr. Scheirman Are Insufficient
     To Create A Strong Inference Of His Scienter In Making
     Statements Attributed To Him. ...................................................................90

D.   The Allegations With Respect To Mr. Koch Fail To
     Create A Strong Inference Of His Scienter In Making
     The Statements Attributed To Him. ...........................................................93

E.   Plaintiff's Allegations Of Corporate Scienter Fail
     Because It Has Not Shown Scienter As To Any
     Individual That Could Be Imputed To Western Union. ............................94

IV.     Count II Should Be Dismissed Because Plaintiff Has Not
        Adequately Pleaded Either A Primary Violation Of Securities
        Laws Or Control Person Status.................................................................96

# **TABLE OF AUTHORITIES**

**Cases**                                                                                     **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...................................................................................57, 88, 94

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) .................................................................................70

*Anderson v. Spirit AeroSys. Holdings, Inc.*,
    105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) .......................61

*Anderson v. Spirit Aerosys. Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016) .......................................................................... *passim*

*In re Apple Comput., Inc., Sec. Litig.*,
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) .............................................................................37

*In re Arbinet-thexchange, Inc.*,
    2006 WL 3831396 (D.N.J. Dec. 28, 2006) .........................................................................92

*Bank v. Allied Jewish Fed'n of Colo.*,
    4 F. Supp. 3d 1238 (D. Colo. 2013) ....................................................................................3

*Bd. of Tr. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*,
    811 F.Supp. 2d 853 (S.D.N.Y. 2011),
    *aff'd sub nom. Federick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) .........................85

*Bien v. LifeLock Inc.*,
    2015 WL 12819154 (D. Ariz. July 21, 2015),
    *aff'd, In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947 (9th Cir. 2017).........................83, 84

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ..........................................................................................54

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................................74

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..............................................................................................78

*In re Cable & Wireless, PLC, Sec. Litig.*,
    332 F. Supp. 2d 896 (E.D. Va. 2004) .................................................................................54

iv

*Campo v. Sears Holdings Corp.*,
   371 F. App'x 212 (2d Cir. 2010) ...........................................................35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ...........................................................30, 31

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ...................................................79, 92, 94

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
   2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)......................................32

*City of New Orleans Emps.' Ret. Sys. v. PrivateBancorp, Inc.*,
   2011 WL 5374095 (N.D. Ill. 2011) .......................................................35

*City of Philadelphia v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ................................................... *passim*

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009).....................................................95

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
   2014 WL 3610877 (N.D. Ill. July 22, 2014).........................................68

*Cornelia I. Crowell GST Trust v. Possis Med., Inc.*,
   519 F.3d 778 (8th Cir. 2008) ...............................................................74

*Coyne v. Metabolix, Inc.*,
   943 F. Supp. 2d 259 (D. Mass. 2013) ..................................................60

*In re Crocs, Inc. Sec. Litig.*,
   774 F. Supp. 2d 1122 (D. Colo. 2011)............................................26, 96

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) ...............................................................77

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)..................................................................58

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)....................................................57

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015).............................................................74, 94

*Fulton Cty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*,
    2010 WL 601364 (E.D. Wis. Feb. 18, 2010),
       *aff'd*, 675 F.3d 1047 (7th Cir. 2012) ................................................................... 35

*GFF Corp. v. Associated Wholesale Grocers, Inc.*,
    130 F.3d 1381 (10th Cir. 1997) ............................................................... 42, 48

*Glazer Capital Mgmt., L.P. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ......................................................................... 95

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ..................................................................... 96

*In re Gold Res. Corp. Sec. Litig.*,
    957 F. Supp. 2d 1284 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015) ..................... 65

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................................... 26, 53

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ......................................................................... 36

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ....................................................................................... 28

*Kennedy v. Peele*,
    552 F. App'x 787 (10th Cir. 2014) ................................................... 3, 42, 48, 61

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ......................................................................... 39

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    2010 WL 5129524 (D. Colo. Dec. 10, 2010), *aff'd sub nom. In re Level 3
    Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331 (10th Cir. 2012) ............................. 68, 70

*In re Level 3 Commc'ns Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ......................................................... *passim*

*Lieblein v. Ersek*,
    2016 WL 1274399 (D. Colo. Mar. 31, 2016) ("*Lieblein I*") ................................... 48

*Lieblein v. Ersek*,
    2017 WL 4337719 (D. Colo. Sept. 29, 2017) ("*Lieblein II*") ......................... *passim*

*In re LifeLock, Inc. Sec. Litig.*,
    690 F. App'x 947 (9th Cir. 2017) ............................................................47

*Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc.*,
    140 F. Supp. 3d 120 (D. Mass. 2015), *aff'd sub nom. Local No. 8 IBEW Ret.*
    *Plan & Tr. v. Vertex Pharm. Inc.*, 838 F.3d 76 (1st Cir. 2016) .............................................77

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2017 WL 3891676 (D. Del. Sept. 6, 2017) ........................................................................7, 70

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) ........................................................................................96

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................................................27

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd,* 312 F. App'x 400 (2d Cir. 2009) ..........76, 78, 88

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................................57

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
    761 F.3d 1109 (10th Cir. 2014) (Gorsuch, J.)..................................................................58

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ..................................................................................30, 31

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017) ......................................................................................45, 80

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
    135 S. Ct. 1318 (2015)........................................................................................... *passim*

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ............................................................................................72

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    245 F. Supp. 3d 870 (S.D. Tex. 2017) ..............................................................................47

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009)................................................................................70

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004)................................................................................32

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ................................................................95

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ...........................................................80, 92

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).................................................32, 59

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ................................................................71

*SEB Asset Mgmt. S.A. v. The Western Union Co.*,
  2015 WL 5708532 (D. Colo. Sept. 29, 2015)...................................52, 54

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)...................................................................60

*In re Skechers U.S.A., Inc. Sec. Litig.*,
  273 F. App'x 626 (9th Cir. 2008) ..........................................................34

*In re Sofamor Danek Grp., Inc.*,
  123 F.3d 394 (6th Cir. 1997) ................................................................79

*Southland Sec. Corp. v. Inspire Ins. Sol. Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................95

*Steinberg v. PRT Grp., Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000).......................................................54

*In re Sun Healthcare Grp., Inc. Sec. Litig.*,
  181 F. Supp. 2d 1283 (D.N.M. 2002) ...............................................54, 94

*Sw. Carpenters Pension Tr. v. Merge Techs., Inc.*,
  2008 WL 11381377 (E.D. Wis. Mar. 31, 2008) ....................................97

*Teachers' Ret. Sys. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ................................................................78

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)...................................................................94

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................... *passim*

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016)...................................................................30, 31, 32

*Weinstein v. McClendon,*
    757 F.3d 1110 (10th Cir. 2014) ...................................................................26, 27

*In re Zagg, Inc. Sec. Litig.,*
    797 F.3d 1194 (10th Cir. 2015) ................................................... *passim*

*Zhang v. LifeVantage Corp.,*
    2017 WL 2599883 (D. Utah June 15, 2017).....................................................27, 72

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ...............................................................36, 37, 85

**Statutes**

15 U.S.C. § 78u–4(b)(1) .................................................................25, 26, 61

15 U.S.C. § 78u-4(b)(2) .................................................................26, 27, 71

15 U.S.C. § 78u-4(b)(3) ...............................................................................26

15 U.S.C. § 78u-5(c) ...................................................................................65

**Other Authorities**

17 C.F.R. § 230.405 ....................................................................................96

Defendants The Western Union Company ("Western Union" or the "Company") and Hikmet Ersek, Scott Scheirman, and Rajesh Agrawal (collectively with Barry Koch, the "Individual Defendants") hereby move to dismiss the Consolidated Amended Class Action Complaint (the "Complaint" or "Compl.") filed by Lead Plaintiff Lawrence Henry Smallen and Laura Anne Smallen Revocable Living Trust ("Plaintiff").[1]

## **INTRODUCTION**

In order for a securities fraud action to avoid dismissal under controlling Tenth Circuit law and the stringent pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), the complaint must provide *particularized facts* (1) demonstrating that *each* defendant made one or more materially false or misleading statements, *and* (2) creating a compelling "strong inference" that each such false statement was made with scienter – *i.e.*, intent to defraud.  This Complaint utterly fails to sustain these strict burdens.  Instead, it constitutes a failed attempt by Plaintiff to force the square peg of *corporate* liability for certain criminal conduct *from 2004 to 2012* – as reflected in a January 2017 Deferred Prosecution Agreement ("DPA") between Western Union and the Department of Justice ("DOJ") – into the round hole of alleged *personal* liability of the Individual Defendants for various statements they made during the period *from February 24, 2012 to May 2, 2017* (*i.e.*, the putative "Class Period").  There is no fit, and the Complaint's attempt to extrapolate from one to the other is an exercise in speculation supported by little more than 20/20 hindsight.

---

[1] In addition, a separate Brief in Support of Defendant Barry Koch's Motion to Dismiss is being submitted contemporaneously with this Brief.  Plaintiff has dismissed all claims against Stewart Stockdale, who is no longer a defendant in this action.  (Dkt. No. 44.)

The Complaint asserts that four of the top executives of Western Union deliberately lied on virtually every occasion during a more than five-year period when they expressed any positive views regarding the Company's existing anti-money laundering ("AML") and anti-fraud compliance efforts.  According to Plaintiff, each of the Individual Defendants supposedly knew throughout this period, but fraudulently failed to disclose when discussing compliance, "that the Company lacked the most basic components of an effective AML or anti-fraud program" and knowingly "did not discipline agents that [they] knew engaged in rampant money laundering and consumer fraud."  (Compl. ¶ 12.)  Despite its prolixity and broad, rhetorical assertions, the 175-page Complaint fatally lacks the particularized factual support demanded by the PSLRA and its heightened pleading requirements.  Apart from reciting various public statements made by the Individual Defendants, very few of the Complaint's pleaded *facts* have anything at all to do with these particular individuals and what they actually knew, believed, or were informed at the times of their respective statements.

For example, among the statements claimed to be fraudulent – indeed, at the very core of the Complaint's allegations of fraud – are certain statements made during the Class Period by various of the Individual Defendants expressing a "belief" that the Company's compliance efforts were *currently* legally compliant, such as "*we believe* our fraud prevention efforts . . . comply with applicable law."  (Compl. ¶¶ 12, 76, 305, 366, 411, 447.)  These statements appeared as part of a recurring set of risk warnings contained in the Company's annual Form 10-K filings with the Securities and Exchange Commission ("SEC") from 2012 through 2016 (each signed by the Company's Chief Executive Officer, Mr. Ersek, and the Chief Financial Officer ("CFO") at the time).  (*See id.* ¶ 12.)  In order to draw the required strong inference that

Mr. Ersek's and the relevant CFO's expressions of "belief" were fraudulent, Plaintiff must allege particularized facts indicating that each of them did not "actually hold[] the stated belief" each year that this statement was made. *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1326 (2015). The Complaint does not come close to doing this, though, nor does it provide any facts at all showing that any of these individuals actually believed at the time "that the Company lacked the most basic components of an effective AML or anti-fraud program." (Compl. ¶ 12.)[2]

As another example, the Complaint recites numerous occasions over the years in which various of the Individual Defendants voiced the opinion that the Company's compliance infrastructure in over 200 countries and territories constituted a "long-term competitive advantage," with other actual and potential competitors hard-pressed to match such global ubiquity or to make the necessary investments to obtain it. Once again, the Complaint contains no particularized facts indicating that each Individual Defendant did not genuinely hold such views at the time of his statements – or even attempt to provide any facts at all about the competitive landscape that Western Union faced.

Instead, Plaintiff primarily seizes upon the DPA to support its claims of fraud by the Individual Defendants. The time frame of the conduct addressed in the DPA (2004-2012), however, has but slight overlap with the putative Class Period here. Moreover, nothing in the

---

[2] The facts herein are taken from Plaintiff's allegations, SEC filings, and documents referred to and relied upon in the Complaint, all of which the Court may consider on a motion to dismiss. *See Lieblein v. Ersek*, 2017 WL 4337719, at *2 (D. Colo. Sept. 29, 2017) ("*Lieblein II*") (a court may consider anything within "the four corners of the Complaint, any documents attached thereto, and any external documents that are referenced in the Complaint and whose accuracy is not in dispute"); *Kennedy v. Peele*, 552 F. App'x 787, 792 (10th Cir. 2014); *Bank v. Allied Jewish Fed'n of Colo.*, 4 F. Supp. 3d 1238, 1240 (D. Colo. 2013).

DPA indicates that any of the Individual Defendants engaged in any of the underlying violations, or that any of them was aware of some ongoing, systemic compliance violations at the times (beginning in February 2012) they made the statements about their beliefs regarding *current* compliance efforts.  The DPA makes no mention at all of Mr. Scheirman or Mr. Agrawal (the two CFOs who signed the Forms 10-K at various times).  As to Mr. Ersek, the other signatory, the DPA singles him out for praise, noting that "remedial measures and compliance enhancements" taken "[s]ince *at least* September 2012" at "the direction of the Chief Executive Officer," together with his General Counsel and Chief Compliance Officer, "*reflect their ongoing commitment* to enhancing compliance policies and procedures."  (Ex. 1, DPA Statement of Facts ("DPA SOF") ¶ 100 (emphases added).)  These compliance enhancements and the commitment behind them noted in the DPA are, however, entirely consistent with what the Individual Defendants said they believed during the Class Period.  In short, the DPA says nothing at all adverse about what each of the Individual Defendants believed and knew at the times of their challenged statements (and the same is true of the complaint filed and settled by the Federal Trade Commission ("FTC") the same day as the DPA, which is likewise entirely silent regarding the Individual Defendants).

In an effort to mask the Complaint's factual gaps, Plaintiff undertakes a variety of stratagems, but none of them provides the missing particularized facts required by the PSLRA's heightened pleading standards.  For example, the Complaint cites information it claims to have obtained from a handful of so-called "confidential witnesses" ("CWs").  But what these four CWs do *not* say is far more significant than what they are alleged to have said (which is generally innocuous).  None of the CWs claims that any of the Individual Defendants was told

by Company personnel at any time during the Class Period "that the Company lacked the most basic components of an effective AML or anti-fraud program," or was engaged in ongoing violations of federal laws, or that there was merit to any such charges made by others.  That is the fundamental issue in this securities fraud action, yet the highly selective presentation of CW allegations skirts it.  *See* pp. 33-35, 41-46, 82-84, *infra*.  The same is true of the Complaint's conclusory references to various internal reports (which the Complaint does not even allege were ever provided to the Individual Defendants) and mischaracterizations of various materials presented at Board meetings (which said nothing indicating some ongoing legal violations).

These fatal deficiencies and the numerous others elaborated below cause the Complaint's assertions of falsity to be entirely inadequate – and egregiously so as it relates to the expressions of opinions by the various Individual Defendants (which constitute the bulk of the statements alleged to be "false").  Moreover, there is an additional and paramount insufficiency of the Complaint that pervades all of Plaintiff's claims:  the allegations fail to create a "strong inference" of scienter with respect to *any* of the Individual Defendants – a showing that the PSLRA requires be made on a defendant-by-defendant *and* statement-by-statement basis.  *See* pp. 27-28, *infra*.  Plaintiff seeks to end-run this requirement that specific facts supporting a strong inference of scienter be pleaded as to each defendant separately, claiming that Western Union already admitted in the DPA that "it knew" that certain agents were engaged in wrongdoing but did not act at the time to shut down those agents.  (*See, e.g.,* Compl. ¶ 542.)  The "it" alleged, however, is not any of these Individual Defendants.  By contrast, what matters here is what was personally known and believed by each of these Individual Defendants at the time each made his respective statements – and such particularized facts are entirely absent.

Underscoring that point is the fact that the two CFOs, Messrs. Scheirman and Agrawal, are not even mentioned (much less criticized) in the DPA, and neither is alleged to have had any responsibilities for AML or anti-fraud compliance.

Plaintiff's alternative attempts to establish scienter also fall well short of the mark, including the Complaint's pointing to stock sales made by certain of the Individual Defendants over the course of five years.  Two of the Individual Defendants (Messrs. Scheirman and Koch) are not alleged to have sold a single share of Western Union stock, and the two who did (largely through the exercise of options, with Mr. Agrawal having made only one minimal sale) *increased* their overall holdings during the Class Period.  *See* pp. 74-80, 88-89, *infra*.  Nor is this a case where inferences can simply be drawn in Plaintiff's favor when assessing the claims of scienter.  Instead, as the Supreme Court has made clear, under the PSLRA the Court must weigh competing inferences, and it is only if the (factually supported) inferences asserted by the Complaint are "at least" as cogent and compelling as opposing innocent inferences that a complaint can survive.  That is not the case here.  The far more "cogent and compelling" inference with respect to each of these Individual Defendants is that they genuinely believed what they said when they made the challenged statements.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

For these reasons and those discussed at length below, the Complaint should be dismissed in its entirety and with prejudice as to all Defendants.

## **FACTUAL BACKGROUND**

While the Complaint's insufficiencies are fundamental and obvious in nature, they are numerous and Plaintiff attempts to characterize literally dozens of statements set out in over 50 pages of the 175-page Complaint as being false or misleading.  That, in turn, necessitates the length of this brief.  While the Complaint's heft is apparently designed to deter such close analysis, length is not synonymous with substance or a substitute for the particularized facts that the PSLRA demands as a prerequisite for allowing a securities fraud claim to proceed.  *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *2 (D. Del. Sept. 6, 2017) ("A complaint can be long-winded, even prolix, without pleading with particularity." (citation omitted)).  To minimize repetition, the facts relevant to each statement at issue are discussed in connection with the analysis and argument regarding that statement, and are not detailed and repeated in this Factual Background section.  Instead, the facts described below are designed only to provide an overview of certain relevant matters.

### A.    **Western Union's Global Business**

Western Union is the world's largest provider of money movement and payment services.  (Compl. ¶ 35.)  It became a public company in September 2006, when, after being a subsidiary of First Data Corporation, it was spun off in an initial public offering.  (*See id.* ¶ 27.)

The Company operates in over 200 countries and territories worldwide.  (*Id.* ¶ 38.)  A substantial portion of this global business involves the Company's Western Union Financial Services, Inc. ("WUFSI") subsidiary, which provides consumer-to-consumer money transfers and has annual revenues of at least $4.3 billion.  (*See id.* ¶ 34.)  Indeed, in 2014 alone, over 150 million people sent more than $85 billion dollars via Western Union.  (*Id.* ¶ 35.)  A significant

portion of these consumer money transfers are sent internationally by immigrants as remittances back to family members and others in their home countries for essential living expenses such as food, housing, and clothing.  (*Id*. ¶ 48.)  Such transactions provide a vital service and are entirely legitimate.

Western Union's global reach is accomplished through a network of more than 500,000 "agent" locations, 90% of which are located outside the United States.  (*Id*. ¶¶ 38, 40.)  The Company's "agents" generally are not employees of Western Union.  Instead, they typically are third-party independent business operations – such as travel agencies, postal services, banks, and other retailers – which operate in physical locations where senders and recipients of funds can conduct their transactions.  (Ex. 3, 2012 10-K at 8.)

**B.      The Individual Defendants**

The Complaint names four of Western Union's most senior current or former officers as defendants.  First, Mr. Ersek has been Western Union's President and CEO since September 2010, and a Director since April 2010.  (Compl. ¶ 26.)  Mr. Ersek served briefly as the Company's Chief Operating Officer between January and August 2010, and before that he served in various positions overseas.  (*Id.*; *see also* Ex. 4, 2017 Annual Proxy at 7.)

Second, Mr. Scheirman served as the Company's CFO from September 2006 until December 31, 2013, after which he served briefly as a "Senior Advisor" until February 28, 2014.  (Compl. ¶ 27.)  Mr. Scheirman ceased being an officer of Western Union before many of the government subpoenas were issued to the Company, and long before the government reached any conclusions regarding the nature and scope of the Company's liability (if any).  (*See id*. ¶¶ 269, 272, 273, 277, 509.)  Plaintiff does not allege that, as CFO, Mr. Scheirman had any

responsibility whatsoever for any compliance activities at Western Union, including its AML or anti-fraud compliance programs.

Third, Mr. Agrawal is Western Union's current CFO, a position he has held on either an interim or full-time basis since January 2014. (*Id.* ¶ 28.) Before that, he was the President of Western Union Business Solutions, a separate business segment conducting business-to-business transactions, from August 2011 through December 2013. (*Id.*) As with Mr. Scheirman, the previous CFO, Plaintiff does not allege that Mr. Agrawal has had any responsibility for Western Union's AML or anti-fraud compliance programs in his capacity as CFO.

Finally, Mr. Koch served as the Company's Chief Compliance Officer from May 2013 until November 2015. (*Id.* ¶ 29.) Unlike the other Defendants, Mr. Koch never signed any of Western Union's SEC filings, nor did he speak to the public during any earnings calls or at investor meetings. The claims against Mr. Koch are based solely on three statements that he made (*id.* ¶¶ 395, 405, 436) and are the subject of a separate filing that focuses on the handful of allegations against him.

### C.     Pre-Class Period Regulatory Actions And Settlements

The Complaint makes reference to various consent agreements entered into long ago by the Company with certain state and federal authorities regarding AML and anti-fraud compliance. (*Id.* ¶¶ 118, 122.) Five of these earlier settlements, which primarily concerned alleged reporting and recordkeeping violations, occurred even before Western Union became a public company in September 2006, and a sixth occurred in October 2008.[3] These consent

---

[3] Although Plaintiff alleges that each of these agreements included admissions that "Western Union and its agents were willfully violating AML laws and regulations" (Compl. ¶ 122), in fact,

settlements were disclosed years ago in the Company's public filings, beginning with the very

first Form 10-K filed by Western Union as an independent Company.  (Ex. 8, 2006 10-K at 28.)[4]

The Complaint does not allege any particularized facts indicating that any of the

Individual Defendants – most of whom did not even assume their positions until years later –

was ever told by anyone that the Company was in violation of any of these earlier consent

agreements.  Moreover, various of the agreements acknowledged on their face that remedial

steps had already been taken.[5]

The Complaint also refers to one other pre-Class Period settlement:  the Southwest

Border Agreement ("SWB Agreement"), which was entered into in February 2010 between

WUFSI and five Southwest Border states.  (*See, e.g.*, Compl. ¶¶ 84-101, 231-47.)  The SWB

---

each agreement contains an explicit provision that Western Union did *not* admit liability in connection with such agreement.  (*See* Ex. 5, New York 2002 Agreement at 1; Ex. 6, Financial Crimes Enforcement Network 2003 Agreement ("FinCEN 2003 Agreement") at 1; Ex. 7, California 2003 Agreement at 1; Ex. 9, 47 States and D.C. 2005 Agreement at 10; Ex. 10, Arizona 2006 Consent Order at 1, 8; Ex. 11, Arizona 2008 Consent Order at 1, 6.)

[4]The Complaint includes mention of several warnings and alerts that the Company received from law enforcement agencies during the putative Class Period.  (Compl. ¶¶ 119-21, 174, 206, 226.)  But Plaintiff does not allege that any penalties were attached to any of these communications, or that the Company did not resolve any "concerns" expressed by regulators in Japan and Korea without any further regulatory action.

[5] For example, the FinCEN 2003 Agreement recited that Western Union had recently implemented a "new automated system nationwide" that "properly aggregates multiple transactions to detect and report structuring."  (Ex. 6, at 4 n.3.)  Likewise, in connection with the 2002 New York Agreement, the New York authorities noted "the immediate steps taken by [WUFSI] to correct the noted deficiencies as well as the enhancements to its compliance program that have been implemented."  (Ex.12, Dec. 18, 2002 Article.)  Moreover, the ongoing reporting mandates of both the New York and California agreements *were lifted in 2008* by the New York and California governmental authorities – *i.e.*, four years before the beginning of the Class Period.  (Ex. 13, 2013 10-K at 39.)

Agreement involved certain alleged conduct occurring between 2003 and 2007 at 16 agent

locations.[6]

Despite the claims regarding these alleged violations from years past, the SWB

Agreement specifically acknowledged WUFSI's recent, extensive compliance efforts:

> Western Union has developed and implemented a risk-based anti-money laundering ("AML") compliance program that is designed to prevent, detect, and report potential Money laundering activities.  In so doing, Western Union has dedicated substantial resources to, among other things:  developing transactions monitoring systems to detect potentially suspicious activity; building a team of AML professionals; screening, training and monitoring its Agents; producing AML policies and manuals; and implementing compliance measures in certain high-risk geographical areas, including all of Arizona and the area within 200 miles north and south of the United State/Mexico border.

(Ex. 14, Feb. 16, 2010 Form 8-K, Ex. 10.1 at p. 1, ¶ 3.)  To further improve WUFSI's AML

compliance, however, the parties also agreed to appointment of a monitor ("Monitor") through

July 2013.  (*Id.* ¶ 22.)  The Monitor was charged with evaluating WUFSI's compliance and

making "such Recommendations as the Monitor believes *may improve the Program*."  (*Id.* ¶ 21

(emphasis added.)

During the course of the monitorship, there were three changes in the identity of the

Monitor and accompanying changes to and expansions of the various Monitors'

---

[6] The SWB Agreement included a "Statement of Admitted Facts" that concerned AML violations at eight Arizona agent locations from 2003 to 2005 (before Western Union became a standalone company in 2006) and eight agent locations "outside the United States" at unspecified times from 2005 to 2007.  The violations were *not* by WUFSI employees, nor was there a finding that *anyone* at WUFSI was *actually* aware of the violations at these 16 locations.  Rather, WUFSI acknowledged only that, during these earlier times, it had "data and other information *available* to it, which, when viewed as a whole, gave [it] *reason to know*" that one or more persons employed at these 16 agent locations was engaged in a pattern of money laundering violations.  (Ex. 14, Feb. 16, 2010 Form 8-K at Ex. A ¶¶ 4-7 (emphases added); *see* Compl. ¶ 87.)

11

recommendations.  (*See, e.g.*, Ex. 15, 2014 Q3 10-Q at 13; Ex. 16, 2013 Q1 10-Q at 14.)
Ultimately, Western Union was unable to complete implementation of all of the
recommendations by July 2013, and the monitorship was extended by agreement.[7]  The
Amended SWB Agreement recognized that Western Union "ha[d] made substantial progress in
completing the Monitor's Recommendations" and provided more time for Western Union to
complete its obligations.  (Ex. 17, Feb. 3, 2014 Form 8-K, Ex. 10.1 at ¶ 2.)  Western Union
regularly made public disclosures regarding the status of these matters.  (*See, e.g.*, Ex. 18, 2016
10-K at 109; Ex. 19, 2014 10-K at 16; Ex. 13, 2013 10-K at 17.)

In a press release issued on July 28, 2016, following the successful implementation by
Western Union of the Monitor's primary recommendations, the Arizona Attorney General
praised Western Union's compliance achievements:  "We believe Western Union's Southwest
AML Compliance Program should be a model for others in the industry."  (Ex. 20.)

### D.    U.S. Regulatory Investigations During The Class Period

During the Class Period, the Company was informed of various formal investigations into
its compliance practices that were initiated by the DOJ, four U.S. Attorney's Offices, and the
FTC – the investigations that eventually resulted in the January 2017 settlements that prompted
this litigation.  Most of these investigations were initiated early on in the Class Period, and
focused on still earlier time periods, but did not culminate until years later.  In each instance, the
Company promptly publicly disclosed the investigation in its SEC filings – as the Complaint

---

[7] The Complaint nakedly asserts that (unidentified) Monitor recommendations with which the
Company's compliance was delayed were "necessary for Western Union to bring its AML
compliance program in line with its legal obligation under the BSA."  (Compl. ¶ 231.)  The
Complaint cites no source or particularized facts in support of that conclusory assertion.

itself admits (Compl. ¶¶ 255-56) – and thereafter provided status updates, always noting the potential material risks and uncertainties as to outcome.

For instance, on November 25, 2013, the Company was served with a subpoena issued by the U.S. Attorney's Office for the Middle District of Pennsylvania ("MDPA") seeking documents relating to complaints made by customers regarding fraud-induced transactions, and was informed that it was the subject of an investigation. (*Id.* ¶ 268.) The Company promptly disclosed the investigation in its next periodic SEC filing. (*See id.* ¶ 413; Ex. 13, 2013 10-K at 40.)[8]  Additional subpoenas from the MDPA were received over the next several years, and these too were referenced in the Company's periodic SEC filings. (*See, e.g.*, Ex. 21, 2015 Q3 10-Q at 60.)  A new development was then reported in early 2016, in the Company's Form 10-K filed on February 16, 2016:  "the MDPA indicated 'that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012.'"  (Compl. ¶¶ 271, 476 (both quoting Ex. 22, 2015 10-K at 110).)  At the same time, the

---

[8] The same was true of the investigations launched by other U.S. Attorney's offices.  On March 20, 2012, the Company received a subpoena from the U.S. Attorney's Office for the Central District of California seeking documents related to U.S. Shen Zhou International, a former agent, and notified that it was a target of the investigation. (Compl. ¶ 265.)  The Company promptly disclosed these matters in its next periodic SEC filing.  (*See* Compl. ¶ 318; Ex. 23, 2012 Q1 10-Q at 44-46.)  On March 6, 2014, the Company received a subpoena from the U.S. Attorney's Office for the Southern District of Florida and was subsequently informed that it was a target of the investigation (which later focused on gambling transactions).  (Compl. ¶¶ 272, 275, 277.)  Once again, this was promptly disclosed in the next periodic SEC filing.  (*Id.* ¶ 275; Ex. 24, 2014 Q2 10-Q at 15.)  The Company also received a subpoena from the U.S. Attorney's Office for the Eastern District of Pennsylvania, focused on former Western Union agent Hong Fai General Contractors Corp., without being informed that it was also a subject of the investigation.  (*See* Compl. ¶ 264.)  Nonetheless, the Company disclosed the investigation in 2014, and warned investors that it could face liability and penalties.  (Ex. 24, 2014 Q2 10-Q at 15.)

Company noted that it was unable to estimate the possible loss "associated with the resolution of any possible charges or claims that may be brought against the Company" by the MDPA – a matter that Plaintiff does not allege was even under discussion with the MDPA at the time.  (Ex. 22, 2015 10-K at 110.)  Subsequently, however, when discussions about a potential resolution of the MDPA and other U.S. Attorney investigations were about to commence, the Company publicly disclosed that, too, in a November 1, 2016 filing:  "The Company anticipates entering into discussions with the United States Department of Justice to potentially resolve the four investigations described immediately above."  (Ex. 25, 2016 Q3 10-Q at 14.)  And while the Company stated that it was unable to predict the outcome of these matters at that time, including whether these discussions would produce an agreed resolution or the cost of any such resolution, the Company expressly warned that the outcome could entail "significant fines, payments, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows."  (*Id.*)

The Company was similarly prompt in disclosing the FTC's investigation and developments relating to that investigation.  The Company received an initial Civil Investigative Demand ("CID") from the FTC on December 12, 2012 (Compl. ¶ 258), which the Company reported in its Form 10-Q filed on May 6, 2013 (Ex. 16, 2013 Q1 10-Q at 51).  Over the course of the next several years, the Company received several additional CIDs from the FTC, and reported the receipt and the subject matter of each in its next periodic SEC filing.[9]

---

[9] For example, on October 22, 2014, the Company received an additional CID from the FTC. (Compl. ¶ 260.)  In a Form 10-Q filed eight days later, the Company reported this new CID and its contents.  (Ex. 15, 2014 Q3 10-Q at 57; *see also* Compl. ¶ 260.)  Another CID was received

In August 2016, the Company further disclosed that the FTC had "recently advised the Company of its view that the Company [had] violated . . . the Federal Trade Commission Act and the Telemarketing Sales Rule, by failing to take timely, appropriate, and effective measures to mitigate fraud." (Compl. ¶ 262 (quoting Ex. 26, 2016 Q2 10-Q at 58).)  The Complaint does not dispute the accuracy or timeliness of Western Union's disclosure of this new development. The Company further disclosed that it had entered into discussions with the FTC in an attempt to resolve the matter, but stated that if the matter proceeded to litigation, the Company "intends to defend itself vigorously." (Compl. ¶ 262.)  The Complaint contains no particularized facts indicating that this was not actually the Company's intent at the time.  At the same time, the Company warned that, whether or not a settlement was reached, the Company could "be required to make significant restitution and/or disgorgement payments and changes to its programs, any of which separately or combined could have a material adverse effect on the Company's business, financial condition and results of operations." (Ex. 26, 2016 Q2 10-Q at 58.)

Finally, in its next periodic SEC filing, made on November 1, 2016, the Company disclosed another new development:  the FTC staff was taking the position that the Company was not only liable for the principal amounts of all *reported* instances of fraud-induced money transfers occurring on its system since 2004, but also for transactions *as to which no report of fraud had ever been made*. (*See* Compl. ¶ 263; *see also* Ex. 25, 2016 Q3 10-Q at 59.)  Based on this novel "underreporting" theory of damages, the FTC staff claimed that the Company was responsible for "a multiple" of the "hundreds of millions" of dollars of *reported* fraud amounts

---

on July 31, 2015, which the Company likewise reported in its next Form 10-Q filing. (Compl. ¶ 261; Ex. 21, 2015 Q3 10-Q at 62.)

since 2004.[10]  (Compl. ¶ 263; *see also* Ex. 25, 2016 Q3 10-Q at 59.)  It was in response to this new and novel position that the Company said it "strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof" (Compl. ¶ 263 (quoting Ex. 25, 2016 Q3 10-Q at 15)) – a statement which, contrary to the Complaint's conclusory mischaracterizations, was made only on this single occasion.[11]  And, once again, the Complaint contains no facts whatsoever indicating that the Company did not actually "strongly disagree" at the time, or that either Mr. Ersek or Mr. Agrawal (the signatories to this Form 10-Q) secretly agreed with the FTC staff's recent position.

### E.    The DPA And The FTC Complaint

On January 19, 2017, the Company announced settlements with the DOJ, the four U.S. Attorney's Offices, the FTC, and FinCEN (the "Regulatory Settlements") to resolve the previously disclosed investigations into the Company's anti-fraud program and AML controls.[12]  (*See* Compl. ¶ 2; Ex. 1, DPA & DPA SOF;  Ex. 2, FTC Compl.)

---

[10] While the figure of "hundreds of millions of dollars" in transactions since 2004 where a money sender claimed to have been defrauded by a recipient may sound very large, it is important to remember that in any given year, Western Union's customer-to-customer remittances are in the ***tens*** of ***billions*** of dollars – *e.g.*, $85 billion in 2014 alone (Compl. ¶ 35) – and well in excess of half a ***trillion*** dollars over the course of a decade.  Accordingly, "hundreds of millions of dollars" is less than one-tenth of one percent (.1%) of total transaction amounts.  (*See also* Ex. 27, Jan. 19, 2017 Press Release (noting that during the past 10 years "[t]he incidence of consumer fraud reports associated with Western Union money transfers has been extremely low – less than one-tenth of 1 percent of all consumer-to-consumer money transfer transactions").)

[11] The Complaint distorts both the content and timing of this single statement in November 2016, attempting to transform it into some repeated statement of strong disagreement with all of "the regulators' claims."  (*See* Compl. ¶¶ 18, 82, 281, 301.)  That is simply inaccurate.

[12] On January 31, 2017, an additional related settlement between 49 states and the District of Columbia was announced.  (Compl. ¶ 526.)  The settlement included a $5 million payment to the states and the District for costs and fees.  (Ex. 28, 2017 State Settlement Agreement at VII.A.)

***The DPA.***  As part of this resolution, the Company entered into the DPA, which included a stipulated Statement of Facts.  In the DPA, the Company accepted responsibility for certain criminal conduct related to AML and anti-fraud compliance that occurred "[s]tarting in 2004 and ending in December 2012" – a period that only slightly overlaps with the putative Class Period here.  (DPA SOF ¶ 1.)  The DPA also noted "the Company's significant compliance enhancements since at least [September] 2012 designed to improve its anti-money laundering and anti-fraud compliance programs, which demonstrate the Company's commitment to maintaining and enhancing the effectiveness of its compliance program."  (Ex. 1, DPA ¶ 4(c); *see also* DPA SOF ¶ 100.)

Generally speaking,[13] the DPA Statement of Facts addresses two primary categories of conduct, all of which took place no later than 2012.  First, it concerns instances in which certain Western Union employees became aware of high numbers of consumer fraud complaints relating to transactions paid at certain specified individual foreign agent locations, but then failed to take effective disciplinary action against the agents (*i.e.*, suspending or terminating them) even after receiving warnings and recommendations.  (*Id.* ¶¶ 21-54.)  The consumer fraud complaints typically involved "fraudster" scams – *e.g.*, someone falsely posing as a relative traveling overseas and claiming to be in urgent need of money (*id.* ¶ 21) – that resulted in money being sent to a foreign country and picked up at a foreign agent location utilized by the fraudsters (sometimes with the complicity of certain agents or their employees and sometimes not).  Out of the hundreds of thousands of Western Union agent locations worldwide, the DPA Statement of

---

[13] Nothing in this brief is intended in any way to disclaim or contest the full contents of the DPA Statement of Facts.

Facts identifies two agents in the United Kingdom and certain agents in Spain, Mexico, and Peru that Western Union compliance employees failed to take sufficient action against with regard to consumer fraud complaints.  (*Id.* ¶¶ 33-37, 44-50, 51-53.)

Second, the DPA Statement of Facts addresses four domestic agents – one in Los Angeles, two in New York, and one in Philadelphia – that "engaged in violations of Western Union policies regarding structuring transactions" (*id.* ¶ 57) in transactions sending money from the U.S. to China (*id.* ¶¶ 55-89).  These agents were terminated, respectively, in late 2010, December 2011, and March 2012.  (*Id.* ¶¶ 68, 76, 89.)  However, their suspicious activity had been known to certain Western Union employees well before their terminations, but did not lead to appropriate discipline at those earlier times (well prior to the Class Period) – *contrary to Western Union's own compliance policies*.  (*See, e.g.*, *id.* at ¶¶ 66, 80.)[14]

The Complaint contains no particularized allegations that the criminal conduct addressed in the DPA was contemporaneously known as such to any of the Individual Defendants, let alone that they were somehow complicit in the conduct.[15]  Nor does the DPA itself support any such

---

[14] The DPA Statement of Facts also addresses three instances, between 2004 and January 2008, of "specific actions or policies and procedures" that certain Western Union employees recommended (DPA SOF ¶ 31) but which were not adopted.  These instances occurred long before the Class Period, however – with two of the instances being before Western Union became a public company.  None of the Individual Defendants is alleged to have had any involvement in or knowledge of these matters.

[15] The DPA Statement of Facts also includes a section regarding deficiencies involving offshore gambling transactions, particularly with respect to transactions from Florida involving agents in Costa Rica.  (¶¶ 91-99.)  The DPA SOF acknowledges that "Western Union had some systems and controls in place to combat the use of Western Union's system to transmit illegal gambling-related transactions" (¶ 92), and acknowledges that the Company adopted in 2009 "enhanced consumer monitoring on transactions from the U.S. to Costa Rica" (¶ 93) and then added in March 2011 a "Real Time Risk Assessment" program for Costa Rica that had been recommended by certain employees (¶ 97).  The DPA SOF concludes, however, that these steps

18

assertion.  In fact, as previously noted, the DPA Statement of Facts does not mention (much less call into question the conduct of) either Mr. Scheirman or Mr. Agrawal, and is highly complimentary of Mr. Ersek and Mr. Koch (who did not even join the Company until after the violation period set forth in the DPA).  The SOF refers to remedial measures adopted since at least September 2012 at the direction of the Company's Chief Executive Officer (Mr. Ersek) and the Company's Chief Compliance Officer (a position Mr. Koch occupied beginning in May 2013), together with the Company's General Counsel, which the DOJ found reflect their "ongoing commitment to enhancing compliance policies and procedures."  (*Id.* ¶ 100.)

   ***The FTC Complaint.***  While there is overlap between the DPA and the FTC Complaint as they relate to the issue of consumer frauds, there are also significant differences (including that the Company accepted responsibility for the allegations in the DPA Statement of Facts but did not admit or deny the allegations contained in the FTC Complaint).  The DPA focused on allegations of "willful" *criminal* violations by Western Union, in that certain employees knew or suspected that certain, specific agent locations were complicit in consumer fraud but failed to take effective disciplinary action against those agent locations.  *See* pp. 17-18, *supra*.  By contrast, the *civil* FTC Complaint, while acknowledging that Western Union has had anti-fraud programs in place and has enhanced them over time, alleged that the Company's programs have "failed to *adequately* and *effectively* detect and prevent consumer frauds employing Western Union's money transfer system."  (FTC Compl. ¶ 23 (emphasis added).)

---

were not "sufficiently effective" and that Western Union employees continued to detect that its services were being used for gaming purposes in Costa Rica (¶ 99).  Once again, there is no mention of any ongoing issues or violations being brought to the attention of any of the Individual Defendants.

The occurrence of instances of consumer fraud is an unfortunate and inescapable reality of the money transfer business, just as instances of credit card fraud are an inescapable reality of the credit card business.  As the FTC Complaint itself concedes, there are countless and ever-changing scams by which fraudsters seek to induce people to wire money to them.  (*Id.* ¶¶ 29-30.)  And these frauds can and frequently do occur without anyone at a Western Union agent location being complicit, much less with complicity by anyone employed by Western Union.  As one government authority has acknowledged, "Western Union cannot be expected to detect and/or prevent all illicit uses of its services" because "a money services business may act in good faith to take reasonable and considered steps . . . and yet still be abused by persons engaged in illicit activity."  (Ex. 14, Feb. 16, 2010 Form 8-K, Ex. 10.1 at Ex B, ¶ 31.2.)

The Company compiles fraud reports it receives from consumers claiming to have been victimized, reports typically made after money has already been paid out to the fraudster recipient.  (Compl. ¶ 153.)  At times, these reports show higher instances of fraud in connection with certain agent locations.  (*Id.* ¶ 162.)  That fact does not by itself mean or indicate, however, that the agent location is itself complicit, or has failed to implement appropriate procedures. (Nor is a fraud report necessarily directed at any conduct by the agent.)  Instead, multiple fraud reports may simply indicate, for example, that the fraudsters are clustered in that particular area, which is not an unexpected occurrence particularly when dealing with certain urban centers. Accordingly, Western Union has used instances of multiple fraud reports as a trigger for further investigation (to attempt to ensure that the agent location is operating properly) and action

(including additional training).[16]  Indeed, the FTC Complaint recites that "Western Union's general practice has been to attempt to rehabilitate agents and subagents exhibiting high level of consumer fraud by requiring its agents to implement 'action plans' to address the problems." (FTC Compl. ¶ 72.)  The FTC alleged, however, that this "practice has been inadequate and ineffective."  (*Id.*)

The FTC Complaint also notes that Western Union adopted enhancements to its anti-fraud program in January 2011 (when it reported to the FTC its implementation of "a comprehensive anti-fraud program") and in 2012 (during which the Class Period begins).  (*Id.* ¶¶ 9, 25, 26, 96.)  In fact, the FTC Complaint concedes that "Western Union has improved aspects of its anti-fraud program since 2012" and "made progress" in "identifying and blocking potentially fraudulent transactions and in otherwise protecting consumers from fraud."  (*Id.* ¶¶ 26, 96.)  Nonetheless, the FTC Complaint alleged that "*in certain cases*" since 2012 the Company had failed "to promptly suspend and terminate certain high-fraud agent locations." (*Id.* at 26 (emphasis added).)  A list of these alleged "certain cases" appears in paragraph 167 of the Complaint here, mirroring similar allegations in the FTC Complaint.

There is no allegation in either the FTC Complaint or in the Complaint here that any of the Individual Defendants had any contemporaneous knowledge of or was involved in any of these "certain cases" post-dating 2012.[17]  Moreover, while repeating the FTC Complaint's claims

---

[16] As the FTC Complaint notes, Western Union developed and revised over the years internal procedures for identifying agents for review, and possible suspension, based on consumer fraud complaints.  (FTC Compl. ¶ 24.)

[17] Plaintiff identifies one agent that was the subject of fraud reports and concerns in 2010-11 but nevertheless remained open through the announcement of the Regulatory Settlements in January 2017, presumably to create the impression that Western Union still had not taken appropriate

of post-2012 failings in "certain cases," the Complaint does not identify with particularity any structural deficiencies in Western Union's anti-fraud programs that allegedly existed throughout the Class Period, or key components known to be missing – much less provide particularized facts showing that any of the Individual Defendants had any knowledge that the Company "lacked the most basic components of an effective . . . anti-fraud program" throughout the Class Period, the Complaint's core allegation.  (Compl. ¶ 12.)  The same is true of the periods prior to 2012, as to which there are likewise no particularized facts pleaded showing that any of the Individual Defendants was personally involved in or made aware at the time of alleged widespread failures to enforce the Company's anti-fraud policies.  Indeed, like the DPA Statement of Facts, the FTC Complaint contains virtually no mention of any of the Individual Defendants.[18]

---

actions as of that date.  (*E.g.*, Compl. ¶ 172.)  But the Complaint contains no particularized facts regarding what happened with this one agent since 2011, including whether any issues were remediated and consumer fraud reports ceased.  Nor does the Complaint contain any particularized facts demonstrating knowledge by the Individual Defendants regarding this particular agent, either in 2010-11 or subsequently.  (*Id.* ¶ 139.)

[18] The FTC Complaint contains one reference to the Minnesota Attorney General's Office sending letters to the Company's "President and Chief Executive Officer," *i.e.*, Mr. Ersek, beginning in June 2011.  (FTC Compl. ¶ 54.)  These letters noted that "each year thousands of consumers are defrauded" and suggested that refunds should be provided by the Company in such cases given the Company's apparent "inability or unwillingness" to prevent such frauds.  (*Id.*)  The Company, in turn, declined to issue refunds to all victims.  (*Id.*)  The correspondence does not mention, must less specifically identify, any specific alleged legal violations by Western Union, or even identify for Mr. Ersek any alleged fundamental weaknesses in the Company's fraud prevention procedures.  Allegations that the Company declined to serve as an insurer for all instances where a consumer was defrauded by others says nothing about knowledge by Mr. Ersek of some ongoing legal violations by Western Union.

**F.      The Complaint**

Count I of the Complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, alleging that each of the Defendants defrauded investors by making false or misleading statements, and doing so with scienter.  Count II alleges that each of the Individual Defendants also bears derivative "control person" liability under Section 20(a) of the Exchange Act for the fraud alleged in Count I.

While the Complaint is frequently vague (including due to its use of block quotations) regarding precisely which statements it is challenging and why, the principal statements challenged appear to fall into five categories:

- Statements made in each of Western Union's annual Forms 10-K from 2012 through 2016 to the effect that "*we believe* our fraud prevention efforts are effective," "*we believe* our fraud prevention efforts . . . comply with applicable law," and "*we believe* that Western Union is compliant with its regulatory responsibilities,"[19] which Plaintiff alleges were false or misleading each year because it turned out that Western Union was not legally compliant.[20]

- Numerous statements expressing the view that the Company's worldwide compliance infrastructure, large annual investments in compliance, and capabilities in more than 200 countries and territories constitute a "long-term competitive advantage" or a "competitive strength,"[21] which Plaintiff similarly alleges were false or misleading because it turned out that Western Union was not legally compliant.[22]

---

[19] Compl. ¶¶ 12, 76, 305, 366, 411, 447.

[20] *See* Compl. ¶¶ 12, 303, 310, 371, 416, 451.

[21] Compl. ¶¶ 311, 336, 337, 374, 434, 459, 465, 480; *see also id.* ¶¶ 12, 78, 125, 313, 314, 321, 322, 328, 333-34, 338-39, 349, 357, 363, 375, 381, 388, 408, 423, 432, 456.

[22] *See, e.g.*, Compl. ¶¶ 12, 79, 303, 312, 315, 327, 330, 335, 340, 350, 359, 364, 380, 382, 390, 409, 424, 433, 458.

- Statements that the Company was unable to predict the outcome of government investigations that were underway during the Class Period,[23] which Plaintiff alleges were false or misleading because the individuals making those statements purportedly knew in advance throughout the Class Period that the investigations were "nearly certain . . . to expose the Company to substantial liability."[24]

- Statements regarding the Company's undertaking enhancements to its compliance systems at various times during the Class Period, including making significant additional investments.[25]  Plaintiff does not claim that the enhancements were not undertaken or the investments not made.  Instead, it claims that these statements were misleading because they failed to acknowledge that the Company purportedly had "utterly inadequate anti-fraud and AML compliance programs."

- Statements regarding Western Union's ability to charge premium prices to its customers, which Plaintiff claims were rendered untrue because of the *non sequitur* fact that Western Union's compliance costs were rising.[26]

Plaintiff relies on three sources as ostensible support for its allegations that these various statements were allegedly false or misleading:  (i) documents associated with the Regulatory Settlements, (ii) Board materials principally discussing the Company's compliance with the SWB Agreement, and (iii) four so-called "confidential witnesses."  From these sources, Plaintiff concocts various theories to support its allegations that the Individual Defendants knew "that the Company lacked the most basic components of an effective AML or anti-fraud program." (Compl. ¶ 12.)  This brief first discusses each of the categories into which the allegedly misleading statements fall, along with Plaintiff's theories regarding the statements' falsity, and then addresses Plaintiff's allegations regarding each Defendant's scienter.

---

[23] Compl. ¶ 301; *see also id.* ¶¶ 308, 318, 326, 344, 368, 413, 417, 449, 476, 483, 489, 493.

[24] Compl. ¶ 301; *see also id.* ¶¶ 18, 82, 303(v).

[25] Compl. ¶¶ 81, 146, 358, 361, 388.

[26] Compl. ¶¶ 389, 456; *see also id.* ¶¶ 303(vi), 390, 458.

## ARGUMENT

### I.     The Applicable Legal Standards

In order to state a claim under Section 10(b) and Rule 10b-5, a private plaintiff must allege that (i) the defendant made a false or misleading statement of material fact; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) upon which the plaintiff relied; (v) suffering an economic loss; and (vi) that the material misrepresentation was the cause of the plaintiff's loss. *Anderson v. Spirit Aerosys. Holdings, Inc.*, 827 F.3d 1229, 1236-37 & n.4 (10th Cir. 2016). The first two elements are the core of a Section 10(b) claim and are the ones at issue in this motion. In pleading these elements, plaintiffs are subject to a set of particularly heightened pleading standards. As the Tenth Circuit has explained, "[t]he enactment of the PSLRA . . . marked a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits. . . . The PSLRA thus mandates a more stringent pleading standard for securities fraud actions." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks and citation omitted); *see also Tellabs,* 551 U.S. at 321-22; *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015). These heightened pleading standards far exceed the general plausibility standards of Rule 8(a) of the Federal Rules of Civil Procedure.

*First*, the PSLRA requires a complaint to "specify each statement alleged to have been misleading" and further specify "the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(1)). Moreover, the PSLRA subjects allegations based on "information and belief" to heightened requirements – a matter that is particularly relevant here given that the Complaint states that *all* of its allegations are on

25

"information and belief," with the sole exception of allegations relating to the named Plaintiff itself.  (Compl. at 1.)  Specifically, the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Unless "information and belief" allegations are accompanied by particularized supporting facts pleaded in the complaint, they are entitled to no weight.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (dismissing complaint that contained "[m]ere conclusory allegations of falsity").[27]

**Second**, the PSLRA creates uniquely heightened pleading requirements in determining whether scienter – the required state of mind in securities fraud cases, *City of Philadelphia*, 264 F.3d at 1258-59 – has been adequately pleaded.  Critically, these heightened pleading standards modify the analysis of a motion to dismiss under Rule 12(b)(6).  *See id.* at 1259.  Under the PSLRA, a securities fraud case cannot survive unless the particularized facts give rise to a "strong" inference of scienter.  15 U.S.C. § 78u-4(b)(2); *City of Philadelphia*, 264 F.3d at 1262. Unlike under Rule 12(b)(6), "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling."  *Weinstein v. McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (quoting *Tellabs*, 551 U.S. at 324).  The PSLRA expressly requires the court to dismiss a complaint if these requirements are not met.  15 U.S.C. § 78u-4(b)(3).  "To judges raised on notice pleading, the idea of drawing a 'strong inference' from factual allegations

---

[27] *See also Weinstein v. McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (" a complaint alleging a violation of Section 10(b)" based upon information and belief must be dismissed unless it "state[s] with particularity all facts on which that belief is formed" (quoting 15 U.S.C. § 78u–4(b)(1)); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1140 (D. Colo. 2011) ("[T]he PSLRA requires a plaintiff to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements.  Generalized or conclusory allegations of fraud will not be sufficient." (internal quotation omitted)).

is mysterious." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). Yet it is an inquiry that Congress has mandated "to curb abuse in private securities lawsuits." *In re Zagg*, 797 F.3d at 1201 (quoting *Weinstein*, 757 F.3d at 1112). Moreover, not only must any inference of scienter be "strong," it also must be "at least as compelling as any opposing inference." *Anderson*, 827 F.3d at 1237 (quoting *Tellabs*, 551 U.S. at 314). Thus, although reasonable inferences are generally drawn in a plaintiff's favor when considering a 12(b)(6) motion, the PSLRA explicitly requires more for scienter pleading. Rather, the Court is *required* to *weigh* potentially competing inferences regarding scienter at the pleading stage, and determine their relative strength. *Tellabs*, 551 U.S. at 324.

Moreover, the plaintiff must make this showing of scienter as to *each* defendant and with respect to *each* statement made by that defendant that is alleged to be actionable. *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (plaintiffs must plead strong inference of scienter "with respect to each act or omission alleged" (quoting 15 U.S.C. § 78u-4(b)(2)). It is not sufficient for the plaintiff to lump individuals together, and sweepingly allege that they all somehow knew of and participated in the alleged wrongdoing. As the court in *Zhang* held in dismissing the plaintiff's securities fraud claims, the "PSLRA demands that the facts giving rise to the necessary inference of scienter be pled with particularity as to each defendant." *Zhang v. LifeVantage Corp.*, 2017 WL 2599883, *10 (D. Utah June 15, 2017). In other words, if, with respect to any Defendant here, Plaintiff fails to allege particularized facts **specific to that Defendant** establishing an inference of scienter that is at least as compelling as any opposing innocent inference, the Complaint must be dismissed as to that Defendant.

***Third,*** a defendant can be held liable only for those statements made by him (and made with the requisite scienter).  Only the *maker* of each statement, *i.e.*, the person with "ultimate authority over the statement, including its content and whether and how to communicate it," can be held liable with respect to that statement.  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

As demonstrated below, the Complaint here fails to meet these stringent requirements. Plaintiff does not sufficiently plead materially false or misleading statements or scienter with respect to any of the Defendants, and its claims accordingly should be dismissed.

## II.    Count I Should Be Dismissed Because Plaintiff Has Not Sufficiently Alleged With Factual Particularity That Defendants Made Any False Or Misleading Statements.

While the Complaint is diffuse and difficult to follow at many points, in part because of the repeated use of block quotes without indicating precisely what is false or why, Plaintiff appears to be challenging five primary categories of statements as false or misleading, as previously noted.  *See* pp. 23-24, *supra*.  Below, we first address each of these categories and discuss how the Complaint fails to allege the requisite particularized facts supporting Plaintiff's assertion that these statements were false.  In addition, many of the alleged misstatements are either non-actionable puffery or insufficiently identified, as discussed next at pp. 66-71, *infra*.

### A.    Statements Of Opinion Regarding Anti-Fraud And AML Compliance In The Company's Forms 10-K

One of Plaintiff's principal challenges is to statements in each of Western Union's Forms 10-K filed with the U.S. Securities and Exchange Commission throughout the Class Period indicating that "***we believe*** our fraud prevention efforts are effective" (Compl. ¶¶ 12, 76, 305, 366, 411), "***we believe*** our fraud prevention efforts . . . comply with applicable law" (*id.*

28

¶¶ 12, 76, 305, 366, 411, 447), and "*we believe* that Western Union is compliant with its

regulatory responsibilities" (*id.* ¶¶ 305, 366, 411, 447; *see also id.* ¶¶ 12, 76) (emphases added).[28]

The Forms 10-K were signed by Mr. Ersek throughout the Class Period, by Mr. Scheirman on

February 24, 2012 and February 22, 2013 (*see id.* ¶¶ 304, 365), and by Mr. Agrawal between

February 24, 2014 and February 19, 2016 (*id.* ¶¶ 410, 450, 473).  Although truncated by

Plaintiff, these statements were made as *part of* the risk disclosure sections of the Forms 10-K,

sections that were designed to underscore that there could be no guarantees that the Company

compliance efforts would be successful.  The following examples from the Company's 2011

Form 10-K (filed on February 24, 2012) are illustrative (the portion selectively quoted by

Plaintiff within each excerpt is bolded, with other italicized emphases added by Defendant):

- The remittance industry has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others.  While **we believe our fraud prevention efforts are effective and comply with applicable law and best practices**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, *make the prevention of consumer fraud a significant and challenging problem.  Our failure to continue to help prevent such frauds or a change in laws or their interpretation could have an adverse effect on our business, financial condition and results of operations.*  (Ex. 30, 2011 10-K at 32; Compl. ¶ 305.)

- While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly

---

[28] The Complaint alleges that the Company made one additional statement regarding compliance with applicable laws.  Paragraph 388 purports to quote Mr. Ersek as stating, "[w]e comply with all regulations world[wide] and try to be best in class and leading our industry here."  This inaccurately describes what Mr. Ersek said, which was actually on the topic of "competitive advantage," a subject discussed in further detail below.  Mr. Ersek stated as follows, in response to a question about whether the Company foresaw "a meaningful pickup in compliance costs in 2014": "I think it will continue to – we're going to have this investment.  But long-term, as Scott said, I just want to repeat that, given our skill, we have a competitive advantage.  Don't forget we are in 200 countries, to comply with all regulations world and try to be the best in class, and leading our industry."  (Ex. 29, July 30, 2013 Earnings Call Tr. at 13.)

> changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage. . . . *In some cases, we could be liable for the failure of our agents or subagents to comply with laws which also could have an adverse effect on our business, financial condition, and result of operation*.  (Ex. 30, 2011 10-K at 18, 33; Compl. ¶ 305.)

As the Supreme Court recently emphasized, a statement's context within risk disclosures of precisely this type is crucial, and must be taken into account.  *Omnicare*, 135 S. Ct. at 1330 ("an investor reads each statement within [an SEC filing], whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information").

Here, as a matter of law, the statements of belief relating to compliance that Plaintiff attacks were expressly qualified opinions that cannot support a securities fraud claim.

### 1.    The Legal Standards For Falsity Of Opinion Statements

The Supreme Court recently addressed when there can be liability under the securities laws for allegedly misleading opinion statements in *Omnicare*.[29]  In order adequately to allege falsity with respect to statements of opinion of exactly the sort at issue here – *e.g.*, "I believe our marketing practices are lawful," *see Omnicare,* 135 S. Ct. at 1326 – the Court stressed that the plaintiff cannot allege that the statement is false simply because the "belief turned out to be wrong."  *Id.* at 1327.  Instead, the plaintiff must allege particularized facts demonstrating that the speaker *subjectively* did not "actually hold[] the stated belief" at the time the statement was made.  *Id.* at 1326.  As the Court explained in an illustration, a "statement about legal

---

[29] Although *Omnicare* concerned claims brought under Section 11 of the Securities Act of 1933, the Tenth Circuit, in *Nakkhumpun v. Taylor*, has applied its reasoning to complaints, like this one, asserting claims under Section 10(b) of the Exchange Act and Rule 10b-5.  782 F.3d 1142, 1159 (10th Cir. 2015).  *See also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (applying *Omnicare* to Section 10(b) claims); *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (same).

compliance ('I believe our marketing practices are lawful') would falsely describe [the speaker's] own state of mind if she thought her company was breaking the law." *Id.*[30]

The Supreme Court also indicated in *Omnicare* that there can, in some instances, be a second type of "objective" falsity for statements of belief – but only under very limited circumstances, *i.e.*, if a complaint pleads particularized facts indicating that in making the statement the speaker did not undertake any due diligence or investigation of the type that would be expected by a reasonable investor in order for the statement to have grounding. *See* 135 S. Ct. at 1332 (requiring plaintiffs alleging this kind of falsity to identify "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context"). The Second Circuit's recent explanation of this type of falsity is instructive, since it concerns precisely the context at issue in this Complaint, *i.e.*, one where an issuer's statement of its "belief that its conduct is lawful" was claimed to be false. *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016). As the Second Circuit recently held, such statements "do[] not imply that the issuer's conduct is, in fact, lawful, but only that the issuer *has conducted a meaningful inquiry* and has a reasonable basis upon which to make such an assertion." *Id.* (emphasis added). Accordingly, merely alleging that the conduct was in fact unlawful is not sufficient. "[S]o long

---

[30] *See also Align Tech.,* 856 F.3d at 615-16 ("when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege . . . that the speaker did not hold the belief she professed") (internal quotation marks omitted); *Tongue*, 816 F.3d at 208 (affirming dismissal when "Plaintiffs had failed to allege any facts suggesting that Defendants did not genuinely believe what they were saying at the time they said it" (internal quotation marks omitted)); *Nakkhumpun*, 782 F.3d at 1159 (affirming dismissal where plaintiff did not allege facts that "would cast doubt on the sincerity or reasonableness of [the defendants'] statement of [their] opinion").

as Defendants conducted a 'meaningful' inquiry and in fact held that view, the statements did not

mislead in a manner that is actionable." *Id.* Here, however, Plaintiff does not even attempt to

allege that any of the statements were false for this reason under *Omnicare.* Plaintiff alleges no

particularized facts from any source regarding what any of the Individual Defendants did or did

not do by way of conducting an inquiry – such as what information they received or who they

talked with – prior to signing the Form 10-Ks.

Instead, Plaintiff's focus is on its claim that Defendants supposedly *actually knew* at the

time of each of these statements that Western Union was committing ongoing violations of the

compliance laws, and therefore did not genuinely, subjectively believe what they professed to

believe. A "subjective falsity" theory of this sort relating to an opinion essentially duplicates the

scienter requirement, and is therefore subject to the PSLRA's strong inference requirement. *See*

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) ("[W]here plaintiffs allege a

false statement of opinion, 'the falsity and scienter requirements are essentially identical'

because 'a material misstatement of *opinion* is by its nature a false statement, not about the

objective world, but about the defendant's own belief.'" (quoting *Podany v. Robertson Stephens,*

*Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)), *aff'd* 816 F.3d at 214; *City of Monroe Emps.'*

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *13-14 (S.D.N.Y. Sept. 19,

2011) (dismissing allegations of false opinion statements when plaintiffs did not "plead[] facts

creat[ing] a strong inference . . . that defendants did not sincerely believe the opinion they

purported to hold"). Accordingly, in order adequately to allege that the statements of opinion

were false, Plaintiff must plead with particularity facts that create a strong inference – at least as

compelling as any competing innocent inferences – that each of Messrs. Ersek, Scheirman, and

Agrawal did not believe what he said but, instead, that each believed throughout the Class Period that the Company was engaged in ongoing violations of applicable legal requirements and believed that its compliance systems were fundamentally ineffectual.  As discussed below, none of the various sources that Plaintiff enumerates even comes close to providing particularized facts supporting such a conclusion.

### 2. Plaintiff Fails To Allege Any Particularized Facts Showing That The Statements Of Opinion Regarding Compliance Were Not Believed.

**Confidential Witnesses.**  Plaintiff includes in its Complaint allegations from four purported Confidential Witnesses.  But the Confidential Witness allegations are striking mostly for what they omit:  none of the Confidential Witnesses claims that any Individual Defendant knew of or was internally informed about any ongoing, persistent legal violations during the Class Period, let alone that they were lying to investors in statements that they respectively made about their "beliefs" regarding Western Union's compliance efforts.

Only two of the Confidential Witnesses even mention the Individual Defendants:  CW3 and CW4.[31]  CW3 allegedly participated in the investigation that led to the 2017 Regulatory Settlements.  While he does not claim to have had any direct contact with Messrs. Ersek, Scheirman, or Agrawal, he allegedly opines that "there was no way that Defendants Ersek, Scheirman, and Agrawal were not informed about the on-going investigations that resulted in the [Regulatory Settlements]."  (Compl. ¶ 249.)  But the existence of the investigations, prompted by conduct occurring *before* the Class Period, was hardly a secret – the Company itself regularly disclosed these investigations in its periodic SEC filings, as the Complaint itself admits.  (*See,*

---

[31] While the allegations of CW1 and CW2 make no mention of any of the Individual Defendants, they are addressed below at pp. 41-43, 45-46, *infra*.

*e.g.*, *id.* ¶¶ 255-56.)  And nowhere does CW3 describe, much less with the required factual particularity, *what* any of these individuals was told about these investigations *or about the status of current compliance* – which was the subject of the challenged "belief" statements in the various Forms 10-K.  Moreover, not only does CW3 omit any factual particulars regarding the substance of what any of these individuals was allegedly "informed," he provides no factual particulars regarding timing, either.  Timing matters as well, however, both because the various "belief" statements were made at different times *and* because Messrs. Scheirman and Agrawal had limited and distinct tenures.

CW4, an alleged "high-level" compliance officer, in turn, makes reference only to Mr. Ersek, and only with respect to a limited period of time.  He claims to have "regularly briefed Ersek on relevant compliance-related issues, including the status of the Southwest Border Agreement" (*id.* ¶ 284) during the period from late 2011 to April 2013.  But nowhere does CW4 detail what he said to Mr. Ersek at any of these times – much less claim that he told him, in effect, "that the Company [currently] lacked the most basic components of an effective AML or anti-fraud program."  (*Id.* ¶ 12.)  As the Supreme Court has made clear, however, under the PSLRA, deliberate omissions and ambiguities count against a plaintiff, not for it, in determining the adequacy of a complaint.  *Tellabs*, 551 U.S. at 325-26.  Courts have thus repeatedly refused to credit so-called "confidential witness" allegations when the critical details of purported communications are omitted.  *See Anderson*, 827 F.3d at 1243 (finding allegations from purported confidential witness regarding reports on cost overruns insufficient when the purported witness omitted details regarding crucial portions of the report); *In re Skechers U.S.A., Inc. Sec. Litig.*, 273 F. App'x 626, 627 (9th Cir. 2008) (refusing to credit allegations of purported

confidential witnesses regarding reports when the purported witnesses "fail[ed] to describe with any detail the contents of these interim reports, who drafted them, or how the confidential witnesses were in a position to know that the defendants received the alleged reports"); *City of New Orleans Emps.' Ret. Sys. v. PrivateBancorp, Inc.*, 2011 WL 5374095 at *3 (N.D. Ill. 2011) (finding confidential witness allegation of discussion of "problems" at a meeting insufficient when the CW did not describe the particular problems discussed). Indeed, because CW4 allegedly would have been in a position to know whether Mr. Ersek received such information (*see* Compl. ¶ 284 (alleging CW4 to be a "high-level" compliance officer who "regularly briefed" Mr. Ersek)), the fact that CW4 does not allege any such communication of ongoing legal violations or "that the Company [currently] lacked the most basic components" of an effective compliance program suggests that Mr. Ersek was not told any such thing. *See Fulton Cty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 2010 WL 601364, at *17 (E.D. Wis. Feb. 18, 2010) (when a confidential source does not allege a material fact despite being in a position to know, it suggests the requested inference is not accurate), *aff'd*, 675 F.3d 1047 (7th Cir. 2012).

CW4 also claims that Mr. Ersek and the Company's General Counsel were briefed about regulatory reviews and "always briefed on the discipline or shutdown of agents and any related investigations." (Compl. ¶ 284.) Once again, however, the critical details *of what was said* and *when* are entirely absent.[32] Moreover, while it is hardly surprising that Mr. Ersek and the

---

[32] CW4 does not even claim to have been present on these various occasions. When a confidential witness's allegations are speculative or constitute hearsay, they are likewise routinely disregarded by the courts. *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (finding purported CW testimony without value when witnesses admitted they "had no personal knowledge" of the information in question); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (rejecting purported CW testimony because "[s]ome of

General Counsel were told when an important agent was being disciplined or shut down, the DPA and FTC Complaint were concerned with instances in which agent locations should have been shut down due to employee failings or agent misconduct *but were not*.  Tellingly, CW4 does not claim that this was a topic he discussed with Mr. Ersek, much less claim that he or anyone else flagged for Mr. Ersek at any time during the Class Period some *ongoing*, systemic problem with respect to inadequate agent discipline.

Finally, CW4 is alleged to have described Mr. Ersek as having a "hand[s]-on management style," including having a "regular involvement in compliance-related issues."  (*Id.* ¶ 549.)  However, a CEO's being "hands-on" provides no basis to conclude that he has knowledge of any particular fact or event in a company the size of Western Union, let alone with respect to over 500,000 agent locations in far-flung places.  Once again, CW4 provides no particularized facts about the specific issue here – *i.e.*, whether Mr. Ersek was told by others at Western Union in the course of this unspecified "involvement" that the Company was, during the Class Period, currently violating its general legal obligations and "lacked the most basic components of an effective AML or anti-fraud program."  Courts have frequently rejected similar attempts to avoid providing particularized facts showing knowledge of wrongdoing by resorting instead to "hands on" and "must have known" generalizations.  *See, e.g.*, *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (allegations of defendant's "hands-on management style . . . coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference

---

the confidential witnesses were simply not positioned to know the information alleged, [and] many report only unreliable hearsay").

of scienter"); *In re Apple Comput., Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) ("general allegations about a 'hands-on' management style are insufficient" to support scienter); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) (testimony that defendants "had to have known" certain facts based on their positions was insufficiently particular to support scienter).

In sum, none of the "Confidential Witnesses" provides a single particularized fact indicating that any of the Individual Defendants was told at any point in time – by anyone – that Western Union allegedly was systematically currently violating legal requirements or regulatory responsibilities.  That omission is glaring, because according to Plaintiff these witnesses supposedly were on the inside and supposedly had information regarding what was actually going on at the Company.  Indeed, none of the Confidential Witnesses even alleges that he believed Western Union was violating legal requirements or regulatory responsibilities or "lacked the most basic components of an effective AML or anti-fraud program."  As such, the allegations attributed to the Confidential Witnesses do not support any inference of scienter with regard to any of the opinion statements of belief contained in the various Forms 10-K – let alone the *strong* inference required by the PSLRA.

**Regulatory Settlements.**  Lacking any witness who claims to have knowledge showing that, at the times of the various Forms 10-K, the stated beliefs of Messrs. Ersek, Scheirman, and Agrawal regarding current compliance were not genuinely held – and were contrary to what they were being told by others at Western Union – Plaintiff tries to create an inference to that effect based on the Regulatory Settlements.  None of Plaintiff's theories in that regard, however,

supports any inference that the Individual Defendants did not each actually believe what he said at the time he said it.

**First,** Plaintiff repeatedly refers to Western Union's admissions in the DPA (*e.g.*, Compl. ¶¶ 19, 186, 191, 505, 521, 541).  But these were not admissions of any violations by Messrs. Ersek, Scheirman, or Agrawal.  To the contrary, as the DPA Statement of Facts makes clear throughout, the conduct forming the bases for the violations was that of various other Western Union *employees* who willfully failed to take action, particularly relating to the discipline of certain agents whose conduct they had identified as suspicious.  (*See, e.g.*, DPA SOF ¶ 2 (summarizing categories of conduct by "employees").)  This "willful" failure by some employees to act when in possession of information that they knew or should have known warranted action was, in turn, imputed to the Company, under basic principles of vicarious liability.  And it was these employees' "willful" failures to act that resulted in a failure "to adequately *implement* and *maintain*" an *effective* AML and anti-fraud program.  (*Id.* ¶¶ 1-2 (emphasis added).)  In short, as Judge Krieger recently noted when faced with allegations similar to those made here by Plaintiffs, Western Union admitted in the DPA that "some of its employees and agents willfully failed to abide by AML laws and aided and abetted fraudsters" – ***not*** that the Company's very most senior officers knowingly undermined the implementation of an effective compliance regime.  *Lieblein v. Ersek*, 2017 WL 4337719, at *5 (D. Colo. Sept. 29, 2017) ("*Lieblein II*").

The Complaint attempts to sidestep this inconvenient fact by alleging that, according to the DPA, unidentified "very senior managers" were aware of the agent- and employee-level conduct at issue in the DPA.  (Compl. ¶ 168.)  But even if that were true, this is not a

particularized allegation showing that any of *Messrs. Ersek, Scheirman, or Agrawal* was himself aware of this employee misconduct.  *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 828-29 (8th Cir. 2003) (alleging that information was known to "senior officers" was "not specific enough to support a strong inference" of knowledge on the part of individual defendants).

Moreover, the challenged "belief" statements in the Forms 10-K relate to then-*current* compliance efforts, with the first set of such statements made in February 2012 and the others made from 2013 to 2016.  However, none of the admissions in the DPA post-date 2012.  And the DPA contains nothing indicating that, as of February 2012, Mr. Ersek and Mr. Scheirman knew or believed that the Company was violating its legal compliance obligations at that time.  Indeed, while the Complaint refers to issues involving a couple of agents mentioned in the DPA that continued into 2012, neither the DPA itself nor the Complaint makes any attempt to show any knowledge of these circumstances by Mr. Ersek or Mr. Scheirman at the time the 2011 Form 10-K was issued in February 2012.  And the DPA praises the efforts led by Mr. Ersek since "at least" 2012 (while Mr. Scheirman was still CFO, and before he stepped down in late 2013) to institute enhancements in Western Union's compliance systems.  (DPA SOF ¶ 100.)

***Second,*** the Complaint asserts that there were alleged failures to "adequately or timely discipline . . . derelict agents" that persisted during the Class Period.  (Compl. ¶ 167.)  Although the Complaint contains allegations (primarily drawn from the FTC Complaint (*see id.*)) regarding a handful of specific agents whose locations were the subject of multiple fraud reports during the Class Period or some portion thereof, Plaintiff provides no facts that link any involvement in or knowledge of these instances to any of the Individual Defendants.  Tellingly, the Complaint contains no particularized factual allegations of there having been any discussions

with or documents provided to any of the Individual Defendants *concerning these particular agents*, much less any knowledge by Messrs. Ersek, Agrawal, or Scheirman that there were ongoing violations during the Class Period connected to these specific agents – or otherwise.[33]

For example, Plaintiff makes much of a particular agent described in the DPA, Hong Fai General Contractors Corp. ("Hong Fai"), which was terminated on March 19, 2012 – less than a month into the Class Period.  (Compl. ¶¶ 186-87.)  But Plaintiff alleges nothing demonstrating that either Mr. Ersek or Mr. Scheirman (whose position and responsibilities did not even involve AML compliance) was aware of any violations of the Bank Secrecy Act ("BSA") *by Western Union employees* in connection with Hong Fai at the time the 2011 Form 10K was issued (or familiar in any way with Hong Fai and its history at that time).[34]  Nor does the Complaint or DPA contain any other allegations demonstrating that, as of February 24, 2012, Mr. Ersek or Mr. Scheirman knew that there was some generalized deficiency in Western Union's disciplinary policies or practices.  To the contrary, the DPA noted that Western Union had put into place "internal procedures" that would require agents like Hong Fai to be "discipline[d] or

---

[33] Plaintiff also argues that the FTC Complaint alleged that Western Union "had knowledge" of the compliance violations related to fraud because at least 146 of Western Union's 500,000 agent locations around the world were charged with colluding in fraud.  (Compl. ¶¶ 253-54; FTC Compl. ¶¶ 34-36.)  But there is no allegation that any of the Individual Defendants knew about the activities of these agents prior to their indictment.  Nor is there any allegation that any of them allowed any wrongdoing, once known, to continue.

[34] The same failure to link knowledge of alleged inadequate agent discipline during the Class Period to any of the Individual Defendants is evident with respect to another example provided by Plaintiff (*see* Compl. ¶¶ 169-72), and already discussed above (see p. 22 n.17, *supra*), as to which the allegations likewise make no mention of any of the Individual Defendants.  Similarly, the Complaint refers to administrative sanctions imposed by Spanish regulators based on conduct occurring in 2011 and 2012 (*id.* ¶¶ 173-74; DPA SOF ¶¶ 49-50), but it does not include any allegations regarding what the conduct at issue was, much less whether any of the Individual Defendants was aware of it.

terminate[d]," but certain employees who were aware of the agent's conduct "did not follow" those policies – without any reference to the Individual Defendants.  (DPA SOF ¶ 80.)

  **Third,** Plaintiff alleges that the Company failed to implement what it conclusorily asserts were "best practices" (Compl. ¶ 205) because it allegedly twice decided not to implement protocols that were part of settlement agreements agreed to by MoneyGram:

- In October 2009, MoneyGram agreed with the FTC to implement certain compliance measures.  (*Id.*)  Western Union employees met with the FTC in December 2009 and chose not to implement the standards that MoneyGram had implemented, but instead eventually reached agreement with the FTC on a different compliance protocol.  (*Id.* ¶¶ 207-08; *see also* FTC Compl. ¶ 52 (describing the 2009 MoneyGram settlement); DPA SOF ¶ 39 (describing the protocol Western Union agreed on with the FTC).)

- In November 2012, MoneyGram reached a settlement with the DOJ.  (Compl. ¶¶ 209-10.)  According to CW2, Western Union chose not to adopt the protocol agreed upon between MoneyGram and the DOJ.  (*Id.* ¶ 211.)

Plaintiff attempts to imply that because Western Union did not adopt MoneyGram's settlement-imposed measures, its own programs must therefore have been legally deficient *and known to be so by the Individual Defendants at the time.*  The conclusion simply does not follow, however, and amounts to a speculative leap.  For example, Plaintiff itself acknowledges that the FTC agreed with Western Union on a different compliance protocol.  (*Id.* ¶ 208.)  While the Complaint offers the conclusory allegation that the protocol Western Union agreed upon with the FTC was "less-demanding" (*id.*) – with no particularized facts provided to support that assertion – "less demanding" is not at all the same thing as legally noncompliant.  By definition, Western Union's protocol – under which the Company would immediately suspend and investigate any agent in certain regions that, within a 30-day period, processed a sufficiently high number of transactions reported as fraudulent – was stringent enough to be accepted and agreed to by the

FTC at the time.[35]  (DPA SOF ¶ 39.)  Similarly, whether or not the protocol imposed on

MoneyGram in its 2012 settlement was "stronger,"[36] that says nothing about whether, when

Mr. Ersek and Mr. Scheirman expressed their beliefs about the Company's regulatory

compliance in the next Form 10-K filing (made in February 2013), they actually knew and

---

[35] The Complaint also alleges that Western Union "decided that it would not implement" the
protocol it agreed upon with the FTC.  (Compl. ¶ 208.)  This allegation fundamentally distorts
the facts as set forth in the DPA, and the Court need not accept Plaintiff's self-serving
characterizations of that document.  *See Kennedy*, 552 F. App'x at 792 ("[F]actual allegations
that contradict . . . a properly considered document are not well-pleaded facts that the court must
accept as true." (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385
(10th Cir. 1997)).  In fact, there were no violations of the Company's agreement with the FTC,
which required specific actions in the event that there were certain levels of complaints for
specific agents.  In *addition* to taking those actions, Western Union also completely shut down
all money transfers from the United States to certain agents in the United Kingdom – which
meant that there could be no fraudulent transfers (or any others).  (DPA SOF ¶¶ 39-41.)  In any
event, there is no linkage to Messrs. Ersek or Scheirman (the only Individual Defendants present
at the time), or even any suggestion that any of the Individual Defendants was in any way
involved in these decisions.

[36] The Complaint describes the additional protocols adopted by MoneyGram as "stronger," but
the source for this characterization is unclear.  Plaintiff alleges that CW2 stated that Western
Union "chose not to implement the stronger AML protocol that Money[G]ram adopted as part of
its 2012 agreement with the DOJ" (Compl. ¶ 211), but it is unclear whether "stronger" is the
confidential witness's characterization or Plaintiff's own.  In any event, regardless whether the
specific new protocols were "stronger," neither CW2 nor Plaintiff provides any detailed
comparison of MoneyGram's existing compliance protocols with Western Union's, as would be
required adequately to allege that the additional MoneyGram protocols adopted as a result of its
2012 settlement caused its compliance programs to be "stronger" *overall* compared to Western
Union's.

The Complaint also asserts that Mr. Ersek, Mr. Scheirman, and "likely [Mr.] Agrawal" made a
"conscious decision" not to adopt MoneyGram's protocol, but in support of that conclusory
allegation Plaintiff cites only a Board meeting at which management described "key features of a
recent settlement reached between MoneyGram and the U.S. Department of Justice."  (*Id.* ¶ 214.)
This says nothing about whether there was any discussion of adopting MoneyGram's protocol,
much less whether some "decision" was made by any of the Individual Defendants.  Moreover,
the Complaint's bare, conclusory assertion about Messrs. Scheirman and Agrawal is particularly
unfounded, since the Complaint contains no particularized allegations that either of the CFOs
had any responsibility for or authority over such compliance-related "protocols" or other
compliance issues.

believed *at the time* that Western Union's own compliance program was legally inadequate. Accordingly, Plaintiff's allegations about the MoneyGram settlement measures fail to show that there was anything known at the time to be legally noncompliant with Western Union's compliance program.[37]

      **Fourth**, in yet another specious attempt to allege fraud by hindsight, Plaintiff alleges that the remedial measures Western Union was recently required to adopt in connection with its January 2017 Regulatory Settlements somehow show that "even at that late stage, the Company still did not have AML and anti-fraud programs that met minimal legal requirements." (Compl. ¶ 150.) To begin, even if this assertion were true, it still would not show that any of the Form 10-K statements made by any of the Individual Defendants regarding his belief did not actually reflect those beliefs *at these earlier times*. Indeed, as noted above (p. 12, *supra*) , the Company was being told by others in mid-2016, for example, that its compliance programs "should be a model for others in the industry."

      But Plaintiff's conclusory assertion is also unsupported and misleading. The relevant period of the DPA concluded in 2012, and the DPA contained no adverse statements regarding Western Union's compliance program after that time and no findings that the Company's *current* compliance programs (or those at any time since 2012) were legally deficient. Moreover, while the Company agreed to make further "enhancements," the DOJ recognized the agreement to do

---

[37] Plaintiff alleges that some of the remedial measures adopted by MoneyGram in 2012 are similar to those Western Union was later required to adopt as part of its own regulatory settlements in 2017. (Compl. ¶¶ 215-16.) However, the fact that the DOJ may impose certain similar *remedial* measures *after* finding violations does not mean that those same measures are required for regulatory compliance *ab initio* – much less that the Individual Defendants knew or believed as of November 2012 that adopting the MoneyGram settlement remedial provisions was now a legal requirement as of that time for all money transmitters.

so as reflecting "the Company's commitment to *continue to enhance* its anti-money laundering

and anti-fraud compliance programs" – not as some acknowledgement of current legal

noncompliance.  (DPA at ¶ 4(d) (emphasis added).)[38]

      **Internal Reports, Analyses, And Records.**  Lacking particularized facts showing that

any of the Individual Defendants was aware of any ongoing, systematic failure to discipline

agents, Plaintiff tries to create an inference of their knowledge by referring to certain internal

reports.  (*See* Compl. ¶¶ 9, 14, 114, 137, 153, 155-56, 160-67, 169, 175, 179, 297, 542-43, 545-

46, 552.)  But the Complaint provides no facts demonstrating that any of the Individual

Defendants even received these reports, let alone any supporting details or specifics regarding

contents at any given point in time.

      For example, CW1 states that consumer fraud hotline complaints[39] were "aggregated"

into a "composite set of data" which was then distributed to unidentified "senior managers."  (*Id.*

¶ 161.)  Conspicuously, however, there is no allegation that CW1 (allegedly a low-level Western

Union employee) ever spoke with or had any other communications with any of the Individual

---

[38] Indeed, the "Enhanced Compliance Undertaking" expressly recognized that the Company's
commitments included various matters that the Company "has" undertaken.  (DPA at C-1.)
Similarly, the FTC Complaint did not allege – much less did the Company admit – that the
Company "still did not have AML and anti-fraud programs that met minimal legal requirements"
(Compl. ¶ 150).  Instead, as discussed above, the FTC Complaint alleged post-2012 failures to
take adequate action in "certain cases."  And while the Stipulated Order for Permanent
Injunction entered into with the FTC imposed certain ongoing requirements and prohibitions
(many of which merely reflect what Western Union was already doing), that document
constitutes a going-forward settlement agreement, not some articulation of past "minimal legal
requirements" applicable outside the settlement context.

[39] A hotline complaint or fraud complaint is by no means necessarily a complaint about agent
misconduct.  Instead, such complaints frequently involve a customer reporting that he or she was
scammed by a third party, and do not necessarily include an allegation of agent complicity.

Defendants, or has any knowledge whatsoever about what data the Individual Defendants received. And none of the Individual Defendants is identified (by CW1 or otherwise) as one of the persons receiving this "composite data." *See, e.g., Anderson*, 827 F.3d at 1240 (rejecting claimed inference of knowledge based on information in report that contradicted public statements where plaintiffs did "not establish that the . . . executives actually had seen the . . . report or were aware of" the information it reported); *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (even when "reports were made available," plaintiffs cannot adequately use that fact to plead that a defendant had knowledge of the reports' contents if they "have not directly alleged that [the defendant] actually read" them). Moreover, "composite data" would appear to be the very opposite of agent-by-agent data. In any event, there is no description of the specific contents of any of these reports at any time during the Class Period – much less any particularized facts demonstrating that some particular report clearly flagged some ongoing, unaddressed agent violations. *See., e.g., Anderson*, 827 F.3d at 1241 (rejecting claim of executive knowledge based on report when plaintiffs also failed adequately to "describe the content" of the report).

Similarly, citing the DPA, the Complaint refers to "60-Day Fraud Reports" prepared by the Company's Corporate Security Department; these reports identified agent locations that processed five or more transactions that had been reported as fraud. (Compl. ¶ 162; *see also* DPA SOF ¶¶ 31.b, 36.) But neither the Complaint nor the DPA alleges that any of the Individual Defendants routinely received these reports – much less that they were made aware *during the Class Period* of certain agents appearing on these reports with no action being taken.

Moreover, the mere fact that various agents may have processed money transfers that later generated multiple fraud reports does not necessarily mean that these agents were complicit with the fraudsters, much less known to be so by any of the Individual Defendants.  There can be a variety of reasons for multiple fraud reports, some innocuous and others not.  That is why, as discussed above (p. 20-21), multiple fraud reports served as a trigger for further investigation under Western Union's procedures.  In any event, Plaintiff includes no particularized facts suggesting that *any* internal reports, analyses, or records provided to Messrs. Ersek, Scheirman, or Agrawal gave any of them knowledge of agents found to be complicit with fraudsters as to whom no appropriate action was being taken.

**Response to Government Subpoenas.**  Plaintiff also tries to invent support for knowledge of misconduct by the Individual Defendants by pointing to the Company's production of millions of pages of information to the government.  (*See, e.g.*, Compl. ¶¶ 301, 543.)  But this argument requires the Court to engage in multiple layers of speculation, none of which are supported by particularized factual allegations in the Complaint.  Plaintiff assumes that some unidentifed set of the documents within this mass facially revealed ongoing wrongdoing and noncompliance *by Western Union* employees, and further assumes that each of the Individual Defendants reviewed these millions of pages.  But Plaintiff has provided no support whatsoever for either of these speculative assumptions.  Indeed, no document, witness, or other fact identified in the Complaint indicates that any of these individuals, who were among the Company's highest-level officers, reviewed any of the document productions provided to the government during the course of various years-long investigations, or were given any information about the documents produced that revealed some ongoing and uncorrected

employee-level misconduct.[40]  Nor is there even an allegation that any other Western Union

representatives who may have reviewed those productions came to the same conclusions as the

government ultimately reached, let alone that they informed the Individual Defendants of any

such conclusions.  *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951, 953 (9th Cir. 2017)

(affirming dismissal because plaintiffs did not show both that defendants knew about underlying

conduct *and* that the conduct constituted a violation); *In re Plains All Am. Pipeline, L.P. Sec.

Litig.*, 245 F. Supp. 3d 870, 909 (S.D. Tex. 2017) (same).[41]

### 3.   Plaintiff Distorts The Board Of Director Materials, Which Also Fail To Provide Particularized Facts In Support Of Plaintiff's Allegations.

Plaintiff claims that materials from meetings of the Company's Board of Directors during

the Class Period show that the Individual Defendants were supposedly aware that the Company

was violating its regulatory compliance obligations and that its compliance efforts were

ineffective.  (*See* Compl. ¶¶ 88-101, 231-47.)  As Plaintiff admits, the materials it cites on this

subject were obtained from filings in the related *Lieblein* derivative lawsuit.  But the Complaint

---

[40] This allegation is especially deficient as to Mr. Scheirman, who stepped down as CFO in 2013, long before many of the government document subpoenas were even issued (*see, e.g.,* Compl. ¶¶ 269, 272, 273, 277, 509).  Likewise, Mr. Koch's tenure was also of limited duration.  These distinctions matter because nowhere does the Complaint allege when the particular documents (none of which is identified) were produced that (purportedly) revealed some ongoing legal violations by Western Union employees.

[41] As discussed in further detail on pages 9-12, Plaintiff also points to investigations that had been concluded prior to the Class Period.  (*See, e.g.*, Compl. ¶¶ 300, 302.)  The fact that the Company had years ago entered into prior consent agreements with certain regulators does not in any way indicate that any of the Individual Defendants did not honestly believe Western Union was complying with the law during the Class Period.  Although Plaintiff asserts that "the Company did not cure the compliance failures addressed in government enforcement actions that were revealed prior to the Class period" (*id.* ¶ 302), the Complaint provides no facts indicating that Defendants was aware of any such ongoing compliance failures, or were made aware of any provisions of prior consent agreements that had not been addressed.

distorts these Board materials and repeatedly fails to provide the full context for the materials it

cites.  Copies of the relevant Board materials, in the same form as those materials were submitted

in *Lieblein*, are also attached as Exhibits 42-86.  These documents are properly considered in

ruling on this motion,[42] and the Court need not accept Plaintiff's self-serving characterizations of

the documents, which conflict with the content of the documents themselves, as well-pleaded

facts.  *See Kennedy v. Peele*, 552 F. App'x 787, 792 (10th Cir. 2014) ("factual allegations that

contradict . . . a properly considered document are not well-pleaded facts that the court must

accept as true" (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385

(10th Cir. 1997))).

     With regard to actual issues of compliance with the AML and anti-fraud regulations at

issue in this Complaint, the Board materials Plaintiff cites nowhere express or endorse a view

that the Company was contemporaneously violating its regulatory obligations.  It is thus no

accident that Plaintiff is uanble to cite any particulars to that effect.  Instead, the bulk of the

allegations regarding these Board materials concern the Company's progress in completing work

on the recommendations made by the Monitor appointed in connection with the SWB Agreement,

*not* the Company's compliance with anti-fraud and AML statutes and regulations, as Plaintiff

misleadingly suggests.  (*See* Compl. ¶¶ 100-101, 232-239, 241-42, 244-45.)  Reliance upon the

"Monitor's demands as a proxy for allegations that WU's compliance systems were indeed

defective" is "improper[]."  *Lieblein v. Ersek*, 2016 WL 1274399, at *7 n.10 (D. Colo. Mar. 31,

2016) ("*Lieblein I*").

---

[42] *Lieblein II*, 2017 WL 4337719, at *2 (a court may consider anything within "the four corners of the Complaint, any documents attached thereto, and any external documents that are referenced in the Complaint and whose accuracy is not in dispute").

Plaintiff nonetheless alleges that the Monitor's recommendations were "necessary for Western Union to bring its AML compliance program in line with its legal obligations under the BSA." (Compl. ¶ 231.) But, as noted previously, *see* p.12, n.7, *supra*, this is a bare, conclusory assertion unsupported by any particularized facts. In fact, as part of the initial SWB Agreement executed in 2010, the Attorney Generals of the states of Arizona, Texas, New Mexico, and California specifically acknowledged that since the time of the alleged violations committed during the 2003-2007 period the Company "has developed and implemented a risk-based anti-money laundering . . . compliance program that is designed to prevent, detect, and report potential money laundering activities." (*See* p.11, *supra*; Ex. 14, Feb. 16, 2010 Form 8-K, Ex. 10.1 at ¶ 3 (emphases added).) The Complaint does not cite a single statement made to or by the Company's Board to the contrary – *i.e.*, that the Company did not have an AML or anti-fraud compliance system in place or that Western Union believed that its systems were legally noncompliant and critically deficient.

Moreover, the statements regarding the status of the Company's efforts to complete the Monitor's recommendations are themselves taken out of context. As just one example, Plaintiff alleges that at a July 19, 2012 Audit Committee meeting, management stated that the Monitor "'expressed issues' with several of the Company's AML controls, including '[v]arious deficiencies in the documentation of policies and procedures.'" (Compl. ¶ 234.) But as is clearly evident from the pages Plaintiff quotes (*see* Ex. 62, July 19, 2012 Audit Committee Presentation at 6-7, titled "Southwest Border Update"), the topic at issue in this portion of the

presentation relates to the SWB Agreement and the Monitor's recommendations.[43]  The "issues"

the Monitor raised related to one aspect of the business ("Sender/Receiver Information"), and the

presentation indicates that an outside expert, "Navigant[,] has been engaged to review existing

controls" and provide its view of their appropriateness.  (*Id.* at 6.)  Moreover, the *Company's*

view – as expressed in this very document – was that the "*current controls on these products are*

*appropriate*." (*Id.*) (emphasis added).  The Complaint contains no facts indicating that the

Company personnel making this presentation did not genuinely hold that view, or that those

receiving the presentation – including Mr. Ersek – came to some different conclusion.  Thus,

even if the topic discusssed was a more general one of AML and anti-fraud compliance, which it

was not, no inference regarding the Individual Defendants' knowledge of some ongoing

noncomliance can be drawn.

 The remainder of the Board materials cited by Plaintiff are simply irrelevant.  For

instance, the Complaint alleges that certain Individual Defendants were warned that "'high' risk

assessments for certain geographic regions were 'likely inherent given the nature of [Western

Union's consumer-to-consumer] business.'"  (Compl. ¶ 241 (citing Ex. 80, July 18-19, 2013

Board Minutes at 3).)  This is an assessment that the Company's business *inherently* involves

risk, a warning the Company repeatedly provided to investors.  It says nothing about whether or

---

[43] The Complaint attempts to create the misimpression that the Audit Committee was informed at
this meeting that the Company was hopelessly behind in completing the Monitor's
recommendations.  (*See, e.g.,* Compl. ¶¶ 100, 233, 236, 242.)  In fact, precisely the opposite was
the case.  The Audit Committee was informed:  "The SWB program remains largely on track
with major milestones being delivered on a near constant basis per the program plan."  (Ex. 62,
July 19, 2012 Audit Committee Presentation at 2.)

not the Company was currently complying with regulations.[44]  In addition, many of Plaintiff's allegations simply relate to the status of individual items the Company was planning to complete with regard to the Monitor's recommendations.  (Compl. ¶¶ 100, 233, 236, 238-39, 242.)

### B.    Statements Regarding Western Union's Compliance Programs Being A "Long-Term Competitive Advantage" Or A "Competitive Strength"

Plaintiff also challenges a large number of statements to the effect that the Company's compliance capabilities were a "long-term competitive advantage" or a "competitive strength." (Compl. ¶¶ 311, 336, 337, 374, 434, 459, 465, 480; *see also id.* ¶¶ 12, 78, 125, 313, 314, 321, 322, 328, 333-34, 338-39, 349, 357, 363, 375, 381, 388, 408, 423, 432, 456.)  These statements generally expressed the view that the Company had, and would in the future have, a competitive advantage because, unlike competitors, it already had in place a worldwide compliance infrastructure in more than 200 countries, built up over time and at very substantial cost, and involving many hundreds of compliance employees around the globe.  The resulting ubiquity, including obtaining required licensures and establishing regulatory compliance infrastructure in each of the more than 200 jurisdictions, allowed for a breadth of coverage in transmitting money between jurisdictions that competitors were unable to match.   Moreover, the Company was investing hundreds of millions of dollars to bolster its compliance systems.  (Compl. ¶¶ 366, 411, 447.)   Existing competitors would have difficulty spending at those levels.  Possible new competitors (including potential digital entries) would have even more difficulty – because the

---

[44] Similarly, Plaintiff alleges that the Audit Committee was told on October 25, 2012 that the Company had received a "'marginal' AML compliance rating" from four state regulators. (Compl. ¶ 235 (citing Ex. 64, Oct. 25, 2012 Audit Committee Compliance Update at 4).)  But such a rating is a *passing* rating, not one of legal noncompliance.

complexity of establishing compliance systems in 200 countries is daunting, and they would have to start from scratch.

For example, Plaintiff quotes Mr. Agrawal's answer "to a question [at a conference on September 11, 2014] about competition from other companies, including Apple's announcement that it was moving into the payments business." (*Id*. ¶ 432.)  Mr. Agrawal responded:

> We believe that compliance can be a competitive advantage for us . . . because it's very difficult for most other organizations to spend at the level that we are, and we've been doing this for many years.  This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time. . . .
>
> And so, I think, we're really well-positioned whether it's an offline transaction, or an online transaction, or if it's a business, or if you want to do a transaction through your bank or other means, we have a lot of different options available for consumers.  And it's about the global compliance capability that we have, that's not easy to replicate, the global operational capabilities.  So we have a lot of advantages that will keep us well-positioned I believe. . . .
>
> Nobody else has the global compliance capabilities that we have, the global operational capabilities.  We operate in every country of the world and that's not an easy infrastructure to replicate.  And so that's why I feel good about where we are.

(Ex. 31, Sept. 11, 2014 Conference Call Tr. at 7-8, 12-13 (quoted in part in Compl. ¶ 432.)

The Complaint contains not a single factual allegation contradicting these assessments of Western Union's competitive advantages stemming from the global nature of its compliance capabilities and the substantial infrastructure investments already made.  Indeed, Judge Krieger already considered several of these exact statements in an earlier case, and she dismissed claims based upon them because they are "patently true on their face."  *SEB Asset Mgmt. S.A. v. The Western Union Co.*, 2015 WL 5708532, at *4 (D. Colo. Sept. 29, 2015).  Plaintiff does not dispute that Western Union *had* built up a vast set of compliance programs that accounted for

each of the 200 countries and territories in which it operates around the world, nor that it had

devoted enormous resources to its compliance infrastructure.  These would be extremely difficult

hurdles for any competitor or potential competitor, particularly a start-up, to surmount.

Plaintiff's allegations regarding these statements fail for this reason alone.

There is, moreover, also a second reason why this statement and similar ones about

compliance being a competitive advantage are not actionable:  they are simply too vague and

nonspecific to be considered material.  *See, e.g., In re Level 3 Commc'ns*, 667 F. 3d at 1340

(holding that optimistic statements lacking any specificity were inactionable as a matter of law);

*Grossman,* 120 F.3d at 1119-20 ("Vague, optimistic statements are not actionable because

reasonable investors do not rely on them in making investment decisions.").  None of the

statements regarding a "competitive advantage" from having established a worldwide

compliance infrastructure was tied to any particular time frame, much less claimed to result in a

short-term financial benefit.  Nor were any financial or other metrics quantifying the extent of

this "advantage" ever provided by the Company.  In circumstances like these, courts have

repeatedly held that "puffery" statements of this sort are not actionable because, as a matter of

law, they are too vague and unquantified to have any impact.

Indeed, Judge Krieger reached the same conclusion with respect to many of the same

statements at issue here (*i.e.*, that the Company's anti-money laundering policies are a

"competitive advantage" and "long-term investment," and that the Company's regulatory

burdens "scare [its competitors] to death"), as well as other statements Plaintiff challenges, such

as that the Company sets "the industry standard" for compliance.[45]  *SEB Asset Mgmt.*, 2015 WL 5708532, at *3.  The Court held that those statements, which it termed "vague suggestions that WU would be a leader or trend-setter in the future, or that it was better positioned than its rivals to meet broad challenges," were "'rosy affirmations'" that could not "possibly constitute actionable misstatements."  *Id.* at *4 (internal citation omitted).[46]  The same is true here, and Plaintiff's allegations with respect to these statements should be dismissed for that independent reason as well.

### C.  Statements Regarding The Company's Inability To Predict The Outcomes Of The Various Governmental Investigations Underway During The Class Period

Plaintiff also claims that the Company's SEC filings "misrepresented the nature of the government investigations" that were underway.  (Compl. ¶ 301.)  But there was nothing at all

---

[45] *See, e.g.*, Compl. ¶¶ 338 ("industry leader"), 351 ("[w]e are the industry leader"), 375 ("our goal is to . . . have best-in-class compliance programs"), 383 ("our goal is to be best-in-class with compliance"), 386 ("we're clearly a market leader"), 388 ("[w]e . . . try to be the best in class and leading our industry" in compliance), 389 ("we . . . want to have best-in-class compliance programs"), 398 (Western Union is a "'market leader' setting the 'industry standard'"), 408 (we are the "industry leader, we are setting your best practices"), 423 ("law enforcement are really looking up to us and saying that, hey, it will be great as the leader, you are leading the market and [setting] the best practice"), 456 ("industry leader"), 480 ("state-of-the-art compliance platform").

[46] *Accord, e.g.*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (statement that company's integrity and reliability is a competitive advantage is non-actionable as mere "puffery"); *In re Cable & Wireless, PLC, Sec. Litig.*, 332 F. Supp. 2d 896, 901 n.6 (E.D. Va. 2004) (statement that "our current strong net cash position of £2.2 billion remains a source of competitive advantage" was "little more than inactionable puffery or corporate optimism" and therefore "not material"); *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1291 (D.N.M. 2002) (statement that "[the company] is well positioned to thrive" and "[w]e think [the product] will give the company a unique competitive advantage" held to be non-actionable puffing); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 304 (S.D.N.Y. 2000) (statement that a company "held a 'competitive advantage'" in recruiting "is not actionable because it is a vague statement of general optimism").

false in anything said on that subject in those filings, or misleading in the slightest.  The

Company did not at any time state or suggest that it did not face serious threats as a result of the

government investigations.  To the contrary, each and every SEC filing contained extensive

warnings about the serious risks.  (*See supra*, pp. 13, 30; *see also*, *e.g*., Ex. 25, 2016 Q3 10-Q at

14 (warning that the outcome of investigations could result in "significant fines, payments,

damage awards or regulatory consequences which could have a material adverse effect on the

Company's business, financial condition, results of operations, and cash flows.")).

In an attempt to invent something misleading with regard to the Company's statements

about the investigations, the Complaint tries two approaches.  ***First,*** the Complaint refers to

certain statements that the Company "intends to defend itself vigorously" against or "strongly

disagrees" with "the regulators' claims."  (Compl. ¶ 301.)  These statements were made only

very late in the putative Class Period, and, contrary to Plaintiff's characterizations, did not relate

generally to "the regulators' claims"; instead, they related to the FTC and certain of its claims.

*See* pp. 15-16, *supra*.  Specifically, the "intends to defend itself vigorously" statement first

appeared in an August 2016 Form 10-Q filing – four and a half years into the Class Period – in

which the Company disclosed that it had recently been informed of the FTC staff's request for

authority to file a complaint.  (Compl. ¶ 262.)  The statement appeared once more, in the Form

10-Q filed in November 2016.  In that Form 10-Q, the Company made clear that it was in

discussions about a potential consensual resolution but, if such an agreed resolution was not

reached and litigation proceeded, it intended to defend itself "vigorously."  Tellingly, the

Complaint contains not a single particularized fact demonstrating that it was not the Company's

actual intent, either in August or November 2016, to defend itself "vigorously" in the event of

litigation brought by the FTC.  Nor does the Complaint contain any facts at all regarding the understandings, beliefs, and intentions of Mr. Ersek and Mr. Agrawal (the signatories to the Forms 10-Q) at the time.  Moreover, "defending vigorously" is another of those vague phrases so lacking in specific content as to be immaterial as a matter of law.  *See* pp. 53-55, *supra*.

The "strongly disagrees" statement was, in turn, made only once, in the November 2016 Form 10-Q.  *See supra*, p. 15-16 (citing Ex. 25, 2016 Q3 10-Q at 15).  The statement related  to the FTC's position, of which it had recently informed the Company, that the Company was liable not only for the principal amounts of reported instances of fraud-induced money transfers, but also for transactions *as to which no report of fraud had ever been made.  See supra*, pp 15-16; Compl. ¶ 263.  Once again, there are no particularized facts alleged in the Complaint showing that the Company did not in fact "strongly disagree" with the FTC's position, which would potentially expose the Company to liability for "a multiple" of the "hundreds of millions" of dollars of reported fraud amounts since 2004.  (Compl. ¶ 263.)

***Second,*** Plaintiff takes issue with the fact that the Company's accurate descriptions of the investigations in its SEC filings declined also to predict their eventual outcomes.  (*See* Compl. ¶¶ 308, 318, 326, 344, 368, 413, 417, 449, 476, 483, 489, 493.)  Instead, the Company typically noted that it was "unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company."  (*See, e.g.*, Ex. 13, 2013 10-K at 40; *see also* Ex. 25, 2016 Q3 10-Q at 14.)  Plaintiff claims that this statement was misleading because the various signatories to the SEC filings purportedly knew in advance throughout the Class Period that the investigations were "nearly certain . . . to expose

the Company to substantial liability."  (Compl. ¶ 301; *see also id.* ¶¶ 82, 303(v).)[47]  But this

"near certainty" of outcome claim is mere assertion, unsupported by citation to any witness,

document, or other contemporaneous source.  Rather, it amounts to fraud merely by virtue of

20/20 hindsight, which does not suffice under the securities laws.

Plaintiff's only attempt to support its assertion that the outcomes of the investigations

were known in advance to be "nearly certain" is its suggestion that Mr. Ersek and the respective

CFOs who signed various SEC filings must each have known as much based on their purported

"knowledge of the Company's many compliance failures before and during the Class Period."

(Compl. ¶ 302.)  But this supposed predicate – which is apparently derived from Plaintiff's

theory that the Individual Defendants themselves reviewed document productions made in the

course of the investigations, and thereby discovered the wrongdoing eventually claimed in the

regulatory actions (*see, e.g.*, *id.* ¶¶ 301, 543) – is itself fallacious, for reasons already discussed.

*See* pp. 47-48, *supra*.

Yet even if, *arguendo*, one or more of the Individual Defendants eventually learned of,

for example, alleged compliance failings prior to the Class Period that ultimately proved to be

among those that were the subject of the regulatory settlements (and no particularized facts are

---

[47] Plaintiff does not allege that Defendants were required to hazard a guess as to outcome in the
absence of such purported "near certainty."  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362
(S.D.N.Y. 2008) (disclosure was not required where "the risk that [the company's]
noncompliance . . . would actually cause a loss to the company or its shareholders had neither
'transpired' nor become a 'near certainty'"); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53
(2d Cir. 1995) (company was not required to disclose deficiencies noted in two FDA inspections
where ultimate adverse consequences of inspection were not a "*foregone conclusion*" (emphasis
added)); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y.
2006) (no duty to disclose impending litigation "absent an allegation that the litigation 'was
*substantially certain* to occur during the relevant period'" (emphasis added, citation omitted)).

alleged suggesting that), that by itself hardly would suffice to support the speculative leap that,

contrary to what they said, the Individual Defendants actually believed that they were able

confidently to predict the outcome of the investigations and the extent of any potential loss to the

Company[48] – and harbored such a belief throughout the entirety of the Class Period.  There are,

of course, a myriad of factors that can affect such investigatory outcomes, including, among

others, whether there are potential factual disputes or uncertainties, or potential

counterarguments regarding what occurred; the degree of culpability of various persons involved

and the extent of losses causally attributable; how long ago the alleged conduct occurred (the

vast bulk of the alleged conduct here having occurred many years before the settlements); and

whether more recent conduct and actions might affect exercises of prosecutorial discretion

(including the nature and extent of any remedies or penalties sought) – to name but a very few of

the countless variables.  Plaintiff ignores all of this, however, and provides no facts at all about

what any of the Individual Defendants was being told (if anything) *at the various times* of the

---

[48] The Individual Defendants' supposed "nearly certain" ability (to use Plaintiff's term) to predict outcomes, and, conversely, their respective statements of an inability to predict, are clearly in the nature of opinions.  *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1120-21 (10th Cir. 2014) (Gorsuch, J.) (holding that when a statement "necessarily implicate[s] a heavy degree of judgment," it should be viewed as a statement of opinion); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (holding that prediction of potential loss (for loan loss reserves in that case), "is inherently subjective, and . . . estimates will vary depending on a variety of predictable and unpredictable circumstances," and accordingly such predictions are statements of opinion).  Accordingly, for liability to attach to any of the Individual Defendants' statements of inability to predict, it would have to be shown that each of them did not actually believe his opinion at the time of his statement.  *See* pp. 30-31, *supra*.

SEC filings,[49] or any views the Individual Defendants themselves expressed regarding whether there was some ability to predict outcomes with "near certainty."

Indeed, the very fact that the investigations involved here took more than five years – and that discussions about potential resolution did not even begin until late 2016 (*see* pp. 14-16, *supra*), a disclosed fact which Plaintiff does not allege was inaccurate – speaks volumes. The Regulatory Settlements were the product of *negotiations* between multiple regulators and the Company. Plaintiff's allegation, that each of the Individual Defendants must have known what the outcome was going to be because the dollar liability ultimately imposed was significant, is pure fraud by hindsight, and it does not suffice for a claim for securities fraud. *See Anderson*, 827 F.3d at 1250 (recognizing that "'fraud by hindsight' . . . does not constitute securities fraud" and rejecting plaintiffs' allegations that defendants must have known about a loss of great magnitude prior to its disclosure (citing *In re Level 3 Commc'ns*, 667 F.3d at 1347)); *see also In re Sanofi*, 87 F. Supp. 3d at 545 (rejecting allegation that defendants should have disclosed interim negative feedback from the FDA, because "without the benefit of hindsight" they did not have reason to know what the agency's ultimate conclusion would be).

---

[49] The "inability to predict" statements were made at various times over the course of almost five years, yet Plaintiff makes no attempt to identify what facts were supposedly known to which Individual Defendants at which time that supposedly allowed them to predict outcomes with "near certainty." Instead, Plaintiff indiscriminately treats the entire period as one. But timing also matters. For instance, many of the "unable to predict" statements Plaintiff challenges were made within weeks or months of the Company's initial receipt of subpoenas in investigations that ultimately lasted years. And as discussed above, the subpoenas themselves were not received all at once but only over a period of years (including, for example, after Mr. Scheiman's departure). *See* pp. 14-15, *supra*.

### D.   Statements Regarding The Company's Investments In And Increased Costs From Compliance Expenditures

Plaintiff also challenges certain statements regarding expected increases in the Company's compliance costs and investments.  (Compl. ¶¶ 146, 358, 361, 388.)  According to the Complaint, these statements were misleading because, when touching upon the reasons for these increased costs, the Individual Defendants failed to disclose that the expenditures were "needed because of the Company's utterly inadequate anti-fraud and AML compliance programs."  (*Id.* ¶ 81.)  For example, the Complaint cites the following statement by Mr. Scheirman made at a November 7, 2012 conference:  "We now spend over $100 million a year on compliance and just given how the compliance requirements are generally tightening around the globe, that's one spend we'll probably continue to increase as we move forward."  (*Id.* at ¶ 358.)  Plaintiff does not allege that the current spend figure mentioned was inaccurate, does not deny that compliance requirements were "tightening around the globe" at the time, and does not challenge that the Company planned global spending increases.  Instead, the Complaint contends that this statement was somehow misleading because Mr. Scheirman did not also volunteer perjorative statements regarding the state of the Company's own compliance system.

But neither Mr. Scheirman nor the speakers of similar statements were under any obligation to do so.  To begin, it is well established that Companies have no obligation to engage in gratuitous self-criticism of the sort that Plaintiff claims was required (especially when, as here, there are no facts alleged showing that the speaker shared these views).  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view"); *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d

259, 269 (D. Mass. 2013) ("A defendant does not have a duty to cast the descriptions of its business in the most negative light.").  And it is also well-established that unless what is said is affirmatively misleading in the absence of additional information, there is no obligation to disclose that additional information.  *Anderson v. Spirit AeroSys. Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260 (D. Kan. 2015) ("Silence is not misleading under Rule 10b-5 unless there is a duty to disclose."), *aff'd*, 827 F.3d 1229 (10th Cir. 2016); *see also Omnicare*, 135 S. Ct. at 1329 (material omissions not actionable if they do not "conflict with what a reasonable investor would take from the statement" that the company made).[50]  Nothing in Mr. Scheirman's statement or similar statements was affirmatively misleading.

Faced with this reality, Plaintiff attempts to concoct allegedly misleading statements on the subject of increased compliance costs by mischaracterizing what was actually said.  For instance, Plaintiff alleges that, on another occasion, "in response to a question about future compliance costs, [Mr.] Scheirman stated that compliance costs would likely increase as a result of the changing environment, *rather than because of the Company's failure to meet current compliance requirements*."  (Compl. ¶ 388 (emphasis added).)  But Mr. Scheirman only made half of the statement Plaintiff says he did, and the Court need not acccept Plaintiff's self-serving characterization of what he did say.  *See Kennedy*, 552 F. App'x at 792.  Rather, what Mr. Scheirman actually said is the following:

> [H]aving a robust compliance program and a strong culture of compliance is very important to us. ***Broadly, as we think about the global landscape, the regulatory***

---

[50] In order to make out a claim based on the *omission* of allegedly material facts, Plaintiff must adequately allege that (i) the omission is tied to a specific statement; and (ii) the failure to include the additional information makes that statement materially false or misleading.  15 U.S.C. § 78u-4(b)(1); *see also Anderson*, 105 F. Supp. 3d at 1260.

> ***environment continues to move.  As I think about 2014 in 2015, right now, I'd
> expect our compliance regulatory cost to increase.***  What is important about that
> is that it protects the brand.  It protects the customer.  It protects our agents.  And
> the longer term, we believe that is going to be competitive advantage because of
> our scale and our scope and what we can do with compliance and regulatory.

(Ex. 29, July 30, 2013 Earnings Call Tr. at 13 (emphasis added).)  The Complaint alleges no

facts to suggest that the regulatory environment was not "continu[ing] to move," as

Mr. Scheirman stated, or that he did not "expect our compliance regulatory cost to increase."

Instead, what Plaintiff alleges to have been false – a purported assertion by Mr. Scheirman that

anticipated compliance cost increases were not "because of the Company's failure to meet

current compliance requirements" – was not actually something he said.

Moreover, contrary to Plaintiff's mischaracterizations, the Company *did* disclose that a

variety of factors – including the Company's own reviews of its existing compliance procedures

– were causing the Company's compliance costs to increase.  For instance, during the October

29, 2013 investor conference call discussed in the Complaint, Mr. Scheirman was asked whether

compliance costs were increasing because it was costing the Company more than anticipated to

comply with laws of which it was already aware, or whether new regulations had "popped up."

Mr. Scheirman responded:

> *[A] lot of these things are not necessarily black and white or have not been
> historically*.  So, when we work with regulators around the world and around the
> states and you get clarifications on what's needed and make agreement on what
> programs you'll do, these things are kind of fluid.  And so some of these are
> interpretations of older rules, some of these are new things, some of these are just
> clarifications of the regulators, ***some of them are our own reviews, so there's a
> lot of different things going in here.***

(Compl. ¶ 399 (emphases added).)  In short, Mr. Scheirman made clear that there were

multiple causes for increased compliance costs ("a lot of different things"), including the

Company's own reviews, a matter as to which the Complaint contains no contrary facts at all.

In summary, none of the statements in this category contained anything false or misleading.  Plaintiff's conclusory assertions to the contrary are factually unsupported, based on mischaracterizations, and grounded in legally baseless notions that Company officials should have offered gratuitous and self-accusatory derogations.

### E.  Statements Regarding Premium Pricing

Plaintiff challenges two statements made by Mr. Ersek concerning premium pricing, the first during the question-and-answer portion of an earnings call on October 30, 2013, and the second during the question-and-answer session at an investor conference on May 19, 2015:

- "We, as Western Union, *I believe deserve the premium pricing*" (Compl. ¶ 389 (emphasis added); *see also* Ex. 32, Oct. 30, 2012 Earnings Call Tr. at 7);

- "[O]verall, I will say that our brand, our locations, our compliance programs, our trust *does deserve a premium* and the customers pay for that" (*id.* ¶ 456 (emphasis added); *see also* Ex. 33, May 19, 2015 Conference Call Tr. at 7).

Plaintiff alleges that these statements by Mr. Ersek were false because the Company "could not maintain its competitive premium pricing during the Class Period while implementing effective compliance policies."  (Compl. ¶ 303(vi); *see also id.* ¶¶ 390, 458.)  Once again, however, this conclusory assertion is unsupported by any facts.

*First,* despite the assertion that the Company allegedly could not maintain "premium pricing" during the Class Period, the Complaint contains no facts whatsoever regarding the Company's actual prices and pricing practices during this period, including whether, as a general matter, the Company has *in fact* continued to charge overall price premiums when compared to

63

competitors (whose prices likewise remain entirely unspecified in the Complaint). That conspicuous failing alone renders these unsupported claims of falsity insufficient.

   *Second,* Plaintiff's theory appears to be that because the Company was increasing its compliance *expenditures*, that factor somehow necessarily prevented it from charging premium *prices*. (*See id.* ¶ 516 ("Because the Company was now forced to substantially increase its compliance expenditures . . . it could no longer justify its premium pricing.").) But that conclusion is not only factually unsupported, it simply does not follow: costs going up does not alone say anything at all about what prices can be charged. And increased expenditures resulting in stronger compliance programs would, if anything, seem to better "justify" existing prices (if not higher ones). Nor are there any facts pleaded demonstrating an *actual* linkage between increased compliance expenditures and Western Union's ability to continue premium pricing.[51]

   Instead, Plaintiff appears to have confused *profits* with *pricing*.[52] While increased costs may affect profits (revenues minus expenses) and profit margins, pricing – including whether

---

[51] The Company itself disclosed during the Class Period that its ability to maintain premium pricing might vary by corridor due to increased *competitive* pressures. (*See, e.g.*, Ex. 34, May 16, 2013 Conference Call Tr. at 6 ("There [are] certain corridors w[h]ere we have seen more competitive activity or where we have seen our price premium maybe be a little bit too wide. And that's why we have implemented the pricing reductions that we did beginning late 2012 into the first couple of quarters of this year.") (cited in Compl. ¶ 383).) But this is quite different than premium pricing being affected by increased compliance *costs*.

[52] The Complaint points to two analyst reports issued in mid-2014 following the Company's release of its second quarter earnings – a time that does not correspond to either of Mr. Ersek's two challenged statements. (Compl. ¶¶ 514-515.) The first cited analyst report expressly addressed profit "margin pressure" and spoke of increased long term costs for all money transfer providers due to increased pressure from governmental authorities. (*Id.* ¶514.) The second analyst report included a similar "investment thesis" that "'greater regulatory scrutiny and higher compliance costs' would make it very difficult [for Western Union] to achieve financial growth." (*Id.* ¶ 515; *see also id.* ¶ 516.) That too refers to the Company's *profits*. The second analyst also stated that its "revenue estimates are materially unchanged as Western Union continues facing

prices higher than those charged by competitors ("premium") can be charged – are a different matter.

**Third,** Plaintiff has in any event once again ignored the actual content of the statements it challenges.  The statements at issue were not about whether the Company would be able to *maintain* premium pricing over time.  Rather, Mr. Ersek's comments were, by their terms, addressed to his view that Western Union *deserved* premium pricing – and his belief that it did, including because of the strength of Western Union's brand and its locations.  Plaintiff does not allege any particularized facts that remotely suggest that Mr. Ersek did not honestly believe that Western Union *deserved* premium pricing.  *See Omnicare,* 135 S. Ct. at 1326.  Moreover, even if, *arguendo,* his comments were interpreted as some prediction about the Company's future ability to charge premium prices, under the PSLRA any such forward-looking statement would be non-actionable absent a showing that Mr. Ersek had "actual knowledge" to the contrary. 15 U.S.C. § 78u-5(c) (setting out "[s]afe harbor" provision whereby defendants "shall not be liable" with respect to such statements if plaintiff fails to prove that they were made with "actual knowledge . . . that the statement[s] w[ere] false or misleading"); *see also In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1293 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015). The Complaint contains no particularized facts on that score either, including no facts regarding internal Company pricing projections received by Mr. Ersek at any point in time.  Accordingly,

---

adverse compliance-induced mix shifts and likely lower long-term pricing," and stated that "we believe the deck remains stacked against Western Union given its premium prices, high-cost agent network and compliance challenges."  (*Id.* ¶ 515 (emphasis eliminated).)  These future revenue predictions from this one analyst, however, do not link Western Union's ability to charge premium prices to its compliance *costs*.

Plaintiff has not sufficiently alleged that the few statements regarding "premium pricing" were false or misleading.

### F.    Remaining Statements Regarding Compliance

The Complaint is also littered with additional allegations challenging virtually every other statement the Company made about its compliance during the Class Period.[53]  These allegations fail for at least two reasons.  First, many of the statements Plaintiff identifies as being false or misleading are non-actionable puffery.  Second, it is unclear in many instances what disclosures Plaintiff is even challenging – which violates the PSLRA's particularity requirement.

**Non-Actionable Puffery.**  Plaintiff challenges numerous vaguely positive statements that mention the Company's continued work on compliance and its aspirations in that regard, many of which were contained in SEC filings.  Typical of these statements are that Western Union "continue[s] to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices" (Compl. ¶ 305 (emphasis omitted)), is "fully engaged in the fight against money laundering and fraud"[54] (*id.* ¶ 395), and "ha[s] made and continue[s] to make enhancements to our processes and systems designed to detect and prevent

---

[53] Plaintiff alleges these statements were made not only by the Individual Defendants, but also by Khalid Fellahi, who the Complaint alleges "held several different positions at the Company over the course of 10 years" (Compl. ¶¶ 313-14, 372); Diane Scott, Western Union's Chief Marketing Officer (*id.* ¶ 324); Michael Salop, Western Union's Senior Vice President of Investor Relations (*id.* ¶¶ 326, 399); David Thompson, Western Union's Chief Technology Officer (*id.* ¶ 480); and an unnamed Chief Compliance Officer (with regard to one press release announcing a compliance industry conference) (*id.* ¶ 347).  The Complaint does not even try to allege that these individuals did not honestly believe the statements they made, and presents no particularized facts regarding any of them or what they knew.

[54] This statement is discussed at greater length in the separate brief filed on behalf of Mr. Koch.

money laundering . . . fraud and other illicit activity" (*id.* ¶ 342).  (*See also id.* ¶¶ 366, 411, 447, 474.)[55]

These statements regarding the compliance efforts being undertaken by the Company – and, significantly,  there is no allegation that the Company did not in fact undertake extensive efforts – were nothing more than the sort of nonspecific expressions of vague optimism that, as discussed earlier, are nonactionable as a matter of law.  *See supra* at pp. 53-58.  But Defendants were not required to denigrate their own very significant compliance efforts, and, in any event, no reasonable investor would attach importance to such vague generalizations.  *See* pp. 53, *supra.*

**Failure To Identify False Or Misleading Statements.**  Finally, in many instances, Plaintiff has not identified specifically what statements it is challenging as false, let alone allege the required particularized facts demonstrating such falsity.  For example, in numerous places, Plaintiff quotes portions of the Company's SEC filings (often spanning multiple pages, with certain parts in bold and italics in unexplained patterns).  (*See, e.g.*, Compl. ¶¶ 305, 366, 411, 447, 474.)  These passages include numerous seemingly uncontroversial statements.  To take but

---

[55] *See also, e.g.,* Compl. ¶¶ 324 (Western Union has a "deep understanding" of "compliance and regulatory environments" worldwide), 329 (it is "a huge competency" for Western Union to "deal with [regulatory compliance] in 200 countries"), 357 ("Company "set[s] the standards hopefully"), 374 ("we want to be best-in-class"), 375 (the Company's "goal is to comply with the letter and the spirit of the law"), 385 (the Company has "robust compliance and regulatory capabilities"), 389 ("culture of compliance"), 425 ("compliance and regulatory capabilities . . . are strong" and getting better), 417 (the Company has "a good program" of compliance), 479 ("I think we are very good in compliance"), 426 (describing Western Union as "well positioned"), 434 (the Company has "accomplish[ed] [its] key objectives on the compliance side"), 457 (with respect to the Company's fraud programs, the Company is headed in the right direction, and, as Mr. Ersek stated, "I think I am quite satisfied" although "you are never [all the way] there"), 459 ("[o]ur strong regulatory and compliance capabilities")).

one example, paragraph 306 refers to statements about  the Company being subject to a "wide range of laws and regulations," "an increasingly strict set of legal and regulatory requirements," a description of "particular requirements of the BSA," and an observations that "[m]any states impose similar, and in some cases, more stringent requirements" which "also apply to our agents."  (*See also id*. ¶¶ 367, 412, 448, 475.)  Plaintiff does not describe specifically which of these various statements it is challenging as false (much less why).  Instead, the Complaint indiscriminately declares that the "statements referenced" in ¶ 306 were false or misleading (*id*. ¶ 310), without indicating whether all of the statements are being so challenged or some unknown and unidentified subset.  This fails to satisfy the most basic of the PSLRA's basic pleading requirements.  *See Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014) (noting that the Plaintiff's use of bold and italics to emphasize certain statements "does nothing to clarify Plaintiffs' assertions of false statements"); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 2010 WL 5129524, at *9 (D. Colo. Dec. 10, 2010) (rejecting complaint in part because it "le[ft] the Court to the task of teasing out which specific statements are at issue"), *aff'd sub nom. In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331 (10th Cir. 2012).[56]  And the Complaint is replete with such instances.

In addition to failing to identify precisely which statements (or portions of statements) are false, Plaintiff fails to explain with the requisite particularity *why* it takes issue with many of the allegedly false statements.  Over the course of 175 pages and more than 580 paragraphs, the Complaint alleges that virtually every statement that the Company made over five years touching

---

[56] Defendants have attempted to piece together what statements Plaintiff actually is challenging, but reserve their rights to address statements that Plaintiff may focus on for this first time in its brief in opposition to this motion.

on the subject of compliance and the investigations was false or misleading.  But, despite the Complaint's length, it repeatedly cites to the same laundry list of reasons that appears in a single paragraph of the Complaint – Paragraph 303 – to explain "why" each of the statements enumerated in Paragraphs 304-495 was false or misleading.  (*E.g.*, Compl. ¶ 310 ("The statements referenced in ¶¶ 305-08 above were materially false and/or misleading for the reasons set forth in ¶ 303 (i)-(v) and (vii) above.").)  But these generic cross-references provide virtually nothing by way of explanation, and they are no substitute for the specificity required by the PSLRA.

Paragraph 397 of the Complaint is illustrative.  This paragraph quotes Mr. Ersek's oral statement during the October 29, 2013 investor conference call during which he stated, among other things, that some banks have faced large fines, that Western Union had recently initiated procedures at 50,000 agent locations in the U.S. to comply with the Dodd-Frank Remittance Transfer Rule (and did so in time for the deadline) and implemented new AML and fraud prevention enhancements in countries such as Spain and the UK, and that the Company was now working with its third monitor under the SWB Agreement (and referred to the recent passing of Arizona's primary attorney on the matter).  (Compl. ¶ 397.)  Although the Complaint alleges that these statements were false and/or misleading "for the reasons set forth in ¶ 303 (i)-(v) and (vii) above" (*id.* ¶ 400), nothing in Paragraph 303 addresses anything related to the issues mentioned by Mr. Ersek during the October 29, 2013 call.

Moreover, Paragraph 303 nowhere attempts to take account of differences among statements, including differences in timing.  For example, Plaintiff challenges Mr. Ersek's statement during the earnings call held on February 10, 2015 that "one of Western Union's four

'key results' that it delivered in 2014 was '[e]nhanced global compliance programs.'" (Compl. ¶ 444 .)  But Plaintiff does not allege that Western Union's global compliance programs were *not* enhanced in 2014, let alone provide any particularized facts that remotely support such a position.  Instead, Plaintiff merely cross-references a standardized litany of supposed failings that have nothing to do with this issue.  (*Id.* ¶ 445 ("The statements referenced in ¶ 444 above were materially false and misleading for the reasons set forth in ¶ 303 (i)-(iii) above.").)  Plaintiff once again refers to its generalized claim that the Company at various times failed to discipline or take corrective action against certain agents or subagents (*id.* ¶ 303(iii)), but that has nothing whatsoever to do with whether enhancements were made to Western Union's compliance programs in 2014.

Plaintiff's failure to explain why each statement is alleged to be false on its own is sufficient grounds for dismissal.  "[P]lacing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts . . . is deficient under the pleading standards."  *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005); *Navient*, 2017 WL 3891676, at *3 ("Plaintiffs have failed to craft a complaint in such a way that a reader can determine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason why each statement is false or misleading.").  "Such 'puzzle pleading' is an improper means of pleading a claim."  *In re Level 3 Commc'ns*, 2010 WL 5129524, at *9; *see also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 733 n.14 (S.D. Ind. 2009); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d at 534.  The Tenth Circuit expressly "disapprove[s]" this tactic.  *In re Level 3*

*Commc'ns*, 667 F.3d at 1334 (rejecting a complaint whose "fundamental weakness . . . is that [it] gives us a great volume of puzzle pieces that, despite our best efforts, we cannot fit together").

\* \* \*

Because Plaintiff does not sufficiently allege that any Defendant made any false statements, the Complaint should be dismissed.

### III.  Count I Also Should Be Dismissed Because Plaintiff Has Failed To Allege Facts Giving Rise To A Strong Inference of Scienter.

As discussed above, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2) – that is, a strong inference of the defendants' alleged "intent to deceive, manipulate, or defraud" investors.  *City of Philadelphia*, 264 F.3d at 1259 (quotation omitted).  In addition, the inference of scienter must not only be "strong," it must be "*at least as compelling* as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324 (emphasis added).  Plaintiff does not come close to meeting this burden here.[57]

"Generalized imputations" of scienter "do not suffice."  *City of Philadelphia*, 264 F.3d at 1264.  Plaintiffs must allege a "strong inference" of scienter with respect to *each* defendant in

---

[57] Plaintiff alternatively alleges (Compl. ¶ 539) that the Individual Defendants each made their respective statements with some reckless disregard of falsity.  In the context of Section 10(b) allegations, "recklessness" by a defendant in making a statement requires the plaintiff to plead particularized facts showing conduct that is so "extreme" as to be "akin to conscious disregard" of whether the statement is false.  *In re Zagg*, 797 F.3d at 1206-07 (dismissing recklessness-based claims) (quoting *City of Philadelphia*, 264 F.3d at 1265, and *In re Level 3 Commc'ns*, 667 F.3d at 1343 n.12).  As a result of this steep burden, courts have "been cautious about imposing liability for securities fraud" based on recklessness.  *City of Philadelphia*, 264 F.3d at 1260 (quoting *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)).  In any event, the Complaint does not adequately plead facts sufficient to create a "strong inference" supporting recklessness.

order to satisfy its pleading burden with respect to that defendant.  *See Zhang*, 2017 WL 2599883, at *10 (holding that "the PSLRA demands that the facts giving rise to the necessary inference of scienter be pled with particularity as to each defendant" and dismissing claims that failed to do so); *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) ("The central issue in this case is whether the [complaint] contains sufficient facts to allege scienter as to each defendant.").

Lumping all of the Individual Defendants together into an undifferentiated mass, Plaintiff here claims that each of the Individual Defendants deliberately and knowingly lied each and every time they made any statements touching on compliance over a five-year period because each of them knew, at all times, that "the Company lacked the most basic components of an effective AML or anti-fraud program" (Compl. ¶ 12) and that its compliance systems routinely violated the Company's legal obligations.  As discussed at length above, however, Plaintiff provides no particularized facts to support these claims.  There is not a single witness who claims that any of the Individual Defendants was told by other Western Union personnel during the Class Period that the Company's *existing* compliance systems – systems into which hundreds of millions of dollars had been and were being invested (*see, e.g.*, *id.* ¶¶ 358, 365, 411, 447, 474), and which even the DOJ and FTC stated were in the process of being continually improved (*see* DPA SOF ¶ 100; FTC Compl. ¶¶ 9, 26, 96) – were nonexistent or nonfunctional, or that legal violations were ongoing.  There is not a single internal document cited that says anything about systemic, ongoing legal violations *during the Class Period*, much less that is shown to have reached any of the Individual Defendants.  Plaintiff does not identify a single agent location any Individual Defendant knew should be terminated during the Class Period but which he allowed to remain in place, or specify any Company compliance policies the Individual Defendants knew

72

were legally deficient.  Moreover, as discussed above (pp. 38-46, *supra*), nothing in the DPA (which largely concerns events prior to the alleged Class Period) or any other settlement document supplies the missing links either – to the contrary, those documents either are silent with respect to the Individual Defendants or else *praise* their efforts and dedication to strengthening Western Union's compliance.  (*E.g.*, DPA SOF ¶ 100.)

While these fundamental failings bear on the falsity issues, they are even more pertinent to the scienter inquiry, especially given the PSLRA's "strong inference" requirement and the mandate that the Court weigh potentially competing inferences – not simply defer to Plaintiff's assertions.  Plaintiff's theory that each of the Individual Defendants deliberately lied whenever he expressed positive sentiments about the Company's compliance systems and the Company's commitments to compliance requires the Court to draw an inference that is far less plausible than the competing alternative inference – that is, that the Individual Defendants were well-intentioned corporate officers whose statements regarding the Company's compliance were informed by their honest belief that the Company's significant investments in compliance during the Class Period had paid off and were causing it to be well positioned in the years to come.

Plaintiff's primary attempt to cast doubt on the Individual Defendants' *bona fides* is to point to certain stock sales by certain of the Individual Defendants.  But, as discussed below, two of the four Individual Defendants (Messrs. Scheirman and Koch) are not alleged to have made *any* sales whatsoever and one (Mr. Agrawal) had a single *de minimis* sale.  Moreover, Mr. Ersek's sales were not suspicious in nature, much less sufficient to create a strong inference of scienter.  And while the Complaint contains a laundry list of "additional" factors that supposedly point to each Individual Defendant's scienter (Compl. ¶¶ 539-52), these are mere

assertions and either are factually unsupported or do not support the scienter gloss that Plaintiff seeks to apply.  The inference that Defendants were committing fraud is neither cogent nor compelling, as described in more detail below as to each of the Individual Defendants.

### A. The Allegations With Respect to Mr. Ersek Are Insufficient To Create A Strong Inference Of His Scienter In Making The Statements Attributed To Him.

#### 1. The Allegations Regarding Mr. Ersek's Stock Sales Fail To Create A Strong Inference Of His Scienter.

Plaintiff argues that Mr. Ersek was motivated to commit securities fraud for a single reason:  because of the purported benefit he derived from the sale of Company stock during the Class Period.  (Compl. ¶ 569.)  In fact – when viewed in context and stripped of Plaintiff's misleading characterizations – Mr. Ersek's stock transactions during the Class Period mitigate *against* an inference of scienter, as discussed below.

**First,** Mr. Ersek's aggregate stock holdings *increased* over the course of the Class Period by approximately 495,849 shares.  (*See* Ex. 35, 2012 Annual Proxy at 79 (66,454 shares); Ex. 4, 2017 Annual Proxy at 79 (562,303 shares).)  An increase in holdings during the period in which the company's stock was purported to be artificially inflated is "a fact wholly inconsistent with fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see also Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) ("[defendant] *increased* his holdings of . . . stock . . . during the Class Period, which negates any inference that he had a motive to artificially inflate [the company's] stock during that period"); *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008) (rejecting scienter where "[t]hroughout the allegedly suspicious period, several of the

74

insiders' holdings actually increased if the ownership of both stock and stock options is considered").

     *Second,* Plaintiff vastly overstates the amount of profits attributed to the sales. Plaintiff alleges that Mr. Ersek sold approximately 600,000 shares of Western Union stock during the Class Period for proceeds of more than $12 million. (Compl. ¶ 285.) But these numbers fail to account for the fact that, as is reflected in the public documents disclosing those sales, the vast majority of those sales were made pursuant to options grants (*i.e.*, grants of the right to *buy* the Company's stock by a certain date *for a set price*) that were exercised on the very same day as the sale. (The economic value of exercised options derives, of course, not from the full value of the shares subject to the option but from any difference between the option price and market price.) When the price Mr. Ersek paid to purchase the stock he then sold is accounted for, his profits are much smaller than the amounts Plaintiff misleadingly alleges. Mr. Ersek made at most $2,830,961[58] over the course of the five-year Class Period from the sales Plaintiff identifies – not "more than $12 million." (*Id.*) By contrast, as of the date of the Company's annual Proxy filing on March 29, 2017, Mr. Ersek beneficially owned outright 562,303 shares of Western Union common stock (excluding options), an amount worth $11,386,635.75 as of that date. (Ex.

---

[58] With respect to the October 28, 2013 sale, Mr. Ersek purchased 48,694 shares of the Company's stock pursuant to an "employee stock option" grant for a price of $17.78. (Ex. 36, Ersek Oct. 28, 2013 Form 4 (noting that the right to exercise that option expired on February 12, 2014, just a few months later).) He sold 47,711 shares out of those 48,694 at a price of $19.50. (*Id.*) Accordingly, Mr. Ersek's *profit* on the October 28, 2013 sale was $64,585.18 – not over $900,000 as Plaintiff alleges. (*See* Compl. ¶ 287.) On May 5, 2015, Mr. Ersek profited $1,379,619 (Ex. 37, Ersek May 5, 2015 Form 4), and on August 4, 2015, Mr. Ersek profited $726,894 (Ex. 38, Ersek Aug. 4, 2015 Form 4). This amounts to a profit of at most $2,106,513 on these dates, not "over $5.5 million" as Plaintiff alleges. (*See* Compl. ¶ 288.) On August 23-24, 2016, Mr. Ersek profited $659,862.32 (Ex. 39, Ersek Aug. 25, 2016 Form 4), not "over $5.9 million" as Plaintiff alleges (*see* Compl. ¶ 289).

4, 2017 Annual Proxy at 79 & n.6.)  The profits Plaintiff identifies from the option exercises

made over the course of the five-year Class Period are far smaller in comparison to the total

economic value of his outright and retained stock holdings (*i.e.*, approximately 25%).  Moreover,

Mr. Ersek had the right to exercise many more options during the Class Period:  for instance,

2,068,614 options as of early 2016.  (Ex. 40, 2016 Annual Proxy at 78 & n.5 (noting that

Mr. Ersek had the right to exercise such options within 60 days of March 14, 2016).)

Plaintiff's asserted inference that Mr. Ersek's limited option exercises and sales of shares

amounting to just a fraction of the economic value of his total holdings would have been

sufficient to motivate him to commit a fraud over the course of five years (or any fraud at all) is

hardly "strong."  Indeed, courts have repeatedly held that when, as here, an executive sells only a

portion of his holdings, while retaining a very signficant investment in the company's stock, that

significantly undermines any claimed inference of scienter.  *See, e.g.*, *Malin v. XL Capital Ltd.*,

499 F. Supp. 2d 117, 153 (D. Conn. 2007), *aff'd,* 312 F. App'x 400 (2d Cir. 2009) (finding no

inference of fraud in the fact that a "[d]efendant . . . decreased his holdings by 30.84%," and

noting that "[c]ourts have found no inference of scienter in cases involving similar and even

greater percentages of sales"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

Moreover, many of the options that Mr. Ersek exercised in connection with these stock

sales were close to expiring[59] – which meant that, if they had not been exercised, they would

have been forfeited for no value.  Courts have routinely recognized the need to exercise options

before they expire as a competing innocent inference that is stronger than the alternative culpable

---

[59] *See, e.g.*, Ex. 36, Ersek Oct. 28, 2013 Form 4 (options expired Feb. 12, 2014) (*compare* Compl. ¶ 287); Ex. 39, Ersek Aug. 25, 2016 Form 4 (options exercised on August 23 and 24, 2016 expired Sept. 29, 2016) (*compare* Compl. ¶ 289).

one, even in cases where "substantial" options were exercised.  *See Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc.*, 140 F. Supp. 3d 120, 136 (D. Mass. 2015) ("[t]here is, however, an entirely plausible explanation for [defendant's] exercise of options":  that defendant has "a limited period of time to exercise" them (citation omitted)), *aff'd sub nom. Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm. Inc.*, 838 F.3d 76 (1st Cir. 2016).[60]

*Third***,** the Class Period stretches more than five years, and Plaintiff has singled out only five wholly unremarkable instances of stock sales by Mr. Ersek.  (*See* Compl. ¶¶ 287-89.)  But there is nothing suspicious about these sales either in amount (as discussed above) or in timing.  Indeed, although Plaintiff argues that on two instances the sales were made in proximity to public announcements, Plaintiff *admits* that the first of these sales was made pursuant to an SEC Rule 10b5-1 trading plan adopted months before (*see id.* ¶ 287) and that the other (allegedly made shortly before announcement of the Regulatory Settlements) was made pursuant to a 10b5-1 plan adopted more than *seven months* before the announcement (with the sale itself made four months prior to the announcement, and only *after* the Company publicly disclosed the most recent update regarding investigations, including the FTC staff's threats to sue, *see* pp. 15-16, *supra*).  (See Compl. ¶ 289.)

----

[60] Plaintiff acknowledges that the stock transactions were made pursuant to SEC Rule 10b5-1 trading plans (*see* Compl. ¶¶ 287, 288, 289), which pre-committed Mr. Ersek to make sales at a given price and which further undermine any inference of scienter from the stock sales.  *See In re Level 3 Commc'ns*, 667 F.3d at 1346-47 (citing *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (stock sales pursuant to automatic trading plans that represent only a small portion of each seller's holdings do not suggest scienter)).  Plaintiff attempts to cast aspersions on the 10b5-1 plans adopted here, but it does so with absolutely no particularized factual support.  For instance, Plaintiff does not allege that the plan was adopted in secret by Mr. Ersek, rather than requiring the input of others at the Company with no motive to commit fraud, such as the Company's general counsel.  Thus, Plaintiff's efforts to delegitimize Mr. Ersek's 10b5-1 plans cannot support an inference of scienter, much less the required strong, cogent one.

Moreover, there is little, if any, relationship apparent between these two sales and the timing or contents of any alleged false statements.  For example, the Complaint refers to an October 28, 2013 sale made on behalf of Mr. Ersek (pursuant to an established 10b5-1 plan, as noted above[61]) before an announcement of earnings that "were disappointing because of [the Company's] increased compliance costs."  (*Id.* ¶ 287.)  But the Complaint does not allege that prior to that time Mr. Ersek had made any allegedly false statements about compliance costs and whether they would be increasing.  To the contrary, the Complaint admits that in July 2013, the Company warned investors that "I'd expect our compliance and regulatory costs to increase." (*Id*. at ¶ 388.)

Failing to identify anything meaningfully suspicious about these sales, Plaintiff attempts to suggest that *any* stock sales are somehow grounds for suspicion.  But in fact it would be more surprising if over the more than five-year class period there were no such sales at all by an executive whose shareholdings were very substantial and increasing.[62]  Indeed, large insider sales are a routine occurrence in corporate America, and there are a multitude of innocent reasons (including diversification of assets) why an executive may want to shed some of his or her holdings.  *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir.

---

[61] Under 10b5-1 plans, sales in pre-established amounts are typically mandated to occur when and if a pre-set target market price is reached – without any control of when or if that will occur.

[62] Indeed, the length of the Class Period alone weakens any inference of scienter with respect to stock sales.  *See Malin*, 499 F. Supp. 2d at 150-51 (noting that two-year-long class period was "exceedingly lengthy" and that "[a]lleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades,' and 'strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim" (quoting *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007)).

1997) ("A large number of today's corporate executives are compensated in terms of stock and stock options.  It follows then that these individuals will trade those securities in the normal course of events.  We will not infer fraudulent intent from the mere fact that some officers sold stock." (internal citation omitted)); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 403 (6th Cir. 1997) ("there nearly always are some insiders selling stock in a given time period" (internal citation omitted)).

\* \* \*

Plaintiff's failure to allege any compelling, concrete motive for Mr. Ersek to have engaged in some prolonged fraud greatly weakens the claimed inference that he did so – and in no event is that alleged inference stronger than the competing innocent inferences.[63]  That is because while a showing of motive is not essential, and the alleged facts are to be viewed collectively, it is the rare case in which fraud by a prominent executive occurs without some accompanying, ascertainable motive.  *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it.").  Moreover, for precisely that reason the absence of any meaningful motive for Mr. Ersek to have committed fraud increases the scrutiny of Plaintiff's allegations that he purportedly had actual knowledge inconsistent with the statements he made, and affects the plausibility of inferences Plaintiff claims to draw.  *See In re Level 3 Commc'ns*,

---

[63] Mr. Ersek's supposed motive is further undercut by the Company's robust risk disclosures during the Class Period, and its comprehensive disclosures regarding the investigations underlying the Regulatory Settlements.  These interim disclosures are inconsistent with an intent to defraud investors regarding the state of Western Union's compliance.  *See In re Zagg*, 797 F.3d at 1206 (holding that plaintiffs' allegations of motive were undercut by interim disclosures: "had [the defendant's] motive been to keep the margin account a secret in order to keep share prices high, he would have failed to disclose" the account).

667 F.3d at 1347; *Neiman*, 854 F.3d at 748 ("[w]here, as here, the plaintiff[s have] not alleged a

clear motive for the alleged misstatements or omissions, the strength of [the] circumstantial

evidence of scienter must be correspondingly greater" (quoting *R2 Invs. LDC v. Phillips*, 401

F.3d 638, 644-45 (5th Cir. 2005)).  Here, given the absence of any particularized facts directly

linking Mr. Ersek to some contemporaneous knowledge of ongoing wrongdoing or deliberate

falsity, Plaintiff's assertions of scienter are simply neither as strong nor as cogent and compelling

as the competing inference that Mr. Ersek believed the truth of the various statements he made.

### 2. Plaintiff's "Additional" Scienter Allegations Fail To Support A Strong Inference Of Scienter With Respect To Mr. Ersek.

As discussed above, Plaintiff must also allege scienter statement-by-statement, in

addition to alleging it Defendant-by-Defendant.  *See supra* pp. 27-28 (citing *In re Level 3*

*Commc'ns*, 667 F.3d at 1333).  Plaintiff here not only lumps the "Defendants" together in

alleging scienter (Compl. ¶¶ 539-53), Plaintiff additionally fails to provide any explanation

regarding how its allegations of scienter connect to the various statements, made at various

times, that it claims were false or misleading.  To the contrary, Plaintiff includes no

particularized scienter allegations related to numerous statements, such as statements regarding

compliance as a "competitive advantage" and statements regarding premium pricing.  Moreover,

as discussed below, where Plaintiff does attempt to allege scienter as to particular statements, its

allegations fail to create the strong, cogent inference required by the PSLRA.

**Mr. Ersek's Certification Pursuant to the Sarbanes-Oxley Act.**  First, the Complaint

continually references the fact that Mr. Ersek signed certifications pursuant to the Sarbanes-

Oxley Act of 2002 with respect to the Company's SEC filings.[64]  But the Tenth Circuit has found this exact allegation "unpersuasive."  *In re Zagg*, 797 F.3d at 1205.  The bare allegation of the signing of such certifications, without additional particularized facts supporting an inference that Mr. Ersek knew they were false at the time, "adds nothing substantial to the scienter calculus" and "[a]t most . . . support[s] an inference of negligence."  *Id.* (citation omitted).

      **The Regulatory Settlements and Regulatory Actions.**  Plaintiff next alleges that the Regulatory Settlements, the underlying regulatory actions, and other investigations, including those concluded well before the start of the Class Period, somehow support an inference of knowledge of falsity for scienter purposes as to Mr. Ersek.  (*See* Compl. ¶¶ 541-42.)  As discussed in detail above, that is not the case – the investigations lack any such admissions or allegations that support this inference.  *See supra*, pp. 38-48.  Instead, Mr. Ersek is praised rather than accused in those documents.

      **Board of Director Meetings.**  The Complaint also alleges that Mr. Ersek's attendance at various meetings of the Company's Board of Directors (Compl. ¶¶ 95-100, 231-43) contributes to an inference of his scienter.  But as discussed above, *supra*, pp. 48-51, when viewed in context and without Plaintiff's misleading characterizations, the cited Board materials do nothing of the sort.  The Board materials primarily concern adherence to the Southwest Border Agreement Monitor's recommendations, *not* compliance with AML or anti-fraud regulations, and have nothing to do with Mr. Ersek's supposed knowledge of ongoing wrongdoing or legal violations, much less reveal some fraud on his part.

---

[64] *See* Compl. ¶¶ 309, 319, 345, 355, 370, 379, 393, 403, 415, 421, 430, 440, 450, 454, 463, 469, 477, 484, 490, 494.

**Confidential Witnesses.**  Plaintiff next refers to allegations attributed to CW3 and CW4 as a further alleged additional basis for Mr. Ersek's scienter.  (Compl. ¶¶ 548-49.)  But as discussed above (*supra*, pp. 33-38), neither of these so-called witnesses comes anywhere close to alleging that Mr. Ersek was aware during the Class Period that any of his statements was false.

CW3 allegedly participated in the investigation that led to the 2017 Regulatory Settlements and alleged that "there was no way" that Mr. Ersek was "not informed about the on-going investigations that resulted in the [Regulatory Settlements]."  (*Id.* ¶ 249; *see also id.* ¶ 548.)  This seemingly ties to Plaintiff's assertion that it was misleading for the Company to say that it could not predict the outcome of the investigations that resulted in the Regulatory Settlements.  Plaintiff implies that because the Individual Defendants were "informed" about the ongoing investigations, they must have known what the outcomes would be.  But CW3 – who appears to have left the Company in November 2015 (*id.* ¶ 249) – says nothing of the sort, and provides no specifics at all regarding *what* precisely Mr. Ersek or any of the other Individual Defendants was told on that subject (or any other) during his tenure – much less that they were told either that the investigatory outcomes were already "nearly certain" or "that the Company [currently] lacked the most basic components of an effective AML or anti-fraud program."

The same is true of CW4.  To begin with, he was at the Company for only a short portion of the putative Class Period, *i.e.*, up to January 2014 (*id.* at ¶ 284) – three years before the Regulatory Settlements were announced.  And while he claims that Mr. Ersek "would be" briefed on certain general topics, the Complaint conspicuously avoids providing any details from him as well regarding the contents of any of these conversations – or any of the other "who, what, when and where" –  much less set forth with factual particularity anything said to

Mr. Ersek that shows he knew any of his statements were false.  (*Id.*; *see also id.* ¶ 549.)  Instead, Plaintiff uses the mere existence of these conversations in an attempt to heap inference upon inference regarding their contents – when that is something that CW3 and CW4 themselves would know and could describe if the details were in fact supportive.  *See supra*, pp. 35-36.

Courts routinely decline to draw an inference of scienter where confidential witnesses allege facts that much more directly support inferences of defendants' knowledge than those at issue here.  For example, the Tenth Circuit recently rejected the plaintiffs' attempts to draw a strong inference of scienter from allegations by a confidential witness that a corporate officer actually *received*, but disregarded, information from managers regarding cost overruns that ultimately were disclosed to investors.  *Anderson*, 827 F.3d at 1244 (noting that the officer even "threatened to find managers who could achieve the forecasts" without the overruns).  The Tenth Circuit held that even this direct evidence of knowledge was not enough, holding that the innocent inference, *i.e.*, that the officer "was simply too optimistic about [the company]'s ability to control costs," was more compelling than the opposing inculpatory inference.  *Id.*

Similarly, in an opinion affirmed by the Ninth Circuit, the District of Arizona recently refused to draw a strong inference of scienter even where the plaintiffs included allegations from former employees who stated that the company's officers *knew* about individual instances of compliance violations and were warned that the violations might violate an FTC consent order. *See Bien v. LifeLock Inc.*, 2015 WL 12819154, at *4 (D. Ariz. July 21, 2015), *aff'd*, *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951, 953 (9th Cir. 2017).  The *LifeLock* court found that this was not enough because the plaintiffs had failed to allege that "defendants were aware

of undisclosed material facts tending to significantly undermine the accuracy of their belief that [the company] was still in compliance with the FTC Order." *Id.*

No allegations of remotely that caliber exist here. Plaintiff consulted with former employees, but none of them was able to supply Plaintiff with any evidence that Mr. Ersek was told by persons within Western Union that the Company's *current* compliance systems were fundamentally lacking and *currently* violative of legal obligations, or that Mr. Ersek was made aware of and disregarded ongoing instances of failures to adequately discipline "certain" agents, or that he was told that the outcome of the various ongoing governmental investigations was somehow known with certainty in advance. Accordingly, since the allegations of knowledge are far weaker than those in *Anderson* and *LifeLock*, the Court should find that Plaintiff has failed adequately to plead the required strong inference of scienter.

**Core Operations.** Failing to provide any other support for an inference of scienter, the Complaint alleges that the Company's "compliance efforts . . . are a core operation of a money transfer business such as Western Union" and that, as one of the Company's "most senior executives," Mr. Ersek would have been aware of "essential" parts of the Company's business, and accordingly would have been aware of purported ongoing violations with respect to inadequate agent discipline during the Class Period and past violations pre-dating the Class Period. (Compl. ¶¶ 552-53.) But this bare, unsupported allegation gets Plaintiff nowhere. *See, e.g.*, *Anderson*, 827 F.3d at 1246 (rejecting allegation that defendants' involvement in "core operations" gave them "a good reason to believe" that crucial projects were unlikely to meet forecasts); *City of Philadelphia*, 264 F.3d 1263-64 (allegations that four individual securities fraud defendants "must have known" about allegedly fraudulent business practices at issue in

undisclosed customer litigation because of their senior positions in the company, and because two of them submitted affidavits or were deposed in that litigation, were not sufficient to support a strong inference of scienter); *Zucco Partners*, 552 F.3d at 998 (testimony that defendants "had to have known" certain facts based on their position was insufficiently particular to support scienter).

The fact that a Company's CEO may be expected to be interested in and concerned about a certain important area of operations – *e.g.*, "compliance" – does not mean that the executive is aware or expected to be aware of all details regarding everything relating to that topic, especially where, as here, the company has worldwide operations involving hundreds of thousands of agent locations.  Accordingly, simply characterizing an operational area as "core" or "important" does not suffice for purposes of creating a strong scienter inference, because otherwise this "could potentially sweep in *all*" operational details of a "core" segment within the presumed knowledge of top executives, which "would eviscerate the cogent and compelling inference of scienter required by *Tellabs*."  *Bd. of Tr. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F.Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub nom. Federick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  That is precisely the case here.  Plaintiff implies, for example, that because compliance is important, Mr. Ersek must have been aware of all instances of issues relating to inadequate agent discipline.  That simply does not follow and is anything but a "strong" inference.  Put simply, using the "core operation" label cannot substitute for particularized facts demonstrating Mr. Ersek's actual knowledge of various matters.

**B.      The Allegations Regarding Mr. Agrawal Are Insufficient To Create A Strong Inference Of Scienter In Making The Statements Attributed To Him.**

The paucity of factual allegations relating to Mr. Agrawal make the claim of scienter against him weaker still.  Prior to 2014, Mr. Agrawal was the President of Western Union Business Solutions, a subsidiary that offers primarily business-to-business money transfers – *not* the consumer-to-consumer transfers that were the focus of the 2017 Regulatory Settlements.  In 2014, he became the Company's interim CFO and then CFO.  (Compl. ¶ 28.)  It is during this period when Mr. Agrawal is alleged to have made the vast majority of the statements attributed to him in the Complaint.  (*See id.* ¶¶ 271, 410, 415, 417, 419-21, 425-26, 430, 432, 434, 438-40, 450, 452-54, 459, 461-63, 467-69, 473-77, 482-84, 488-90, 492-94; *compare id.* ¶ 324 (the single statement attributed to Mr. Agrawal prior to 2014).)  For instance, beginning in February 2014, he is alleged to have had scienter with respect to each of the "belief" statements regarding compliance contained in the Company's Forms 10-K.  (*See* pp. 29-30, *supra*; Compl. ¶¶ 411, 415, 447, 450, 474, 477.)  But there is nothing at all in the Complaint regarding the state of the Company's compliance in February of 2014, much less what Mr. Agrawal knew or was told *at that time* or at the times of any subsequent 10-Ks.

Indeed, the Complaint does not allege any particularized facts indicating that Mr. Agrawal had any responsibilities related to consumer-to-consumer transfers or compliance with AML or anti-fraud regulations.  Nor does the Complaint explain why Mr. Agrawal's CFO position would have caused him to have had any responsibilities for or involvement in compliance oversight, including issues regarding compliance at certain agent locations (it would not).  That omission is no accident.

86

Mr. Agrawal additionally made statements that, for instance, Western Union's compliance operation in "every country of the world" in 2014 was "not an easy infrastructure to replicate" (*id.* ¶ 432); that the Company had a "multi-faceted program to prevent consumer fraud" (*id.* ¶ 417); and that the Company had "been able to accomplish [its] key objectives on the compliance side" (*id.* ¶ 434).  But nowhere in the Complaint are there particularized facts indicating that Mr. Agrawal actually believed the contrary – *i.e.*, that establishing a compliance operation in every country was an easy undertaking, that the Company did *not* have a multi-faceted approach to compliance, or that the Company had *not* been able to accomplish its key objectives as of 2014.

Given the total absence of particularized facts showing information actually received by Mr. Agrawal that was contrary to any of his statements, the Complaint falls back on his single stock sale and the same inadequate list of "additional scienter allegations" utilized with respect to Mr. Ersek.  The Complaint alleges a single stock sale by Mr. Agrawal during the Class Period as supposed support for its claim of his scienter.  Specifically, Plaintiff alleges that on August 30, 2016, Mr. Agrawal sold over 9,000 shares for proceeds of approximately $200,000.  (*Id.* ¶ 290.)  Once again, however, this was an exercise of stock options, involving a purchase of stock pursuant to the options followed by a sale.  (Ex. 41, Agrawal Aug. 30, 2016 Form 4.)  When the price of Mr. Agrawal's options is accounted for, he made only *$21,918.11* from this sale, which was made pursuant to a 10b5-1 trading plan adopted on May 13, 2015.  (*Id.*)

The  Complaint identifies no facts at all showing something "suspicious" about this one

*de minimis* sale by Mr. Agrawal over the entire course of the more than five-year Class Period.[65]

Plaintiff alleges, however, that Mr. Agrawal's stock sale was suspiciously timed because it was

made "shortly before the [Regulatory Settlements were] announced."  (Compl. ¶ 290.)  But the

sale was made pursuant to a 10b5-1 plan adopted on *May 13, 2015*.  (Ex. 41, Agrawal Aug. 30,

2016 Form 4.)  That is nowhere close to the Regulatory Settlements announcement in January

2017 (nor is August 30, 2016, the date of the actual sale, for that matter).  And the sale was made

in connection with an exercise of options that were to expire only one month later, on September

29, 2016, unless exercised.  (*Id.*)  Although Plaintiff conclusorily alleges that Mr. Agrawal was

in possession of material nonpublic information when the sale was made (Compl. ¶ 290),

Plaintiff fails to plead any particularized facts alleging what that purported nonpublic

information was (and, in any event, the 10b5-1 plan removed discretion from Mr. Agrawal with

respect to the sale).  In fact, the sale was made *after* the Company's second quarter Form 10-Q

was filed, in which the Company *disclosed* that the FTC staff had recently advised the Company

that it had requested authority to file a complaint against Western Union if the FTC and the

Company were unable to reach an agreement.  (*Id.* ¶ 489.)  And the sale was made well after all

of Mr. Agrawal's purported false or misleading statements, with one exception:  the Form 10-Q

---

[65] The absence of any allegation that Mr. Scheirman or Mr. Koch sold any stock during this entire time further undercuts any inference as to Mr. Agrawal's and Mr. Ersek's alleged scienter. The absence of any concrete motive for fraud by these *other* supposed co-conspirators further reinforces that the more cogent and compelling inference here is that *all of* the Individual Defendants simply genuinely believed what they said.  *See Malin*, 499 F. Supp. 2d at 152 (finding that stock sales did not support an inference of scienter and noting that "the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiff's claim regarding motive" (citation omitted)); *Acito*, 47 F.3d at 54.

he signed (*id.* ¶ 492) that *disclosed* various information about the FTC that had arisen in the interim since the Company's previous report, including the Company's disagreement with the FTC concerning liability (*see supra* pp. 15-16), which could not have been disclosed before it arose.

Moreover, the sale was but a small portion of Mr. Agrawal's stock holdings. Mr. Agrawal held 125,058 shares of Company stock, valued at $2,532,242.50, as of the Company's 2017 annual Proxy.  (Ex. 4, 2017 Annual Proxy at 79 & n.6.)  And, like Mr. Ersek, Mr. Agrawal's aggregate stock holdings increased over the course of the Class Period by 113,151 shares.  (Ex. 35, 2012 Annual Proxy at 79 & n.4; Ex. 4, 2017 Annual Proxy at 79 & n.6.)  In addition, during the Class Period Mr. Agrawal had the right to exercise many more options:  481,123 as of early 2016.  (Ex. 40, 2016 Annual Proxy at 78 & n. 5 (noting that Mr. Agrawal had the right to exercise such options within 60 days of March 14, 2016).)  The miniscule sale that Plaintiff cites does not provide a motive for Mr. Agrawal to have commited fraud – to the contrary, his holdings during the Class Period *aligned* his incentives with those of stockholders.

The Complaint also indiscriminately includes its list of "additional" scienter allegations" against Mr. Agrawal (Compl. ¶¶ 540-52) *without even once mentioning him by name, much less providing any particularized facts about him.*  Those allegations are, in any event, insufficient for reasons already discussed above.  For example, Plaintiff's bare allegations regarding Mr. Agrawal's position at the Company and his certifications pursuant to the Sarbanes-Oxley Act (*see, e.g.*, *id.* ¶¶ 540, 552) say nothing about what he actually knew or intended – and are insufficient to support a strong inference of scienter.  Nor do any of the Complaint's other

allegations tie Mr. Agrawal with particularity to knowledge that any of his statements were false or misleading.  Additionally, no confidential witness alleged that Mr. Agrawal was provided with some knowledge of ongoing compliance violations during the Class Period.  He is not alleged to have routinely received any reports about compliance issues at agent locations (a matter that would be far afield from his CFO responsiblities).  While alleged by CW3 to have been aware of the publicly disclosed governmental investigations, he is not alleged to have had any responsibilities pertaining to those investigations.  He is not mentioned in the DPA or the FTC Complaint.  And while, as discussed above, the Board materials do not support Plaintiff's claims or characterizations, in any event Plaintiff pleads *no facts* indicating that Mr. Agrawal even attended *any of* the meetings at issue.  Instead, Plaintiff baldly asserts that Mr. Agrawal's attendance was nonetheless "likely."  (*Id.* ¶¶ 99-100, 214, 236, 239, 241, 243.)

### C.     The Allegations Regarding Mr. Scheirman Are Insufficient To Create A Strong Inference Of His Scienter In Making Statements Attributed To Him.

Mr. Scheirman was the Company's CFO only during the first two years of the Class Period – he was not an officer during the remaining nearly three and one-half years and made none of the alleged misstatements during that extended period.  With regard to the statements he is alleged to have made while employed at the Company (*see* Compl. ¶¶ 309, 316, 341, 353, 370, 377, 391, 401), Plaintiff fails to plead any facts – let alone facts pleaded with the requisite particularity – showing that Mr. Scheirman made those statements with fraudulent intent.

Plaintiff does not allege that in his financial and accounting role Mr. Scheirman had any responsibility for or involvement in compliance matters or compliance oversight, including issues regarding compliance at certain agent locations.  To the contrary, Western Union had a

90

Chief Compliance Officer who had those responsibilities.  Similarly, the Complaint nowhere alleges any particularized facts indicating that Mr. Scheirman had any responsibility whatsoever related to compliance with AML or anti-fraud regulations.  Again, as with Mr. Agrawal, that omission is no accident.

Instead, Plaintiff's scienter allegations rely heavily on the assertion that the investigations resulting in the Regulatory Settlements were ongoing during the Class Period, and that "Defendants" collectively were somehow aware of those investigations and the massive numbers of documents produced as a result of them.  (*See, e.g.*, *id.* ¶¶ 543, 548.)  But by the time Mr. Scheirman stepped down as CFO in late 2013, *the Company had not even received subpoenas from the government with respect to all of those investigations.*  (*See, e.g., id.* ¶¶ 268, 272.)  And the Complaint alleges no facts suggesting that at the time of his last allegedly false statement in 2013, Mr. Scheirman – or anyone else at Western Union for that matter – knew what those millions of pages of documents that eventually got produced showed about potential compliance violations by Western Union agents, or had any inkling of how the government investigations ultimately would be resolved in 2017, *three years after Mr. Scheirman had left Western Union*.  The fact that Mr. Scheirman in his financial and accounting role as CFO had no responsbilities for the Company's compliance efforts makes drawing any such inference here even more untenable.[66]  This also makes Plaintiff's allegations concerning Mr. Scheirman's

---

[66] To the extent that Plaintiff suggests that Mr. Scheirman must have known of the alleged misconduct because "the Company's compliance efforts . . . are a core operation of a money transfer business such as Western Union" (Compl. ¶ 552), as discussed above, pp. 85-86, *supra*, such conclusory allegations are insufficient to plead scienter under controlling Tenth Circuit law, especially because Mr. Scheirman's responsibilities as CFO did not include compliance.  *See, e.g., Anderson*, 827 F.3d at 1246; *City of Philadelphia,* 264 F.3d 1263-64.

statements regarding the state of the investigations themselves (*see id.* ¶¶ 308, 318, 344, 368) fatally deficient.

Moreover, unlike the allegations directed at Messrs. Ersek and Agrawal, Plaintiff does not even attempt to plead *any* motive that conceivably would have induced Mr. Scheirman to have committed securities fraud.  In particular, Plaintiff has not alleged that Mr. Scheirman made *any* stock sales.  Nor does Plaintiff allege that Mr. Scheirman benefitted from the alleged fraud in any way.  Since Plaintiff has not even attempted to allege motive or benefit, this Court should view with great skepticism and intense scrutiny Plaintiffs' attempt to allege scienter as to Mr. Scheirman.  *See In re Level 3 Commc'ns*, 667 F.3d at 1347; *City of Livonia*, 711 F.3d at 758; *R2 Invs. LDC*, 401 F.3d at 644-45.

Furthermore, no "confidential witness" alleges that Mr. Scheirman had knowledge of any compliance violations during the Class Period, he is not alleged to have read any reports that would have informed him of such violations, and there are no allegations or admissions in the Regulatory Settlements that remotely suggest that Mr. Scheirman otherwise became aware of the conduct at issue.  Indeed, Mr. Scheirman is not mentioned – by name or position at Western Union – in any government complaint, in the DPA, or in any other document issued by the government.  Likewise, the Board materials provide no support for the requisite strong inference of scienter.  The meeting minutes themselves for at least some of the meetings show that Mr. Scheirman never attended those meetings, and these documents control and supersede Plaintiff's unsupported allegations that he did attend.  (*See, e.g.,* Ex. 54 (Board minutes); *see also In re Arbinet-thexchange, Inc.*, 2006 WL 3831396, at *2 n.5 (D.N.J. Dec. 28, 2006) (dismissing claims that trends had a materially adverse impact on financial performance because they were

"clearly contradicted by the financial documents referenced in Plaintiffs' complaint and submitted by the parties").)  And the minutes for the meetings that Mr. Scheirman did attend also do not show that he was informed at those meetings of the kind of ongoing, severe, and unremediated compliance failures that would have called into question the accuracy of the statements he allegedly made.  *See supra* pp. 48-51[67]

With no apparent motive to commit securities fraud, no responsibilities for compliance, and no facts – let alone *particularized* facts – that Mr. Scheirman knew that any of his statements were false or that he otherwise intended to commit fraud, any inference that he committed fraud is neither cogent nor compelling.  Indeed, any such inference would be far less likely than the competing inference that he affirmatively believed the statements he made were materially accurate.  Moreover, because he was not responsible for compliance, any statements Mr. Scheirman made on that subject matter necessarily depended on information that he obtained from others at the Company.  But the Complaint nowhere alleges a single fact showing that others told him that the Company had ongoing, serious compliance failures, or that he did not believe whatever information he did receive about the adequacy of the Company's compliance efforts.  In short, the Complaint should be dismissed as to Mr. Scheirman.

### D.    The Allegations With Respect To Mr. Koch Fail To Create A Strong Inference Of His Scienter In Making The Statements Attributed To Him.

As discussed in more detail in the brief submitted separately on his behalf and incorporated herein by reference, the allegations against Mr. Koch also are meritless.  Mr. Koch

---

[67] Similarly, for the same reasons discussed above at pp.81-82, 85-86, Plaintiff's bare allegations regarding Mr. Scheirman's position at the Company and his certifications pursuant to the Sarbanes-Oxley Act are not sufficient to support a strong inference of scienter.

is alleged only to have made three highly general statements in various press releases during the Class Period.  (Compl. ¶¶ 395, 405-06.)  These statements were vague puffery, at most, and were not false.  Plaintiff also does not plead any particularized facts supporting scienter on the part of Mr. Koch, who also is not alleged to have engaged in any stock sales or to have had any motive for making fraudulent statements (much less related to conferences of compliance professionals).  The Complaint should be dismissed as to Mr. Koch as well.

> **E.**    **Plaintiff's Allegations Of Corporate Scienter Fail Because It Has Not Shown Scienter As To Any Individual That Could Be Imputed To Western Union.**

In order adequately to allege scienter on the part of Western Union, Plaintiff must plead particularized facts "creat[ing] a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also Anderson*, 827 F.3d at 1240 (dismissing complaint, including claims against corporate defendant, where plaintiffs failed to allege a strong inference of scienter with respect to any individual defendant); *City of Livonia*, 711 F.3d at 759 ("unless the complaint created a strong inference that [the individuals] who made the allegedly false statements . . . knew they were false, there would be no fraud to impute either to them or to" the company).[68]

---

[68] Some statements included in the Complaint are not attributed to the Individual Defendants but are claimed to have been made by others.  (Compl. ¶¶ 313-14, 324, 326, 331, 347, 372, 399, 406, 480.)  However, Plaintiff does not even attempt to allege scienter with respect to these individuals.  That some of these individuals (*see id*. ¶¶ 293, 295) and assorted other employees wholly unrelated to the facts alleged in the Complaint (*see id*. ¶¶ 292, 294) engaged in some small stock sales during the Class Period is hardly surprising.  The Class Period is five years long, and *some* employees are bound to buy and sell stock during that timeframe.  In addition, the Complaint contains no facts regarding the trading histories of any of these individuals, no facts attempting to show that the timing or amounts of their respective trades were suspicious,

For the reasons explained above, the claims of scienter as to each of the Individual Defendants fail.  Nor does the Complaint identify any other natural person alleged to have acted with scienter as the "maker" of allegedly false statements – which is what is required for Section 10(b) liability to attach to the corporate entity vicariously.  *Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (holding that the plaintiff must plead scienter "with respect to those individuals who actually made the false statements" for such scienter to be imputed to the corporate entity); *Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) ("the corporate scienter inquiry must focus on the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment") (internal quotation marks omitted).[69]  Plaintiff makes no attempt to identify any such other individual, or to identify any facts showing that there must be some other natural person bearing primary liability under the securities laws that can then vicariously be imputed to Western Union.

---

and no particularized facts showing that any of these individuals were in receipt of some material nonpublic material information.  *See Abiomed*, 778 F.3d 228, 246 (1st Cir. 2015) ("For stock sales by corporate officials to bolster an inference of scienter, the trading must be, at a minimum, . . . unusual, well beyond the normal patterns of trading by those defendants." (citation omitted)); *In re Sun Healthcare Grp.*, 181 F. Supp. 2d at 1296 ("In order to infer scienter, insider stock activity must be 'unusual.'" (quoting *Acito*, 47 F. 3d at 54)).

[69] *See also Southland Sec. Corp. v. Inspire Ins. Sol. Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter."); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 425 (D. Del. 2009) ("the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, such a statement").

As Plaintiff fails adequately to allege scienter with respect to each of the Defendants, the Complaint should be dismissed.

**IV.     Count II Should Be Dismissed Because Plaintiff Has Not Adequately Pleaded Either A Primary Violation Of Securities Laws Or Control Person Status.**

To state a claim under Section 20(a) of the Exchange Act, Plaintiff much demonstrate *both* a primary violation of the securities laws *and* that a particular Individual Defendant had control over the primary violator.  *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1118 (10th Cir. 2015); *City of Philadelphia*, 264 F.3d at 1270.  The Complaint fails in both respects.

*First*, as demonstrated above, the Complaint fails to demonstrate any primary securities violation.  Plaintiff has not adequately alleged that any statements were false or misleading, much less that they were made with scienter.  When a complaint is deficient in either of these respects, all Section 20(a) claims must be dismissed.  *City of Philadelphia*, 264 F.3d at 1270-71 (dismissing control person liability claims because the complaint failed to establish an underlying violation of the securities laws); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1154-55 (D. Colo. 2011) (same).

*Second*, to plead control person liability adequately, Plaintiff must allege that the alleged controlling person in general possessed power over the operations of the controlled person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998) (control is the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person") (quoting 17 C.F.R. § 230.405; internal quotation marks omitted). While conclusorily asserting that all of the Individual Defendants were controlling persons, Plaintiff has not alleged that Mr. Scheirman, Mr. Agrawal, or Mr. Koch each had the ability to

exercise control over one another (or anyone else alleged to have made a false or misleading statement).  For example, Messrs. Scheirman and Agrawal served as consecutive Chief Financial Officers of the Company, with Mr. Agrawal assuming that position after Mr. Scheirman had left; there is no allegation that either of them had any control over Mr. Ersek, their superior, or over one another.  There also is no allegation that either CFO had any responsibility whatsoever for compliance, let alone oversight over the Chief Compliance Officer.  There is, in turn, no allegation that the Chief Compliance Officer had any responsibility over the Chief Financial Officers.  In fact, the Complaint does not allege that any of these Defendants even reported to each other.  Accordingly, none of Mr. Scheirman, Mr. Agrawal, or Mr. Koch can bear control person liability for any statement made by any other Individual Defendant.  *See Sw. Carpenters Pension Tr. v. Merge Techs., Inc.*, 2008 WL 11381377, at *8 (E.D. Wis. Mar. 31, 2008) (dismissing Section 20(a) claim where complaint did not allege facts showing that defendant had primary control over alleged violators).

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint in its entirety, and with prejudice.

Dated:  January 16, 2018

/s/ David F. Graham

David F. Graham
Hille R. Sheppard
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

Holly Stein Sollod

97

CiCi Cheng
HOLLAND & HART, LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

*Attorneys for Defendants*
*The Western Union Company,*
*Hikmet Ersek,*
*Scott T. Scheirman, and*
*Rajesh K. Agrawal*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system on January 16, 2018, which sent notification of such filing to the following email addresses:

rusty@shumanlawfirm.com
mgrunfeld@pomlaw.com
ahood@pomlaw.com
jalieberman@pomlaw.com
henryr@rgrdlaw.com
kip@shumanlawfirm.com

/s/ David F. Graham
*Attorney for Defendants*