# Exhibit 13

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**FORM 10-K**

---

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the fiscal year ended: December 31, 2013**

**OR**

☐ **TRANSITION REPORT PURSUANT TO   SECTION 13 OR 15(d) OF THE   SECURITIES EXCHANGE ACT OF 1934**
    **For the transition period from              to**

Commission File Number: 001-32903

# THE WESTERN UNION COMPANY

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **DELAWARE** | **20-4531180** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |

**THE WESTERN UNION COMPANY**
**12500 East Belford Avenue**
**Englewood, Colorado 80112**
**(Address of principal executive offices)**
**Registrant's telephone number, including area code: (866) 405-5012**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 Par Value | The New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its Corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐   (Do not check if a smaller reporting company)        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☑

As of June 28, 2013, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $9.4 billion based on the closing sale price of $17.11 of the common stock as reported on the New York Stock Exchange.

As of February 18, 2014, 547,936,621 shares of the registrant's common stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's proxy statement for the 2014 annual meeting of stockholders are incorporated into Part III of this Annual Report on Form 10-K.

Table of Contents

## International Investment

No provision has been made for United States federal and state income taxes on certain of our outside tax basis differences, which primarily relate to accumulated foreign earnings of approximately $5.0 billion as of December 31, 2013 , as we have reinvested and expect to continue to reinvest these earnings outside the United States indefinitely. We intend to invest these earnings to expand and diversify our global distribution and explore new service offerings, and we may also consider international acquisition opportunities. In 2011, our foreign cash allowed us to acquire TGBP and the remaining interests in two of our largest European-based agents, Finint S.r.l. and Angelo Costa, S.r.l. However, if we are unable to utilize accumulated earnings outside of the United States and we repatriate these earnings to the United States in the form of actual or constructive dividends, we would be subject to significant United States federal income taxes (subject to an adjustment for foreign tax credits), state income taxes and possible withholding taxes payable to various foreign countries.

## Regulation

Our business is subject to a wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union. These include an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity. These also include laws and regulations regarding: financial services, consumer disclosure and consumer protection, currency controls, money transfer and payment instrument licensing, payment services, credit and debit cards, electronic payments, foreign exchange hedging services and the sale of spot, forward and option currency contracts, unclaimed property, the regulation of competition, consumer privacy, data protection and information security. Failure by Western Union, our agents, or their subagents (agents and subagents are third parties, over whom Western Union has limited legal and practical control) to comply with any of these requirements or their interpretation could result in the suspension or revocation of a license or registration required to provide money transfer services and/or payment services or foreign exchange products, the limitation, suspension or termination of services, loss of consumer confidence, the seizure of our assets, and/or the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services.

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements. These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer and payment service networks operate through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities. In 2013 , the Company spent over $150 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona.

### Money Transfer and Payment Instrument Licensing and Regulation

Our money transfer and money order services are subject to anti-money laundering laws and regulations, including the Bank Secrecy Act, as amended, including by the USA PATRIOT Act of 2001 (collectively, the "BSA"), and similar state laws and regulations. The BSA, among other things, requires money transfer companies and the issuers and sellers of money orders, to develop and implement risk-based anti-money laundering programs, to report large cash transactions and suspicious activity, and in some cases, to collect and maintain information about consumers who use their services and maintain other transaction records. Many states impose similar and, in some cases, more stringent requirements. These requirements also apply to our agents and their subagents. In addition, the United States Department of the Treasury has interpreted the BSA to require money transfer companies to conduct due diligence into and risk-based monitoring of their agents inside and outside the United States, and certain states also require money transfer companies to conduct due diligence reviews of their agents and subagents. Compliance with anti-money laundering laws and regulations continues to be a focus of regulatory attention, with agreements being reached with Western Union and several large financial institutions, including another money transfer provider.

15

Table of Contents

Economic and trade sanctions programs administered by the United States Department of the Treasury Office of Foreign Assets Control ("OFAC") and by certain foreign jurisdictions prohibit or restrict transactions to or from (or dealings with) certain countries, their governments, and in certain circumstances, their nationals, as well as with specifically-designated individuals and entities such as narcotics traffickers, terrorists and terrorist organizations. We provide very limited money transfer and payments services to individuals in Cuba, Syria and Sudan in accordance with United States laws authorizing such services and pursuant to and as authorized by advisory opinions of, or specific or general licenses granted by, OFAC.

In the United States, most states license money transfer services providers and many exercise authority over the operations of our money transfer services and, as part of this authority, regularly examine us. Many states require us to invest the proceeds of money transfers in highly-rated, investment grade securities, and our use of such investments is restricted to satisfy outstanding settlement obligations. We regularly monitor credit risk and attempt to mitigate our exposure by investing in highly-rated securities in compliance with these regulations. The majority of our investment securities, classified within "Settlement assets" in the Consolidated Balance Sheets, are held in order to comply with state licensing requirements in the United States and had credit ratings of "AA-" or better from a major credit rating agency as of December 31, 2013 .

These licensing laws also cover matters such as government approval of controlling shareholders and senior management of our licensed entities, regulatory approval of agents and in some instances their locations, consumer disclosures and the filing of periodic reports by the licensee, and require the licensee to demonstrate and maintain certain net worth levels. Many states also require money transfer providers and their agents to comply with federal and/or state anti-money laundering laws and regulations.

Outside of the United States, our money transfer business is subject to some form of regulation in all of the countries and territories in which we offer those services. These laws and regulations may include limitations on what types of entities may offer money transfer services, agent registration requirements, limitations on the amount of principal that can be sent into or out of a country, limitations on the number of money transfers that may be sent or received by a consumer and controls on the rates of exchange between currencies. They also include laws and regulations intended to detect and prevent money laundering or terrorist financing, including obligations to collect and maintain information about consumers, recordkeeping, reporting and due diligence, and supervision of agents and sub-agents similar to and in some cases exceeding those required under the BSA. In most countries, either we or our agents are required to obtain licenses or to register with a government authority in order to offer money transfer services.

The Payment Services Directive ("PSD") in the European Union ("EU") and similar laws in other jurisdictions have imposed rules on payment service providers like Western Union. In particular, Western Union is responsible for the regulatory compliance of our agents and their subagents who are engaged by one of our payments institution subsidiaries. Thus, the costs to monitor our agents and the risk of adverse regulatory action against us because of the actions of our agents in those areas have increased. The majority of our EU business is managed through our Irish PSD subsidiary, which is regulated by the Central Bank of Ireland. Under the PSD, we are subject to investment safeguarding rules and periodic examinations similar to those we are subject to in the United States. These rules have resulted in increased compliance costs and may lead to increased competition in our areas of service. Additional countries may adopt legislation similar to these laws. The PSD, as well as legislation in other countries such as Russia, has also allowed an increased number of non-bank entities to become money transfer agents, allowing Western Union and other money transfer providers to expand their agent networks in these countries but also resulting in increased competition.

16

Table of Contents

In February 2010, Western Union Financial Services, Inc. ("WUFSI"), a subsidiary of the Company, signed an agreement and settlement ("Settlement Agreement"), which resolved all outstanding legal issues and claims with the State of Arizona (the "State") and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. As part of the Settlement Agreement, we have made and expect to make certain investments in our compliance programs along the United States and Mexico border and a monitor (the "Monitor") has been engaged for those programs. We have incurred, and expect to continue to incur, significant costs in connection with the Settlement Agreement. The Monitor has made a number of recommendations related to our compliance programs. In addition, in the fourth quarter of 2012, our Business Solutions business was included in the scope of the Monitor's review. On January 31, 2014, WUFSI and the State agreed to amend the Settlement Agreement. Such amendment (the "Amendment") was subsequently approved by the Superior Court of the State of Arizona In and For the County of Maricopa that same day. The Amendment extends the term of the Settlement Agreement until December 31, 2017, and imposes obligations on the Company and WUFSI in connection with WUFSI's anti-money laundering compliance programs and cooperation with law enforcement. See Part I, Item 1A, Risk Factors - "Western Union is the subject of governmental investigations and consent agreements with or enforcement actions by regulators" for more information on the Settlement Agreement, including the potential impact on our business.

Regulators worldwide are exercising heightened supervision of money transfer providers and requiring increasing efforts to ensure compliance. As a result, we are experiencing increasing compliance costs related to customer, agent, and subagent due diligence, verification, transaction approval, disclosure, and reporting requirements, along with other requirements that have had and will continue to have a negative impact on our business, financial condition, and results of operations.

Government agencies both inside and outside the United States may impose new or additional rules on money transfers affecting us or our agents or their subagents, including regulations that:

- prohibit transactions in, to or from certain countries or with certain governments, individuals and entities;

- impose additional customer identification and customer, agent, and subagent due diligence requirements;

- impose additional reporting or recordkeeping requirements, or require enhanced transaction monitoring;

- limit the types of entities capable of providing money transfer services, impose additional licensing or registration requirements on us, our agents, or their subagents, or impose additional requirements on us with regard to selection or oversight of our agents or their subagents;

- impose minimum capital or other financial requirements on us or our agents and their subagents;

- limit or restrict the revenue which may be generated from money transfers, including transaction fees and revenue derived from foreign exchange;

- require enhanced disclosures to our money transfer customers;

- require the principal amount of money transfers originated in a country to be invested in that country or held in trust until they are paid;

- limit the number or principal amount of money transfers which may be sent to or from the jurisdiction, whether by an individual, through one agent or in aggregate; or

- impose taxes or fees on money transfer transactions.

***Dodd-Frank Wall Street Reform and Consumer Protection Act and Other Similar Legislation***

The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") became United States federal law in 2010. The Dodd-Frank Act created a new Consumer Financial Protection Bureau (the "CFPB") whose purpose is to issue and enforce consumer protection initiatives governing financial products and services, including money transfer services. The CFPB has created additional regulatory oversight for us. Regulations issued by the CFPB have affected our business in a variety of areas. These include: a requirement to provide consumers sending funds internationally from the United States enhanced pre-transaction written disclosures, including the disclosure of third-party fees and taxes, an obligation to resolve various errors, including certain errors that may be outside our control, and an obligation to cancel transactions that have not been completed at a consumer's request. We have modified certain of our systems, business practices, service offerings or procedures to comply with these regulations. We also face liability for the failure of our money transfer agents and their subagents to comply with the rules and have implemented and are continuing to implement additional policies, procedures, and oversight measures designed to foster compliance by our agents. The extent of these policies, procedures, and measures may be considered by the CFPB in any action or proceeding against us for noncompliance with the rules by our agents. The CFPB has also implemented a direct portal for gathering information regarding consumer complaints in the money transfer area. It is likely that this effort will lead to additional regulatory scrutiny. In January 2014, the CFPB proposed a rule to directly supervise "larger participants" in the market for international transfers. If finalized, this rule will result in the direct examination and supervision of Western Union and its largest competitors by the CFPB.

Additionally, rules adopted under the Dodd-Frank Act by the Commodity Futures Trading Commission, as well as by member states of the European Union pursuant to the European Market Infrastructure Regulation ("EMIR"), have subjected our foreign exchange hedging transactions, including certain intercompany hedging transactions, certain of the corporate interest rate hedging transactions we may enter into in the future, and certain of the foreign exchange derivative contracts we offer as part of our Business Solutions segment, to reporting, recordkeeping, and other requirements. Additionally, certain of the corporate interest rate hedging transactions we may enter into in the future are subject to centralized clearing and margin requirements and certain of our other transactions may become so in the future. Further, we may become subject to additional and potentially costly regulatory and supervisory requirements if we exceed derivative transaction thresholds set forth in the Dodd-Frank Act and EMIR, including subjecting our foreign exchange derivative transactions to centralized clearing and margin requirements under EMIR. Governments outside of the United States and the European Union are also considering regulations similar to those described above. These regulations have added costs to our business and any additional requirements could result in additional costs or impact the way we conduct our hedging activities as well as impact how we conduct our business within our Business Solutions segment. For further discussion of these risks, see Part I, Item 1A, *Risk Factors - " The Dodd-Frank Act, as well as the regulations required by that Act and the actions of the Consumer Financial Protection Bureau and similar legislation and regulations enacted by other government authorities, could adversely affect us and the scope of our activities, and could adversely affect our operations, results of operations and financial condition . "*

***Unclaimed Property Regulations***

Our Company is subject to unclaimed property laws in the United States and abroad. These laws require us to turn over to certain government authorities the property of others held by our Company that has been unclaimed for a specified period of time, such as unpaid money transfers and money orders. We hold property subject to unclaimed property laws and we have an ongoing program to comply with the laws. We are subject to audits with regard to our escheatment practices.

Table of Contents

*Privacy and Information Security Regulations*

We must collect, transfer, disclose, use and store personal information in order to provide our services. These activities are subject to information security standards, data privacy, data breach and related laws and regulations in the United States and other countries. In the United States, data privacy and data breach laws such as the federal Gramm-Leach-Bliley Act and various state laws apply directly to a broad range of financial institutions including money transfer providers like Western Union, and indirectly to companies that provide services to or on behalf of those institutions. The United States Federal Trade Commission ("FTC") has an on-going program of investigating the privacy practices of companies and has commenced enforcement actions against many, resulting in multimillion dollar settlements and multi-year agreements governing the settling companies' privacy practices. The FTC and several states have expanded their area of concern to include privacy practices related to mobile applications. Many state laws require us to provide notification to affected individuals, state officers and consumer reporting agencies in the event of a security breach of computer databases or physical documents that contain certain types of non-public personal information and present a risk for unauthorized use.

The collection, transfer, disclosure, use and storage of personal information required to provide our services is subject to data privacy laws outside of the United States, such as laws adopted pursuant to the EU's 95/46 EC Directive of the European Parliament (the "Data Protection Directive"), and national and provincial laws throughout the world. In some cases, these laws are more restrictive than the Gramm-Leach-Bliley Act and impose more stringent duties on companies. These laws, which are not uniform, do one or more of the following: restrict the collection, transfer, processing, storage, use and disclosure of personal information, require notice to individuals of privacy practices and give individuals certain rights to prevent the use or disclosure of personal information for secondary purposes such as marketing.

These regulations, laws and industry standards also impose requirements for safeguarding personal information through the issuance of internal data security standards, controls or guidelines.

In connection with regulatory requirements to assist in the prevention of money laundering and terrorist financing and pursuant to legal obligations and authorizations, Western Union makes information available to certain United States federal and state, as well as certain foreign, government agencies when required by law. In recent years, Western Union has experienced increasing data sharing requests by these agencies, particularly in connection with efforts to prevent terrorist financing or reduce the risk of identity theft. During the same period, there has also been increased public attention to the corporate use and disclosure of personal information, accompanied by legislation and regulations intended to strengthen data protection, information security and consumer privacy. These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

*Banking Regulation*

We have subsidiaries that operate under banking licenses granted by the Austrian Financial Market Authority and the Brazilian Central Bank which subject these subsidiaries to Austrian and Brazilian regulations. We are also subject to regulation, examination and supervision by the New York State Department of Financial Services (the "Financial Services Department"), which has regulatory authority over our entity that holds all interests in these subsidiaries, a limited liability investment company organized under Article XII of the New York Banking Law. An Agreement of Supervision with the Financial Services Department imposes various regulatory requirements including operational limitations, capital requirements, affiliate transaction limitations, and notice and reporting requirements. Approval is required from the Financial Services Department under New York Banking Law, and from the Austrian Financial Market Authority and the Brazilian Central Bank under Austrian and Brazilian regulations, respectively, prior to certain direct or indirect changes in control of the Article XII investment company and its banking subsidiaries, including a change in control of its ultimate parent, the Company.

Since these subsidiaries do not operate any banking offices in the United States and do not conduct business in the United States except as may be incidental to their activities outside the United States, our Company's affiliation with these subsidiaries does not cause them to be subject to the provisions of the Bank Holding Company Act in the United States.

Table of Contents

## ITEM 1A.  RISK FACTORS

There are many factors that affect our business, financial condition and results of operations, some of which are beyond our control. These risks include, but are not limited to, the risks described below. Such risks are grouped according to:

- Risks Relating to Our Business and Industry;
- Risks Related to Our Regulatory and Litigation Environment; and
- Risks Related to the Spin-Off.

You should carefully consider all of these risks.

### Risks Relating to Our Business and Industry

***If consumers' confidence in our business or in consumer money transfer and payment service providers generally deteriorates, our business, financial condition and results of operations could be adversely affected.***

Our business is built on consumers' confidence in our brands and our ability to provide fast, reliable money transfer and payment services. Erosion in consumers' confidence in our business, or in consumer money transfer and payment service providers as a means to transfer money, could adversely impact transaction volumes which would in turn adversely impact our business, financial condition and results of operations.

A number of factors could adversely affect consumers' confidence in our business, or in consumer money transfer and payment service providers generally, many of which are beyond our control, and could have an adverse impact on our results of operations. These factors include:

- changes or proposed changes in laws or regulations or regulator or judicial interpretation thereof that have the effect of making it more difficult or less desirable for consumers to transfer money using consumer money transfer and payment service providers, including additional customer due diligence, identification, reporting, and recordkeeping requirements;

- the quality of our services and our customer experience, and our ability to meet evolving consumer needs and preferences, including customer preferences related to our digital services;

- failure of our agents or their subagents to deliver services in accordance with our requirements;

- reputational concerns resulting from actual or perceived events, including those related to fraud or consumer protection;

- actions by federal, state or foreign regulators that interfere with our ability to transfer consumers' money reliably, for example, attempts to seize money transfer funds, or limit our ability to or prohibit us from transferring money in certain corridors;

- federal, state or foreign legal requirements, including those that require us to provide consumer or transaction data pursuant to our agreement and settlement with the State of Arizona and other requirements or to a greater extent than is currently required;

- any significant interruption in our systems, including by fire, natural disaster, power loss, telecommunications failure, terrorism, vendor failure, unauthorized entry and computer viruses or disruptions in our workforce; and

- any breach of our security policies or legal requirements resulting in a compromise of consumer privacy or data use and security.

Many of our money transfer consumers are migrants. Consumer advocacy groups or governmental agencies could consider migrants to be disadvantaged and entitled to protection, enhanced consumer disclosure, or other different treatment. If consumer advocacy groups are able to generate widespread support for actions that are detrimental to our business, then our business, financial condition and results of operations could be adversely affected.

***Global economic downturns or slower growth or declines in the money transfer, payment service, and other markets in which we operate, including those related to interruptions in migration patterns, and difficult conditions in global financial markets and financial market disruptions could adversely affect our business, financial condition and results of operations.***

The global economy has experienced in recent years, and in the future may experience, downturns, volatility and disruption, and we face certain risks relating to such events, including:

- Demand for our services could soften, including due to low consumer confidence, high unemployment, or reduced global trade.

- Our Consumer-to-Consumer money transfer business relies in large part on migration, which brings workers to countries with greater economic opportunities than those available in their native countries. A significant portion of money transfers are sent by international migrants. Migration is affected by (among other factors) overall economic conditions, the availability of job opportunities, changes in immigration laws, and political or other events (such as war, terrorism or health emergencies) that would make it more difficult for workers to migrate or work abroad. Changes to these factors could adversely affect our remittance volume and could have an adverse effect on our business, financial condition and results of operations.

- Many of our consumers work in industries that may be impacted by deteriorating economic conditions more quickly or significantly than other industries. Reduced job opportunities, especially in retail, healthcare, hospitality, and construction, or overall weakness in the world's economies could adversely affect the number of money transfer transactions, the principal amounts transferred and correspondingly our results of operations. If general market softness in the economies of countries important to migrant workers occurs, our results of operations could be adversely impacted. Additionally, if our consumer transactions decline, if the amount of money that consumers send per transaction declines, or if migration patterns shift due to weak or deteriorating economic conditions, our results of operations may be adversely affected.

- Our agents or clients could experience reduced sales or business as a result of a deterioration in economic conditions. As a result, our agents could reduce their numbers of locations or hours of operation, or cease doing business altogether. Businesses using our services may make fewer cross-currency payments or may have fewer customers making payments to them through us, particularly businesses in those industries that may be more affected by an economic downturn.

- Our exposure to receivables from our agents, consumers and businesses could impact us. For more information on this risk, see risk factor, *"We face credit, liquidity and fraud risks from our agents, consumers and businesses that could adversely affect our business, financial condition and results of operations ."*

- The market value of the securities in our investment portfolio may substantially decline. The impact of that decline in value may adversely affect our liquidity, results of operations and financial condition.

- The counterparties to the derivative financial instruments that we use to reduce our exposure to various market risks, including changes in interest rates and foreign exchange rates, may fail to honor their obligations, which could expose us to risks we had sought to mitigate. That failure could have an adverse effect on our financial condition and results of operations.

- We aggregate our foreign exchange exposures in our Business Solutions business, including the exposure generated by the derivative contracts we write to our customers as part of our cross-currency payments business, and typically hedge the net exposure through offsetting contracts with established financial institution counterparties. If our customers fail to honor their obligations or if the counterparties to our offsetting positions fail to honor their obligations, our business, financial condition and results of operations could be adversely affected.

- We may be unable to refinance our existing indebtedness as it becomes due or we may have to refinance on unfavorable terms, which could require us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing funds available for working capital, capital expenditures, acquisitions, share repurchases, dividends, and other purposes.

Table of Contents

- Our revolving credit facility with a consortium of banks is one source for funding liquidity needs and also backs our commercial paper program. If any of the banks participating in our credit facility fails to fulfill its lending commitment to us, our short-term liquidity and ability to support borrowings under our commercial paper program could be adversely affected.

- The third-party service providers on whom we depend may experience difficulties in their businesses, which may impair their ability to provide services to us and have a potential impact on our own business. The impact of a change or temporary stoppage of services may have an adverse effect on our business, results of operations and financial condition.

- Banks upon which we rely to conduct our business could fail or be unable to satisfy their obligations to us. This could lead to our inability to access funds and/or credit losses for us and could adversely impact our ability to conduct our business.

- If market disruption and volatility occurs, we could experience difficulty in accessing capital on favorable terms and our business, financial condition and results of operations could be adversely impacted.

***We face competition from global and niche or corridor money transfer providers, United States and international banks, card associations, card-based payments providers and a number of other types of service providers, including electronic and Internet providers and digital currencies. Our future growth depends on our ability to compete effectively in the industry.***

Money transfer and global business payments are highly competitive industries which include service providers from a variety of financial and non-financial business groups. Our competitors include banks, credit unions, automated teller machine providers and operators, card associations, card-based payments providers such as issuers of e-money, travel cards or stored-value cards, informal remittance systems, web-based services, phone payment systems (including mobile phone networks), postal organizations, retailers, check cashers, mail and courier services, currency exchanges, consumer money transfer companies, and digital currencies. These services are differentiated by features and functionalities such as brand recognition, customer service, trust and reliability, distribution network and channel options, convenience, price, speed, variety of payment methods, service offerings, and innovation. Distribution network and channel options, such as the electronic money transfer business, which includes online, account based, and mobile money transfer, have been and may continue to be impacted by increased competition, which could adversely affect our business, financial condition, and results of operations.

Our future growth depends on our ability to compete effectively in money transfer and global business payments. For example, if we fail to price our services appropriately, consumers may not use our services, which could adversely affect our business and financial results. In addition, failure to compete on service differentiation and service quality could significantly affect our future growth potential and results of operations.

As noted below under risk factor *" Risks associated with operations outside the United States and foreign currencies could adversely affect our business, financial condition and results of operations* , *"* many of our agents outside the United States are national post offices. These entities are usually governmental organizations that may enjoy special privileges or protections that could allow them to simultaneously develop their own money transfer businesses. International postal organizations could agree to establish a money transfer network among themselves. Due to the size of these organizations and the number of locations they have, any such network could represent significant competition to us.

***We may not realize the anticipated benefits of pricing reductions, which could adversely affect our business.***

We have made, and expect to continue to make, periodic pricing reductions from time to time in response to competition and to implement our brand investment strategy, which includes better meeting consumer needs, maximizing market opportunities and strengthening our overall competitive positioning. Pricing reductions generally reduce margins and adversely affect financial results in the short term, but are done in anticipation that they will result in increased transaction volumes which may lead to increased revenues and operating income in these certain corridors thereafter. However, the anticipated benefits of these pricing reductions may not be realized within a certain time period or at all. If we fail to realize the anticipated benefit of the pricing reductions, our business and financial results could be adversely affected.

25

Table of Contents

***Our ability to adopt new technology to respond to new and enhanced products, changing industry and regulatory standards, and evolving customer needs or trends poses a challenge to our business.***

Our industry is subject to rapid and significant technological changes, with the constant introduction of new and enhanced products and services and evolving industry and regulatory standards and consumer needs and preferences. Our ability to enhance our current products and services and introduce new products and services that address these changes has a significant impact on our ability to be successful. We actively seek to respond in a timely manner to changes in customer (both consumer and business) needs and preferences, technology advances and new and enhanced products such as technology-based money transfer and Business Solutions payments services, including Internet, phone-based and other mobile money transfer services and prepaid, stored-value and other card-based money transfer services. Failure to respond well to these challenges on a timely basis could adversely impact our business, financial condition and results of operations. Further, even if we respond well to these challenges, the business and financial models offered by many of these alternative, more technology-reliant means of money transfer and electronic payment solutions may be less advantageous to us than the model offered by our traditional cash/agent model.

***Risks associated with operations outside the United States and foreign currencies could adversely affect our business, financial condition and results of operations .***

A substantial portion of our revenue is generated in currencies other than the United States dollar. As a result, we are subject to risks associated with changes in the value of our revenues and net monetary assets denominated in foreign currencies. Our Business Solutions business provides currency conversion and, in certain countries, foreign exchange hedging services to its customers, further exposing us to foreign currency exchange risk. In order to mitigate these risks, we enter into derivative contracts. However, these contracts do not eliminate all of the risks related to fluctuating foreign currency rates.

For example, a substantial portion of our revenue is generated in the euro. Due to concerns in recent years regarding the ability of certain European countries to continue to service their sovereign debt obligations, the value of the euro has fluctuated more widely than in the past. If there is a significant devaluation of the euro and we are unable to hedge our foreign exchange exposure to the euro, the value of our euro-denominated net monetary assets and liabilities would be correspondingly reduced when translated into United States dollars for inclusion in our financial statements.

We operate in almost all the emerging markets throughout the world. For many countries in these markets, our foreign currency exposure is limited because most transactions are receive transactions and we settle with our agents in either United States dollars or euros as reimbursement for the payment of these transactions. However, there are certain countries in these emerging markets where we generate transaction revenue from send transactions. Our exposure to foreign currency fluctuations in those countries is increased as these fluctuations impact our revenues and operating profits. Typically, in these markets the cost of hedging activities is prohibitive.

We have operations in countries where government-imposed restrictions limit the transfer of cash outside the country. In Argentina, our money transfer and bill payment operations together represent less than 5% of our 2013 total consolidated revenues. However, as of December 31, 2013, approximately $100 million in cash and cash equivalents, representing several years of accumulated operating profits and excess cash flows from both businesses, continue to be held in Argentina due to government imposed restrictions. Changes in the official Argentine peso exchange rate are immediately reflected in net income for our money transfer operations, whereas these effects are reflected in other comprehensive income for our bill payment operations. The continued devaluation of the Argentine peso and limits on returning excess cash balances could further adversely affect future distributions and our results of operations.

Our foreign exchange risk is relatively greater, and our foreign exchange risk management is heightened, in our Business Solutions business. The majority of Business Solutions' revenue is from exchanges of currency at the spot rate enabling customers to make cross-currency payments. In certain countries, this business also writes foreign currency forward and option contracts for its customers. The duration of these derivative contracts at inception is generally less than one year. The credit risk associated with our derivative contracts increases when foreign currency exchange rates move against our customers, possibly impacting their ability to honor their obligations to deliver currency to us or to maintain appropriate collateral with us. Business Solutions aggregates its foreign exchange exposures arising from customer contracts, including the derivative contracts described above, and hedges the resulting net currency risks by entering into offsetting contracts with established financial institution counterparties. If we are unable to obtain offsetting positions, our business, financial condition and results of operations could be adversely affected.

Table of Contents

A substantial portion of our revenue is generated outside of the United States and much of the cash and cash equivalents from this business are held by our foreign entities. Repatriating these funds to the United States would, in many cases, result in significant tax obligations because most of these funds have been taxed at foreign tax rates that are relatively low compared to our combined federal and state tax rates in the United States. If repatriation of these funds is required or if a change in legislation requires a different tax treatment, our business, financial condition and results of operations could be adversely impacted. For further discussion regarding the risk that our future effective tax rates could be adversely impacted by changes in tax laws, both domestically and internationally, see risk factor *" Changes in tax laws and unfavorable resolution of tax contingencies could adversely affect our tax expense "* below.

Money transfers and payments to, from, within, or between countries may be limited or prohibited by law. At times in the past, we have been required to cease operations in particular countries due to political uncertainties or government restrictions imposed by foreign governments or the United States. Occasionally agents or their subagents have been required by their regulators to cease offering our services, see risk factor *" Regulatory initiatives and changes in laws, regulations and industry practices and standards affecting us, our agents or their subagents could require changes in our business model and increase our costs of operations, which could adversely affect our operations, results of operations, financial condition, and liquidity "* below. Additionally, economic or political instability or natural disasters may make money transfers to, from, within, or between particular countries difficult or impossible, such as when banks are closed, when currency devaluation makes exchange rates difficult to manage or when natural disasters or civil unrest makes access to agent locations unsafe. These risks could negatively impact our ability to offer our services, to make payments to or receive payments from international agents or our subsidiaries or our ability to recoup funds that have been advanced to international agents or are held by our subsidiaries, and as a result could adversely affect our business, financial condition and results of operations. In addition, the general state of telecommunications and infrastructure in some lesser developed countries, including countries where we have a large number of transactions, creates operational risks for us and our agents that generally are not present in our operations in the United States and other more developed countries.

Many of our agents outside the United States are post offices, which are usually owned and operated by national governments. These governments may decide to change the terms under which they allow post offices to offer remittances and other financial services. For example, governments may decide to separate financial service operations from postal operations, or mandate the creation or privatization of a "post bank," which could result in the loss of agent locations, or they may require multiple service providers in their network. A government could decide to restrict remittance service to only the national post office. These changes could have an adverse effect on our ability to distribute, offer or price our services in countries that are material to our business.

***Breaches of our information security policies or safeguards could adversely affect our ability to operate and could damage our reputation, business, financial condition and results of operations.***

We collect, transfer and retain consumer, business, employee and agent data as part of our business. These activities are subject to laws and regulations in the United States and other jurisdictions, see risk factor *" Current and proposed regulation addressing consumer privacy and data use and security could increase our costs of operations, which could adversely affect our operations, results of operations and financial condition "* below. The requirements imposed by these laws and regulations, which often differ materially among the many jurisdictions, are designed to protect the privacy of personal information and to prevent that information from being inappropriately used or disclosed. We have developed and maintain technical and operational safeguards designed to comply with applicable legal requirements. However, despite those safeguards, it is possible that hackers, employees acting contrary to our policies or others could improperly access our systems or the systems of our business partners and service providers and improperly obtain or disclose data about our consumers, business customers, agents and/or employees. Further, because some data is collected and stored by third parties, it is possible that a third party could intentionally or inadvertently disclose personal data in violation of law. Also, in some jurisdictions we transfer data related to our employees, business customers, consumers, agents and potential employees to third-party vendors in order to perform due diligence and for other reasons. It is possible that a vendor could intentionally or inadvertently disclose such data. Any breach of our security policies or applicable legal requirements resulting in a compromise of consumer, business, employee or agent data could require us to notify impacted individuals, and in some cases regulators, of a possible or actual breach, expose us to regulatory enforcement action, including fines, limit our ability to provide services, subject us to litigation and/or damage our reputation.

Table of Contents

*Interruptions in our systems, including as a result of cyber attacks, or disruptions in our workforce may have a significant effect on our business.*

Our ability to provide reliable service largely depends on the efficient and uninterrupted operation of our computer information systems and those of our service providers. Any significant interruptions could harm our business and reputation and result in a loss of consumers. These systems and operations could be exposed to damage or interruption from fire, natural disaster, power loss, telecommunications failure, terrorism, vendor failure, unauthorized entry and computer viruses or other causes, many of which may be beyond our control or that of our service providers. Further, we have been and continue to be the subject of cyber attacks. These attacks are primarily aimed at interrupting our business or exploiting information security vulnerabilities. Historically, none of these attacks or breaches has individually or in the aggregate resulted in any material liability to us or any material damage to our reputation, and disruptions related to cybersecurity have not caused any material disruption to the Company's business, although there can be no assurance that a material breach will not occur in the future. Although we have taken steps to prevent systems disruptions, our measures may not be successful and we may experience problems other than system disruptions. We also may experience software defects, development delays, installation difficulties and other systems problems, which would harm our business and reputation and expose us to potential liability which may not be fully covered by our business interruption insurance. Our data applications may not be sufficient to address technological advances, regulatory requirements, changing market conditions or other developments. In addition, any work stoppages or other labor actions by employees, the significant majority of which are located outside the United States, could adversely affect our business.

*Acquisitions and integration of new businesses create risks and may affect operating results.*

We have acquired and may acquire businesses both inside and outside the United States. The acquisition and integration of businesses involve a number of risks. The core risks involve valuation (negotiating a fair price for the business based on inherently limited due diligence) and integration (managing the complex process of integrating the acquired company's people, products and services, technology and other assets in an effort to realize the projected value of the acquired company and the projected synergies of the acquisition). In addition, the need in some cases to improve regulatory compliance standards is another risk associated with acquiring companies, see "Risks Related to Our Regulatory and Litigation Environment" below. Acquisitions often involve additional or increased risks including, for example:

- realizing the anticipated financial benefits from these acquisitions and where necessary, improving internal controls of these acquired businesses;

- managing geographically separated organizations, systems and facilities;

- managing multi-jurisdictional operating, tax and financing structures;

- integrating personnel with diverse business backgrounds and organizational cultures;

- integrating the acquired technologies into our Company;

- complying with regulatory requirements;

- enforcing intellectual property rights in some foreign countries;

- entering new markets with the services of the acquired businesses; and

- general economic and political conditions, including legal and other barriers to cross-border investment in general, or by United States companies in particular.

Integrating operations could cause an interruption of, or divert resources from, one or more of our businesses and could result in the loss of key personnel. The diversion of management's attention and any delays or difficulties encountered in connection with an acquisition and the integration of the acquired company's operations could have an adverse effect on our business, financial condition and results of operations.

Table of Contents

As of December 31, 2013 , we had $3,172.0 million of goodwill comprising approximately 31% of our total assets, including $1,947.7 million of goodwill in our Consumer-to-Consumer reporting unit and $996.0 million of goodwill in our Business Solutions reporting unit. TGBP represents a significant majority of the goodwill related to the Business Solutions reporting unit. For the Business Solutions reporting unit, a decline in estimated fair value of approximately 15% could occur before triggering an impairment of goodwill. If we or our reporting units do not generate operating cash flows at levels consistent with our expectations, we may be required to write down the goodwill on our balance sheet, which could have a significant adverse impact on our financial condition and results of operations in future periods. See the "Critical Accounting Policies and Estimates" discussion in Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operation* , for more detail.

***We face credit, liquidity and fraud risks from our agents, consumers and businesses that could adversely affect our business, financial condition and results of operations .***

The vast majority of our global funds transfer business is conducted through third-party agents that provide our services to consumers at their retail locations. These agents sell our services, collect funds from consumers and are required to pay the proceeds from these transactions to us. As a result, we have credit exposure to our agents. In some countries, our agent networks include superagents that establish subagent relationships; these agents must collect funds from their subagents in order to pay us. We are not insured against credit losses, except in certain circumstances related to agent theft or fraud. If an agent becomes insolvent, files for bankruptcy, commits fraud or otherwise fails to pay money order, money transfer or payment services proceeds to us, we must nonetheless pay the money order, complete the money transfer or payment services on behalf of the consumer.

The liquidity of our agents is necessary for our business to remain strong and to continue to provide our services. If our agents fail to settle with us in a timely manner, our liquidity could be affected.

From time to time, we have made, and may in the future make, short-term advances and longer term loans to our agents. These advances and loans generally are secured by settlement funds payable by us to these agents. However, the failure of these borrowing agents to repay these advances and loans constitutes a credit risk to us.

In our Business Solutions business, we are also exposed to credit risk relating to foreign currency forward and option contracts written by us to our customers. The duration of these derivative contracts at inception is generally less than one year. The credit risk associated with our derivative contracts increases when foreign currency exchange rates move against our customers, possibly impacting their ability to honor their obligations to deliver currency to us or to maintain appropriate collateral with us. If a customer becomes insolvent, files for bankruptcy, commits fraud or otherwise fails to pay us for the value of these contracts, we may be exposed to the value of an offsetting position with a financial institution counterparty.

We offer consumers, primarily in the United States, the ability to transfer money utilizing their bank account or credit or debit card via the Internet and phone. These transactions have experienced and continue to experience a greater risk of fraud and higher fraud losses. Additionally, money transfers funded by ACH, or similar methods, are not preauthorized by the sender's bank and carry the risk that the account may not exist or have sufficient funds to cover the transaction. We apply verification and other tools to help authenticate transactions and protect against fraud. However, these tools are not always successful in protecting us against fraud. As the merchant of these transactions, we may bear the financial risk of the full amount sent in some of the fraudulent transactions. Issuers of credit and debit cards may also incur losses due to fraudulent transactions through our distribution channels and may elect to block transactions by their cardholders in these channels with or without notice. We may be subject to additional fees or penalties if the amount of chargebacks exceeds a certain percentage of our transaction volume. Such fees and penalties escalate over time if we do not take effective action to reduce chargebacks below the threshold, and if chargeback levels are not ultimately reduced to acceptable levels, our merchant accounts could be suspended or revoked, which would adversely affect our results of operations.

Table of Contents

***If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected .***

Most of our Consumer-to-Consumer revenue is derived through our agent network. In addition, our international agents may have subagent relationships in which we are not directly involved. If, due to competition or other reasons, agents or their subagents decide to leave our network, or if we are unable to sign new agents or maintain our agent network under terms consistent with those currently in place, or if our agents are unable to maintain relationships with or sign new subagents, our revenue and profits may be adversely affected. Agent attrition might occur for a number of reasons, including a competitor engaging an agent, an agent's dissatisfaction with its relationship with us or the revenue derived from that relationship, or an agent's or its subagents' unwillingness or inability to comply with our standards or legal requirements, including those related to compliance with anti-money laundering regulations, anti-fraud measures, or agent registration and monitoring requirements. For example, changes to our compliance-related practices as a result of our agreement and settlement with the State of Arizona and changes to our business model, primarily related to our Vigo and Orlandi Valuta brands, resulted in the loss of over 7,000 agent locations in Mexico in 2012. In addition, agents may generate fewer transactions or less revenue for various reasons, including increased competition, political unrest, or changes in the economy, and the cost of maintaining agent or subagent locations may increase because of increased compliance efforts. Because an agent is a third party that engages in a variety of activities in addition to providing our services, it may encounter business difficulties unrelated to its provision of our services, which could cause the agent to reduce its number of locations, hours of operation, or cease doing business altogether.

We rely on our agents' information systems and/or processes to obtain transaction data. If an agent or their subagent loses information, if there is a significant disruption to the information systems of an agent or their subagent, or if an agent or their subagent does not maintain the appropriate controls over their systems, we may experience reputational and other harm which could result in losses to the Company.

We have relationships with over 15,000 consumer payments businesses to which our customers can make payments. These relationships are a core component of our global payments services, and we derive a substantial portion of our Consumer-to-Business revenue through these relationships. If we are unable to sign new relationships or maintain our current relationships under terms consistent with those currently in place, our revenue and profit growth rates may be adversely affected.

For example, changes in laws regulating competition or in the interpretation of those laws could undermine our ability to enter into or maintain our exclusive arrangements with our current and prospective agents, especially in certain inbound countries. See risk factor *"Regulatory initiatives and changes in laws, regulations and industry practices and standards affecting us, our agents or their subagents could require changes in our business model and increase our costs of operations, which could adversely affect our operations, results of operations, financial condition, and liquidity "* below. In addition, certain of our agents and subagents have refused to enter into exclusive arrangements. The inability to enter into exclusive arrangements or to maintain our exclusive rights under our contracts could adversely affect our operations, revenue, and operating profit by, for example, allowing competitors to benefit from the goodwill associated with the Western Union brand at our agent locations.

***Our business, financial condition and results of operations could be harmed by adverse rating actions by credit rating agencies.***

If our credit ratings are downgraded, or if they are placed under review or revised to have a negative outlook, our business, financial condition and results of operations could be adversely affected and perceptions of our financial strength could be damaged, which could adversely affect our relationships with our agents, particularly those agents that are financial institutions or post offices, and our banking and other business relationships. In addition, an adverse credit rating by a rating agency, such as a downgrade or negative outlook, could result in regulators imposing additional capital and other requirements on us, including imposing restrictions on the ability of our regulated subsidiaries to pay dividends. Also, a downgrade below investment grade will increase our interest expense under certain of our notes and any significant downgrade could increase our costs of borrowing money more generally or adversely impact or eliminate our access to the commercial paper market, each of which could adversely affect our business, financial condition and results of operations.

Table of Contents

***We may not realize all of the anticipated benefits from productivity and cost-savings and other related initiatives, which may include decisions to downsize or to transition operating activities from one location to another, and we may experience disruptions in our workforce as a result of those initiatives.***

We have engaged in actions and activities associated with productivity improvement initiatives and expense reduction measures. We may implement additional initiatives in future periods. While these initiatives are designed to increase productivity and result in cost savings, there can be no assurance that the anticipated benefits will be realized, and the costs to implement such initiatives may be greater than expected. In addition, these initiatives have resulted and will likely result in the loss of personnel, some of whom may support significant systems or operations. Consequently, these initiatives could result in a disruption to our workforce. If we do not realize the anticipated benefits from these initiatives, or the costs to implement them are greater than expected, or if the actions result in a disruption to our workforce greater than anticipated, our business, financial condition, and results of operations could be adversely affected.

***There can be no guarantee that we will continue to make dividend payments or repurchase stock.***

For risks associated with our ability to continue to make dividend payments or repurchase shares, please see Part II, Item 5, *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.*

***Our ability to remain competitive depends in part on our ability to protect our brands and our other intellectual property rights and to defend ourselves against potential intellectual property infringement claims.***

The Western Union brand, which is protected by trademark registrations in many countries, is material to our Company. The loss of the Western Union trademark or a diminution in the perceived quality associated with the name would harm our business. Similar to the Western Union trademark, the Vigo, Orlandi Valuta, Speedpay, Equity Accelerator, Pago Fácil, Western Union Payments, Quick Collect, Quick Pay, Quick Cash, Convenience Pay, Western Union Business Solutions and other trademarks and service marks are also important to our Company and a loss of the service mark or trademarks or a diminution in the perceived quality associated with these names could harm our business.

Our intellectual property rights are an important element in the value of our business. Our failure to take appropriate actions against those who infringe upon our intellectual property could adversely affect our business, financial condition and results of operations.

The laws of certain foreign countries in which we do business do not protect intellectual property rights to the same extent as do the laws of the United States. Adverse determinations in judicial or administrative proceedings in the United States or in foreign countries could impair our ability to sell our services or license or protect our intellectual property, which could adversely affect our business, financial condition and results of operations.

We have been, are and in the future may be, subject to claims alleging that our technology or business methods infringe intellectual property rights of others, both inside and outside the United States. Unfavorable resolution of these claims could require us to change how we deliver a service, result in significant financial consequences, or both, which could adversely affect our business, financial condition and results of operations.

***Changes in tax laws and unfavorable resolution of tax contingencies could adversely affect our tax expense .***

Our future effective tax rates could be adversely affected by changes in tax laws, both domestically and internationally. From time to time, the United States Congress and foreign, state and local governments consider legislation that could increase our effective tax rates or impose other obligations. If changes to applicable tax laws are enacted, our results of operations could be negatively impacted.

31

Table of Contents

Our tax returns and positions (including positions regarding jurisdictional authority of foreign governments to impose tax) are subject to review and audit by federal, state, local and international taxing authorities. An unfavorable outcome to a tax audit could result in higher tax expense, thereby negatively impacting our results of operations. We have established contingency reserves for a variety of material, known tax exposures. As of December 31, 2013 , the total amount of unrecognized tax benefits was a liability of $125.5 million , including accrued interest and penalties, net of related items. Our reserves reflect our judgment as to the resolution of the issues involved if subject to judicial review. While we believe that our reserves are adequate to cover reasonably expected tax risks, there can be no assurance that, in all instances, an issue raised by a tax authority will be resolved at a financial cost that does not exceed our related reserve, and such resolution could have a material effect on our effective tax rate, financial condition, results of operations and cash flows in the current period and/or future periods. With respect to these reserves, our income tax expense would include (i) any changes in tax reserves arising from material changes during the period in the facts and circumstances (i.e. new information) surrounding a tax issue, and (ii) any difference from the Company's tax position as recorded in the financial statements and the final resolution of a tax issue during the period. Such resolution could increase or decrease income tax expense in our consolidated financial statements in future periods and could impact our operating cash flows. For example, in 2011, we reached an agreement with the United States Internal Revenue Service ("IRS") resolving substantially all of the issues related to the restructuring of our international operations in 2003, which resulted in a tax benefit of $204.7 million related to the adjustment of reserves associated with this matter and requires cash payments to the IRS and various state tax authorities of approximately $190 million , of which $92.4 million has been paid as of December 31, 2013. See the "Capital Resources and Liquidity" discussion in Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

The IRS completed its examination of the United States federal consolidated income tax returns of First Data, which include our 2005 and pre-Spin-off 2006 taxable periods and issued its report on October 31, 2012 ("FDC 30-Day Letter"). Furthermore, the IRS completed its examination of our United States federal consolidated income tax returns for the 2006 post-Spin-off period through 2009 and issued its report also on October 31, 2012 ("WU 30-Day Letter"). Both the FDC 30-Day Letter and the WU 30-Day Letter propose tax adjustments affecting us, some of which are agreed and some of which are unagreed. We filed our protest on November 28, 2012 related to the unagreed proposed adjustments with the IRS Appeals Division. See Part II, Item 8, *Financial Statements and Supplementary Data* , Note 10, "Income Taxes" for a further discussion of this matter.

***We receive services from third-party vendors that would be difficult to replace if those vendors ceased providing such services adequately or at all. Cessation of or defects in various services provided to us by third-party vendors could cause temporary disruption to our business.***

Some services relating to our business, such as software application support, the development, hosting and maintenance of our operating systems, check clearing, and processing of returned checks are outsourced to third-party vendors, which would be difficult to replace quickly. If our third-party vendors were unwilling or unable to provide us with these services in the future, our business and operations could be adversely affected.

***Material changes in the market value or liquidity of the securities we hold may adversely affect our results of operations and financial condition.***

As of December 31, 2013 , we held $1.9 billion in investment securities, the significant majority of which are state and municipal debt securities. The majority of this money represents the principal of money transfers sent by consumers and money orders issued by us to consumers in the United States. We regularly monitor our credit risk and attempt to mitigate our exposure by investing in highly-rated securities and by diversifying our investments. As of December 31, 2013 , the majority of our investment securities had credit ratings of "AA-" or better from a major credit rating agency. Despite those ratings, it is possible that the value of our portfolio may decline in the future due to any number of factors, including general market conditions, credit issues, the viability of the issuer of the security, failure by a fund manager to manage the investment portfolio consistently with the fund prospectus or increases in interest rates. Any such decline in value may adversely affect our results of operations and financial condition.

Table of Contents

The trust holding the assets of our pension plan has assets totaling approximately $295.8 million as of December 31, 2013 . The fair value of these assets held in the trust are compared to the plan's projected benefit obligation to determine the pension liability of $70.4 million recorded within "Other liabilities" in our Consolidated Balance Sheet as of December 31, 2013 . We attempt to mitigate risk through diversification, and we regularly monitor investment risk on our portfolio through quarterly investment portfolio reviews and periodic asset and liability studies. Despite these measures, it is possible that the value of our portfolio may decline in the future due to any number of factors, including general market conditions and credit issues. Such declines could have an impact on the funded status of our pension plan and future funding requirements.

***We have substantial debt obligations that could restrict our operations.***

As of December 31, 2013 , we had approximately $4.2 billion in consolidated indebtedness, and we may also incur additional indebtedness in the future.

Our indebtedness could have adverse consequences, including:

- limiting our ability to pay dividends to our stockholders or to repurchase stock consistent with our historical practices;

- increasing our vulnerability to changing economic, regulatory and industry conditions;

- limiting our ability to compete and our flexibility in planning for, or reacting to, changes in our business and the industry;

- limiting our ability to borrow additional funds; and

- requiring us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing funds available for working capital, capital expenditures, acquisitions and other purposes.

There would be adverse tax consequences associated with using certain earnings generated outside the United States to pay the interest and principal on our indebtedness. Accordingly, this portion of our cash flow will be unavailable under normal circumstances to service our debt obligations.

Table of Contents

**Risks Related to Our Regulatory and Litigation Environment**

As described under Part I, Item 1, *Business* , our business is subject to a wide range of laws and regulations enacted by the United States federal government, each of the states (including licensing requirements), many localities and many other countries and jurisdictions. Laws and regulations to which we are subject include those related to: financial services, consumer disclosure and consumer protection, currency controls, money transfer and payment instrument licensing, payment services, credit and debit cards, electronic payments, foreign exchange hedging services and the sale of spot, forward and option currency contracts, unclaimed property, the regulation of competition, consumer privacy, data protection and information security. The failure by us, our agents or their subagents to comply with any such laws or regulations could have an adverse effect on our business, financial condition and results of operations and could seriously damage our reputation and brands, and result in diminished revenue and profit and increased operating costs.

***Our business is subject to a wide range of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition and results of operations.***

Our services are subject to an increasingly strict set of legal and regulatory requirements, including those intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity. The interpretation of those requirements by judges, regulatory bodies and enforcement agencies is changing, often quickly and with little notice. Economic and trade sanctions programs that are administered by the United States Treasury Department's Office of Foreign Assets Control prohibit or restrict transactions to or from or dealings with specified countries, their governments, and in certain circumstances, their nationals, and with individuals and entities that are specially-designated nationals of those countries, narcotics traffickers, and terrorists or terrorist organizations. As United States federal and state as well as foreign legislative and regulatory scrutiny and enforcement action in these areas increase, we expect that our costs of complying with these requirements will continue to increase, perhaps substantially, or our compliance will make it more difficult or less desirable for consumers and others to use our services or for us to contract with certain intermediaries, either of which would have an adverse effect on our revenue and operating profit. For example, we anticipate significant additional investments in 2014 in our compliance programs based on the current and rapidly evolving environment and our internal reviews of the increasingly complex and demanding global regulatory requirements, and we expect incremental compliance program costs as well as the potential negative business impact from new compliance procedures. These additional investments relate to enhancing our compliance capabilities, including our consumer protection efforts. Further, failure by Western Union, our agents, or their subagents (agents and subagents are third parties, over whom Western Union has limited legal and practical control) to comply with any of these requirements or their interpretation could result in the suspension or revocation of a license or registration required to provide money transfer, payment or foreign exchange services, the limitation, suspension or termination of services, loss of consumer confidence, the seizure of our assets, and/or the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services.

We are subject to regulations imposed by the Foreign Corrupt Practices Act (the "FCPA") in the United States and similar laws in other countries, such as the Bribery Act in the United Kingdom, which generally prohibit companies and those acting on their behalf from making improper payments to foreign government officials for the purpose of obtaining or retaining business. Some of these laws, such as the Bribery Act, also prohibit improper payments between commercial enterprises. Because our services are offered in virtually every country of the world, we face significant risks associated with our obligations under the FCPA, the Bribery Act, and other national anti-corruption laws. Any determination that we have violated these laws could have an adverse effect on our business, financial condition and results of operations.

In addition, our United States business is subject to reporting, recordkeeping and anti-money laundering provisions of the Bank Secrecy Act, as amended, including by the USA PATRIOT Act of 2001 (collectively, the "BSA"), and to regulatory oversight and enforcement by the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCEN"). We have subsidiaries that are subject to banking regulations, primarily those in Brazil and Austria. These subsidiaries are also subject to regulation, examination and supervision by the New York Department of Financial Services. Under the Payment Services Directive ("PSD") in the European Union ("EU"), which became effective in late 2009, and similar legislation enacted or proposed in other jurisdictions, we have and will increasingly become directly subject to reporting, recordkeeping, and anti-money laundering regulations, and agent oversight and monitoring requirements, which have increased and will continue to increase our costs. These laws could also increase competition in some or all of our areas of service.

Table of Contents

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

Further, any determination that our agents or their subagents have violated laws and regulations could seriously damage our reputation and brands, resulting in diminished revenue and profit and increased operating costs. In some cases, we could be liable for the failure of our agents or their subagents to comply with laws which also could have an adverse effect on our business, financial condition and results of operations.

For example, in the EU, Western Union is responsible for the compliance of our agents and their subagents with the PSD when they are acting on behalf of one of our payments institution subsidiaries. The majority of our EU business is managed through our Irish PSD subsidiary, which is regulated by the Central Bank of Ireland. Thus, the risk of adverse regulatory action against Western Union because of actions by its agents or their subagents and the costs to monitor our agents or their subagents in those areas has increased. The Consumer Financial Protection Bureau (the "CFPB") created by the Dodd-Frank Act has issued amendments to the final regulations implementing the remittance provisions of the Dodd-Frank Act, which impose responsibility on us for any related compliance failures of our agents and their subagents.

The changes associated with the PSD, the Dodd-Frank Act and similar legislation enacted or proposed in other countries have resulted and will likely continue to result in increased costs to comply with the new requirements, and in the event we or our agents are unable to comply, could have an adverse impact on our business, financial condition and results of operations. Additional countries may adopt similar legislation.

***Our fees, profit margins and/or foreign exchange spreads may be reduced or limited because of regulatory initiatives and changes in laws and regulations or their interpretation and industry practices and standards that are either industry wide or specifically targeted at our Company.***

The evolving regulatory environment, including increased fees or taxes, regulatory initiatives, and changes in laws and regulations or their interpretation, industry practices and standards imposed by state, federal or foreign governments and expectations regarding our compliance efforts, is impacting the manner in which we operate our business and may change the competitive landscape and is expected to continue to adversely affect our financial results. New and proposed legislation relating to financial services providers and consumer protection in various jurisdictions around the world has and may continue to affect the manner in which we provide our services, see risk factor *" The Dodd-Frank Act, as well as the regulations required by that Act and the actions of the Consumer Financial Protection Bureau and similar legislation and regulations enacted by other government authorities, could adversely affect us and the scope of our activities, and could adversely affect our operations, results of operations and financial condition . "* Recently proposed and enacted legislation related to financial services providers and consumer protection in various jurisdictions around the world and at the federal and state level in the United States has subjected and may continue to subject us to additional regulatory oversight, mandate additional consumer disclosures and remedies, including refunds to consumers, or otherwise impact the manner in which we provide our services. If governments implement new laws or regulations that limit our right to set fees and/or foreign exchange spreads, then our business, financial condition and results of operations could be adversely affected. In addition, changes in regulatory expectations, interpretations or practices could increase the risk of regulatory enforcement actions, fines and penalties.

For example, our business has been affected and is currently being affected by on-going changes to our compliance procedures related to our agreement and settlement with the State of Arizona. See risk factor *" Western Union is the subject of governmental investigations and consent agreements with or enforcement actions by regulators ."* Due to regulatory initiatives, we have changed our compliance related practices and business model along the United States and Mexico border, including in the southwestern region of the United States. Such changes have had, and will likely continue to have an adverse effect on our revenue, profit margins, and business operations related to our United States to Mexico and United States to Latin America and the Caribbean corridors.

Table of Contents

In addition, one state has passed a law imposing a fee on certain money transfer transactions, and certain other states have proposed similar legislation. Several foreign countries have enacted rules imposing taxes or fees on certain money transfer transactions, as well. Although money transfer services themselves are not generally subject to sales tax on money transfer services elsewhere in the United States, the current budget shortfalls in many jurisdictions, combined with continued federal inaction on comprehensive immigration reform, may lead other states or localities to impose similar taxes or fees. Similar circumstances in foreign countries could invoke similar consequences. A tax or fee exclusively on money transfer services like Western Union could put us at a competitive disadvantage to other means of remittance which are not subject to the same taxes or fees.

Other examples of changes to our financial environment include the possibility of regulatory initiatives that focus on lowering international remittance costs. For example, members of the Canadian parliament have proposed legislation that would limit the fees and foreign exchange spreads charged by remittance companies. Such initiatives may have an adverse impact on our business, financial condition and results of operations.

Regulators around the world look at each other's approaches to the regulation of the payments and other industries. Consequently, a development in any one country, state or region may influence regulatory approaches in other countries, states or regions. This includes the interpretation of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). Similarly, new laws and regulations in a country, state or region involving one service may cause lawmakers there to extend the regulations to another service. As a result, the risks created by any one new law or regulation are magnified by the potential they have to be replicated, affecting our business in another place or involving another service. Conversely, if widely varying regulations come into existence worldwide, we may have difficulty adjusting our services, fees and other important aspects of our business, with the same effect. Either of these eventualities could materially and adversely affect our business, financial condition and results of operations.

***Regulatory initiatives and changes in laws, regulations and industry practices and standards affecting us, our agents or their subagents could require changes in our business model and increase our costs of operations, which could adversely affect our operations, results of operations, financial condition, and liquidity .***

Our agents and their subagents are subject to a variety of regulatory requirements, which differ from jurisdiction to jurisdiction and are subject to change. Material changes in the regulatory requirements for offering money transfer services, including with respect to anti-money laundering requirements, fraud prevention, consumer protection, customer due diligence, agent registration, or increased requirements to monitor our agents or their subagents in a jurisdiction important to our business have meant and could continue to mean increased costs and/or operational demands on our agents and their subagents, which have resulted and could continue to result in their attrition, a decrease in the number of locations at which money transfer services are offered, an increase in the commissions paid to agents and their subagents to compensate for their increased costs, and other negative consequences. For example, changes to our compliance-related practices as a result of our agreement and settlement with the State of Arizona and changes to our business model, primarily related to our Vigo and Orlandi Valuta brands, resulted in the loss of over 7,000 agent locations in Mexico in 2012.

Our regulatory status and the regulatory status of our agents could affect their ability to offer our services. For example, we and our agents are considered Money Service Businesses, or "MSBs," under the BSA. An increasing number of banks view MSBs, as a class, as higher risk customers for purposes of their anti-money laundering programs. Furthermore, some of our agents and our businesses have had difficulty establishing or maintaining banking relationships due to the banks' policies. If a significant number of our agents are unable to maintain existing or establish new banking relationships, or if these agents face higher fees to maintain or establish new bank accounts, they may not be able to continue to offer our services. Additionally, if we are unable to maintain our banking relationships, it would have an adverse effect on our business, financial condition, and results of operations.

Table of Contents

The types of enterprises that are legally authorized to act as our agents vary significantly from one country to another. Changes in the laws affecting the kinds of entities that are permitted to act as money transfer agents (such as changes in requirements for capitalization or ownership) could adversely affect our ability to distribute our services and the cost of providing such services, both by us and our agents. For example, a requirement that a money transfer provider be a bank or other highly regulated financial entity could increase significantly the cost of providing our services in many countries where that requirement does not exist today or could prevent us from offering our services in an affected country. Further, any changes in law that would require us to provide directly the money transfer services to consumers as opposed to through an agent network (which would effectively change our business model) or that would prohibit or impede the use of subagents could significantly adversely impact our ability to provide our services, and/or the cost of our services, in the relevant jurisdiction. Changes mandated by laws which make Western Union responsible for acts of its agents while they are providing the Western Union money transfer service increase our risk of regulatory liability and our costs to monitor our agents' performance.

Although most of our Orlandi Valuta and Vigo branded agents also offer money transfer services of our competitors, most of our Western Union branded agents have agreed to offer only our money transfer services. While we expect to continue signing agents under exclusive arrangements and believe that these agreements are valid and enforceable, changes in laws regulating competition or in the interpretation of those laws could undermine our ability to enforce them in the future. Over the past several years, several countries in Eastern Europe, the Commonwealth of Independent States, Africa and South Asia, including India, have promulgated laws or regulations, or authorities in these countries have issued orders, which effectively prohibit payment service providers, such as money transfer companies, from agreeing to exclusive arrangements with agents in those countries. Certain institutions, non-governmental organizations and others are actively advocating against exclusive arrangements in money transfer agent agreements. Advocates for laws prohibiting or limiting exclusive agreements continue to push for enactment of similar laws in other jurisdictions. In addition to legal challenges, certain of our agents and their subagents have refused to enter into exclusive arrangements. See risk factor *" If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected "* above.

The Foreign Account Tax Compliance provisions of the Hiring Incentives to Restore Employment Act ("FATCA"), which is intended to address tax compliance issues related to United States taxpayers holding non-United States accounts, may require some of our business units outside the United States to report to the IRS, directly or through foreign government agencies cooperating with the IRS, information about financial transactions made by United States taxpayers and other specified entities or individuals, and could impose withholding, documentation and reporting requirements on such transactions. This provision may also affect withholding, documentation, and reporting requirements of certain payments made to non-United States recipients. Full implementation of FATCA will be phased in over a multi-year period. The additional administrative requirements of FATCA may result in increased compliance costs and could have an adverse effect on our business, financial condition, or results of operations.

In addition to legal or regulatory restrictions discussed in the "Capital Resources and Liquidity" section in Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations* , some jurisdictions use tangible net worth and other financial strength guidelines to evaluate financial position. If our regulated subsidiaries do not abide by these guidelines, they may be subject to heightened review by these jurisdictions, and the jurisdictions may be more likely to impose new formal financial strength requirements. Additional financial strength requirements imposed on our regulated subsidiaries or significant changes in the regulatory environment for money transfer providers could impact our primary source of liquidity.

37

***Western Union is the subject of governmental investigations and consent agreements with or enforcement actions by regulators .***

On February 11, 2010, Western Union Financial Services, Inc. ("WUFSI"), a subsidiary of the Company, signed an agreement and settlement ("Settlement Agreement," filed as Exhibit 10.1 to the Company's Current Report on Form 8-K filed on February 16, 2010), which resolved all outstanding legal issues and claims with the State of Arizona (the "State") and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The Settlement Agreement also required us to make payments to the State for its costs associated with this matter. In addition, as part of the Settlement Agreement, we have made and expect to make certain investments in and enhancements to our compliance programs along the United States and Mexico border and a monitor (the "Monitor") has been engaged for those programs. We have incurred, and expect to continue to incur, significant costs in connection with the Settlement Agreement. The Monitor has made a number of recommendations related to our compliance programs. In addition, in the fourth quarter of 2012, our Business Solutions business was included in the scope of the Monitor's review.

On January 31, 2014, WUFSI and the State agreed to amend the Settlement Agreement. Such amendment (the "Amendment") was subsequently approved by the Superior Court of the State of Arizona In and For the County of Maricopa that same day. The Amendment extends the term of the Settlement Agreement until December 31, 2017, and imposes obligations on the Company and WUFSI in connection with WUFSI's anti-money laundering compliance programs and cooperation with law enforcement. In particular, the Amendment requires WUFSI to continue implementing the primary and secondary recommendations made by the Monitor appointed pursuant to the Settlement Agreement related to WUFSI's anti-money laundering compliance program, and includes, among other things, timeframes for implementing such primary and secondary recommendations. Under the Amendment, the Monitor may make additional primary recommendations until January 1, 2015, and additional secondary recommendations until January 31, 2017. After these dates, the Monitor may only make additional primary or secondary recommendations, as applicable, that meet certain requirements as set forth in the Amendment. Primary recommendations may also be re-classified as secondary recommendations.

The Amendment provides that if WUFSI is unable to implement an effective anti-money laundering compliance program along the U.S. and Mexico border, as determined by the Monitor and subject to limited judicial review, within the timeframes to implement the Monitor's primary recommendations, the State may, within 180 days after the Monitor delivers its final report on the primary recommendations on December 31, 2016, and subsequent to any judicial review of the Monitor's findings, elect one, and only one, of the following remedies: (i) assert a willful and material breach of the Settlement Agreement and pursue remedies under the Settlement Agreement, which could include initiating civil or criminal actions; or (ii) require WUFSI to pay (a) $50 million plus (b) $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully. There are currently more than 70 primary recommendations and groups of primary recommendations.

If the Monitor concludes that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border within the timeframes to implement the Monitor's primary recommendations, the State cannot pursue either of the remedies above, except that the State may require WUFSI to pay $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully.

If, at the conclusion of the timeframe to implement the secondary recommendations on December 31, 2017, the Monitor concludes that WUFSI has not implemented an effective anti-money laundering compliance program along the U.S. and Mexico border, the State cannot assert a willful and material breach of the Settlement Agreement but may require WUFSI to pay an additional $25 million. Additionally, if the Monitor determines that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border but has not implemented some of the Monitor's secondary recommendations or groups of secondary recommendations that were originally classified as primary recommendations or groups of primary recommendations on the date of the Amendment, the State may require WUFSI to pay $500,000 per such secondary recommendation or group of recommendations. There is no monetary penalty associated with secondary recommendations that are classified as such on the date of the Amendment or any new secondary recommendations that the Monitor makes after the date of the Amendment.

The Amendment also requires WUFSI to make a one-time payment of $250,000 and thereafter $150,000 per month for five years to fund the activities and expenses of a money transfer transaction data analysis center formed by WUFSI and a Financial Crimes Task Force comprised of federal and state and local law enforcement representatives, including those from the State. In addition, the Amendment requires WUFSI to continue funding the Monitor's reasonable expenses in $500,000 increments as requested by the Monitor.

Table of Contents

The changes in WUFSI's anti-money laundering program required by the Settlement Agreement, including the Amendment, and the Monitor's recommendations have had, and will continue to have, adverse effects on the Company's business, including additional costs. Additionally, if WUFSI is not able to implement a successful anti-money laundering compliance program along the U.S. and Mexico border or timely implement a substantial portion of the Monitor's primary recommendations, each as determined by the Monitor, pursuit by the State of remedies under the Settlement Agreement, including the Amendment, could have a material adverse effect on the Company's business, financial condition or results of operations.

We are in the process of making or have made certain changes to our compliance program for transactions from the United States to Mexico and the Latin America and the Caribbean region, including:

- revisions to agent agreements to increase our ability to oversee the compliance of our agents and their subagents;

- reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and

- enhancement of our information systems including migrating customer information for our Orlandi Valuta and Vigo brands onto our Western Union database and migrating to a standard point of sale system.

Such changes have had, and will likely continue to have adverse effects on our business, primarily our United States to Mexico business and our United States to Latin America and the Caribbean business. Such adverse effects include fewer transactions, lower revenue, lower profits, increased compliance costs, loss of agents, reduced ability to attract or activate new agents, and a less desirable customer experience. Any additional changes that we elect or are required to make in the United States to Mexico and the United States to Latin America and the Caribbean corridors, or similar changes that we may elect or be required to make in other corridors or for our other services, could have a material adverse effect on our business, financial condition and results of operations.

Over the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money laundering requirements and related consumer identification matters. These agreements required us to make various payments and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law.

The consent agreements with the New York Department of Financial Services and the California Department of Financial Institutions were lifted during 2008. However, the financial services industry and businesses like ours continue to be under significant federal and state regulatory scrutiny with respect to the BSA and anti-money laundering compliance matters. It is possible that as a result of periodic examinations or otherwise, we could be subject to deficiency findings, fines, criminal penalties, asset seizures or enforcement actions that could adversely affect our business, financial condition and results of operations.

In 2011, 2012 and 2013, Western Union received Civil Investigative Demands from certain state attorneys general who have initiated an investigation into the adequacy of the Company's consumer protection efforts over the last several years. The Civil Investigative Demands seek information and documents relating to money transfers sent from the United States to certain countries, consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, the Company could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices that could have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's anti-money laundering compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company continues to cooperate fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

The Company has had discussions with the United States Federal Trade Commission (the "FTC") regarding the Company's consumer protection and anti-fraud programs. On December 12, 2012, the Company received a Civil Investigative Demand ("CID") from the FTC requesting that the Company produce (i) all documents relating to communications with the monitor appointed pursuant to the Settlement Agreement, including information the Company provided to the monitor and any reports prepared by the monitor, and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011. On April 15, 2013, the FTC filed a petition in the United States District Court for the Southern District of New York requesting an order to compel production of the requested documents. On June 6, 2013, the Court granted in part and denied in part the FTC's request. On August 14, 2013, the FTC filed a notice of appeal. On August 27, 2013, Western Union filed a notice of cross-appeal. On February 21, 2014, the Company received another CID from the FTC requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004, except for documents that were already produced to the FTC in response to the first CID. The Company is unable to predict the outcome of this matter, or provide a range of loss, if any, which could be associated with any possible claims that might be brought against the Company.

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies.  The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

We regularly receive subpoenas and other requests for documents and information from governmental authorities (federal, state, local, and foreign) concerning our current or former agents, customers or other third parties. We cooperate with such subpoenas and requests in the ordinary course of our business. However, it is possible that, during the course of any investigation or review by such governmental authorities, allegations of misconduct or wrongdoing could arise regarding Western Union, its employees, or agents, which could lead to investigations or enforcement actions against us.

Table of Contents

***The Dodd-Frank Act, as well as the regulations required by that Act and the actions of the Consumer Financial Protection Bureau and similar legislation and regulations enacted by other government authorities, could adversely affect us and the scope of our activities, and could adversely affect our operations, results of operations and financial condition .***

The Dodd-Frank Act, which became law in the United States on July 21, 2010, calls for significant structural reforms and new substantive regulation across the financial services industry. In addition, the Dodd-Frank Act created the CFPB, whose purpose is to issue and enforce consumer protection initiatives governing financial products and services, including money transfer services. The CFPB has created additional regulatory oversight for us. The CFPB's regulations implementing the remittance provisions of the Dodd-Frank Act have affected our business in a variety of areas. These include: a requirement to provide consumers sending funds internationally from the United States enhanced pre-transaction written disclosures, including the disclosure of third-party fees and taxes, an obligation to resolve various errors, including certain errors that may be outside our control, and an obligation to cancel transactions that have not been completed at a consumer's request. In addition, these regulations impose responsibility on us for any related compliance failures of our agents. These requirements have changed the way we operate our business and along with other potential changes under CFPB regulations could adversely affect our operations and financial results and change the way we operate our business. The Dodd-Frank Act and actions by the CFPB could also have a significant impact on us by, for example, requiring us to limit or change our business practices, limiting our ability to pursue business opportunities, requiring us to invest valuable management time and resources in compliance efforts, imposing additional costs on us, requiring us to meet more stringent capital, liquidity and leverage ratio requirements, impacting the value of our assets, delaying our ability to respond to marketplace changes, requiring us to alter our products and services in a manner that would make our products less attractive to consumers and impair our ability to offer them profitably, or requiring us to make other changes that could adversely affect our business.

We may also be subject to examination by the CFPB, which in January 2014 initiated a rulemaking process to define "larger participants of a market for other consumer financial products or services" to include companies, such as Western Union, that make at least one million aggregate annual international money transfers. Companies that are included in a final rule will be subject to direct supervision by the CFPB, which may involve providing reports to the CFPB and being examined by the CFPB. The scope, frequency, and details of these reports and examinations are still being developed by the CFPB. In addition, the CFPB has broad authority to enforce consumer financial laws. In July 2011, many consumer financial protection functions formerly assigned to the federal banking agency and other agencies were transferred to the CFPB. The CFPB has a large staff and budget, which is not subject to Congressional appropriation, and has broad authority with respect to our money transfer service and related business. It is authorized to collect fines and provide consumer restitution in the event of violations, engage in consumer financial education, track consumer complaints, request data and promote the availability of financial services to underserved consumers and communities. In April 2013, the CFPB expanded the coverage of its consumer complaints portal to permit the submission of complaints regarding money transfer issues. In addition, the CFPB may adopt other regulations governing consumer financial services, including regulations defining unfair, deceptive, or abusive acts or practices, and new model disclosures. The CFPB's authority to change regulations adopted in the past by other regulators, or to rescind or ignore past regulatory guidance, could increase our compliance costs and litigation exposure. Our litigation exposure may also be increased by the CFPB's authority to limit or ban pre-dispute arbitration clauses. In December 2013, the CFPB released the preliminary results of its arbitration study, which is widely viewed as the first step in an effort to restrict the use of such clauses in consumer financial contracts.

The effect of the Dodd-Frank Act and the CFPB on our business and operations has been and will continue to be significant and the application of the Dodd-Frank Act's implementing regulations to our business may differ from the application to certain of our competitors, including banks. Some of the Dodd-Frank Act's implementing regulations have not been issued and the function and scope of the CFPB, the reactions of our competitors and the responses of consumers and other marketplace participants are uncertain. Further, and in addition to our own compliance costs, implementation of requirements under Dodd-Frank could impact our business relationships with financial institution customers who outsource processing of consumer transactions to our Business Solutions segment. These financial institutions may determine that the compliance costs associated with providing consumer services are too burdensome and consequently may limit or discontinue offering such services.

41

Table of Contents

Rules adopted under the Dodd-Frank Act by the Commodity Futures Trading Commission, as well as by member states of the European Union pursuant to EMIR, have subjected our foreign exchange hedging transactions, including certain intercompany hedging transactions, certain of the corporate interest rate hedging transactions that we may enter into in the future, and certain of the foreign exchange derivative contracts we offer as part of our Business Solutions segment, to reporting, recordkeeping, and other requirements. Additionally, certain of the corporate interest rate hedging transactions that we may enter into in the future are subject to centralized clearing and margin requirements and certain of our other transactions may become so in the future. Our implementation of these requirements has resulted in additional costs to our business and our failure to implement them correctly could result in fines and other sanctions, as well as necessitate a temporary or permanent cessation to some or all of our hedging activities, and possibly limit the types of derivative contracts we may offer as part of our Business Solutions segment. Any such fines, sanctions or limitations on our business could adversely affect our operations and financial results. Further, we may become subject to additional and potentially costly regulatory and supervisory requirements if we exceed derivative transaction thresholds set forth in Dodd-Frank and EMIR, including subjecting our foreign exchange derivative transactions to centralized clearing and margin requirements under EMIR. Governments outside of the United States and the European Union are also considering or have begun to implement regulations similar to those described above and these will result in greater costs to us as well.

***Western Union has been the subject of class-action litigation, and remains the subject of other litigation.***

Western Union has been the subject of class-action litigation in the United States, alleging that its foreign exchange rate disclosures failed to adequately inform consumers about the revenue that Western Union and its agents derive from international remittances. These suits were all settled in or before 2004, without an admission of liability, and we have made changes in our advertising and consumer forms. Future litigation may require that we modify our disclosures or our practices further. These modifications could be costly to implement, restrict our ability to advertise or promote our services, limit the amount of our foreign exchange income and/or change our consumers' behavior.

In addition, as a company that provides global financial services primarily to consumers, we could be subject to future class-action lawsuits, other litigation or regulatory action alleging violations of consumer protection or other laws. We also are subject to claims asserted by consumers based on individual transactions.

Table of Contents

The Company and one of its subsidiaries are defendants in two purported class action lawsuits: James P. Tennille v. The Western Union Company and Robert P. Smet v. The Western Union Company, both of which are pending in the United States District Court for the District of Colorado. The original complaints asserted claims for violation of various consumer protection laws, unjust enrichment, conversion and declaratory relief, based on allegations that the Company waits too long to inform consumers if their money transfers are not redeemed by the recipients and that we use the unredeemed funds to generate income until the funds are escheated to state governments. During the fourth quarter of 2012, the parties executed a settlement agreement, which the Court preliminarily approved on January 3, 2013. On June 25, 2013, the Court entered an order certifying the class and granting final approval to the settlement.  Under the approved settlement, a substantial amount of the settlement proceeds, as well as all of the class counsel's fees, administrative fees and other expenses, would be paid from the class members' unclaimed money transfer funds, which are included within "Settlement obligations" in our consolidated balance sheets. During the final approval hearing, the Court overruled objections to the settlement that had been filed by several class members. In July 2013, two of those class members filed notices of appeal. The United States Court of Appeals for the Tenth Circuit has scheduled oral argument for March 18, 2014. The settlement requires Western Union to deposit the class members' unclaimed money transfer funds into a class settlement fund, from which class member claims, administrative fees and class counsel's fees, as well as other expenses will be paid. On November 6, 2013, the Attorney General of California notified Western Union that the California Controller's position that Western Union's deposit of the unclaimed money transfer funds into the class settlement fund pursuant to the settlement "will not satisfy Western Union's obligations to report and remit funds" under California's unclaimed property law, and that "Western Union will remain liable to the State of California" for the funds that would have escheated to California in the absence of the settlement. The State of Pennsylvania and Washington, D.C. have expressed similar views. There is thus reason to believe that these and potentially other jurisdictions may bring actions against the Company seeking reimbursement for amounts equal to the class counsel's fees, administrative costs and other expenses that are paid from the class settlement fund. If such actions are brought or claims that may otherwise require Western Union to incur additional escheatment-related liabilities are asserted, Western Union would defend itself vigorously. For more information, see Part II, Item 8, *Financial Statements and Supplementary Data* , Note 5, "Commitments and Contingencies."

All of the actions described below are in a preliminary stage and the Company is unable to predict the outcome, or the possible loss or range of loss, if any, which could be associated with these actions. The Company and the named individuals intend to vigorously defend themselves in all of these matters.

On December 10, 2013, the City of Taylor Police and Fire Retirement System filed a purported class action complaint in the United States District Court for the District of Colorado against The Western Union Company, its President and Chief Executive Officer, and a former executive officer of the Company, asserting claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 against all defendants, and under Section 20(a) of the Exchange Act against the individual defendants. Plaintiff alleges that during the alleged class period, February 7, 2012 through October 30, 2012, defendants made false or misleading statements or failed to disclose adverse facts known to them, including: (1) the Company was experiencing difficulties in complying with its increased duties required by the Southwest Border Agreement and that the State of Arizona was dissatisfied with the Company's efforts; (2) the Company was spending significantly more than forecast on its efforts to satisfy the compliance and monitoring program; (3) the Company had downplayed the impact that changes in its compliance and regulatory environment were having on its operations, including its operations in Mexico and Latin America; (4) the scope of the Monitor's review was being expanded to include Western Union Business Solutions, which would increase compliance costs; and (5) the Company's ability to charge a premium for its core money transfer product was under competitive pressure, which would require drastic price reductions to stem market share losses. On January 30, 2014, another shareholder, Norma A. Garavaglia, filed a second purported class action complaint in the United States District Court for the District of Colorado that names the same defendants and contains allegations which are substantially similar to those made in the City of Taylor Police and Fire Retirement System lawsuit.

43

Table of Contents

On January 13, 2014, Natalie Gordon served the Company with a Verified Shareholder Derivative Complaint and Jury Demand that was filed in District Court, Douglas County, Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all of its current directors as individual defendants and the Company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty and gross mismanagement against all individual defendants and unjust enrichment against the President and Chief Executive Officer and the former executive officer based on allegations that between February 12, 2012 to October 30, 2012, the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding the effects of the Southwest Border Agreement, including regarding the anticipated costs of compliance with the Southwest Border Agreement, potential effects on business operations, and Company projections. Plaintiff also alleges that the individual defendants caused or allowed the Company to lack requisite internal controls, caused or allowed financial statements to be misstated, and caused the Company to be subject to the costs, expenses and liabilities associated with the City of Taylor Police and Fire Retirement System lawsuit. Plaintiff further alleges that the Company's President and Chief Executive Officer and a former executive officer received excessive compensation based on the allegedly inaccurate financial statements.

On January 19, 2014, Stanley Leiblein filed a shareholder derivative complaint in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The allegations and claims in this lawsuit are similar to those made in the Gordon lawsuit but relate to a longer period - April 27, 2010 through October 30, 2012. The complaint asserts claims for violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer in connection with the Company's repurchase of its stock at an alleged cost of $1.557 billion; for violations of Section 20(a) of the Exchange Act and waste of corporate assets against the director defendants in connection with the Company's stock repurchases; for breaches of fiduciary duty against all of the individual defendants; for unjust enrichment against all of the individual defendants relating to their receipt of compensation; and for misappropriation of information and insider trading against a former executive officer of the Company. The claims are based on allegations that the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding, among other things, the effects of the Southwest Border Agreement (including regarding the anticipated costs of compliance with the Southwest Border Agreement and potential effects on business operations), Company projections and trends and the adequacy of internal controls.

On February 11, 2014, R. Andre Klein filed a shareholder derivative complaint in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The allegations and claims in this lawsuit are similar to those made in the Leiblein lawsuit and relate to the same period - April 27, 2010 through October 30, 2012. The complaint asserts claims for violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer in connection with the Company's repurchase of its stock at an alleged cost of $1.557 billion; for violations of Section 20(a) of the Exchange Act against the director defendants in connection with the Company's stock repurchases; for breaches of fiduciary duty against all of the individual defendants; for unjust enrichment against all of the individual defendants relating to their receipt of compensation; for abuse of control and gross mismanagement against all of the individual defendants; and for misappropriation of information and insider trading against a former executive officer of the Company. The claims are based on allegations that the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding, among other things, the effects of the Southwest Border Agreement (including regarding the anticipated costs of compliance with the Southwest Border Agreement and potential effects on business operations), Company projections and trends and the adequacy of internal controls.

Table of Contents

On February 20, 2014, City of Cambridge Retirement System filed a Verified Shareholder Derivative Complaint and Jury Demand in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, another current executive officer, two of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty against the individual defendants, violation of Section 14(a) of the Exchange Act against the director defendants, violation of Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer and violation of Section 20(a) of the Exchange Act against the director defendants and a former executive officer. The claims are based on, among other things, allegations that the director defendants affirmatively declined to stop and prevent the Company's non-compliance with state and federal anti-money laundering laws and regulations after receiving red flags indicating prolonged willful illegality, reappointed the same directors to the Company's Audit Committee between 2006 and 2014 and awarded excessive compensation packages to Western Union's senior executives despite the executives' responsibility for the Company's non-compliance with state and federal anti-money laundering laws. The complaint also alleges that between 2009 and 2013, the director defendants caused the Company to issue proxy statements that contained materially incomplete and inaccurate disclosures, including that the Company's financial results depended on the non-compliance with anti-money laundering requirements; the Board was aware of regulatory and criminal enforcement actions and that the directors were not curing violations; the extent to which the Board considered increasing red flags in their determination to re-nominate certain directors to the Audit Committee; and the extent to which the Board considered ongoing regulatory and criminal investigations in awarding compensation to senior executives. The complaint further alleges that the officer defendants caused the Company to willfully ignore the mandatory recording and reporting requirements of the Bank Secrecy Act and similar state laws and authorized and implemented policies and practices they knew or should have known to be inadequate for monitoring and enforcing compliance with those requirements. In addition, the complaint alleges that between April 27, 2010 and October 30, 2012, the Company's President and Chief Executive Officer and one of its former executive officers made or participated in the preparation and dissemination of materially false and misleading statements or failed to make adequate disclosures regarding, among other things, the Company's cooperation with the Southwest Border Monitor and progress in improving its anti-money laundering monitoring program, and that they profited from those statements through insider stock sales at artificially inflated stock prices and caused the Company to suffer damages via the repurchase of its stock.

Additional civil actions or any criminal actions could adversely affect our business, financial condition and results of operations.

***Current and proposed regulation addressing consumer privacy and data use and security could increase our costs of operations, which could adversely affect our operations, results of operations and financial condition .***

We are subject to requirements relating to privacy and data use and security under federal, state and foreign laws. For example, the United States Federal Trade Commission has an on-going program of investigating the privacy practices of companies and has commenced enforcement actions against many, resulting in multi-million dollar settlements and multi-year agreements governing the settling companies' privacy practices. Furthermore, certain industry groups require us to adhere to privacy requirements in addition to federal, state and foreign laws, and certain of our business relationships depend upon our compliance with these requirements. As the number of countries enacting privacy and related laws increases and the scope of these laws and enforcement efforts expand, we will increasingly become subject to new and varying requirements. Failure to comply with existing or future privacy and data use and security laws, regulations, and requirements to which we are subject or could become subject, including by reason of inadvertent disclosure of confidential information, could result in fines, sanctions, penalties or other adverse consequences and loss of consumer confidence, which could materially adversely affect our results of operations, overall business and reputation.

45

In addition, in connection with regulatory requirements to assist in the prevention of money laundering and terrorist financing and pursuant to legal obligations and authorizations, Western Union makes information available to certain United States federal and state, as well as certain foreign, government agencies when required by law. In recent years, Western Union has experienced increasing data sharing requests by these agencies, particularly in connection with efforts to prevent terrorist financing or reduce the risk of identity theft. During the same period, there has also been increased public attention to the corporate use and disclosure of personal information, accompanied by legislation and regulations intended to strengthen data protection, information security and consumer privacy. These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy - may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

***We are subject to unclaimed property laws, and differences between the amounts we have accrued for unclaimed property and amounts that are claimed by a state or foreign jurisdiction could have a significant impact on our results of operations and cash flows.***

We are subject to unclaimed property laws in the United States and abroad which require us to turn over to certain government authorities the property of others held by us that has been unclaimed for a specified period of time, such as unpaid money transfers. We have an ongoing program to comply with those laws. In addition, we are subject to audits with regard to our escheatment practices. Any difference between the amounts we have accrued for unclaimed property and amounts that are claimed by a state or foreign jurisdiction could have a significant impact on our results of operations and cash flows. See "Unclaimed Property Regulations" for further discussion.

***Our consolidated balance sheet may not contain sufficient amounts or types of regulatory capital to meet the changing requirements of our various regulators worldwide, which could adversely affect our business, financial condition and results of operations.***

Our regulators expect us to possess sufficient financial soundness and strength to adequately support our regulated subsidiaries. We have substantial indebtedness as of December 31, 2013 , which could make it more difficult to meet these requirements if such requirements are increased. In addition, although we are not a bank holding company for purposes of United States law or the law of any other jurisdiction, as a global provider of payments services and in light of the changing regulatory environment in various jurisdictions, we could become subject to new capital requirements introduced or imposed by our regulators that could require us to issue securities that would qualify as Tier 1 regulatory capital under the Basel Committee accords or retain earnings over a period of time. Also, our regulators specify the amount and composition of settlement assets that certain of our subsidiaries must hold in order to satisfy our outstanding settlement obligations. These regulators could further restrict the type of instruments that qualify as settlement assets or these regulators could require our regulated subsidiaries to maintain higher levels of settlement assets. For example, we have seen increased scrutiny from government regulators regarding the sufficiency of our capitalization and the appropriateness of our investments held in order to comply with state and other licensing requirements. Any change or increase in these regulatory requirements could have a material adverse effect on our business, financial condition and results of operations.

46

Table of Contents

**Risks Relating to the Spin-Off**

We were incorporated in Delaware as a wholly-owned subsidiary of First Data on February 17, 2006. On September 29, 2006, First Data distributed 100% of its money transfer and consumer payments businesses and its interest in a Western Union money transfer agent, as well as related assets, including real estate, through a tax-free distribution to First Data shareholders (the "Spin-off") through this previously owned subsidiary.

***If the Spin-off does not qualify as a tax-free transaction, First Data and its stockholders could be subject to material amounts of taxes and, in certain circumstances, we could be required to indemnify First Data for material taxes pursuant to indemnification obligations under the tax allocation agreement.***

First Data received a private letter ruling from the IRS to the effect that the Spin-off (including certain related transactions) qualifies as a tax-free transaction to First Data, us and First Data stockholders for United States federal income tax purposes under sections 355, 368 and related provisions of the Internal Revenue Code, assuming, among other things, the accuracy of the representations made by First Data to the IRS in the private letter ruling request. If the factual assumptions or representations made in the private letter ruling request were determined to be untrue or incomplete, then First Data and ourselves would not be able to rely on the ruling.

The Spin-off was conditioned upon First Data's receipt of an opinion of Sidley Austin LLP, counsel to First Data, to the effect that, with respect to requirements on which the IRS did not rule, those requirements would be satisfied. The opinion was based on, among other things, certain assumptions and representations as to factual matters made by First Data and us which, if untrue or incomplete, would jeopardize the conclusions reached by counsel in its opinion. The opinion is not binding on the IRS or the courts, and the IRS or the courts may not agree with the opinion.

If, notwithstanding receipt of the private letter ruling and opinion of tax counsel, the Spin-off were determined to be a taxable transaction, each holder of First Data common stock who received shares of our common stock in connection with the Spin-off would generally be treated as receiving a taxable distribution in an amount equal to the fair value of our common stock received. First Data would recognize taxable gain equal to the excess of the fair value of the consideration received by First Data in the contribution over First Data's tax basis in the assets contributed to us in the contribution. If First Data were unable to pay any taxes for which it is responsible under the tax allocation agreement, the IRS might seek to collect such taxes from Western Union.

Even if the Spin-off otherwise qualified as a tax-free distribution under section 355 of the Internal Revenue Code, the Spin-off may result in significant United States federal income tax liabilities to First Data if 50% or more of First Data's stock or our stock (in each case, by vote or value) is treated as having been acquired, directly or indirectly, by one or more persons as part of a plan (or series of related transactions) that includes the Spin-off. For purposes of this test, any acquisitions, or any understanding, arrangement or substantial negotiations regarding an acquisition, within two years before or after the Spin-off are subject to special scrutiny.

With respect to taxes and other liabilities that could be imposed as a result of a final determination that is inconsistent with the anticipated tax consequences of the Spin-off (as set forth in the private letter ruling and relevant tax opinion) ("Spin-off Related Taxes"), we, one of our affiliates or any person that, after the Spin-off, is an affiliate thereof, will be liable to First Data for any such Spin-off Related Taxes attributable solely to actions taken by or with respect to us. In addition, we will also be liable for 50% of any Spin-off Related Taxes (i) that would not have been imposed but for the existence of both an action by us and an action by First Data or (ii) where we and First Data each take actions that, standing alone, would have resulted in the imposition of such Spin-off Related Taxes. We may be similarly liable if we breach certain representations or covenants set forth in the tax allocation agreement. If we are required to indemnify First Data for taxes incurred as a result of the Spin-off being taxable to First Data, it likely would have an adverse effect on our business, financial condition, results of operations and cash flows.

**ITEM 1B.  UNRESOLVED STAFF COMMENTS**

Not applicable.

Table of Contents

## ITEM 2.  PROPERTIES

### Properties and Facilities

As of December 31, 2013 , we have offices in over 50 countries, which includes five owned facilities and approximately 20 United States and over 400 international leased properties. Our owned facilities include our corporate headquarters located in Englewood, Colorado.

Our owned and leased facilities are used for operational, sales and administrative purposes in support of our Consumer-to-Consumer, Consumer-to-Business, and Business Solutions segments and are all currently being utilized. In certain locations, our offices include customer service centers, where our employees answer operational questions from agents and customers. Our office in Dublin, Ireland serves as our international headquarters.

We believe that our facilities are suitable and adequate for our current business; however, we periodically review our facility requirements and may acquire new facilities and update existing facilities to meet the needs of our business or consolidate and dispose of or sublet facilities which are no longer required.

## ITEM 3.  LEGAL PROCEEDINGS

On December 10, 2013, the City of Taylor Police and Fire Retirement System filed a purported class action complaint in the United States District Court for the District of Colorado against The Western Union Company, its President and Chief Executive Officer, and a former executive officer of the Company, asserting claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 against all defendants, and under Section 20(a) of the Exchange Act against the individual defendants. Plaintiff alleges that during the alleged class period, February 7, 2012 through October 30, 2012, defendants made false or misleading statements or failed to disclose adverse facts known to them, including: (1) the Company was experiencing difficulties in complying with its increased duties required by the Southwest Border Agreement and that the State of Arizona was dissatisfied with the Company's efforts; (2) the Company was spending significantly more than forecast on its efforts to satisfy the compliance and monitoring program; (3) the Company had downplayed the impact that changes in its compliance and regulatory environment were having on its operations, including its operations in Mexico and Latin America; (4) the scope of the Monitor's review was being expanded to include Western Union Business Solutions, which would increase compliance costs; and (5) the Company's ability to charge a premium for its core money transfer product was under competitive pressure, which would require drastic price reductions to stem market share losses. On January 30, 2014, another shareholder, Norma A. Garavaglia, filed a second purported class action complaint in the United States District Court for the District of Colorado that names the same defendants and contains allegations which are substantially similar to those made in the City of Taylor Police and Fire Retirement System lawsuit.

On January 13, 2014, Natalie Gordon served the Company with a Verified Shareholder Derivative Complaint and Jury Demand that was filed in District Court, Douglas County, Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all of its current directors as individual defendants and the Company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty and gross mismanagement against all individual defendants and unjust enrichment against the President and Chief Executive Officer and the former executive officer based on allegations that between February 12, 2012 to October 30, 2012, the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding the effects of the Southwest Border Agreement, including regarding the anticipated costs of compliance with the Southwest Border Agreement, potential effects on business operations, and Company projections. Plaintiff also alleges that the individual defendants caused or allowed the Company to lack requisite internal controls, caused or allowed financial statements to be misstated, and caused the Company to be subject to the costs, expenses and liabilities associated with the City of Taylor Police and Fire Retirement System lawsuit. Plaintiff further alleges that the Company's President and Chief Executive Officer and a former executive officer received excessive compensation based on the allegedly inaccurate financial statements.

On January 19, 2014, Stanley Leiblein filed a shareholder derivative complaint in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The allegations and claims in this lawsuit are similar to those made in the Gordon lawsuit but relate to a longer period - April 27, 2010 through October 30, 2012. The complaint asserts claims for violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer in connection with the Company's repurchase of its stock at an alleged cost of $1.557 billion; for violations of Section 20(a) of the Exchange Act and waste of corporate assets against the director defendants in connection with the Company's stock repurchases; for breaches of fiduciary duty against all of the individual defendants; for unjust enrichment against all of the individual defendants relating to their receipt of compensation; and for misappropriation of information and insider trading against a former executive officer of the Company. The claims are based on allegations that the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding, among other things, the effects of the Southwest Border Agreement (including regarding the anticipated costs of compliance with the Southwest Border Agreement and potential effects on business operations), Company projections and trends and the adequacy of internal controls.

On February 11, 2014, R. Andre Klein filed a shareholder derivative complaint in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The allegations and claims in this lawsuit are similar to those made in the Leiblein lawsuit and relate to the same period - April 27, 2010 through October 30, 2012. The complaint asserts claims for violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer in connection with the Company's repurchase of its stock at an alleged cost of $1.557 billion; for violations of Section 20(a) of the Exchange Act against the director defendants in connection with the Company's stock repurchases; for breaches of fiduciary duty against all of the individual defendants; for unjust enrichment against all of the individual defendants relating to their receipt of compensation; for abuse of control and gross mismanagement against all of the individual defendants; and for misappropriation of information and insider trading against a former executive officer of the Company. The claims are based on allegations that the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding, among other things, the effects of the Southwest Border Agreement (including regarding the anticipated costs of compliance with the Southwest Border Agreement and potential effects on business operations), Company projections and trends and the adequacy of internal controls.

49

Table of Contents

On February 20, 2014, City of Cambridge Retirement System filed a Verified Shareholder Derivative Complaint and Jury Demand in the United States District Court for the District of Colorado naming the Company's President and Chief Executive Officer, another current executive officer, two of its former executive officers, and all but one of its current directors as individual defendants and the Company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty against the individual defendants, violation of Section 14(a) of the Exchange Act against the director defendants, violation of Exchange Commission Rule 10b-5 against the Company's President and Chief Executive Officer and a former executive officer and violation of Section 20(a) of the Exchange Act against the director defendants and a former executive officer. The claims are based on, among other things, allegations that the director defendants affirmatively declined to stop and prevent the Company's non-compliance with state and federal anti-money laundering laws and regulations after receiving red flags indicating prolonged willful illegality, reappointed the same directors to the Company's Audit Committee between 2006 and 2014 and awarded excessive compensation packages to Western Union's senior executives despite the executives' responsibility for the Company's non-compliance with state and federal anti-money laundering laws. The complaint also alleges that between 2009 and 2013, the director defendants caused the Company to issue proxy statements that contained materially incomplete and inaccurate disclosures, including that the Company's financial results depended on the non-compliance with anti-money laundering requirements; the Board was aware of regulatory and criminal enforcement actions and that the directors were not curing violations; the extent to which the Board considered increasing red flags in their determination to re-nominate certain directors to the Audit Committee; and the extent to which the Board considered ongoing regulatory and criminal investigations in awarding compensation to senior executives. The complaint further alleges that the officer defendants caused the Company to willfully ignore the mandatory recording and reporting requirements of the Bank Secrecy Act and similar state laws and authorized and implemented policies and practices they knew or should have known to be inadequate for monitoring and enforcing compliance with those requirements. In addition, the complaint alleges that between April 27, 2010 and October 30, 2012, the Company's President and Chief Executive Officer and one of its former executive officers made or participated in the preparation and dissemination of materially false and misleading statements or failed to make adequate disclosures regarding, among other things, the Company's cooperation with the Southwest Border Monitor and progress in improving its anti-money laundering monitoring program, and that they profited from those statements through insider stock sales at artificially inflated stock prices and caused the Company to suffer damages via the repurchase of its stock.

All of the actions described above are in a preliminary stage and the Company is unable to predict the outcome, or the possible loss or range of loss, if any, which could be associated with these actions. The Company and the named individuals intend to vigorously defend themselves in all of these matters.

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

50

Table of Contents

The Company has had discussions with the United States Federal Trade Commission (the "FTC") regarding the Company's consumer protection and anti-fraud programs. On December 12, 2012, the Company received a Civil Investigative Demand ("CID") from the FTC requesting that the Company produce (i) all documents relating to communications with the monitor appointed pursuant to the agreement and settlement the Company entered into with the State of Arizona on February 11, 2010, including information the Company provided to the monitor and any reports prepared by the monitor, and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011. On April 15, 2013, the FTC filed a petition in the United States District Court for the Southern District of New York requesting an order to compel production of the requested documents. On June 6, 2013, the Court granted in part and denied in part the FTC's request. On August 14, 2013, the FTC filed a notice of appeal. On August 27, 2013, Western Union filed a notice of cross-appeal. On February 21, 2014, the Company received another CID from the FTC requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004, except for documents that were already produced to the FTC in response to the first CID. The Company is unable to predict the outcome of this matter, or provide a range of loss, if any, which could be associated with any possible claims that might be brought against the Company.

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's anti-money laundering compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company continues to cooperate fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

In 2011, 2012 and 2013, Western Union received Civil Investigative Demands from certain state attorneys general who have initiated an investigation into the adequacy of the Company's consumer protection efforts over the last several years. The Civil Investigative Demands seek information and documents relating to money transfers sent from the United States to certain countries, consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, the Company could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices, that could have a material adverse effect on our business, financial condition and results of operations.

In addition, the Company is a party to a variety of other legal proceedings that arise in the normal course of our business. While the results of these legal proceedings cannot be predicted with certainty, management believes that the final outcome of these proceedings will not have a material adverse effect on the Company's results of operations or financial condition.

## ITEM 4.  MINE SAFETY DISCLOSURES

Not applicable.

51

Table of Contents

**THE WESTERN UNION COMPANY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.  Commitments and Contingencies**

*Letters of Credit and Bank Guarantees*

The Company had approximately $100 million in outstanding letters of credit and bank guarantees as of December 31, 2013 with expiration dates through 2016 , the majority of which contain a one -year renewal option. The letters of credit and bank guarantees are primarily held in connection with lease arrangements and certain agent agreements. The Company expects to renew the letters of credit and bank guarantees prior to expiration in most circumstances.

*Litigation and Related Contingencies*

The Company and one of its subsidiaries are defendants in two purported class action lawsuits: James P. Tennille v. The Western Union Company and Robert P. Smet v. The Western Union Company, both of which are pending in the United States District Court for the District of Colorado. The original complaints asserted claims for violation of various consumer protection laws, unjust enrichment, conversion and declaratory relief, based on allegations that the Company waits too long to inform consumers if their money transfers are not redeemed by the recipients and that the Company uses the unredeemed funds to generate income until the funds are escheated to state governments. The Tennille complaint was served on the Company on April 27, 2009. The Smet complaint was served on the Company on April 6, 2010. On September 21, 2009, the Court granted the Company's motion to dismiss the Tennille complaint and gave the plaintiff leave to file an amended complaint. On October 21, 2009, Tennille filed an amended complaint. The Company moved to dismiss the Tennille amended complaint and the Smet complaint. On November 8, 2010, the Court denied the motion to dismiss as to the plaintiffs' unjust enrichment and conversion claims. On February 4, 2011, the Court dismissed the plaintiffs' consumer protection claims. On March 11, 2011, the plaintiffs filed an amended complaint that adds a claim for breach of fiduciary duty, various elements to its declaratory relief claim and Western Union Financial Services, Inc. ("WUFSI"), a subsidiary of the Company, as a defendant. On April 25, 2011, the Company and WUFSI filed a motion to dismiss the breach of fiduciary duty and declaratory relief claims. WUFSI also moved to compel arbitration of the plaintiffs' claims and to stay the action pending arbitration. On November 21, 2011, the Court denied the motion to compel arbitration and the stay request. Both companies appealed the decision. On January 24, 2012, the United States Court of Appeals for the Tenth Circuit granted the companies' request to stay the District Court proceedings pending their appeal. During the fourth quarter of 2012, the parties executed a settlement agreement, which the Court preliminarily approved on January 3, 2013. On June 25, 2013, the Court entered an order certifying the class and granting final approval to the settlement. Under the approved settlement, a substantial amount of the settlement proceeds, as well as all of the class counsel's fees, administrative fees and other expenses, would be paid from the class members' unclaimed money transfer funds, which are included within "Settlement obligations" in the Company's consolidated balance sheets. During the final approval hearing, the Court overruled objections to the settlement that had been filed by several class members. In July 2013, two of those class members filed notices of appeal. The United States Court of Appeals for the Tenth Circuit has scheduled oral argument for March 18, 2014. The settlement requires Western Union to deposit the class members' unclaimed money transfer funds into a class settlement fund, from which class member claims, administrative fees and class counsel's fees, as well as other expenses will be paid. On November 6, 2013, the Attorney General of California notified Western Union of the California Controller's position that Western Union's deposit of the unclaimed money transfer funds into the class settlement fund pursuant to the settlement "will not satisfy Western Union's obligations to report and remit funds" under California's unclaimed property law, and that "Western Union will remain liable to the State of California" for the funds that would have escheated to California in the absence of the settlement. The State of Pennsylvania and Washington, D.C. have expressed similar views. There is thus reason to believe that these and potentially other jurisdictions may bring actions against the Company seeking reimbursement for amounts equal to the class counsel's fees, administrative costs and other expenses that are paid from the class settlement fund.  If such actions are brought or claims that may otherwise require Western Union to incur additional escheatment-related liabilities are asserted, Western Union would defend itself vigorously.

Table of Contents

### THE WESTERN UNION COMPANY

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

On February 11, 2010, WUFSI signed an agreement and settlement ("Settlement Agreement"), which resolved all outstanding legal issues and claims with the State of Arizona (the "State") and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. As part of the Settlement Agreement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor (the "Monitor") has been engaged for those programs. The Company has incurred, and expects to continue to incur, significant costs in connection with the Settlement Agreement. The Monitor has made a number of recommendations related to the Company's compliance programs. In addition, in the fourth quarter of 2012, the Company's Business Solutions business was included in the scope of the Monitor's review.

On January 31, 2014, WUFSI and the State agreed to amend the Settlement Agreement. Such amendment (the "Amendment") was subsequently approved by the Superior Court of the State of Arizona In and For the County of Maricopa that same day. The Amendment extends the term of the Settlement Agreement until December 31, 2017, and imposes obligations on the Company and WUFSI in connection with WUFSI's anti-money laundering compliance programs and cooperation with law enforcement. In particular, the Amendment requires WUFSI to continue implementing the primary and secondary recommendations made by the Monitor appointed pursuant to the Settlement Agreement related to WUFSI's anti-money laundering compliance program, and includes, among other things, timeframes for implementing such primary and secondary recommendations. Under the Amendment, the Monitor may make additional primary recommendations until January 1, 2015, and additional secondary recommendations until January 31, 2017. After these dates, the Monitor may only make additional primary or secondary recommendations, as applicable, that meet certain requirements as set forth in the Amendment. Primary recommendations may also be re-classified as secondary recommendations.

The Amendment provides that if WUFSI is unable to implement an effective anti-money laundering compliance program along the U.S. and Mexico border, as determined by the Monitor and subject to limited judicial review, within the timeframes to implement the Monitor's primary recommendations, the State may, within 180 days after the Monitor delivers its final report on the primary recommendations on December 31, 2016, and subsequent to any judicial review of the Monitor's findings, elect one , and only one, of the following remedies: (i) assert a willful and material breach of the Settlement Agreement and pursue remedies under the Settlement Agreement, which could include initiating civil or criminal actions; or (ii) require WUFSI to pay (a) $50 million plus (b) $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully. There are currently more than 70 primary recommendations and groups of primary recommendations.

If the Monitor concludes that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border within the timeframes to implement the Monitor's primary recommendations, the State cannot pursue either of the remedies above, except that the State may require WUFSI to pay $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully.

If, at the conclusion of the timeframe to implement the secondary recommendations on December 31, 2017, the Monitor concludes that WUFSI has not implemented an effective anti-money laundering compliance program along the U.S. and Mexico border, the State cannot assert a willful and material breach of the Settlement Agreement but may require WUFSI to pay an additional $25 million . Additionally, if the Monitor determines that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border but has not implemented some of the Monitor's secondary recommendations or groups of secondary recommendations that were originally classified as primary recommendations or groups of primary recommendations on the date of the Amendment, the State may require WUFSI to pay $500,000 per such secondary recommendation or group of recommendations. There is no monetary penalty associated with secondary recommendations that are classified as such on the date of the Amendment or any new secondary recommendations that the Monitor makes after the date of the Amendment.

The Amendment also requires WUFSI to make a one-time payment of $250,000 and thereafter $150,000 per month for five years to fund the activities and expenses of a money transfer transaction data analysis center formed by WUFSI and a Financial Crimes Task Force comprised of federal and state and local law enforcement representatives, including those from the State. In addition, the Amendment requires WUFSI to continue funding the Monitor's reasonable expenses in $500,000 increments as requested by the Monitor.

Table of Contents

**THE WESTERN UNION COMPANY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The changes in WUFSI's anti-money laundering program required by the Settlement Agreement, including the Amendment, and the Monitor's recommendations have had, and will continue to have, adverse effects on the Company's business, including additional costs. Additionally, if WUFSI is not able to implement a successful anti-money laundering compliance program along the U.S. and Mexico border or timely implement a substantial portion of the Monitor's primary recommendations, each as determined by the Monitor, pursuit by the State of remedies under the Settlement Agreement, including the Amendment, could have a material adverse effect on the Company's business, financial condition or results of operations.

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's anti-money laundering compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company continues to cooperate fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

On December 10, 2013, the City of Taylor Police and Fire Retirement System filed a purported class action complaint in the United States District Court for the District of Colorado against The Western Union Company, its President and Chief Executive Officer, and a former executive officer of the Company, asserting claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 against all defendants, and under Section 20(a) of the Exchange Act against the individual defendants. Plaintiff alleges that during the alleged class period, February 7, 2012 through October 30, 2012, defendants made false or misleading statements or failed to disclose adverse facts known to them, including: (1) the Company was experiencing difficulties in complying with its increased duties required by the Southwest Border Agreement and that the State of Arizona was dissatisfied with the Company's efforts; (2) the Company was spending significantly more than forecast on its efforts to satisfy the compliance and monitoring program; (3) the Company had downplayed the impact that changes in its compliance and regulatory environment were having on its operations, including its operations in Mexico and Latin America; (4) the scope of the Monitor's review was being expanded to include Western Union Business Solutions, which would increase compliance costs; and (5) the Company's ability to charge a premium for its core money transfer product was under competitive pressure, which would require drastic price reductions to stem market share losses. On January 30, 2014, another shareholder, Norma A. Garavaglia, filed a second purported class action complaint in the United States District Court for the District of Colorado that names the same defendants and contains allegations which are substantially similar to those made in the City of Taylor Police and Fire Retirement System lawsuit. These actions are in a preliminary stage and the Company is unable to predict the outcome, or the possible loss or range of loss, if any, which could be associated with these actions. The Company and the named individuals intend to vigorously defend themselves in all of these matters.

In addition, in the normal course of business, the Company is subject to other claims and litigation. Management of the Company believes such matters involving a reasonably possible chance of loss will not, individually or in the aggregate, result in a material adverse effect on the Company's financial condition, results of operations and cash flows. The Company accrues for loss contingencies as they become probable and estimable.

111

Table of Contents

**THE WESTERN UNION COMPANY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Pursuant to the separation and distribution agreement with First Data in connection with the Spin-off (see Note 1), First Data and the Company are each liable for, and agreed to perform, all liabilities with respect to their respective businesses. In addition, the separation and distribution agreement also provides for cross-indemnities principally designed to place financial responsibility for the obligations and liabilities of the Company's business with the Company and financial responsibility for the obligations and liabilities of First Data's retained businesses with First Data. The Company also entered into a tax allocation agreement that sets forth the rights and obligations of First Data and the Company with respect to taxes imposed on their respective businesses both prior to and after the Spin-off as well as potential tax obligations for which the Company may be liable in conjunction with the Spin-off (see Note 10).

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)   Registration Statements (Form S-3 Nos. 333-191606 and 333-191608) of The Western Union Company, and

(2)   Registration Statement (Form S-8 No. 333-137665) pertaining to The Western Union Company 2006 Long-Term Incentive Plan, The Western Union Company 2006 Non-Employee Director Equity Compensation Plan, and The Western Union Company Supplemental Incentive Savings Plan;

of our reports dated February 24, 2014 , with respect to the consolidated financial statements and schedule of The Western Union Company and the effectiveness of internal control over financial reporting of The Western Union Company included in this Annual Report (Form 10-K) of The Western Union Company for the year ended December 31, 2013 .

/s/ Ernst & Young LLP

Denver, Colorado
February 24, 2014

**Exhibit 31.1**

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER

I, Hikmet Ersek, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2014

/ S / Hikmet Ersek

**Hikmet Ersek**
**President and Chief Executive Officer**

Exhibit 31.2

## CERTIFICATION OF THE CHIEF FINANCIAL OFFICER

I, Rajesh K. Agrawal, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2014

/ s /   R AJESH  K. A GRAWAL

**Rajesh K. Agrawal**
**Executive Vice President and Interim Chief Financial Officer**

**Exhibit 32**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

The certification set forth below is being submitted in connection with the Annual Report of The Western Union Company on Form 10-K for the period ended December 31, 2013 (the "Report") for the purpose of complying with Rule 13a-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

Hikmet Ersek and Rajesh K. Agrawal certify that, to the best of each of their knowledge:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of The Western Union Company.

Date: February 24, 2014

/ s /   H IKMET  E RSEK

**Hikmet Ersek**
**President and Chief Executive Officer**

Date: February 24, 2014

/s/   R AJESH  K. A GRAWAL

**Rajesh K. Agrawal**
**Executive Vice President and Interim Chief Financial Officer**