# Exhibit 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of The
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): February 11, 2010

# THE WESTERN UNION COMPANY

**(Exact name of registrant as specified in its charter)**

| Delaware | 001-32903 | 20-4531180 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**12500 East Belford Avenue**
**Englewood, Colorado**     **80112**
(Address of principal executive offices)     (Zip Code)

**Registrant's telephone number, including area code: (866) 405-5012**

**N/A**
(Former name or former address, if changed since last report)

☐ Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.**     **Entry into a Material Definitive Agreement**

On February 11, 2010, Western Union Financial Services, Inc. ("Western Union"), a subsidiary of The Western Union Company, entered into a Settlement Agreement with the State of Arizona (the "State") regarding claims concerning Western Union's ability to prevent its service from being abused to launder money or to facilitate other criminal activity. The Settlement Agreement resolves all outstanding legal issues and claims with the State, and provides that Western Union will reimburse the State up to $21 million for certain of its costs associated with this matter and pay up to $50 million to fund a multi-state not-for-profit organization promoting safety and security along the U.S. and Mexico border. Western Union accrued for this contingency in the third quarter of 2009. In addition, as part of the Settlement Agreement, Western Union expects to make certain investments in its compliance programs along the U.S. and Mexico border and to engage a monitor of that program, which are expected to cost up to $23 million over the next several years. These amounts will be expensed as incurred and were included in Western Union's 2010 outlook provided in its fourth quarter 2009 earnings announcement released on February 3, 2010.

A copy of the Settlement Agreement is attached hereto as Exhibit 10.1 and is incorporated by reference into this Item 1.01.

**Item 9.01.**     **Financial Statements and Other Exhibits**

The following Exhibit is filed herewith.

| Exhibit Number | Description of Exhibit |
|---|---|
| 10.1 | Settlement Agreement, dated as of February 11, 2010, by and between Western Union Financial Services, Inc. and the State of Arizona. |

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: February 12, 2010                              THE WESTERN UNION COMPANY

By:          /S/    SARAH J. KILGORE
             **Sarah J. Kilgore**
             **Assistant Secretary**

3

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 10.1 | Settlement Agreement, dated as of February 11, 2010, by and between Western Union Financial Services, Inc. and the State of Arizona. |

4

**Exhibit 10.1**

| | |
|---|---|
| STATE OF ARIZONA, ex rel. ) | |
| ATTORNEY GENERAL ) | |
| TERRY GODDARD, ) | |
| Plaintiff, ) | **SETTLEMENT** |
| ) | **AGREEMENT** |
| v. ) | |
| WESTERN UNION FINANCIAL ) | |
| SERVICES, INC., ) | |
| Defendant, ) | |
| ) | |

Western Union Financial Services, Inc., ("Western Union") a corporation organized under the laws of Colorado, pursuant to authority granted by its Board of Directors, and the State of Arizona ("State") hereby enter into this Settlement Agreement ("Agreement").

**Recitals**

1. Western Union offers money transfer and other payment services at over 50,000 agent locations in the United States and over 375,000 locations around the world. In Arizona, Western Union is licensed to do business as a money transmitter under the Arizona Transmitters of Money Act, A.R.S. §§ 6-1201-1242.

2. Western Union conducts its business through "Agents," referred to as "authorized delegates" in Arizona. *See* A.R.S. §§ 6-1201(1) and 6-1208. In some foreign countries, such as Mexico, Western Union's Agents enter into agreements with additional locations (sometimes referred to as "subagents") entitling the subagents to offer Western Union services to the public.

3. Western Union has developed and implemented a risk-based anti-money laundering ("AML") compliance program that is designed to prevent, detect, and report potential money laundering activities. In so doing, Western Union has dedicated substantial resources to, among other things: developing transaction monitoring systems to detect potentially suspicious activity; building a team of AML professionals; screening, training, and monitoring its Agents; producing AML policies and manuals; and implementing compliance measures in certain high-risk geographical areas, including all of Arizona and the area within 200 miles north and south of the United States/Mexico border (the "Southwest Border Area").

4. Prior to the execution of this Agreement, Western Union requested from the State a global resolution of all potential regulatory, civil, and criminal actions that could arise from conduct described in the Statement of Admitted Facts, attached hereto as Exhibit A and incorporated herein by this reference, and it also provided the State with a May 8, 2009 report by an independent consulting firm evaluating Western Union's current AML

(3) that Western Union Financial Services, Inc. fully and completely understands each and every one of the terms of the Agreement;

(4) that the Board of Directors of Western Union Financial Services, Inc. has adopted a resolution reflecting that understanding, a copy of which has been provided to the State;

(5) that Western Union Financial Services, Inc. is fully satisfied with the advice and representation provided to it by its attorneys; and

(6) that Western Union Financial Services, Inc. has signed this Agreement voluntarily.

/s/   David Schlapbach                                                            DATE: February 11, 2010
**Western Union Financial Services, Inc.**
David Schlapbach
General Counsel for Western Union Financial Services, Inc.

The undersigned are outside counsel for Western Union Financial Services, Inc. In connection with such representation, we acknowledge that:

(1) we have discussed this Agreement with our client; and

(2) we believe our client completely understands all of the Agreement's terms.

DATE: February 11, 2010                                                           DATE: February 11, 2010

/s/   Larry Hammond                                                               /s/   Jan Little
Larry Hammond                                                                     Jan Nielsen Little
Osborn Maledon PA,                                                                Keker and Van Nest, LLP
Attorneys for Western Union Financial Services, Inc.

**On Behalf of the STATE OF ARIZONA**

DATE: February 11, 2010

/s/   Terry Goddard
Terry Goddard
Arizona Attorney General

DATE: February 11, 2010

/s/   Cameron H. Holmes
Cameron H. Holmes
Senior Litigation Counsel
Financial Remedies Section
Criminal Division

13

**Exhibit A**

Statement of Admitted Facts

1. Western Union Financial Services, Inc. ("Western Union") is licensed to do business in Arizona and elsewhere as a money transmitter, also known as a money service business. Western Union conducts its business through "Agents," referred to as authorized delegates in Arizona. *See* A.R.S. §§ 6-1201(1) and 6-1218. In some foreign countries, such as Mexico, Western Union's Agents enter into agreements with additional locations (sometimes referred to as subagents) entitling the subagents to offer Western Union services to the public.

2. Western Union has specific duties imposed by federal and state law to develop, implement, and maintain an effective anti-money laundering program and to comply with various record keeping and reporting requirements that are designed to assist governmental agencies in detecting and preventing money laundering.

3. An effective anti-money laundering program is, in part, one that is reasonably designed to prevent the money service business from being used to facilitate money laundering (recognizing that any reasonably applied controls, including controls implemented as a result of a reasonably implemented risk-based approach, will not identify and detect all instances of money laundering).

4. Between 2003 and 2007, Western Union had data and other information available to it, which, when viewed as a whole, gave Western Union reason to know that one or more persons employed at the authorized delegate locations in Arizona referred to in paragraph 5 below, and at the locations referred to in paragraph 7 below, while acting within the scope of their employment and motivated at least in part to benefit Western Union, were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona.

5. From 2003-2005 the Western Union payouts at the eight Arizona locations listed below totaled $176,735,000 in wires of $500 or more sent to the location from one of the 29 States that were the most frequent destinations for persons being smuggled from Mexico into the United States through Arizona. These amounts include both legal and illegal transactions.

| Location | Amount | Location | Amount |
|---|---|---|---|
| Location A | $34,825,000 | Location E | $18,702,000 |
| Location B | $28,706,000 | Location F | $16,567,000 |
| Location C | $28,428,000 | Location G | $15,507,000 |
| Location D | $18,892,000 | Location H | $15,108,000 |

6. Beginning in 2006, Western Union limited money transfer transactions into Arizona to a maximum of $450. Because smuggling into the United States through Arizona continued, smugglers had their payments wired to other places outside the United States.

7. From 2005-2007, Western Union payouts at the following eight locations outside the United States totaled $142,446,000 in wires of $500 or more sent to the location from one of the 29 States that were the most frequent destinations for persons being smuggled into the United States through Arizona. These amounts include both legal and illegal transactions.

| Location | Amount | Location | Amount |
|---|---|---|---|
| Location I | $36,200,000 | Location M | $18,141,000 |
| Location J | $20,666,000 | Location N | $14,654,000 |
| Location K | $20,069,000 | Location O | $ 6,664,000 |
| Location L | $19,872,000 | Location P | $ 6,180,000 |

**Exhibit B**

28. If at any time during the course of the Engagement, the Monitor discovers evidence of a potential violation by Western Union of money laundering laws in the Southwest Border Area that occurred after the date of the Agreement, the Monitor shall have the discretion to investigate and report to the State and Western Union about the matter. At the sole and reasonable discretion of the State, the State may direct the Monitor to discontinue the investigation to allow for a government investigation to commence.

29. Western Union agrees that during the Engagement, the Monitor shall review activities and transaction data relating to activities that occurred prior to the date of the Agreement for the purpose of informing himself or herself of the facts relevant to the development of Recommendations, the evaluation of Western Union's Risk Assessment, the determination of the advisability of potential Recommendations, and the determination of the efficacy of Recommendations during the course of the Engagement in their historical context.

**Periodic Reviews and Final Report**

30. The Monitor shall undertake periodic reviews every six months, commencing when the Monitor submits the Implementation Plan, to further monitor and evaluate compliance with this Monitor Engagement Letter and determine whether Western Union's Program is reasonably designed and effectively implemented to detect, deter, and prevent money laundering.

31. With regard to the periodic reviews and Final Report, the requirements set forth above for the Implementation Plan shall apply, except for the following modifications:

     31.1 The periodic reviews will not require a work plan, but will instead be periodic evaluations of the Program and its effectiveness and Western Union's progress in implementing the Recommendations required under this Monitor Engagement Letter, and shall include analysis of transaction data relevant to the efficacy of the required Recommendations, whether Recommendations should be added to or deleted from the Implementation Plan based on transaction data or on changes in the risk circumstances, and empirical tests of the effectiveness of the Program;

     31.2 In the discretion of the Monitor, the Monitor may designate any periodic review after the end of the twenty-ninth month after the Agreement is fully executed, as the Final Report if the Monitor certifies that the conditions provided in the Agreement for early termination are present. In making its determination whether Western Union has complied with all of the terms of the Agreement, consistent with the principles enunciated in the FATF RBA Guidance, the Monitor's evaluation of the Program shall acknowledge that Western Union cannot be expected to detect and/or prevent all illicit uses of its services, that Western Union's ability to detect and deter money laundering can sometimes be necessarily limited, and that information about risks is not always robust or freely available. The Monitor shall bear in mind that a money services business may act in good

faith to take reasonable and considered steps to prevent money laundering, and document the rationale for its decisions, and yet still be abused by persons engaged in illicit activity. If the Monitor makes no certification of early compliance, the Monitor will make his or her Final Report on the last day of the forty-first month after the Agreement is fully executed.

31.3 The Monitor shall prepare a written work plan for a Final Report and submit it to the State and Western Union for comment at least sixty (60) days prior to issuing the Final Report. If Western Union or the State objects to any part of the work plan, the Monitor, Western Union, and the State shall use best efforts to reach a resolution agreeable to all parties, but the State shall, in its sole discretion, determine the matter. If the Monitor elects to terminate this Engagement before the end of the forty-first month after the Agreement is fully executed, the Monitor's Final Report must certify that Western Union has implemented all of the Recommendations required under this Monitor Engagement Letter and that, in the Monitor's opinion and based on the evaluation described in Paragraph 31.2, the Program is reasonably designed and effectively implemented to deter, detect, and prevent money laundering.

**Access to Information**

32. Western Union shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps, in his or her view, as may be necessary to be fully informed about the operations of Western Union within the scope of his or her responsibilities under this Engagement. To that end, if requested by the Monitor, Western Union shall provide the Monitor:

32.1 access to all files, books, records, personnel, transaction and other data, and facilities that fall within the scope of responsibilities of the Monitor under this Engagement;

32.2 the right to interview any director, officer, employee, agent, or consultant of Western Union and to participate in any meeting, other than meetings protected by the attorney-client privilege, concerning any matter within or relating to the scope of the Monitor's responsibilities under this Engagement;

32.3 the right to observe Western Union business operations that fall within the scope of responsibilities of the Monitor under this Engagement;

32.4 open access to information relating to the risk involved in its credit card, stored value, and phone transactions to permit evaluation of the product/service risk of new or innovative products or services offered by Western Union in the Southwest Border Area, particularly, but not limited to, products or services that may inherently favor a degree of anonymity or can readily cross international borders, such as online money transmittals, stored value cards or other devices, money orders, and money transmittals by mobile phone;