# Exhibit 15

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Form 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2014

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission File Number: 001-32903

# THE WESTERN UNION COMPANY
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **DELAWARE** | **20-4531180** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **12500 EAST BELFORD AVENUE** | **80112** |
| **ENGLEWOOD, CO** | **(Zip Code)** |
| (Address of Principal Executive Offices) | |

Registrant's telephone number, including area code (866) 405-5012

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  ☒    No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  ☒    No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  ☒        Accelerated filer  ☐        Non-accelerated filer  ☐   (Do not check if a smaller reporting company)        Smaller reporting company  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  ☐    No  ☒

As of October 24, 2014, 522,627,069 shares of our common stock were outstanding.

THE WESTERN UNION COMPANY

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

## 6. Commitments and Contingencies

*Letters of Credit and Bank Guarantees*

The Company had approximately $215 million in outstanding letters of credit and bank guarantees as of September 30, 2014 . The letters of credit and bank guarantees are primarily held in connection with lease arrangements, certain agent agreements, and in relation to an uncertain tax position. The letters of credit and bank guarantees have expiration dates through 2018 , with the majority having a one -year renewal option, except for the bank guarantee related to the uncertain tax position, which will expire upon resolution of this matter. The Company expects to renew the letters of credit and bank guarantees prior to expiration in most circumstances.

*Litigation and Related Contingencies*

The Company is subject to certain claims and litigation, including but not limited to those discussed below:

*State of Arizona Agreement and Settlement*

On February 11, 2010, Western Union Financial Services, Inc. ("WUFSI"), a subsidiary of the Company, signed an agreement and settlement ("Southwest Border Agreement"), which resolved all outstanding legal issues and claims with the State of Arizona (the "State") and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. As part of the Southwest Border Agreement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor (the "Monitor") has been engaged for those programs. In October 2014, the Superior Court of the State of Arizona In and For the County of Maricopa approved the removal of the Monitor and the appointment of a replacement Monitor. The Company has incurred, and expects to continue to incur, significant costs in connection with the Southwest Border Agreement. The Monitor has made a number of recommendations related to the Company's compliance programs, which also related to our Business Solutions business.

On January 31, 2014, the Southwest Border Agreement was amended to extend its term until December 31, 2017 (the "Amendment") and imposes obligations on the Company and WUFSI in connection with WUFSI's anti-money laundering ("AML") compliance programs and cooperation with law enforcement. In particular, the Amendment requires WUFSI to continue implementing the primary and secondary recommendations made by the Monitor appointed pursuant to the Southwest Border Agreement related to WUFSI's AML compliance program, and includes, among other things, timeframes for implementing such primary and secondary recommendations. Under the Amendment, the Monitor may make additional primary recommendations until January 1, 2015, and additional secondary recommendations until January 31, 2017. After these dates, the Monitor may only make additional primary or secondary recommendations, as applicable, that meet certain requirements as set forth in the Amendment. Primary recommendations may also be re-classified as secondary recommendations.

The Amendment provides that if WUFSI is unable to implement an effective AML compliance program along the U.S. and Mexico border, as determined by the Monitor and subject to limited judicial review, within the timeframes to implement the Monitor's primary recommendations, the State may, within 180 days after the Monitor delivers its final report on the primary recommendations on December 31, 2016, and subsequent to any judicial review of the Monitor's findings, elect one , and only one, of the following remedies: (i) assert a willful and material breach of the Southwest Border Agreement and pursue remedies under the Southwest Border Agreement, which could include initiating civil or criminal actions; or (ii) require WUFSI to pay (a) $50 million plus (b) $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully. There are currently more than 70 primary recommendations and groups of primary recommendations.

**THE WESTERN UNION COMPANY**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

If the Monitor concludes that WUFSI has implemented an effective AML compliance program along the U.S. and Mexico border within the timeframes to implement the Monitor's primary recommendations, the State cannot pursue either of the remedies above, except that the State may require WUFSI to pay $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully.

If, at the conclusion of the timeframe to implement the secondary recommendations on December 31, 2017, the Monitor concludes that WUFSI has not implemented an effective AML compliance program along the U.S. and Mexico border, the State cannot assert a willful and material breach of the Southwest Border Agreement but may require WUFSI to pay an additional $25 million . Additionally, if the Monitor determines that WUFSI has implemented an effective AML compliance program along the U.S. and Mexico border but has not implemented some of the Monitor's secondary recommendations or groups of secondary recommendations that were originally classified as primary recommendations or groups of primary recommendations on the date of the Amendment, the State may require WUFSI to pay $500,000 per such secondary recommendation or group of recommendations. There is no monetary penalty associated with secondary recommendations that are classified as such on the date of the Amendment or any new secondary recommendations that the Monitor makes after the date of the Amendment.

The Amendment requires WUFSI to continue funding the Monitor's reasonable expenses in $500,000 increments as requested by the Monitor. The Amendment also requires WUFSI to make a one-time payment of $250,000 , which was paid in March 2014, and thereafter $150,000 per month for five years to fund the activities and expenses of a money transfer transaction data analysis center formed by WUFSI and a Financial Crimes Task Force comprised of federal, state and local law enforcement representatives, including those from the State. In addition, California, Texas, and New Mexico are also participating in the money transfer transaction data analysis center.

The changes in WUFSI's AML program required by the Southwest Border Agreement, including the Amendment, and the Monitor's recommendations have had, and will continue to have, adverse effects on the Company's business, including additional costs. Additionally, if WUFSI is not able to implement a successful AML compliance program along the U.S. and Mexico border or timely implement a substantial portion of the Monitor's primary recommendations, each as determined by the Monitor, pursuit by the State of remedies under the Southwest Border Agreement, including the Amendment, could have a material adverse effect on the Company's business, financial condition or results of operations.

*United States Department of Justice Investigations*

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO-CDCA") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO-CDCA seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's AML compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

14

**THE WESTERN UNION COMPANY**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

In March 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Eastern District of Pennsylvania ("USAO-EDPA") seeking documents relating to Hong Fai General Contractor Corp. (formerly known as Yong General Construction) ("Hong Fai"), a former Western Union agent located in Philadelphia, Pennsylvania. Since March 2012, the Company has received additional subpoenas from the USAO-EDPA seeking additional documents relating to Hong Fai. The government has interviewed several current Western Union employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

On March 6, 2014, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL") seeking a variety of AML compliance materials, including documents relating to the Company's AML, Bank Secrecy Act ("BSA"), Suspicious Activity Report ("SAR") and Currency Transaction Report procedures, transaction monitoring protocols, BSA and AML training programs and publications, AML compliance investigation reports, compliance-related agent termination files, SARs, BSA audits, BSA and AML-related management reports and AML compliance staffing levels. The subpoena also calls for Board meeting minutes and organization charts. The period covered by the subpoena is January 1, 2007 to November 27, 2013. The Company has received additional subpoenas from the USAO-SDFL and the Broward County, Florida Sheriff's Office relating to the investigation, including a federal grand jury subpoena issued by the USAO-SDFL on March 14, 2014, seeking information about 33 agent locations in Costa Rica such as ownership and operating agreements, SARs and AML compliance and BSA filings for the period January 1, 2008 to November 27, 2013. Subsequently, the USAO-SDFL served the Company with seizure warrants requiring the Company to seize all money transfers sent from the United States to two agent locations located in Costa Rica for a 10-day period beginning in late March 2014. On July 8, 2014, the government served a grand jury subpoena calling for records relating to transactions sent from the United States to Nicaragua and Panama between September 1, 2013 and October 31, 2013. The government has also notified the Company that it is a target of the investigation. The investigation is ongoing and the Company may receive additional requests for information or seizure warrants as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

**THE WESTERN UNION COMPANY**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

*Shareholder Action and Other Matters*

On December 10, 2013, City of Taylor Police and Fire Retirement System filed a purported class action complaint in the United States District Court for the District of Colorado against The Western Union Company, its President and Chief Executive Officer and a former executive officer of the Company, asserting claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission rule 10b-5 against all defendants. On September 26, 2014, the Court appointed SEB Asset Management S.A. and SEB Investment Management AB as lead plaintiffs. On October 27, 2014, lead plaintiffs filed a consolidated amended class action complaint, which asserts the same claims as the original complaint, except that it brings the claims under section 20(a) of the Exchange Act only against the individual defendants. The consolidated amended complaint also adds as a defendant another former executive officer of the Company. The consolidated amended complaint alleges that, during the purported class period, February 7, 2012 through October 30, 2012, defendants made false or misleading statements or failed to disclose adverse material facts known to them, including those regarding: (1) the competitive advantage the Company derived from its compliance program; (2) the Company's ability to increase market share, make limited price adjustments and withstand competitive pressures; (3) the effect of compliance measures under the Southwest Border Agreement on agent retention and business in Mexico; and (4) the Company's progress in implementing an anti-money laundering program for the Southwest Border Area. This action is in a preliminary stage and the Company is unable to predict the outcome, or the possible loss or range of loss, if any, which could be associated with this action. The Company and the named individuals intend to vigorously defend themselves in this matter.

THE WESTERN UNION COMPANY

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

The Company and one of its subsidiaries are defendants in two purported class action lawsuits: James P. Tennille v. The Western Union Company and Robert P. Smet v. The Western Union Company, both of which are pending in the United States District Court for the District of Colorado. The original complaints asserted claims for violation of various consumer protection laws, unjust enrichment, conversion and declaratory relief, based on allegations that the Company waits too long to inform consumers if their money transfers are not redeemed by the recipients and that the Company uses the unredeemed funds to generate income until the funds are escheated to state governments. The Tennille complaint was served on the Company on April 27, 2009. The Smet complaint was served on the Company on April 6, 2010. On September 21, 2009, the Court granted the Company's motion to dismiss the Tennille complaint and gave the plaintiff leave to file an amended complaint. On October 21, 2009, Tennille filed an amended complaint. The Company moved to dismiss the Tennille amended complaint and the Smet complaint. On November 8, 2010, the Court denied the motion to dismiss as to the plaintiffs' unjust enrichment and conversion claims. On February 4, 2011, the Court dismissed the plaintiffs' consumer protection claims. On March 11, 2011, the plaintiffs filed an amended complaint that adds a claim for breach of fiduciary duty, various elements to its declaratory relief claim and WUFSI as a defendant. On April 25, 2011, the Company and WUFSI filed a motion to dismiss the breach of fiduciary duty and declaratory relief claims. WUFSI also moved to compel arbitration of the plaintiffs' claims and to stay the action pending arbitration. On November 21, 2011, the Court denied the motion to compel arbitration and the stay request. Both companies appealed the decision. On January 24, 2012, the United States Court of Appeals for the Tenth Circuit granted the companies' request to stay the District Court proceedings pending their appeal. During the fourth quarter of 2012, the parties executed a settlement agreement, which the Court preliminarily approved on January 3, 2013. On June 25, 2013, the Court entered an order certifying the class and granting final approval to the settlement. Under the approved settlement, a substantial amount of the settlement proceeds, as well as all of the class counsel's fees, administrative fees and other expenses, would be paid from the class members' unclaimed money transfer funds, which are included within "Settlement obligations" in the Company's Condensed Consolidated Balance Sheets. During the final approval hearing, the Court overruled objections to the settlement that had been filed by several class members. In July 2013, two of those class members filed notices of appeal. The United States Court of Appeals for the Tenth Circuit heard oral arguments on March 18, 2014. The settlement requires Western Union to deposit the class members' unclaimed money transfer funds into a class settlement fund, from which class member claims, administrative fees and class counsel's fees, as well as other expenses will be paid. On November 6, 2013, the Attorney General of California notified Western Union of the California Controller's position that Western Union's deposit of the unclaimed money transfer funds into the class settlement fund pursuant to the settlement "will not satisfy Western Union's obligations to report and remit funds" under California's unclaimed property law, and that "Western Union will remain liable to the State of California" for the funds that would have escheated to California in the absence of the settlement. The State of Pennsylvania and District of Columbia have expressed similar views. Thus, there is reason to believe that these and potentially other jurisdictions may bring actions against the Company seeking reimbursement for amounts equal to the class counsel's fees, administrative costs and other expenses that are paid from the class settlement fund. If such actions are brought or claims that may otherwise require Western Union to incur additional escheatment-related liabilities are asserted, Western Union would defend itself vigorously.

In August 2013, the Consumer Financial Protection Bureau (the "CFPB") served Paymap, Inc. ("Paymap"), a subsidiary of the Company which operates solely in the United States, with a civil investigative demand requesting information and documents about Paymap's Equity Accelerator service, which is designed to help consumers pay off their mortgages more quickly. The CFPB's investigation sought to determine whether Paymap's marketing of the Equity Accelerator service violated the Consumer Financial Protection Act's prohibition against unfair, deceptive and abusive acts and practices ("UDAAP"). The Company cooperated with the investigation. After reviewing information and documents provided by the Company, in August 2014, the CFPB advised the Company of its view that certain aspects of Paymap's marketing violated UDAAP. The Company has advised the CFPB that it disagrees with the CFPB's position. The Company is in discussions with the CFPB and is seeking to reach an appropriate resolution of this matter. Due to the early stage of the discussions, the Company is unable to predict whether the CFPB will institute an enforcement action to bring any claims against the Company as a result of the investigation, or the possible range of loss, if any, which could be associated with such an action. Should the CFPB institute an enforcement action against the Company, the Company could face significant restitution payments to certain Equity Accelerator consumers, civil money penalties, or regulatory consequences that could have a material adverse effect on the Company's business, financial condition and results of operations.

PART II

OTHER INFORMATION

**Item 1. Legal Proceedings**

*United States Department of Justice Investigations*

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO-CDCA") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO-CDCA seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's anti-money laundering ("AML") compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

In March 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Eastern District of Pennsylvania ("USAO-EDPA") seeking documents relating to Hong Fai General Contractor Corp. (formerly known as Yong General Construction) ("Hong Fai"), a former Western Union agent located in Philadelphia, Pennsylvania. Since March 2012, the Company has received additional subpoenas from the USAO-EDPA seeking additional documents relating to Hong Fai. The government has interviewed several current Western Union employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies.  The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

On March 6, 2014, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL") seeking a variety of AML compliance materials, including documents relating to the Company's AML, Bank Secrecy Act ("BSA"), Suspicious Activity Report ("SAR") and Currency Transaction Report procedures, transaction monitoring protocols, BSA and AML training programs and publications, AML compliance investigation reports, compliance-related agent termination files, SARs, BSA audits, BSA and AML-related management reports and AML compliance staffing levels. The subpoena also calls for Board meeting minutes and organization charts. The period covered by the subpoena is January 1, 2007 to November 27, 2013. The Company has received additional subpoenas from the USAO-SDFL and the Broward County, Florida Sheriff's Office relating to the investigation, including a federal grand jury subpoena issued by the USAO-SDFL on March 14, 2014, seeking information about 33 agent locations in Costa Rica such as ownership and operating agreements, SARs and AML compliance and BSA filings for the period January 1, 2008 to November 27, 2013. Subsequently, the USAO-SDFL served the Company with seizure warrants requiring the Company to seize all money transfers sent from the United States to two agent locations located in Costa Rica for a 10-day period beginning in late March 2014. On July 8, 2014, the government served a grand jury subpoena calling for records relating to transactions sent from the United States to Nicaragua and Panama between September 1, 2013 and October 31, 2013. The government has also notified the Company that it is a target of the investigation. The investigation is ongoing and the Company may receive additional requests for information or seizure warrants as part of the investigation. The Company is cooperating fully with the government. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

*Other Governmental Investigations*

In 2011, 2012 and 2013, Western Union received civil investigative demands from certain state attorneys general who have initiated an investigation into the adequacy of the Company's consumer protection efforts over the last several years. The civil investigative demands seek information and documents relating to money transfers sent from the United States to certain countries, consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, the Company could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices, that could have a material adverse effect on our business, financial condition and results of operations.

The Company has had discussions with the United States Federal Trade Commission (the "FTC") regarding the Company's consumer protection and anti-fraud programs. On December 12, 2012, the Company received a civil investigative demand from the FTC requesting that the Company produce (i) all documents relating to communications with the monitor appointed pursuant to the agreement and settlement (the "Southwest Border Agreement") Western Union Financial Services, Inc. entered into with the State of Arizona on February 11, 2010, as amended, including information the Company provided to the monitor and any reports prepared by the monitor; and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011. On April 15, 2013, the FTC filed a petition in the United States District Court for the Southern District of New York requesting an order to compel production of the requested documents. On June 6, 2013, the Court granted in part and denied in part the FTC's request. On August 14, 2013, the FTC filed a notice of appeal. On August 27, 2013, Western Union filed a notice of cross-appeal. On February 21, 2014, the Company received another civil investigative demand from the FTC requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004, except for documents that were already produced to the FTC in response to the first civil investigative demand. On October 7, 2014, the United States Court of Appeals for the Second Circuit entered a summary order reversing in part and vacating and remanding in part the June 6, 2013 order entered by the United States District Court for the Southern District of New York. On October 22, 2014, the Company received another civil investigative demand issued by the FTC requesting documents and information since January 1, 2004 relating to the Company's consumer fraud program, its policies and procedures governing agent termination, suspension, probation and reactivation, its efforts to comply with its 2005 agreement with 47 states and the District of Columbia regarding consumer fraud prevention, and complaints made to the Company by or on behalf of consumers concerning fraud-induced money transfers that were sent to or from the United States, excluding complaint-related documents that were produced to the FTC in response to the earlier civil investigative demands. The civil investigative demand also seeks various documents concerning approximately 720 agents, including documents relating to the transactions they sent and paid and the Company's investigations of and communications with them. The Company may receive additional civil investigative demands from the FTC. The Company is unable to predict the outcome of this matter, or provide a range of loss, if any, which could be associated with any possible claims that might be brought against the Company.

In August 2013, the Consumer Financial Protection Bureau (the "CFPB") served Paymap, Inc. ("Paymap"), a subsidiary of the Company which operates solely in the United States, with a civil investigative demand requesting information and documents about Paymap's Equity Accelerator service, which is designed to help consumers pay off their mortgages more quickly. The CFPB's investigation sought to determine whether Paymap's marketing of the Equity Accelerator service violated the Consumer Financial Protection Act's prohibition against unfair, deceptive and abusive acts and practices ("UDAAP"). The Company cooperated with the investigation. After reviewing information and documents provided by the Company, in August 2014, the CFPB advised the Company of its view that certain aspects of Paymap's marketing violated UDAAP. The Company has advised the CFPB that it disagrees with the CFPB's position. The Company is in discussions with the CFPB and is seeking to reach an appropriate resolution of this matter. Due to the early stage of the discussions, the Company is unable to predict whether the CFPB will institute an enforcement action to bring any claims against the Company as a result of the investigation, or the possible range of loss, if any, which could be associated with such an action. Should the CFPB institute an enforcement action against the Company, the Company could face significant restitution payments to certain Equity Accelerator consumers, civil money penalties, or regulatory consequences that could have a material adverse effect on the Company's business, financial condition and results of operations.

In December 2013, the United States Securities and Exchange Commission (the "SEC") advised the Company that it was conducting an investigation relating to (i) the Company's digital and electronic channels and the revenues allocated to and reported by those channels; and (ii) the Payment Services Directive and the Company's strategic initiatives surrounding the Payment Services Directive. Subsequently, the SEC served the Company with subpoenas seeking information relating to its investigation. On September 3, 2014, in connection with its investigation relating to the Company's digital and electronic channels, the SEC filed an application in the United States District Court for the District of Colorado seeking an order compelling the production of certain email and other electronically stored information for three employees. After the Company and the SEC reached an agreement on the production of that material, the SEC withdrew its application. The Company is unable to predict the outcome of this matter, or the range of loss, if any, which could be associated with the resolution of this investigation.

**Exhibit 15**

**Letter from Ernst & Young LLP Regarding Unaudited Interim Financial Information**

The Board of Directors and Stockholders of The Western Union Company

We are aware of the incorporation by reference in the following Registration Statements:

(1) Registration Statements (Form S-3 Nos. 333-191606 and 333-191608) of The Western Union Company, and

(2) Registration Statement (Form S-8 No. 333-137665) pertaining to The Western Union Company 2006 Long-Term Incentive Plan, The Western Union Company 2006 Non-Employee Director Equity Compensation Plan, and The Western Union Company Supplemental Incentive Savings Plan;

of our reports dated May 1, 2014, July 31, 2014, and October 30, 2014 relating to the unaudited condensed consolidated interim financial statements of The Western Union Company that are included in its Forms 10-Q for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014 .

/s/ Ernst & Young LLP

Denver, Colorado
October 30, 2014

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**

I, Hikmet Ersek, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| | |
|---|---|
| Date: October 30, 2014 | /s/ H<small>IKMET</small> E<small>RSEK</small> |
| | **Hikmet Ersek** |
| | **President and Chief Executive Officer** |

**Exhibit 31.2**

## CERTIFICATION OF THE CHIEF FINANCIAL OFFICER

I, Rajesh K. Agrawal, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 30, 2014

/s/ Rajesh K. Agrawal
**Rajesh K. Agrawal**
**Executive Vice President and Chief Financial Officer**

Exhibit 32

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

The certification set forth below is being submitted in connection with the Quarterly Report of The Western Union Company on Form 10-Q for the period ended September 30, 2014 (the "Report") for the purpose of complying with Rule 13a-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

Hikmet Ersek and Rajesh K. Agrawal certify that, to the best of each of their knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of The Western Union Company.

Date:  October 30, 2014                           /s/  Hikmet Ersek
                                                  **Hikmet Ersek**
                                                  **President and Chief Executive Officer**

Date:  October 30, 2014                           /s/  Rajesh K. Agrawal
                                                  **Rajesh K. Agrawal**
                                                  **Executive Vice President and Chief Financial Officer**