# Exhibit 23

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

_____

# Form 10-Q
_____

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the quarterly period ended March 31, 2012

or

☐ **TRANSITION REPORT PURSUANT TO   SECTION 13 OR 15(d) OF THE   SECURITIES EXCHANGE ACT OF 1934**
For the transition period from          to

Commission File Number: 001-32903
_____

# THE WESTERN UNION COMPANY
**(Exact name of registrant as specified in its charter)**
_____

| | |
|---|---|
| **DELAWARE** | **20-4531180** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **12500 EAST BELFORD AVENUE** | **80112** |
| **ENGLEWOOD, CO** | **(Zip Code)** |
| (Address of Principal Executive Offices) | |

**Registrant's telephone number, including area code (866) 405-5012**
_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes  ☑    No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes  ☑    No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  ☑        Accelerated filer  ☐        Non-accelerated filer  ☐        Smaller reporting company  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes  ☐    No  ☑

As of April 27, 2012, 612,951,394 shares of our common stock were outstanding.

PART II
OTHER INFORMATION

**Item 1. Legal Proceedings**

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California seeking documents relating to Shen Zhou International (US Shen Zhou), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and is currently awaiting trial in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. The Company has cooperated fully with the government's investigation into US Shen Zhou. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

In the fourth quarter of 2011, Western Union received Civil Investigative Demands from certain state attorneys general who have initiated an investigation into whether the Company took adequate steps to help prevent consumer fraud from 2010 to 2011. The Civil Investigative Demands seek information and documents relating to consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, we could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices, that could have a material adverse effect on our business, financial condition, and results of operations.

On July 26, 2010, U.F.C.W. Local 1776 & Participating Employers Pension Fund filed a Verified Shareholder Double Derivative Complaint and Jury Demand in United States District Court for the District of Colorado, alleging that the Company's Board of Directors failed to appropriately oversee the Company's compliance program, particularly in regard to the alleged deficiencies which resulted in the Company's agreement and settlement with the State of Arizona and other states in early 2010. In addition to naming the Company's Board members as individual defendants, the complaint names the Company and its subsidiary Western Union Financial Services, Inc. as nominal defendants. The complaint seeks damages from the individual defendants for breach of fiduciary duty and waste of corporate assets and an order requiring various corrective measures. On September 10, 2010, the United States District Court for the District of Colorado dismissed the complaint for lack of subject matter jurisdiction. On September 23, 2010, the plaintiff re-filed the complaint in Maricopa County Superior Court in Arizona. The complaint was removed to the United States District Court for the District of Arizona. On September 29, 2011, the Court denied Defendants' motion to dismiss on jurisdictional grounds. On December 15, 2011, the Company and Western Union Financial Services, Inc. filed a Notice of Settlement. The terms of the settlement are set forth in a Memorandum of Understanding attached to the Notice of Settlement and include corporate governance changes that the Company and Western Union Financial Services, Inc. have agreed to make relating to anti-money laundering monitoring. The Memorandum of Understanding also indicates that the individual defendants deny any wrongdoing or liability with respect to the plaintiff's claims and that the settlement does not constitute an admission of liability of wrongdoing by any party. None of the defendants will be required to pay monetary damages. The plaintiff's counsel is seeking attorney's fees and expenses from the Company not to exceed $850,000. Defendants have agreed not to oppose the amount of a requested fee and expense award up to that amount. The settlement and the attorney's fee and expense award are subject to the approval of the United States District Court for the District of Arizona.

In the second quarter of 2009, the Antitrust Division of the United States Department of Justice ("DOJ") served one of the Company's subsidiaries with a grand jury subpoena requesting documents in connection with an investigation into money transfers, including related foreign exchange rates, from the United States to the Dominican Republic from 2004 through the date of subpoena. The Company is cooperating fully with the DOJ investigation. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

The Company is a party to a variety of legal proceedings that arise in the normal course of our business. While the results of these legal proceedings cannot be predicted with certainty, management believes that the final outcome of these proceedings will not have a material adverse effect on the Company's results of operations or financial condition.

**Item 1A. Risk Factors**

There have been no material changes to the risk factors described in our 2011 Annual Report on Form 10-K, except as described below.

***Western Union is the subject of governmental investigations and consent agreements with or enforcement actions by regulators.***

In the second quarter of 2009, the Antitrust Division of the United States Department of Justice ("DOJ") served one of our subsidiaries with a grand jury subpoena requesting documents in connection with an investigation into money transfers, including related foreign exchange rates, from the United States to the Dominican Republic from 2004 through the date of subpoena. The Company is cooperating fully with the DOJ investigation. Due to the stage of the investigation, we are unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against us. Should such charges or claims be brought, we could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on our business, financial condition and results of operations.

On February 11, 2010, we signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The agreement also required us to make payments to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, we have made and expect to make certain investments in and changes to our compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in our programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013. The monitor has made a number of recommendations related to our compliance programs.

We are in the process of making certain changes to our compliance program for transactions from the United States to Mexico, including:

- revisions to agent agreements to increase our ability to oversee the compliance of our agents and subagents;

- reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and

- enhancement of our information systems including migrating customer information for our Western Union, Orlandi Valuta and Vigo brands onto a common database and migrating to a standard point of sale system.

Such changes will likely have an adverse effect on our United States to Mexico business. Any additional changes that we elect or are required to make in the United States to Mexico corridor, or similar changes that we may elect or be required to make in other corridors, could have a material adverse effect on our business, financial condition or results of operations.

Over the past several years, we have entered into consent agreements with federal and state authorities, including FinCEN, the New York Department of Financial Services, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the BSA and anti-money laundering requirements and related consumer identification matters. These agreements required us to pay civil penalties and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law. The consent agreements with the New York Department of Financial Services and the California Department of Financial Institutions were lifted during 2008. However, the financial services industry and businesses like ours continue to be under significant federal and state regulatory scrutiny with respect to the BSA and anti-money laundering compliance matters. It is possible that as a result of periodic examinations or otherwise, we could be subject to deficiency findings, fines, criminal penalties, asset seizures or enforcement actions that could adversely affect our business, financial condition and results of operations.

In the fourth quarter of 2011, Western Union received Civil Investigative Demands from certain state attorneys general who have initiated an investigation into whether the Company took adequate steps to help prevent consumer fraud from 2010 to 2011. The Civil Investigative Demands seek information and documents relating to consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, we could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices that could have a material adverse effect on our business, financial condition, and results of operations.

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California seeking documents relating to Shen Zhou International (US Shen Zhou), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and is currently awaiting trial in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. The Company has cooperated fully with the government's investigation into US Shen Zhou. The Company is unable to predict the outcome of the government's investigation, or the possible loss or range of loss, if any, which could be associated with the resolution of any possible criminal charges or civil claims that may be brought against the Company. Should such charges or claims be brought, the Company could face significant fines, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition and results of operations.

### Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

The following table provides information about the Company's repurchases of shares of the Company's common stock during the first quarter of 2012:

| | Total Number of Shares Repurchased* | Average Price Paid per Share | Total Number of Shares Repurchased as Part of Publicly Announced Plans or Programs** | Remaining Dollar Value of Shares that May Yet Be Repurchased Under the Plans or Programs (in millions) |
|---|---|---|---|---|
| January 1 - 31 | 222 | $ 18.26 | — | $ 615.5 |
| February 1 - 29 | 2,703,206 | $ 17.79 | 2,477,800 | $ 571.5 |
| March 1 - 31 | 5,813,100 | $ 17.66 | 5,813,100 | $ 468.8 |
| Total | 8,516,528 | $ 17.70 | 8,290,900 | |

_____

\* These amounts represent both shares authorized by the Board of Directors for repurchase under a publicly announced plan, as described below, as well as shares withheld from employees to cover tax withholding obligations on restricted stock awards and units that have vested.

\*\* On February 1, 2011, the Board of Directors authorized $1 billion of common stock repurchases through December 31, 2012, of which $468.8 million remains available as of March 31, 2012. Management has historically and may continue to establish prearranged written plans pursuant to Rule 10b5-1. A Rule 10b5-1 plan permits the Company to repurchase shares at times when the Company may otherwise be prevented from doing so, provided the plan is adopted when the Company is not aware of material non-public information.

### Item 3. Defaults Upon Senior Securities

None.

### Item 4. Mine Safety Disclosures

Not applicable.

### Item 5. Other Information

None.

### Item 6. Exhibits

See "Exhibit Index" for documents filed herewith and incorporated herein by reference.

**Exhibit 15**

**Letter from Ernst & Young LLP Regarding Unaudited Interim Financial Information**

The Board of Directors and Stockholders of The Western Union Company

We are aware of the incorporation by reference in the following Registration Statements:

(1)  Registration Statements (Form S-3 Nos. 333-170967 and 333-170410) of The Western Union Company, and

(2)  Registration Statement (Form S-8 No. 333-137665) pertaining to The Western Union Company 2006 Long-Term Incentive Plan, The Western Union Company 2006 Non-Employee Director Equity Compensation Plan, and The Western Union Company Supplemental Incentive Savings Plan;

of our report dated May 1, 2012 relating to the unaudited condensed consolidated interim financial statements of The Western Union Company that are included in its Form 10-Q for the quarter ended March 31, 2012.

/s/ Ernst & Young LLP

Denver, Colorado
May 1, 2012

**Exhibit 31.1**

## CERTIFICATIONS

I, Hikmet Ersek, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2012

/s/ HIKMET ERSEK
**Hikmet Ersek**
**President and Chief Executive Officer**

**Exhibit 31.2**

## CERTIFICATIONS

I, Scott T. Scheirman, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of The Western Union Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2012

/s/ Scott T. Scheirman
**Scott T. Scheirman**
**Executive Vice President, Chief Financial Officer and Global Operations**

Exhibit 32

# CERTIFICATIONS

The certification set forth below is being submitted in connection with the Quarterly Report of The Western Union Company on Form 10-Q for the period ended March 31, 2012 (the "Report") for the purpose of complying with Rule 13a-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

Hikmet Ersek and Scott T. Scheirman certify that, to the best of each of their knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of The Western Union Company.

Date:  May 1, 2012                                                                          /s/   Hikmet Ersek
                                                                                                         **Hikmet Ersek**
                                                                                      **President and Chief Executive Officer**

Date: May 1, 2012                                                                           /s/   Scott T. Scheirman
                                                                                                      **Scott T. Scheirman**
                                                         **Executive Vice President, Chief Financial Officer and Global Operations**