# Exhibit 25

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 10-Q

---

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2016**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 001-32903**

# THE WESTERN UNION COMPANY

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **DELAWARE**<br>**(State or Other Jurisdiction of Incorporation or Organization)** | **20-4531180**<br>**(I.R.S. Employer Identification No.)** |
| **12500 EAST BELFORD AVENUE**<br>**ENGLEWOOD, CO**<br>**(Address of principal executive offices)** | **80112**<br>**(Zip Code)** |

**Registrant's telephone number, including area code: (866) 405-5012**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐ (Do not check if a smaller reporting company) Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of October 28, 2016, 484,855,170 shares of the registrant's common stock were outstanding.

No non-recurring fair value adjustments were recorded during the three and nine months ended September 30, 2016 and 2015.

*Other Fair Value Measurements*

The carrying amounts for many of the Company's financial instruments, including cash and cash equivalents, settlement cash and cash equivalents, and settlement receivables and settlement obligations approximate fair value due to their short maturities. The Company's borrowings are classified as Level 2 of the valuation hierarchy, and the aggregate fair value of these borrowings was based on quotes from multiple banks and excluded the impact of related interest rate swaps. Fixed rate notes are carried in the Company's Condensed Consolidated Balance Sheets at their original issuance values as adjusted over time to accrete that value to par, except for portions of notes hedged by these interest rate swaps, as disclosed in Note 8. As of September 30, 2016, the carrying value and fair value of the Company's borrowings was $3,224.8 million and $3,328.0 million, respectively (see Note 9). As of December 31, 2015, the carrying value and fair value of the Company's borrowings was $3,215.9 million and $3,279.6 million, respectively.

The Company's investments in foreign corporate debt securities are classified as held-to-maturity securities within Level 2 of the valuation hierarchy and are recorded at amortized cost in "Other Assets" in the Company's Condensed Consolidated Balance Sheets. As of September 30, 2016, the carrying value and fair value of the Company's foreign corporate debt securities was $44.8 million and $44.9 million, respectively. As of December 31, 2015, the carrying value and fair value of the Company's foreign corporate debt securities was $9.3 million.

**4. Commitments and Contingencies**

*Letters of Credit and Bank Guarantees*

The Company had approximately $180 million in outstanding letters of credit and bank guarantees as of September 30, 2016 that are primarily held in connection with safeguarding consumer funds, lease arrangements, and certain agent agreements. The letters of credit and bank guarantees have expiration dates through 2021, with many having a one-year renewal option. The Company expects to renew the letters of credit and bank guarantees prior to expiration in most circumstances.

*Litigation and Related Contingencies*

The Company is subject to certain claims and litigation that could result in losses, including damages, fines and/or civil penalties, which could be significant, and in some cases, criminal charges. The Company regularly evaluates the status of legal matters to assess whether a loss is probable and reasonably estimable in determining whether an accrual is appropriate. Furthermore, in determining whether disclosure is appropriate, the Company evaluates each legal matter to assess if there is at least a reasonable possibility that a loss or additional loss may have been incurred and whether an estimate of possible loss or range of loss can be made. Unless otherwise specified below, the Company believes that there is at least a reasonable possibility that a loss or additional loss may have been incurred for each of the matters described below. For certain of these matters, management is unable to provide a meaningful estimate of the possible loss or range of loss because, among other reasons: (a) the proceedings are in preliminary stages; (b) specific damages have not been sought; (c) damage claims are unsupported and/or unreasonable; (d) there is uncertainty as to the outcome of pending appeals or motions; (e) there are significant factual issues to be resolved; or (f) novel legal issues or unsettled legal theories are being asserted.

*State of Arizona Settlement Agreement*

On February 11, 2010, Western Union Financial Services, Inc. ("WUFSI"), a subsidiary of the Company, signed a settlement agreement ("Southwest Border Agreement"), which resolved all outstanding legal issues and claims with the State of Arizona (the "State") and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the U.S. and Mexico border, in which California, Texas and New Mexico are participating with the State. As part of the Southwest Border Agreement, the Company has made and expects to make certain investments in its anti-money laundering ("AML") compliance programs along the U.S. and Mexico border and a monitor (the "Monitor") has been engaged for those programs. The Company has incurred, and expects to continue to incur, significant costs in connection with the Southwest Border Agreement. The Monitor has made a number of primary and secondary recommendations related to WUFSI's AML compliance programs, which WUFSI has implemented or is implementing, including programs related to the Company's Business Solutions segment.

On January 31, 2014, the Southwest Border Agreement was amended to extend its term until December 31, 2017 (the "Amendment"). The Amendment imposes additional obligations on the Company and WUFSI in connection with WUFSI's AML compliance programs and cooperation with law enforcement. In particular, the Amendment requires WUFSI to continue implementing the primary and secondary recommendations made by the Monitor, and includes, among other things, timeframes for implementing such primary and secondary recommendations. Under the Amendment, the Monitor could make additional primary recommendations until January 1, 2015 and may make additional secondary recommendations until January 31, 2017. After these dates, the Monitor may only make additional primary or secondary recommendations, as applicable, that meet certain requirements as set forth in the Amendment.

WUFSI implemented all of the primary recommendations prior to October 31, 2015. On June 29, 2016, the Monitor notified WUFSI and the State that the Monitor had determined that (i) WUFSI had successfully implemented all of the primary recommendations, and (ii) WUFSI has implemented an effective AML compliance program along the U.S. and Mexico border. On July 27, 2016, the Monitor delivered its final report for the primary recommendations period and the Superior Court of Arizona in and for Maricopa County accepted the report. Accordingly, the State cannot pursue any remedies under the Southwest Border Agreement with respect to the primary recommendations.

The Amendment also provides until June 30, 2017 for implementation of the secondary recommendations, and provides a deadline of December 31, 2017 for the Monitor to issue a report evaluating implementation of the secondary recommendations. If the Monitor concludes in that report that WUFSI has not implemented an effective AML compliance program along the U.S. and Mexico border, the State cannot assert a willful and material breach of the Southwest Border Agreement but may require WUFSI to pay $25 million (the "Secondary Period Remedy"). There is no monetary penalty associated with secondary recommendations that were classified as such on the date of the Amendment or any new secondary recommendations that the Monitor makes after the date of the Amendment. There are currently 15 such secondary recommendations and groups of secondary recommendations.

The Amendment requires WUFSI to continue funding the Monitor's reasonable expenses in $500,000 increments as requested by the Monitor. The Amendment also requires WUFSI to make a one-time payment of $250,000, which was paid in March 2014, and thereafter $150,000 per month for five years from the date of the Amendment to fund the activities and expenses of a money transfer transaction data analysis center formed by WUFSI and a Financial Crimes Task Force comprised of federal, state and local law enforcement representatives, including those from the State. In addition, California, Texas, and New Mexico are participating in the money transfer transaction data analysis center.

The changes in WUFSI's AML compliance program required by the Southwest Border Agreement, including the Amendment, and the Monitor's recommendations have had, and will continue to have, adverse effects on the Company's business, including additional costs. The Company is unable at this stage to predict whether the Monitor will conclude at the end of the timeframe for implementing the secondary recommendations that WUFSI has successfully implemented the secondary recommendations and has an effective AML compliance program, and, accordingly, whether the State will pursue the Secondary Period Remedy.

**THE WESTERN UNION COMPANY**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

*United States Department of Justice Investigations*

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO-CDCA") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO-CDCA seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's AML compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government.

In March 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Eastern District of Pennsylvania ("USAO-EDPA") seeking documents relating to Hong Fai General Contractor Corp. (formerly known as Yong General Construction) ("Hong Fai"), a former Western Union agent located in Philadelphia, Pennsylvania. Since March 2012, the Company has received additional subpoenas from the USAO-EDPA seeking additional documents relating to Hong Fai. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government. The government has interviewed several current and former Western Union employees. In March 2016, the government filed a criminal complaint against the principal of Hong Fai General Contractor Corp. and in June 2016, he pled guilty to one count of mail fraud, two counts of transporting illegal aliens and one count of tax evasion in violation of United States federal law in U.S. v. Yong Quan Zheng (2:16-cr-00212-AB E. D. Pa.).

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union's agent suspension and termination policies. The government has interviewed several current and former employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government has indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government.

On March 6, 2014, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL") seeking a variety of AML compliance materials, including documents relating to the Company's AML, Bank Secrecy Act ("BSA"), Suspicious Activity Report ("SAR") and Currency Transaction Report procedures, transaction monitoring protocols, BSA and AML training programs and publications, AML compliance investigation reports, compliance-related agent termination files, SARs, BSA audits, BSA and AML-related management reports and AML compliance staffing levels. The subpoena also calls for Board meeting minutes and organization charts. The period covered by the subpoena is January 1, 2007 to November 27, 2013. Since March 6, 2014, the Company has received seizure warrants and additional subpoenas from the USAO-SDFL seeking documents relating to certain Western Union agents in, and certain transactions to, specified countries. The government advised the Company that it is investigating concerns the Company was aware there were gaming transactions being sent to Panama, Nicaragua, Haiti, Philippines, Vietnam, the Dominican Republic, Peru, Antigua, the Bahamas, and Costa Rica and that the Company failed to take proper steps to stop the activity. The government has also notified the Company that it is a target of the investigation. The government has interviewed several current and former Western Union employees. The government's investigation is ongoing and the Company may receive additional requests for information or seizure warrants as part of the investigation. The Company has provided and continues to provide information and documents to the government.

Table of Contents

THE WESTERN UNION COMPANY

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

The Company anticipates entering into discussions with the United States Department of Justice to potentially resolve the four investigations described immediately above. Due to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters, or reasonably estimate the possible loss or range of loss, if any, which could be associated with the potential resolution of these matters or with any possible charges or claims that may be brought against the Company in connection with them. Should such charges or claims be brought, or should the Company reach a resolution of these matters with the United States Department of Justice, the Company could face significant fines, payments, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows.

THE WESTERN UNION COMPANY

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

*Federal Trade Commission Investigation*

The Company has had discussions with the United States Federal Trade Commission (the "FTC") regarding the Company's consumer protection and anti-fraud programs. On December 12, 2012, the Company received a civil investigative demand from the FTC requesting that the Company produce (i) all documents relating to communications with the Monitor appointed pursuant to the Southwest Border Agreement, including information the Company provided to the Monitor and any reports prepared by the Monitor; and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011. On April 15, 2013, the FTC filed a petition in the United States District Court for the Southern District of New York requesting an order to compel production of the requested documents. On June 6, 2013, the Court granted in part and denied in part the FTC's request. On August 14, 2013, the FTC filed a notice of appeal. On August 27, 2013, Western Union filed a notice of cross-appeal. On February 21, 2014, the Company received another civil investigative demand from the FTC requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004, except for documents that were already produced to the FTC in response to the first civil investigative demand. On October 7, 2014, the United States Court of Appeals for the Second Circuit entered a summary order reversing in part and vacating and remanding in part the June 6, 2013 order entered by the United States District Court for the Southern District of New York. On October 22, 2014, the Company received another civil investigative demand issued by the FTC requesting documents and information since January 1, 2004 relating to the Company's consumer fraud program, its policies and procedures governing agent termination, suspension, probation and reactivation, its efforts to comply with its 2005 agreement with 47 states and the District of Columbia regarding consumer fraud prevention, and complaints made to the Company by or on behalf of consumers concerning fraud-induced money transfers that were sent to or from the United States, excluding complaint-related documents that were produced to the FTC in response to the earlier civil investigative demands. The civil investigative demand also seeks various documents concerning approximately 720 agents, including documents relating to the transactions they sent and paid and the Company's investigations of and communications with them. On July 31, 2015, the Company received another civil investigative demand requesting documents and information relating to the total number of agent and subagent locations in 13 countries annually since 2010, the average and median dollar values for money transfers sent anywhere in the world annually since 2010, copies of the Company's anti-fraud programs, know your agent policy, know your customer policy, representative agent contracts, transaction data, background investigation documents and fraud complaints associated with four agents in Greece, Peru and Mexico and consumer fraud reports not already produced to the FTC. The Company has responded to each of the civil investigative demands it has received from the FTC and may receive additional civil investigative demands. In the second quarter of 2016, the FTC advised the Company of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers. Since that time, the Company has engaged in discussions with the FTC seeking to reach an appropriate resolution of this matter. The FTC staff has advised the Company that it believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004. The Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof, but has continued to engage in discussions with the FTC in an effort to reach an appropriate resolution of this matter. As of September 30, 2016, the Company adjusted its accrual to $30 million, based on its recent offer towards a proposed resolution and upon other facts and circumstances known to the Company. Due to the stage of the discussions, the Company is unable to predict the possible range of additional loss exceeding the amount already accrued for this matter. There can be no assurance that the Company will reach an agreement with the FTC and the amount of any loss ultimately incurred in relation to this matter may be substantially higher than the amount currently accrued. The FTC staff has advised the Company that it will request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company. Should the Company enter into a settlement agreement with the FTC, or if the FTC files a complaint against the Company, the Company could be required to make significant restitution and/or other payments and changes to its programs, any of which separately or combined could have a material adverse effect on the Company's business, financial condition and results of operations. If the FTC files a complaint against the Company, the Company intends to defend itself vigorously.

THE WESTERN UNION COMPANY

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

*Other Matters*

Since 2011, Western Union has received several civil investigative demands from a group of state attorneys general in connection with an investigation into the adequacy of the Company's consumer protection efforts. The civil investigative demands sought information and documents relating to money transfers sent from the United States to certain countries, consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. The Company has provided and continues to provide information and documents to the attorneys general. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or reasonably estimate the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, the Company could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices, that could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows.

The Company and one of its subsidiaries are defendants in two purported class action lawsuits: James P. Tennille v. The Western Union Company and Robert P. Smet v. The Western Union Company, both of which are pending in the United States District Court for the District of Colorado. The original complaints asserted claims for violation of various consumer protection laws, unjust enrichment, conversion and declaratory relief, based on allegations that the Company waits too long to inform consumers if their money transfers are not redeemed by the recipients and that the Company uses the unredeemed funds to generate income until the funds are escheated to state governments. The Tennille complaint was served on the Company on April 27, 2009. The Smet complaint was served on the Company on April 6, 2010. On September 21, 2009, the Court granted the Company's motion to dismiss the Tennille complaint and gave the plaintiff leave to file an amended complaint. On October 21, 2009, Tennille filed an amended complaint. The Company moved to dismiss the Tennille amended complaint and the Smet complaint. On November 8, 2010, the Court denied the motion to dismiss as to the plaintiffs' unjust enrichment and conversion claims. On February 4, 2011, the Court dismissed the plaintiffs' consumer protection claims. On March 11, 2011, the plaintiffs filed an amended complaint that adds a claim for breach of fiduciary duty, various elements to its declaratory relief claim and WUFSI as a defendant. On April 25, 2011, the Company and WUFSI filed a motion to dismiss the breach of fiduciary duty and declaratory relief claims. WUFSI also moved to compel arbitration of the plaintiffs' claims and to stay the action pending arbitration. On November 21, 2011, the Court denied the motion to compel arbitration and the stay request. Both companies appealed the decision. On January 24, 2012, the United States Court of Appeals for the Tenth Circuit granted the companies' request to stay the District Court proceedings pending their appeal. During the fourth quarter of 2012, the parties executed a settlement agreement, which the Court preliminarily approved on January 3, 2013. On June 25, 2013, the Court entered an order certifying the class and granting final approval to the settlement. Under the approved settlement, a substantial amount of the settlement proceeds, as well as all of the class counsel’s fees, administrative fees and other expenses, would be paid from the class members' unclaimed money transfer funds, which are included within "Settlement obligations" in the Company's Condensed Consolidated Balance Sheets. These fees and other expenses are currently estimated to be approximately $50 million. During the final approval hearing, the Court overruled objections to the settlement that had been filed by several class members. In July 2013, two of those class members filed notices of appeal. On May 1, 2015, the United States Court of Appeals for the Tenth Circuit affirmed the District Court’s decision to overrule the objections filed by the two class members who appealed. On January 11, 2016, the United States Supreme Court denied petitions for certiorari that were filed by the two class members who appealed. On February 1, 2016, pursuant to the settlement agreement and the Court's June 25, 2013 final approval order, Western Union deposited the class members' unclaimed money transfer funds into a class settlement fund, from which class member claims, administrative fees and class counsel’s fees, as well as other expenses will be paid. On November 6, 2013, the Attorney General of California notified Western Union of the California Controller’s position that Western Union’s deposit of the unclaimed money transfer funds into the class settlement fund pursuant to the settlement “will not satisfy Western Union’s obligations to report and remit funds” under California’s unclaimed property law, and that “Western Union will remain liable to the State of California” for the funds that would have escheated to California in the absence of the settlement. The State of Pennsylvania and District of Columbia have previously expressed similar views. Other states have also recently expressed concerns about the settlement and many have not yet expressed an opinion. Since some states and jurisdictions believe that the Company must escheat its full share of the settlement fund and that the deductions for class counsel's fees, administrative costs, and other expenses that are required under the settlement agreement are not permitted, there is a reasonable possibility a loss could result up to approximately the amount of those fees and other expenses. However, given the number of jurisdictions involved and the fact that no actions have been brought, the Company is unable to provide a more precise estimate of the range of possible loss.

## PART II

## OTHER INFORMATION

### Item 1. Legal Proceedings

*United States Department of Justice Investigations*

On March 20, 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Central District of California ("USAO-CDCA") seeking documents relating to Shen Zhou International ("US Shen Zhou"), a former Western Union agent located in Monterey Park, California. The principal of US Shen Zhou was indicted in 2010 and in December 2013, pled guilty to one count of structuring international money transfers in violation of United States federal law in U.S. v. Zhi He Wang (SA CR 10-196, C.D. Cal.). Concurrent with the government's service of the subpoena, the government notified the Company that it is a target of an ongoing investigation into structuring and money laundering. Since March 20, 2012, the Company has received additional subpoenas from the USAO-CDCA seeking additional documents relating to US Shen Zhou, materials relating to certain other former and current agents and other materials relating to the Company's anti-money laundering ("AML") compliance policies and procedures. The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government.

In March 2012, the Company was served with a federal grand jury subpoena issued by the United States Attorney’s Office for the Eastern District of Pennsylvania ("USAO-EDPA") seeking documents relating to Hong Fai General Contractor Corp. (formerly known as Yong General Construction) ("Hong Fai"), a former Western Union agent located in Philadelphia, Pennsylvania. Since March 2012, the Company has received additional subpoenas from the USAO-EDPA seeking additional documents relating to Hong Fai. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government. The government has interviewed several current and former Western Union employees. In March 2016, the government filed a criminal complaint against the principal of Hong Fai General Contractor Corp. and in June 2016, he pled guilty to one count of mail fraud, two counts of transporting illegal aliens and one count of tax evasion in violation of United States federal law in U.S. v. Yong Quan Zheng (2:16-cr-00212-AB E. D. Pa.).

On November 25, 2013, the Company was served with a federal grand jury subpoena issued by the United States Attorney’s Office for the Middle District of Pennsylvania ("USAO-MDPA") seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008. Concurrent with the government's service of the subpoena, the government notified the Company that it is the subject of the investigation. Since November 25, 2013, the Company has received additional subpoenas from the USAO-MDPA seeking documents relating to certain Western Union agents and Western Union’s agent suspension and termination policies. The government has interviewed several current and former employees and has served grand jury subpoenas seeking testimony from several current and former employees. The government has indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012. The government's investigation is ongoing and the Company may receive additional requests for information as part of the investigation. The Company has provided and continues to provide information and documents to the government.

On March 6, 2014, the Company was served with a federal grand jury subpoena issued by the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL") seeking a variety of AML compliance materials, including documents relating to the Company's AML, Bank Secrecy Act ("BSA"), Suspicious Activity Report ("SAR") and Currency Transaction Report procedures, transaction monitoring protocols, BSA and AML training programs and publications, AML compliance investigation reports, compliance-related agent termination files, SARs, BSA audits, BSA and AML-related management reports and AML compliance staffing levels. The subpoena also calls for Board meeting minutes and organization charts. The period covered by the subpoena is January 1, 2007 to November 27, 2013. Since March 6, 2014, the Company has received seizure warrants and additional subpoenas from the USAO-SDFL seeking documents relating to certain Western Union agents in, and certain transactions to, specified countries. The government advised the Company that it is investigating concerns the Company was aware there were gaming transactions being sent to Panama, Nicaragua, Haiti, Philippines, Vietnam, the Dominican Republic, Peru, Antigua, the Bahamas, and Costa Rica and that the Company failed to take proper steps to stop the activity. The government has also notified the Company that it is a target of the investigation. The government has interviewed several current and former Western Union employees. The government's investigation is ongoing and the Company may receive additional requests for information or seizure warrants as part of the investigation. The Company has provided and continues to provide information and documents to the government.

The Company anticipates entering into discussions with the United States Department of Justice to potentially resolve the four investigations described immediately above. Due to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters, or reasonably estimate the possible loss or range of loss, if any, which could be associated with the potential resolution of these matters or with any possible charges or claims that may be brought against the Company in connection with them. Should such charges or claims be brought, or should the Company reach a resolution of these matters with the United States Department of Justice, the Company could face significant fines, payments, damage awards or regulatory consequences which could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows.

*Federal Trade Commission Investigation*

The Company has had discussions with the United States Federal Trade Commission (the "FTC") regarding the Company's consumer protection and anti-fraud programs. On December 12, 2012, the Company received a civil investigative demand from the FTC requesting that the Company produce (i) all documents relating to communications with the monitor (the "Monitor") appointed pursuant to the agreement and settlement (the "Southwest Border Agreement") Western Union Financial Services, Inc. entered into with the State of Arizona on February 11, 2010, as amended, including information the Company provided to the Monitor and any reports prepared by the Monitor; and (ii) all documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2011. On April 15, 2013, the FTC filed a petition in the United States District Court for the Southern District of New York requesting an order to compel production of the requested documents. On June 6, 2013, the Court granted in part and denied in part the FTC's request. On August 14, 2013, the FTC filed a notice of appeal. On August 27, 2013, Western Union filed a notice of cross-appeal. On February 21, 2014, the Company received another civil investigative demand from the FTC requesting the production of all documents relating to complaints made to the Company by or on behalf of consumers relating to fraud-induced money transfers that were sent from or received in the United States since January 1, 2004, except for documents that were already produced to the FTC in response to the first civil investigative demand. On October 7, 2014, the United States Court of Appeals for the Second Circuit entered a summary order reversing in part and vacating and remanding in part the June 6, 2013 order entered by the United States District Court for the Southern District of New York. On October 22, 2014, the Company received another civil investigative demand issued by the FTC requesting documents and information since January 1, 2004 relating to the Company’s consumer fraud program, its policies and procedures governing agent termination, suspension, probation and reactivation, its efforts to comply with its 2005 agreement with 47 states and the District of Columbia regarding consumer fraud prevention, and complaints made to the Company by or on behalf of consumers concerning fraud-induced money transfers that were sent to or from the United States, excluding complaint-related documents that were produced to the FTC in response to the earlier civil investigative demands. The civil investigative demand also seeks various documents concerning approximately 720 agents, including documents relating to the transactions they sent and paid and the Company’s investigations of and communications with them. On July 31, 2015, the Company received another civil investigative demand requesting documents and information relating to the total number of agent and subagent locations in 13 countries annually since 2010, the average and median dollar values for money transfers sent anywhere in the world annually since 2010, copies of the Company’s anti-fraud programs, know your agent policy, know your customer policy, representative agent contracts, transaction data, background investigation documents and fraud complaints associated with four agents in Greece, Peru and Mexico and consumer fraud reports not already produced to the FTC. The Company has responded to each of the civil investigative demands it has received from the FTC and may receive additional civil investigative demands. In the second quarter of 2016, the FTC advised the Company of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers. Since that time, the Company has engaged in discussions with the FTC seeking to reach an appropriate resolution of this matter. The FTC staff has advised the Company that it believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC’s belief that fraud-induced money transfers are underreported by consumers, dating back to 2004. The Company strongly disagrees with the FTC’s assertions regarding its potential liability and any scope thereof, but has continued to engage in discussions with the FTC in an effort to reach an appropriate resolution of this matter. As of September 30, 2016, the Company adjusted its accrual to $30 million, based on its recent offer towards a proposed resolution and upon other facts and circumstances known to the Company. Due to the stage of the discussions, the Company is unable to predict the possible range of additional loss exceeding the amount already accrued for this matter. There can be no assurance that the Company will reach an agreement with the FTC and the amount of any loss ultimately incurred in relation to this matter may be substantially higher than the amount currently accrued. The FTC staff has advised the Company that it will request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company. Should the Company enter into a settlement agreement with the FTC, or if the FTC files a complaint against the Company, the Company could be required to make significant restitution and/or other payments and changes to its programs, any of which separately or combined could have a material adverse effect on the Company’s business, financial condition and results of operations. If the FTC files a complaint against the Company, the Company intends to defend itself vigorously.

*Other Governmental Investigations*

Since 2011, Western Union has received several civil investigative demands from a group of state attorneys general in connection with an investigation into the adequacy of the Company's consumer protection efforts. The civil investigative demands sought information and documents relating to money transfers sent from the United States to certain countries, consumer fraud complaints that the Company has received and the Company's procedures to help identify and prevent fraudulent transfers. The Company has provided and continues to provide information and documents to the attorneys general. Due to the stage of the investigation, the Company is unable to predict the outcome of the investigation, or reasonably estimate the possible loss or range of loss, if any, which could be associated with any possible civil claims that might be brought by one or more of the states. Should such claims be brought, the Company could face significant fines, damage awards, or regulatory consequences, or compulsory changes in our business practices, that could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows.

*Shareholder Actions*

On January 13, 2014, Natalie Gordon served the Company with a Verified Shareholder Derivative Complaint and Jury Demand that was filed in District Court, Douglas County, Colorado naming the Company's President and Chief Executive Officer, one of its former executive officers, one of its former directors, and all but one of its current directors as individual defendants, and the Company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty and gross mismanagement against all of the individual defendants and unjust enrichment against the President and Chief Executive Officer and the former executive officer based on allegations that between February 12, 2012 to October 30, 2012, the individual defendants made or caused the Company to issue false and misleading statements or failed to make adequate disclosures regarding the effects of the Southwest Border Agreement, including regarding the anticipated costs of compliance with the Southwest Border Agreement, potential effects on business operations, and Company projections. Plaintiff also alleges that the individual defendants caused or allowed the Company to lack requisite internal controls, caused or allowed financial statements to be misstated, and caused the Company to be subject to the costs, expenses and liabilities associated with City of Taylor Police and Fire Retirement System v. The Western Union Company, et al., a lawsuit that was subsequently renamed and dismissed. Plaintiff further alleges that the Company's President and Chief Executive Officer and the former executive officer received excessive compensation based on the allegedly inaccurate financial statements. On March 12, 2014, the Court entered an order granting the parties' joint motion to stay proceedings in the case during the pendency of certain of the shareholder derivative actions described below.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**The Western Union Company (Registrant)**

| | | | |
|---|---|---|---|
| Date: | November 1, 2016 | By: | /s/ Hikmet Ersek<br>**Hikmet Ersek**<br>**President and Chief Executive Officer (Principal Executive Officer)** |
| Date: | November 1, 2016 | By: | /s/ Rajesh K. Agrawal<br>**Rajesh K. Agrawal**<br>**Executive Vice President and Chief Financial Officer (Principal Financial Officer)** |
| Date: | November 1, 2016 | By: | /s/ Amintore T.X. Schenkel<br>**Amintore T.X. Schenkel**<br>**Senior Vice President, Chief Accounting Officer and Controller (Principal Accounting Officer)** |