# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-00474-KLM
    Consolidated with 1:17-cv-00648-KLM

LAWRENCE HENRY SMALLEN AND LAURA ANNE SMALLEN REVOCABLE LIVING
TRUST, individually and on behalf of all others similarly situated, and
UA LOCAL 13 PENSION FUND, individually and on behalf of all others similarly situated,

       Plaintiffs,

vs.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
RAJESH K. AGRAWAL, and
BARRY KOCH,

       Defendants.

---

## PLAINIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE
## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

---

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................ 8

      A.    Overview of Western Union's Business ................................................ 8

      B.    Western Union's Compliance Failures ............................................... 11

      C.    Western Union's Compliance Failures Existed Through the Joint Settlement..... 15

      D.    Defendants' Knowledge of Western Union's Compliance Failures.................... 18

      E.    Western Union Falsely Professed Its Commitment to Anti-Fraud and AML
            Compliance During the Class Period ................................................... 23

      F.    Defendants Ersek and Agrawal, and Other High-Level Executives, Profited From
            Selling Stock Before the Joint Settlement was Disclosed .................................... 25

III.  ARGUMENT ................................................................................................... 25

      A.    This Action Raises New Issues that Have Not Been Addressed Before ............. 26

      B.    The Complaint Adequately Alleges Misrepresentations and Omissions............. 27

            1.    Statements of Legal Compliance ................................................. 27

            2.    Statements Touting Western Union's Compliance Practices ................... 32

            3.    Statements Describing Ongoing Government Investigations................... 38

            4.    Statements Explaining Increased Compliance Expenditures................... 42

      C.    The Complaint Adequately Alleges False and Misleading Statements by
            Defendant Koch ............................................................................... 44

      D.    The Complaint Adequately Identifies False and Misleading Statements ............ 46

      E.    The Complaint Adequately Alleges Scienter ...................................... 49

            1.    Red Flags Alerted Defendants to Western Union's Compliance Problems
                  ................................................................................................. 51

            2.    Defendants' Awareness of Compliance Failures Discussed in the Joint
                  Settlement ................................................................................. 55

            3.    Defendants were Aware of the Progress of Ongoing Government
                  Investigations ............................................................................. 57

            4.    The Individual Defendants' Positions at the Company Further Support the
                  Strong Inference that they were Aware of the Information Produced to the
                  Government................................................................................. 61

            5.    Viewing All of the Evidence Holistically Supports a Strong Inference of
                  Scienter ..................................................................................... 64

            6.    The Complaint Adequately Alleges Corporate Scienter on Behalf of
                  Western Union ........................................................................... 66

            7.    Defendants' Motives Further Support a Strong Inference of Scienter ..... 68

F.      The Complaint Adequately Alleges Claims Under Section 20(a) ........................ 70

IV.     CONCLUSION ................................................................................................................. 72

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acito v. IMCERA Grp.*,
   47 F.3d 47 (2d Cir. 1995)..........................................................................40

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ............................................................. *passim*

*Anderson v. Spirit AeroSys. Holdings, Inc.*,
   105 F. Supp. 3d 1246 (D. Kan. 2015)...............................................43, 44

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) .......................................................62, 67

*Aronstein v. Thompson Creek Metals Co.*,
   No. 15-cv-00204, 2016 U.S. Dist. LEXIS 187313 (D. Colo. Sept. 15, 2016)...........................5

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................26

*Better v. YRC Worldwide, Inc.*,
   No. 11-2072-KHV, 2012 U.S. Dist. LEXIS 136749 (D. Kan. Sep. 25, 2012).................36, 37

*Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012)......................................................36

*Christine Asia Co. v. Yun Ma*,
   No. 16-2519-cv, 2017 U.S. App. LEXIS 24647 (2d Cir. Dec. 5, 2017)................................62

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ..............................................................62

*City of Pontiac Gen. Empls. Ret. Sys. v. Wal-Mart Stores*, No. 12-CV-5162,
   2014 U.S. Dist. LEXIS 136165 (W.D. Ark. Sep. 26, 2014)........................................... *passim*

*Corporate Stock Transfer, Inc. v. AE Biofuels, Inc.*,
   663 F. Supp. 2d 1056 (D. Colo. Oct. 13, 2009).......................................................5

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ...................................................................35

*Flynn v. Sientra, Inc.*,
   No. CV 15-07548, 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) .........................49

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................................70

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ....................................................................................... 28, 67

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) .................................................................................... 30, 37

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000) ..........................................................................................64

*In re Adaptive Broadband Sec. Litig.*,
    2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002) .................................................................61

*In re Am. Apparel S'holder Litig.*,
    NO. CV 10-06352, 2013 U.S. Dist. LEXIS 189797 (C.D. Cal. Aug. 8, 2013) ......................28

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ............................................................................................30

*In re Barrick Gold Sec. Litig.*,
    2015 U.S. Dist. LEXIS 43053 (S.D.N.Y. Apr. 1, 2015) ......................................................28

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................................... 56, 65

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) ..............................................................................7, 67

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ............................................................................. 29, 33

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ............................................................................ 58, 59

*In re EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) .................................................................................34

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................................................40

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ..................................................................................48

*In re ITT Educ. Servs.*,
    34 F. Supp. 3d 298 (S.D.N.Y. 2014) .......................................................................... *passim*

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. Mar. 28, 2005) ...........................................................7, 51, 66

*In re Level 3 Communs. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ..................................................................................36, 48

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................................40

*In re Molycorp, Inc. Sec. Litig.*,
    157 F. Supp. 3d 987 (D. Colo. 2016)......................................................................61, 62, 67

*In re Nevsun Res. Ltd.*,
    No. 12-cv-1845, 2013 U.S. Dist. LEXIS 162048 (S.D.N.Y. Sept. 27, 2013) ..................32, 50

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ..........................................................................................7, 67

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ..................................................................................28, 31, 32

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015).......................................................................20, 31, 36

*In re Quality Sys.*,
    865 F.3d 1130 (9th Cir. 2017) ................................................................................30, 34, 37

*In re Qwest Communs. Int'l, Inc. Secs. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004)........................................................................50, 61

*In re SemGroup Energy Partners, L.P.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010),
    *reconsideration granted in part on other grounds*, 729 F. Supp. 2d 1276 ..................... *passim*

*In re Silvercorp Metals Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)..................................................................................67

*In re Sprint Corp. Sec. Litig.*,
    232 F. Supp. 2d 1193 (D. Kan. 2002)..............................................................29, 32, 34, 35

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005).......................................................................39, 65, 66

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................................64

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    No. 2672 CRB, 2017 U.S. Dist. LEXIS 112977 (N.D. Cal. July 19, 2017)...........................35

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
No. 2672 CRB, 2017 U.S. Dist. LEXIS 1109 (N.D. Cal. Jan. 4, 2017) ..................7, 8, 61, 67

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1242 (N.D. Okl. 2003)............................................................................48, 49

*In re Zagg Sec. Litig.*,
797 F.3d 1194 (10th Cir. 2015) .............................................................................................65

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006)...................................................................................37

*Lieblein v. Ersek*,
No. 14-cv-00144-MSK-KLM, 2017 U.S. Dist. LEXIS 160864 (D. Colo. Sep.
29, 2017) ................................................................................................................................26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
797 F.3d 160 (2d Cir. 2015)............................................................................................7, 67

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)...................................................................................29, 30, 32

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) ................................................................................. *passim*

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)..................................................................................................50

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
135 S. Ct. 1318 (2015)..............................................................................................31, 32, 41

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
No. 15 Civ. 7199, 2016 U.S. Dist. LEXIS 138439 (S.D.N.Y. Oct. 5, 2016) .........................28

*Pirraglia* v. *Novell*,
339 F.3d 1182 (10th Cir. 2003) .............................................................................................69

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .................................................................................................62

*Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)...................................................................................................30

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)..............................................................................................5, 51

*SBM Site Servs., LLC v. Severin*,
No. 10-cv-762, 2010 U.S. Dist. LEXIS 112256 (D. Colo. Oct. 20, 2010) ..............................5

*Schott v. Nobilis Health Corp.*,
    211 F. Supp. 3d 936 (S.D. Tex. 2016) ................................................................65

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .........................................................................29, 32

*SEB Asset Mgmt. S.A. v. Western Union Company*,
    No. 13-cv-03325, 2015 U.S. Dist. LEXIS 131387 (D. Colo. Sep. 29, 2015)...................26, 37

*SEPTA v. Orrstown Fin. Servs.*,
    No. 1:12-cv-00993, 2016 U.S. Dist. LEXIS 14947 (M.D. Pa. Feb. 8, 2016).........................58

*Simmons Invs., Inc. v. Conversational Computing Corp.*,
    No. 09-CV-2345 EFM, 2011 U.S. Dist. LEXIS 15962 (D. Kan. Feb. 17, 2011)....................37

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ....................................................................................61

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................25, 49, 50, 69

*Touchtone Grp., LLC v. Rink*,
    913 F. Supp. 2d 1063 (D. Colo. 2012).....................................................................64

*U.S. v. Ahidley*,
    486 F.3d 1184 (10th Cir. 2007) .................................................................................5

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013).....................................................................70

*Villella v. Chem. Mining Co. of Chile Inc.*,
    No. 15-cv-2106 (ER), 2017 U.S. Dist. LEXIS 45501 (S.D.N.Y. 2017).................................31

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    2008 U.S. Dist. LEXIS 47748 (D. Colo. Mar. 28, 2008) .................................48, 49

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................62

## Statutes & Rules

Bank Secrecy Act...........................................................................................9, 13, 28

FTC Act .............................................................................................................13, 29, 39

PSLRA .........................................................................................................25, 30, 47, 49

Telemarketing Sales Rule ..............................................................................................13, 29, 39

Fed. R. Civ. P. Rule 9(b)..............................................................................................................25

Fed. R. Civ. P. 10(c) ...................................................................................................................48

Fed. R. Civ. P. Rule 12(b)(6) ................................................................................................20, 25

Lead Plaintiff Lawrence Henry Smallen and Laura Anne Smallen Revocable Living Trust, on its behalf and on behalf of all other persons similarly situated ("Plaintiff"), respectfully submits this memorandum in opposition to The Western Union Company ("Western Union" or the "Company"), Hikmet Ersek, Scott T. Scheirman, Rajesh Agrawal, and Barry Koch's (collectively, "Defendants") Motions to Dismiss the Consolidated Amended Class Action Complaint (the "Complaint").[1]

## I.     INTRODUCTION

On January 19, 2017, the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") announced that Western Union agreed to pay $586 million and admitted to criminal violations to settle charges related to fundamental flaws in the Company's anti-money laundering ("AML") and anti-fraud compliance programs (the "Joint Settlement").  This penalty amounted to the largest forfeiture ever by a money services business.  Shortly thereafter, Western Union reached an agreement with the attorneys general of 49 states and the District of Columbia to settle charges arising out of the same compliance failures.  The Company's stock price fell over ten percent between the announcements of the Joint Settlement and the settlement with the states.

Western Union admitted to the DOJ that this liability was for "a flawed corporate culture," including because of "Western Union's failure to implement proper controls and discipline agents."  ¶131.[2]  Western Union prioritized profits ahead of compliance by knowingly rewarding high-earning agents "without regard to the blatant lack of compliance and illegal

---

[1] On January 16, 2018, Defendants Western Union, Hikmet Ersek, Scott T. Scheirman, and Rajesh Agrawal filed a brief in support of their Joint Motion to Dismiss.  ("Defs. Br.," Dkt. No. 54).  In addition, Defendant Barry Koch filed a brief in support of his separate Motion to Dismiss in which he "fully support[ed]" the other Defendants' Joint Motion to Dismiss and made additional arguments concerning himself.  ("Koch Br.," Dkt. No. 56, at 2).  Plaintiff submits this brief in opposition to both Motions to Dismiss.

[2] Unless otherwise indicated, ¶_ references paragraphs of the Complaint.

practices taking place." *Id.* These agents were complicit in laundering at least hundreds of millions of dollars of funds used for human smuggling, drug trafficking, and other serious crimes. In addition, the FTC determined that Western Union "knew that a massive fraud was afoot and had the ability to address it, but chose to look the other way." ¶134. Evidence that the FTC reviewed through October 2015 showed that the Company "had rarely, if ever, terminated agent locations for fraud in certain high-risk countries . . . despite high levels of fraud and indications of complicity at agent locations." ¶224. According to the FTC, billions of dollars of fraudulent payments were sent through Western Union's systems since 2004. Both the DOJ and FTC determined that Western Union's knowing failure to discipline agents was the result of *systemic* failures in the Company's AML and anti-fraud programs.

Defendants cannot deny—indeed, they are legally required to accept—the facts that Western Union admitted in its deferred prosecution agreement with the DOJ (the "DPA"). Faced with these clearcut admissions, Defendants challenge the timing of Western Union's compliance failures and of their knowledge of that misconduct. Both of these tactics fail.

**Timing of Western Union's Compliance Failures.** Defendants claim that Western Union's systemic compliance failures stopped at the end of 2012 because that is the last date of their admitted wrongdoing in the DPA. But that is not the end of the story. The FTC included extensive factual findings in its complaint against Western Union that is part of the Joint Settlement (the "FTC Complaint"). These findings were based on substantial evidence through October 2015. Nor did the FTC determine that Western Union's compliance failures abated after that point at which its factual investigation concluded.

Defendants claim that the FTC's post-2012 allegations relate to isolated incidents rather than "structural" compliance failures. (Defs. Br. at 21-22). In fact, however, the FTC did not

distinguish between pre- and post-2012 conduct in the way that Defendants claim.  The Complaint here alleges several structural flaws that the FTC identified based on its review of evidence through October 2015.  For example, among other compliance problems, Western Union failed to: "adopt adequate and effective policies and procedures to detect and prevent fraud-induced money transfers" and "to adhere to its own anti-fraud and AML programs, policies, and procedures"; promptly investigate and discipline agents that repeatedly violated anti-fraud and AML laws and the Company's policies; conduct adequate due diligence on its agents; effectively train, monitor, and review its agents; and adequately record transaction information.  ¶135.  In addition, the FTC determined that "[e]ven in the face of obvious evidence that many of its own agents were complicit, Western Union ignored it while pocketing massive cash."  ¶134.  Overall, the FTC determined that "[i]n some cases Western Union has failed to adopt adequate and effective policies and procedures to detect and prevent fraud-induced money transfers."  ¶135.  The FTC's confidence in these facts, among other evidence described below, easily satisfies Plaintiff's burden to plausibly allege that Western Union's compliance failures extended through the announcement of the Joint Settlement, and certainly through late 2015.

More fundamentally, Defendants mischaracterize efforts to improve Western Union's compliance practices as complete solutions.  Even if the Company began making improvements in late 2012—which was already seven months into the Class Period—such deep-seated problems could not be cured overnight.  Those efforts did not mean (and nothing in the Joint Settlement found) that Western Union's compliance practices spontaneously went from being so flawed to adhering to all applicable laws and being an industry-leading program.  It was therefore false and misleading for Defendants to portray Western Union's compliance practices so positively when such drastic changes were still needed to avoid the material risk of sanctions

for illegal conduct.   Western Union's settlement with the DOJ reflects a highly negotiated agreement in which the Company took the extraordinary step of admitting willful criminal violations related to its blatant failure to 1 – maintain an adequate AML program and 2 – discipline agents that were complicit in consumer fraud.   Based on the FTC Complaint, as well as other evidence described below, the conclusion that Western Union's systemic compliance failures continued until the announcement of the Joint Settlement in 2017 is far more plausible than Defendants' contention that those problems suddenly ceased at the end of 2012.

Furthermore, regardless of when the underlying fraudulent misconduct stopped, investors continued to be misled up until the 2017 announcement of the Joint Settlement.   Defendants failed to disclose the Company's fundamental flaws that created the high risk of unprecedented sanctions for a money services business.   This failure to disclose is evidenced by the fact that the New York State's Department of Financial Services ("NYDFS") recently fined Western Union an additional $60 million—on top of the $586 million paid in the Joint Settlement—because even after Western Union became aware in the course of the DOJ's investigation of:

> the full scope of the misconduct by such high-volume New York agents in early 2015, the Company waited approximately two years to fully disclose this information to the Department. . .   [I]nstead, the Company provided to the Department only non-specific reports that merely cited the pendency of federal investigations identified in the Company's public filings with the U.S. Securities and Exchange Commission."

(Declaration of Michael Grunfeld ("Grunfeld Decl.") Ex. 1 (NYDFS Consent Order) ¶¶5, 60).   It stands to reason that if a government agency determined that it had been misled by the Company's failure in its SEC filings to adequately disclose its exposure, so too were investors. The Court may take judicial notice of the information in this publicly available legal document that arose after the Complaint here was filed, particularly because it relates to a governmental

consent order with Western Union.[3]

     ***Timing of Defendants' Knowledge.***  In addition to challenging the "when"—rather than "whether"—of Western Union's compliance failures, Defendants challenge whether the Complaint adequately alleges that they knew of those material flaws.  The Complaint's scienter allegations are based on several sources.  These include materials from meetings of the Company's Board of Directors that the Individual Defendants attended; Western Union's admissions and FTC's findings in the Joint Settlement that the Company knew of the compliance failures at issue; many red flags that the Joint Settlement identifies that alerted Western Union to its fundamental compliance problems for years leading up to, and into, the Class Period; the progress of the government investigations that led to the Joint Settlement; and statements by confidential witnesses showing the types of information that the Individual Defendants reviewed.

     For example, a June 2012 Governance Committee presentation discussed the government's "[i]ncreased attention to US/China Agent base which continues to present challenge[s]."  ¶252.  One of these agents, who was responsible sending over $300 million in laundered funds used for crimes such as human trafficking, was even discussed at a Board meeting that Defendant Ersek attended in 2010. ¶¶196, 251.  Board materials also discussed an internal Fraud Policy Report that described an agent engaging in precisely the types of suspicious practices identified by the Joint Settlement as obvious signs of fraud.

     Viewing this wide array of sources holistically, as is required under the law, these facts

---

[3] *See U.S. v. Ahidley*, 486 F.3d 1184, 1192 n. 5 (10th Cir. 2007) (taking "take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand"); *Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (granting plaintiff's request for judicial notice of filing in another lawsuit made after the operative complaint); *SBM Site Servs., LLC v. Severin*, No. 10-cv-762-WDM-MJW, 2010 U.S. Dist. LEXIS 112256, at *9-10 (D. Colo. Oct. 20, 2010).  At the very least, this new information is a basis amending the Complaint.  *Corporate Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d 1056, 1059-61, 1064-67 (D. Colo. Oct. 13, 2009); *Aronstein v. Thompson Creek Metals Co.*, No. 15-cv-00204, 2016 U.S. Dist. LEXIS 187313, at *2-3, 7-16 (D. Colo. Sept. 15, 2016).

raise a strong inference that each of the Individual Defendants knew of or recklessly disregarded Western Union's compliance failures since the beginning of the Class Period (or during their tenures at the Company).   Moreover, the Complaint raises an even stronger inference that Defendants knew of, or turned a blind eye to, Western Union's compliance failures as the government's investigations progressed.   Western Union produced documents and made witnesses available to the DOJ and FTC in the course of these investigations.   Those materials formed the basis for the Joint Settlement's findings.   For example, internal reports that aggregated and analyzed consumer fraud complaints made it "obvious" that an easily identifiable subset of agents were responsible for the vast majority of the fraudulent transactions that Western Union facilitated.   ¶¶134, 160, 163.   The Individual Defendants—Western Union's CEO, CFOs, and Chief Compliance Officer—would have been apprised of these significant transmittals to the DOJ and FTC.   And because they were on notice of Western Union's compliance failures based on the many prior regulatory actions that Western Union faced and discussions of compliance problems during Board meetings, the Individual Defendants either realized the scope of the misconduct or recklessly turned a blind eye to the red flags in those documents.   All they would have had to do to learn that information would have been to ask the person coordinating Western Union's response to the government's investigations.

All of these facts taken as a whole make it equally if not more plausible that at some point early in the Class Period, and certainly well before the announcement of the Joint Settlement in January 2017, a "tipping point" of critical information was presented or available, and that the Individual Defendants became sufficiently aware of or recklessly disregarded the Company's significant compliance failures that posed a serious and predictable material risk of substantial government sanctions.   That is all that the law requires.   *See In re ITT Educ. Servs.*,

34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014) (holding the court need not "identify the precise moment at which the culpable inference overtook the innocent one"); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. Mar. 28, 2005) (holding that "[p]laintiffs need not allege 'the exact date and time' when defendants became aware of [contrary] information" as long as they "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged").

This evidence also raises a strong inference of "corporate scienter". First, Defendants acknowledge that Western Union faces "corporate liability" for the willful criminal violations that it admitted to DOJ through 2012. (Defs. Br. at 1). Second, the FTC concluded that Western Union was aware of the compliance failures identified in the Company's internal reports and records through October 2015. Third, NYDFS determined that it had been misled by the Company's failure to adequately disclose the underlying wrongdoing in its jurisdiction. Fourth, the high-ranking corporate official in charge of Western Union's response to the ongoing government investigations would have been aware of the evidence that the Company produced to the DOJ, FTC, and state attorneys general during the Class Period. That individual's scienter is attributable to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, 797 F.3d 160, 177 (2d Cir. 2015) (holding corporate scienter may be pled by alleging "either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by [sufficiently knowledgeable] corporate officials"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) (holding "the individual making an alleged misstatement and the one with scienter do not have to be one and the same"); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB

(JSC), 2017 U.S. Dist. LEXIS 1109, at *839 (N.D. Cal. Jan. 4, 2017).

## II.    STATEMENT OF FACTS

### A.    Overview of Western Union's Business

Western Union is the largest company in the world that provides money transfer services. ¶35.  This case centers on compliance problems in the Company's core consumer-to-consumer segment, which involves money transfers between individuals.   ¶34.   That segment is the Company's primary business line, representing at least $4.3 billion in annual revenues during the Class Period.  *Id.*

The Company's business model centers on a worldwide network of over 500,000 agents in more than 200 countries and territories around the world.  ¶38.  These agents are the public face of Western Union's business.  They are the parties that interact with customers when they send and receive funds through Western Union's money transfer system.   Western Union advertises that it has locations "around every corner" that are staffed by "knowledgeable agents" and that it offers "fast, convenient, and safe" money transfer services.  ¶39.

As Western Union acknowledges, this business model is ripe for compliance abuses such as money laundering and consumer fraud.  (Defs. Br. at 20, 50).  Federal regulators, including the United States Treasury Department, Department of Justice, and Department of Homeland Security, have warned that "[m]oney transmitters remain a particularly attractive vehicle for money laundering due to several inherent characteristics of the industry."   ¶54.   Criminals engage in money laundering to hide the proceeds of other serious crimes, such as terrorism, human trafficking, drugs deals, and organized crime.  ¶59.  Similarly, the FTC explained specifically in connection with Western Union that "money transfers have increasingly become the payment method of choice for scams that prey on consumers around the world."  ¶55.

Because of the known risks associated with Western Union's business model, the Company has repeatedly acknowledged in its annual Form 10-K, filed with the SEC and signed by Defendants Ersek and (depending on the timing) Scheirman or Agrawal, that federal and state regulators hold Western Union accountable for the conduct of its agents.  ¶43.  Western Union therefore faces criminal and civil liability, and the threat that essential business licenses may be revoked, if its agents use Western Union's money transfer systems to violate the law.  *Id.*

Several regimes are designed to prevent money laundering and consumer fraud.  In the United States, Western Union is subject to federal and state AML laws, including the Patriot Act and the Bank Secrecy Act ("BSA"), as well as federal and state consumer protection laws designed to protect consumers from fraud.  ¶¶53-75.  These laws impose requirements on how Western Union must oversee and monitor its vast network of agents.  For example, under the BSA and parallel state laws, Western Union is required to maintain an effective AML program that includes risk-based compliance measures.  ¶60.  The Company must therefore establish internal policies, procedures, and controls to guard against money laundering by identifying potentially illegal transactions and taking action in response to risky or suspicious behavior.  *Id.* These AML rules and regulations also require that Western Union conduct risk-based due diligence and monitoring of its agents; screen for "structured" transactions that seek to evade reporting requirements; and discipline agents that present an unreasonable risk of money laundering.  ¶¶61-67.  Consumer protection rules also impose legal obligations on Western Union related to the conduct of its agents, including that the Company not support certain parties that the Company "knows or consciously avoids knowing" are violating consumer protection rules.  ¶¶69-75.  As will be described further below, the Joint Settlement makes clear that Western Union failed to meet these legal obligations before and during the Class Period.

Defendant Ersek has been Western Union's Chief Executive Officer and President since September 2010 and a Member of its Board of Directors since April 2010. ¶26.  He joined the Company in 1999 and served in senior management roles until he was appointed CEO.  Ersek has stated that Western Union's "culture of compliance" is particularly important because of the life-changing benefits to individuals that receive remittances from its migrant customers.  ¶48.

Defendant Scheirman served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from September 2006 until December 31, 2013.  ¶27.  He then served as a "Senior Advisor" until February 28, 2014.  Scheirman reported directly to Ersek and was responsible for internal audits at the Company.  He was also responsible for Global Operations from January 2012 through November 2012.  *Id.*  On November 14, 2013, Western Union announced that Defendant Scheirman would be resigning as CFO without any explanation for his departure.  ¶¶506-08.  Defendant Agrawal stepped in for Scheirman and has served as the Company's CFO since January 2014.  ¶28.  Agrawal previously held other senior positions at the Company and has been an Executive Vice President since November 2011.  *Id.*  Defendants Ersek, Scheirman, and Agrawal signed SOX Certifications included with all of the Company's quarterly and annual SEC filings during their tenures as CEO and CFO during the Class Period.

Defendant Barry Koch served as Western Union's Chief Compliance Officer from May 2013 until late 2015.  ¶29.  Koch was responsible for the Company's compliance practices and reported to the Compliance Committee of its Board of Directors.  *Id.*  During his tenure at the Company, Defendant Koch regularly spoke at publicly advertised industry conferences where he portrayed Western Union as an industry leader by discussing best practices for compliance programs and combating human trafficking.  ¶247.  As will be described further below, each of the Individual Defendants attended Board meetings during the Class Period at which the

Company's compliance failures were discussed.

**B.      Western Union's Compliance Failures**

On January 19, 2017, the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and the U.S. Attorney's Offices for the Middle District of Pennsylvania ("MDPA"), the Central District of California ("CDCA"), the Eastern District of Pennsylvania ("EDPA"), and the Southern District of Florida ("SDFL," collectively, "DOJ"), the FTC, and the Financial Crimes Enforcement Network ("FinCEN") announced the Joint Settlement.  ¶126.  A settlement with the attorneys general of 49 states and the District of Columbia arising out of these same issues followed shortly thereafter.  ¶127.  Western Union agreed to pay $586 million—the largest forfeiture ever imposed on a money services business— in connection with the Joint Settlement with federal regulators and an additional $5 million to the states.  ¶128.  As part of these settlements, Western Union agreed to undertake comprehensive remedial measures to fix its compliance problems.  ¶129.

The Joint Settlement highlights the scope of Western Union's compliance failures.  DOJ called the Joint Settlement an "historic agreement, involving the largest financial forfeiture by a money service business."  ¶131.  Western Union admitted that it willfully "fail[ed] to develop, implement, and maintain an effective anti-money laundering program" and "admitted to a flawed corporate culture that failed to provide a checks and balances approach to combat criminal practices."  ¶¶8, 131.  The Company's failure to implement proper controls and discipline agents allowed agents to facilitate—and be complicit in—money laundering involving human smuggling and drug trafficking, as well as fraudulent schemes.  *Id.*

Overall, Western Union exhibited a "blatant disregard" for AML compliance responsibilities.  *Id.*  Western Union admitted that it failed to discipline agents that it knew sent

a high volume of transactions from the U.S. to China ('"China Corridor Agents") that repeatedly violated AML laws and Western Union policy.  ¶¶183-90.  The China Corridor is particularly known as an avenue for human trafficking.  ¶184.  Even when the Company's systems caught agents allowing money laundering or consumer fraud, senior executives and high-level managers ignored this information and allowed these bad actors to continue their criminal activity because the Company profited from these agents' substantial business.  *See, e.g.*, ¶¶11, 192-202, 223; *see also* ¶131, Ex. 2 to Defs. Motion ("FTC Complaint") ¶67.[4]  For example, in June 2010, Western Union's President of the Americas told the Company's CEO at the time that "[w]e are trying to save" a high-value agent that Compliance employees raised concerns about because the agent accepted a bag of $80,000 in cash and made up false transactions.  ¶¶198-99.  Other agents that facilitated money laundering were allowed to remain open into the Class Period because Sales employees protected them from being disciplined.  ¶¶186, 195, 199, 200.

Furthermore, the FTC determined that Western Union failed to implement effective anti-fraud and AML programs "to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system."  ¶¶9, 13, 136, 152.  As a result of these failures, "as of October 2015, Western Union had rarely, if ever, terminated agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at agent locations."  ¶224.  The FTC determined that Western Union "*knew* that a massive fraud was afoot and had the ability to address it, but chose to look the other way."  ¶134 (emphasis added).  Western Union's awareness was based on (a) the Company's internal records, reports, and analyses identifying particularly problematic agents, (b) the hundreds of thousands of

---

[4] The exhibits that Defendants include with their Joint Motion to Dismiss (Dkt. No. 57) are referenced herein as Defs. Ex. _.

consumer fraud complaints that the Company received between January 1, 2004 and August 29, 2015; (c) years of warnings from government agencies throughout the world; (d) the arrests of many agents since 2007 for being complicit in defrauding customers; and (e) employee recommendations that high-level managers ignored.  ¶¶133, 136-37, 254.  The FTC determined that between 2004 and August 2015, billions of dollars in fraudulent transactions were sent through Western Union's systems.  ¶¶103-04.

The DOJ's and FTC's actions against Western Union were based on the following violations of AML and anti-fraud laws:  1 – willfully aiding and abetting wire fraud from 2004 through December 2012 (which Western Union admitted it was guilty of); 2 – willfully failing to maintain an effective AML program as required by the BSA  from 2004 through December 2012 (which Western Union admitted it was guilty of); 3 – engaging in unfair acts or practices in violation of Section 5 of the FTC Act; and 4 – engaging in deceptive telemarketing in violation of the Telemarketing Sales Rule.  ¶139.

Western Union's agents that were complicit in or facilitated consumer fraud were "easily identifiable" based on several types of evidence from Western Union's internal reports and other records that it produced to the government.  ¶¶9, 114, 136-37, 162.  First, internal reports highlighted the easily identifiable and distinct subset of agents that were responsible for paying out most of the fraud losses that were reported to the Company.  ¶¶160-65.  Second, these internal reports alerted the Company to transactions that displayed suspicious factors indicative of fraud.  These signs included data integrity issues relating to agents that failed to properly record recipient information; payouts within minutes after money transfers were sent; "flipping" (*i.e.*, funds being sent shortly after being received); substantial transfers to high-risk countries known for fraud; spikes in the number of transfers received; and amounts that far exceed the

13

average transfer amount; among other indicia of fraud.  ¶¶166, 179-182.  Third, Western Union's internal documents show that consumer fraud complaints can be grouped into several categories of common scams, such as family emergencies targeted at grandparents.  Consumers reported at least tens of thousands of each of these schemes through August 2015.  ¶157.  Defendants obfuscate the issue by claiming that not all suspicious, or even fraudulent, transactions involve complicit or delinquent agents.  (Defs. Br. at 20-21, 44 n.39, 46).  This ignores the fact that Western Union admitted to DOJ, and the FTC determined, that the Company was aware of problematic agents based on this obvious evidence from Western Union's internal reports.[5]

Defendants also try to minimize Western Union's malfeasance by characterizing the bad acts of its agents, and the employees that looked the other way, as isolated incidents of "employee-level misconduct".  (*See* Defs. Br. at 21-22, 40, 46-47 n.40).  But the Complaint makes clear that the Joint Settlement addresses *systemic* problems that resulted in the failure to maintain an effective AML and anti-fraud program.  ¶¶132, 135, 139.  These systemic flaws include Western Union's failure to:  "adequately develop, implement and maintain effective policies, procedures, and internal controls to discipline" agents that repeatedly violated AML and anti-fraud laws and the Company's policies; conduct adequate due diligence on its agents; implement effective policies and procedures for the filing of suspicious activity reports identifying agents as suspicious actors; effectively train its agents; effectively monitor and review its agents; adequately record transaction information; and take effective action to control illegal gambling.  ¶¶132-33, 135, 186, 191, 203, 217-25.  Western Union also did not keep

---

[5] Defendants also argue that only a small portion of Western Union's overall transactions or total pool of agents involved fraud or money laundering.  (Defs. Br. at 16 n.10 and 17-18).  But Defendants do not try to claim that the compliance violations identified by the Joint Settlement are not material as a matter of law.  Nor could they because those violations resulted in the largest forfeiture ever by a money services business.  The proportion of Western Union's transactions that constituted money laundering or fraud is therefore irrelevant.

adequate records of consumer fraud complaints and failed to warn consumers of obvious signs of fraud.  ¶225.  Even after Western Union identified problematic agents based on its internal data, the Company's compliance procedures were not designed to adequately investigate and discipline those agents.  ¶181; *see also* ¶¶176-77, 202, 223.  In addition, in the years leading up to the Class Period, and through at least 2012, the Company consciously rejected specific compliance measures that would have prevented substantial amounts of fraudulent transactions. ¶¶173-74, 205-16.

The extent of Western Union's failure to discipline its agents is demonstrated by an October 2012 incident where a 74-year-old victim tried to report fraud.  A Company employee told this customer "that she was 'wasting [her] time' reporting the fraud because 'there are thousands of these complaints laying on the desk and nothing gets done.'"  ¶178.

## C.   Western Union's Compliance Failures Existed Through the Joint Settlement

Defendants attempt to downplay the compliance failures disclosed in the Joint Settlement by claiming that these problems ended in 2012.  (Defs. Br. at 17-22, 39, 43-44).  This misreads the clear language of the settlement documents.  The FTC found that Western Union's internal reports *through October 2015* identified agents whose fraudulent practices were "obvious" and "easily identifiable."   ¶¶14, 134, 149, 160, 163, 167(d), 224, 545.   Moreover, the FTC determined that "between January 1, 2004 and *August 29, 2015*, Western Union received at least 550,928" consumer fraud complaints and facilitated "billions of dollars in fraud-induced payments."  ¶104 (emphasis added).   Nor did the FTC find that Western Union's practices improved after October 2015.  Rather, information through October 2015 was the most recent factual data that the FTC incorporated into its review.  ¶¶14, 149.

Furthermore, the FTC determined that through 2015, Western Union not only identified

bad agents in its internal reports, but affirmatively reviewed those agents and decided not to discipline them.   ¶¶167, 175.   For example, "in 2014, company executives approved the reactivation of [an agent that was reviewed for fraud many times between 2010 and 2014] despite being informed that confirmed and potential fraud, as well as suspicious activity, amounted to approximately 54% of the agent's pay volume."  Defs. Ex. 2 (FTC Compl.) ¶97.

Nor does it matter that Western Union might have improved certain aspects of its compliance program since 2012.  (*See* Defs. Br. at 21).  The systemic failures identified by the FTC are based on the evidence that the FTC reviewed through 2015.  ¶¶135, 202, 217-25, 202, 205-08, 212.  One of the FTC's key conclusions was that "as of October 2015, Western Union had rarely, if ever, terminated agent locations for fraud in certain high-risk countries . . . despite high levels of fraud and indications of complicity at agent locations."  ¶14; *see also* ¶¶134, 156-67, 160, 163-67, 224; Defs. Ex. 2 (FTC Compl.) ¶¶73, 96.  The FTC also determined that "since 2012, Western Union still has failed in many cases to promptly suspend and terminate agent locations facilitating fraud."  Defs. Ex. 2 (FTC Compl.) ¶9.  Overall, the FTC concluded based on evidence through October 2015 that "[a]s implemented by Western Union, for many years [the Company's] interrelated [anti-fraud and AML] programs failed to adequately and effectively detect and prevent consumer frauds."  Defs. Ex. 2 (FTC Compl.) ¶¶23-24, 27, 64; *see also* ¶¶134-36, 152.[6]

Defendants curiously minimize the significance of the FTC Complaint because, unlike

---

[6] Defendants also mischaracterize how the FTC described Western Union's compliance steps that it took as of 2012.  These measures were not the unqualified improvements that Defendants describe.  (Defs. Br. at 21).  Rather, Western Union "claimed" in written reports in January 2011 and September 2012 that it "implemented 'a comprehensive anti-fraud program,'" but FTC did not state that it accepted those representations.   Defs. Ex. 2 (FTC Compl.) ¶¶25, 96.  The most that FTC acknowledged was that "since 2012 (*i.e.*, between 2012 and the present), the Company improved limited aspects of its compliance program "as a result of the FTC's investigation" (Defs. Ex. 2 (FTC Compl.) ¶¶9, 26, 96), while the failures identified above remained.

with DOJ, the Company did not admit to FTC's findings and the FTC brought a civil rather than criminal complaint.  (Defs. Br. at 19).  But the FTC's conclusions were based on its extensive review of the "Western Union's internal reports, communications, and other records."  ¶¶114, 137.  These findings are more than sufficient to support a plausible inference that Western Union's anti-fraud and AML compliance problems that the FTC identified continued through the announcement of the Joint Settlement.

Furthermore, although Western Union's agreement with DOJ, reached in January 2017, states that the Company took certain remedial measures since September 2012, DOJ did not find that the Company's anti-fraud and AML compliance programs were adequate as of that time. ¶144; (*see* Defs. Br. at 19).  Even if Western Union began to improve its compliance program, the "blatant" flaws in its program could not be cured overnight.  ¶¶131, 144-48.  The fact that Defendants Ersek and Koch—who the DPA specifically identifies—were personally involved in these steps since late 2012 shows that they knew of the fundamental flaws in those compliance features that needed to be fixed.  Defs. Ex. 1 (DPA) ¶100.

Indeed, as part of the Joint Settlement, Western Union vowed to undertake extensive remedial measures and to be subject to extended monitoring that the government regulators announced in January 2017 would ensure that the Company complies with its AML and anti-fraud legal obligations going forward.  ¶¶140-43 ¶¶140-45, 150-51.  With these new measures, Western Union was finally agreeing to "create a real and strong anti-fraud program" was "chang[ing] the way it conducts business" to ensure that it "effectively controls its agents and prevents the use of its money transfer system for illegal purposes."  ¶150.  Lastly, the $586 million that Western Union forfeited in connection with the Joint Settlement is being used to compensate fraud victims that sent money through Western Union from before the Class Period

all the way until January 19, 2017.  ¶151.

All of these components of the Joint Settlement make the conclusion that Western Union's compliance failures extended through the settlement date more plausible than Defendants' contention that those flaws ceased to exist at the end of 2012.

### D.      Defendants' Knowledge of Western Union's Compliance Failures

Several sources show that Defendants knew, or recklessly avoided knowing, of Western Union's compliance failures during the Class Period.  The specific facts supporting Defendants' scienter will be discussed in the sections below addressing that legal issue.  *See infra* at 49-70. Those facts come from the following sources.

*Red Flags Alerted Defendants to Western Union's Compliance Difficulties.*  Red flags going back several years prior to the Class Period alerted Western Union to compliance problems that the Company faced.  These include "law enforcement agencies in the United States and throughout the world [that] have warned the company for many years that its money transfer system was being used to perpetrate consumer frauds, and that Western Union was not adequately addressing the problem."  Defs. Ex. 2 (FTC Complaint) ¶49.  In addition, Western Union agents have been arrested for fraud and money laundering as far back as 2007.  ¶¶134, 253-54.  Defendants attempt to pick apart the particular details of prior regulatory actions from before and during the Class Period.   (Defs. Br. at 9-12).   But they ignore the FTC's determination that these actions were one of the factors that made Western Union aware "of the consumer fraud problem with its money transfer system."  Defs. Ex. 2 (FTC Compl.) ¶49; *see also* ¶¶116-22, 173-74, 205-08, 226-230.

*Compliance Problems Were Discussed at Board Meetings.*  Each of the Individual Defendants attended Board and Committee meetings during and shortly before the Class Period

at which Western Union's compliance problems were discussed.  ¶¶88-92.[7]  Defendant Ersek attended all of these meetings.  *Id.*  The Complaint and the materials from the meetings themselves that Defendants have included with their Motion show what specifically was addressed at these meetings and which of the Individual Defendants attended them.  ¶¶88-101, 214, 231-46, 251-52; Defs. Exs. 42-86.

Many of these Board materials relate to Western Union's efforts to comply with the Southwest Border Agreement.[8]  Defendants make much of the fact that in July 2016, the Company announced that it completed the primary recommendations of the monitor for the Southwest Border Agreement.  (Defs. Br. at 12, 43).  But that is *over four years* into the Class Period.  Moreover, the Company's compliance efforts in response to the Southwest Border Agreement were expressly limited to the Southwest Border region and did not apply to other "Very High" risk areas.  ¶¶245-46.  Lastly, evidence from these Board materials is significant in the new light of the Joint Settlement.  Board materials discussing 1 – Western Union's insufficient efforts to comply with the Southwest Border Agreement and 2 – other compliance issues separate from the Southwest Border Agreement show Defendants' awareness of the same failures that the Joint Settlement makes clear existed when those meetings took place.

The voluminous Board materials that Defendants provide—spanning 45 exhibits and over 250 pages—do not support their Motion.  Rather, these documents provide additional facts that

---

[7] The Board materials that Defendants have included with their Motion and that are cited above confirm that Defendant Agrawal did in fact attend key meetings where the Company's compliance program was discussed.  (*See* Defs. Br. at 90).  Defendants acknowledge, and the Board materials discussed above show, that Defendant Scheirman also attended relevant Board meetings.  (*See* Defs. Br. at 92-93).  The discussion below of specific meetings specifies which Defendants attended each meeting.

[8] The Southwest Border Agreement arose out of the Arizona Attorney General's investigation into Western Union's compliance practices along the southwest border related to transactions that facilitated human smuggling.  ¶¶84-85.

support the Complaint, as described below. *See infra* at 53-59.[9]   At best, these materials raise

factual issues that cannot be resolved at this stage. *See Tal v. Hogan*, 453 F.3d 1244, 1264-66, &

n. 24 (10th Cir. 2006) (holding that documents that defendants cited did not support their motion

to dismiss because Rule 12(b)(6) motions are not designed to weigh evidence).[10]

> ***Western Union's Internal Reports and Reviews.*** Western Union admitted to DOJ, and

the FTC found, that the Company was aware of its compliance failures based on internal records,

reports, and analyses identifying particularly problematic agents.  ¶¶133, 136-37.  In particular,

Western Union generated reports that analyzed the hundreds of thousands of consumer fraud

complaints that the Company received.  These internal reports showed that discrete and easily

identifiable subsets of agents in various locations were responsible for paying out the majority of

fraud-induced money transfers that contained "obvious" signs of fraud.  Board materials show

that the Individual Defendants saw summaries of information from internal fraud reports that

discussed the types of compliance failures raised by the Joint Settlement.

> ***Compliance Failures Were Identified in the Ongoing Government Investigations.***  The

Joint Settlement was the result of parallel investigations by several U.S. Attorneys offices, the

FTC, state attorneys general, and FinCEN.   These investigations commenced in 2011 and 2012.

¶¶249-51, 258, 278.  Western Union's descriptions in its quarterly and annual SEC filings of the

---

[9] Since Defendants have submitted these documents with their Motion, the Court should consider them in their entirety.  *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378-80 (S.D.N.Y. 2015) (materiality sufficiently pled based on the entirety of testimony at issue).

[10] The selective nature of these documents further shows why they do not support Defendants' Motion. First, these documents are heavily redacted in important places. *See, e.g.*, Defs. Ex. 57 at 8 (redacting compliance "Issue[s] Identified"); Defs. Ex. 83 at 9-10.  Second, Defendants leave out large swaths of key documents.  An AML Risk Assessment discussed in October 2013 includes only three pages of a memo that is well over 16 pages long.  Defs. Ex. 86.  Third, because these materials originated in an earlier case, none are dated past October 2013.  ¶88; Defs. Index of Exs. (Dkt. No. 57).  Even these limited materials, however, show the Individual Defendants discussed or saw information related to the compliance failures at issue here.

government's investigations make clear that the Company provided the government with detailed information—including documents and witness testimony—for the topics covered by the investigations as they progressed during the Class Period.  ¶¶250, 255-59.  Some of these regulators informed Western Union that it was the "target" or the "subject" of their investigations, or raised even more specific concerns as to Western Union's compliance practices.  ¶¶258-79.

The evidence of the compliance failures discussed in the Joint Settlement comes from the documents that Western Union provided to the government in the course of its ongoing investigations.  Several sources show that Defendants were aware of those sources during the Class Period.

First, Board materials show that at least certain of DOJ's investigations were discussed at Board and committee meetings that Defendant Ersek attended before and during the Class Period.  ¶¶251-52.  Similarly, a Compliance Update for the July 19, 2012 meeting of the Audit Committee, attended by Defendants Ersek and Scheirman, noted that the FTC told Western Union on June 19, 2012 of the regulator's "observations regarding areas of weakness in our fraud prevention program."  Defs. Exs. 61 and 62 at 3.  These discussions led to the FTC commencing its formal investigation (which would result in the Joint Settlement) by serving a Civil Investigative Demand on the Company on December 12, 2012.  ¶258.

Second, in January 2018, NYDFS fined Western Union $60 million, in addition to the $586 million Joint Settlement payment, because even after Western Union became aware in the course of the DOJ's investigation that began in 2012 "of the full scope of the misconduct by such high-volume New York agents in early 2015, the Company waited approximately two years to fully disclose this information to the Department."  (Grunfeld Decl. Ex. 1 (NYDFS Consent

Order) ¶¶5, 60 and Ex. 2 (NYDFS Press Release)).  NYDFS's findings were focused on those New York agents because they fall within that regulator's jurisdiction.  But NYDFS's conclusion also shows more generally how Western Union knew of the Joint Settlement's key results before they were publicly disclosed.

Third, all of the red flags discussed above alerted Defendants to Western Union's compliance problems even before the Class Period started.  These warnings came from other regulatory actions, the criminal prosecution of many Western Union agents dating back to 2007, and discussions in Board materials of Compliance problems.  Western Union also acknowledged in SEC filings the importance of its compliance practices to its financial stability.  Given the many warning signs related to an issue of utmost importance to the Company, Defendants' contention that the Individual Defendants failed to keep abreast of the status of the pending investigations into Western Union's compliance practices is not believable.  The inference that they did so—or that they recklessly failed to learn that information—is at least as strong as the opposing inference that they did not know what information the Company was providing to the government throughout the Class Period concerning these crucial topics.  *See infra* at 58-64.

Furthermore, the fact that Western Union provided the government with the information that formed the basis for the Joint Settlement shows, by definition, that the Company was aware of that information.  Senior officers at the Company would undoubtedly have been managing Western Union's response to the various pending investigations.  The knowledge of those individuals is attributable to the Company.  *See infra* at 66-69.

The specific factual details from all of these sources showing that the Individual Defendants were aware of Western Union's compliance failures during the Class Period will be discussed in the sections addressing Defendants' scienter below.

     **E.**      **Western Union Falsely Professed Its Commitment to Anti-Fraud and AML Compliance During the Class Period**

During the Class Period, Defendants consistently touted Western Union's anti-fraud and AML compliance efforts while ignoring the underlying problems in those programs that existed at the time.   In addition, regardless of when Western Union's underlying misconduct stopped, Defendants continued to mislead investors up until the 2017 announcement of the Joint Settlement as to the Company's prior fundamental flaws that created the material risk of substantial monetary sanctions and necessitated significantly increased compliance expenditures. At no point during the Class Period did Defendants disclose 1 – Western Union's current compliance failures; 2 – that Western Union's current and past compliance failures were so severe that they gave rise to the substantial risk of the largest forfeiture ever imposed on a money services business; and 3 – that Western Union's compliance efforts during the Class Period were undertaken in response to the ongoing government investigations rather than because of the positive reasons that Defendants professed.

Defendants made the following types of false and misleading statements throughout the Class Period in SEC filings, on quarterly earnings conference calls, at industry conferences, and in other public forums:[11]

- *Affirmations of Legal Compliance.*  All of Western Union's annual 10-K filings during the Class Period stated that "we believe our fraud prevention efforts are effective and comply with applicable law" and/or "we believe that Western Union is compliant with its regulatory responsibilities" relating to money laundering and other illegal transactions. ¶¶76, 305, 366, 411, 447, 474.

  Defendants Ersek and Scheirman also affirmed Western Union's compliance with AML and anti-fraud laws on conference calls and at industry conferences.  For example, Ersek

---

[11] Each of Western Union's quarterly and annual filings during the Class Period were signed by—and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") from—Defendants Ersek and Scheirman (through Q3 2013) or Agrawal (since the 2013 10-K).  ¶¶309, 319, 345, 355, 370, 379, 393, 403, 415, 421, 430, 440, 450, 454, 463, 469, 477, 484, 490, 494.

stated on July 30, 2013 that "[w]e comply with all regulations world[wide]." ¶388; *see also* ¶¶321-22, 329, 349, 383, 385, 425, 456, 465, 471. Scheirman stated that "we will continue to comply with the letter and the spirit of the law." ¶¶374-75; *see also* ¶386.

- ***Statements Touting Compliance Standards.*** Defendants constantly praised Western Union's AML and anti-fraud compliance practices during the Class Period. Ersek described the Company's "regulatory and AML] capabilities" as ***one of Western Union's four "core strengths"*** that allows consumers to "trust" the Company. ¶¶333-34; *see also* ¶¶336, 385, 388-89, 434, 444. Agrawal made similar statements. ¶¶425-26. Defendant Koch specifically touted the Company's commitment to using its agent network to alert and enable the public to prevent human trafficking. ¶405.

  Defendants also consistently described Western Union as the ***"industry leader"*** in terms of compliance. ¶408 ("We are the industry leader. . .setting your best practices."); ¶423 ("law enforcement are really looking up to us [and] saying. . .you are leading the market"); *see also* ¶¶338, 347, 351, 357, 360, 363, 374-75, 386, 388-89, 395, 398, 436, 442, 456.

  Similarly, Defendants described Western Union's compliance practices as a ***"competitive advantage"*** or as a feature that made Western Union superior to other money transfer services. ¶¶311, 321-23, 328, 337, 381, 388, 417, 423, 432, 459, 465.

- ***Descriptions of Government Investigations.*** Western Union's SEC filings noted the government investigations that would ultimately result in the Joint Settlement, but always stated that they were too preliminary to be able to predict their outcomes "[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought." ¶¶282, 308, 318, 344, 368, 413, 449, 476, 483; *see also* ¶489 (also stating in August 2016 that "[i]f the FTC files a complaint . . . , the Company intends to defend itself vigorously"), ¶493 (adding that "[t]he Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof").

  Defendants also falsely reassured investors when asked specifically about risks from regulatory investigations. They continued to describe Western Union's compliance practices positively and failed to disclose its failures that subjected the Company to unprecedented liability. ¶¶360-61, 326, 374-75, 381, 386, 417.

- ***Defendants Misrepresented the Reason for Western Union's Increased Compliance Expenditures.*** As the Class Period progressed, Western Union was forced to increase its compliance expenditures as a result of the ongoing government investigations into its compliance failures. Rather than acknowledge that this was the reason for the Company's substantial increase in compliance costs, Defendants attributed these expenditures solely to more benign sources, such as the Company's supposedly industry leading compliance standards, increasingly complex regulations, or the Southwest Border Agreement that investors already knew about. ¶¶342, 358, 361, 363, 366, 374, 388, 397-99, 411, 447, 459, 465, 474, 480, 483, 486, 489, 493.

For each of these false and misleading statements, the Complaint states expressly which Defendant made the statement and the specific date when, and forum where, it was made.

### F.     Defendants Ersek and Agrawal, and Other High-Level Executives, Profited From Selling Stock Before the Joint Settlement was Disclosed

Defendant Ersek sold approximately 600,000 shares of Western Union stock at artificially inflated prices during the Class Period, reaping millions of dollars in profit.  ¶285; (Defs. Br. at 75 (acknowledging $3 million in profit)).  Nearly all of Ersek's sales were made in three large transactions between May 2015 and August 2016.  ¶¶286-89.  Other high-level executives sold a total of approximately $10 million in stock between early 2015 and August 2016 after having sold less than $500,000 in stock earlier in the Class Period.  ¶¶290-95 (including Defendant Agrawal's sale of 9,000 shares).  These transactions suggest that Ersek, Agrawal, and others were unloading shares at inflated prices as the government was nearing the end of its investigations that would culminate in the Joint Settlement.

## III.    ARGUMENT

When ruling on a "Rule 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  While Plaintiffs must meet a heightened pleading standard under both Rule 9(b) and the PSLRA, the Tenth Circuit applies a "common sense" test assessing multiple factors to determine whether the facts alleged in a complaint, "taken as a whole," support "a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099, 1102-03 (10th Cir. 2003). A motion to dismiss must be denied where the complaint plausibly articulates the circumstances constituting fraud. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### A.     This Action Raises New Issues that Have Not Been Addressed Before

Defendants cite several times to two earlier actions against Western Union that arose out of the Southwest Border Agreement.   Those cases are not relevant here because they were about that earlier regulatory action and not the Joint Settlement.

One of those cases, *SEB Asset Mgmt. S.A. v. Western Union Company*, was decided long before the Joint Settlement was announced and held that certain statements made after Defendants knew of the potential need to terminate a large number of agents did in fact give rise to a duty to disclose that information.  No. 13-cv-03325, 2015 U.S. Dist. LEXIS 131387, at *38-41 (D. Colo. Sep. 29, 2015).   In the other case, *Lieblein v. Ersek*, the court limited its consideration of the Joint Settlement—which was announced after motion to dismiss briefing was complete—to "the few events that could be said to be timely and relevant to the Plaintiffs' allegations concerning WU's compliance with the" Southwest Border Agreement.  No. 14-cv-00144-MSK-KLM, 2017 U.S. Dist. LEXIS 160864, at *26 (D. Colo. Sep. 29, 2017).

Moreover, *Lieblein* is even further afield because it was a shareholder derivative action that therefore applied a different legal standard.  The plaintiff there was required "to show that when faced with the knowledge that agents were evading AML controls, the Board consciously disregarded that knowledge and failed to take meaningful action."  *Id.* at *26; *see also id.* at *17-18 (assessing whether "WU's management actually undermined the implementation of a legally compliant AML program under the [Southwest Border Agreement]").  The fact that the plaintiff in *Lieblein* did not meet that standard says nothing about whether Defendants committed securities fraud here.   What matters here is whether Defendants accurately described the Company's compliance practices that they knew to be flawed, as well as related issues, regardless of whether they also started trying to fix those failures.  Other differences between this

action and those two prior actions are noted as they relate to the specific topics discussed below.

**B.     The Complaint Adequately Alleges Misrepresentations and Omissions**

Throughout the Class Period, Defendants made several categories of statements related to Western Union's compliance practices.  *See supra* at 23-25.  These statements were false and misleading because they did not accurately describe the Company's compliance practices, omitted current and past compliance failures, and failed to properly describe ongoing government investigations and compliance efforts, among the other reasons described below.

1.     Statements of Legal Compliance

Defendants affirmed throughout the Class Period that Western Union's anti-fraud and AML compliance efforts complied with applicable laws.  Every one of the Company's annual 10-K filings, which were signed by Defendants Ersek and Scheirman or Agrawal, contained an extended description of the importance of these laws.  These discussions included testaments that "we believe our fraud prevention efforts are effective and comply with applicable law" and/or "we believe that Western Union is compliant with its regulatory responsibilities."  ¶¶76-77, 305-06 (2011), 366-67 (2012), 411-12 (2013), 447-48 (2014), 474-75 (2015).  When making these statements, Defendants also described the "wide range" of federal, state, and international AML and anti-fraud laws that applied to Western Union's business.  *Id.*

Defendants also made other statements affirming Western Union's compliance with AML and anti-fraud laws on many conference calls during the Class Period.  For example, Defendant Ersek assured investors during a July 30, 2013 earnings call that "[w]e comply with all regulations world[wide]."  ¶388; *see also* ¶¶321-22, 329, 349, 383, 385, 425, 456, 465, 471 (describing compliance with regulatory systems around the world as one of its main strengths).  On April 30, 2013, when asked about ongoing regulatory actions, Scheirman stated that "we will

continue to comply with the letter and the spirit of the law."  ¶¶374-75; *see also* ¶386.

The law is clear that affirmations of legal compliance give rise to Section 10(b) liability when defendants violate the rules they adopted.  *See In re Omnicare, Inc. Sec. Litig*., 769 F.3d 455, 477-81 (6th Cir. 2014) (holding statements that company "was in material compliance with federal, state, and local laws" were actionable in light of audits showing legal violations); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008) (statements of compliance with securities laws were actionable); *Pirnik v. Fiat Chrysler Automobiles, N.V.,* No. 15 Civ. 7199 (JMF), 2016 U.S. Dist. LEXIS 138439, at *18-19 (S.D.N.Y. Oct. 5, 2016) (holding that plaintiffs "easily" alleged that statements that company was "substantially in compliance with the relevant global regulatory requirements" were actionable); *In re Barrick Gold Sec. Litig.,* 2015 U.S. Dist. LEXIS 43053, at *33-35 (S.D.N.Y. Apr. 1, 2015) (holding that complaint sufficiently alleged material misstatements regarding compliance with environmental rules); *In re Am. Apparel S'holder Litig*., NO. CV 10-06352 MMM (RCx), 2013 U.S. Dist. LEXIS 189797, at *45 (C.D. Cal. Aug. 8, 2013) (representations of "diligent efforts" to comply with immigration laws were false).

Defendants' statements of legal compliance were false and misleading because, as Western Union admitted to DOJ, and as the FTC determined, the Company did not comply with its AML and anti-fraud obligations during the Class Period.  Western Union's legal violations included admitted criminal liability for willfully failing to maintain an effective AML program as required by the BSA and willfully "failing to suspend and/or terminate complicit Agents" and "allowing them to continue to process fraud-induced monetary transactions" through 2012; as well as civil liability for violating the FTC Act by failing to detect and prevent consumer fraud and violating the Telemarketing Sales Rule by providing substantial assistance to parties that

engaged in consumer fraud through the date of the Joint Settlement.  ¶139.

Moreover, once defendants choose to make positive statements about a topic, they are "under a duty to be honest and forthright" by disclosing adverse information.  *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1220 (D. Kan. 2002); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (same); *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (holding that description of pollution-prevention efforts, even if true, gave rise to a duty to disclose that these steps were "failing to prevent substantial [regulatory] violations").  Defendants' statements touting Western Union's legal compliance gave investors the impression that the Company's compliance practices were up to par.  It was therefore misleading for Defendants to fail to disclose the many ways that Western Union engaged in activities that gave rise to the high probability of substantial government sanctions.  *See Sprint*, 232 F. Supp. 2d at 1220; *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 731-32 (S.D.N.Y. 2015) (statements gave rise to a duty to disclose past compliance failures because they could be understood to refer to "legal compliance for anything relating to its legal liabilities, rather than only to its existing business segments"); *City of Pontiac Gen. Empls. Ret. Sys. v. Wal-Mart Stores*, No. 12-CV-5162, 2014 U.S. Dist. LEXIS 136165, at *6 (W.D. Ark. Sep. 26, 2014) (holding "Defendants' omission from their 2011 statement of the 2005-2006 events [related to suspected corruption] renders that statement materially misleading").

Defendants do not challenge the basic principle that statements of legal compliance are actionable as a matter of law.  Instead, they raise futile piecemeal objections to the wording of individual statements.  First, Defendants argue that the statements of legal compliance from Western Union's 10-K filings were included in those filings' risk disclosures.  (Defs. Br. at 29).  But the law is clear that statements of current or historical fact are not insulated from liability

just because they are labeled as "risk disclosures." *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997) (holding that risk disclosures did not insulate defendants from liability "[b]ecause several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions"); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017); *In re Quality Sys.*, 865 F.3d 1130, 1141-42, 1146-48 (9th Cir. 2017); *JinkoSolar Holds.*, 761 F.3d at 251. Western Union's warning language here therefore did nothing to absolve Defendants of false statements that the Company presently complied with all applicable AML and anti-fraud laws and regulations.

Similarly, cautionary language does not insulate defendants from liability when they fail to disclose that those risks have already occurred. *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) (holding PSLRA safe-harbor does not apply where risk disclosures "fail[] to disclose that the risk has [already] transpired" (internal quotation marks omitted)). Defendants warned that "[o]ur failure to continue to help prevent such frauds or a change in laws or their interpretation could have an adverse effect on our business." (Defs. Br. at 29). But they did not disclose that Western Union *already* failed to comply with AML and anti-fraud laws and *already* faced the high risk of substantial monetary sanctions when they made those statements throughout the Class Period.

Defendants also argue that the context of Ersek's statement on a July 30, 2013 earnings call was not about legal compliance, but rather about the Company's "competitive advantage" in the compliance sphere. (Defs. Br. at 29 n.28 (citing ¶388)).[12] But the fact remains that Ersek stated, in the context of touting Western Union's compliance capabilities, that "We comply with

---

[12] Defendants quote Ersek as stating "[d]on't forget we are in 200 countries, to comply with all regulations world . . . ." (Defs. Br. at 29 n.28). The final version of the transcript, however, states as an independent sentence that "We comply with all regulations world and try to be the best in class and leading our industry here," as quoted in the Complaint. (Grunfeld Decl. Ex. 3).

all regulations world[wide]."[13]  This straightforward statement means exactly that.  The fact that Ersek also singled Western Union out as having better compliance practices than its competitors, if anything, *adds* to the significance an investor would place in his statement.

Defendants next argue that certain of their statements of legal compliance are non-actionable statements of opinion because Defendants prefaced them with the phrase "we believe."  (Defs. Br. at 30).  These statements are actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318 (2015).  *Omnicare* dealt with statements of legal compliance just like those that Defendants made here.  *Id.* at 1326. The Supreme Court held that such statements can be false and misleading in several ways.

First, a statement of belief "about legal compliance" is false if the speaker does not actually hold the stated belief.  *Id.*; *see also Villella v. Chem. Mining Co. of Chile Inc.*, No. 15-cv-2106 (ER), 2017 U.S. Dist. LEXIS 45501, at *29-31 (S.D.N.Y. 2017) (holding the complaint adequately alleged that defendant "did not believe its statements regarding compliance with all relevant regulations").   Second, even if they are actually held beliefs, statements of legal compliance give rise to a duty to disclose omitted information if the statements do not "fairly align[] with the information in the issuer's possession at the time" that "conflict[s] with what a reasonable investor would take from the statement itself."  *Omnicare*, 135 S. Ct. at 1329; *In re Petrobras Sec. Litig.,* 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2016) (holding defendants omitted material facts about AML violations when opining that internal controls were sufficient).[14]

---

[13] Defendants also repeatedly made similar statements in which they included compliance with regulatory systems around the world as one of the Company's main strengths.  ¶¶321-22, 329, 349, 383, 385, 425, 456, 465, 471.

[14] Defendants spend several pages expounding on cases applying *Omnicare*.  (Defs. Br. at 30-33).  But the Supreme Court in *Omnicare* held that omissions liability arises either where the plaintiff alleges that the defendant did not undertake a "meaningful inquiry" *or* where the defendant omitted material facts "going to the basis for the issuer's opinion" that "conflict with

As will be discussed in the section addressing scienter below, Defendants had knowledge of the Company's compliance failures from several sources throughout the Class Period. *See infra* at 49-70. That information also means that Defendants could not have actually believed their statements of legal compliance. And even if Defendants did believe those statements, they did not have a reasonable basis to do so in light of the undisclosed evidence that they were aware of showing the Company's blatant compliance failures. *See In re Nevsun Res. Ltd.*, No. 12-cv-1845, 2013 U.S. Dist. LEXIS 162048, at *45 (S.D.N.Y. Sept. 27, 2013) (holding that where contrary information "is alleged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined").

### 2.   Statements Touting Western Union's Compliance Practices

In addition to representing that Western Union complied with its legal obligations, Defendants constantly touted the quality of the Company's compliance practices throughout the Class Period. These lofty messages took several forms. All of these statements were misleading because throughout the Class Period, Western Union had the compliance failures described above. Defendants therefore had a duty to disclose those serious current compliance failures, as well as ones from the recent past that subjected the Company to the material risk of substantial monetary sanctions. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d at 1220; *see also Arena Pharms.*, 840 F.3d at 707-08; *JinkoSolar Holdings Co.*, 761 F.3d at 249; *Wal-Mart Stores*, 2014 U.S. Dist. LEXIS 136165, at *6; *BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 731-32.

Defendants consistently praised Western Union as the "industry leader" and "market leader" that established "best practices" in terms of compliance. *See, e.g.*, ¶¶338, 351, 357, 360, 363, 374-75, 388-89, 398, 408, 456. For example, Defendant Scheirman pronounced at an

what a reasonable investor would take from the statement itself." *Id.* at 1329, 1332. Those contrary facts that do not "fairly align[] with the information in the issuer's possession" mean that the defendant did not have a reasonable basis for his or her opinion. *Id.*

industry conference on June 13, 2013 that "we're clearly a market leader."  ¶386.  Ersek even

stated at an investor conference on May 7, 2014, when describing the Company's compliance

practices, that law enforcement was "really looking up to us [and] saying that . . . you are leading

the market."   ¶¶423.  In addition, Defendants regularly described the Company's compliance

capabilities as one of the Company's four "core strengths" or capabilities.   ¶¶333-34, 336, 385,

388-89, 425-56, 434, 444.  Defendants also oftentimes described Western Union's strong level of

compliance as reflecting a "culture of compliance."  ¶¶374, 381, 388-89.

Western Union also portrayed itself as the industry leader in statements made in

connection with the Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference

that the Company hosted.  This event was billed as "teaching best practices in identifying and

preventing fraud and money laundering" to the Company's agents and professionals from other

industries. ¶347 (2012 conference); *see also* ¶¶395, 436 (2013 and 2014 conferences), 442 (2015

European Business Forum and Compliance Conference).[15]

All of these statements describing Western Union as the "industry" or "market leader" in

terms of compliance and stating that compliance was one of the Company's four "core strengths"

gave investors the impression that all was well with Western Union's compliance practices.

They therefore gave rise to a duty to disclose its compliance failures.  It does not matter whether

the Company was in the process of trying to fix those problems in the future.  The fact remains

that Defendants failed to disclose that those failures still existed while improvements were being

made and that prior failures gave rise to the high risk of substantial liability.

---

[15] Defendants argue that Western Union's ability to charge "premium pricing" is unconnected to
the Company's compliance costs.  (Defs. Br. at 63-66).  But Western Union justified its premium
pricing based on the supposedly superior compliance capabilities it provided to customers.
¶¶351, 389 (Ersek believed Western Union "deserve[d] the premium pricing" because its
"compliance programs are very valuable" and "protect[] the customers"), 456, 516.  Defendants'
statements about premium pricing are thus another example of statements touting Western
Union's compliance practices without sufficient basis.

Another one of Defendants' constant talking points was that the Company's compliance capabilities were "competitive strengths" or "competitive advantages" for the Company that gave it an edge over its competitors, who did not have as good compliance programs.  ¶¶311, 321-23, 328, 337, 381, 388, 417, 423, 459.  Defendants argue that these statements are not false and misleading because they "expressed the view that the Company had, and would in the future have, a competitive advantage because, unlike competitors, it already had in place a worldwide compliance infrastructure" that would be difficult to replicate.  (Defs. Br. at 51).  That context does not give Defendants license to tout the Company's compliance efforts while failing to disclose significant current and past failures.  These statements plainly praised the high *quality*, in addition to the large *quantity*, of the Company's compliance infrastructure.  If Defendants truly intended to distinguish between those aspects of Western Union's compliance program as they now attempt to do, they should have done so when they made these laudatory statements during the Class Period.

Defendants are also wrong that their many statements touting Western Union's compliance program are mere puffery.  (*See* Defs. Br. at 53-54 and 66-67).  "[T]here is a distinction between optimistic 'spin' of presently verifiable facts and optimistic forecasts of future events." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d at 1217. In particular, descriptions of compliance with "industry best practices" are not puffery.  *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 206-08 (S.D.N.Y. 2016).

The statements that Defendants made touting Western Union's compliance practices were "presently verifiable" facts.  For example, Defendant Ersek stated that "[w]e *are* the industry leader" and that "[o]ur compliance programs *are* very valuable. We *are* protecting the customers."  ¶¶351, 389, 408.  Similarly, Defendant Agrawal stated on September 11, 2014 that

34

compliance "*already is* a competitive advantage . . . *we've been doing this for many years*.  This is not just a 2014 effort, we've been in the compliance area and investing there *for quite some time*."  ¶432 (emphasis added).  Moreover, his statement later in this discussion that "*[n]obody else* has the global compliance capabilities that we have" definitively placed Western Union as the company with the single best global compliance capabilities.  That statement, and others favorably comparing Western Union to all of its competitors, were particularly false in light of Western Union's failure to adopt compliance measures that they knew Moneygram agreed to implement.  *See infra* at 54.

Moreover, it is well established that the materiality of omitted information can make "optimistic statements . . . much more likely themselves to be material."  *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d at 1218-20 (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).  Statements touting a key aspect of a company's business are therefore actionable when they represent a condition vastly different from what actually existed.  Such statements are "adjudged in light of the 'total mix' of information available to the market" and may be actionable "because of the materiality of the nondisclosed information undermining the truth of the statements."  *Id.*; *see also In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1293-94 (N.D. Okla. 2010), *reconsideration granted in part on other grounds*, 729 F. Supp. 2d at 1308; *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 112977, *687 (N.D. Cal. July 19, 2017) (holding statements that "'top priority' and 'focal point' for R&D was to" reduce emissions were not puffery); *Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243-44 (S.D.N.Y. 2012) (statement that defendant "conducted 'extensive' training and safety programs" was actionable because "[i]n an industry as dangerous as deepwater drilling,"

investors are "greatly concerned" about "safety and training efforts").

For example, the court in *SemGroup* held that statements describing "'Competitive Strengths' that positioned [the company] well 'to successfully achieve [its] primary business objective and execute [its] business strategy" were "materially misleading because they failed to disclose the Parent's speculative trading strategy and its impact on the Parent's ability to fulfill its contractual obligations." 2010 U.S. Dist. LEXIS 42791, at *41-42.[16]  And the statement that "our valued customers and our employees are supportive" of an integration plan was actionable where plaintiffs alleged that defendants "had no reasonable basis" for that optimistic statements *Better v. YRC Worldwide, Inc.*, No. 11-2072-KHV, 2012 U.S. Dist. LEXIS 136749, at *20 (D. Kan. Sep. 25, 2012).  Defendants' constant drumbeat of statements touting Western Union's compliance practices were significant to a reasonable investor because they "were not reflective of the true state of affairs at the Company." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381 (statements of "general integrity and ethical soundness" were not puffery because they were "made repeatedly in an effort to reassure the investing public about the Company's integrity").

Similarly, statements that otherwise might be puffery "may be material . . . if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact." *Simmons Invs., Inc. v. Conversational Computing Corp.*, No. 09-CV-2345 EFM/KMH, 2011 U.S. Dist. LEXIS 15962, at *16-17 (D. Kan. Feb. 17, 2011) (citing *Grossman*, 120 F.3d at 1120 n.6); *In re Quality Sys.*, 865 F.3d at 1143 (same).  Statements that a company's corporate

---

[16] The statements at issue in *In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012), the main case that Defendants cite in support of their puffery argument, were far more general than the statements at issue here.  Defendants fail to mention that the Tenth Circuit in *Level 3* held that other statements, such as that "[a] majority of the physical network interconnections are completed" and "[m]ost of the physical integration of WilTel is now complete," were not puffery, because they should have had "some basis in objective and verifiable fact." *Id.* at 1340-41.

36

policies are "'at the heart' of its business" or that "attempt[] to distinguish itself from other institutions"—just like the statements here that "industry leading" compliance practices were one of Western Union's four "core strengths" and a "competitive advantage" over all others in the industry—are therefore actionable when the defendant "knew the contrary was true." *Lapin v. Goldman Sachs Grp.*, Inc., 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006).   As described below, Defendants knew when they positively characterized Western Union's compliance practices that it suffered from significant compliance failures and its efforts were behind—and were by no means better than—those of others in the industry. *See infra* at 49-70.

Because the materiality of a statement is assessed in light of the defendant's basis for making it, Defendants are off base in citing one of the prior cases noted above that addressed statements related to the Southwest Border Agreement.  (Defs. Br. at 52 (citing *SEB Asset Mgmt. S.A.*, 2015 U.S. Dist. LEXIS 131387)).   In *SEB*, the evidence of the Company's many compliance failures during the Class Period was not yet publicly known because those facts were not revealed until the Joint Settlement was announced in January 2017.  The court in *SEB* concluded that "WU's decision to embrace the benefits of strict regulatory compliance may have been sudden and opportunistic, but the Complaint has not alleged any facts to suggest that it was misleading." *Id.* at *14.  The Complaint here, however, alleges precisely those types of facts showing that Western Union's compliance practices were fundamentally flawed during the Class Period.[17] All of Defendants' positive descriptions of Western Union's compliance practices are

---

[17] Moreover, any statements made after October 16, 2012—the date of the last statement raised in the *SEB* operative complaint—were not at issue in that prior action.  *SEB*, No. 13-cv-3325, Dkt. No. 68 ¶¶130-33; (*see* Defs. Br. at 53-54).  And unlike there, where the statements about Western Union being an industry leader were limited to predictions of how Western Union "would be a leader or trend-setter in the future," *SEB*, 2015 U.S. District LEXIS 131387, at *12, Defendants here characterized the Company as the *current* and best industry and market leader. *See, e.g.*, ¶¶351 and 408 (Ersek stating that "[w]e *are* the industry leader"); ¶389 (Ersek stating that "[o]ur compliance programs *are* very valuable. We *are* protecting the customers."), ¶432.

therefore actionable in light of the underlying information that Defendants failed to disclose concerning the substantial failures in the Company's compliance program.

3.    <u>Statements Describing Ongoing Government Investigations</u>

Defendants made many statements related to the ongoing government investigations by four separate U.S. Attorney offices, the FTC, and state attorneys general that would culminate in the Joint Settlement.  Starting in the first quarter of 2012, Western Union's annual and quarterly filings signed by Defendants Ersek and Scheirman or Agrawal disclosed the existence of these investigations into the Company's AML and anti-fraud programs.  ¶¶264-65.  As the Class Period progressed, Defendants continued to disclose the existence and topics of information requested in these and other investigations.  *See, e.g.*, ¶¶308, 318, 344, 368, 413, 449, 476, 483, 489, 493.[18]  They also disclosed whether Western Union was a "target" or "subject" of these investigations.  ¶¶265, 275, 268.  But they stated at all times that these inquiries were too preliminary to be able to predict their outcomes "[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought."  ¶282.

Western Union used this same language to describe the status of these investigations even when disclosing on February 19, 2016, that MDPA "indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions . . . from at least 2008 to 2012."  ¶476; *see also* 483, 489, 493 (same as to Q1-Q3 2016 10-Qs).  Beginning on August 3, 2016, Western Union disclosed that FTC believed that the Company violated the FTC Act and the Telemarketing Sales Rule because it failed to take adequate measures to prevent fraud.  ¶¶489, 493.  But the Company stated that "[i]f the FTC files a complaint against the Company, the

---

[18] Defendants' descriptions of the DOJ, FTC, and state attorney general investigations are described in further detail in Paragraphs 248 through 282 of the Complaint.

Company intends to defend itself vigorously." *Id.* Then, on November 1, 2016, the FTC staff had "advised the Company that it believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof." ¶493. Western Union stated that it "strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof." *Id.*

These descriptions of the many ongoing government investigations were false and misleading because Western Union's potential liability was in fact substantial. *See In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 306-07 (S.D.N.Y. 2014) (holding statement that defendants "could not predict the maximum potential liability to which they were exposed" was actionable where plaintiffs alleged "that Defendants knew that their liability . . . would be substantial"); *Wal-Mart Stores*, 2014 U.S. Dist. LEXIS 136165, at *7-9 (holding disclosure of internal investigation into corruption was misleading because the omission of prior knowledge of events misled investors as to when defendants learned of the suspected corruption); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 400-401 (S.D.N.Y. 2005) (holding defendants' warnings of regulatory risks were materially misleading when defendants knew they were also violating NYSE trading laws).  In the *SEB* case that dealt with the Southwest Border Agreement, the court held that statements acknowledging but downplaying the extent of Western Union's compliance problems in Mexico gave rise to a duty to disclose after the point in time at which Defendants "would have had a meaningful estimate" of how many agents failed to meet compliance requirements.  2015 U.S. District LEXIS 131387, at *39-40 (holding Ersek's and Scheirman's statements that they "expected 'some slow down'" and "expected 'some challenges'" were actionable).  Even if Western Union had not yet decided that it would terminate those agents, just the "<u>potential</u> termination of a large number of agents" gave rise to a

duty to disclose.  *Id.* at *40-41 (emphasis in original).

So too here, Defendants downplayed the likely outcome of ongoing government investigations when they knew of substantial compliance failures that subjected Western Union to the high risk of significant liability.[19]  Defendants do not get credit for disclosing the existence of these inquiries and providing generic warnings when they failed to disclose essential information showing that those inquiries raised risks that were far-more substantial than they let on.  Indeed, these misleading disclosures were the basis for NYDFS's recent action against the Company.  (Grunfeld Decl. Ex. 1 ¶60 (Western Union provided "only non-specific reports that merely cited the pendency of federal investigations identified in . . . [SEC] filings")).  If these disclosures misled NYDFS as to the true state of Western Union's compliance practices, then they also deceived the investing public.

Defendants argue that the Complaint does not plead any particularized facts showing that they did not believe that they disagreed with the FTC's stance "that the Company was responsible for 'a multiple' of the 'hundreds of millions' of dollars of *reported* fraud."  (Defs. Br. at 15-16, 56).  But Defendants failed to disclose the FTC's reasons for concluding that consumers underreported fraud—a fact that Western Union *admitted* to DOJ just a few months after "strongly disagree[ing]" with FTC's position.   ¶¶155-56 (explaining that fraud was underreported because internal reports showed the vast majority of victims do not report fraud to

---

[19] Defendants argue that the outcome of these investigations was too speculative to give rise to a duty to disclose.  (Defs. Br. at 57-59).  But the cases that they cite dealt with situations where the defendant's wrongdoing was far less clear than the misconduct at issue here.  *See Acito v. IMCERA Grp.*, 47 F.3d 47, 50, 53 (2d Cir. 1995) (holding prior FDA inspections that did not result in "any sanctions" or "other adverse consequences" were not material); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) ("alleged regulatory violation related to a single, isolated event"); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 468, 476 (S.D.N.Y. 2006) (holding defendant's conduct was not "pre se illegal" and that other statements, including that the company "led the industry in terms of disclosure," were actionable).

Western Union, the Company failed to log complaints, and it failed to provide a fraud hotline in many countries); ¶263.   Moreover, Defendants do not address the argument that regardless of their subjective beliefs, they had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements. *Omnicare*, 135 S. Ct. at 1326, 1329.

Similarly, Defendants contend that their statements that all of the pending government investigations (not just the FTC's) were too preliminary to be able to predict their outcome were not misleading because the Complaint does not adequately allege that they knew of Western Union's compliance failures or when they knew of them.  (Defs. Br. at 57-59).  Defendants' knowledge of these facts is addressed in the discussion of scienter below. *See infra* at 49-70.

Lastly, Defendants do not address the several occasions on which they were asked specifically by analysts about the government's various ongoing investigations into the Company's compliance practices.  In all of these situations, Defendants reassured investors about the status of the Company's compliance efforts and failed to disclose the current and past compliance failures that gave rise to the material risk of substantial liability.[20]  For example, in response to an analyst's question on February 12, 2013 about how Western Union could be confident that there was nothing "out there . . . as large as" the problems that gave rise to the Southwest Border Agreement, Defendant Ersek reassured investors that the Company was a "market leader."  ¶¶360-61.  Similarly, when asked on May 8, 2013 if the "worst is over" in terms of "compliance-related events," Ersek responded that "compliance culture is in our DNA." ¶381.   In response to an analyst's May 1, 2014 question about MDPA's investigation that Western Union was a "subject" of, Defendant Agrawal represented that "[i]t's early in the process and it's something that we're working through. We have good monitoring systems in

---

[20] None of the statements discussed in this section were puffery, because they related to the "objectively verifiable" status of pending government investigations. *See supra* at 34-38.

place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers."   ¶417; *see also* ¶¶326, 374-75, 386.   By making these positive statements concerning ongoing regulatory investigations, Defendants were required—but failed—to give investors the full picture and disclose the underlying compliance failures that gave rise to the substantial risk of liability that Western Union faced.

4.     Statements Explaining Increased Compliance Expenditures

Defendants also falsely characterized the reason for Western Union's compliance expenditures during the Class Period.  The Tenth Circuit has held that statements are false when they inaccurately describe the reason why a certain event occurred.  *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148-49 (10th Cir. 2015) (holding that defendant falsely "attributed the impasse to" financing difficulties rather than valuation concerns).

Throughout the Class Period, Defendants attributed increased compliance costs to innocuous reasons such as "global trends" and increasingly complex regulatory requirements rather than Western Union's flawed practices.  ¶¶342, 358, 366, 374, 388, 397-99, 411, 474, 483, 489, 493.  Similarly, Defendants described their efforts as making the Company "stand apart from the rest of the market" and a "big competitive advantage."  ¶¶459, 465, 480, 486.  Other times, Defendants characterized the Company's compliance difficulties and increased efforts as limited to issues raised by the Southwest Border Agreement.  ¶¶361, 363, 447.  All of these statements were false and misleading because—contrary to the reasons that Defendants gave— Western Union's compliance expenditures were actually made in response to government investigations into the compliance failures that formed the basis for the Joint Settlement.  ¶¶144, 148; Defs. Ex. 2 (FTC Compl.) ¶¶9, 26, 96 (FTC stating Western Union improved certain aspects of its anti-fraud program since 2012 (but still failed in other areas) "as a result of the FTC's investigation").

Defendants raise irrelevant considerations in response to this argument.  First, contrary to Defendants' characterization, the Complaint does not call for them to describe their business "in the most negative light."  (*See* Defs. Br. at 60-61).  The statements at issue here discuss the reasons for Western Union's compliance expenditures.  When giving these reasons, Defendants left out the key reason for those efforts.  Once Defendants chose to discuss Western Union's rationale for its increased compliance efforts, they had a duty to do so forthrightly and without omitting the most important reason.  As the Tenth Circuit held in *Nakkhumpun*, even if the defendant's stated reason was one of several possible reasons for an event, "[t]he existence of multiple explanations is what made [the defendant's] statement misleading."  782 F.3d at 1149.[21]

Rather than address this argument head-on, Defendants state the uncontroversial principle that silence is not misleading absent a duty to disclose.  (Defs. Br. at 61).  But *Anderson v. Spirit AeroSys. Holdings, Inc.*, 105 F. Supp. 3d 1246 (D. Kan. 2015), which Defendants cite, did not address a claim that the defendants misstated the reason for their actions.  Western Union's reason for its compliance expenditures is an objectively verifiable fact.  The Joint Settlement makes clear that the actual reason for the Company's increased compliance costs was its reaction to the government investigations and its awareness of its significant compliance failures.  Moreover, all of the statements at issue in *Anderson* were "too vague to qualify as material."  *Id.* at 1261.  Here, in contrast, Defendants gave precise figures for Western Union's compliance expenditures, which were a substantial expense for the business.  *See* ¶¶358, 360, 366 (stating that the Company spends over $100 million per year on compliance), ¶¶503-04.

---

[21] Defendants take particular issue with the forward-looking nature of Scheirman's statement on a July 30, 2013 call. (Defs. Br. at 61-62).  But many of Defendants' other statements related to compliance expenditures described above addressed compliance costs that were already incurred.  Moreover, even as to statements that might have been forward-looking, Defendants still knowingly omitted the true reason for Western Union's actions.

43

Lastly, Defendants claim that "the Company *did* disclose that . . . the Company's own reviews of its existing compliance procedures – were causing the Company's compliance costs to increase." (Defs. Br. at 62-63 (emphasis in original)). In support of this argument, Defendants cite just a single statement that Scheirman made on October 29, 2013. Even this statement goes out of its way to claim that issues discussed with regulators "are not necessarily black and white," while failing to disclose that Western Union's compliance efforts were undertaken in response to government investigations to address severe compliance failures. Moreover, this single, vague reference to the Company's "own reviews" does not clarify all of the other times that Defendants attributed Western Union's compliance efforts to various reasons other than their being taken to correct the Company's flawed practices.

### C. The Complaint Adequately Alleges False and Misleading Statements by Defendant Koch

Defendant Koch's arguments in his separate brief challenging the falsity of his statements during the Class Period fail for the same reasons described above as to statements made by the other Defendants. On November 6, 2013, Koch stated in a press release concerning Western Union's efforts to combat human trafficking that "[e]nding human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." ¶405.[22] When Koch made this statement, the Company was already responding to two different DOJ investigations—one of which the Company was a "target" of—into China Corridor agents that facilitated the laundering of hundreds of millions of dollars used for human trafficking. ¶¶131, 184, 251, 264-65. Western

---

[22] Other parts of this press release touted the Company's working with, and praise from, law enforcement agencies in these efforts. ¶405.

Union's failure to address those agents' misconduct is at the heart of its settlement with the DOJ. ¶¶110-13, 183-99.  Touting the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading.  Even though Western Union's only *admitted* to willful compliance failures as to the China Corridor Agents through 2012, it was still misleading for Koch to fail to disclose those very recent violations that subjected the Company to the substantial risk of an unprecedented forfeiture for a money services business.

Defendant Koch also stated in connection with Western Union's 8th Annual AML, Anti-Fraud and Compliance Conference in September 2013 that "[t]ogether with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud."  ¶395.  This was misleading absent disclosure of the fact that government investigations that were pending at the time posed the high risk of substantial liability for Western Union's compliance failures.  ¶¶265, 268.

Koch subsequently stated, in connection with Company's 2014 Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference, that "Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business."  ¶436.[23]  This was false and misleading for the reasons described above as to Defendants' other statements touting the Company's compliance practices and its reasons for its compliance expenditures while failing to disclose current and past compliance failures or the true reason for its increased compliance costs.

Koch challenges the falsity of his statements based on the fact that he did not join

---

[23] Press releases for the 2013 and 2014 conferences also misleadingly described on behalf of Western Union the role of its agents in combatting fraud even though compliance failures existing at the time centered on the failure to discipline agents for allowing fraud to take place. ¶395 (stating the Company's dedication to fighting fraud extends to its 520,000 agents), ¶436.

Western Union until May 2013, which is after the time period covered by the DOJ's DPA. (Koch Br. at 7).  He argues that during his tenure at Western Union, the Company spent significant resources on "compliance and regulatory problems."  (Koch Br. at 6).  These arguments miss the mark for the same reasons as Defendants' other timing-related arguments. First, even if Western Union started trying to address its compliance failures at some point during the Class Period, those problems persisted (as the FTC concluded) and therefore needed to be disclosed.  *See supra* at 2-4, 15-17.  Second, regardless of the status of Western Union's current compliance practices (which were flawed for the reasons explained above), Koch and the other Defendants misled investors by failing to disclose the Company's compliance failures from the very recent past (which, according to Western Union's own admissions, extended through 2012) that subjected the Company to the substantial risk of unprecedented liability in the ongoing government investigations.  Third, Koch, like the other Defendants, failed to disclose that the reason for the Company's compliance efforts during his tenure was to address those compliance failures.[24]

### D.  The Complaint Adequately Identifies False and Misleading Statements

Based on a selective reading of a few paragraphs in the Complaint, Defendants argue that the Complaint lacks the requisite particularity required to establish falsity under the PSLRA. (Defs. Br. at 67-71).  The PSLRA requires a plaintiff to plead false or misleading statements by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The Complaint meets this standard.

The Complaint catalogues the many times that Defendants made false and misleading statements related to the Company's compliance practices.   As described above—and as

---

[24] None of Koch's statements were mere puffery for the reasons described above.  *See supra* at 34-38.  His scienter is addressed with that of the other Defendants below.  *See infra* at 49-70.

Defendants had no trouble identifying in their motion to dismiss—these false and misleading statements fall into the following categories: *first*, statements related to Western Union's compliance with AML and anti-fraud laws; *second*, statements touting the Company's AML and anti-fraud compliance practices as better than those of any competitor in the industry; *third*, statements describing the several government investigations that culminated in the Joint Settlement; and *fourth*, statements describing the reasons for Western Union's compliance expenditures during the Class Period. *See supra* at 23-25. The Complaint also explains why each of these statements was false and misleading. This pleading easily satisfies the Tenth Circuit's test for determining whether the allegations in a complaint "taken as a whole . . . support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Adams v. Kinder-Morgan*, 340 F.3d 1083, 1100 (10th Cir. 2003).

Defendants first argue that the Complaint does not "identif[y] specifically what statements it is challenging as false" because it includes block quotations from these statements. (Defs. Br. at 23, 28, 67). Although Defendants claim that "the Complaint is replete with such instances," the only examples that they cite include the same language repeated each year in Western Union's annual 10-K filings. *See* ¶¶305, 366-67, 411-12, 447-48, 474-75; (Defs. Br. at 67-68). Moreover, Defendants argue elsewhere that the Complaint did not provide adequate context for certain statements and *themselves provide block quotations* to give that context. (*See* Defs. Br. at 52 (citing ¶432), 61-62 (citing ¶¶388, 399)). Defendants cannot have it both ways.

Western Union's 10-K filings include important disclosures containing extended discussions of the Company's approach to its AML and anti-fraud compliance obligations. The Complaint puts key language from relevant excerpts in *bold italics*. This limited use of block quotations is necessary to provide the context of how the Company approached key aspects of its

compliance efforts.   The Complaint therefore adequately alleges which of Defendants'
statements were false and misleading.  *W. Palm Beach Firefighters' Pension Fund v. Startek,
Inc.*, 2008 U.S. Dist. LEXIS 47748, *9-14, 24-27, 45-47 (D. Colo. Mar. 28, 2008) ("complaint
separately sets forth the alleged misleading or false statements organized by the year in which
they were made"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1261 (N.D. Okl. 2003)
(complaint "provides notice to each Defendant regarding the [misleading] statements"); *see also
In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014).[25]

       Next, Defendants argue that the Complaint "fails to explain with the requisite
particularity *why*" these statements are false and misleading.  (Defs. Br. at 68).  The Complaint,
however, makes those reasons clear in Paragraph 303, which is then cross-referenced throughout
its description of the alleged false and misleading statements.  ¶¶303-495; Fed. R. Civ. P. 10(c).
In addition, the Complaint's substantive allegations describing Western Union's compliance
failures further explain those reasons.  The Complaint's length is attributable to the trove of
information in the Joint Settlement highlighting Western Union's compliance failures.[26]

       Defendants fail to recognize that, at bottom, all of their alleged misstatements were false
and misleading for similar reasons related to the fact that they falsely represented and failed to
disclose 1 – Western Union's current and past AML and anti-fraud compliance failures, 2 – the
substantial risk that Western Union faced from government investigations into those problems,

---

[25] In a case that Defendants cite, the Tenth Circuit declined to address whether the complaint
warranted dismissal on this basis and went on to consider the merits of the plaintiff's claims.  *In
re Level 3 Communs. Sec. Litig.*, 667 F.3d 1331, 1339 n.8 (10th Cir. 2012) (Defs. Br. at 68).

[26] Defendants cherry-pick two paragraphs for which they claim the Complaint does not specify
the reasons for their falsity.  (Defs. Br. at 69-70 (citing ¶¶397, 444)).  These particular statements
are false and misleading because they misrepresented the reason for Western Union's
compliance expenditures (¶397) and touted its compliance capabilities while failing to disclose
its significant compliance failures (¶444).  More importantly, however, the Complaint as a whole
cannot be judged based on these isolated statements.

and 3 – the Company's compliance efforts in response to those regulatory actions.   These explanations adequately allege the reasons why Defendants' statements are false and misleading. *See Startek, Inc.*, 2008 U.S. Dist. LEXIS 47748, at *9-14, 24-27, 45-47 (holding that where complaint "separately sets forth a lengthy paragraph detailing why the statements were false or misleading," it did not matter that "plaintiffs have not explained how every statement by the company . . . is specifically false or misleading"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d at 1261; *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 U.S. Dist. LEXIS 83409, at *27-28 (C.D. Cal. June 9, 2016).

### E.    The Complaint Adequately Alleges Scienter

In determining whether a complaint states with particularity facts giving rise to a strong inference of scienter under the PSLRA, the Tenth Circuit examines the "plaintiff's allegations in their entirety . . . and determine[s] whether the plaintiff's allegations, taken as a whole, give rise to a strong inference of scienter." *Adams*, 340 F.3d at 1105.   A "strong inference" of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.*   This inference need only be as compelling as any opposing inference, and "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007).   A "tie," in which an inference of scienter is equally as plausible as competing inferences, therefore goes to the plaintiffs. *Id.* at 324, 328.

As the Tenth Circuit recently emphasized, "[s]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun*, 782 F.3d at 1150.   Recklessness "amounts to an extreme departure from the

standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger." *In re Qwest Communs. Int'l, Inc. Secs. Litig.*, 396 F. Supp. 2d 1178, 1187 (D. Colo. 2004). A strong inference of scienter is validly pled where defendants "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Multiple sources show that the Individual Defendants had knowledge of Western Union's compliance failures during the Class Period. This information negates Defendants' arguments as to the falsity of their opinion statements in addition to their scienter arguments. *In re Nevsun Res. Ltd.*, 2013 U.S. Dist. LEXIS 162048, at *45; (*see* Defs. Br. at 33-58, 72-73, 80-84).

First, many prior regulatory actions provided red flags alerting Defendants to Western Union's compliance problems. The arrests of many agents for AML and consumer fraud violations added to their heightened awareness of these issues. Second, many of the compliance failures at issue here were discussed in Board materials during the Class Period. Third, Western Union's internal reports, analyses, and reviews formed the basis for the findings in the Joint Settlement. Board materials and confidential witnesses make clear that the Individual Defendants viewed those types of materials in the ordinary course of business.

In addition, the Individual Defendants had knowledge of or recklessly ignored Western Union's compliance failures identified in the Company's internal documents because those materials were produced to the government during the Class Period. Defendants were already on notice of compliance problems based on the red flags raised by other regulators and from discussions in Board materials. Once the Individual Defendants—who were Western Union's top executives and were specifically responsible for its compliance efforts—had that warning,

they would have kept abreast of the ongoing government investigations, or they were reckless in failing to do so.

These allegations raise a strong inference that the Individual Defendants knew—or were reckless in failing to know—of Western Union's compliance failures at some point during the Class Period long before the announcement of the Joint Settlement in January 2017. That is sufficient at this stage because "[p]laintiffs need not allege 'the exact date and time' when defendants became aware of [contrary] information" in order to plead a strong inference of scienter, as long as they "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. Mar. 28, 2005) (quoting *Rothman v. Gregor,* 220 F.3d 81, 91 (2d Cir. 2000)); *In re ITT Educ. Servs.*, 34 F. Supp. 3d at 310 (holding the court need not "identify the precise moment at which the culpable inference overtook the innocent one").

Lastly, Western Union as a corporation had scienter as to its compliance failures regardless of whether any of the Individual Defendants were aware of those problems. That corporate scienter is based on the knowledge of 1 – the high level official that coordinated the Company's response to the ongoing government investigations and 2 – the senior executives identified in the Joint Settlement as allowing agents to be complicit in money laundering and consumer fraud.

### 1.    Red Flags Alerted Defendants to Western Union's Compliance Problems

Western Union admitted, and the FTC determined, that the arrests of many agents (such as the China Corridor Agents) for fraud and money laundering as far back as 2007 made Western Union aware of its compliance failures. ¶¶134, 253-54. Moreover, "law enforcement agencies

in the United States and throughout the world have warned the company for many years that its money transfer system was being used to perpetrate consumer frauds, and that Western Union was not adequately addressing the problem."   Defs. Ex. 2 (FTC Complaint) ¶49; ¶¶116-22, 173-74, 205-08, 226-230.   The government's investigation into problems with China Corridor agents, which featured so prominently in the DPA, were discussed internally as early as September 2010.   ¶251 (Governance Committee meeting attended by Ersek).

Defendants attempt to pick apart the details of these other regulatory actions from before and during the Class Period.   (Defs. Br. at 9-12).   But they ignore the FTC's determination that these actions were one of the factors that made Western Union aware "of the consumer fraud problem with its money transfer system."   Defs. Ex. 2 (FTC Compl.) ¶49.[27]   These regulatory actions include the Minnesota Attorney General sending letters to Defendant Ersek from 2011 into the Class Period concerning Western Union's "continuing inability or unwillingness to detect and prevent" consumer fraud.   ¶120.   In addition, in February 2012, a Secret Service agent warned Western Union that it "is a complete and almost total safe haven for the criminal element to freely launder illegal proceeds."   ¶226.   Then, in December 2012, Spain's AML regulator concluded an audit by determining that Western Union displayed an "absolute lack of control over the [A]gents' activity" and that Western Union's AML system in Spain was "totally ineffective in preventing money laundering, related to fraud and other offenses, which has taken place on a large scale."   ¶¶173-74.   The Complaint also discusses additional regulatory actions going even further back in time and continuing into the Class Period that warned Western Union

---

[27] For example, Defendants claim the "FTC agreed with Western Union on a different compliance protocol" following the Company's refusal to adopt measures that Moneygram agreed to in 2009.   (Defs. Br. at 41).   But the FTC determined in the Joint Settlement that its discussions with Western Union in 2009 concerning that Moneygram action was one of the warnings that made Western Union aware of its compliance failures.   ¶134; Defs. Ex. 2 (FTC Compl.) ¶¶49, 52.

of the compliance problems at issue in the Joint Settlement.  ¶¶116-22, 173-74, 205-08, 226-230.

Materials from Board of Director and Committee meetings also show that the Individual Defendants were involved in discussions of, or provided information showing, the basic flaws in the Company's compliance practices.  These materials covered discussions before the Class Period about regulators "increasingly expecting stronger and more sophisticated control over [Western Union's] business and consumer activity" and that "Western Union [wa]s increasingly being held responsible for the oversight (and misdeeds) of its Agents and sub-Agents" - ¶95 (February, May, and July 2010 meetings attended by Defendants Ersek and Scheirman); Western Union still being in the process of fixing its "[l]ack of meaningful [AML] reporting" and its failure to conduct risk-based reporting (as is required by AML laws) - ¶97 and Defs. Exs. 48-49 (May 2011 meeting attended by Ersek, Scheirman, and Agrawal); and a "[m]ulti-State exam report" that issued "an unsatisfactory rating" for AML compliance in those states' areas - ¶99 and Defs. Exs. 54-55 (December 2011 meeting attended by Ersek); *see also* ¶¶95-101, 251.

These discussions continued in Board and committee meetings during the Class Period. At a June 15, 2012 meeting of the Governance Committee that Defendant Ersek attended, a presentation described the "[i]ncreased attention to US/China Agent base which continues to present challenge[s]. [Southwest Border] Alliance confirms the US/China corridor is of significant interest to law enforcement."  ¶252.  A July 19, 2012 Audit Committee meeting attended by Ersek and Scheirman included discussions of "[v]arious deficiencies in the documentation of policies and procedures" for AML compliance.  ¶234 and Defs. Exs. 61-62. Then, at a March 28, 2013 Governance Committee meeting attended by Ersek, it was announced that resolution of global due diligence, beneficial sender/receiver information, and agent-control weaknesses identified by the monitor the Southwest Border Agreement remained far off.  ¶238.

Board materials also show that Defendants' knew that Western Union's compliance efforts did not meet the lofty characterizations that Defendants gave them throughout the Class Period. For example, the "key features" of a 2012 settlement that Moneygram—Western Union's main competitor—reached with DOJ for compliance failures very similar to those at issue here were discussed at a December 2012 Board meeting that Defendants Ersek and Agrawal attended. ¶214; Defs. Exs. 65, 67. Over four years later, Western Union was forced in the Joint Settlement to adopt the same compliance measures that Moneygram adopted in its 2012 settlement. ¶¶215-16. CW2 has stated that Western Union did not adopt those measures earlier. ¶211. Defendants quibble with the characterization of the Moneygram steps as "stronger" than Western Union's compliance practices. (Defs. Br. at 42-43). The most straightforward reading of these sources, however, is that Ersek and Agrawal knew that Western Union made a conscious decision not to adopt compliance practices related to agent oversight that the DOJ required its main competitor to implement all the way back in 2012.

Moreover, a July 17, 2013 report from Western Union's outside consultant to a Compliance Committee meeting attended by Defendants Ersek and Koch identified the high risk in the Southwest Border area that "Agents are unknowledgeable of, complicit in, or willfully blind to criminal activity." Defs. Exs. 77 and 79 at 11. Although these risks were "inherent" to the Company's business as Defendants note (Defs. Br. at 50-51), the report identified several mitigating controls that "required further improvement to be fully effective." Ex. 79 at 11. These "mitigating controls" that still needed to be implemented included some of the specific steps that were found to be lacking in the Joint Settlement, including "Enhanced Agent Diligence and Oversight," "Agents AML compliance training," and a compliance template to improve data integrity in the recording of transaction information. *Id.*; ¶¶16, 64, 135, 140, 218, 225.

In addition, an AML SWB Risk Assessment that was approved at the October 11, 2013 Board meeting attended by all of the Individual Defendants noted that even after the Company's recent risk mitigation efforts, the residual risk associated with the Company's agents and "consumer risks" in the Southwest Border area remained high.  In addition to being a result of "inherent risks," this Risk Assessment—which was Defendant Koch's responsibility—explained that these residual risks remained because "several of [the Company's] planned controls are not yet operational or have not been vetted through an independent assessment."  Defs. Exs. 84 and 86 at 14; ¶243.  And even once these controls were to be implemented, they still would not "(a) verify the information provided, (b) prevent multiple consumers from using the same identifying information" or take certain other steps.  Defs. Ex. 86 at 16.  Moreover, this Risk Assessment did not apply to high risk regions outside of the Southwest Border area.  ¶¶245-46.  Western Union's compliance practices outside of that limited area thus lagged even further behind.  *Id.*

### 2.   Defendants' Awareness of Compliance Failures Discussed in the Joint Settlement

Western Union admitted to DOJ, and the FTC found, that the Company was aware of the many compliance problems identified in the Joint Settlement.  ¶¶133, 136.  This knowledge was based on, among other things, Western Union's internal reports and analyses, as well as interviews of Western Union employees.  ¶¶133, 136-37.  This information supports a strong inference of scienter.  *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 502, 504 (S.D.N.Y. 2011) (holding scienter adequately pled based in part on SEC report released after the class period).

In particular, Western Union's internal reports and records identifying fraud and AML violations included reports that aggregated and analyzed consumer fraud complaints and reviewed particularly suspicious agents.  ¶162.  This evidence showed particular agents that

processed a vastly disproportionate amount of fraud-induced money transfers and showed transactions that exhibited suspicious factors indicative of fraud flowing repeatedly through those agents.  ¶¶160-67, 179, 182-90.  Moreover, Western Union admitted to DOJ that through 2012, even when compliance employees raised problematic agents, senior executives and sales employees prevented those agents from being disciplined because of how valuable they were to the Company.   ¶¶192-201.   And the FTC determined that "in 2014, company executives approved the reactivation of [an agent that was reviewed for fraud many times between 2010 and 2014] despite being informed that confirmed and potential fraud, as well as suspicious activity, amounted to approximately 54% of the agent's pay volume."  (Defs. Ex. 2 (FTC Compl.) ¶97).

Defendants argue that the Complaint does not allege "that any of the Individual Defendants even received these [internal Company] reports" or the information contained in them.  (Defs. Br. at 44).  The Board materials that Defendants included with their Motion belie this contention.  All of the Individual Defendants received a report in July 2013 describing the findings of a March-April "Fraud Policy Report" showing that "confirmed and potential fraud account for more than a third of" transactions sent to an entity in India, all of which came from United States consumers.  Defs. Exs. 77-78 and 80 and 81 at 9.  These transactions included multiple suspicious indications of fraud, including that the senders reported that they were the victims of known types of scams, multiple transactions were "paid out minutes apart each day," and the same identifying information was entered for multiple payees.  *Id.*   These are some of the very same signs of fraud that formed the basis of Western Union's liability in the Joint Settlement.  *See* ¶¶166, 168, 176.  Despite the fact that this identifiable fraud had been taking place since at least March 2013, the issue was still just pending with Regional Compliance when it was reported to the Board four months after the problem arose.  Defs. Exs. 77-81.  The FTC

specifically determined that one of Western Union's compliance failures was that the Company would often just "escalate" or refer problematic agents for further review without proper resolution of the problem.  ¶181.

Similarly, Defendants say that "the Complaint contains no particularized factual allegations of there having been any discussions with or documents provided to any of the Individual Defendants *concerning these particular agents*" referenced in the Joint Settlement. (Defs. Br. at 39-40 (emphasis in original)).  But the documents that Defendants include with their Motion again contradict their claim.  Defendant Koch attended a September 2013 Compliance Committee meeting where he received a report describing "continued data integrity issue" at Elektra stemming from the master agent's failure to properly record consumer information. Defs. Exs. 82 and 83 at 9.  Elektra was a master agent that the FTC determined the Company's compliance team reviewed in March 2012 and failed to discipline despite determining that for the prior few months, the agent paid "nearly 85% of all emergency fund fraud complaints filed with Western Union."  ¶167(d).  The failure to properly record transactions—as Elektra did here—was one of the systemic compliance failures identified by the Joint Settlement.  ¶¶45, 122(e), 140(e), 166(d), 225(b).  Even so, the only action that the Company took to address the problem as of  September 2013 was to require that valid information be recorded (as it should have been all along), without any disciplinary action noted in this report.  Defs. Ex. 83 at 9. Then, even after Elektra was discussed in this report, it continued to facilitate a high volume of fraud through at least 2014.  Defs. Ex. 2 (FTC Compl.) ¶44.

> 3.  Defendants were Aware of the Progress of Ongoing Government Investigations

Government investigations into a company's wrongdoing add to the inference of scienter that the defendant were aware of that misconduct.  *See SEPTA v. Orrstown Fin. Servs.*, No. 1:12-

cv-00993, 2016 U.S. Dist. LEXIS 14947, at *18 (M.D. Pa. Feb. 8, 2016) (holding that "[t]he timing and substance of the Enforcement Actions may, when viewed in connection with the other allegations of the SAC, support a scienter finding"); *In re ITT Educ. Servs.*, 34 F. Supp. 3d at 307, 309-10 (holding scienter adequately pled where "numerous pending investigations of ITT's loan programs by state and federal regulators raise a strong inference that Defendants knew or recklessly disregarded their potential liability"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (holding that DOJ investigation added to "'holistic' view" of scienter).  Moreover, the allegations here showing the progress of ongoing investigations goes far beyond the mere existence of these governmental inquiries.

In March 2012, CDCA and EDPA served Western Union with grand jury subpoenas related to two China Corridor Agents, with CDCA informing the Company that it was a target of the investigation.   ¶¶264-65.   Ersek subsequently attended a June 15, 2012 Governance Committee meeting where a presentation described the "[i]ncreased attention to US/China Agent base which continues to present challenge. [Southwest Border] Alliance confirms the US/China corridor is of significant interest to law enforcement."  ¶252.

In addition, Board materials provided to Defendants Ersek and Scheirman in July 2012 show that the FTC identified "areas of weakness" and expected Western Union to provide "a fraud prevention program focused on consumer protection, agent oversight and law enforcement interaction" and "to demonstrate significant improvement over our current fraud prevention activities."  Defs. Exs. 61 and 62 at 3.  The proposal that the Company planned internally in response would focus initially only on "specific high risk corridors" with no concrete plan to expand "globally."  *Id.*  This new program was to be reviewed by "senior management."  *Id.* This modest plan did not appease the FTC because the regulator served a Civil Investigative

Demand on the Company just a few months later, thereby starting its formal investigation that would culminate in the Joint Settlement.  ¶¶262-63.

Western Union's descriptions in SEC filings of the progress of the DOJ and FTC investigations show the topics of information that Western Union provided to these regulators during the Class Period.  The Company consistently stated in these filings (signed by Defendants Ersek and Scheirman or Agrawal) that it "provided and continues to provide information and documents to the government."  ¶256.  That cooperation included responses to demands from the FTC for information related to: consumer fraud complaints ¶¶258-59 (December 12, 2012 and February 21, 2014); the Company's consumer fraud program ¶229; policies and procedures related to agent discipline and documents related to 720 specific agents ¶260 (October 22, 2014); and aggregate agent data ¶261 (July 31, 2015).  Western Union also received civil investigative demands from state attorneys general from 2011 through 2013 related to "the adequacy of the Company's consumer protection efforts over the last several years."  ¶¶278-79.  Western Union also cooperated with the DOJ's grand jury subpoenas seeking information on the Company's AML compliance policies and procedures, fraud-induced money transfers, agent suspension and termination policies, specific agents, and a wide range of AML compliance materials.  ¶266, 268-69, 271-74, 277.  In addition to providing documents in response to these demands, the DOJ interviewed current and former Western Union employees on several occasions throughout the Class Period.  ¶¶264, 267, 270, 276.  These descriptions of the government investigations leading to the Joint Settlement show that throughout the Class Period, Western Union gave the regulators the detailed evidence—including internal reports, analyses, reviews, and witness testimony—that formed the basis for the government's conclusions.

Western Union's recent settlement with NYDFS confirms that through its participation in

DOJ's investigations, Western Union became aware "of the full scope of the misconduct by such high-volume [China Corridor] New York agents in early 2015, [yet] the Company waited approximately two years to fully disclose this information to the Department." (Grunfeld Decl. Ex. 1 (NYDFS Consent Order) ¶¶5, 60). Moreover, CW3, a former senior AML compliance employee from June 2013 to November 2015 who participated in the government's investigations, stated that there was no way that Defendants Ersek, Scheirman, and Agrawal were not informed about the ongoing investigations. ¶249. And CW4, a former high-level compliance officer who frequently briefed Ersek through the beginning of the Class Period, stated that Ersek was a very involved chief executive who was regularly briefed on compliance issues, including regulatory reviews and agent discipline. ¶284.

In addition, in June 2010, Western Union's President of the Americas (Stewart Stockdale) protected one of the China Corridor Agents from being disciplined despite knowledge that this agent engaged in blatant compliance violations. ¶198; *see also* ¶190. Stockdale was Western Union's President, Global Consumer Financial Services and an Executive Vice President during the beginning of the Class Period. ¶30. The fact that Stockdale abruptly resigned in October 2012 without sufficient explanation as the government investigations into compliance failures were pending further shows that Defendants knew of the investigations' findings at that time. *In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *43 (N.D. Cal. 2002) (holding resignation that occurred as company was conducting an internal investigation was "one more pieces of the scienter puzzle"); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 1109, at *840-41 (N.D. Cal. Jan. 4, 2017) (holding resignations supported strong inference of scienter).

4.    The Individual Defendants' Positions at the Company Further Support the
Strong Inference that they were Aware of the Information Produced to the
Government

Allegations that "an individual defendant knew certain information based on that individual's position in a company" support a strong inference of scienter in several types of circumstances. *Qwest Communs. Int'l, Inc. Secs. Litig.*, 396 F. Supp. 2d at 1187; *Adams*, 340 F.3d at 1106. First, generalized allegations support a holistic analysis when combined with other evidence of knowledge; second, particularized allegations based on a defendant's position independently support scienter when they "suggest that defendants had actual access to the disputed information"; and third, such allegations support scienter even "in a more bare form" where "it would be 'absurd' to suggest that management was without knowledge." *South Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016); *Qwest Communs.*, 396 F. Supp. 2d at 1187.

Defendants' positions support a strong inference of scienter based on particularized allegations of the specific evidence at issue here. Once the Individual Defendants were on notice of Western Union's compliance problems based on discussions in Board materials, prior regulatory actions, and the arrests of many agents, the Individual Defendants either realized the scope of this misconduct, or recklessly turned a blind eye to these red flags. In particular, Board materials show that the Individual Defendants were aware of information relating to compliance weaknesses, government investigations related to the Joint Settlement, specific reports (such as a Fraud Policy Report) showing that agents were not disciplined properly, and the "key features" of the 2012 Moneygram settlement. These documents therefore show that even in the ordinary course of business, Defendants had knowledge of the types of information that formed the basis for the Joint Settlement. *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d at 1298-99, 1308 (holding based on holistic analysis that defendants' positions giving "them access to

material non-public information regarding SemGroup's core operations and financial condition" supported a strong inference of scienter); *Adams*, 340 F.3d at 1106. And because Koch was the Company's Chief Compliance Officer over a key two-year period during the government's investigations, he had an even stronger reason to know in the ordinary course of his job of the information described in the Joint Settlement. *Reese v. Malone*, 747 F.3d 557, 575-77 (9th Cir. 2014) (scienter sufficiently alleged as to officer who oversaw company's operations at issue).[28]

There is even an even stronger basis to conclude that the Individual Defendants were aware of this evidence as it was produced to the government in response to ongoing investigations during the Class Period.  Compliance concerns were one of the main risks to Western Union's business.  ¶¶48, 52, 77, 503.  Defendants also repeatedly identified compliance as a key positive component of the Company's business.  *See supra* at 23-25.  Given the importance of the pending government investigations to this critical business issue, and the significant risk of substantial liability that they exposed Western Union to, "it would be 'absurd' to suggest that management was without knowledge of the matter."  *Molycorp*, 157 F. Supp. 3d at 1011; *Christine Asia Co. v. Yun Ma*, No. 16-2519-cv, 2017 U.S. App. LEXIS 24647, at *7 (2d Cir. Dec. 5, 2017) (holding that although defendants did not attend meeting at issue, it was "virtually inconceivable that this threat was not communicated to the senior level of Alibaba's management").[29]

---

[28] The cases that Defendants cite concerning the significance of positions at a company dealt with very different situations.  In *Anderson*, 827 F.3d at 1246, *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001), and *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009), the courts did not rule that the defendants' positions were irrelevant, but rather, that the underlying data was not itself clear.  Here, in contrast, Western Union's internal reports and analyses showed "blatant" and "obvious" compliance failures.  ¶¶131, 134.

[29] Defendants also claim that Scheirman and Agrawal, as CFOs, did not have "any responsibility" for Western Union's compliance programs and that Ersek was not "aware or expected to be aware of all details regarding everything relating" the important topic of

Defendants make several claims as to their lack of knowledge that are simply not believable.  They contend that the Company's active participation in the investigations that led to the Joint Settlement does not show the Individual Defendants' knowledge of the Company's compliance failures because no "fact identified in the Complaint indicates that any of these individuals, who were among the Company's highest-level officers, reviewed . . . or were given any information about the" materials produced to the government that revealed Western Union's compliance failures.  (Defs. Br. at 46-47).  Given the significance of these investigations and the Company's ongoing cooperation with the government's many requests for documents and witness testimony, it is absurd to suggest that the Individual Defendants were not provided updates on the Company's response during each of their respective tenures as CEO, CFO, and Chief Compliance Officer.

Moreover, if Defendants did not know the status of the Company's cooperation with the government investigations—an implausible scenario—that would only be because they turned a blind eye to that information.   Based on the Individual Defendants' awareness of red flags concerning Western Union's history of compliance failures, that so many government entities were investigating the adequacy of those practices, and the fact that internal reports existed on these topics, they should have inquired as to the status of the Company's response to the government's investigations.  *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1080 (D. Colo. 2012) (holding that defendants' positions along with "the magnitude of the alleged fraud" supported a finding "that they either knew that their alleged statements were false or were

---

compliance.  (Defs. Br. at 8, 42, 85-86, 90-91).   (Defendants do not, and could not possibly, argue that Koch, the Chief Compliance Officer, did not have responsibility for compliance.)  But Defendants' job responsibilities cannot absolve them of information they actually knew.  Their job responsibilities are therefore relevant only as to the whether scienter can be imputed to them based on their positions at the Company.  In this regard, Defendants' ignore that the Company's compliance problems took on a heightened importance for the reasons described above.

reckless in not knowing as much"); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (holding that "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable" to actual knowledge); *Howard v. Everex Sys.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) ("potential alarm signals" supported scienter).  Defendants would only have had to ask the individual coordinating the Company's response to the government investigations, or those with knowledge of the relevant internal reports, to learn that information.  If they did not do so, such willful blindness supports a strong inference of scienter.

Similarly, Spain's AML regulator concluded on December 20, 2012 that Western Union displayed an "absolute lack of control over the [culpable A]gents' activity" and that its AML system in Spain was "totally ineffective in preventing money laundering, related to fraud and other offenses, which has taken place on a large scale."  ¶174.  Defendants contend that the Complaint does not say "whether any of the Individual Defendants was aware" this misconduct. (Defs. Br. at 40 n.34).  It is not credible to suggest that the Company's CEO, CFOs, and Chief Compliance Officer would not have been told of these serious compliance failures related to agent oversight once they were raised by that regulator.[30]

5.    <u>Viewing All of the Evidence Holistically Supports a Strong Inference of Scienter</u>

Defendants attempt to pick apart each of the individual facts described above.  But scienter must be considered on an overall basis.  Accepting the Complaint's "factual allegations as true and assess[ing] them holistically," Plaintiff adequately pleads a strong inference that the Individual Defendants knew of the Company's compliance failures during the Class Period.

---

[30] As the Chief Compliance Officer, Defendant Koch would have been aware of this severely critical regulatory finding that occurred just a few months before he joined the Company. Moreover, compliance problems in Spain continued through at least 2014.  Defs. Ex 2 (FTC Compl.) ¶¶36(c), 68.

*Nakkhumpun*, 782 F.3d at 1149.  That "conclusion [is] logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading."  *Adams*, 340 F.3d at 1105.

Based on all of the evidence described above, "a reasonable person would consider the inference of scienter at least as compelling as the defendants' alternative inference." *Nakkhumpun*, 782 F.3d at 1149; *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d at 407 (it could "be inferred from the facts alleged . . . that the information in the examination reports were brought to the[] attention [of the individual defendants] or made available to them"); *In re Bear Stearns*, 763 F. Supp. 2d at 502, 504.[31]  The Class Period spans approximately five years because Defendants knew about the Company's compliance failures for a long time before the Joint Settlement revealed them to the public.  The fact that the government investigations lasted for so long before this information was made public shows that Defendants were concerned about the results and did not want to reveal them until forced to do so.  *Wal-Mart Stores, Inc.*, 2014 WL 4823876, at *9-11 (holding that waiting until an inflammatory article was published to reveal facts about an internal investigation showed that defendants were concerned about the suspected corruption).

Defendants misleadingly argue that the Complaint does not allege scienter as to each Individual Defendant in connection with the specific information that each knew when they made their false and misleading statements.  (Defs. Br. at 34, 59 n.49, 69-70, 72, 80-84, 86-94).

---

[31] The Sarbanes-Oxley certifications that Ersek and Scheirman or Agrawal signed in Company's SEC filings further support their scienter.  ¶¶309, 319, 345, 355, 370, 379, 393, 403, 415, 421, 430, 440, 450, 454, 463, 469, 477, 484, 490, 494; *see In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d at 1298 (holding SOX certifications are an "indicia of scienter" when considering all of the facts alleged); *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 950 (S.D. Tex. 2016).  Unlike here, the Complaint in *In re Zagg Sec. Litig.*, 797 F.3d 1194, 1204-05 (10th Cir. 2015), cited by Defendants, did not allege other facts that also supported a strong inference of scienter from a holistic perspective.  (*See* Defs. Br. at 80-81, 89, 93 n.67).

But all of the allegations described above support the strong inference that Western Union's compliance failures were "brought to their attention or made available to them" during the Class Period.  *In re Van der Moolen Holding*, 405 F. Supp. 2d at 407.  The Complaint is not required to plead anything further because "[p]laintiffs need not allege 'the exact date and time' when defendants became aware of [contrary] information" in order to plead a strong inference of scienter, as long as they "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d at 624.

For example, NYDFS's findings leave no doubt that Western Union knew of the compliance failures addressed in the DPA by early 2015 at the latest.  (Grunfeld Decl. Ex. 1). Board materials show that the Individual Defendants were aware of compliance problems much earlier.  Plaintiffs are not required to "identify the precise moment at which the culpable inference overtook the innocent one."  *In re ITT Educ. Servs.*, 34 F. Supp. 3d at 310.  Based on all of the sources described above, viewed holistically, it is at least equally—and in fact much more—plausible that each of the Individual Defendants had knowledge of the compliance failures discussed in the Joint Settlement during their tenures at the Company.

6.    The Complaint Adequately Alleges Corporate Scienter on Behalf of Western Union

Because the Complaint adequately pleads scienter as to each of the Individual Defendants, scienter is imputed to Western Union as to each of their statements.  *Adams*, 340 F.3d 1106 (holding the scienter of a corporate defendant's agent is attributable to the corporation under Section 10(b)); *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d at 1011.

Moreover, corporate scienter may be pled by alleging "either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the

statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted)); *see also In re Silvercorp Metals Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014). Overall, "[t]here is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants. . . . Furthermore, the individual making an alleged misstatement and the one with scienter do not have to be one and the same." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. Aug. 28, 2017) (internal quotation marks omitted) (citing cases where knowledge of managing director, of regional vice president, and vice president of department were attributed to the Company).[32] Corporate scienter is also supported where a "company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

Even if scienter is not found as to any Individual Defendant, a strong inference is easily raised as to Western Union. Indeed, Western Union acknowledges that it is subject to "*corporate* liability for certain criminal conduct *from 2004 to 2012*" because it willfully failed to maintain an effective AML program. Defs. Br. at 1, 38; ¶114. Moreover, the FTC determined

---

[32] Defendants misstate the law as to corporate scienter. They claim that the Ninth Circuit in *Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008), held that a "plaintiff must plead scienter 'with respect to those individuals who actually made the false statements' for such scienter to be imputed to the corporate entity." (Defs. Br. at 95). But *Glazer* actually held that "that the doctrine [of collective scienter] might be appropriate in some cases." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (discussing *Glazer*); *see also In re Volkswagen*, 2017 U.S. Dist. LEXIS 1109, at *839 (holding, based on *Glazer*, that corporate scienter was plausibly alleged). Furthermore, *Anderson v. Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229 (10th Cir. 2016), the only case from the Tenth Circuit that Defendants cite on this topic, did not even address the issue of corporate scienter.

that Western Union knew of the compliance failures that the FTC found based on the Company's internal records, reports, and analyses.  ¶¶114, 137.  CW1, a former Senior AML Compliance manager from July 2011 to May 2017, explained that these types of composite reports were distributed to senior managers at the Company.  ¶161.  And, as NYDFS determined, by early 2015, Western Union was already aware "of the full scope of the misconduct by such high-volume New York agents."  (Grunfeld Decl. Ex. 1 (NYDFS Consent Order) ¶¶5, 60).   The fact that these conclusions are based on information that Western Union produced to the government also supports corporate scienter.   The knowledge of the high-level employee that ran the Company's response to the government's investigations is attributable to the Company.

Furthermore, the FTC found that Company executives allowed an agent to be reactivated in 2014 "despite being informed that confirmed and potential fraud, as well as suspicious activity, amounted to approximately 54% of the agent's pay volume."  Defs. Ex. 2 (FTC Compl.) ¶97.  And the DPA discusses several senior executives that were aware of—and participated in—the Company's failure to discipline agents because they put financial motivations over compliance concerns.  ¶¶192-202.  For example, Stewart Stockdale—Western Union's President, Global Consumer Financial Services and an Executive Vice President during the beginning of the Class Period—protected a profitable agent from being disciplined in 2010 and remained employed at Western Union through October 2012.[33]  ¶¶198-99; *see also* ¶190.  The scienter of all of these executives are attributable to the Company.

### 7.   Defendants' Motives Further Support a Strong Inference of Scienter

Defendants go to great lengths to try to explain why stock sales during the Class Period by Defendants Ersek and Agrawal, as well as other high-level employees, are not evidence of a

---

[33] Stockdale also made several statements during the Class Period touting Western Union's legal compliance, its compliance practices, and its agents.  ¶¶325, 329, 349.

68

motive to commit fraud.  (Defs. Br. at 74-78, 87-88).  But "scienter allegations may suffice even without a motive."  *Nakkhumpun*, 782 F.3d at 1152 (citing *Tellabs*, 551 U.S. at 325); *see also Pirraglia* v. *Novell*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not…infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors.").

 Although suspicious stock sales are not necessary to plead scienter, the transactions alleged in the Complaint further support the strong inference of scienter here.  Defendant Ersek's and Agrawal's stock sales, and those of the other individuals identified in the Complaint, are particularly suspicious because nearly all of them occurred toward the end of the Class Period. Defendants acknowledge that nearly all of Ersek's sales were made in three large transactions between May 2015 and August 2016, pursuant to trading plans that were executed only months prior to these sales.  (Defs. Br. at 75 n.58); ¶¶286-89.  Defendant Agrawal also benefited from selling stock in August 2016, while in possession of non-public information.  ¶290.  Other high-level executives also sold approximately $10 million in stock between early 2015 and August 2016 after having sold less than $500,000 in stock earlier in the Class Period.  ¶¶291-95.  At that critical time, the various government regulators were nearing the end of their investigations and closing in on reaching the Joint Settlement in January 2017.  Defendants' arguments do not account for this suspicious timing within the Class Period.

 The fact that Ersek made these sales pursuant 10b-5 trading plans does not shield him from liability because the trading plans for all of these sales were entered into just months prior to the sales.  "[A] clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010).  Ersek's 10b5-1 trading plans related to his sales in 2015 and 2016 were entered into no in early 2015 or

later.  ¶¶288-89.  By that time, according to NYDFS, Western Union was already aware "of the full scope of the misconduct by such high-volume New York agents."  (Grunfeld Decl. Ex. 1).  Moreover, the fact that Defendant Ersek increased his holdings overall does not negate the suspicious nature of the nearly $3 million profit that he received by selling approximately one-quarter of his total holdings.  (Defs. Br. at 74, 76).  *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (holding that "sales by two executives . . . , although comparatively small in amount, can be considered unusual because of their timing").[34]

### F.       The Complaint Adequately Alleges Claims Under Section 20(a)

To plead a claim for control person liability under Section 20(a), a complaint must allege "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  *Adams*, 340 F.3d at 1107.  Defendants do not dispute that Defendant Ersek is a control person for purposes of Section 20(a).  *Id.* at 1109 (holding CEO "clearly" qualified as a control person); (Defs. Br. at 96-97).  Defendants are incorrect, however, that the allegations against Scheirman, Agrawal, and Koch are insufficient to show that they exercised control over the Company's compliance-related statements.

Defendants Scheirman and Agrawal were both the CFO and Executive Vice President of Western Union at various points during the Class Period.  ¶¶27-28.  They signed the Company's SEC filings that described in detail the Company's compliance obligations and their relevance to the Company's financial performance.  ¶¶305, 366, 411, 447, 474.  They also stated in SEC filings throughout the Class Period that the government investigations into the Company's

---

[34] Defendants note that the Complaint does not allege that Scheirman or Koch sold stock during the Class Period.  (Defs. Br. at 88 n.65).  But Defendant Scheirman left the Company in 2014, before the suspicious period when Ersek and others sold stock before the Joint Settlement.  In addition, it is not surprising that Koch, who was employed at the Company for only 2.5 years, would not have accumulated the same amount of stock as longstanding executives.

compliance practices were too preliminary for the Company to be able to predict their outcome. ¶¶282, 308, 318, 344, 368, 413, 449, 476, 483, 489, 493.  Those investigations resulted in the Company paying over $600 million (including settlements following the Joint Settlement)—the largest forfeiture every by a money services business—because of its compliance problems. ¶128.  Defendants Scheirman and Agrawal also regularly attended Board meetings at which compliance issues were discussed.  Because of the financial significance of Western Union's known compliance failures, Scheirman and Agrawal are controlling persons as to Defendants' statements concerning those issues.  *See In re SemGroup*, 729 F. Supp. 2d at 1302 (holding CFO who signed public documents and was involved in managing the company was a control person).

Because the issues in this case relate to Western Union's compliance practices, Defendant Koch, as the Chief Compliance Officer during his tenure at the Company, is also properly alleged to be a control person.  In fact, Defendants attempt to cast off liability from other Defendants by noting that "Western Union had a Chief Compliance Officer who had those responsibilities" for compliance matters.  (Defs. Br. at 90-91, 97).  Defendants argue that Koch did not have "the ability to exercise control over" the other Defendants.  But "control" under Section 20(a) can be indirect.  Just as "it is reasonable to infer that [a Chief Financial Officer] had at least indirect control over the [company's] financial reporting," *Adams*, 340 F.3d at 1109, it is reasonable to infer that the Chief Compliance Officer has that same level of authority over how the Company represents its compliance practices.  Koch reported to the Board's Compliance Committee rather than to any of the other Individual Defendants.  ¶29; see *also* Defs. Br. at 97. This separate reporting line shows that Koch was not beholden to the other Defendants and therefore exercised at least indirect control over compliance issues at Western Union through the Company's compliance function.

## IV.    CONCLUSION

For all the reasons stated above, Defendants' Motions to Dismiss should be denied in their entirety.

DATED:  April 5, 2018                          Respectfully submitted,

                                                */s/ Jeremy A. Lieberman*
                                                **POMERANTZ LLP**
                                                Jeremy A. Lieberman
                                                Marc I. Gross
                                                Michael Grunfeld
                                                600 Third Avenue, 20th Floor
                                                New York, NY  10016
                                                Telephone: (212) 661-1100
                                                Facsimile: (212) 661-8665
                                                Email:  jalieberman@pomlaw.com
                                                        migross@pomlaw.com
                                                        mgrunfeld@pomlaw.com

                                                **POMERANTZ LLP**
                                                Patrick V. Dahlstrom (not admitted)
                                                10 South La Salle Street, Suite 3505
                                                Chicago, Illinois 60603
                                                Telephone: (312) 377-1181
                                                Facsimile: (312) 377-1184
                                                Email: pdahlstrom@pomlaw.com

                                                *Lead Counsel for Lead Plaintiff and the*
                                                *Putative Class*

                                                **BRONSTEIN, GEWIRTZ**
                                                **& GROSSMAN, LLC**
                                                Peretz Bronstein
                                                60 East 42nd Street, Suite 4600
                                                New York, NY 10165
                                                Telephone: (212) 697-6484
                                                Facsimile (212) 697-7296
                                                Email: peretz@bgandg.com

                                                *Additional counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2018, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.


*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman