# EXHIBIT 1

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

---

In the Matter of

WESTERN UNION FINANCIAL SERVICES, INC.

---

## CONSENT ORDER UNDER
## NEW YORK BANKING LAW §§ 39 and 44

The New York State Department of Financial Services (the "Department") and Western Union Financial Services, Inc. ("Western Union" or the "Company") are willing to resolve the matters described herein without further proceedings.

**WHEREAS**, Western Union is a global financial institution and money services business headquartered in Englewood, Colorado, that, together with its affiliates, employs approximately 10,000 people worldwide and has assets of more than $9.4 billion;

**WHEREAS**, the Company is licensed by the Department to operate a money transmission business in New York State;

**WHEREAS**, in 2016, Western Union agents in New York State processed more than 18 million consumer-to-consumer money transfers, totaling in excess of $4 billion; this volume accounted for approximately 10 percent of all Western Union money transfers effectuated in the United States.

**WHEREAS**, the Department has been conducting an investigation of Western Union's money services business. The Department hereby finds as follows:

1

## The Department's Findings After Investigation

### Introduction

1.     The Department has been conducting an investigation of Western Union, including reviewing thousands of pages of documents obtained from the Company and obtaining information from third party sources.

2.     Under New York law, Western Union must establish, implement, and maintain an effective anti-money laundering ("AML") compliance program that, among other things, provides for:  internal policies, procedures, and controls to guard against money laundering; an individual or individuals to coordinate and monitor day-to-day compliance with the federal Bank Secrecy Act ("BSA"), and New York banking laws and regulations; an employee training program; independent program testing; customer identification verification; and accurate, complete and timely reports of suspicious activity.

3.     One way that criminals and other bad actors may utilize money transmitters for improper purposes is to send money illicitly through the practice of "structuring." "Structuring" occurs when a party executes financial transactions in a specific pattern, like breaking up a larger sum into smaller transactions.  The purpose of structuring typically is to avoid (a) triggering the obligation of a money transmitter like Western Union to file reports with the federal government required by the BSA, or (b) the money transmitter's own requirements for providing certain types of identification and other evidence of the legitimacy of the financial transaction.[1]  New York laws and regulations require money transmitters like Western Union to maintain effective controls to combat structuring by its agents or customers.

---

[1] *See, e.g.,* Internal Revenue Service, Internal Revenue Manual Part 4 (https://www.irs.gov/irm/part4/irm_04-026-013).

4.       Western Union failed to satisfy this obligation for many years.  Between 2004 and 2012, Western Union willfully failed to implement and maintain an effective anti-money laundering program that was designed to deter, detect, and report on criminals' use of Western Union to facilitate fraud, money laundering, and structuring schemes.  Despite having evidence that a substantial number of its agents were engaging in suspicious activity, the Company continued to maintain relationships with suspect but profitable business partners, sometimes bending its own policies and procedures to do so.  The conduct involved various Western Union offices and agents located in New York, other states, and around the world.

5.       Additionally, several Western Union executives and managers knew about (or willfully ignored) improper conduct involving certain high-volume agents located in New York State as it occurred, yet the Company never disclosed this to the Department.  Moreover, even after the United States Department of Justice ("DOJ") launched an investigation of Western Union in 2012, and the Company became aware of the full scope of the misconduct by such high-volume New York agents in early 2015, the Company waited approximately two years to fully disclose this information to the Department.

6.       On January 19, 2017, The Western Union Company (the parent of the Department's licensee, Western Union) entered into a deferred prosecution agreement with DOJ, in which, based on conduct occurring between 2004 and 2012, it admitted to the federal criminal offenses of (a) willfully failing to implement an effective anti-money laundering program under the BSA (31 U.S.C. §§ 5318(h), 5322 and regulations thereunder), and (b) aiding and abetting wire fraud (18 U.S.C. §§ 2, 1343) (the "DPA").  On the same day, The Western Union Company settled related civil charges brought by the Federal Trade Commission ("FTC") pursuant to a Stipulated Order (the "FTC Order").

7.      Pursuant to the DPA, The Western Union Company agreed to forfeit to DOJ a total of $586 million for the purpose of "mak[ing] the funds available to compensate victims of the fraud scheme described in the [accompanying] Statement of Facts." The Western Union Company further "acknowledge[d] that at least $586 million in consumer fraud proceeds are traceable to transactions" that constituted wire fraud, as described in the DPA's Statement of Facts ("DPASOF").[2] *See* DPA at 8.

8.      The Western Union Company also consented to an assessment of a civil monetary penalty in the amount of $184 million by the United States Financial Crime Enforcement Network ("FINCEN") for failing to maintain an effective anti-money laundering program. The entirety of this penalty was credited against the payment of the above-mentioned forfeiture to DOJ of $586 million; in other words, Western Union did not make an additional payment in that amount. Accordingly, all of the money paid in forfeiture was determined to be the proceeds of fraud, which is to be returned to victims via federal restitution mechanisms.[3]

**New York's Important Role in Western Union's Business**

9.      Western Union operates an electronic network by which consumers can send money to individuals and businesses in the United States and around the world. Western Union provides money transfer services to consumers via approximately 550,000 Western Union agent locations in more than 200 countries and territories. Some agents are individuals or small corporate entities that own or operate an independent business and have a contractual

---

[2] *See U.S. v. The Western Union Company,* 17-CR-00011 (CCC) (M.D. Pa. Jan. 19, 2017).

[3] *See* "Justice Department Announces Compensation Process for Western Union Fraud Victims With Funds Recovered Through Asset Forfeiture," https://www.justice.gov/opa/pr/justice-department-announces-compensation-process-western-union-fraud-victims-funds-recovered (Nov. 13, 2017).

relationship with Western Union that authorizes the agent to offer Western Union's money transfers to consumers.

10.     Western Union earns revenue by charging consumers a fee based on the transfer amount and its destination. The Company earns additional revenue on international transactions sent in one currency and received in a different currency.

11.     Western Union pays each agent a commission for each money transfer the agent processes. Western Union may also pay an agent bonuses and other compensation based on transaction volume. The Company can terminate or suspend any agent or agent location for a variety of reasons, but especially compliance reasons.

12.     Western Union has held a money transmitter license issued by the Department since 1990. The Department is the sole prudential regulator for Western Union in the State of New York.

13.     New York plays an important role in Western Union's business operations, with more than 2,800 agent locations in the State. In 2016, New York agents processed more than 18 million consumer-to-consumer money transfers, totaling in excess of $4 billion. This volume accounted for approximately 10 percent of all Western Union money transfers effectuated in the United States.

14.     Moreover, in 2016, money transfers involving New York agents yielded $224 million in revenue for Western Union. This resulted in gross profits to the Company of approximately $50 million.

**Prior Compliance Failures at Western Union Uncovered by the Department**

15.     The Department previously determined that Western Union suffered from compliance failures involving its anti-money laundering program in general, and its efforts to

prevent structuring in particular.  In or about 2002, the Department's predecessor agency, the New York State Banking Department, conducted an examination of the Company and determined that it failed to establish effective procedures to monitor its agents, detect suspicious transactions, and file suspicious activity reports (the "2002 Examination").  One of the key deficiencies that the 2002 Examination uncovered was that Western Union agents were permitting structuring to occur.

16.     To resolve the deficiencies identified in the 2002 Examination, in December 2002, Western Union agreed to pay a civil monetary penalty of $8 million for violations of New York law.  The Company also agreed to (a) conduct further reviews to identify suspected structuring, (b) establish enhanced due diligence policies to monitor its agents for AML compliance, and, notably, (c) create protocols for terminating agents who consistently violate AML rules and regulations or compliance policies (the "2002 Agreement").

17.     As part of a parallel resolution with FINCEN in 2003, Western Union also agreed to conduct further agent reviews to identify suspected structuring to avoid the filing of Currency Transaction Reports or recordkeeping requirements imposed by  31 C.F.R. § 1010.410,[4] and to "establish an enhanced nationwide due diligence policy to monitor its agents for BSA compliance [, which] shall include . . . terminating such agents that Western Union determines to be in chronic violation of Western Union policies and/or a substantial risk for money laundering."[5]

---

[4]  Formerly 31 C.F.R. § 103.33(f).

[5]  DPASOF ¶ 55.

**Western Union's Willful Failure to Maintain An Effective Anti-Money
Laundering Program and Its Impact on New York Residents and Consumers**

18.     Unfortunately, Western Union did not sufficiently improve its compliance in response to the 2002 Agreement.   Although the Company made some initial progress through 2006, nonetheless, between 2004 and 2012, Western Union repeatedly failed to meet its compliance obligations by neglecting to terminate or effectively discipline certain agents, in New York and elsewhere, that Western Union knew or should have known were persistently engaging in illegal behavior, such as assisting structuring and abetting third parties perpetrating consumer fraud.

### *Willful Failure to Prevent Structuring and Other Unlawful Conduct – New York "China Corridor" Agents*

19.     Many of Western Union's agents conduct money transmission for customers that wish to send funds abroad.  A number of New York agents, for example, conduct large volumes of transactions to Western Union locations in China ("NY China Corridor Agents").

20.     For many years, Western Union knew or willfully ignored the fact that certain NY China Corridor Agents facilitated suspicious transactions on behalf of customers.  These agents (referred to herein as "Agent 1," "Agent 2" and "Agent 3") were some of Western Union's largest agent locations in the world by transaction volume – and thus some of the most profitable for the Company.

21.     **Agents 1 and 2**:  Agent 1, located in lower Manhattan, was a small travel agency that offered Western Union money transmission services.  Agent 2, located in the Sunset Park neighborhood of Brooklyn, was a small business that sold wireless cellphone services to consumers, and also offered Western Union money transmission services.  Moreover, Agent 1

and Agent 2 were closely linked -- Agent 2 apparently was owned by the spouse of the owner of Agent 1.

22.     Despite its small size, between 2004 and 2011 Agent 1 processed more than 447,000 transactions totaling more than $1.14 billion.  Similarly, although a small business entity, between 2005 and 2011, Agent 2 processed more than 302,000 transactions, totaling more than $600 million.

23.     Almost all of the more than $1.7 billion worth of transfers processed by Agent 1 and Agent 2 together in this time period were transmitted to China.  According to federal law enforcement authorities, at least 25 to 30 percent of the transactions processed by Agents 1 and 2 in this time period bore characteristics indicative of structured transactions.[6]

24.     Likewise, between 2004 and 2012, Agent 3 processed more than 735,000 transactions, totaling more than $1.2 billion.  Like Agents 1 and 2, most of the transfers processed by Agent 3 were sent to China.

25.     The sheer number and size of transactions processed by these agents, which were small independent stores each with a small number of employees, stood out as clear indicators of increased money laundering risk.  For example, for Agent 1 to have legitimately processed the number and volume of transactions indicated by its aggregate 2005 Western Union money transfer activity, the agent, a small business in New York City, would have had to process an average of 200 transfers, with an average value of $2,160, each and every day of the year.

26.     Western Union possessed evidence that these agents were failing to meet compliance standards.  For example, between 2004 and 2011, the Company conducted almost two dozen compliance reviews of Agents 1 and 2.  On each occasion Western Union compliance

---

[6] *See* DPASOF ¶ 69.

staff found that the employees of Agents 1 and 2 were not complying with certain elements of the BSA or Western Union policy.

27.     Shortcomings identified by Western Union's own compliance staff included (a) permitting consumers to apparently structure transactions, (b) failing to file suspicious activity reports in every instance where such a report was required, and (c) failing to have sufficient compliance programs.  Western Union's reviews even determined that employees of both Agents 1 and 2 were, in certain instances, entering false data into Western Union's transfer records to aid customers in evading regulatory scrutiny.

28.     Strikingly, the compliance officer for Agent 1 admitted to a Western Union investigator that she had accepted a large sum of cash from a consumer for transmission, and had fabricated a series of smaller transactions to circumvent reporting requirements.

29.     For years, Western Union failed to adequately respond to improper conduct committed by certain of its agents.  During the relevant time period, Western Union had an unwritten policy to suspend an agent location from conducting transactions if that agent location was placed on probation three times.  "Probation," as understood by Western Union compliance staff, referred to Western Union's policy of engaging in enhanced reviews of an agent location. Company policies called for problematic agents to face escalating levels of discipline for improper or illegal conduct:  from probation, to suspension, and finally termination.

30.     Nonetheless, on a number of occasions, Western Union management intervened to obtain more lenient treatment for NY China Corridor Agents, which were some of the Company's highest fee generators.  For example, in 2009, Western Union compliance staff circulated information about agents who had been placed on probation multiple times due to negative compliance reviews, a group that included Agent 2.  As previously noted, Western

Union had an unwritten policy requiring suspension of an agent location if the agent location was placed on probation three times, with "no appeal."

31.     Apparently to reduce the chance that less-compliant agents (such as Agent 2) would again be identified as policy violators, a Western Union compliance employee explained by e-mail to a business executive that compliance staff would give "*plenty of notice before they conduct reviews with agents who have 2 or more probations*," apparently maximizing the chance for such agents to avoid more serious discipline, and a corresponding suspension or cessation of fee revenue.

32.     An executive in charge of business planning for the U.S. Northeast region made extra efforts to shield Agent 2 because of its significance to Western Union business, asking in an e-mail that other business staff "help [the] compliance group understand how important those Chinese agents are – *not shut them down automatically.  [Agent 2] is [the] #2 agent in the region and we can't afford [a] one week suspension.*"

33.     Similarly, in approximately 2008, Agent 1's owner had been exempted from Western Union's policy of being suspended after accruing multiple negative compliance reviews, given the very large dollar volume of transactions conducted for Western Union.  Indeed, rather than suspend the agent for these multiple violations, Company management actually paid Agent 1's owner a $250,000 bonus to renew the contract with Western Union.

34.     Later, in 2010, Western Union's then-Director of Compliance reported to Western Union's then-Chief Compliance Officer ("WU CCO") that a compliance review of Agent 1 had uncovered numerous additional legal and policy violations.  These included the incident discussed above (¶ 28), where Agent's 1's compliance officer admitted fabricating consumer transaction records to conceal a customer's illegal structuring activity.  The Director of

Compliance reported to the WU CCO that these new findings warranted suspension of Agent 1, which would constitute Agent 1's third compliance-related suspension.

35.     Western Union's business management intervened to ensure that only a short suspension of 24 days was imposed on Agent 1.   Moreover, Agent 1's internal compliance officer, who had admitted falsifying records, was permitted to remain in that position and continue to processing voluminous Western Union transfers.

36.     Only a few months later, Western Union compliance staff identified a series of additional violations of anti-money laundering policies committed by Agent 1.   A compliance officer stated that, under Western Union's policies, this warranted suspension of the agent, given the accrual of negative compliance reviews.   No suspension occurred, however, and another compliance staffer noted that this result was a so-called "policy exception."

37.     In light of this history, Western Union compliance staff subsequently sought means, other than their own internal disciplinary processes, to address ongoing compliance issues with Agent 1.   In 2011, upon obtaining evidence from a former employee of Agent 1 that Agent 1 was potentially involved in criminal activity,  Western Union compliance staff discussed bypassing internal processes altogether and referring the matter directly to law enforcement.  "In this case," a senior compliance officer wrote in an e-mail to a colleague, ***rather than fighting with the business to gain support to suspend, etc., we thought that [a] better tactic would be to give law enforcement a crack at it*.**"

38.     Later in 2011, the bank that held direct deposit accounts for Agents 1 and 2 asked Western Union for information about these (and other) agents' compliance programs and Company reviews.   Western Union initially resisted this request, fearful that the bank would close the deposit accounts and imperil Western Union's lucrative relationship with these agents.

One Company sales executive told colleagues in an e-mail that responding frankly risked Western Union's agency relationships, and asked whether the Company could conceal what it knew about these agents from the bank:

> *Closing [Agents 1 and 2] at this time will impact the US-China corridor BADLY. Please see if there is anything we can do (like verify that [Agent 1] has done something 'not compliant' and [promising to] re-educate Agent 2 to be compliant) and to re-open them in a few weeks to catch the Chinese New Year rush.*

Subsequently, in December 2011, Western Union terminated Agents 1 and 2.

39.     The seriousness of the misconduct detected at Agent 1 by Western Union was subsequently confirmed, when Agent 1's owner admitted to law enforcement agents that he knew at least some consumers used Western Union's money transfer services to pay debts to human traffickers based in China, and that consumers would structure transactions to keep them under $2,500, in order to avoid having to provide identification.[7]

40.     Despite Western Union's knowledge of illegal and improper activity at Agent 1, Western Union almost never filed a SAR about Agent 1's own suspicious conduct (filing only two over the span of a decade) -- even though the Company had filed many thousands of SARs regarding particular consumer transactions processed by Agent 1.

41.     **Agent 3**:   Western Union's relationship with Agent 3 also demonstrates the Department's concerns with Western Union's conduct in this matter.  In January 2011, for instance, Western Union's compliance review of Agent 3, which was located in the Flushing neighborhood of Queens, raised serious questions as to whether the agent was allowing structuring activity to occur.  The information received included the occurrence of multiple transactions on a particular date without a corresponding quantity of customer traffic.  Based on this and other information, a senior employee in Western Union's Global Monitoring and

---

[7] DPASOF ¶ 71.

Intelligence ("GMI") division explained that these revelations, coupled with prior intelligence, indicated that this agent was a significant compliance risk and recommended that Western Union take "immediate action to mitigate the risk." Further discussions involving a senior lawyer in Western Union's compliance group led the compliance team to decide that the Company should terminate its relationship with this agent. The senior lawyer asked that a memo be prepared "*so that I can go to the business and explain what we've done. . . . [I] want to ensure the business understands this is not a first time thing or that rehabilitation is an option.*"

42.     Later the same day, the senior compliance lawyer reported to her team by e-mail that the business side rejected termination of Agent 3 due to its revenue-generating significance:

> *[A business executive with whom she spoke] is not going along with termination. Agent is too significant to the business. I explained the [serious compliance] issues . . . but all he sees is the volume and Chinese New Year.*"

Agent 3 was suspended only for a short period of time, despite the compliance concerns.

43.     Not long after, in February 2011, GMI staff reported that, after further investigation, the GMI staff was comfortable lifting Agent 3's suspension, as some of the underlying information initially relied upon by the compliance team had turned out to be inaccurate. Nevertheless, a GMI official noted that Western Union would subject Agent 3 to "a specially designed AML Compliance Probation . . . as a condition of reactivation." The official warned: "*With that said, this location is still at risk . . . and a reactivation does present financial and reputational risk to Western Union.*"

44.     Less than six months later, in July 2011, compliance staff identified new compliance issues at Agent 3. An analyst noted that the team had discovered a series of transactions processed by Agent 3 that were sent within minutes of each other -- many of which were sent by different people, but all of which were directed to the same recipient in China. This

"many-to-one" pattern may be an indicator of illegal structuring. The analyst noted that many of the transactions were specifically crafted to avoid triggering various enhanced scrutiny or reporting requirements imposed by the Company or state and federal law.

45.     A Western Union investigator also reported that, during five different site visits to Agent 3 over the course of two weeks, the investigator witnessed Agent 3 employees permitting (and in some cases, encouraging) customers to structure large transactions by enlisting friends or relatives to assist, and then dividing the larger transactions into smaller ones, so as to keep their transactions below the limit at which Western Union's enhanced customer due diligence review would apply. The investigator further reported that he informed Agent 3 this was not permissible, and that the agent's employees should convince customers to combine split transactions and undergo Western Union's enhanced customer due diligence.

46.     The Western Union investigator also reported that he witnessed other compliance shortcomings at Agent 3, including permitting customers to use a photocopy of an identification document instead of an original. Additionally, it was subsequently determined by the compliance team that Agent 3 had failed to file SARs that compliance had asked Agent 3 to file.

47.     As the Compliance team then weighed suspending Agent 3 once again for compliance deficiencies, business interests objected to any action that would curtail revenues from this highly profitable agent:

> *[Agent 3] is our top location to China in the entire United States.  Please note that we need to work together to keep this agent active while still satisfying our compliance requirements.*[8]

---

[8] Western Union's compliance deficiencies in connection with China Corridor agents reached beyond those located in New York. Between 2004 and 2012, for example, customers of other Western Union China Corridor agents illegally structured hundreds of millions of dollars in transactions to China. *See* DPASOF ¶ 63.

48.     Eventually, Agent 3 provided to Western Union the compliance information that was requested.  Western Union has represented to the Department that it has had no serious compliance issues with Agent 3 since 2012, even though it continues to be a high-volume agent.

**By Failing to Exercise Reasonable Supervision Over Its Agents,**
**Western Union Aided and Abetted Fraudulent Schemes**
**Perpetrated Against Consumers in New York and Elsewhere**

49.     Between 2004 and 2012, Western Union aided and abetted various unlawful fraud schemes by failing to exercise reasonable supervision over agency locations that knowingly facilitated fraudulent schemes.  These schemes were directed at consumers in the United States and around the world, and likely including residents of New York.

50.     Criminals relied on Western Union's money transfer system to facilitate payments from victims of fraudulent schemes to perpetrators around the world.  Western Union's conduct, including its failure to take effective corrective actions in a timely fashion, contributed to the success of the fraudsters' schemes.

51.     Fraudsters contacted victims by phone, mail, or the internet, inducing them to send money via Western Union by, *inter alia,* (a) promising large cash prizes or sweepstakes winnings in exchange for up-front payments; (b) offering expensive items for sale; (c) promising moneymaking opportunities in return for an advanced payment; and (d) posing as the victim's relative and claiming to urgently need money.

52.     These criminals directed victims to send advance payments to fictitious payees via Western Union.  Fraudsters obtained payment details from the victim and used them to claim the money.  Some Western Union agents were in on the scheme, helping to conceal the identity of the fraudster in exchange for a share in the proceeds.

15

53.     Western Union became aware of many of these fraudulent payments because a number of victims reported the fraud to the Company.  Western Union maintained a database with details of all the fraud reports by consumers, using that information to track and investigate agent locations that paid out victims' payments to fraudsters.

54.     Between 2004 and 2012, Western Union identified more than $500 million in reported consumer fraud transactions sent through Western Union agents – a sum that represented only a portion of the total amount of fraud, as many victims did not report fraud to Western Union.[9]

**Western Union Failed to Make**
**Timely Supervisory Disclosures to the Department**

55.     As the prudential regulator for money transmitters such as Western Union and other financial institutions, the Department relies on transparency from its licensed entities about their financial condition, compliance adequacy, market conduct, and transactions with New York consumers.   Licensed financial institutions must observe a duty of prompt and complete disclosure of improper conduct to the Department about which it knows or discovers, including misconduct engaged in by the entity itself, including through employees and agents.

56.     With such transparency, the Department is able to help ensure the safety and soundness of such institutions; protect consumers from abusive conduct; and determine that institutions are in compliance with New York laws and regulations.

---

[9] Additional serious and long-term deficiencies in its BSA/AML compliance were identified in the DPA (*see* DPASOF ¶¶ 55-99).

57.     Moreover, and just as essential, information obtained from one licensee may assist the Department in supervising other licensees in that category of financial institution and/or in the same vicinity as the subject licensee.[10]

58.     Here, at a minimum, several senior Western Union executives and managers knew about (or ignored) improper conduct involving NY China Corridor agents as it occurred. The compliance issues regarding agents stretched back as far as 2004 – close in time to the 2002 Agreement between the Department and Western Union, which involved similar misconduct by certain New York agents.   Western Union was thus fully on notice that it needed to keep a watchful eye for agent misconduct in this State.

59.     Moreover, Western Union's lack of disclosure to the Department of its prior knowledge concerning NY China Corridor Agents continued after DOJ commenced its investigation of the Company in 2012.   Following receipt of grand jury subpoenas from DOJ, Western Union responded (through counsel) to DOJ's investigation for a period of four years, including providing DOJ historic documents, and making periodic presentations to DOJ about Western Union's prior conduct, in an effort to mitigate the consequences of the conduct uncovered.

60.     No later than early or mid-2015, Western Union was in a position to disclose its understanding about NY China Corridor Agents to the Department, as it had done with DOJ.   No such disclosure was made; instead, the Company provided to the Department only non-specific

---

[10] Disclosure obligations of licensed money transmitters such as Western Union are clearly set forth in the New York Banking Law and its regulations.  For example (and without limitation): (a) money transmitters are obligated to submit a report to the Superintendent immediately upon discovering fraud, dishonesty, making of false entries or omission of true entries, or other misconduct, whether or not a criminal offense (3 N.Y.C.R.R. §§ 300.1(a), 406.10(c).); and (b) money transmitters are obligated to submit a report to the Superintendent of incidents that appear to relate to a plan or scheme that would be of interest to other money transmitters or licensed entities located in the same area (3 N.Y.C.R.R. §§ 300.4, 406.10(c)).

reports that merely cited the pendency of federal investigations identified in the Company's public filings with the U.S. Securities and Exchange Commission.

61.     The first time that the Department learned of the extent of the conduct engaged in by Agents 1, 2 and 3 was in March 2017 – and only after the Department requested a presentation by the Company on compliance issues affecting Western Union's New York State operations based on the information gathered by the Company during the DOJ investigation.

62.     By withholding this information, Western Union deprived the Department of its ability to effectively supervise the Company.   Additionally, the Department would have been able to employ this information in supervising other money transmitters with agents in the same or nearby vicinity, and with other licensed financial institutions that interacted with those money transmitters.   Further, the Department would have had the ability to analyze the underlying data to uncover broader trends of structuring, money laundering and other illicit financial transactions.   None of this occurred when Western Union failed to timely disclose this information to the Department.

**Remediation Undertaken By Western Union**

63.     The Department acknowledges that, since 2012, Western Union has undertaken significant remedial measures, and implemented compliance enhancements, to improve its anti-fraud and anti-money laundering programs.   Western Union has informed the Department of these remedial and compliance measures, which include (but are not limited to):

> a.   between 2013 and 2015, an increase in the number of employees in The Western Union Company's Compliance Department by more than 100 percent, and an increase to the Compliance Department budget of more than 60 percent;
>
> b.   creation of Western Union's Fraud Risk Management Department in 2012, which instituted global agent oversight standards to identify and investigate any agent worldwide that processed a certain number of reported fraud

transactions, along with new compliance procedures to increase compliance authority and accountability, including with regard to Agent oversight;

c. hiring a new Chief Compliance Officer and other senior compliance staff in 2013. The Chief Compliance Officer was given a direct reporting line to the Chairperson of the Compliance Committee of The Western Union Company Board of Directors;

d. creating new compliance procedures to increase compliance authority and accountability, including with regard to agent oversight. In particular, Western Union created a new AML Oversight Committee, which meets regularly and has authority to take corrective action against agents and implement automatic transaction controls such as Real Time Risk Assessment ("RTRA") rules.

e. empowering employees in eight departments to suspend Agents based on analyses, on-site observations, and/or investigation results, and implementing explicit decision procedures and timelines for agent oversight actions, including corrective action;

f. creating new teams within its Financial Intelligence Unit to work with law enforcement and generate internal information for agent and consumer analysis, including a Global Rapid Response Team to reach out to law enforcement proactively with investigative results related to crisis events and Strategic Intelligence Units to identify emerging criminal typologies;

g. creating and expanding its Courtesy Call Back program, under which certain potentially fraudulent transactions are held while Western Union contacts the sender to determine whether the transaction is legitimate; and

h. expanding fraud reporting mechanisms, including international hotlines, which assist consumers outside the United States in reporting fraud scams to Western Union.

64.     Moreover, the Department further recognizes that Western Union has made and continues to make substantial contributions to law enforcement efforts through its continuing cooperation with law enforcement authorities in New York and elsewhere. In setting forth the agreed-upon remedies and relief set forth below, the Department has given positive consideration (among other factors) to the factors set forth in Paragraphs 63 - 64.

* * * *

65.     **NOW THEREFORE**, to resolve this matter without further proceedings pursuant to the Superintendent's authority under Sections 39 and 44 of the Banking Law, the Department and Western Union stipulate and agree to the terms and conditions below:

## VIOLATIONS OF LAW AND REGULATIONS

66.     Western Union failed to maintain an effective and compliant AML program, in violation of 3 N.Y.C.R.R. § 417.2.

67.     Western Union failed to exercise reasonable supervision over its agents to ensure compliance with applicable laws, rules, and regulations, in violation of 3 N.Y.C.R.R. § 406.3(g).

## SETTLEMENT PROVISIONS

**Monetary Payment**

68.     Western Union shall pay a civil monetary penalty to the Department pursuant to Banking Law § 44 in the amount of $60,000,000.  Western Union shall pay the entire amount within ten days of executing this Consent Order.  Western Union agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

**Remediation**

69.     Within 90 days of this Consent Order's effective date, Western Union shall submit to the Department a written plan, acceptable to the Department, that is designed to ensure the enduring adequacy of its anti-money laundering and anti-fraud programs.  The plan shall address, at a minimum, the following elements:

       a.  maintenance of an independent Compliance Committee of The Western Union Company Board of Directors with oversight of the Chief Compliance Officer and the Compliance Program, including anti-money laundering and anti-fraud programs;

b.   requiring all Western Union agents around the world, regardless of their location, to adhere, at a minimum, to U.S. regulatory and anti-money laundering standards, unless in direct conflict with local law;

c.   implementing a risk-based Know Your Agent program to ensure Western Union agents throughout the world are complying with this plan;

d.   procedures for corrective action, including termination, against agents, including foreign agent locations that process consumer to consumer money transfers conducted through Western Union agents to, from, or through the United States, that the Company has determined pose an unacceptable risk of money laundering or the financing of terrorism, or have demonstrated systemic, willful, or repeated lapses in compliance;

e.   ensuring that, when the Company identifies agent locations in violation of law or Western Union policy and procedures, unless asked to do otherwise by law enforcement, or inconsistent with applicable law, the Company will provide notice to the agent in writing of the nature of the violation; and that the Company will document any training or remedial measures taken by the Company with regard to the violation;

f.   ensuring that all consumer-to-consumer money transfers conducted through Western Union agents to, from, or through the United States, regardless of the origin or destination, are monitored to identify potentially fraudulent transactions;

g.   policies and procedures to ensure that the Company will follow all laws and regulations concerning the filing of Suspicious Activity Reports in the United States for any suspicious activity, as defined by the BSA, its implementing regulations, and New York laws and regulations, including, but not limited to, filing SARs according to regulatory requirements identifying:

   i.   suspicious activity identified by the Company related to consumer to consumer money transfers conducted through Western Union agents of $2,000 or more (or pursuant to the relevant SAR reporting threshold) to, from, or through the United States, regardless of where in the world the suspicious transactions originate or are received;

   ii.   consumer-to-consumer money transfers conducted through Western Union agents of $2,000 or more (or pursuant to the relevant SAR reporting threshold) to, from, or through agent locations in the United States that are reported by consumers to the Company as fraud-related, regardless of where in the world the suspicious transactions are received; and

21

      iii.  agent location owners, operators or employees anywhere in the world that the Company identifies as engaged in or allowing suspicious activity related to consumer to consumer money transfers conducted through Western Union agents of $2,000 or more (or pursuant to the relevant SAR reporting threshold) to, from, or through the United States; and

    h.  ensuring that Western Union provides prompt, complete and accurate information to the Department as required by New York laws and regulations.

70.    If applicable SAR reporting thresholds are altered by law or regulation, the Company's policies and procedures shall be modified to conform to any new thresholds, and the plans required by this Order shall be modified accordingly.

**Compliance Point of Contact**

71.    Western Union shall designate to the Department a Western Union employee who shall serve as a point of contact with the Department to ensure that Western Union provides, at a minimum, prompt, complete and accurate information to the Department as required by New York laws and regulations. Without limitation, among the information that may be requested by the Department from Western Union includes a written report listing all Western Union agents located in New York State who are in the top five percent of agents in terms of SARS filed by the Company, which includes, for each agent location on the list: (a) information identifying the owner of the agent; and (b) what actions, if any, have been taken with respect to the agent location and/or owner or employees of the agent location and the reason for any such action or lack of action.

**Reports to the Department**

72.    At the point of six months, twelve months, eighteen months and twenty-four months after execution of this Consent Order, Western Union shall submit to the Department a

written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order, and the results of any such actions.

**Full and Complete Cooperation of Western Union**

73.     Western Union commits and agrees that it will fully cooperate with the Department regarding all terms of this Consent Order.  Such cooperation shall include, but not be limited to, Western Union's agreement to request that DOJ and the FTC share with the Department any reports Western Union has provided to DOJ or the FTC pursuant to the DPA and the FTC Order; and providing the Department with copies of any such reports, as requested.

**Breach of Consent Order**

74.     If the Department believes Western Union to be in material breach of this Consent Order, the Department will provide written notice to Western Union and the Company must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

75.     The parties understand and agree that Western Union's failure to make the required showing within the designated time period shall be presumptive evidence of the Company's breach.  Upon a finding that Western Union has breached this Consent Order, the Department has all the remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

76.     The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

77.     This Consent Order is binding on the Department and Western Union, as well as any successors and assigns.  This Consent Order does not bind any federal or other state agency or any law enforcement authority.

78.     No further action will be taken by the Department against Western Union for the specific conduct set forth in this Consent Order, provided that the Company complies with the terms of this Consent Order.

79.     Notwithstanding any other provision contained in this Consent Order, the Department may undertake action against Western Union for transactions or conduct that Western Union did not disclose to the Department in the written materials that Western Union submitted to the Department in connection with this matter.

**Notices**

80.     All notices or communications regarding this Consent Order shall be sent to:

For the Department:

> For the Department:
>
> James F. Caputo
> Senior Assistant Deputy Superintendent
>   for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004

Megan Prendergast
Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

For Western Union:

Caroline Tsai
Executive Vice President and General Counsel
Western Union
12500 East Belford Avenue
Englewood, CO 80112

Sharon Cohen Levin
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

**Miscellaneous**

81.     Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

82.     No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provision of the Consent Order.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this

 4   day of January, 2018.

**WESTERN UNION FINANCIAL
SERVICES, INC.**


By: _____
**DARREN A. DRAGOVICH**
**Vice President and Assistant Secretary**

**NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES**

By: _____
**MARIA T. VULLO**
**Superintendent of Financial Services**


By: _____
**MATTHEW L. LEVINE**
**Executive Deputy Superintendent for
Enforcement**

26