**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-00474-KLM
     Consolidated with 1:17-cv-00648-KLM

LAWRENCE HENRY SMALLEN AND LAURA ANNE SMALLEN REVOCABLE LIVING
TRUST, individually and on behalf of all others similarly situated, and
UA LOCAL 13 PENSION FUND, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
RAJESH K. AGRAWAL, and
BARRY KOCH,

     Defendants.

---

**REPLY BRIEF IN SUPPORT OF DEFENDANTS THE WESTERN UNION COMPANY,
HIKMET ERSEK, SCOTT T. SCHEIRMAN, AND RAJESH K. AGRAWAL'S MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................1

ARGUMENT ....................................................................................................6

I.   The Court Should Dismiss Plaintiff's Claims As To
     Statements Of Belief About Current Legal Compliance. ....................................8

     A.   Plaintiff Misstates The Standard For Falsity Applicable To Statements Of Belief,
          Misapplying the Supreme Court's Ruling In *Omnicare*. ................................8

     B.   The Complaint Fails To Allege Particularized Facts Showing That The
          Individual Defendants Did Not Actually Believe Their Statements Of Belief
          Regarding Legal Compliance Or Knew Them To Be False. ....................................13

          1.   Alleged "Red Flags" Alerting Defendants
               To Ongoing Compliance Violations. ..............................................14

          2.   Discussion Of Compliance Matters In Board Materials. ..................................18

          3.   Internal Reports Supposedly Seen by Defendants. ...........................................27

          4.   Internal Documents Produced To The Government. ............................................31

II.  The Court Should Dismiss Plaintiff's Claims Based On Positive Statements About
     The Company's Compliance Infrastructure And Investments. ................................34

     A.   The Complaint Lacks Particularized Facts
          Demonstrating the Falsity of These Statements. ..........................................34

     B.   Plaintiff's Claims With Respect To These Statements Also Fail
          Because The Statements Were Too Vague And Nonspecific To Be Material. ..........42

III. The Court Should Dismiss Allegations Regarding Statements
     Describing Ongoing Government Investigations. ..........................................49

IV.  The Court Should Dismiss Allegations Regarding
     The Reasons The Company Made Compliance Investments. ...................................55

V.   The Court Should Dismiss The Remainder Of Plaintiff's Allegations,
     Which Were Not Well-Pleaded And Have Been Abandoned. ...................................56

VI.  The Complaint Also Should Be Dismissed Because It Does Not Allege
     A Strong Inference Of Scienter As To Any Defendant. .......................................................59

     A.   Plaintiff's Allegations Do Not Give Rise To A Strong Inference
          That Mr. Scheirman Acted With Scienter. ....................................................................60

     B.   Plaintiff's Allegations Do Not Give Rise To A Strong Inference
          That Mr. Agrawal Acted With Scienter. .......................................................................69

     C.   Plaintiff's Allegations Do Not Give Rise To A Strong Inference
          That Mr. Ersek Acted With Scienter. ............................................................................75

     D.   Plaintiff's Corporate Scienter Arguments Should Be Rejected. ..................................80

VII. Plaintiff Fails To Plead A Claim Under Section 20(a) Of The Exchange Act. ....................84

CONCLUSION ........................................................................................................................86

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ................................................................50

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ....................................................6, 84

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005)................................................58

*Anderson v. Spirit AeroSys. Holdings, Inc.*,
105 F. Supp. 3d 1246 (D. Kan. 2015)................................................10

*Anderson v. Spirit Aerosys. Holdings Inc.*,
827 F.3d 1229 (10th Cir. 2016) ..........................................10, 50, 80

*In re Apple Comput., Inc., Sec. Litig.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002) ............................................77

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................44

*Better v. YRC Worldwide Inc.*,
2012 WL 4433500 (D. Kan. Sept. 25, 2012) ....................................47

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)............................................10, 11

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ....................................................43, 46

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)................................................47

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)................................................23

*In re Cable & Wireless, PLC, Sec. Litig.*,
332 F. Supp. 2d 896 (E.D. Va. 2004) ..........................................43, 46

*City of Philadelphia v. Fleming Companies, Inc.*,
264 F.3d 1245 (10th Cir. 2001) ..................................................79, 80

*City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*,
   2014 WL 4823876 (W.D. Ark. Sept. 26, 2014).........................................................11, 51, 74

*Ellis v. Spectranetics Corp.*,
   2018 WL 1583837 (D. Colo. Apr. 2, 2018)..............................................................................6

*Emps. Ret. Sys. of City of Providence v. Embraer*,
   2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ......................................................................54

*Emps.' Ret. Sys. of R.I. v. Williams Cos.*,
   889 F.3d 1153 (10th Cir. 2018) ...............................................................................10, 60, 70

*In re EZCorp, Inc. Sec. Litigs.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016)...................................................................................48

*In re FBR Inc., Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)...................................................................................50

*Fulton Cty. Emps.' Ret. Sys.*,
   2010 WL 601364 (E.D. Wis. Feb. 18, 2010) .......................................................................76

*Glazer Capital Mgmt. LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ................................................................................................82

*In re Gold Res. Corp. Sec. Litig.*,
   776 F.3d 1103 (10th Cir. 2015) ......................................................................................68, 86

*Grossman v. Novell*,
   120 F.3d 1112 (10th Cir. 1997) .................................................................................42, 44, 45

*Guardian Title Agency, LLC v. Matrix Capital Bank*,
   141 F. Supp. 2d 1277 (D. Colo. 2001).................................................................................57

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ................................................................................................77

*In re ITT Educ. Servs., Sec. Litig.*,
   34 F. Supp. 3d 298 (S.D.N.Y. 2014)..............................................................................23, 50

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................................10

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ................................................................................................29

iv

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................45, 47

*In re Level 3 Commc'ns Inc. Sec. Litig.*,
  2010 WL 5129524 (D. Colo. Dec. 10, 2010)................................................................59

*In re Level 3 Commc'ns Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ....................................................... *passim*

*Lieblein v. Ersek*,
  2017 WL 4337719 (D. Colo. Sept. 29, 2017)..............................................18, 19

*Lieblen v. Ersek*,
  2016 WL 1274399 (D. Colo. Mar. 31, 2016) ..............................................23, 24

*Loreley Fin. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).................................................................................82

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..............................................................................82

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................50

*Martin v. Quartermain*,
  2018 WL 2024719 (2d Cir. May 1, 2018) ..............................................................9

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................12

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
  761 F.3d 1109 (10th Cir. 2014) ..........................................................................51

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016)...................................................................79

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ..............................................................55, 56, 59

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ..............................................................................27

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ......................................................................69, 82

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) ................................................................................. *passim*

*In re Petrobras Sec. Litig.,*
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................. 47

*Pirnik v. Fiat Chrysler Auto.,*
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ......................................................... 9

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ...................................................................... 81, 82

*In re Quality Sys., Inc. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) .................................................................... 45, 47

*In re Qwest Commc'ns Int'l, Inc.,*
    396 F. Supp. 2d 1178 (D. Colo. 2004) ............................................................. 79

*Schioppi v. Costco Wholesale Corp.,*
    2007 WL 4277455 (D. Colo. Nov. 30, 2007) .................................................... 57

*Schueneman v. Arena Pharm., Inc.,*
    840 F.3d 698 (9th Cir. 2016) ........................................................................ 12

*SEB Asset Mgmt. S.A. v. W. Union Co.,*
    2015 WL 5708532 (D. Colo. Sept. 29, 2015) ............................................ *passim*

*In re SemGroup Energy Partners, L.P.,*
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ............................................. 46, 47, 85

*SEPTA v. Orrstown Fin. Servs., Inc.,*
    2016 WL 7117455 (M.D. Pa. Dec. 7, 2016) ..................................................... 23

*SEPTA v. Orrstown Fin. Servs., Inc.,*
    2016 WL 466958 (M.D. Pa. Feb. 8, 2016) ....................................................... 23

*Simmons Investments, Inc. v. Conversational Computing Corp.,*
    2011 WL 673759 (D. Kan. Feb. 17, 2011) ................................................. 44, 47

*South Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ...................................................................... 79, 80

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
    365 F.3d 353 (5th Cir. 2004) ........................................................................ 80

*In re Sprint Corp. Sec. Litig.,*
  232 F. Supp. 2d 1193 (D. Kan. 2002) ........................................................12, 45, 46

*Steinberg v. PRT Grp., Inc.,*
  88 F. Supp. 2d 294 (S.D.N.Y. 2000) ...........................................................43, 46

*In re Sun Healthcare Grp., Inc. Sec. Litig.,*
  181 F. Supp. 2d 1283 (D.N.M. 2002) ...............................................................43

*Sw. Carpenters Pension Tr. v. Merge Techs., Inc.,*
  2008 WL 11381377 (E.D. Wisc. Mar. 31, 2008) ................................................85

*Teamsters Local 445 Freight v. Dynex Capital,*
  531 F.3d 190 (2d Cir. 2008).............................................................................82

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ...........................................................................7, 19, 76

*Tongue v. Sanofi,*
  816 F.3d 199 (2d Cir. 2016)..............................................................................9

*In re Van der Moolen Holding N.V. Sec. Litig.,*
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..............................................................50

*Van Dongen v. CNinsure Inc.,*
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................75

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
  2017 WL 3058563 (N.D. Cal. July 19, 2017)......................................................47

*In re Zagg, Inc. Sec. Litig.,*
  797 F.3d 1194 (10th Cir. 2015) ........................................................................68

**Statutes and Regulations**

15 U.S.C. § 78u-4(b).............................................................................6, 58, 59

15 U.S.C. § 78u-5(c).............................................................................35, 59

17 C.F.R. § 240.10b-5(b).............................................................................10

**INTRODUCTION**[1]

This putative securities fraud case is not about whether some Western Union employees committed compliance violations in the past, as long ago as 2004. Nor is it about a faceless corporate entity. Rather, it is about whether certain specific people named as defendants – Western Union's CEO, a current and a former CFO, and a former Chief Compliance Officer – deliberately lied on each and every occasion over a five-year period (2012-2017) when any of them expressed a view regarding the Company's then-current compliance systems, or expressed any optimistic sentiments regarding the benefits of the Company's ongoing worldwide investments in its compliance infrastructure. For such a claim of securities fraud to survive dismissal, the PSLRA requires particularized facts – on an individual-by-individual and statement-by-statement basis – that support a strong and compelling inference that each individual deliberately and repeatedly lied. Those facts are absent here.

Instead, as Plaintiff's Opposition makes crystal clear, the Complaint should be dismissed with prejudice for two principal reasons. First, not a single statement challenged in the Complaint has been shown to have been false or misleading. Second, Plaintiff has not shown that any of the Individual Defendants made any statements that he did not genuinely believe to be true at the time, or that he knew were contradicted by materially inconsistent facts. Plaintiff thus fails adequately to plead scienter as to any Individual Defendant. While these two core

---

[1] Except where noted, capitalized or abbreviated terms have the same meaning as in the Defendants' Brief in Support of their Motion to Dismiss, Dkt. No. 54 (the "Opening Brief" or "Br."). Plaintiff's Opposition to Defendants' Motions to Dismiss, Dkt. No. 63, is referred to here as the "Opposition" or "Opp." All emphases contained in this brief with respect to quoted materials are additions unless specifically noted otherwise. Exhibit references herein are to exhibits submitted with the Opening Brief (Exhibits 1-86) or exhibits submitted herewith (Exhibits 87-109).

bases for dismissal are each discussed in detail in the body of this brief, there are certain pervasive failings of the Opposition that bear mention at the very outset.

***No Misstatements Have Been Shown.***  The Opposition attempts to duck the pleading burdens imposed by the PSLRA by repeatedly blurring together or mischaracterizing the "facts" cited in the Complaint and taking statements out of context.  This includes conflating and confusing time frames (which Plaintiff inappropriately attempts to lump together) and different alleged misstatements (which Plaintiff pretends say things other than what they actually say).

For example, as to time frames, the vast bulk (if not all) of the statements at issue here are about current or future matters – not about what may or may not have occurred in earlier periods.  That is true, for example, of the beliefs expressed (***not*** guarantees provided) in the Forms 10-K regarding ***current*** compliance (*e.g.*, Compl. ¶ 447 ("we believe our fraud prevention efforts comply with applicable law" (quoting 2014 Form 10-K dated Feb. 20, 2015)), and of the predictions that investments in the Company's compliance infrastructure would prove to be a ***future*** competitive advantage (*e.g.*, Compl. ¶ 388 ("longer term we believe [our increased compliance spending is] going to be a competitive advantage") (quoting Ex. 29, July 30, 2013 Conference Call Tr. at 13)).  Plaintiff nonetheless repeatedly attempts to treat the subject matter of these statements as if they were addressed to compliance ***in years past***, and repeatedly asserts that the statements were somehow false and misleading because they omitted "past compliance failures."  (*E.g.*, Opp. at 27, 29, 32.)  However, statements of belief regarding ***current*** compliance or regarding anticipated future compliance advantages neither say nor reasonably imply anything about whether there may or may not have been any "past compliance failures."

Put simply, a statement about current or future compliance is not deceptive by failing to disclose "past compliance failures."

There is a reason why Plaintiff repeatedly attempts to transform statements about the present or future into something they are not, *i.e.*, statements about the past. There are simply no particularized facts showing that any of the Individual Defendants believed or had contemporaneous knowledge at any time during the Class Period (much less at all times) that the Company was ***currently*** committing ongoing, serious legal violations. Tellingly, none of the so-called Confidential Witnesses says any such thing, nor do any of the cited Board materials (none of which post-dates 2013, and which are primarily from earlier periods). Nor do the Regulatory Settlements make any such accusation with respect to any of the Individual Defendants. A conspicuous example is the FTC Complaint's (unadmitted) allegations of failures "in some cases" to adequately discipline certain agents between 2013 and October 2015, *i.e.*, even after the Company had substantially revamped its fraud compliance systems during 2011-2012 (*see infra* at 14-15). The FTC Complaint makes no mention of any of the Individual Defendants in connection with these 2013-2015 occurrences. Yet the Opposition repeatedly cites these FTC allegations without providing any particularized factual link to the Individual Defendants and their respective knowledge at the time. That is why, in an attempt to fill this yawning factual gap, Plaintiff resorts to entirely unfounded speculation – *e.g.*, positing, without an iota of factual detail or support, that all of the Individual Defendants "would have been apprised" (Opp. at 6) by unspecified persons at entirely unspecified times that unspecified portions of the millions of pages of documents produced in connection with the government investigations supposedly revealed ***existing*** violations. (*See infra* at 31-33, 61-63, 73-74, 76-77; Koch Br. at 14-15.)

3

Relatedly, Plaintiff also misrepresents the content of different statements and different categories of representations.  For example, Plaintiff repeatedly asserts that statements that did not mention and were not about the government investigations were somehow misleading by failing to disclose "the high risk of unprecedented sanctions" from the investigations.  (*See, e.g.,* Opp. at 4, 29, 33.)  There was nothing misleading, however, in failing to offer gratuitous commentary of this sort as an add-on to unrelated statements.  And when it comes to the Company statements that ***did*** expressly address the investigations, the Opposition ignores what these statements actually said, claiming that they failed to disclose that "Western Union's potential liability was in fact substantial."  (*Id.* at 39.)  But while the Company declined to make predictions regarding ultimate resolutions, the Company indisputably disclosed that an adverse outcome of the investigations could have material adverse consequences – including warning repeatedly that the Company could face significant fines, damages, or regulatory consequences that could have a material adverse effect on the Company's business, financial condition, and results of operations.  (*E.g.*, Ex. 23, 2012 Q1 10-Q at 44.)  Nor does Plaintiff contest that the Company accurately disclosed developments regarding the investigations over the course of the years in its quarterly SEC filings.

***No Strong Inference of Scienter Has Been Shown.***  Plaintiff continually lumps all of the Defendants together, largely ignoring differences in their tenures, in their job responsibilities, and in the statements each made (as well as the different times of those statements).  In fact the Opposition, like the Complaint, typically refers to "the Defendants" collectively, rarely mentioning any of the Individual Defendants separately, let alone attempting to separately analyze each one's knowledge as of the time he made a particular challenged statement.  That

attempt to gloss over and avoid the individual-by-individual analysis mandated by the PSLRA is underscored by the very structure of the Opposition. Defendants' Brief separately addressed the claims of scienter as to each of the Individual Defendants, in separate sections focused on the allegations specific to each individual; we do so again below. In stark contrast, the Opposition addresses issues of scienter jointly, not on an individual-by-individual basis.

Once again, there is a reason for these tactics. By attempting to avoid addressing scienter separately for each Individual Defendant, as the PSLRA requires, Plaintiff apparently hopes to avoid highlighting the paucity of facts as to each individual supporting any such scienter inference. Plaintiff also thereby seeks to minimize the importance of individual-by-individual factors that render the claims of scienter far less compelling than opposing inferences, including (to name but a few): the utter absence of any identified motive for Mr. Scheirman or Mr. Koch to commit securities fraud; the *de minimis* nature of the one stock sale by Mr. Agrawal over the course of five years, and Mr. Ersek's significant expansion of his own stock holdings; the inapposite job responsibilities of the CFO position occupied first by Mr. Scheirman (for but a portion of the Class Period) and then by Mr. Agrawal; the differing tenures of the Individual Defendants; and the limited nature of the very few, generalized statements made by Mr. Koch regarding the Company's aspirational "commitments." And while the Opposition seeks to stitch together a narrative premised on portions of the Regulatory Settlements that make no mention of these Individual Defendants, it virtually ignores the DOJ's having ***praised*** Messrs. Ersek and Koch for their ongoing commitment to compliance in its settlement with Western Union. Nor does any Confidential Witness allege that any of these individuals was deliberately lying, nor does any cited document so suggest.

5

At bottom, this case is about whether each of these Individual Defendants knowingly lied in making his respective statements, and whether the Complaint creates a "strong inference" to that effect at this stage.  But no facts pleaded in the Complaint create *any* inference of such actual knowledge at the time of each challenged statement, much less the required *strong* inference.  Because there is no such "strong inference," and because particularized facts supporting Plaintiff's accusations are absent, the Complaint should be dismissed in its entirety and with prejudice against all Defendants.

## ARGUMENT

Plaintiff repeatedly asserts that its claims of knowing falsity are "plausible" and thus should be accepted for pleading purposes.  (*See, e.g.,* Opp. at 3, 4, 6, 17, 18.)  But mere "plausibility" is not the standard here.  Rather, the PSLRA's "stringent" pleading burdens, *see Ellis v. Spectranetics Corp.*, 2018 WL 1583837, at *3 (D. Colo. Apr. 2, 2018), require a plaintiff to identify particularized *facts* that support its allegations, as to each defendant and as to each allegedly fraudulent statement; "information and belief" assertions do not suffice.  (*See* Br. at 25-26.)  Absent such particularized facts, the Complaint must be dismissed.  *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003).  Moreover, when it comes to claims of scienter – which substantially overlap with claims of falsity for statements of opinion or that are forward-looking in nature (Br. at 32, 65), as are most of the statements challenged here – the pleading standard is even more stringent.  The particularized facts must create not only a "strong" inference of scienter, but the Court also must weigh competing inferences.  It is only if the (factually supported) inferences alleged in the Complaint are *at least* as compelling as opposing innocent inferences "with respect to each act or omission alleged" (15 U.S.C. § 78u-

6

4(b)(2)) that a complaint can survive. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); Br. at 27-28.  That is not the case here.

      In its Opposition, Plaintiff focuses on four categories of statements:  (1) statements of belief regarding the Company's current compliance with legal requirements, (2) statements expressing the opinion that the Company's compliance infrastructure in 200+ countries, and continuing large "industry leader" investments in compliance, are and would be over the long term a "competitive advantage," (3) statements of the Company's inability to predict the outcomes of various disclosed government investigations, and (4) statements regarding the reasons for Western Union's increase in compliance expenditures.  (*See* Opp. at 23-24.)  As discussed next, each category of challenged statements fails these PSLRA pleading requirements, and is deficient in other key respects as well.[2]

---

[2] Plaintiff also previously challenged a fifth category of statements regarding the company's "premium pricing."  (Compl. ¶ 303(vi).)  However, Plaintiff has abandoned the Complaint's assertion that a handful of statements referring to "premium pricing" were allegedly false because "Western Union could not maintain its competitive premium pricing." (*Id.*)  As Defendants explained, this was simply a conclusory assertion unsupported by any facts.  (*See* Br. at 63-64.)  Plaintiff now argues in a footnote that statements by Mr. Ersek that the Company "deserved" premium pricing, in which he mentioned among other reasons that the Company's "compliance programs are very valuable," are "another example of statements touting Western Union's compliance practices without sufficient basis."  (Opp. at 33 n.15 (citing Compl. ¶¶ 351, 389, 456, 516).)  This shift in argument has nothing to do with the "maintaining premium pricing" allegations, however; instead, it collapses the premium pricing arguments into those regarding Mr. Ersek's beliefs regarding the "value" of the Company's compliance programs.  Moreover, the Complaint still alleges no facts remotely suggesting that Mr. Ersek did not genuinely believe that the Company deserved premium pricing.  (*See* Br. at 65-66.)

I.   **The Court Should Dismiss Plaintiff's Claims As To Statements Of Belief About Current Legal Compliance.**

A.   **Plaintiff Misstates The Standard For Falsity Applicable To Statements Of Belief, Misapplying the Supreme Court's Ruling In *Omnicare*.**

At the core of Plaintiff's Complaint is its claim of falsity with respect to statements by certain of the Individual Defendants of their ***belief*** at various times that the Company was then currently compliant with its AML and antifraud legal obligations.  (*See* Br. at 28-51.)  Plaintiff treats these statements, which were contained in the risk disclosure sections of the Company's annual Forms 10-K,[3] as if they were guarantees of compliance, claiming that "Defendants' statements of legal compliance were false and misleading ***because . . . the Company did not comply*** with its AML and anti-fraud obligations during the Class Period."  (Opp. at 28.)  This fundamentally misstates the legal standards applicable to such statements of belief and contravenes the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).

*Omnicare* expressly held that statements of belief regarding legal compliance are ***not*** rendered false even if the speaker "afterward discover[s] a longtime violation of law."  *Id.* at 1326.  If the compliance violation is discovered after the statement of belief regarding

_____

[3] The Forms 10-K were signed by Mr. Ersek throughout the Class Period.  However, they were signed by Mr. Scheirman only in 2012 and 2013, and by Mr. Agrawal only in 2014, 2015, and 2016.  (*See* Compl. ¶¶ 304, 365, 410, 450, 473.)  Plaintiff erects a strawman, arguing that "statements of current or historical fact are not insulated from liability just because they are labeled as 'risk disclosures.'"  (Opp. at 29-30.)  But Defendants have made no such argument.  Defendants' point is that the statements of belief must be read in their full context, as the Supreme Court has recently emphasized – including both the cautionary language that plainly surrounded the statements as well as the disclosures of ongoing investigations.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015); Br. at 29-30.

8

compliance was made, "the statement would have been ***true***," not false or misleading, since it only "expressed . . . a view, not a certainty, about legal compliance." *Id.* In other words, "a statement of opinion ***is not misleading just because external facts show the opinion to be incorrect***." *Id.* at 1328; *see also id.* at 1327 (the fact that Omnicare's stated belief that it was not violating anti-kickback laws "turned out to be wrong" "will not give rise to liability").[4] Accordingly, in order to make out a claim with respect to a statement of belief, Plaintiff must allege particularized facts indicating that the speaker either did not "actually hold[] the stated belief" (*id.* at 1326) or had actual knowledge at the time of undisclosed contradictory facts that "cannot be squared with" (*i.e.*, do not "fairly align[] with") the belief expressed (*id.* at 1329-30).[5]

Plaintiff also misstates the correct legal inquiry in a second respect. Ignoring that the challenged statements are ones of belief regarding ***current*** compliance, Plaintiff also claims that it was misleading to express beliefs about current compliance without disclosing ***past*** compliance failures. (Opp. at 30.) As discussed earlier (*supra* at 2-3), that too is fundamentally incorrect. A statement of belief regarding current compliance with legal obligations neither says nor implies

---

[4] The cases cited in the Opposition (at 28) are not contrary to and cannot trump the plain holding of *Omnicare*. In fact, most of the cases pre-date the Supreme Court's *Omnicare* decision. The single post-*Omnicare* case Plaintiff cites does not deal with statements of ***belief*** regarding compliance at all, but instead involved a flat-out representation of compliance. *See Pirnik v. Fiat Chrysler Auto.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) ("[defendant] represented . . . that it was 'substantially in compliance with the relevant global regulatory requirements'").

[5] As *Omnicare* made clear, and subsequent decisions have confirmed, to adequately plead liability under this latter prong, it does not suffice to allege that a statement of belief is "misleading" because it failed to disclose some fact known to the speaker that "cut[s] the other way." 135 S. Ct. at 1329. This is true even if the undisclosed fact "cutting the other way" is a "contrary opinion of an expert or authority" in a circumstance where competing views are expressed and weighed. *See, e.g., Martin v. Quartermain*, 2018 WL 2024719 at *3 (2d Cir. May 1, 2018); *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016).

anything about whether there may have been failings in years past, and therefore gives rise to no disclosure obligation regarding such past failures (even if known).[6] *Anderson v. Spirit AeroSys. Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260 (D. Kan. 2015) ("Silence is not misleading under Rule 10b–5 unless there is a duty to disclose.  Disclosure is required under this Rule **only** when necessary 'to make the statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting 17 C.F.R. § 240.10b–5(b)), *aff'd*, 827 F.3d 1229 (10th Cir. 2016); *see also Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1164 (10th Cir. 2018).

The cases cited by Plaintiff are not to the contrary, and involve entirely distinguishable facts.  For example, Plaintiff claims that *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015), recognized a "duty to disclose past compliance failures" when discussing the topic of legal compliance.  (Opp. at 29 (citing *id.* at 731-32).)  But there is no such broad holding in that case.  *BioScrip* focused on the defendants' failure to disclose a pending government investigation, including receipt of a civil investigative demand ("CID").  That failure rendered a variety of statements affirmatively misleading, including statements in SEC filings warning that the company **might** receive governmental subpoenas or be subject to governmental scrutiny – statements misleadingly implying that this was a hypothetical possibility when the truth was that

---

[6] Plaintiff erects a strawman in arguing that it need not allege "'the exact date and time' when Defendants became aware of contrary information."  (Opp. at 51 (quoting *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005)); *see also id. at* 6-7.)  Defendants do not argue to the contrary.  Rather, Defendants take issue with Plaintiff's failure to allege any particularized factual basis for finding that Defendants deliberately lied at the widely varying times of their respective statements.  As the quote Plaintiff provided from the *JP Morgan Chase* case immediately goes on to state, "but plaintiffs must 'supply **some factual basis** for the allegation that the defendants knew or should have known that the statements were false at some point during the time alleged.'"  363 F. Supp. 2d at 624 (citation omitted).  It is this requirement that Plaintiff has failed to satisfy.

the company **had already** received the CID and was therefore **already** under such scrutiny. *BioScrip*, 95 F. Supp. 3d at 726-27.  Notably, the disclosure failing in *BioScrip* stands in stark contrast to the facts alleged here, where there is no claim that Western Union failed to promptly disclose government investigations in its SEC filings.[7]

Similarly inapposite is *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, 2014 WL 4823876 (W.D. Ark. Sept. 26, 2014), which Plaintiff also wrongly suggests imposes a duty to disclose past compliance failures when discussing current compliance.  Once again, the decision contains no such holding.  Instead, what was found misleading in *City of Pontiac* was a statement that Wal-Mart had begun an internal investigation of suspected corruption in fiscal year 2012, a statement which, when combined with surrounding verbiage, misleadingly implied "that Defendants *first* learned of the suspected corruption in fiscal year 2012" and had promptly begun the internal investigation shortly thereafter.  *Id.* at *1. In truth, the suspected corruption had been known by the defendants since 2005-2006.  *Id.* at *1-2.  These facts and the holding are entirely inapposite here.  And what made the failure to disclose the past event misleading in *City of Pontiac* was statements that misleadingly sought to portray the defendants' timeliness.  *Id.*  Here, by contrast, the disclosure duty that Plaintiff

---

[7] The *BioScrip* defendants also attempted to claim that the company's statements in its 2012 Form 10-K (filed in March 2013) should not be read as pertaining to a specialty pharmacy division that had been sold in May 2012.  The court rejected this argument, however, finding that the misstatements in the 2012 10-K covered the five months of 2012 during which BioScrip operated the division and further finding that even after the division was spun off, BioScrip retained liability for the segment.  *Id.* at 731-32.  None of these facts finds any parallels here, and the attempt to extrapolate some broad holding regarding a duty to disclose past compliance failures is invented.

incorrectly asserts does not derive from any overlap with the subject matter of the statements regarding current compliance.[8]

Plaintiff also points to a recent Consent Order with the New York State Department of Financial Services ("NYDFS") in a further attempt to claim that there was some obligation to disclose past compliance failures when describing beliefs regarding the Company's current compliance. Specifically, Plaintiff claims that the NYSDFS Consent Order shows that "a government agency determined that it had been misled by the Company's failure in its SEC filings to adequately disclose its exposure" as of 2015. (Opp. at 4, 21-22, 66.) But the NYDFS Consent Order says no such thing. The NYDFS Consent Order concerned two New York agents who were also mentioned in the DPA. (*Compare* Ex. 1, DPA SOF ¶¶ 69-77 *with* Opp. Ex. 1, NYDFS Consent Order ¶¶ 21-40.) Those two agents were terminated by the Company in *December 2011*, *i.e.*, predating the class period. (DPA SOF ¶ 76; Opp. Ex. 1 ¶ 38.) The NYDFS alleged that the Company had learned of "the full scope of the misconduct" by these long-terminated New York agents "in early 2015," and faulted the Company for not reporting these

---

[8] The other cases cited in the Opposition (at 29) are even farther afield and entirely irrelevant. In each the defendant made some affirmative statement that was clearly false or misleading in the absence of contrary, undisclosed information. None of these cases remotely suggests that there is a duty to disclose alleged past violations when, as here, the statement made is only about current compliance. *See In re Sprint Corp. Sec. Litig.,* 232 F. Supp. 2d 1193, 1206, 1220 (D. Kan. 2002) (denying dismissal only with respect to statements expressing confidence that a merger would go through that were made after the DOJ had told the defendants it was "very unlikely" to approve the merger, and after the FCC had suspended its investigation of the merger in light of the defendants' failure to supply it with certain information); *Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 708 (9th Cir. 2016) (defendants represented that "all the animal studies that [had] been completed" supported approval, when in fact the defendants were aware that the FDA had already identified studies as deficient); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (touting environmental compliance when defendants were aware that prophylactic solutions were already "then failing to prevent serious ongoing pollution").

additional historical details *to the NYDFS* at that time, which it claimed was required by NYDFS

regulations.  (*See* Opp. Ex. 1 ¶¶ 5, 60, 61.)  While Plaintiff attempts to equate Western Union's

reporting obligations *to the NYDFS* regarding historical matters with ongoing reporting

obligations to the public under the federal securities laws, the two are not remotely the same –

and also have nothing to do with the Company's inability to predict the resolution of the

government investigations.

Thus, the relevant inquiry here is whether the Complaint pleads particularized facts

showing that *at the time* of each of the statements of belief regarding *current* legal compliance,

the relevant Individual Defendants believed or knew otherwise, *i.e.*, that current compliance

efforts were not legally compliant.  As discussed next, the Complaint pleads no such

particularized facts.

**B.      The Complaint Fails To Allege Particularized Facts Showing That The Individual Defendants Did Not Actually Believe Their Statements Of Belief Regarding Legal Compliance Or Knew Them To Be False.**

Plaintiff asserts that Mr. Ersek (in 2012-2016), Mr. Scheirman (in 2012 and 2013), and

Mr. Agrawal (in 2014-2016) each purportedly knew at the time of their respective "belief"

statements that the Company was systematically violating legal requirements with respect to its

AML/anti-fraud compliance.  The Opposition identifies four sources of this purported knowledge

(Opp. at 18-22):  (1) supposed "red flags" from past governmental actions, (2) Board materials

from 2010 through 2013 that mention compliance matters, (3) internal reports regarding

consumer fraud complaints, and (4) information provided to the government in the course of the

investigations leading up to the Regulatory Settlements.  Because the standard for falsity here

requires a showing of *actual* disbelief in the statements made or *actual* knowledge of

contradictory facts (*see supra* at 8-9), the PSLRA's "strong inference" requirement is directly applicable to these claims, which we discuss in turn below.  (*See* cases cited in Br. at 32.)

>    1.    **Alleged "Red Flags" Alerting Defendants To Ongoing Compliance Violations.**

The Opposition includes a cursory paragraph regarding purported "red flags" that does little more than parrot certain allegations contained in the FTC Complaint and the DPA.  (Opp. at 18.)  But the referenced allegations are almost entirely focused on matters pre-dating the Class Period here.  Moreover, none of these allegations makes any mention of, or accusations against, the Individual Defendants, or provides any facts whatsoever regarding what each of them knew or was told at the time of their respective statements regarding belief in current compliance.

*First*, Plaintiff suggests that the Individual Defendants somehow must have been aware of current compliance violations at Western Union during the putative Class Period because of previous regulatory actions and complaints dating back as far as 2002.  (Opp. at 18, 52-53.)  But the bulk of the matters mentioned pre-date the Class Period, and none is from after 2012.  (Br. at 9-10; *see also* Ex. 2, FTC Compl. ¶¶ 49-60; Opp. at 52-53.)  None of this sheds any light on what Defendants knew regarding the Company's compliance in 2013, 2014, 2015, or 2016. Moreover, as discussed in the Opening Brief (at 9-10), the Complaint does not identify a single fact indicating that Mr. Ersek or Mr. Scheirman believed, knew, or was told at the time of the 10-K filing in February 2012 (*i.e.*, the beginning of the Class Period) that any prior regulatory consent decrees or resolutions were not being complied with, or that any warnings had been left unaddressed.  The Opposition does not even attempt to respond to this basic point.

14

Instead, Plaintiff resorts to sheer, unsupported speculation, asserting that the matters addressed by these earlier regulatory actions involved problems so "deep-seated" that they "could not be cured overnight." (Opp. at 3.) Not only is there no source cited for these bare assertions, but Plaintiff entirely ignores the history of extensive compliance improvement efforts adopted over time that is recited in the very documents it cites, including among others:

- The consent decrees and agreements resolving the earlier regulatory actions themselves acknowledged that the Company had already taken actions to remediate the concerns identified (*see* Br. at 10 n.5);

- The acknowledgement in the February 2010 Southwest Border Agreement that "Western Union has developed and implemented a risk-based anti-money laundering ('AML') compliance program that is designed to prevent, detect, and report potential money laundering activities" (Ex. 14 ¶ 3);

- A September 2010 revision to the Company's Standard Operating Procedure that "outline[d] a process and guidelines for identifying agents for review and suspension based on consumer fraud complaints, as well as a process for reinstating or terminating agents" (FTC Compl. ¶ 24);

- Western Union's report to the FTC of "enhancements to its consumer protection program" (FTC Compl. ¶ 25);

- Western Union's report to the FTC on September 14, 2012 that it **had** "implemented 'a comprehensive anti-fraud program' that included agent training, agent monitoring, and '[p]rompt action, including suspensions and terminations, against Agents when the Company identifies fraudulent activity'" (*id.*); and

- The DPA's finding that additional remedial measures and compliance enhancements had indeed been implemented "[s]ince at least September 2012" (DPA SOF ¶ 100).

The Company's ongoing compliance enhancements thus had been going on for years and were hardly an "overnight" matter.

**Second**, once again copying from the FTC Complaint and DPA, Plaintiff refers to a hodgepodge of communications in late 2011-2012. (*See* Opp. at 52.) To begin with, there are no particularized facts pleaded indicating that any of the Individual Defendants present at the time

was contemporaneously provided with knowledge of these alleged communications, *e.g.*, the alleged warning by a Secret Service agent in February 2012.[9]  Nor are any particularized facts alleged regarding what the Company did or did not do by way of a response to many of these communications – or, once again, what the Individual Defendants knew in that regard.[10]

The allegations plucked from the DPA regarding Spain are an example of these failings. (Opp. at 52.)  The Complaint alleges no particularized facts as to whether any of the Individual Defendants knew or was told about the reports issued by certain Spanish authorities late in 2012 (*i.e.*, well after the February 2012 Form 10-K) – and, if so, ***what*** each of them knew or was told (including, importantly, whether Western Union personnel disagreed with the reports).  Indeed, the Complaint alleges no facts indicating that this was handled at anything other than a regional level within Western Union.  Nor, once again, are any facts alleged regarding what happened or was done after these reports (and when), and, specifically, whether there were any alleged violations that ***the Individual Defendants knew*** remained unabated.  The absence of these

---

[9] The one exception is the allegation of letters sent by the Minnesota Attorney General to Mr. Ersek suggesting that the Company should provide refunds to consumers given its "apparent" inability to prevent consumer fraud ***perpetrated by others***.  (FTC Compl. ¶ 54; Compl. ¶ 120.)  While the Opposition repeats that allegation (at 52), it simply ignores the arguments raised by Defendants in the Opening Brief (at 22 n.18) – including that the described correspondence did not identify any alleged legal violations ***by*** Western Union or even identify any alleged fundamental weaknesses in the Company's fraud prevention procedures.

[10] For example, the Complaint (¶ 121) mentions a meeting held by unspecified persons with the Korea Financial Supervisory Services in November 2011 to discuss the regulator's "concerns about consumer fraud involving Western Union's money transfer system."  (The "concerns" too are not specified.)  This is alleged to have resulted in "a plan to alleviate consumer fraud" in Korea.  (*Id.*)  But the Complaint says not a word about whether this plan was then implemented (or when) – much less provide any facts indicating that Mr. Ersek, Mr. Scheirman, or others were told or believed that there was some ongoing violation of Korean law as of the February 2012 Form 10-K (or as of the time of later 10-K filings).

critical particulars matters.  And that is particularly so because not only do the DPA and FTC Complaint make no mention of any of the Individual Defendants in connection with these matters, but the DPA expressly acknowledges, with specific reference to Spain, that as of September 2012, Western Union had in fact implemented and executed effective worldwide antifraud policies (DPA SOF ¶ 51).[11]  Thus, to the extent Plaintiff is attempting to suggest that at the time of the next 10-K (February 22, 2013), and in succeeding years as well, any alleged compliance issues in Spain remained unaddressed *and* the Individual Defendants somehow knew of ongoing violations in Spain, that suggestion is unsupported by any particularized facts.

*Third,* relying on the FTC Complaint, the Opposition also notes that over time there have been arrests of some of Western Union's independent agents for allegedly colluding with fraudsters.  (Opp. at 18.)  Specifically, the FTC alleged that during a period spanning more than a decade, and from among more than 500,000 agent locations, 146 of Western Union's independent agents have been so charged, including 39 agents in the United States.  The vast bulk of these agent arrests either pre-dated the Class Period or involved already-terminated agents.[12]  (*See id.* at 18, 51 (citing Compl. ¶¶ 134, 253-54); *see also* FTC Compl. ¶ 35.)

---

[11] The DPA also alleges no violations after 2012 with respect to Spain (or elsewhere).  Similarly, although the FTC Complaint alleges large numbers of fraud complaints at agent locations in Spain that Western Union allegedly "failed to promptly suspend and terminate," the specifics provided all relate to the period between 2009 and 2012.  (FTC Compl. ¶ 45.)  Moreover, the DPA acknowledges that the reports received from Spanish authorities in late 2012 were based on the results of earlier audits.  By the time of those reports, Western Union had already "reported to the Executive Service a significant numbers of [Agents] and cancelled the corresponding agency contracts" (DPA SOF ¶ 49).

[12] That is true, for example, of the arrests of "China Corridor Agents" (Opp. at 51), which are the only specific arrests mentioned in the Opposition:  (1) Frank Wang, the owner of U.S. Shen Zhou International, was arrested on September 27, 2010; (2) Hong Fai General Contractors Corp. was terminated by Western Union as an agent on March 19, 2012, just weeks into the Class

Although Plaintiff claims that Western Union has "admitted" that these arrests of some independent agents made Western Union aware of its own compliance failures (Opp. at 51), that is flatly incorrect.[13]  Indeed, knowledge of criminal conduct by an agent, standing alone, says nothing at all about there being knowledge of a legal violation *by Western Union* in conjunction with the agent arrest.  Moreover, knowledge of a past agent arrest says nothing about there being some continuing violation *by Western Union* made known *to any of the Individual Defendants* at the times of their respective statements of belief each year regarding *current* legal compliance.

### 2. Discussion Of Compliance Matters In Board Materials.

Plaintiff next argues that, as a result of their participation in Board meetings, the Individual Defendants were each aware at all times of "basic flaws in the Company's compliance practices."  (Opp. at 53; *see also id.* at 53-55.)  But the cited Board materials say no such thing; instead, Plaintiff repeatedly mischaracterizes the contents of the materials on which it purports to rely.[14]  Moreover, while the Class Period extends to 2017, few of the cited materials are from

---

Period and years before its operators were arrested in 2016; and (3) other China Corridor agents mentioned in the DPA were terminated by Western Union in December 2011, again, before the start of the Class Period.  (DPA SOF ¶¶ 68, 76, 79, 89.)  Indeed, the listing of U.S. court cases contained in Paragraph 35 of the FTC Complaint reveals that all but five of these agent arrests occurred prior to 2012, with four occurring at unspecified times during 2012 and only one occurring thereafter.  The Complaint contains no allegations regarding these latter five cases or about the Individual Defendants' knowledge of (or stemming from) these arrests.

[13] As purported support, the Opposition cites Paragraphs 134 and 253-54 of the Complaint, which in turn refer to the FTC Complaint.  However, Western Union did not admit the allegations of the FTC Complaint; it was only the Statement of Facts in the DPA that were admitted.

[14] Plaintiff complains about Defendants' use of exhibits consisting of the very Board materials cited in the Complaint, while simultaneously acknowledging that the Court "should consider" those documents.  (Opp. at 19-20 & n.9.)  Specifically, Plaintiff notes that the materials provided contain redactions.  However, Plaintiff admits that it obtained the Board documents it relies upon from the *Lieblein* derivative action (Compl. ¶ 88).  And it is undisputed that the documents

2013 and there are none after 2013.  This is important because of the timing of various statements, the timing of tenures (*e.g.*, Mr. Agrawal only became Interim CFO in January 2014 and Mr. Koch's tenure only commenced in May 2013 (Compl. ¶¶ 28-29)), and because there was continued evolution and investment in compliance throughout the Class Period (*see, e.g., id.* ¶¶ 411 ($150 million in compliance expenditures in 2013), 447 ($180 million in 2014), 474 ($200 million in 2015)).

The "example" of supposedly inculpatory Board materials cited in the Opposition's Introduction underscores how Plaintiff plays fast and loose both with timing matters and the contents of the Board materials.  The Opposition refers to a Board meeting *in September 2010* (18 months before the start of the putative Class Period) at which an agent accused of improper transmittals to China was "discussed."  (Opp. at 5.)  But all that was "discussed" at the 2010 meeting was that the agent was the subject of a criminal money-laundering investigation and that the Company was "working with law enforcement to investigate the underlying activity." (Compl. ¶ 251; Ex. 107, Sept. 2010 Compliance Executive Board Report at 4.)  The agent was arrested days later and subsequently terminated by Western Union.  (DPA SOF ¶ 68.)  The

---

Defendants submitted are, in turn, the same ones filed in *Lieblein* and in precisely the same form obtained by Plaintiff, with the very same redactions.  The reason for examining these documents is so that this Court can determine for itself whether Plaintiff's characterization of the **unredacted** contents of these documents, *i.e.*, the portions that it has seen and purports to summarize and rely on, is fair and accurate.  The **redacted** contents are irrelevant to that inquiry because they are not what Plaintiff has seen or purports to characterize.  Moreover, the case law is crystal clear that for purposes of a motion to dismiss, a court can review materials cited in a complaint in order to see whether, on their face, those documents do or do not comport with the plaintiff's characterizations.  *Lieblein v. Ersek*, 2017 WL 4337719, at *2 (D. Colo. Sept. 29, 2017); *see also Tellabs*, 551 U.S. at 322.  Contrary to Plaintiff's position, that is an everyday task on motions to dismiss, not one that poses a "factual issue[ ] that cannot be resolved at this stage." (Opp. at 20.)

Opposition next plucks a snippet from a June 2012 Board committee report that noted "Increased attention to U.S./China Agent base which continues to present challenge. [Southwest Border] Alliance confirms the US/China corridor is of significant interest to law enforcement." (Compl. ¶ 252; Ex. 109 at 3.) But neither "increased attention" nor "challenges" in dealing with independent U.S./China agents is remotely equivalent to some acknowledged ongoing violations *by the Company itself*.

*__May 19-20, 2011 Meeting of the Board of Directors (Exs. 48-49).__* Plaintiff egregiously mischaracterizes the materials from this pre-Class Period meeting. Plaintiff claims that the Consumer Protection, Compliance & Ethics Strategy Update states that the Company had a "[l]ack of meaningful [AML] reporting" and that it "fail[ed] to conduct risk-based reporting (as is required by AML laws)." (Opp. at 53 (citing Ex. 49 at 1-2, 4).) But Plaintiff's citations come from a slide titled plainly "Before State" – *i.e.*, the state of the Company's compliance **before** the Company had implemented compliance improvements. (*See id.* at 3.) In fact, the presentation goes on to list four pages of "Accomplishments" – *i.e.*, the "after" state. (*See id.* at 5-8.)

*__December 9, 2011 Corporate Governance and Policy Committee Meeting (Exs. 54-55.)__* Plaintiff identifies a portion of a presentation made in 2011, at a pre-Class Period meeting attended by no Individual Defendant other than Mr. Ersek (*see* Ex. 54), which notes that an earlier "Multi-State exam report" had returned an unsatisfactory rating. (Opp. at 53; *see* Ex. 55 at 4.) But Plaintiff omits that, in the very same paragraph, the presentation states that the Company had already submitted a response in October 2011 and a further follow-up in November 2011, planned "to visit Texas, Washington and Ohio to meet in person to discuss the examination and [the Company's] Mexico business," and had "asked for re-examination in

March 2012." (*Id.*)  Tellingly, Plaintiff pleads no facts at all indicating that the Company did not

promptly and successfully address any perceived deficiencies in the Fall of 2011.  Indeed, as

Defendants' Opening Brief points out, by 2012, the Company had received a passing rating on a

multi-state exam covering many of the same states.  (Br. at 51 n.44 (citing Ex. 64).)[15]

### June 15, 2012 Corporate Governance and Policy Committee Meeting (Exs. 108-09).

As already noted (*supra* at 19-20), Plaintiff refers to a portion of a presentation at this meeting

(attended only by Mr. Ersek (*see* Ex. 108)), which mentioned governmental regulators'

"[i]ncreased attention to US/China corridor."  (Opp. at 5, 53; *see* Ex. 109 at 3.)  Plaintiff attempts

to portray this as if it was a warning that the Company's compliance systems were failing with

respect to those agents.  (Opp. at 5.)  But the presentation does not say anything remotely like

that.  And indeed, just sentences above, the same presentation states that internal compliance

examinations "[g]enerally *have not identified meaningful patterns of complicity* by Agents or

front-line associates."  (Ex. 109 at 3.)

### July 19, 2012 Audit Committee Meeting (Exs. 61-62).  Plaintiff argues that this Audit

Committee meeting (which only Messrs. Ersek and Scheirman attended (*see* Ex. 61)) included a

report that "[v]arious deficiencies in the documentation of policies and procedures" had been

---

[15] Moreover, neither the Opposition nor the Complaint provides any facts at all linking the primary alleged deficiency noted by this Multi-State exam (or any other of the noted alleged deficiencies, for that matter) to the violations later described in the DPA or alleged in the FTC Complaint.  The alleged deficiencies noted had nothing to do with some failure to adequately discipline agents suspected of involvement with fraud complaints.  Instead, the primary alleged deficiency described related to an AML program relative to Mexican sub-agents.  (*See* Ex. 55 at 4.)  But nothing in the DPA or the FTC Complaint mentions any such program for Mexican sub-agents or claims a resulting legal violation.  The same is true of the other matters mentioned, *e.g.*, failure by some agents to post signage.

noted by the SWB Monitor.  (Opp. at 53; *see* Ex. 62 at 7.)  But that some (entirely unspecified)

policies and procedures were claimed not to be ***properly documented*** does not say either that

were no such policies and procedures or that the policies and procedures were themselves

deficient – much less that this constituted a legal violation.  And even on that score, the

presentation notes that "[a]n ongoing project is already in place to identify areas of need," and

"[e]xternal resources are being engaged."  (Ex. 62 at 7.)  Moreover, this documentation issue has

nothing whatsoever to do with the violations asserted in the DPA or the FTC Complaint, nor

does the Complaint establish any particularized factual linkage to the violations alleged.

Elsewhere in the Opposition, Plaintiff refers to a report made at this meeting of the FTC

staff having met with Company personnel to "outline for WU their observations regarding areas

of weakness in our fraud prevention program."  (Opp. at 58 (citing Exs. 61, 62 at 3).)  But

alleged weaknesses are not the same as acknowledged legal violations.  And the results of the

meeting with the FTC staff, reported in the very next paragraph, were that Western Union agreed

to provide an improved fraud prevention program within 60 days – which it is undisputed it did

(a fact both acknowledged and given substantial weight in the DPA (*see* DPA ¶ 4)).  There is

nothing in either this presentation or in subsequent Board documents indicating that Western

Union personnel or any of the Individual Defendants believed following these improvements that

the Company's fraud prevention program was not legally compliant.  While Plaintiff notes that

the FTC served a CID some months later (Opp. at 58-59), that says nothing about the legitimacy

of any of the continued ***beliefs*** regarding Company compliance expressed by any of the

Individual Defendants in the wake of the CID.[16]  In any event, the Company **publicly disclosed** its receipt of the CID, as the Complaint itself concedes (Compl. ¶ 258), and noted that it could not predict the results of any investigation, all of which are part of the context for the challenged "belief" statements.  (Ex. 16, 2013 Q1 10-Q at 53.)

***Board Materials Concerning Progress on the SWB Monitor's Recommendations.***  The Opposition refers to several Board documents in which it was reported that the SWB Monitor had indicated that additional improvements or actions were required with respect to certain open items that were the subject of his recommendations.  (*See* Opp. at 53-56 (referencing Exs. 73-74, 77, 79, 84, 86).)  But as Judge Krieger has already held, the attempt to use the Company's progress in completing the Monitor's recommendations "as a proxy for allegations that WU's compliance systems were indeed defective" is "improper."  (Br. at 48 (quoting *Lieblein v. Ersek*, 2016 WL 1274399, at *7 n.10 (D. Colo. Mar. 31, 2016)); *see also* Ex. 103 ¶ 21 (explaining that the Monitor was charged with making recommendations "as the Monitor believes may improve

---

[16] "[A]n investigation is not evidence of fraud, or even negligence or mistake." *SEPTA v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016).  Plaintiff cites an early opinion in the *SEPTA* case, in which the court permitted the plaintiff to amend its complaint to include allegations relating to investigations, without knowing what those allegations would be.  (Opp. at 57-58 (citing *SEPTA v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016)).)  Ultimately, however, the plaintiff ended up asserting only the bare existence of the investigations, and the court therefore dismissed the amended complaint.  *See SEPTA*, 2016 WL 7117455, at *11.  Plaintiff cites two more cases that it argues stand for the proposition that "pending investigations" support an inference of scienter.  (Opp. at 58.)  Those citations are equally inapt.  *See In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (the fact of an investigation is "not tremendously probative" of scienter, especially when "it is not clear whether, or how much, each investigation hinged on the Defendants' states of mind – which is the key issue"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 156 (S.D.N.Y. 2008) (taking into account an investigation because it was spurred by a company's admission that it had intentionally deceived regulators about the subject matter at issue in the securities fraud suit).

the program").)  Although Plaintiff claims that Judge Krieger's determination is "not relevant," it is directly on point and correct.[17]

Moreover, the Company made no secret of the fact that there would be a delay in implementing all of the recommendations made by the SWB Monitor.  To the contrary, it repeatedly and thoroughly disclosed that fact, as well as the fact that the Monitorship was ultimately extended by agreement.  (*See* Ex. 13, 2013 10-K at 17; Ex. 15, 2014 Q3 10-Q at 13; Ex. 16, 2013 Q1 10-Q at 14; Ex. 17, Feb. 3, 2014 8-K, Ex. 10.1 at ¶ 2; Ex. 18, 2016 10-K at 109; Ex. 19, 2014 10-K at 16.)  Thus, even if the incomplete implementation of various Monitor recommendations directly related to the question of compliance with other legal obligations – which it does not – this context was a matter disclosed in the same SEC filings containing the statements of belief regarding current compliance.

**_July 17, 2013 and October 11, 2013 Compliance Committee Meetings (Exs. 77, 79, 84, and 86)._**  Plaintiff finally refers to two reports, which state that certain risks related to Western Union's agents are "inherent" – a term that says nothing at all indicating legal noncompliance.[18]

---

[17] Plaintiff argues that the *Lieblein* case is "not relevant" because it was a derivative lawsuit and therefore subject to a different legal standard.  (Opp. at 26.)  But the difference in legal standard had nothing to do with Judge Krieger's consideration of and holding on the precise issue here: whether the fact that the Monitor believed a certain change would improve Western Union's compliance program was sufficient to demonstrate "that WU's policies were [legally] inadequate" without that change.  *Lieblein*, 2016 WL 1274399, at *7 n.10.  Moreover, the PSLRA's pleading requirements are, if anything, ***stricter*** than those applicable to a derivative lawsuit.

[18] As Defendants pointed out in their Opening Brief, the recognition of "inherent risks" is a far cry from any acknowledgement of legal noncompliance by Western Union.  (Br. at 50-51.) Being a firefighter also involves "inherent risk," but that does not mean that firefighters are committing legal violations.

(Opp. at 54-55 (quoting Ex. 79 at 11) and 55 (quoting Ex. 86 at 14); *see supra* at 24 n.18.)  One

of these reports (provided only to Messrs. Ersek and Koch (*see* Ex. 77)) stated that certain

controls "required further improvement to be fully effective" (Opp. at 54 (quoting Ex. 79 at 11)),

and the other stated that certain "planned controls [were] not yet operational or had not been

vetted through an independent assessment and as such their impact . . . cannot yet be

determined" (*id.* at 55 (quoting, in part, Ex. 86 at 14)).  But the need for "further improvement"

or vetting is a far cry from a known violation of federal laws.  Additionally, both reports focus

solely on the Southwest Border region.  (*See* Ex. 79 at 11 (describing the focus of the report as

evaluating AML risks in "the SWB WU"); Ex. 86 (titled in part "Anti-Money Laundering Risk

Assessment of the Southwest Border Region").)  These documents provide no basis at all for

concluding that either Mr. Ersek or Mr. Scheirman believed Western Union was violating legal

requirements at the time of their compliance belief statements in 2013, much less support such a

conclusion with respect to Mr. Agrawal's and Mr. Ersek's compliance belief statements in each

of 2014, 2015, and 2016.

Plaintiff nonetheless argues that the controls mentioned in the July 17, 2013 report as

"requir[ing] further improvement to be fully effective" included "some of the specific steps that

were found to be lacking in the Joint Settlement."  (Opp. at 54.)  Not only is this an

impermissible exercise in 20/20 hindsight, but it is also incorrect.  Two of the three controls at

issue were "Agents AML compliance training" and "Compliance Templates for Enhanced Data

Integrity."  (Ex. 79 at 11.)  Lack of training in anti-money laundering compliance and lack of

templates for data integrity are not described anywhere in the Regulatory Settlements as a

violation or as the cause of any violation.  Unable to cite any such violation, Plaintiff instead

cites a paragraph of the Complaint describing the Enhanced Compliance Undertaking Western Union entered into with the DOJ. (*See* Opp. at 54 (citing Compl. ¶ 16 (listing some items on the Enhanced Compliance Undertaking that Western Union "agreed to implement")).)[19] Plaintiff argues that the fact that Western Union entered into the Enhanced Compliance Undertaking means that the Company must have been failing with respect to all of the matters covered by the Undertaking as of January 2017. (*See, e.g.*, Opp. at 17, 57.) But, as Defendants pointed out in their Opening Brief, and Plaintiff entirely ignores, the Enhanced Compliance Undertaking spells out enhancements that Western Union agreed with the DOJ that it "***has or will*** undertake" – in other words, it included a requirement ***to maintain*** certain types of enhancements that it "has" already put in place. (Br. at 44 n.38 (quoting DPA at C-1).) That a particular item is included in that list thus does not mean that it was lacking at the time Western Union entered into the Regulatory Settlements, much less that it constituted a knowing violation of law or regulation. Plaintiff's contrary argument reads the word "has" out of the Undertaking entirely.[20]

---

[19] The additional Complaint references Plaintiff provides are not relevant because they either (1) relate to the FTC Complaint, which discussed agent training "***with respect to consumer fraud***," not money laundering, as described in the Board report (Compl. ¶ 135; *see also id.* ¶¶ 140, 218, 225 (cited Opp. at 54)), or (2) or say nothing whatsoever about Western Union (Compl. ¶ 64 (describing FinCEN's explanation of BSA requirements)).

[20] Plaintiff cites two other Board documents (Exs. 65, 67), which it claims demonstrate that Messrs. Ersek and Agrawal attended a December 2012 meeting at which a briefing was provided on the "key features" of a 2012 MoneyGram settlement. (Opp. at 54.) However, the Complaint pleads no particularized facts indicating that any of the Individual Defendants, or anyone else at Western Union for that matter, believed or were informed that the "key features" of the MoneyGram settlement somehow revealed that Western Union's then-existing compliance programs were so faulty as to violate the law. Indeed, Plaintiff does not even provide any specifics about the compliance measures in effect at Western Union at the time. (The allegations regarding the MoneyGram settlement are discussed further below (*see infra* at 39 & n.27).) It is also incorrect that Mr. Agrawal attended the meeting discussing the "key features" of the settlement, and the cited materials show no such thing. (*See* Exs. 65, 66 (briefing on "key

### 3.    Internal Reports Supposedly Seen by Defendants.

Plaintiff's next tactic is to argue that certain internal reports regarding fraud complaints supposedly informed the Individual Defendants of widespread, ongoing compliance violations *by Western Union itself*.  But Plaintiff offers virtually no response to the multiple deficiencies in these allegations identified in Defendants' Opening Brief.  (*See* Br. at 44-46.)

*First*, the Complaint contains no particularized facts indicating that any of the Individual Defendants actually received either (i) the internal "senior managers" reports mentioned by CW1 (which in any event are only described as containing "aggregated" or "composite" fraud complaint data, not individual agent-by-agent data) (Compl. ¶ 161), or (ii) the "60-Day Fraud Reports" prepared by the Company's Corporate Security Department (which identified agent locations that processed five or more transactions reported as fraud) (*id.* ¶ 162).  *See, e.g., Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (plaintiffs must "directly allege[]" that defendants actually received and read reports,  not just that they were "made available"); *see also* Br. at 45 (citing additional cases).  CW1 himself conspicuously makes no such assertion, nor is any other source provided.  The Opposition nonetheless conclusorily asserts that this evident factual gap is "belie[d]" by two discrete occasions in which the Compliance Committee or Board received reports on issues regarding two specific agents.  (Opp. at 56-57.)  This is a complete *non sequitur*; the two specific update reports (discussed further below) show nothing at all about receipt of these *other* materials.

---

features" at a Corporate Governance and Public Policy Committee, with Mr. Agrawal not among the listed attendees).)

**Second,** Plaintiff asserts that Western Union agents that "were complicit in or facilitated consumer fraud" were "easily identifiable" from these reports. (Opp. at 13). Even putting aside that there is no showing the Individual Defendants received these reports, Plaintiff ignores the fact that, as pointed out in the Opening Brief (at 20-21, 46), the identification of multiple fraud reports at a certain agent location served as a trigger for further investigation under Western Union's procedures, so as to determine if there was an issue for which remediation was appropriate and, if so, what the remediation should be. (*See, e.g.*, FTC Compl. ¶¶ 24, 72.) In turn, the gravamen of both the DPA and the FTC's Complaint against Western Union was that when, as a result of these investigations or otherwise, various Western Union employees became aware of suspicious or improper agent conduct, appropriate discipline sometimes was not imposed at all, or not imposed promptly. But the results of follow-up from these internal investigations, including any findings and what remedial or disciplinary steps if any may (or may not) have been taken, are not alleged to have been contained in these reports. That is why it is no accident that Plaintiff is unable to identify the contents of any particular reports as systematically flagging some ongoing, unaddressed agent violations – much less as doing so for the Individual Defendants throughout the Class Period. (*See* Br. at 45.)

The disconnect is actually underscored by Plaintiff's reference to Western Union's admission to the DOJ that "through 2012, even when compliance employees raised problematic agents, senior executives and sales employees prevented those agents from being disciplined." (Opp. at 56.) This allegation of improper interference with disciplinary processes says nothing about the knowledge **of the Individual Defendants** regarding these episodes; nor does the Complaint plead particularized facts showing that these improprieties were somehow evident

28

from the face of the (unreceived) 60-Day Fraud Reports.  In fact, the DOJ found that the actions of the executives and sales employees were *in violation of the Company's own policies* in various instances.  (DPA SOF ¶¶ 66, 80.)[21]

The same is true of the allegations in the FTC Complaint that certain agents should have received greater discipline between 2013 and 2015.  The fact that the FTC alleged that, after 2012, "Western Union continued to fail, in certain cases, to promptly suspend and terminate certain high-fraud agent locations" (FTC Compl. ¶ 26) once again says nothing about the Individual Defendants' knowledge of those circumstances at the time – and is not tied to any internal reports claimed to have been received by the Individual Defendants.  (*See supra* at 27.)

*Third,* Plaintiff has taken out of context two snippets of materials contained in the exhibits Defendants submitted to the Court:  (i) a mention of a "data integrity issue" with one master agent, Elektra (Opp. at 5, 56-57 (citing Exs. 82-83)), and (ii) a report regarding a single agent in India (*id.* at 5, 56 (citing Exs. 77-78, 80-81)).  From these isolated snippets, Plaintiff seeks to extract a "strong" inference that the Individual Defendants were made aware of widespread, ongoing compliance violations through internal reports.  But these examples support no such leap and instead illustrate the fundamental weakness of Plaintiff's arguments.

---

[21] Plaintiff also refers to an allegation by the FTC that "in 2014, company executives approved the reactivation of" a certain agent "despite being informed that confirmed and potential fraud, as well as suspicious activity, amount to approximately 54% of the agent's pay volume."  (Opp. at 56 (citing FTC Compl. ¶ 97).)  It is well established, however, that allegations that unspecified "company executives" were aware of something is not sufficient to support a securities fraud claim against specific individuals.  (*See* Br. at 38-39 (citing *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 828-29 (8th Cir. 2003)).)

With respect to Elektra, Plaintiff does not claim that any Individual Defendant other than Mr. Koch received the September 2013 report at issue.  (Opp. at 57.)  Mr. Koch, in turn, is not alleged to have made any of the challenged statements of belief regarding current legal compliance.[22]  In any event, the September 2013 memo says nothing to indicate some ongoing, unaddressed legal noncompliance, or any facilitation of consumer fraud.  To the contrary, the report mentions that Elektra had a "practice of inputting its own telephone number instead of the actual consumer's telephone number."  (*See* Ex. 83 at 9.)  But there is no suggestion that this posed a risk related to fraud – it is information about the ***consumer*** (*i.e.*, the potential fraud ***victim***) that was omitted, not information about the individual receiving the funds.  In addition, the report goes on to state that the issue ***had already been addressed*** by Western Union's having implemented an automated solution "requir[ing] valid telephone number[s] for all transactions and rely[ing] on automation to enforce."  (*Id.*)  In short, this example shows that one Defendant received a ***single report*** of a single data completion problem with an agent, and that the problem was fully addressed – *i.e.*, the very opposite of any knowledge of a systemic, unaddressed compliance problem.

Plaintiff's other example, a single paragraph appearing in a July 2013 report made to the Board's Compliance Committee regarding a single agent in India, fares no better.  (*See* Opp. at 5,

_____

[22] Plaintiff attempts to imply some link between the "data integrity" issue raised with respect to Elektra in September 2013 and the FTC Complaint's allegations of a failure to discipline Elektra in March 2012 – predating Mr. Koch's arrival at the Company by more than a year, and not a matter as to which any of the other Individual Defendants are claimed to have been involved. The attempted linkage is pure invention.  The FTC Complaint does not even mention the alleged "data integrity" issue raised in September 2013.  Nor does the Complaint here allege the "data integrity" issue or provide any facts linking this issue to earlier fraud complaints.

56 (citing Exs. 77-78, 80-81).)[23]  The paragraph cited reports that because the agent at issue appeared on a "Fraud Policy Report," the Company investigated further and identified issues such as "common dates of birth and ID numbers . . . entered for multiple payees."  (Exs. 78 at 9, 81 at 9.)  The paragraph concludes by saying that a "Critical Escalation was sent to Regional Compliance."  (Exs. 78 at 9, 81 at 9.)  While Plaintiff speculatively attempts to analogize this to instances of "further review without proper resolution" (Opp. at 57), there is not a single fact alleged about what happened following this escalation, including any facts about the "resolution" of the escalation.  And nothing about this one-paragraph report of a "critical escalation" remotely shows knowledge by the Individual Defendants of some deliberate, widespread failure to adequately discipline non-compliant agents, or of any impropriety even in this single instance.

### 4.    Internal Documents Produced To The Government.

Finally, Plaintiff claims that the Individual Defendants must each have had knowledge of compliance violations throughout the Class Period because the Company provided a "mass of underlying information" to regulators in the course of the investigations (Compl. ¶ 543), and this "mass" eventually "formed the basis for the government's conclusions" (Opp. at 59).  As noted above (*see supra* at 3), and as discussed in the Opening Brief (at 46-47), this argument heaps speculation upon speculation.

The Opposition offers no facts to support the notion that the Individual Defendants themselves personally reviewed the "mass" of documents and other information provided during the course of the investigations, and it cites no facts supportive of any such theory.  Instead,

---

[23] Neither Mr. Scheirman nor Mr. Agrawal is alleged to have received this report or to have been present at the Compliance Committee meeting.

Plaintiff conclusorily asserts that "it is absurd to suggest that the Individual Defendants were not provided updates on the Company's response" to the investigations.  (Opp. at 63; *see also id*. at 6 (asserting that the Individual Defendants "would have been apprised" of transmittals to the DOJ and FTC).)  Not only are these assertions unsupported by factual particulars, but, more fundamentally, they beg the question.  Even if, *arguendo*, some or all of the Individual Defendants were provided "updates" regarding "transmittals" or other Company responses to the investigations, there are no particularized facts pleaded regarding the contents of these hypothesized communications.  Most importantly, there are simply no particularized facts pleaded showing that any of the Individual Defendants ever received internal updates regarding these transmittals that included a report of current legal violations by Western Union.  (*See* Br. at 33-37, 46-47.)

The Opposition simply ignores this fundamental point.  It refers once again to CW3 and CW4.  (Opp. at 60.)  But as explained in the Opening Brief (at 33-37), neither of these CWs provided any particularized facts regarding any particular communications – and, conspicuously, neither says that any of the Individual Defendants was ever told during the Class Period, either by them or by any other Western Union employees, that the Company was not in compliance with respect to its regulatory obligations.  The Opposition does not even attempt a response.

Instead, Plaintiff hypothesizes that some (unidentified) "person coordinating Western Union's response to the government investigations" (Opp. at 6) must have (1) himself become familiar with the contents of the "mass" of materials transmitted; (2) in the course of doing so, become familiar with unspecified documents that eventually caused regulatory authorities to allege "certain" violations occurring during the Class Period (*e.g.*, the "certain cases" in 2013-

2015 as to which the FTC alleged a failure "to promptly suspend and terminate certain high fraud agent locations" (FTC Compl. ¶ 26)); (3) reached his own conclusion from reviewing the transmitted materials, or been advised, that there were legal violations *by Western Union* in these instances; (4) reached a further conclusion that the violations were not just historical but constituted a current, ongoing violation of legal requirements; and (5) then "apprised" one or more of the Individual Defendants that the Company was currently legally noncompliant.  Not one step in this speculative chain is supported by particularized pleaded *facts*.

Finally, in addition to these numerous fundamental deficiencies, Plaintiff's reliance on transmittals made during the course of the multi-year investigation also ignores critical issues of timing.  The Complaint provides no factual particulars regarding, among other things, *when* transmissions of various information were made, *what* was known *when* about the particulars of the contents (and by whom), and *when* any (hypothesized) internal communications of current legal violations were supposedly made to any of the Individual Defendants.  These particulars are important, however, because the compliance belief statements were made at different times by different Individual Defendants over the course of a lengthy period.  Plaintiff's failure to provide these particulars does not comply even with Rule 9(b), much less with the heightened pleading requirements of the PSLRA.[24]

---

[24] As Defendants noted in their Opening Brief (Br. at 29 n.28), in addition to the belief statements regarding compliance contained in the Forms 10-K, Plaintiff also purports to identify one other statement made by Mr. Ersek on a July 30, 2013 earnings call.  (*See* Opp. at 27, 30-31.)  Putting aside questions of transcription, it is clear that, when read in context, Mr. Ersek's statement was not only aspirational but a statement of belief.  The point is underscored by the fact that at the beginning of the conference call, the Company *expressly* incorporated by reference the risk factors in the Company's Form 10-K.  These of course included the very risk factor statements that made clear that statements regarding current compliance were statements

33

II.   **The Court Should Dismiss Plaintiff's Claims Based On Positive Statements About The Company's Compliance Infrastructure And Investments.**

    A.   **The Complaint Lacks Particularized Facts Demonstrating the Falsity of These Statements.**

Plaintiff's Opposition lumps together more than 30 different statements made by various of the Individual Defendants at conferences and on investor calls on the topic of competitive advantages pertaining to the Company's compliance infrastructure, claiming that all of these statements misleadingly gave "investors the impression that all was well with Western Union's compliance practices." (Opp. at 33.) But the statements said no such thing and provided no such blanket assurances. Nor, contrary to Plaintiff's argument (*id.* at 32-33), did these statements say or imply anything about whether there may have been prior compliance failures. (*See supra* at 2-3, 9-10.)

Instead, as discussed below, the challenged statements within this category were generally either (a) forward-looking statements predicting competitive advantages eventually to be gained from large, ongoing compliance investments or (b) present-tense statements of opinion regarding the competitive advantages of having already established compliance infrastructure in more than 200 countries. In either instance, the statements were ***comparative*** in nature and focused on potential ***business*** advantages from having a ubiquitous compliance infrastructure

---

of "belief," not guarantees. (Ex. 97 at 2 (incorporating by reference these statements from the Company's Form 10-K).) And that point is further underscored by the incorporated-by-reference disclosure of various government investigations with repeated disclaimers of an ability to predict results.

It is also the case, however, that Plaintiff's attempt to characterize its Bloomberg transcription as accurate and "final" (*see* Opp. at 30 n.12) is itself inaccurate, and lacks any factual foundation. To the contrary the Bloomberg version expressly states on its face that it "may not be 100 percent accurate and may contain misspellings or other inaccuracies." (Ex. 97 at 14.)

and the willingness to spend more than competitors worldwide.  The Opposition identifies no particularized facts rendering these business assessments false.  And because these were either forward-looking statements or statements of opinion (or both), the standards for demonstrating falsity once again overlap with those required for scienter, requiring lack of subjective belief by the speaker or the speaker's actual knowledge to the contrary at the time of his statement.  *See* 15 U.S.C. § 78u-5(c); *Omnicare*, 135 S. Ct. at 1326-1330.  The Complaint fails to satisfy these standards.

### *Statements Regarding Compliance As A Long Term "Competitive Advantage" Or "Competitive Strength."*  Most of the statements Plaintiff challenges were opinions regarding the current and future advantages to Western Union of having already invested in a global compliance infrastructure (thereby enabling it to provide money transfer services within and among more than 200 countries, a scope unmatched by any competitors), or expressing a belief in the future advantages of continued large investments in compliance (as much as $200 million a year (Compl. ¶ 474)) at levels that competitors would find it very difficult to match, or both. Plaintiff cites no facts whatsoever contradicting these competitive assessments, much less any facts creating a strong inference that when the Individual Defendants expressed these views they did not actually believe them.

Judge Krieger previously considered statements identical in substance to those here in another securities case against Western Union –including the "frequent talking point for WU" that its "operations in 200 countries and territories" involved compliance expenses and burdens that its competitors would find difficult to match.  *SEB Asset Mgmt. S.A. v. W. Union Co.*, 2015 WL 5708532, at *3 (D. Colo. Sept. 29, 2015); *see* Br. at 52.  Judge Krieger found that these

"statements are patently true on their face – compliance with hundreds of discrete national and international regulations is difficult and costly, and those difficulties and costs also serve to discourage competitors from attempting to match the breadth of WU's market." *SEB Asset Mgmt.*, 2015 WL 5708532, at *4. Plaintiff fails to acknowledge or respond to this portion of Judge Krieger's ruling, attempting only (unsuccessfully) to distinguish her holding regarding "puffery" (see *infra* at 43-44).

For example, Plaintiff points to a statement made by Mr. Agrawal at a conference on September 11, 2014, quoting just an edited fragment of one sentence: "[n]obody else has the global compliance capabilities that we have." (Opp. at 35 (quoting Compl. ¶ 432).) But the full context of Mr. Agrawal's statement makes clear that he was referring to Western Union's unmatched operational capabilities in numerous jurisdictions – precisely the type of statement considered by Judge Krieger:

> [B]ut again, when you look at our – what we're doing in our dot-com business, we operate in 24 markets today. We allow consumers to send cash to 200 countries and territories around the world and we can also, we also let consumers send money into 50 markets around the world into a bank account. All right. So **we are much more broad and global in our scope** . . . So I really believe that we are extremely well-positioned. Nobody else has the global compliance capabilities that we have, **the global operational capabilities**. **You know we operate in every country of the world and that is not an easy infrastructure to replicate and so that is why I feel good about where we are**.

(Ex. 102 at 12 (quoted in Compl. ¶ 432).)[25]  Plaintiff cites no contrary particularized facts showing that other competitors had equivalent global compliance operational capabilities, that

---

[25] Elsewhere in the same conference, in another set of statements selectively edited in the Opposition (at 34-35), Mr. Agrawal discussed similar topics and mentioned Western Union's "competitive advantage" from its large past and present investments in creating a global compliance infrastructure: "**We have been investing heavily in our compliance area**. . . . **This**

the existing Western Union global compliance infrastructure would be easy for other competitors to replicate, or that having this global compliance infrastructure did not constitute a "competitive advantage." Moreover, the Complaint provides no facts at all regarding any of these matters as of September 2014, *i.e.*, the date on which Mr. Agrawal made these statements.

The statements regarding "competitive advantage" or "competitive strength" challenged by Plaintiff all similarly focus, when read fairly in context, on the current or future advantages from the Company's already having established compliance infrastructures in more than 200 countries and also making large additional investments difficult for competitors to match. (*See* Opp. at 33.) Additional examples include the following, several of which are statements that were also expressly at issue before and considered by Judge Krieger:[26]

- A statement mentioning the Company's compliance capabilities as one of a series of "core strengths" all related to Western Union's global reach, and as a "competitive advantage": "It scares to death the competition to enter this market, the regulatory environment . . . . And don't forget, we are not only regulated in the US or in the UK; we are regulated in 200 countries. We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers. And it's not easy to get a money transfer license in Tajikistan. It's not that easy to have a money license in Gabon and Brazil or other states I'm talking about. So it's a competitive

---

*year, we plan to spend about 3.5% to 4% of our revenues in compliance*. . . . It's a global effort. . . . It is not just an effort in the United States . . . We believe that compliance can be a competitive advantage for us. It already is a competitive advantage and I believe it can be a bigger competitive advantage for us as we operate because *it is very difficult for most other organizations to spend at the level that we are and we've been doing this for many years*. This is not just a 2014 effort. *We've been in the compliance area and investing there for quite some time*." (Ex. 102 at 6.)

[26] The Class Period in the *SEB* action ran through October 30, 2012 (*SEB Asset Mgmt.*, 2015 WL 5708532, at *5), and in that action Judge Krieger explicitly addressed some of the same statements from March 13, 2012, May 9, 2012, June 12, 2012, July 24, 2012, and October 16, 2012 that are the subject of the current Complaint. (*Compare id.* at **12-16 *with* Compl. ¶¶ 311, 321-22, 333-34, 338, 349.)

advantage for Western Union and we are very proud of that."  (Ex. 88, June 12, 2012 Conference Call Tr. at 3-4 (quoted in Compl. ¶ 333).)

- "We be now [sic] in, as I mentioned, in 500,000 locations in 200 countries – somebody has to do that.  It's not easy to build that.  You have to get the regulatory environment – somebody has to do that.  It's not easy to do that.  You have to [go down to] money laundering – somebody has to do that.  You have to settle in 135 currencies.  How do you settle in 135 currencies in minutes?  Somebody has to do that.  So that has been definitely something we are very proud.  We built that."  (*Id.* at 6 (quoted in Compl. ¶ 334).)

- Referring to Company's "global compliance capabilities" as one of its "competitive strengths":  "What we are doing here is building on our fundamentals of our global network, global compliance capabilities, and global brands.  We are connecting electronic with locations, with retail.  No one but Western Union can connect 16,000 corridors with electronic and locations.  No one else can send money from US to New Zealand in minutes or to Chad or to Morocco in minutes than us." (Ex. 89, July 24, 2012 Conference Call Tr. at 3, 12 (quoted in Compl. ¶ 336).)

- Explaining that, unlike potential digital competitors, the Company was "well-positioned to build its digital platform" and had an "advantage" because it already had in place an anti-money laundering system, "so we are really building on our existing fundamentals." (Ex. 94, Feb. 14, 2013 Goldman Sachs Conference Statement at 9 (quoted in Compl. ¶ 363).)

- "*[L]onger term we believe [our increased compliance spending] is going to be a competitive advantage* because of our scale and our scope of what we can do with compliance and the regulatory."  (Compl. ¶ 388 (quoting Ex. 29, July 30, 2013 Conference Call Tr. at 13).)

These statements say exactly what Judge Krieger said that they say, and the Complaint contains no facts showing that they were false or misleading in mentioning the competitive advantages Western Union enjoys due to the global scope of its compliance infrastructure and large continuing investments.

Moreover, even if these statements or others were read as something they were not, *i.e.*, assessments of "the quality of the Company's compliance practices" (Opp. at 32), by their own terms the statements are ***comparisons*** to competitors and their capabilities at various points in time – not absolute assurances.  And on that comparative score, the Complaint supplies no

38

metrics, third-party assessments, or any other particularized facts, as of any point in time, regarding comparative actual compliance performance or comparative "quality" by Western Union's numerous global competitors (*e.g.*, comparative percentages of fraud complaints made against them). The only thing it singles out is the fact that one competitor in the United States, MoneyGram, entered into a settlement with the DOJ in December 2012, which required MoneyGram to undertake certain additional compliance measures.[27] (Opp. at 54; *see also id.* at 52 n.27.) But this single agreement with the DOJ by a single competitor says nothing about the general comparative strength of Western Union's compliance systems across the globe, which is the topic of the statements at issue (not a single competitor comparison). Nor does the fact that MoneyGram *agreed* to implement certain compliance measures even say anything about whether it successfully did so, or about how MoneyGram's compliance programs actually performed in practice in various subsequent years in comparison to Western Union's. Once again, the Complaint provides no particularized facts.

### *Statements That Western Union Was an "Industry Leader," or a "Market Leader."*

Defendants made various statements that the Company was spending significant sums on compliance, and either was or aimed to be the market leader in this respect. Plaintiff alleges no

---

[27] As previously pointed out by Defendants, the Complaint fails to provide any factual particulars regarding what was included in the MoneyGram "protocol" that was supposedly lacking in substantive equivalents at Western Union. (Br. at 41-42.) Accordingly, the characterization of the DOJ requirements imposed on MoneyGram as being "stronger," is entirely conclusory in nature. Moreover, as previously noted, that conclusory characterization is apparently not even one made by CW2, but is a wording insertion by Plaintiff. (Br. at 42 n.36.) In its Opposition Plaintiff does not deny that the word "stronger" is its own and not that of its CW. Instead, Plaintiff dismisses this point as a "quibble" (Opp. at 54), and then says that in any event the sources show that Western Union did not adopt the measures required of MoneyGram in 2012. But this lends no support to whether those measures were "stronger."

facts that these statements were not true, however measured.  Indeed, Plaintiff does not allege a single fact about any of the Company's competitors or their compliance spending relative to Western Union's at any point in time.

The very first example Plaintiff provides in its string cite on page 32 of the Opposition regarding these statements is illustrative.  In the cited statement, Mr. Ersek says that the Company is "very serious" about "upgrading our compliance. . . . It's a competitive advantage, long term.  I think we are investing heavily here to be, really acting as an industry leader." (Compl. ¶ 338 (quoting Ex. 89, July 24, 2012 Earnings Call at 8).)  Not only is the statement forward-looking ("long term") and aspirational in part ("to be"), but Plaintiff alleges no facts suggesting that the Company was not investing heavily, that it was not or would not be an industry leader in doing so, or that the Company was not serious about upgrading its compliance.

The remainder of the statements in Plaintiff's string cite are similarly non-actionable. The majority state that Western Union is acting as a market leader by putting the most money and resources into compliance, a fact Plaintiff does not dispute, or merely mention that these large investments are consistent with Western Union's indisputable status as the leading firm in the money transfer industry:

- "*[W]e are investing more in being an industry leader*, putting some compliance requirements for our customers which are tougher and higher than it was in the past." (Compl. ¶ 351 (citing Ex. 104, Oct. 30, 2012 Conference Call Tr. at 11).)

- "*Now, we are spending about $100 million in compliance.*  It's a lot of money. . . . *It's a good investment.  We believe it will be a competitive advantage* and also applying with regulatory environment will be definitely we have some work to catch up and we are doing it, but *as an industry leader in the sector obviously we set the standards hopefully*."  (Compl. ¶ 357 (quoting Ex. 92, Nov. 07, 2012 Conference Call Tr. at 7).)

40

- *"[A]ll our investments, about $100 million a year that we invest* in anti-money laundering and compliance, *are really putting us as an industry standard*." (Compl. ¶ 360 (quoting Ex. 93, Feb. 12, 2013 Earnings Call Tr. at 16).)

- "*I am spending about $100 million globally for the compliance activities of Western Union. So we believe that it[']s long term industry standard* and the competitive advantage for us and for people who do that because I think we are investing a lot from that."[28]  (Compl. ¶ 363 (quoting Ex. 94, Feb. 14, 2013 Conference Call Tr. at 5).)

- "Q:  Do competitors have additional compliance costs as well? . . . A:  Well I can't make comment on the competitors, but we believe that's the industry standard, what we are setting here. . . . *We are investing on that.  As a market leader, I assume that will be the industry standard*."  (Compl. ¶ 398 (quoting Ex. 98, Oct. 29, 2013 Conference Call Tr. at 13).)

- Q:  "As you think about kind of the business impact, the compliance costs, the 3.5% to 4%, longer term, Hikmet, . . . [i]s that something you expect to accelerate as we work our way through the year?"  A:  "It's hard to say. . . . *My expectation is that competition will also invest here on the compliance environment.  And the people who can't do that, maybe they exit.  We will see some, in some markets.  They can't afford it*.  Maybe they can't get the revenue here. . . . *We are [the] [l]eader.  We are focused on that.  We are driving it, and we would like to set up, and I believe it's long term.  Long term, I believe, yes, it's a competitive advantage*."  (Compl. ¶ 408 (quoting Ex. 99, Feb. 11, 2014 Earnings Call Tr. at 13).)

The remaining statements are aspirational and forward-looking – expressing Western Union's

*desire* to have best-in-class compliance programs:

- "*[W]e want to be best-in-class. . . . [O]ur goal is to* comply with the letter and the spirit of the law, *have best-in-class compliance programs*."  (Compl. ¶¶ 374-75 (quoting Ex. 95, April 30, 2013 Earnings Call Tr. at 7, 11).)

- "*[W]e want to be a best-in-class* and see that as a long-term competitive advantage."  (Compl. ¶ 360 (quoting Ex. 93, February 12, 2013 Earnings Call Tr. at 16).)

- We "*want to have best-in-class compliance programs*.  That is very important to our brand."  (Compl. ¶¶ 388-89 (quoting Ex. 105, July 30, 2013 Conference Call Tr. at 15).)

---

[28] In Paragraph 363, the Complaint attempts to suggest that the Company's upgrading of compliance was "limited" to the Southwest Border area.  That is flatly inaccurate and mischaracterizes the cited portion of the transcript, which makes clear that the Company's extensive compliance investments were being made "globally."

Regardless of the slight variances in wording, there are simply no contrary facts indicating that *any* of these statements were not true, and were not genuinely believed to be true, at the respective times they were made during the Class Period.[29]

**B.     Plaintiff's Claims With Respect To These Statements Also Fail Because The Statements Were Too Vague And Nonspecific To Be Material.**

As Defendants pointed out in their Opening Brief, these so-called "touting" statements are not actionable for a second reason – they are all classic statements of puffery, *i.e.*, statements that, under governing Tenth Circuit law, are too vague, unquantified, and nonspecific to be considered material.  (*See* Br. at 53 (quoting *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012); *Grossman v. Novell,* 120 F.3d 1112, 1119-20 (10th Cir. 1997)).)  Plaintiff, however, largely ignores the holdings in these leading Tenth Circuit cases.  The Opposition makes no mention of *Grossman*'s rulings on these issues.  It cites *Level 3* simply to note that the Court there found *some* of the statements at issue not to be puffery.  (*See* Opp. at 36 n.16.)  But the statements found potentially actionable in *Level 3* were far more concrete and quantifiable than the "touting" statements here.  *See In re Level 3*, 667 F.3d at 1340-4 (declining to dismiss statements that quantified the company's progress with respect to integration efforts in concrete terms, including statements that "[a] majority of the physical network interconnections are completed" and "[m]ost of the physical integration of WilTel is now complete") (internal quotation marks omitted).  And those statements at issue in *Level 3* that were, like those here,

---

[29] Plaintiff also takes issue with a handful of statements relating to "best practices," but as discussed below (*infra* at 47-48 & n.33), Plaintiff alleges no facts suggesting these statements were false – and in any event they are precisely the sort of generalizations regarding business practices that courts (including Plaintiff's own authorities) have held to be classic puffery.

unquantified and unspecific were precisely the ones that the Court held to be insufficiently concrete or specific to be actionable.  *See id.* at 1340 (finding that broad claims by defendants regarding "integration efforts and the customer experience" and "general, forward-looking expressions of confidence" regarding integration efforts, even though made while the company knew integration was not going well, were immaterial as a matter of law).

It is not merely the Tenth Circuit cases that Plaintiff ignores.  The Opposition also ignores the numerous cases cited in the Opening Brief (at 54) that have already found statements using precisely the same "competitive advantage" language as used here to be nonactionable puffery.  As these other cases have held, a company's statements touting a particular capacity as a "competitive advantage" are simply too vague and unquantified to be material.  (*See* Br. at 54 & n.46 (citing *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012); *In re Cable & Wireless, PLC, Sec. Litig.*, 332 F. Supp. 2d 896, 901 n.6 (E.D. Va. 2004); *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1291 (D.N.M. 2002); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 304 (S.D.N.Y. 2000)).)

Judge Krieger also made precisely the same ruling in the *SEB* case, where she held that challenged statements characterizing Western Union's compliance infrastructure as a "competitive advantage" were nonactionable because they are "loosely optimistic statements that are so vague, so lacking in specificity that no reasonable investor could find them important." *SEB Asset Mgmt.*, 2015 WL 5708532, at *4 (quoting *In re Level 3*, 667 F.3d at 1340).  Plaintiff argues that Judge Krieger's decision should be disregarded because it was issued before the Regulatory Settlements were announced.  (Opp. at 26.)  But the Regulatory Settlements have nothing to do with the question of whether the statements in question are, on their face, so vague

and nonspecific as to be immaterial as a matter of law – which is what Judge Krieger previously determined in holding the statements to be nonactionable "puffery."

What Plaintiff has done is conflate falsity with materiality, but the two issues are distinct. Indeed, materiality is a required element of a Section 10(b) violation separate and apart from falsity.  In other words, even if a statement is arguably false or misleading, it must also be material to be actionable.  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). And where, as here, affirmative statements are at issue, the inquiry with respect to materiality is an objective one of whether a reasonable investor would consider the statements at issue "important in determining whether to buy or sell stock."  *In re Level 3*, 667 F.3d at 1339 (quoting *Grossman*, 120 F.3d at 1119).  Whether a reasonable investor would attach investment significance at the time to a particular statement does not change based on what the speaker allegedly did or did not know when he made the statement (*i.e.*, the falsity/scienter inquiry) – and it does not change here based on the fact that, years later, the Regulatory Settlements were entered into.

Despite the fundamental distinction between materiality and falsity, Plaintiff nonetheless argues that a statement that would otherwise be nonactionable puffery may somehow be transformed if the speaker knew it was untrue, citing an edited sentence from the unpublished district court decision in *Simmons Investments, Inc. v. Conversational Computing Corp.*, 2011 WL 673759 at *5 (D. Kan. Feb. 17, 2011).  (Opp. at 36.)  The full sentence from *Simmons* made reference to "[s]tatements of corporate optimism ***and*** forward-looking statements," lumping the two together.  *Id.*  This conflation was erroneous.  Indeed, while *Simmons* cites *Grossman*, 120

44

F.3d at 1119 n.6, and the Opposition does likewise as purported support for its argument (at 36),

*Grossman* says no such thing about puffery statements.  Instead, *Grossman* itself categorically

held that "mere puffing" statements, including forward-looking statements "of optimism that are

not capable of objective verification," are ***not*** actionable "because reasonable investors do not

rely on them in making investment decisions."[30]  *Id.* at 1119.  *Grossman*'s accompanying

footnote 6 in turn merely noted that this did not mean that other "forward-looking statements

cannot be material."  *Id.*  And the next sentence of the footnote, *i.e.*, the portion relied on by

Plaintiff here, merely notes that a forward-looking statement "may be actionable" if known by

the speaker to be untrue.  But this innocuous *dicta* had nothing to do with puffery statements,

which *Grossman* had already correctly held to be nonactionable.[31]

---

[30] Even the older district court case Plaintiff cites in support of its argument makes exactly this point:  statements that "any reasonable investor . . . would easily recognize as nothing more than a kind of self-directed corporate puffery" are "immaterial as a matter of law."  *In re Sprint Corp.*, 232 F. Supp. 2d at 1217 (citation omitted); *see also id.* at 1220 (finding certain statements regarding the likelihood of merger approval were immaterial as a matter of law).  Plaintiff's quotation from the *Sprint* case (Opp. at 35) merely stands for the proposition that if statements are themselves materially ***misleading***, they may be actionable.  *See In re Sprint*, 232 F. Supp. at 1218.  But that does not alter or eliminate the requirement that a statement must itself be material, either in its own right or in what it reasonably is understood to imply, in order for it to be actionable.

[31] The other cases Plaintiff cites (*see* Opp. at 36-37) lend no support to its argument.  They simply hold that certain concrete statements were material because of their content, not because of some alleged knowledge on the part of the defendants.  *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements were material because they were related to the company's "attempt[] to distinguish itself from other institutions" by promising "'truly independent investment research'"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statements were material because they were "not just . . . subjective or emotive," but rather "concrete description of the past and present" facts).

Plaintiff next argues that because some of the statements of "competitive advantage" or "strength" were phrased in the present tense (as noted above, others were forward-looking), the present tense statements must have been statements of "presently verifiable" facts and not puffery.  (Opp. at 34 (citing *In re Sprint*, 232 F. Supp. at 1217).)  But, once again, this ignores Judge Krieger's rulings, which also involved various present tense statements, as well as the holdings of other cases that have squarely found present tense "competitive advantage" statements to be immaterial as a matter of law.  *See, e.g., Bahash*, 506 F. App'x at 37 (holding that statements of current competitive advantage are puffery); *In re Cable & Wireless, PLC*, 332 F. Supp. 2d at 901 n.6 (same); *Steinberg*, 88 F. Supp. 2d at 304 (same).  Moreover, whether or not a statement is so lacking in specificity as to be immaterial does not depend on whether it was framed in the present tense.  Rather, the question is whether the statement is too vague and nonspecific to be actionable, as the statements at issue here were.

Plaintiff's final argument is to ignore all of the authorities that are directly on point and instead cite various cases that it claims are controlling.  But those cases each involve "competitive advantage" or "competitive strength" statements that were far more specific and concrete than the statements at issue here, or that included representations of concrete fact, and were not immaterial puffery for that reason.  For example, Plaintiff relies on *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1289 (N.D. Okla. 2010).  (Opp. at 36.)  But in that case the statements of "Competitive Strengths" were not entirely generalized and unspecific, like the statements in this case.  Instead, they contained numerous, embedded concrete facts, including that (i) certain specific contractual agreements "provided 'stable, fee-based, contracted cash flows,'" and (ii) claims that a relationship with a corporate parent would enable the

46

company "to expand its storage capacity" and "generate stable cash flows."  *In re SemGroup*,

729 F. Supp. 2d at 1288-89.  It is those representations that the Court found material.  Nothing

remotely similar is at issue here.[32]

Plaintiff additionally argues that generalized statements of compliance with unspecified

"industry best practices" are not puffery.  But there are few such statements identified in the

Complaint, and in none of these few instances has Plaintiff specified any acknowledged

"industry best practice" which Western Union was not following at the time.[33]  (Opp. at 34.)  In

---

[32] The same is true of each of the cases Plaintiff cites on pages 35-36 of the Opposition.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017) (statements regarding Volkswagen's top R&D priority were not puffery because "Volkswagen identified its top R & D priority in concrete terms:  'to develop engines and drivetrain concepts to reduce emissions'"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1144 ("[Defendants] did not just describe the pipeline in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline."); *Lapin*, 506 F. Supp. 2d at 240 (plaintiff did "more than identify rosy predictions or vague statements," challenging concrete promise that defendant conducted "truly independent investment research"); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 233 (S.D.N.Y. 2012) (company represented that it "conducted 'extensive' training and safety programs"); *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *7 (D. Kan. Sept. 25, 2012) (while "in the process of combining operational networks," defendant represented that the integration was "improv[ing] [technical] efficiencies"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 375 (S.D.N.Y. 2015) (company asserted in unqualified terms that "its operations were conducted . . . in compliance with applicable laws and regulations . . . [and] repeatedly represented that it maintained effective internal controls and procedures"); *Simmons Invs.*, 2011 WL 673759, at *5  ("Defendants represented that a group of Australian investors were going to make a substantial investment in the Company.").

[33] Plaintiff cites a February 24, 2012 statement by Messrs. Ersek and Scheirman that they **believed** the Company's fraud prevention efforts complied with "best practices," and a February 11, 2014 statement by Mr. Ersek that "I *believe* as an industry leader, we are setting your best practices.  We are driving it."  (Compl. ¶¶ 305, 408).  Plaintiff has alleged no facts to suggest that Messrs. Ersek and Scheirman knew that these statements were false, or indeed anything at all about Western Union's actual compliance practices at the time, or any accepted "best practices" it allegedly failed to follow at the time.  (*See also supra* at 25-26 (addressing Plaintiff's misreading of the Company's Enhanced Compliance Undertaking with the DOJ).) The remaining statements cited by Plaintiff (Opp. at 34) are entirely inapposite, including

any event, the case Plaintiff cites does not say as a blanket matter that "descriptions of compliance with 'industry best practices' are not puffery." (*See* Opp. at 34 (quoting *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016).)  In fact it says quite the opposite:

> [W]hile ***generalizations regarding a company's business practices are precisely the type of puffery that this and other circuits have consistently held to be inactionable***, the statements here were made on the heels of well publicized regulatory guidance ***about specific business practices***. That context makes it reasonable to infer that the statements did not refer to generalized business practices alone.

*In re EZCorp*, 181 F. Supp. 3d at 207 (internal quotation marks and citations omitted).  Indeed, the statement held not to be puffery by the *EZCorp* court expressly alluded to the specific business practice in question, representing that "recent OFT [Office of Fair Trading] activity will not adversely impact the business, as Cash Genie has been following best practices guidelines for the past year." *Id.*  The court found this statement actionable because of the OFT activity that was specifically referenced, which the company knew provided regulatory guidance directly contrary to its current practices.  No such specific practices or specific guidance was referenced in the statements at issue here.  To the contrary, the statements actually made by Defendants are similar to – though even more vague and less specific than – statements the *EZCorp* court found were puffery.

---

(i) instances in which a ***conference*** was billed as discussing "best practices" (Compl. ¶¶ 347, 395, 436, 442), and (ii) one instance in which Mr. Ersek stated in 2014 that law enforcement was assuring the Company with respect to its Southwest Border Agreement compliance investments, "You are leading the market, and ***[will] be*** the best practice" (Compl. ¶ 423 (quoting Ex. 101, May 7, 2014 Conference Tr. at 4)).  Plaintiff has not even alleged that the latter statement was false.

**III.    The Court Should Dismiss Allegations Regarding Statements Describing Ongoing Government Investigations.**

Plaintiff additionally challenges statements, contained primarily in the Company's SEC filings, that referred to the government's investigations during the Class Period.  Plaintiff principally takes issue with one aspect of the descriptions of those investigations:  Defendants' refusal to predict their outcomes.  (*See* Opp. at 39-41; *see also* Br. at 56 (citing Compl. ¶¶ 308, 318, 326, 344, 368, 413, 417, 449, 476, 483, 489, 493).)  Plaintiff's only argument in this respect is that Messrs. Ersek, Scheirman, and Agrawal should each have made predictions whenever mentioning the investigations "because Western Union's potential liability was in fact substantial."  (Opp. at 39.)  But Defendants explicitly and repeatedly disclosed that very fact.  Whenever the investigations were described in SEC filings throughout the Class Period, it was specifically noted that the Company "***could face significant fines***, damage awards or regulatory consequences" as a result of the investigations, and that those consequences "could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows."  (*See, e.g.*, Ex. 3, 2012 10-K at 38; Ex. 13, 2013 10-K at 39-40, 50-51, 111; Ex. 19, 2014 10-K at 46-47, 110; Ex. 22, 2015 10-K at 47-48, 110-11.)  This is a statement that Western Union's potential liability was substantial – and far from an attempt, as Plaintiff argues, to "downplay[] the likely outcome" of the investigations.[34]  (Opp. at 40.)

---

[34] Plaintiff argues that this case is like the *SEB* case in which, it claims, the Court found defendants were liable for their "statements acknowledging but downplaying" compliance problems in Mexico.  (Opp. at 39.)  The analogy is meritless.  In the *SEB* case, the Court held, based on allegations from a confidential witness, that details regarding an action ***the defendants themselves*** were thinking of taking (the termination of 7,000 agents) should have been revealed. *SEB Asset Mgmt.*, 2015 WL 5708532, at *11.  Here, in contrast, Plaintiff argues the Company

Plaintiff apparently wants more – for the various Individual Defendants to have disclosed that substantial liability was a sure thing.  But they were not required to hazard guesses simply based on the potential severity of the outcome – even if that outcome may later have come to pass.  Indeed, it is well established that no prediction regarding the potential outcome of such legal proceedings or investigations is required when that outcome is something short of a "near certainty."  (Br. at 57 n.47 (citing *In re FBR Inc., Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (need not disclose where risk had not become a "near certainty"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (need not disclose where result was not a "foregone conclusion"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) (need not disclose where result was not "substantially certain to occur")).)

Plaintiff's argument to the contrary is one of pure "fraud by hindsight."  (*See* Br. at 59 (quoting *Anderson v. Spirit Aerosys. Holdings Inc.*, 827 F.3d 1229, 1247 (10th Cir. 2016) (rejecting plaintiffs' argument based on "the magnitude of the loss that Spirit ultimately sustained" because "[t]hese arguments amount to allegations of 'fraud by hindsight,' which does not constitute securities fraud"); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 545 (S.D.N.Y. 2015) (similarly rejecting fraud by hindsight argument)).)[35]

---

had the duty to predict what outcomes or resolutions might eventually be accepted or reached ***by others***, *e.g.*, the governmental authorities.

[35] In support of its argument, Plaintiff cites *In re ITT Educational Services Securities Litigation*, 34 F. Supp. 3d 298 (S.D.N.Y. 2014).  (*See* Opp. at 39.)  But that case involved a specific set of contracts ITT signed with lenders requiring ITT to pay for its students loan default losses after the defaults reached a certain threshold.  *Id.* at 302-03.  ITT continued to make representations that the company's liabilities "[w]ould be [i]mmaterial" even after the lenders ***explicitly informed it*** that the threshold had been reached and demanded "increasingly large sums of money."  *Id.* at 302.  Nothing of the sort is alleged here.  The other cases cited by Plaintiff are similarly inapposite.  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-

Indeed, as Defendants pointed out in their Opening Brief (Br. at 57-59), there were numerous factors potentially affecting the resolution or outcome of the investigations.  Plaintiff simply ignores all of these variables, and does not offer any response.  Nor has Plaintiff identified a single fact or source indicating that, in the years prior to the Regulatory Settlements (stretching as far back as 2012), Messrs. Scheirman and Ersek (in 2012-2013, before all of the investigations had even begun) and Messrs. Agrawal and Ersek (in 2014-2016) each actually believed at the time of their respective statements that they were able to predict the outcome of the investigations (as is required, since their statements expressing their inability to predict the outcome were clearly statements of opinion governed by *Omnicare* (*see* Br. at 58 n.48 (citing *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1120-21 (10th Cir. 2014) (Gorsuch, J.)))).

Plaintiff next focuses on the following statement from the Company's November 1, 2016 Form 10-Q, signed by Messrs. Ersek and Agrawal:

> The FTC staff has advised the Company that it believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004.  The Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof, but has continued to engage in discussions with the FTC in an effort to reach an appropriate resolution of this matter.

---

01 (S.D.N.Y. 2005), for example, had nothing to do with an unwillingness to predict the ultimate outcome of an unidentified government investigation.  Instead, the court held that a generic risk warning regarding potential regulatory risks was affirmatively misleading when the company already knew or was recklessly ignorant that its business strategy relied on practices that violated New York Stock Exchange rules.  (*See also supra* at 11-12 (discussing *City of Pontiac*).)

(Ex. 25, 2016 Q3 10-Q at 15, 59; Compl. ¶ 263; *see also* Br. at 16; Opp. at 40-41.)  Plaintiff

argues that this statement was false because Defendants omitted to disclose that the Company did

not actually disagree with the FTC's conclusion that "fraud was underreported."  (Opp. at 40-

41.)  But Defendants never represented that they agreed or disagreed with the FTC's belief that

fraud-induced money transfers are underreported.  Rather, they stated that they disagreed with

"***the FTC's assertions regarding [the Company's] potential liability and any scope thereof***" –

*e.g.*, the FTC's novel theory that the Company was ***liable*** for transactions never reported as

fraudulent in the first instance, and liable not only for fees received by Western Union on those

transactions but for principal amounts.

Finally, Plaintiff refers to three statements made on calls or at conferences between 2013

and early May 2014, which Plaintiff claims mentioned the investigations.  (Opp. at 41-42.)  But

as explained below, two of these statements said nothing about the investigations, much less

made any false or misleading representations about them, and the third simply refers to the SEC

filing and states that it is too early in the process to say more.  Plaintiff's argument that there is

anything remotely misleading about these statements is based entirely on distortions of what was

actually said.

***First***, Mr. Ersek was asked on an earnings call on February 12, 2013 (before the

Company had even received subpoenas in many of the investigations (Br. at 13 n.8)), "is there

anything out there that could be as large as the situation that happened with Vigo and Orlandi

Valuta that could have that kind of an impact on price?" – a question that clearly was about

whether the Company would need to make pricing changes in the future.  Mr. Ersek responded

by ***acknowledging*** that "the regulatory environment is challenging."  He then shifted topics,

away from the question about potential short-term pricing changes, and stated that "our investments, about $100 million a year we invest to anti-money laundering compliance are really putting us as an industry standard.  Being a market leader puts us in an industry standard and we want to be a best-in-class and see that as a long-term competitive advantage."  (Ex. 93 at 16; *see* Opp. at 41.)  Plaintiff argues that this statement relates to the "'objectively verifiable' status of pending government investigations."  (Opp. at 41 n.20.)  But that is simply not what this statement was about.  In any event, Plaintiff cites no particularized facts indicating that, as of this date early in the Class Period, Mr. Ersek somehow secretly knew what the outcome of any disclosed government investigations would be.

*Second*, just a few months later, Mr. Ersek was asked if "the worst is over" in "terms of compliance events."  (Ex. 96, May 8, 2013 Conference Call Tr. at 9.)  Plaintiff offers nothing to suggest Mr. Ersek did not think the worst was over – particularly at this point in the Class Period, when the Company had made the improvements later lauded by the DOJ and others (*see*, *e.g.*, DPA ¶ 100), and more than three years before the investigations would be concluded.  In any event, Mr. Ersek did not say that it was.  He responded that "the regulatory environment is getting tougher" and that "[s]hort term, we believe that it has impact to our business," but "I think that will be long term a competitive advantage."  (Ex. 96 at 9.)

*Third*, on a May 1, 2014 earnings call, Mr. Agrawal was asked for an update on the MDPA subpoena the Company disclosed in its SEC filings.  His full response was as follows:

> Smitty, I would just *refer you to our 10-Q that we are filing today.  We don't really have more comments beyond that*.  It's *early in the process* and it's something that we're working through.  We have good monitoring systems in place.  We have a multi-faceted program to [prevent] consumer fraud and an outreach program with

consumers.  That's about all we can say right now.  And we're working through that.

(Ex. 100 at 14.)  Plaintiff characterizes this as "a positive statement[] concerning regulatory investigations."  (Opp. at 41.)  It is not.  Instead, Mr. Agrawal said nothing more about the MDPA subpoena than to reference the public disclosure and note that it was "early in the process."  What Plaintiff apparently takes issue with are *other* portions of this statement not involving any predictions about the MDPA subpoena proceedings, *i.e.*, the fact that Mr. Agrawal called the current monitoring systems "good" and the existing fraud prevention program "multifaceted."  But Plaintiff does not allege a single fact to support its contention that these statements, which in any event were too vague and unquantified to be material (*see supra* Section II.B), were false.  The Complaint contains no facts regarding the nature, extent, or quality of the Company's monitoring systems as of May 2014, or any facts showing that fraud prevention program was not "multifaceted" at that time, much less that Mr. Agrawal knew that these statements were false at the time.  And while Plaintiff argues that these statements somehow gave rise to a "duty to disclose" past or current compliance failures (of which there is no factual showing Mr. Agrawal was aware at the time), that too was not the subject matter of the statements and the supposed duty is wholly invented.  *See Emps. Ret. Sys. of City of Providence v. Embraer*, 2018 WL 1725574, at *4 (S.D.N.Y. Mar. 30, 2018) ("[T]he Amended Complaint is premised on the faulty notion that [defendant] was required to disclose details of the [compliance] violations and admit that it had engaged in wrongdoing – before it had even been charged and before the investigations were even complete.  However, the Second Circuit has held that disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.").

54

## IV.     The Court Should Dismiss Allegations Regarding The Reasons The Company Made Compliance Investments.

Plaintiff argues that the government investigations were the real reason for all of the Company's increased compliance expenditures during the Class Period, and claims that it was misleading for the Company to fail to disclose that it was making compliance expenditures ***solely*** as a result of the regulatory investigations.  (Opp. at 42-44.)[36]  As the sole support for this bald assertion, Plaintiff cites three paragraphs in the FTC Complaint, each of which include the statement by the FTC that "as a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012."  (FTC Compl. ¶¶ 9, 26, 96 (cited in Opp. at 42).) But this statement by the FTC does not remotely bear the weight that Plaintiff attempts to place on it.  It refers to improvements, not to investments *per se*; it refers only to antifraud programs, not anti-money laundering and other areas of compliance that were the subject of investments; and the FTC does not even claim that its investigation was the ***only*** reason for Western Union undertaking improvements in its antifraud programs over the course of many years.[37]  Nor does

---

[36] Plaintiff also claims that Defendants falsely "characterized the Company's compliance difficulties and increased efforts as limited to issues raised by the Southwest Border Agreement." (Opp. at 42.)  As purported support, the Opposition refers to three of the Complaint's paragraphs, without quoting any actual statements.  In fact, there was no such statement, and the statements identified in the three cited paragraphs say no such thing.  (*See* Compl. ¶¶ 363 (quoting Ex. 94 at 13 (explaining that ***pricing*** changes at the time were related to the changes made pursuant to the SWB Agreement)), 447 ("In 2014, the Company spent over $180 million on its compliance and regulatory programs, ***including*** costs related to our amended settlement agreement with the State of Arizona."), and 361 (purporting to summarize a 23-page transcript, which nowhere characterizes compliance difficulties or efforts as limited to the SWB Area).)

[37] Plaintiff quotes *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015), for the proposition that "the existence of multiple explanations" can make a statement misleading. (Opp. at 43; *see also id.* at 42.)  The statement is unexceptionable but inapposite, as are the facts of *Nakkhumpun*.  In *Nakkhumpun*, the defendants stated publicly that there was only one reason why something had occurred (*i.e.*, a deal to purchase a portion of their company purportedly fell

Plaintiff provide any reason whatsoever to believe that such cited factors as "global trends" and "increasingly complex regulatory requirements" were not indeed among the reasons for various compliance investments made during the Class Period.[38]

## V.   The Court Should Dismiss The Remainder Of Plaintiff's Allegations, Which Were Not Well-Pleaded And Have Been Abandoned.

As explained in the Opening Brief (at 66-71), there are miscellaneous other statements apparently claimed to be false and misleading in the Complaint that do not fall into the various categories otherwise identified by Defendants, many of which are indiscriminately contained within block quotations.  The Complaint's ambiguous allegations with respect to these other statements do not comply with the PSLRA's particularity requirements.  And many of these additional statements also are too vague and nonspecific to be material, as a matter of law.

With the exception of a single footnote (Opp. at 48 n.26),[39] the Opposition does not even attempt to grapple with the specifics of these other statements and their identified deficiencies.

---

through because the potential buyer was unable to get financing), when the plaintiff alleged facts clearly showing there was a different reason (the investor's CEO had "unambiguous[ly]" stated that the deal fell through because the company was not worth what his company had initially thought).  782 F.3d at 1147, 1149.  The statements at issue here are not remotely similar, and none suggests that there was only one specified reason for compliance investments.

[38] As also pointed out in the Opening Brief, Defendants *did* mention discussions with regulators as one reason for increased compliance expenditures.  (Opp. at 44 (citing Br. at 62-63).)  Plaintiff disputes that fact.  But the very first citation provided by Plaintiff, and numerous others, demonstrates Defendants' point in no uncertain terms:  ". . . *as we dialogue with governmental and regulatory authorities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity*."  (Compl. ¶ 342 (quoting Ex. 90, 2012 Q2 10-Q at 34); *see also id.* ¶¶ 366 (same), 411 (same, in early 2014), 474 (same, in early 2016).)

[39] In that footnote, Plaintiff purports to explain why two of the Complaint's statements Defendants noted as illustrative examples (Compl. ¶¶ 397, 444) were misleading.  But this belated attempt underscores the problem.  For example, Plaintiff argues that Mr. Ersek's statements in Paragraph 397 were misleading because they "misrepresented the reason for

Instead, Plaintiff asserts that "Defendants had no trouble identifying in their motion to dismiss" the statements alleged to have been false or misleading that fall within the four categories discussed above.  (Opp. at 47.)  But this simply ignores the other statements Defendants addressed in their Opening Brief.  This includes ignoring (1) the Complaint's failures to specify *which* particular statements contained in block quotations were purportedly false (Br. at 67-68), (2) the failures to provide adequate *why* particulars in many instances (Br. at 68-70), and (3) the more than dozen additional "puffing" statements specifically identified by Defendants, which are not addressed in the Opposition (Br. at 66-67 & n.55).  Because Plaintiff has failed to engage with the specifics of any of these statements, these allegations should accordingly be dismissed. *See Schioppi v. Costco Wholesale Corp.*, 2007 WL 4277455, at *10 (D. Colo. Nov. 30, 2007) (holding that argument was forfeited when "Plaintiff abandoned in her response brief any mention of her initial claim"); *Guardian Title Agency, LLC v. Matrix Capital Bank*, 141 F. Supp. 2d 1277, 1283 n.2 (D. Colo. 2001).

---

Western Union's compliance expenditures."  Putting aside the numerous substantive issues with that claim (*see supra* Section IV), and the fact that it still does not identify a particular false statement in Paragraph 397's block quotation, what is glaring is the mismatch between this newly supplied explanation and the Complaint's own allegations.  The Complaint alleged that "the statements" in Paragraph 397 were false "for the reasons set forth in ¶ 303(i)-(v) and (vii) above" (Compl. ¶ 400) – not one of which mention "the reason for Western Union's compliance expenditures."  As to the February 2015 statement by Mr. Ersek that is the subject of  Paragraph 444 – *i.e.*, that in 2014, the Company "[e]nhanced global compliance programs" – we previously noted that while the Complaint cited its standard litany of generalized claims, this was again emblematic of a repeated, larger failing – the failure to even attempt to identify contrary facts addressed to the specific time when various statements were made.  Plaintiff says nothing in response, and makes no attempt to identify any facts contrary to what was actually said in this specific statement (and numerous others as well).

Nor do Plaintiff's attempts to provide some generalized excuse for the deficiencies in its pleading with respect to these remaining statements suffice.  For example, Plaintiff argues that Defendants are trying to "have it both ways" by (a) pointing out that the Complaint in some cases includes block quotes spanning multiple pages without explaining which statements are allegedly false, and, (b) criticizing Plaintiff at times for mischaracterizing what was said by plucking snippets from their surrounding context (which Defendants have then provided).  (Opp. at 47.)  There is nothing the least bit inconsistent in these dual criticisms.  Nor are Defendants criticizing all uses of block quotes.  They are simply pointing out that Plaintiff has an obligation under the PSLRA to "specify each statement alleged to have been misleading" (15 U.S.C. § 78u-4(b)(1)), and Plaintiff's Complaint fails to meet this requirement in certain instances.  Plaintiff's decision to "[p]lace[] the burden on the Court to sort out the alleged misrepresentations" is an independent ground for dismissal.  *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005); *see also* Br. at 70-71.

Plaintiff similarly fails to meet the PSLRA's requirement that it allege with particularity why each statement is misleading.  (Br. at 25-26.)  Plaintiff generically argues that it suffices continually to cross-reference a short laundry list of reasons why each statement made by four Defendants over a more than five-year period was false because, "at bottom, all of their alleged misstatements were false and misleading for similar reasons."  (Opp. at 48 (referencing Compl. ¶ 303).)  But Plaintiff's failure to match up purportedly false statements with knowledge held by any Individual Defendant ***at the time the statement was made*** is a fundamental problem with Plaintiff's Complaint and its Opposition.  "Such 'puzzle pleading' is an improper means of

pleading a claim." *In re Level 3 Commc'ns Inc. Sec. Litig.*, 2010 WL 5129524, at *9 (D. Colo. Dec. 10, 2010), *aff'd* 667 F.3d 1331 (10th Cir. 2012).

Because Plaintiff's falsity arguments with respect to each category of statements fail to meet the PSLRA's requirements, this alone requires dismissal of the Complaint.

## VI.    The Complaint Also Should Be Dismissed Because It Does Not Allege A Strong Inference Of Scienter As To Any Defendant.

Under the PSLRA, Plaintiff is also required to allege particularized facts that give rise to a strong inference that ***each*** of the Individual Defendants was acting with the requisite scienter[40] when he made ***each*** of the challenged statements attributed to him.  *See* 15 U.S.C. § 78u-4(b)(2); *In re Level 3*, 667 F.3d at 1333.  In their Opening Brief, Defendants discussed each Defendant individually and explained why Plaintiff has not met its burden as to any of them.

By contrast, the Opposition conspicuously avoids any such individual-by-individual scienter analysis, and never analyzes the claims holistically with respect to any of the individuals.  Instead, it repeatedly lumps the Individual Defendants together as a group, with only stray comments about individuals, and without ever tying its arguments to the individual statements made by different Defendants at widely varying times.  This approach ignores the dictates of the PSLRA, which requires an individualized scienter inquiry as to each Defendant.

---

[40] Although Plaintiff repeatedly argues that it need only show that Defendants acted recklessly (*e.g.*, Opp. at 49 (citing *Nakkhumpun*, 782 F.3d at 1150)), that is not the standard for most of the challenged statements, including the statements of belief or opinion, which are subject to the *Omnicare* standards, and forward-looking statements, which require actual knowledge of falsity. *See Nakkhumpun*, 782 F.3d at 1150, 1159 (applying recklessness standard to non-belief statements and then, applying the *Omnicare* standard, finding a lack of scienter as to the belief statement); 15 U.S.C. § 78u-5(c).

What follows is an individual-by-individual response to Plaintiff's arguments concerning scienter.  We begin with the respective CFOs (as to whom the allegations are particularly sparse), then discuss the allegations against the Company's CEO, Mr. Ersek, and finally address Plaintiff's legally inadequate arguments concerning corporate scienter.[41]

### A.   Plaintiff's Allegations Do Not Give Rise To A Strong Inference That Mr. Scheirman Acted With Scienter.

Plaintiff essentially concedes that Mr. Scheirman had no motive or reason to commit fraud.  He is not alleged to have sold a single share of stock, and there is no allegation that he benefited from the alleged fraud in any other way.  Plaintiff asserts, however, that "scienter allegations may suffice even without a motive."  (Opp. at 69 (quotation omitted).)  But the absence of any motive makes Plaintiff's job of alleging a strong inference of scienter much more difficult.  As the Tenth Circuit recently reconfirmed, "[a]lthough the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain."  *Emps.' Ret. Sys. of R.I.*., 889 F.3d at 1173; *see also In re Level 3*, 667 F.3d at 1347.

Moreover, Plaintiff also effectively admits that, as the Company's former CFO, Mr. Scheirman had no responsibility for AML or consumer fraud compliance.  (Opp. at 62-63 n.29.)  And the Complaint contains no particularized factual allegations showing that Mr. Scheirman supervised or had any other involvement whatsoever with the government investigations.  These facts significantly undermine the claims against Mr. Scheirman, including

---

[41] Plaintiff's arguments concerning Mr. Koch are addressed in the separate reply brief being filed on his behalf.

any asserted inference that he would have received detailed, agent-level information concerning compliance matters.  Plaintiff responds, however, that the Defendants' "job responsibilities cannot absolve them of information they actually knew."  (*Id.* at 63 n.29.)  According to Plaintiff itself then, the entire case against Mr. Scheirman with respect to scienter rests on whether Plaintiff has pleaded particularized facts creating a strong inference "that he actually knew" information at the time of each of his statements that rendered each such statement false or misleading.  But the Complaint contains no such facts, let alone any facts pleaded with the particularity required by the PSLRA.

The Opposition identifies just four items that Plaintiff argues reflect culpable knowledge on the part of Mr. Scheirman:  (1) CW3's allegations concerning the investigations, (2) certain Board materials, (3) the Sarbanes-Oxley certifications that he signed in his capacity as CFO, and (4) his departure from the Company.  None of these allegations – either individually or collectively – gives rise to any inference that Mr. Scheirman said anything he knew to be untrue at the time he said it.  Moreover, in the absence of any allegation of motive, it is clear that Plaintiff has not pleaded the required strong inference of scienter.

***CW3's Allegations.***  Citing CW3's alleged statements, Plaintiff argues that there was "no way that Defendants Ersek, Scheirman, and Agrawal were not informed about the ongoing investigations" that resulted in the Regulatory Settlements.  (Opp. at 60 (citing Compl. ¶ 249).)  But not only is CW3's statement largely speculative in nature,[42] as discussed earlier (*supra* at

---

[42] Plaintiff nowhere alleges that CW3 ever spoke with or had any other contact whatsoever with Mr. Scheirman, and CW3 nowhere describes (or claims to have had personal knowledge of) what Mr. Scheirman supposedly was told about the investigations.

32), it also begs the fundamental question of *what* Mr. Scheirman actually was told about which investigations and *when* he was provided with such information.  There is, for example, a fundamental difference between knowing about the existence of the investigations generally and being told that the investigations had shown that the Company currently was not complying with the law.  But Plaintiff does not identify the contents of any information that Mr. Scheirman ever received regarding the investigations, much less identify facts showing that he ever received any information of some ongoing legal noncompliance.  Absent such particularized facts, CW3's generic allegation does not establish that any of Mr. Scheirman's statements were somehow known by him to be false.

Plaintiff also nowhere links the timing of what was supposedly known from the investigations, and when, to the timing of Mr. Scheirman's statements made at varying times, and the timing of his tenure.[43]  The investigations were very much in their infancy when Mr. Scheirman was still with the Company, and they *had not even begun* as of the time (February 2012) he signed the Form 10-K containing his first challenged statement, *i.e.*, "we believe our fraud prevention efforts are effective and comply with applicable law."  (Compl. ¶ 305 (quoting Ex. 30, 2011 10-K at 32); *see id.* ¶¶ 264 (EDPA subpoena received in March

---

[43] Not only is Mr. Scheirman not alleged to have had any involvement with the government investigations, he left Western Union before many of the government subpoenas were even issued to the Company, before the Company had produced the millions of pages of documents to the government that those subpoenas called for, and long before the government had reached any conclusions regarding the nature and scope of the violations and the Company's potential liability.  (*See*, *e.g.,* Compl. ¶¶ 269, 272, 273, 277, 509.)

2012), 265 (CDCA subpoena received March 2012), 258 (FTC CID received December 2012)).[44]

With respect to the similar statement of belief regarding compliance contained in the 2012 Form 10-K filed a year later, in February 2013 (and the last signed by Mr. Scheirman), the Complaint likewise provides no factual basis to support the conclusion that Mr. Scheirman was aware of any information from the investigations on that date that was inconsistent with any of the statements that he allegedly made. There are simply no particularized facts – from CW3 or any other source – regarding what Mr. Scheirman was told or otherwise believed regarding the recently initiated investigations, much less that he was told or otherwise believed as of February 2013 that the Company's current compliance efforts were legally noncompliant.

Finally, the Opposition includes no particularized facts linking the entirely unspecified information supposedly provided to Mr. Scheirman concerning the investigations to any of Mr. Scheirman's other statements. For example, Plaintiff does not argue that Mr. Scheirman received any information about the progress of the investigations that somehow alerted him that Western Union's compliance infrastructure in 200+ countries and ongoing heavy investment in compliance would not be a long-term competitive advantage, or that Western Union would not be an industry leader in compliance. The investigations that were underway at the time Mr. Scheirman was CFO simply had nothing to do with those issues.

---

[44] The MDPA subpoena relating to consumer fraud complaints and the SDFL subpoena focusing on illegal gaming did not come until later in 2013 or 2014, *after* Mr. Scheirman's last challenged statement on November 4, 2013. (*See* Compl. ¶¶ 268, 272, 401.)

**_Board Materials._**  Plaintiff also asserts that Mr. Scheirman attended "relevant Board meetings."  (Opp. at 19 & n.7; *see also id.* at 53-54.)  But the Board minutes do not show that Mr. Scheirman attended the relevant portions of those meetings.  And the cited materials in any event do not show that there was any discussion of compliance violations that would have been inconsistent with the statements that Mr. Scheirman made.

Plaintiff first identifies several Board meetings from 2010 or 2011, which pre-date the Class Period and do not say a word about legal noncompliance as of those earlier times, let alone current non-compliance at the times of Mr. Scheirman's later statements.  (*See supra* at 2-3, 9-10.)  Moreover, as discussed above, Plaintiff's arguments concerning these Board meetings are based on egregious mischaracterizations of the documents.  (*See id.*)  These pre-Class Period Board meetings do not give rise to any inference that Mr. Scheirman had scienter for any statements made by him during the Class Period.

Plaintiff also points to materials from three Board or Board Committee meetings during the Class Period that Mr. Scheirman is alleged to have attended some portion of.  Plaintiff first focuses on the Audit Committee meeting on July 19, 2012, which Plaintiff argues "noted that the FTC told Western Union on June 19, 2012 of the regulator's 'observations regarding areas of weakness in our fraud prevention program.'"  (Opp. at 21 (quoting Ex. 62 at 3, and citing Ex. 61).)  As an initial matter, however, there are no particularized facts demonstrating that Mr. Scheirman actually attended this portion of the meeting.[45]  Moreover, as noted earlier (*supra*

---

[45] The minutes for this meeting indicate that Mr. Scheirman was present "for all *or a portion* of the meeting in person or by teleconference."  (Ex. 61 at 1.)  Plaintiff does not allege that he was present for any compliance discussions, as opposed to other portions of the meeting that were

at 22), "areas of *weakness*" are not the same thing as compliance *violations*.  Regardless, the

slide Plaintiff quotes itself makes clear that Western Union would be making immediate

improvements within 60 days.  (Ex. 62 at 3.)  This timing is significant.  Mr. Scheirman's next

statement of belief concerning legal compliance did not come for another *seven months*, until

February 22, 2013, *i.e.*, months after those improvements were made (and after a report to the

Board that the FTC was "very complimentary" of the Company's progress[46]).  The Complaint is

devoid of facts regarding what Mr. Scheirman was told in the interim or as of February 2013.

(*See also supra* at 14-15.)[47]

Second, Plaintiff points to the July 2013 report to the Board referring to an agent in

Kangpokpi, India that was the subject of a "critical escalation" because of a high number of

fraud reports.  (Ex. 81 at 9; Opp. at 56.)  Once again, however, there are no particularized facts

showing that Mr. Scheirman even attended this portion of the meeting;[48] moreover, as discussed

---

relevant to his role as Chief Financial Officer, just that he "likely" attended the meeting.
(Compl. ¶ 234.)

[46] Indeed, at the December 3, 2012 meeting of the Governance Committee, the Company
reported on subsequent meetings with the FTC in September and October 2012, at which
Western Union had presented its new Anti-Fraud Program and new Fraud Risk Management
Group and reported on "the significant progress that's been made since our June meeting," and
noted that "[t]he FTC was very complimentary of the program outlined in the report and the
follow-up letter."  (Ex. 66 at 3.)

[47] Plaintiff also refers to a single bullet point contained in a 13-page "Southwest Border Update"
presentation which reported that "[v]arious deficiencies in the documentation of policies and
procedures" had been noted by the SWB Monitor.  (Opp. at 53; *see* Ex. 62 at 7.)  As explained
earlier (*supra* at 21-22), this alleged deficiency was reported as being in the process of being
addressed, and, in any event, it has nothing to do with the violations that were the subject of the
Regulatory Settlements years later.

[48] Plaintiff asserts in its Opposition that "[a]ll of the Individual Defendants" received this report,
but the minutes for this two-day Board meeting state that Mr. Scheirman was among the invitees
who were present "for all *or portions of* the meeting," with no specific indication that he

earlier (*supra* at 30-31) there is nothing about this truncated report that indicates some ongoing legal noncompliance **by Western Union** either in this particular case or more generally.  In any event, this report from July 2013 is not relevant to, much less inconsistent with, any subsequent statement by Mr. Scheirman.  And Plaintiff nowhere argues otherwise.  For example, Mr. Scheirman's statements on the July 30, 2013 earnings call – that future compliance costs likely would increase and that "longer term we believe that's going to be a competitive advantage" (*see* Compl. ¶ 388; *see also id.* at ¶ 389 ("we . . . want to have best-in-class compliance programs")) – have nothing whatsoever to do with this report about a single agent location in India.  Nor does this report have anything to do with the statements contained in the second or third quarter 2013 Forms 10-Q signed by Mr. Scheirman, which recited past consent agreements and separately stated that the Company continued to make compliance enhancements.  (*See id.* at ¶¶ 391-93, 401-03; *see also* ¶¶ 342-344.)

Third, Plaintiff mentions an AML SWB Risk Assessment that was approved at the October 11, 2013 Board meeting.  (Opp. at 55 (citing Exs. 84 and 86, and Compl. ¶ 243).)  Once again, Plaintiff provides no particularized facts showing that Mr. Scheirman even attended that portion of the Board meeting (which had nothing to do with his role as CFO).  (*See* Ex. 84 (minutes reflect that Mr. Scheirman was one of the invitees who was "present for all *or portions of* the meeting").)  Nor do the minutes reflect that he ever received a copy of the AML SWB Risk Assessment or the summary memorandum, which on its face does not list him as a recipient of that document.  (*See* Exs. 84, 85.)

---

attended the portion at which the report from the Compliance Committee was discussed.  (*See* Ex. 80 at 1.)

Regardless, there is nothing in the AML SWB Risk Assessment that suggests systemic legal noncompliance or that supports an inference that any statement made by Mr. Scheirman – or anyone else for that matter – was knowingly false.  As discussed above (*supra* at 24-25), Plaintiff's attempt to inflate a single sentence noting that "several of the planned [agent] controls are not yet operational or have not been vetted through an independent assessment" into knowledge of legal noncompliance is utterly groundless.  Indeed, nowhere does the Complaint even identify the "several" controls or their nature.  And, as it relates to Mr. Scheirman, this document is not relevant to, let alone does it contradict in any way, the sole statement made by Mr. Scheirman following this Board meeting, namely the Form 10-Q for the third quarter of 2013 filed with the SEC on November 4, 2013.  (Compl. ¶ 401.)

Plaintiff apparently takes issue with a statement in that Form 10-Q concerning compliance enhancements.  In that statement, the Company stated, among other things, that "[w]e regularly review our compliance programs," that "we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity," that these enhancements have resulted in "changes to certain of our business practices and increased costs," and that "[w]e believe some of these changes will have an adverse effect on our business, financial condition and results of operations."  (*See id.* ¶¶ 401, 342.)  Plaintiff does not identify anything false about these statements, much less anything that Mr. Scheirman knew was false.  Indeed, the AML SWB Risk Assessment ***reflects enhancements being made***, and is thus entirely consistent with this Form 10-Q and does not give rise to a strong inference that Mr. Scheirman made knowing misstatements when he signed that last Form 10-Q.

Thus, none of the Board materials highlighted by Plaintiff supports any inference at all – let alone the required strong inference – that Mr. Scheirman did not believe the things he said or had received any information about the investigations (or otherwise) that was inconsistent with anything he said.

*__Sarbanes-Oxley Certifications.__*   Plaintiff next points to the Sarbanes-Oxley certifications that Mr. Scheirman signed as "further support" of his scienter.  (Opp. at 65 n.31.)  The Tenth Circuit has found this exact allegation "unpersuasive."  (*See* Br. at 81 (quoting *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015)).)  Plaintiff tries to distinguish *Zagg* (Plaintiff's counsel's own case) on the supposed ground that, "[u]nlike here," the *Zagg* complaint "did not allege other facts that also supported a strong inference of scienter from a holistic perspective." (Opp. at 65 n.31.)  Not so.  As with the *Zagg* complaint, the Complaint here is "devoid of particularized facts giving rise to any inference of scienter."  *Zagg*, 797 F.3d at 1206.  Plaintiff also mischaracterizes the *Zagg* holding, which makes clear that a bare allegation concerning SOX certifications, without additional particularized facts supporting an inference that Mr. Scheirman knew they were false at the time, "adds nothing to the scienter analysis."  *Id.* (quoting *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015)).

*__Mr. Scheirman's Departure.__*   Finally, Plaintiff argues that Mr. Scheirman's scienter can be inferred from the fact that, "[o]n November 14, 2013, Western Union announced that Defendant Scheirman would be resigning as CFO *without any explanation for his departure*." (Opp. at 10.)  This argument is utterly specious.  As case law Plaintiff itself cites holds, in a situation like this one, where Mr. Scheirman stayed on as CFO through the end of the year and thereafter served as a consultant for a couple of months to assist with the CFO transition, the

68

"most reasonable inference is that [the departure was] benign."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).[49]

### B.   Plaintiff's Allegations Do Not Give Rise To A Strong Inference That Mr. Agrawal Acted With Scienter.

Plaintiff likewise does not allege facts that give rise to a strong inference that Mr. Agrawal, who only became CFO in 2014, acted with scienter in making any of the few statements attributed to him.

To begin with, as with Mr. Scheirman, the allegations of motive with respect to Mr. Agrawal are essentially nonexistent.  The Opposition contains but a single sentence on this subject, which does nothing more than repeat Plaintiff's conclusory assertion in Paragraph 290 of the Complaint that "Defendant Agrawal also benefited from selling stock in August 2016, while in possession of non-public information."  (Opp. at 69.)  However, Plaintiff does not contest or respond to a single point that Mr. Agrawal made in the Opening Brief concerning this one *de minimis* stock sale, which netted him only $21,918.11.  For instance, Plaintiff completely ignores, among other things, that this sale (i) was made by exercising options that were about to expire and would otherwise have been forfeited, (ii) was done pursuant to a 10b5-1 trading plan

---

[49] Plaintiff also argues that "[t]he fact that [the Company's President, Global Consumer Financial Services Stewart] Stockdale abruptly resigned in October 2012 without sufficient explanation as the government investigations into compliance failures were pending further shows that Defendants knew of the investigations' findings at that time."  (Opp. at 60.)  This assertion is bizarre, particularly given that most of the investigations had not yet even begun as of that time.  (*See supra* at 62-63 & n.44.)  Nor does Plaintiff allege that Mr. Stockdale was fired for cause or that anyone believed he had engaged in any wrongdoing.  To the contrary, the Company announced that it had eliminated his position and that he was eligible for severance.  (Ex. 91, Oct. 30, 2012 Form 8-K.)  Mr. Stockdale's departure at a different time does not somehow give rise to an inference that Mr. Scheirman or any of the other Individual Defendants acted with scienter.

entered into more than a year earlier, on May 31, 2015 (*e.g.*, **not** at a time when "various government regulators were nearing the end of their investigations" (Op. at 69)), (iii) involved only a very small fraction of Mr. Agrawal's stock holdings (which increased over the course of the Class Period) and of the options he was eligible to exercise during the Class Period, and (iv) was the sole sale Mr. Agrawal made over the course of five years.  (Br. at 87-89; *see also* Br. at 74-77 (citing cases).)  Plaintiff's failure even to respond to these points is telling, because the suggestion that a C-suite executive would engage in a years-long conspiracy to defraud investors, risking his career and possible criminal penalties, for a payoff of $21,918.11 is highly implausible.  Once again, the absence of any motive weighs heavily *against* an inference that Mr. Agrawal acted with scienter.  *See Emps. Ret. Sys. of R.I.*, 889 F.3d at 1173.

Plaintiff challenges just one statement by Mr. Agrawal from before he became CFO in 2014:  his statement at the May 2012 Investor Day.  While Plaintiff claims that in this statement Mr. Agrawal "characterized the Company's 'compliance capability' as a 'key asset' for global growth," that inaccurately wrenches these phrases from their more limited context, and also leaves out their going-forward nature ("are going to be").[50]  (Compl. ¶ 324; Ex. 87 at 29.)  In any event, Plaintiff makes no attempt to argue that Mr. Agrawal did not believe at the time that Western Union's compliance capabilities would be a key asset for global growth, or that he had

---

[50] Mr. Agrawal was referring to the WUBS business-to-business subsidiary of which he was President at the time (*see* Br. at 9) and to Travelex, a recently acquired company.  In regard to these two business, he stated:  "As we've brought the two businesses together clearly both organizations have a lot of strengths that they brought to the table.  In particular for Western Union it's very much about balance sheets strength, the global brand and the global licensing and compliance capability.  These are going to be key assets for us as we grow globally around the world."  (Ex. 87 at 29.)

received contrary information prior to making this statement.  There is simply no factual basis

for finding a strong inference of his scienter in making this statement.

As for his statements made after becoming CFO in 2014, as with Mr. Scheirman, Plaintiff

has conceded that Mr. Agrawal had no responsibility for AML or consumer fraud compliance in

his role as CFO, but argues that his "job responsibilities cannot absolve [him] of information [he]

actually knew."  (Opp. at 63 n.29.)  Thus, once again the relevant inquiry is whether Plaintiff has

pleaded particularized facts creating a strong inference that Mr. Agrawal "actually knew"

information at the time of each of his statements which he knew rendered the statement false or

misleading.

On that subject, Plaintiff relies on many of the same deficient scienter arguments already

addressed with respect to Mr. Scheirman, including CW3's purported statements (which likewise

say not a word about what Mr. Agrawal supposedly was told, or when); some of the same Board

materials (including the misrepresented Board presentation from May 2011[51] and the innocuous

October 2013 SWB Risk Assessment approved by the Board[52]); and Mr. Agrawal's signing of

Sarbanes-Oxley certifications (*see supra* at 68).   For reasons already explained, none of these,

either individually or viewed holistically, gives rise to a strong inference that Mr. Agrawal acted

---

[51] Plaintiff does not allege in its Complaint that Mr. Agrawal attended this two-day Board meeting (*see* Compl. ¶ 97), however the minutes reflect that he was one of the invitees who "was present for all *or portions of the meeting*."  (Ex. 48, May 19-20, 2011 Board Meeting Minutes.)  Plaintiff does not allege that Mr. Agrawal attended portions of the meeting that related to compliance, as opposed to portions that were relevant to WUBS, the subsidiary he was heading at time.

[52] As with Mr. Scheirman, the Opposition also provides no particularized facts linking this document to the known falsity at later times of various statements that Mr. Agrawal made over the next several years.

71

with scienter.  We address below the inadequacy of the remaining matters raised with respect to Mr. Agrawal.

**_Board Materials_.**  The only additional Board meeting that Mr. Agrawal is alleged to have attended is the one from December 2012.  Plaintiff asserts that during this meeting the "key features" of a 2012 settlement that MoneyGram had reached with DOJ were discussed.  (Opp. at 54, citing Compl. ¶ 214 and Exs. 65 and 67.)  But as discussed above (at 26 n.20), this discussion occurred only at the meeting of the Corporate Governance and Public Policy Committee, which Mr. Agrawal is **_not_** alleged to have attended.  (*See* Compl. ¶ 214; Ex. 65 at 1; *see* Exs. 67, 68.)

Regardless, the general inadequacies of Plaintiff's attempt to use these minutes from the Corporate Governance and Public Policy Committee to demonstrate some known falsity of opinions expressed about Western Union's "competitive advantage" have already been discussed (*see supra* at 26 n.20, 39 & n.27).  But these deficiencies are particularly egregious as they relate to Mr. Agrawal.  Mr. Agrawal is not alleged to have made a statement about the ubiquity of the Company's compliance infrastructure being a competitive advantage for Western Union until September 2014 (Compl. ¶ 432) – nearly two years after this Board meeting.  The Complaint contains no particularized facts comparing Western Union's compliance programs to industry competitors as a whole **_as of September 2014_**, and likewise contains no particularized facts regarding how Western Union's compliance systems and performance compared specifically to MoneyGram's **_at that time_**.  Instead, Plaintiff illegitimately attempts to disregard differences in timing, accusing Mr. Agrawal of deliberately making false statements on this subject without an iota of factual support from the relevant periods.

**_NYDFS Consent Order._**  Plaintiff also points to Western Union's recent Consent Order

with the NYDFS, which it argues "leave[s] no doubt that **_Western Union_** knew of the

compliance failures addressed in the DPA by early 2015 at the latest."  (Opp. at 66.)  But

Plaintiff points to no facts at all showing that Mr. Agrawal had any such knowledge.  As

discussed above, the compliance failures that the NYDFS claimed should have been reported to

it by 2015 were purely historical in nature, relating to certain New York agents that had been

terminated by Western Union in 2011 (long before Mr. Agrawal became CFO).  (_See supra_ at

12-13.)  Plaintiff does not make any allegations concerning Mr. Agrawal's knowledge of those

agents, or any violations relating to them, at **_any_** time.  Nor does Plaintiff claim that Mr. Agrawal

had any responsibility for reporting to the NYDFS or that he had any knowledge that the

Company should have reported information about these New York agents to the NYDFS but did

not.

Finally, even if, _arguendo_, there were some factual showing of knowledge on

Mr. Agrawal's point with respect to the historical circumstances involving these agents – which

there is not – that would still be insufficient.  Scienter is not some free-floating inquiry.  Instead,

there needs to be a factual link established to the particular statements claimed to have been

made with knowing falsity.  That link is also absent here.  In particular, whether there may have

been **_past_** violations that may have become known during the course of the Class Period is

entirely unrelated to Mr. Agrawal's statements in various Forms 10-K of his belief that the

Company was **_currently_** compliant with its legal obligations.  (_See supra_ at 2-3, 9-10.)

**_Length of the Government Investigations._**  Plaintiff finally asserts that the "Defendants

knew about the compliance failures" that were the subject of the Regulatory Settlements "for a

long time," and claims that the length of the government investigations somehow "shows that Defendants were concerned about the results and did not want to reveal them until forced to do so." (Opp. at 65.) These are nothing more than bare, factually unsupported assertions. They are also entirely unspecific as it relates to Mr. Agrawal (and with respect to the other Individual Defendants as well).

Moreover, not only are these assertions factually unmoored, but Plaintiff fails to establish any link between the purported knowledge of past compliance failures supposedly gained by Mr. Agrawal during the course of the investigations, and knowledge by him of the falsity of any of his statements. In fact, as previously discussed, there is no such link. At no time did any of Mr. Agrawal's statements say or imply that there had never been past violations. Instead, his statements involved matters of current compliance, competitive advantage, or the accurately reported status of the government investigations – none of which said anything about whether there may or may not have been any past violations, including as to the matters that were the subject of the disclosed government investigations.[53]

---

[53] The Opposition (at 65) once again also attempts to draw a false parallel between this case and *City of Pontiac*, 2014 WL 4823876, at *11. The inapposite nature of the *City of Pontiac* decision has already been discussed (*see supra* at 11-12). It also bears noting, however, that the gravamen of *City of Pontiac* was an affirmative misportrayal of whether any internal investigation had been underway until recently. Here, by contrast, there was no masking of the existence of the various government investigations; they were disclosed from day one. And the finding in *City of Pontiac* of a strong inference of scienter stemmed from the fact that not only had the defendants there known that the internal investigation had started years earlier than they misleadingly implied, they had culpable reasons for concealing that fact, including that the CEO defendant allegedly had improperly quashed the earlier investigation. *City of Pontiac*, 2014 WL 4823676, at *10.

**C.    Plaintiff's Allegations Do Not Give Rise To A Strong Inference That Mr. Ersek Acted With Scienter.**

Plaintiff also has not alleged any strong inference of scienter as to Mr. Ersek.  Plaintiff argues that Mr. Ersek had a motive to commit fraud because he sold stock during the Class Period.  (Opp. at 69.)  Plaintiff concedes that it far overstated the amount of his sales in the Complaint, now arguing that he made "nearly $3 million profit" from those sales rather than the more than $12 million it misleadingly alleged.  (Opp. at 70; Compl. ¶ 285.)  Moreover, what he sold was only a fraction of his holdings.  Plaintiff does not dispute that Mr. Ersek's holdings *increased* over the course of the Class Period – which is inconsistent with an intent to commit fraud.  (*See* Br. at 74-75 (citing cases).)  Plaintiff's purported authority regarding increased holdings is not on point, as it does not deal with a defendant whose holdings increased overall. (*See* Opp. at 70 (citing *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013).)

As for Plaintiff's assertion that "nearly all" of Mr. Ersek's stock sales occurred toward the end of the Class Period, that is simply not true.  His largest sales occurred in May 2015, two years before the end of the Class Period, long before the DOJ and FTC provided their views as to the potential liability of the Company, and at a time when Plaintiff does not allege anything unusual occurred.  And his August 2016 sale – made pursuant to a 10b5-1 trading plan put in place nearly eight months before the Regulatory Settlements – was not suspicious as it involved options that, if not exercised, would have been forfeited for no value.  (Br. at 76-77.)  Plaintiff does not respond to this point in its Opposition.

In addition to pointing to Mr. Ersek's stock sales, Plaintiff also seeks to base a strong inference of scienter on allegations by CW3 and CW4, certain Board meetings that Mr. Ersek attended, the DPA itself, his position at the Company, so-called "red flags," the NYDFS Consent Order, and SOX certifications.  Most of these allegations and their deficiencies have already been addressed (*see supra* at 12-13, 14-33, 61-68, 72-74).  Indeed, we will not repeat the earlier discussion regarding the insufficiencies of the last three categories, which applies in full force to Mr. Ersek as well.  But neither singly nor collectively do these allegations give rise to a strong inference of Mr. Ersek's scienter.  Plaintiff's assertions of scienter are simply neither as strong nor as cogent and compelling as the competing inference that Mr. Ersek believed the truth of the various statements he made.

**<u>CW3 and CW4's Allegations.</u>**  As with Messrs. Scheirman and Agrawal, CW3 does not say a word about what Mr. Ersek supposedly was told, or when, or provide any details whatsoever concerning what he learned about the progress of the investigations.  Plaintiff also points to CW4, who worked at Western Union only until April 2013, and who claims that Mr. Ersek was "a very involved chief executive who was regularly briefed on compliance issues, including regulatory reviews and agent discipline."  (Opp. at 60; *see also* Compl. ¶ 284.)  CW4, however, does not allege that Mr. Ersek was ever told in these briefings that Western Union was committing ongoing legal violations, or contemporaneously informed of any of the unaddressed agent discipline problems that gave rise to the DPA.  This conspicuous omission strongly suggests that he was not so briefed and cuts against a finding of scienter.  *See Fulton Cty. Emps' Ret. Sys.*, 2010 WL 601364, at *17 (E.D. Wis. Feb. 18, 2010), *aff'd*, 675 F.3d 1047 (7th Cir. 2012); *see also Tellabs*, 551 U.S. at 326 ("We agree that omissions and ambiguities count against

76

inferring scienter.").  And assertions of a "hands-on" style cannot substitute for particularized facts showing actual knowledge of wrongdoing.[54]

**_Board Meetings._**  Plaintiff also points to several Board meetings that occurred before the Class Period, as well as six meetings that happened during the early part of the Class Period (before the end of 2013), but makes no attempt to tie what was said in any of those Board meetings to any of the statements Mr. Ersek made – much less statements made by him after 2013.  (Opp. at 53-55.)  As for the pre-Class Period meetings, which have already been discussed above (*see supra* at 19-20), there are simply no facts showing that any of those informed Mr. Ersek of any current compliance violations at the times of his Form 10-K belief statements regarding legal compliance **during the Class Period**.

The same is true with respect to the innocuous materials cited from six Board or Board committee meetings during the Class Period:  (1) the June 15, 2012 Governance Committee meeting at which "increased attention" to the U.S./China agent base was reported; (2) the July 19, 2012 Audit Committee meeting at which it was reported that the SWB Monitor had noted the need for better documentation of certain (unspecified) policies and practices, and further reporting on steps being taken by the Company to address that matter; (3) a December 3, 2012 meeting of the Corporate Governance and Public Policy Committee at which a consultant "provided an overview of current trends" in AML laws and regulations in the U.S., including

---

[54] *See, e.g., Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (allegations of defendant's "hands-on management style . . . coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter"); *In re Apple Comput., Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) ("general allegations about a 'hands-on' management style are insufficient" to support scienter).

describing the recent MoneyGram settlement with the DOJ; (4) a SWB update provided at a

March 28, 2013 Governance Committee meeting, reporting that certain recommendations of the

SWB Monitor remained to be resolved and accompanied by action plans; (5) a July 17, 2013

report to the Compliance Committee which referred to certain "inherent risks" in Western

Union's money transfer business, and noted that certain mitigating controls that had been

implemented "required further improvement to be fully effective"; and (6) the AML SWB Risk

Assessment approved at the October 11, 2013 Board meeting, a document showing continued

compliance enhancements being made in the SWB.  Each of these documents has already been

discussed in this brief, as have the insufficiencies of Plaintiff's efforts to build a narrative of

fraud founded upon them.  (*See supra* at 21-26.)  The fact is that none of these materials shows

knowledge of some ongoing legal *violations* by Mr. Ersek, much less shows that Mr. Ersek

believed that to be the case as of the specific times of his Form 10-K statements of belief

regarding legal compliance.  Nor do these materials in any way show Mr. Ersek's knowledge of

the falsity of the other challenged statements made by him over the course of more than five

years, *e.g.*, his repeatedly expressed views that the Company's world-wide compliance

infrastructure and investments were a competitive advantage.

 ***The DPA.***  Perhaps the most preposterous ground Plaintiff identifies for finding scienter

with respect to Mr. Ersek is the DPA.  (Opp. at 17, 55.)  Nowhere does the DPA claim that

Mr. Ersek himself committed any legal violations, or had knowledge of others doing so.  To the

contrary, the DPA ***praises*** Mr. Ersek's leadership with regard to compliance issues since at least

September 2012 – which is inconsistent with an inference that he was simultaneously defrauding

investors.  (*See* DPA SOF ¶ 100.)  Plaintiff's attempt to twist the government's praise of

Mr. Ersek into knowledge of "the fundamental flaws in those compliance features that needed to be fixed" is made up.  (Opp. at 17.)  And even here, Plaintiff does not argue that Mr. Ersek knew of any compliance violations.

**_Mr. Ersek's Position as CEO._**  Finally, Plaintiff seeks to invoke Mr. Ersek's position atop the Company as some generic basis for inferring knowledge that his various statements were false.  (Opp. at 61.)  But Tenth Circuit law is uniform in finding that allegations regarding a defendant's position in the company are **_insufficient_** on their own to support a strong inference of scienter.  *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1197 (D. Colo. 2004) ("[T]he Tenth Circuit [has] found that allegations that a securities fraud defendant must have known of certain information because of his position in the company, without more, are not sufficient." (citing *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263 (10th Cir. 2001))); *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1010 (D. Colo. 2016) (same).[55]

In reality, Plaintiff's attempts to derive presumptions of (unspecified) knowledge at (unspecified) times from Mr. Ersek's "position" are just a variant of its deficient arguments

---

[55] Plaintiff cites the Ninth Circuit's decision in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008), for the proposition that allegations regarding a defendant's position "**_may conceivably_** satisfy the PSLRA standard . . . in **_rare circumstances_** where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  542 F.3d at 785; Opp. at 61.  *South Ferry* gives the example of a company that received stop work orders that had a "disastrous effect" on its business, and which the defendants admitted knowledge of only two weeks after the allegedly false statements.  542 F.3d at 785 n.3.  Whatever the merits of this "rare" exception, it has no applicability to the underlying facts alleged here.  For example, the disciplinary failures that may have occurred at various times with respect to various agents are not alleged to have contemporaneously created some immediate Company-wide crisis that could not have helped but come to the attention of the CEO.

about alleged "internal reports" and the "mass" of material produced in the government

investigations.  (*See supra* at 27-33.)  As discussed earlier, not only are the particulars lacking

regarding what supposedly was contained in these materials at various times that would, for

example, have disclosed any current wrongdoing by Western Union, there are no particularized

facts showing that these materials or their contents were received by Mr. Ersek at the time, or

ever.  "Position" cannot close this factual gap without much more by way of facts that is entirely

lacking here.[56]

### D.    Plaintiff's Corporate Scienter Arguments Should Be Rejected.

The insufficiencies of Plaintiff's scienter claims against each of the Individual

Defendants dooms its claims of scienter against Western Union.  In Plaintiff's own words, in

order to state a claim against Western Union, it must adequately "alleg[e] . . . that someone

whose intent could be imputed to the corporation acted with the requisite scienter."  (Opp. at 66-

67).  But that does not mean that Plaintiff can state a securities fraud claim against Western

Union merely by pleading some knowledge of underlying wrongdoing by some employee at the

Company.  "It is not enough to establish fraud on the part of a corporation that one corporate

officer makes a false statement that another knows to be false."  *Southland Sec. Corp. v. INSpire*

---

[56] *See, e.g., Anderson*, 827 F.3d at 1246 (rejecting allegation that defendants' positions at the company gave them "a good reason to believe" that crucial projects were unlikely to meet forecasts); *City of Philadelphia*, 264 F.3d at 1263-64 (rejecting allegations that defendants "must have known" about allegedly fraudulent business practices at issue in undisclosed customer litigation because of their senior positions in the company).  Plaintiff cites *South Ferry LP,* 542 F.3d at 784 for the proposition that a defendant's position may support an inference of scienter when it "suggested that defendants had actual access to the disputed information" (Opp. at 61 (quoting *id.*).)  But the court held that that meant that, for instance, plaintiff alleged facts that "defendants actually did monitor the data" at issue or they admitted knowing "exactly" what was on a particular database – none of which is remotely at issue here.

*Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (citation omitted).  Rather, in order to state a claim for corporate scienter, the required "action with the requisite scienter" is an action relating to the making of the statement claimed to be fraudulent – because, after all, the securities laws proscribe false or misleading statements made with scienter, not all underlying misconduct.

Admittedly, this does not mean that it is only the person who actually made the false statement whose state of mind can be imputed with respect to that statement.  Instead, it can include those who have approved the making of the statement.

But the key is that *some* person involved in the making of the statement, either by uttering the statement or approving it, must have the requisite scienter.  Scienter cannot be plucked from some other employee who may have been involved in wrongdoing but had no involvement in the statement itself.  *See, e.g., Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) ("the corporate scienter inquiry must focus on 'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment'") (citations omitted).  Thus, while "the individual making an alleged misstatement and the one with scienter do not have to be the same" (Opp. at 67), scienter must inhere in a person having some responsibility for the statement.

The doctrine of "corporate scienter" adopted in some Circuits (but not thus far in the Tenth Circuit) is fully consistent with these fundamental principles.  For example, while the Seventh Circuit has held that it may be possible in certain exceptionally dramatic instances "to draw a strong inference of corporate scienter without being able to name the individuals," the

Court recognized that the inference that would have to be drawn is that the false statement "**would have been approved by corporate officials** sufficiently knowledgeable about the company to know that the announcement was false."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *see also Teamsters Local 445 Freight v. Dynex Capital*, 531 F.3d 190, 197 (2d Cir. 2008) ("Teamsters would have us infer that **someone** whose scienter is imputable to the corporate defendants **and who was responsible for the statements made** . . ."); *Pugh*, 521 F.3d at 697.  The Ninth Circuit cases cited by Plaintiff (Opp. at 67 n.32) are to no different effect, and, significantly, each cited the same "would have been approved by" language from the Seventh Circuit's *Tellabs* decision.[57]

Plaintiff makes no attempt, however, to argue that, separate and apart from the Individual Defendants, there must have been some other corporate executives involved in approving some or all of the challenged statements who acted with scienter in doing so.  Instead, Plaintiff incorrectly focuses on alleged knowledge by others at Western Union **regarding the**

---

[57] *See Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008); *In re NVIDIA*, 768 F.3d at 1063 n.13.  In each of these cases, moreover, the Ninth Circuit found it unnecessary to determine whether to adopt the "corporate scienter" pleading exception created by the Seventh Circuit.  Rather, in each instance the Ninth Circuit found the pleaded facts insufficiently "dramatic" to invoke a "must have been approved by someone with scienter" exception to the general requirement to identify the individual claimed to have acted with scienter, even if the "corporate scienter" doctrine were to be recognized by it.  The same is true here.

Nor are any of the Second Circuit cases cited in the Opposition (p. 67) inconsistent with these fundamental principles requiring scienter by at least some person involved in the making of the challenged statement.  Each of these cases simply recognized that there are two ways to reach this result:  (1) specifically identify the "someone whose intent could be imputed," or (2) show that the statement "would have been approved" by "corporate officials sufficiently knowledgeable to know that those statements were misleading."  *Loreley Fin. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).

***underlying wrongdoing***, including "Company executives [who allegedly] allowed an agent to be reactivated in 2014," and others who supposedly "were aware of – and participated in – the Company's failure to discipline agents" sometime during the 2004-2012 period that was the subject of the DPA (and were not even alleged to have remained employees throughout the Class Period).[58]  (Opp. at 68.)  But none of these individuals counts in the scienter analysis because none of them is claimed to have been involved with any of the challenged statements, much less all of them.[59]   The same is true of the posited "high-level employee than ran the Company's

---

[58] Plaintiff also argues that "Western Union" as a company must have scienter because in the DPA it acknowledged corporate liability for certain conduct from 2004 to 2012, and entered into other regulatory settlements.  (Opp. pp. 67-68.)  Once again, this confuses matters pertaining to underlying wrongdoing with the issue as to whether certain public statements were made with knowledge of falsity at the time by those involved in the issuance of those statements.

[59] Plaintiff also mentions Mr. Stockdale as a purported "example" of someone whose claimed scienter could allegedly be imputed to the Company.  (Opp. at 68.)  But there are no factual allegations that Mr. Stockdale had any involvement in or responsibility for statements made by anyone else during the short portion of the Class Period (February 2012 to October 2012) during which he was present.  While Plaintiff notes three public statements made during this time period by Mr. Stockdale himself (*id*. at 68 n. 33), the statements are either wholly irrelevant to the claims (Compl. ¶325) or the type of "patently true" and non-actionable statements about worldwide compliance capabilities discussed above.  (Compl. ¶¶ 329, 349; *see supra* Section II.)  Indeed, Judge Krieger already dismissed claims against Mr. Stockdale himself premised on one of these statements.  *Compare SEB Asset Mgmt.*, 2015 WL 5708532, at *5 n.3 (dismissing all claims against Mr. Stockdale on this basis).

Moreover, Plaintiff does not plead a single fact supporting any inference of Mr. Stockdale's scienter with respect to these few statements by him or any others.  Plaintiff's sole argument is that in 2010, almost two years before the beginning of the Class Period, Mr. Stockdale had a conversation in which he mentioned efforts to "save" an agent whose employees had committed various violations.  But this episode has nothing to do with the specific contents of the few statements made by Mr. Stockdale during the Class Period (nor does it even show any known wrongdoing on his part).  Instead, this is a further instance of Plaintiff attempting to confuse alleged underlying wrongdoing with alleged scienter in making or approving a statement.

response to the government investigations." (*Id.*)[60]

In short, because there is no strong inference that anyone at the Company involved in the making of various challenged statements acted with the requisite scienter, that is fatal to the claims against the Company, too.

## VII.   Plaintiff Fails To Plead A Claim Under Section 20(a) Of The Exchange Act.

As Plaintiff acknowledges, "to plead a claim for control person liability under Section 20(a), a complaint must allege '(1) a primary violation of the securities laws *and* (2) 'control' over the primary violator by the alleged controlling person.'" (Opp. at 70 (quoting *Adams*, 340 F.3d at 1107).)  Because Plaintiff has failed to allege a primary violation of the securities laws, it cannot satisfy the first prong of this inquiry, and its Section 20(a) claim must be dismissed.

Plaintiff's Section 20(a) claim also should be dismissed because it cannot satisfy the second prong with respect to Messrs. Scheirman or Agrawal, neither of whom controlled any of the other Individual Defendants.[61]  Plaintiff argues that Messrs. Scheirman and Agrawal were control persons because (1) they attended Board meetings at which compliance matters were

---

[60] Not only is there no attempt to show this hypothesized person's responsibility for any challenged statements, but there also are no facts linking his personal knowledge at any particular time (none of which is specified) to the knowing falsity of statements made *at that time*.  That is particularly relevant because, as previously discussed, the challenged statements were generally about present or future matters, and none was a disclaimer of the possibility of past violations having occurred.  (*See supra* at 2-3, 9-10.)  Nor does Plaintiff identify any particularized facts to suggest that this posited individual with responsibility for responses to the various government investigation himself believed that *he* was able with "near certainty" to predict the resolution of the government investigations, or, if so, when he allegedly reached that conclusion.

[61] Mr. Koch is not alleged to have controlled anyone.  (*See also* Koch Reply Section IV.)

discussed and (2) they signed SEC filings that included descriptions of the investigations.  But the fact that each may on occasion have attended Board meetings does not say that, as the Company's successive CFOs, these Defendants somehow controlled the Company's CEO, Mr. Ersek, with respect to any statements made by him.  There are simply no pleaded facts showing any such general or specific control over the executive who was their superior.  There are also no facts alleged showing that Mr. Scheirman or Mr. Agrawal controlled Mr. Koch or his statements; that is hardly surprising since, as CFOs, AML compliance was not in their bailiwick and Mr. Koch is not alleged to have reported to either of them.  Nor, of course, could Mr. Agrawal "control" statements by Mr. Scheirman or vice versa; they served sequentially, and neither reported to nor had "control" over the other.  (Opp. at 62 n.29.)  Finally, while signing various of the Company's SEC filings may give rise to a potential primary liability claim for doing so, it does not mean that either Mr. Agrawal or Mr. Scheirman controlled Mr. Ersek or Mr. Koch, or one another.[62]

Because Messrs. Scheirman and Agrawal did not control any other Individual Defendant, they cannot bear liability for statements made by the other Individual Defendants.  (*See* Br. at 97 (citing *Sw. Carpenters Pension Tr. v. Merge Techs., Inc.*, 2008 WL 11381377, at *8 (E.D. Wisc. Mar. 31, 2008)).)

---

[62] The case that Plaintiff cites for this proposition is not to the contrary.  At issue there was whether officers and/or directors of a parent company as well as of a controlling general partner were liable for statements made on behalf of the company's subsidiary, which was found to be a primary violator.  *SemGroup*, 729 F. Supp. 2d at 1285, 1302.  The case involved control over a corporate entity; it did not hold that individuals who sign a company's SEC filings are in control of ***each other*** or of other officers.

## CONCLUSION

For all of the foregoing reasons and those in the opening Brief, Plaintiff has not stated a claim against any of the Defendants.  The Complaint should be dismissed with prejudice.[63]

Dated:  June 5, 2018


/s/ *David F. Graham*

David F. Graham
Hille R. Sheppard
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

Holly Stein Sollod
Claire E. Wells Hanson
HOLLAND & HART, LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

*Attorneys for Defendants*
*The Western Union Company,*
*Hikmet Ersek,*
*Scott T. Scheirman, and*
*Rajesh K. Agrawal*

---

[63] Plaintiff's Opposition includes a one-sentence assertion that the NYDFS Consent Order (which post-dated the Complaint) is "a basis amending [*sic*] the Complaint."  (Opp. at 5 n. 3.) However, the NYDFS Consent Order is irrelevant, for reasons explained above.  Moreover, Plaintiff has not proposed any other amendments despite having had ample time to do so.  *See In re Gold Res. Corp.*, 776 F.3d at 1119 (affirming dismissal with prejudice of a complaint when no proposed amended complaint was tendered during course of motion to dismiss briefing).

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system on June 5, 2018, which sent notification of such filing to the following email addresses:

rusty@shumanlawfirm.com
mgrunfeld@pomlaw.com
ahood@pomlaw.com
jalieberman@pomlaw.com
migross@pomlaw.com
henryr@rgrdlaw.com
kip@shumanlawfirm.com

/s/ *David F. Graham*

*Attorney for Defendants*