IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00474-KLM
        Consolidated with Civil Action No. 17-cv-00648-KLM

LAWRENCE HENRY SMALLEN AND LAURA ANNE SMALLEN REVOCABLE LIVING
TRUST, individually and on behalf of all others similarly situated, and
UA LOCAL 13 PENSION FUND, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
RAJESH K. AGRAWAL, and
BARRY KOCH,

        Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

        This matter is before the Court on the **Motion to Dismiss the Consolidated
Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b)
and the PSLRA** [#53],[1] filed by Defendants Hikmet Ersek ("Ersek"), Scott T. Scheirman
("Scheirman"), Rajesh K. Agrawal ("Agrawal"), and The Western Union Company ("Western
Union" or the "Company"), and on the **Motion to Dismiss the Consolidated Amended
Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the
PSLRA** [#55], filed by Defendant Barry Koch ("Koch").  Plaintiffs filed a combined

_____

        [1] [#53] is an example of the convention the Court uses to identify the docket number
assigned to a specific paper by the Court's case management and electronic case filing system
(CM/ECF).  This convention is used throughout this Order.

Response [#63] in opposition to the Motions [#53, #55], and Defendants filed separate Replies [#70, #71]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises. As explained in detail below, the Motions [#53, #55] are **GRANTED**.[2]

## I.  Summary of the Case[3]

Western Union is a "money transfer service" which "provides money movement and payment services worldwide." *Am. Compl.* [#40] ¶ 33. During the alleged Class Period (from February 24, 2012, to May 2, 2017), Defendant Hikmet Ersek ("Ersek") was the Chief Executive Officer ("CEO") of the Company. *Id.* ¶¶ 1, 26. Defendant Scott T. Scheirman ("Scheirman") was the Company's Chief Financial Officer ("CFO") and an Executive Vice President from sometime prior to the Class Period until December 31, 2013, and a Senior Advisor until February 28, 2014. *Id.* ¶ 27. Defendant Rajesh K. Agrawal ("Agrawal") was President of Western Union Business Solutions from sometime prior to the Class Period through December 2013, was Interim CFO from January 2014 to July 2014, and CFO from July 2014 to after the end of the Class Period. *Id.* ¶ 28. He also served as an Executive Vice President during the entire Class Period. *Id.* Defendant Barry Koch ("Koch") was the Chief Compliance Officer from May 2013 until about November 2015. *Id.* ¶ 29.

Plaintiffs are investors who acquired Western Union securities during the Class

---

[2]  This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#25, #26].

[3]  At this stage of the litigation, the Court accepts the well-pled factual allegations of the Amended Complaint [#40], as distinguished from conclusory allegations, as true. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003). The court does not "take as true the complaint's legal conclusions." *Dronsejko v. Thornton*, 623 F.3d 658, 666 (10th Cir. 2011).

Period allegedly "at artificially inflated prices" during the Class Period and who were "damaged upon the revelation of the alleged corrective disclosures." *Id.* ¶ 24. In short, Plaintiffs assert that, during the Class Period, Defendants deliberately misled investors regarding Western Union's regulatory compliance regarding anti-money laundering ("AML") and anti-fraud practices. *Id.* ¶¶ 15-19.

On January 19, 2017, Western Union "reached a settlement with several federal regulators [including the Federal Trade Commission ("FTC")] in which it agreed to pay" $586 million. *Id.* ¶ 2. As part of this settlement, which covered a period from 2004 through December 2012, Western Union admitted to criminal violations including willfully failing to maintain an effective AML program and aiding and abetting wire fraud,[4] which resulted in a Deferred Prosecution Agreement ("DPA") between Western Union and the Department of Justice ("DOJ"). *Id.* ¶¶ 130-31, 139. In part, Western Union admitted to failing "to implement proper controls and discipline agents." *Id.* As stated by the DOJ, "[r]ather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place." *Id.* As part of the settlement agreement, Western Union agreed to implement a number of compliance steps, including "ensuring that the Company a) conducts adequate due diligence on its agents; b) adequately monitors agent activity for anti-fraud and AML violations; c) takes prompt disciplinary action against agents that pose an unacceptable risk of money laundering and fraudulent practices; d) reports suspicious or illegal activity by its

---

[4] Despite Defendants having only admitted wrong-doing through December 2012, Plaintiffs make much of the fact that the FTC reviewed evidence through October 2015 in making its findings of fact, even though they admit that the FTC generally did not distinguish between pre- and post-2012 conduct. *See, e.g., Response* [#63] at 11-12.

agents as required by the AML laws; and e) establishes executive review and bonus structures that account for compliance with U.S. law." *Id.* ¶ 16.

On January 31, 2017, Western Union also settled charges brought by the attorney generals of forty-nine states and the District of Columbia for an additional $5 million "to resolve their investigations into how fraudsters used Western Union's money transfer services to defraud customers." *Id.* ¶ 526. Between January 18, 2017, and February 1, 2017, the price of Western Union stock shares declined by 10.57%. *Id.* ¶ 527.

Plaintiffs state that as a result of Defendants' conduct, they "suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented information concerning Western Union's compliance efforts to the investing public." *Id.* ¶ 574. Plaintiffs therefore assert two claims: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder against all Defendants ("Claim One"), and (2) violation of § 20(a) of the Securities Exchange Act against the four individual Defendants, i.e., Defendants Ersek, Scheirman, Agrawal, and Koch ("Claim Two"). *Id.* ¶¶ 564-580.

## II. Standard of Review

### A.    Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."). To withstand a motion to dismiss pursuant to Rule 12(b)(6),

"a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

## B.    Private Securities Litigation Reform Act of 1995 ("PSLRA")

Because the PSLRA governs this case, the Court notes and applies guidance from the Tenth Circuit Court of Appeals regarding interpretation of the Act's "stringent" pleading requirements. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003).

Under the PSLRA, "Section 10(b) and Rule 10b-5 create an implied private cause of action arising from fraud in the purchase or sale of securities." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018). Section 10(b) makes it unlawful for any

person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 prohibits "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[,] . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plausibly allege that "a defendant made statements that (1) contained false or misleading statements of material fact, (2) related to the purchase or sale of a security, (3) were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled (scienter), (4) led to reliance by the plaintiff, and (5) caused the plaintiff's loss (loss causation)." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146-47 (10th Cir. 2015).

The PSLRA, 15 U.S.C. § 78u-4(b), "adjusts the general pleading standard applicable under Federal Rule of Civil Procedure 12(b)(6), which requires a plaintiff to plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hampton*, 897 F.3d at 1298 (internal quotation marks omitted).  "Specifically, under the PSLRA, a plaintiff must meet a heightened pleading standard with regards to the first and third elements of a securities-fraud claim: that is, respectively, as to whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter."  *Id.*

Under the Reform Act, a private complaint that alleges a violation of section

10(b) of the 1934 Act and Rule 10b-5 thereunder must first "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

*Pirraglia*, 339 F.3d at 1186 (citation omitted). "To satisfy this statutory burden, a plaintiff must explain why the statement was misleading, and allege with particularity his basis for believing that the statement was false." *Hampton*, 897 F.3d at 1298 (internal quotation marks omitted).

Second, in order to show that the defendant acted with the requisite state of mind for securities fraud cases, i.e., scienter, the complaint must also, "with respect to each act or omission alleged to violate the [the 1934 Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).

*Pirraglia*, 339 F.3d at 1186 (citation omitted).

When a complaint refers to an investigation of counsel as the basis for a plaintiff's allegations, as is the case here, *see Am. Compl.* [#40] at 5, the Court "treats [the allegations of the complaint] as having been made on information and belief." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003). As indicated above, Plaintiffs must "state with particularity all facts upon which their belief is formed." *Id.* (citation omitted). The Tenth Circuit has interpreted the statutory language about stating "all" facts to mean that Plaintiffs must plead sufficient facts "to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements . . . were false or misleading." *Id.* at 1099.

In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the

plaintiff learned of such facts or experts to prove such facts at trial; whether the sources of the facts are disclosed and the reliability of those sources; and any other factors that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading. To meet the standard, plaintiffs are not required to disclose the documentary or personal sources from which they learned the facts alleged in an information and belief complaint.

*Id.* at 1102-03.

"There is a meaningful distinction between statements of opinion and statements of fact; the former require a plaintiff to meet a higher pleading standard." *Hampton*, 897 F.3d at 1299. "Pure statements of opinion and statements of optimism that are not capable of objective verification are not material misstatements unless they inaccurately represent the speakers' beliefs concerning then-present factual conditions. *Id.* (internal citations, brackets, and quotations marks omitted). "Statements of opinion or belief must rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* (internal brackets and quotation marks omitted).

In *Pirraglia v. Novell, Inc.*, the court first analyzed the complaint's alleged false statements "to determine whether plaintiffs specifi[ed] each statement alleged to have been misleading, the reason or reasons why the statement [was] misleading, and, if an allegation regarding the statement or omission [was] made on information and belief, . . . [whether the complaint] state[d] with particularity all facts on which that belief [was] formed." *Id.* at 1189 (internal quotations omitted). Second, the court "proceed[ed] to examine whether plaintiffs met the scienter requirement," but only as to those statements which the court found met the above particularity requirements. *Id.* at 1190-91.

Regardless of the order in which the Court addresses the PSLRA's pleading requirements, the Court must decline a defendant's invitation to conclude that facts alleged

by the plaintiffs are simply false, regardless of whether the plaintiffs' claims "far-fetched." *Pirraglia*, 339 F.3d at 1193-94. Moreover, the Court must accept the truth of the confidential witnesses' accounts as pled in the Amended Complaint [#40] and decline to assess those witnesses' credibility. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016) (citing *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### III. Analysis

In the interest of efficiency, the Court addresses the allegations asserted against Defendants Ersek, Scheirman, Agrawal, and Western Union collectively but separately from those asserted against Defendant Koch, who filed his Motion to Dismiss [#55] separately from the other Defendants. However, as instructed by Tenth Circuit precedent, the Court has reviewed all of the allegations of the Amended Complaint [#40] and has assessed it holistically. *See Hampton*, 897 F.3d at 1298. The Court has examined the allegations of the lengthy Amended Complaint [#40] in their entirety,[5] and is not required to make explicit findings of fact and conclusions of law on a Rule 12(b)(6) ruling. *Adams*, 340 F.3d at 1093.

### A.    Claim One: Defendant Koch

Defendant Koch was Western Union's Chief Compliance Officer from May 2013 until

---

[5] The Amended Complaint [#40] is 176 pages long and consists of 580 paragraphs. The Court appreciates the inclusion of a lengthy Table of Contents, and understands that the stringent pleading requirements of the PSLRA may not promote brevity and conciseness in drafting complaints. Nevertheless, the Amended Complaint is packed with redundant factual and legal allegations which, if omitted, would likely reduce its length by more than half. Plaintiffs' counsel do themselves no favors by including such redundant material, which significantly prolongs judicial review. Because the filing of motions to dismiss is common in securities fraud cases and because the PSLRA mandates that cases must be stayed while motions to dismiss are pending, filing of prolix complaints works against the parties' interests and should be avoided.

about November 2015. *Am. Compl.* [#40] ¶ 29. He reported to the Compliance Committee of the Board of Directors (the "Board") after its creation in July 2013. *Id.* Plaintiffs note specifically that he attended the Compliance Committee meetings held on July 17, 2013 and September 9, 2013, and the full Board meeting held on October 11, 2013. *Id.* ¶ 92.

At the July 17, 2013 Compliance Committee meeting also attended by Defendant Ersek, Defendant Koch "described a draft risk assessment that would be the 'foundation' for the risk-based AML compliance program of Western Union's core consumer-to-consumer money transfer business." *Id.* ¶ 240. At the September 9, 2013 Compliance Committee meeting attended by Defendants Ersek and Koch, "it was announced that on July 31, 2013, management first submitted a written action plan to the Monitor for his consideration, providing an agreed-to methodology for measuring and ensuring compliance with the Monitor's recommendations."[6] *Id.* ¶ 242.

At the October 11, 2013 Board meeting attended by Defendants Ersek, Scheirman, and "likely" Agrawal, Defendant Koch "explained in a memorandum to the Board (using language that was also included in the risk assessment itself) that an 'AML Risk Assessment is the foundational document upon which [a financial institution's] risk-based AML Compliance program is based. . . . Development and issuance of an AML Risk Assessment is also a regulatory expectation, evidenced in bank and [Money Services Businesses] examination manuals, and is implicitly required by the AML 'program requirement' of [the Bank Secrecy Act].'" *Id.* ¶ 243. According to his meeting

---

[6] The position of Monitor was a requirement of the Southwest Border Agreement ("SBA") signed on February 11, 2010, whose job was to monitor various aspects of Western Union's compliance requirements set out in the SBA. *See Am. Compl.* [#40] ¶¶ 86, 235.

memorandum, "the '[i]nherent' '[g]eographic' risk for Western Union's consumer-to-consumer and business segments was 'Very High.'" *Id.*

On November 6, 2013, Western Union issued "a press release announcing that it would be joining the Blue Campaign, an anti-human trafficking initiative spearheaded by the U.S. Department of Homeland Security." *Id.* ¶ 405. Defendant Koch stated in the press release that "[e]nding human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Id.* At this time, Western Union was responding to two investigations–one aimed directly at Western Union– by the Department of Justice into "China Corridor agents" who facilitated the laundering of hundreds of millions of dollars used for human trafficking. *Id.* ¶¶ 131, 184, 251, 264-65. Plaintiffs argue: "Touting the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54. They further argue: "Even though Western Union[ ] only *admitted* to willful compliance failures as to the China Corridor Agents through 2012, it was still misleading for Koch to fail to disclose those very recent violations that subjected the Company to the substantial risk of an unprecedented forfeiture for a money services business." *Id.*

During his two and a half years as Chief Compliance Officer, Defendant Koch "regularly spoke at publicly advertised industry conferences, representing Western Union, where he portrayed Western Union as an industry leader in compliance by discussing best practices for compliance programs and combating human trafficking." *Am. Compl.* [#40]

¶ 247.  On February 17, 2014, he "presented on best practices for detecting human trafficking at a conference hosted by the Council of Europe and Organization for Security and Cooperation in Europe."  *Id.*  On April 24, 2014, he "was one of three panelists on a publicly advertised webcast hosted by a law firm that addressed '[b]est practices for structuring and implementing compliance programs to identify and mitigate multiple financial crimes risk.'"  *Id.*  On October 23, 2014, he presented at the 8th Annual European AML Financial Crime Conference.  *Id.*  Defendant Koch left Western Union's employment no later than November 2015.  *Id.* ¶ 247.

The first required element of a claim under Rule 10b-5 is that the defendant must have made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading.  *Grossman*, 120 F.3d at 1118.  Plaintiffs direct the Court's attention to three asserted false or misleading statements made by Defendant Koch.  *Response* [#63] at 53-54.

First, in connection with Western Union's 8th Annual AML, Anti-Fraud and Compliance Conference in September 2013, Defendant Koch stated: "Together with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud."  *Id.* at 54 (citing *Am. Compl.* [#40] ¶ 395).  Plaintiffs argue that this statement "was misleading absent disclosure of the fact that government investigations that were pending at the time posed the high risk of substantial liability for Western Union's compliance failures."  *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶¶ 265, 268).

Second, as discussed above, in a November 6, 2013 press release concerning Western Union's efforts to combat human trafficking, Defendant Koch stated: "Ending

human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Response* [#63] at 53 (citing *Am Compl.* [#40] ¶ 405). Plaintiffs argue that "[t]outing the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54 (citing *Am Compl.* [#40] ¶¶ 110-13, 131, 183-99, 251, 264-65).

Third, in connection with Western Union's 2014 Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference, Defendant Koch stated: "Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business." *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶ 436). Plaintiffs argue this statement was false and misleading in light of "Defendants' other statements touting the Company's compliance practices and its reasons for its compliance expenditures while failing to disclose current and past compliance failures or the true reason for its increased compliance costs." *Response* [#63] at 54.

Defendant Koch argues that these statements were mere puffery. *Motion* [#56] at 7-8, 11-12, 13; *Reply* [#71] at 13-15. In another securities-fraud case, *Grossman v. Novell, Inc.*, the allegedly "false and misleading" statements concerned the defendant's potential market-share gain, "compelling" opportunities, "smooth" mergers, and "accelerating" product development. 120 F.3d at 1116-17. The Tenth Circuit Court of Appeals held that such "vague statements of corporate optimism" were "not actionable because reasonable investors do not rely on them in making investment decisions." *Id.* at 1119. "Statements

-13-

classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Id.* The sum of Plaintiffs' argument regarding whether Defendant Koch's statements are puffery is a footnote summarily denying that they are and referring the Court to a multi-page discussion of puffery offered in connection with the other Defendants' statements. *Response* [#63] at 55 n.24 (citing *Response* [#63] at 43-47).

The Court finds that the three statements attributed to Defendant Koch are nothing more than mere puffery consisting of vague corporate optimism. The first statement ("Together with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud.") is similar to a statement analyzed in another securities case, *In re Sturm, Ruger & Co., Inc. v. Securities Litigation*, No. 3:09-cv-1293 (CFD), 2011 WL 494753, at *5 (D. Conn. Feb. 7, 2011). There, the court found that the statement, "Employees are fully engaged, and we see nothing but opportunities ahead of us," was an expression of puffery and corporate optimism not giving rise to a securities violation. 2011 WL 494753, at *5. Here, the Court finds that the assertion that Western Union was "fully engaged in the fight" constitutes similarly inactionable puffery.

Defendant Koch's second statement ("Ending human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity.") and third statement ("Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business.")

constitute similarly inactionable statements of puffery. Other courts have found that general language regarding a company's commitment to risk management is inactionable. For example, in *In re Vale S.A. Securities Litigation*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at *24 (S.D.N.Y. Mar. 23, 2017), the court held that the company's claim to be "committed to achieving the highest possible health and safety standards" was a "general, airy statement of commitment routinely found to constitute non-actionable puffery." In *Matana v. Merkin*, 989 F. Supp. 2d 313, 327 (S.D.N.Y. 2013), the court held that a statement that the company "remain[ed] focused on preserving principal and committed to managing risk" was "not actionable in fraud" because the statement was puffery. In *Woodard v. Raymond James Financial, Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010), the court held that "Raymond James' leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices . . . will continue to serve the company well in the coming year" was puffery consisting of "nothing more than a general platitude that accompanies nearly every press release or public statement issued by a financial institution."

Thus, because the statements made by Defendant Koch and argued by Plaintiffs to be false and misleading are actually nonactionable puffery, the Court finds that Plaintiffs fail to sufficiently allege facts regarding the first required element of a claim under Section 10b and Rule 10b-5, i.e., that Defendant Koch made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading. *See Grossman*, 120 F.3d at 1118. Accordingly, Claim One against Defendant Koch is **dismissed**.

**B.    Claim One: Defendants Ersek, Scheirman, Agrawal, and Western Union**[7]

**1.    Purported False or Misleading Statements**

With respect to Defendants Ersek, Scheirman, Agrawal, and Western Union, Plaintiffs direct the Court's attention to the following purportedly fraudulent misrepresentations/omissions, which they divide into four categories: (1) statements describing ongoing government investigations; (2) statements explaining increased compliance expenditures; (3) statements regarding legal compliance; and (4) statements touting compliance practices. *Response* [#63] at 36-53. In this section, the Court addresses the first three categories, reserving discussion of the fourth category for the scienter analysis below.

**a.    Government Investigations**

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding ongoing government investigations, including the investigations brought by four separate U.S. Attorney offices, the FTC, and state attorneys general. *Response* [#63] at 47-51.

**i.    Filings with the Securities Exchange Commission ("SEC")**

In support of this category of purportedly false/misleading statements regarding government investigations, Plaintiffs cite to the following allegations. *Id.*

1.    "On February 24, 2012, Western Union filed an annual report on Form 10-K with the

---

[7] Due to the repetitive nature of many of the statements to which Plaintiffs direct the Court's attention, the Court notes that it does not separately analyze every single statement but, rather, simply analyzes a material and representative sample of each category throughout Section III.B. However, the Court has considered the pleadings in their entirety. *See Adams*, 340 F.3d at 1093.

SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K")." *Am. Compl.* [#40] ¶ 304. "The 2011 10-K . . . discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 308.

2. In March 2012, the Eastern District of Pennsylvania ("EDPA") served Western Union "with a federal grand jury [subpoena] seeking documents relating to Hong Fai . . . ."[8] *Id.* ¶ 264. "As the Class Period progressed, the Company received additional subpoenas from EDPA and the government interviewed several current Western Union employees as part of this investigation." *Id.*

3. On March 20, 2012, the Central District of California ("CDCA") "served the Company with a federal grand jury subpoena seeking documents relating to" U.S. Shen Zhou International Company ("Shen Zhou").[9] *Id.* ¶ 265. "When CDCA served the

---

[8] "Structuring" is an illegal practice in which a party evades "the law's recording and reporting requirements by breaking large transfers into multiple transactions at smaller amounts below the legal reporting threshold." *Am. Compl.* [#40] ¶ 63. Hong Fai was a Western Union agent which:

> sent over $126 million in Western Union transactions from December 2007 through March 6, 2012. This agent was not terminated until March 19, 2012 even though Western Union admitted to DOJ in the Joint Settlement that "[a]s early as June 2007, [the Company] was aware of 'significant' compliance failures at Hong Fai involving structured transactions and failure to file [Suspicious Activity Reports ("SARs")] for suspicious transactions." This knowledge was based on over a dozen onsite or transaction reviews that Western Union conducted. Western Union admitted that these reviews showed that the agent "repeatedly . . . violated certain elements of the [Bank Secrecy Act, as amended by the USA Patriot Act in 2001 (31 U.S.C. § 5311, et seq.), and rules promulgated thereunder (collectively, the "BSA")] or certain aspects of Western Union policy." Despite Hong Fai's known and repeated violations that should have resulted in disciplinary action under Western Union policy, Western Union did not terminate the agent until 2012, only after law enforcement and Hong Fai's bank continued to raise concerns about illegal transactions and Hong Fai's failure to file SARs. Western Union also did not file any SARs identifying Hong Fai as a suspicious subject until after it terminated Hong Fai in 2012.

*Id.* ¶ 186; *see also* ¶¶ 187, 195.

[9] ". . . Western Union admitted that between 2005 and 2010, Shen Zhou, one of four particularly egregious agents that sent structured transactions to China, sent more than $310 million to China, approximately half of which were structured." *Am. Compl.* [#40] ¶ 112. "The head of Shen Zhou was arrested in 2010 for his structuring activities and pled guilty in December 2013 to structuring international money transfers." *Id.* ¶ 188. "After he was arrested, he told law

Company with this subpoena, it informed Western Union that the Company itself was 'a target of an ongoing investigation into structuring and money laundering.'" *Id.*

4. "On May 1, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the first quarter of 2012, which ended on March 31, 2012 (the "Q1 2012 10-Q")." *Id.* ¶ 316. "The Company . . . described in its Q1 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 318.

5. "[A]t the May 9, 2012 Investor Day conference, Mike Salop, Western Union's Senior Vice President of Investor Relations, specifically addressed DOJ's investigation into Shen Zhou—the agent in California that was arrested and late[r] pled guilty to structuring transactions—that the Company had announced in its 10-Q for the first quarter of 2012 and that Western Union was a target of. He represented that '[w]e believe the company has robust compliance and anti-money laundering policies and processes in place, and we look forward to demonstrating that fact to the U.S. Attorney's office in Los Angeles.' Salop went on to state that '[w]e are not aware of any evidence that suggests that the company or any of its employees knowingly engaged in any conduct with this former agent that would constitute a violation of the law.'" *Id.* ¶ 326. "He explained: 'We have been cooperating with the government in connection with this particular case for almost two years and assisted the government prior to the time the former agent was arrested, just as we cooperate on a daily basis with law enforcement departments throughout the U.S.'" *Id.* ¶ 250.

6. "On August 2, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the second quarter of 2012, which ended on June 30, 2012 (the "Q2 2012 10-Q")." *Id.* ¶ 341. "The Company . . . described in its Q2 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 344.

7. Filed February 22, 2013, the 2012 10-K signed by Defendants Ersek and Scheirman

---

enforcement authorities that a Western Union Sales employee told him that he could open another Western Union agent location in the same area. This Sales employee even advised the agent on how to get away with this by cautioning him to use a relative's name instead of his own name when opening the new location." *Id.* ¶ 196. "[A]t a meeting of the Board's Governance Committee on September 22, 2010, attended by Defendant Ersek, it was discussed in reference to CDCA's investigation of Shen Zhou that a "large" Western Union agent in California was the subject of a criminal money-laundering investigation and that Western Union was "working with law enforcement to investigate the underlying activity." *Id.* ¶ 251.

essentially repeated the information in the 2011 10-K in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 365, 368.

8.    "On April 30, 2013, the Company held a conference call in connection with the release of its earnings for the first quarter of 2013. During this call, an analyst noted the fact that Ersek had mentioned a few times earlier in the call at a general level new compliance and regulatory actions in addition to the Southwest Border Agreement that the Company had not disclosed previously and asked for more information about these activities. Ersek responded by explaining: 'It is no secret that the financial service[s] overall get more regulated and within that also we want to be best-in-class. We create this culture of compliance within our company. And we – so that's the environment we are in currently and we see that as a long-term competitive advantage.' Then, at Ersek's request, Scheirman followed-up by elaborating as follows: '[A]s Hikmet said that we are committed to a strong culture of compliance and invest in compliance programs. And let me give you a flavor of maybe some things that have been ongoing not only in the first quarter, but prior quarters, too. We're doing things to really protect the customer and protect the business. They might be things such as real-time risk assessment when the transaction happens at the point-of-sale, verification programs related to high principal transactions where we – whereby we call back the sender and make sure the transaction is appropriate. But, as Hikmet mentioned, we believe this will be a long-term competitive advantage for us. Near term, there are some headwinds but it's the right investment to make in the business. We believe it'll be a competitive advantage and we continue to work towards that. . . . ***But we will continue to comply with the letter and the spirit of the law and really see that as a competitive advantage long term.***' (Emphasis added.) Ersek then explained that the Company was working to adapt to the U.S. and global trend of increasing regulations. Scheirman added that the Company's efforts often went above and beyond its technical legal requirements. He represented that '***everything isn't necessar[ily] black-and-white and a rule, but we work with regulators in countries around the world to try to do the right thing for our business and for our customers.***' (Emphasis added.)" *Id.* ¶ 374. "Later during this April 30, 2013 conference call, Defendant Scheirman explained that 'our goal is to comply with the letter and the spirit of the law, have best-in-class compliance programs, and really protect our customers and protect our businesses.' Defendant Ersek added, 'I think the general financial service industry is getting more regulated and we are very focused on that. I think we have a great compliance team in place and they are working hard. Generally, I see also being a market leader here as a competitive advantage.'" *Id.* ¶ 375.

9.    "Specifically addressing the regulatory environment, Scheirman stated at [a] June 13, 2013 William Blair conference that 'the regulators start with the market leaders

and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth.'" *Id.* ¶ 386.

10.  On November 25, 2013, the Middle District of Pennsylvania ("MDPA") "served the Company with a grand jury subpoena seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008." *Id.* ¶ 268. "When MDPA served the Company with this subpoena, it informed Western Union that the Company itself was the subject of this investigation." *Id.*

11.  Filed February 24, 2014, the 2013 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011 and 2012 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 410, 413.

12.  Filed July 31, 2014, the Q2 2014 10-Q signed by Defendants Ersek and Agrawal disclosed that the government had notified Western Union that it was a "target" of an investigation by the Southern District of Florida ("SDFL"). *Id.* ¶¶ 275, 428, 430.

13.  Filed February 20, 2015, the 2014 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011, 2012, and 2013 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 446, 449.

14.  Filed February 19, 2016, the 2015 10-K signed by Defendants Ersek and Agrawal, "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators. Although the 2015 10-K disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' the Company continued to claim that all of these investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 473, 476.

15.  Filed on May 3, 2016, the Q1 2016 10-Q signed by Defendants Ersek and Agrawal contained "substantially the same representations" but further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012.' The Company, however, continued to claim that all of its ongoing government investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 482, 483.

16.    Filed August 3, 2016, the Q2 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q1 2016 10-Q and further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' and that the 'FTC staff has advised the Company that it has been directed to request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company.' The Company, however, continued to claim that all of these investigations—including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by taking the strong position that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.'" *Id.* ¶¶ 488-89.

17.    Filed November 1, 2016, the Q3 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q2 2016 10-Q and further "disclosed that the FTC advised the Company 'of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers' and that the FTC staff 'believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004.' The Company continued, however, to claim that all of these investigations—including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by declaring that '[t]he Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof' and that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.'" *Id.* ¶¶ 492-93; *see also id.* ¶ 263. Plaintiffs emphasize that "even though multiple DOJ offices had already taken the position that Western Union committed serious compliance violations, even when Defendants disclosed in the Company's 10-Q for the third quarter of 2016, filed on November 1, 2016, that the Company 'anticipate[d] entering into discussions with the United States Department of Justice to potentially resolve the four investigations' being conducted by the EDPA, CDCA, MDPA, and SDFL, Defendants continued to take the position that '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters.'" *Id.* ¶ 282.

18.    As part of the January 2017 settlement agreement with the DOJ, "Western Union admitted in the Statement of Facts . . . that its employees knew that its analyses and internal reports show that the amount of losses from fraudulent transactions sent through the Company was much higher than the amount identified in the Company's

[Consumer Fraud Reports ("CFRs")] database, because not every victim reported fraud to the Company." *Id.* ¶ 155. "In addition, as the FTC found, fraud complaints in Western Union's database represent only a small percentage of the actual fraud perpetrated through Western Union's money transfer system because (a) as recognized by Western Union's own internal reports, the vast majority of fraud victims do not complain directly to the Company; (b) Western Union has failed to log in its complaint database all of the complaints and reports about fraud that it has received or the particular money transfers related to the complaints; and (c) in many countries, Western Union did not provide a fraud hotline or a toll-free phone number for victims to call to report fraud. Because of these multiple factors, the FTC determined that since 2004, Western Union has likely been used to send billions of dollars in fraud-induced payments to telemarketers and con artists worldwide." *Id.* ¶ 156.

Plaintiffs do not contest that, "[s]tarting in the first quarter of 2012, Western Union's annual and quarterly filings signed by Defendants Ersek and Scheirman and Agrawal disclosed the existence of these investigations into the Company's AML and anti-fraud programs." *Response* [#63] at 47; *see also id.* (stating that "Defendants made many statements related to the ongoing government investigations by four separate U.S. Attorney offices, the FTC, and state attorneys general that would culminate in the Joint Settlement"). Plaintiffs also concede that, "[a]s the Class Period progressed, Defendants continued to disclose the existence and topics of information requested in these and other investigations" and further disclosed that "Western Union was a 'target' or 'subject' of these investigations." *Id.*

Plaintiffs' primary concern, though, is that Defendants "stated at all times that these inquiries were too preliminary to be able to predict their outcomes '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought.'" *Response* [#63] at 47 (quoting *Am. Compl.* [#40] ¶ 282). Plaintiffs argue that "[t]hese descriptions of the many ongoing government investigations were false and misleading because Western Union's potential liability was in fact substantial." *Response* [#63] at 48.

They state that "Defendants downplayed the likely outcome of ongoing government investigations when they knew of substantial compliance failures that subjected Western Union to the high risk of significant liability." *Id.* at 49. Plaintiffs also state that "Defendants do not get credit for disclosing the existence of these inquiries and providing generic warnings when they failed to disclose essential information showing that those inquiries raised risks that were far-more substantial than they let on." *Id.* They further argue that "Defendants failed to disclose the FTC's reasons for concluding that consumers underreported fraud" and that, regardless of Defendants' "subjective beliefs, they had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements." *Id.* at 49-50.

In support of their argument, Plaintiffs cite to several cases. *Id.* at 48. First, in *In re ITT Educational Services, Inc. Securities Litigation*, 34 F. Supp. 3d 298 (S.D.N.Y. 2014), contracts were signed between ITT (a for-profit college) and three student loan lenders which required ITT to pay for its students' loan default losses if those defaults reached a certain threshold. When the lenders informed ITT that the threshold had been reached and consequently began demanding "increasingly large sums of money," ITT continued to publicly represent that its liabilities "[w]ould be [i]mmaterial." The court held that the defendants' public statements that "they were not expecting any significant liability under the [contracts] and that they could not predict the maximum potential liability to which they were exposed" was actionable where the plaintiffs had alleged that the defendants "knew that their liability . . . would be substantial." Here, the Court notes that there are no allegations in the present case similar to the fact in *ITT* that Defendants publicly stated that they were not expecting any significant liability; rather, they only stated that they could not

predict the outcome of those investigations.

Plaintiffs cite to three other cases in support of their argument. First, in *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, No. 12-CV-5162, 2014 WL 4823876 (W.D. Ark. Sept. 26, 2014), the court held that the disclosure of an internal corruption investigation was misleading because the defendants omitted their prior knowledge of events, thereby misleading investors as to when the defendants learned of the suspected corruption. Second, in *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), the court held that a generic warning by the defendants regarding potential regulatory risks was affirmatively and materially misleading when the company already knew or was recklessly ignorant that its business strategy relied on practices that violated New York Stock Exchange trading laws. Third, in *SEB Asset Management S.A. v. Western Union Company*, No. 13-cv-03325-MSK-MJW, 2014 WL 5708522 (D. Colo. Sept. 29, 2015), the court held that statements acknowledging but downplaying the extent of Western Union's compliance problems in Mexico (statements like they "expected 'some slow down'" and "expected 'some challenges'") gave rise to a duty to disclose after the point in time at which the defendants "would have had a meaningful estimate" of how many agents failed to meet compliance requirements. Based on allegations from a confidential witness, the court held that details regarding an action the defendants themselves were thinking of taking (i.e., the termination of 7,000 agents) should have been revealed even if Western Union had not yet decided that it would terminate those agents, because just the "potential termination of a large number of agents" gave rise to a duty to disclose.

In Response, Defendants argue that "they were not required to hazard guesses

simply based on the potential severity of the outcome – even if that outcome may later have come to pass." *Reply* [#70] at 58. They point out that "there were numerous factors potentially affecting the resolution or outcome of the investigations" and that "Plaintiff simply ignores all of these variables." *Id.* at 59.

In support, Defendants cite to the following cases. *Id.* at 58. First, in *In re FBR Inc. Securities Litigation*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008), the court held that there was no duty to disclose an "alleged regulatory violation related to a single, isolated event" in the absence of the risk having become a "near certainty." Second, in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), the Second Circuit held that prior United States Food and Drug Administration "(FDA") inspections which did not result in "any sanctions" or "other adverse consequences" were not material and that the defendants need not disclose upcoming FDA inspection where an adverse result was not a "foregone conclusion." Third, in *In re Marsh & McLennan Companies, Inc. Securities Litigation*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006), the court held the defendants need not disclose where the result was not "substantially certain to occur" but that statements such as how the company "led the industry in terms of disclosure" were thus actionable. Fourth, in *Anderson*, 827 F.3d at 1229, the Tenth Circuit held that "the magnitude of the loss that Spirit ultimately sustained" did not necessarily constitute securities fraud when the plaintiffs' argument "amount[ed] to allegations of 'fraud by hindsight.'" *See also In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (similarly cautioning against finding "fraud by hindsight"). Fifth, in *Société Générale Securities Services, GcmH v. Caterpiller, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018), the plaintiff had "essentially argue[d] that [the defendant] should have admitted a securities or tax law violation while the investigations

were ongoing and the failure to do so was both a material omission and a misstatement." The court found "such a position untenable. If every investigation or executed search warrant was evidence of wrongdoing then what purpose do hearings and trials have[?] . . . [S]ecurities laws generally do not impose such a duty upon publicly traded corporations to confess uncharged, unadjudicated claims of wrongdoing."

The Court agrees with Defendants that the statements regarding ongoing government investigations during the Class Period were not false or misleading. For example, in 2012, 2013, 2014, and 2015, the annual 10-K filings each disclosed the investigations, stated that Western Union "could face significant fines, damage awards or regulatory consequences" and that the investigations "could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows." *See* [#57-3] at 22; [#57-13] at 24-25, 35-36, 39; [#57-19] at 31-32, 39; [#57-22] at 32-33, 41-42. Western Union disclosed that there were investigations and that the results of those investigations could be significant and material. Plaintiffs argue that the statements were false and misleading because Western Union's potential liability was substantial and that the "generic warnings" were insufficient. However, in their Response [#47] they have not pointed to what specific additional information they believe Western Union should have disclosed, and on the basis of these pleadings, the Court cannot determine that the investing public was deceived because Defendants stated that the investigations were too preliminary to predict their outcomes. The allegations before the Court, while certainly grave, fall far short of a finding that the outcomes of the investigations were near certainties or foregone conclusions.

Plaintiffs relatedly argue that Defendants should have disclosed "the FTC's reasons

for concluding that consumers underreported fraud" and that Defendants "had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements." *Response* [#63] at 49-50. In support, Plaintiffs cite to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1326, 1329 (2015). However, the cited portions of *Omnicare* do not precisely stand for the proposition as enunciated by Plaintiffs. While *Omnicare* strongly suggests that a company should make clear, if it makes a statement, whether "the Federal Government [is] taking the opposite view," nothing in the decision mandates that the company must fully lay out the opposing view's arguments and reasoning, as Plaintiffs appear to assert here. 135 S. Ct. at 1329; *Response* [#63] at 49-50. Further, to the extent that Plaintiffs argue that Defendants lied or misled regarding whether it agreed with the FTC's position that "consumers underreported fraud," it is clear that Defendants only stated that they disagreed with "potential liability and any scope thereof," and not that they disagreed that "consumers underreported fraud." *Response* [#63] at 49; *Reply* [#70] at 60; *see also* [#57-25] at 11.

In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

### ii.     2013 & 2014 Statements by Defendants Ersek and Agrawal

Next, Plaintiffs direct the Court's attention to three statements made by Defendants Ersek and Agrawal in 2013 and 2014. First, with respect to Defendant Ersek, they point to the following allegation:

> On February 12, 2013, Western Union issued a press release announcing its financial results for the fiscal year and fourth quarter of 2012. On the Company's earnings conference call that was held the same day, an analyst asked "what gives you confidence that there is nothing in the compliance or something that stings you that you don't know about[?] I mean I guess one

of the ways to think about it I guess is there's probably – is there anything out there that can be as large as the situation that happened with [the Southwest Border Agreement] that can have that kind of an impact on price?" In response, Defendant Ersek represented: "The regulatory environment is challenging. Obviously we are in very regulated market, but all our investments, about $100 million a year we invest in anti-money laundering and compliance, are really putting us as an industry standard. Being a market leader puts us in an industry standard, and we want to be a best-in-class and see that as a long-term as a competitive advantage. I think regulators are looking also at us, and we do have a duty to satisfy customer needs and we are working very hard on that."

*Am. Compl.* [#40] ¶ 360. Plaintiffs further allege that on this same conference call "Defendants Ersek and Scheirman also continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the Southwest Border Agreement, rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements." *Id.* ¶ 361.

Second, also with respect to Defendant Ersek, Plaintiffs direct the Court's attention to the following allegation:

At a May 8, 2013 Jefferies Global Technology, Media and Telecom Conference, Defendant Ersek stated that the "regulatory environment" is "one of our biggest competenc[ies] here" as to the cross-border nature of the Company's business. The Jefferies analyst leading the discussion then picked up on these statements, as well as Defendants' consistent statements elsewhere that its compliance efforts are a "competitive advantage," and asked if the "worst is over" in terms of "compliance-related events." Ersek responded that "compliance culture is in our DNA[]. Meanwhile, I think, creating this culture of compliance is something that it's very important" because of the life-changing benefits of remittances that customers receive through the Company.

*Id.* ¶ 381.

Third, with respect to Defendant Agrawal, Plaintiffs direct the Court's attention to the following allegation:

In the Company's earnings conference call for the first quarter of 2014, held

on May 1, 2014, Defendant Ersek stated as to the Company's ongoing compliance costs that "from today's points of view, I think, the team is doing a great job putting the teams right in place, that we have the compliance programs that it's competitive, even a competitive advantage. And I can see that part of that competitive advantage already in some countries like Mexico. . . . And it's all over actually . . . and I think, we have a good program that we covered world[wide] with that investment. . . . We did put programs, compliance programs, agent programs into place [in Mexico]. They're working." Then, in response to an analyst's question about MDPA's investigation into Western Union's compliance efforts, which the Company disclosed in its 2013 10-K, Defendant Agrawal represented that "[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers. So, that's about all we can say right now and we're working through that."

*Id.* ¶ 417.

Plaintiffs assert that "[b]y making these positive statements concerning ongoing regulatory investigations, Defendants were required—but failed—to give investors the full picture and disclose the underlying compliance failures that gave rise to the substantial risk of liability that Western Union faced." *Id.* at 51. In response, Defendants cite to *Employees Retirement System of the City of Providence v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018), in which the court agreed with the argument that "[t]he Amended Complaint is premised on the faulty notion that Embraer was required to disclose details of the [United States Foreign Corrupt Practices Act] violations and admit that it had engaged in wrongdoing—before it had even been charged and before the investigations were even complete. However, the Second Circuit has held that disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."

The Court finds that Plaintiffs overstate their case regarding Defendants' statements describing then-ongoing government investigations. First, regarding the February 12, 2013

statement by Defendant Ersek that the Company was a "market leader," *Am. Compl.* [#40] ¶ 360, Plaintiffs provide no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader in this realm. For example, they could have alleged other companies which were actually market leaders at this time. Second, regarding the May 8, 2013 statement by Defendant Ersek that "compliance culture is in our DNA," the Court finds (despite Plaintiffs' assertion to the contrary, *see Response* [#63] at 50 n.20) that this type of statement is nothing more than unverifiable puffery. *See Grossman*, 120 F.3d at 1118. Third, Plaintiffs point to Defendant Agrawal's May 1, 2014 statement that ""[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers." When read in the full context of Plaintiff's allegations, as provided above, it is clear that the point was made that there was an ongoing investigation, and accordingly, the Court finds that Defendant Agrawal's subsequent statement constitutes nothing more sinister than vague statements of corporate optimism, which are simply not actionable under the securities laws. *See Pirraglia*, 339 F.3d at 1189. In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding government investigations, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### b.    Compliance Expenditures

Plaintiffs argue that Defendants made untrue or misleading statements of material

fact, or failed to state material facts necessary to make statements not misleading, regarding compliance expenditures. *Response* [#63] at 51-53. In addition to certain previously-quoted allegations which the Court has reviewed,[10] Plaintiffs cite to the following allegations in support of this category of purportedly false/misleading statements. *Id.*

1.  Two years prior to the Class Period (which begins on February 24, 2012), "[a]t a meeting of Western Union's Board of Directors on February 24-25, 2010, attended by Defendants Ersek [and] Scheirman, [i]t was . . . discussed . . . that Western Union conducted a test of 1,014 of its U.S.-based agents that showed that 27% of the agents visited during the review failed to meet compliance requirements. Based on these findings, Western Union retrained only 188 agents and did not take further steps to correct the issue outside of the sample that participated in the test." *Am. Compl.* [#40] ¶¶ 95-96.

2.  "In the [August 2, 2012] Q2 2012 10-Q, the Company stated, in relevant part:

    Enhanced Regulatory Compliance

    We regularly review our compliance programs. In connection with that review and growing global regulatory complexity, and as we dialogue with governmental and regulatory authorities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. We believe some of these changes will have an adverse effect on our business, financial condition and results of operations.

    *Id.* ¶ 342.

3.  "[A]t th[e] November 7, 2012 Citi Financial Technology Conference, Defendant Scheirman blamed the Company's compliance costs and issues on 'glob[al]' trends, stating that '[w]e now spend over $100 million a year on compliance and just given how the compliance requirements are generally tightening around the globe, that's one spend we'll probably continue to increase as we move forward.'" *Id.* ¶ 358.

---

[10] *Am. Compl.* [#40] ¶¶ 360-61 (*see* § III.B.1.a.ii.), ¶ 374 (*see* § III.B.1.a.i.8.), ¶ 483 (*see* § III.B.1.a.i.15.), ¶ 489 (*see* § III.B.1.a.i.16.), and ¶ 493 (*see* § III.B.1.a.i.17.).

4.    "On February 14, 2013, . . . at the Goldman Sachs Technology & Internet Conference, Defendant Ersek explained that the Company was well-positioned to build its digital platform because 'we have the anti-money laundering system, we have everything there that we don't have to deal with so we are really building on our existing fundamentals and new channel on the send side called westernunion.com. That's the biggest advantage.' Ersek also continued to describe the Company's efforts to 'upgrade our compliance activities' as limited to the Southwest Border area and described these efforts as setting the 'long term industry standard and a competitive advantage for us,' rather than meeting minimum and basic legal requirements.'" *Id.* ¶ 363.[11]

5.    In the 2012 10-K, filed on February 22, 2013, the Company stated, in pertinent part:

> Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or their subagents to comply with those laws and regulations or their interpretation and increased costs or loss of business associated with compliance with those laws and regulations could have an adverse effect on our business, financial condition and results of operations. . . .
>
> . . . While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. . . .
> ***
> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements. . . .
> ***
> . . . While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program

---

[11]   The cited paragraph actually states, "[o]n February 14, 2013, 2012, at the Goldman Sachs Technology & Internet Conference . . . ," but the context of this paragraph indicates that "2013," not "2012," is the correct date.

costs, liability and reputational damage.

\*\*\*

Our agents' or their subagents' failure to comply with federal and state laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id* ¶ 366.

6. "On July 30, 2013, the Company held a conference call in connection with the release of its earnings for the second quarter of 2013. In response to a question about future compliance costs, Defendant Scheirman stated that compliance costs would likely increase as a result of the changing regulatory environment, rather than because of the Company's failure to meet current compliance requirements. He stated . . . 'that having a robust compliance program and a strong culture of compliance is very important to us. And so broadly as we think about the global landscape, the regulatory environment continues to move. So as I think about 2014 and 2015, right now I'd expect our compliance and regulatory costs to increase. But what's important about that is that it protects the brand, it protects the customer, it protects our agents. And longer term we believe that's going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory.' Defendant Ersek then added that 'I do see that as a competitive advantage. We have really the culture in our company. And the most importantly, it protects the consumer. . . . We comply with all regulations world[wide] and try to be the best in class and leading our industry here.'" *Id.* ¶ 388.

7. "On October 29, 2013, the Company reported its third quarter 2013 financial results. A main topic on the Company's earnings conference call for the third quarter of 2013, held on that day was the Company's surprisingly high increase in compliance costs for 2014. Defendant Ersek stated:

As you are aware, regulatory requirements and expectations around financial service companies are escalating around the world. Some banks have recently faced large fines, and some have announced billions of dollars of incremental investments in compliance areas. The environments continue to evolve. In the U.S., for example, we recently initiated agent procedures at our 50,000 agent locations to comply with the Dodd-Frank Remittance Transfer Rule. And I am pleased to report that the procedures were implemented in time for the October 28 deadline. As we mentioned, earlier this year we have previously implemented new anti-money laundering and fraud prevention enhancements in countries such as Spain and UK.

Specifically addressing the Southwest Border Agreement, Ersek stated that 'in the U.S., we are now working with our third monitor on the Southwest Border Agreement. As noted in an 8-K filed today, we have agreed to an additional

short-term extension to this agreement to continue discussing amendments. We could not conclude discussions on a long-term expansion under the previous timeframe for reasons including the recent passing of Arizona's primary attorney on the matter.'" *Id.* ¶ 397. "Defendant Ersek also stated on this October 29, 2013 call that '75% of our network [of agents] are banks and financial institutions,' which 'choose us because we have high standards on compliance.' He also stated that the Company's surprisingly high increase in compliance costs for the following year was 'not specific to the Western Union.' Ersek stated that Western Union was 'a market leader' setting the 'industry standard.'" *Id.* ¶ 398. "At the end of this October 29, 2013 conference [c]all, an analyst stated that Defendants' comments earlier in the call 'sound[ed] like what you guys are saying if you kind of roll up all this commentary is that, it's essentially going to cost you more than you previously thought to comply with regulations that you already knew about . . . as opposed to new regulations having just popped up in the last couple of months since the last earnings call.' After Defendant Ersek's equivocal response to this question, Michael Salop, the Company's Senior Vice President of Investor Relations, stated that '[a] lot of these things are not necessarily black and white or haven't been historically. So when we work with regulators around the world and around the states and you get clarification on what's needed and make agreement on what programs you'll do, these things are kind of fluid. And so some of these are interpretations of older rules, some of these are new things, some of these are just clarifications with the regulators, some of them are own reviews, so there's a lot of different things going in here.'" *Id.* ¶ 399.

8.    "The reason for the market's negative reaction was because of the Company's substantial increase in compliance costs, and corresponding decrease in projected profits that resulted directly from those costs. As Bloomberg reported on October 30, 'Western Union Plunges 19% as Compliance Costs Rise.' Indeed, Moody's Investors Service downgraded the rating of Western Union's senior unsecured debt on November 18, 2013 because of the Company's 'unexpected increase in compliance related costs' and the Company's projection that it would not have any operating profit in 2014 as a result of those compliance costs." *Id.* ¶ 503. "These increased compliance costs were a direct result of the Company's compliance failures discussed above. Although the Company did not disclose it at this time, it took these steps as a result of the ongoing government compliance failures and investigations that resulted in the Joint Settlement." *Id.* ¶ 504.

9.    The 2013 10-K, filed on February 24, 2014, largely repeated the same statements in the 2012 10-K, *see* § III.B.1.b.5., with the following pertinent additions/alterations:

> Our business is subject to a wide range of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased

costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition and results of operations. . . .

. . . While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. . . .

. . . In 2013, the Company spent over $150 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona. . . .

***

If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected. . . .

*Id.* ¶ 411.

10.    A year later, the 2014 10-K, filed on February 20, 2015, largely repeated the same statements in the 2013 10-K, *see* § III.B.1.b.9., with the following pertinent additions/alterations:

Our business is subject to a wide range and increasing number of laws and regulations. . . .

***

. . . As of December 31, 2014, these programs included approximately 1,900 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. . . . In 2014 , the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona. . . .

***

If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected. . . .

*Id.* ¶ 447.

11.    "At a June 9, 2015 William Blair Growth Stock Conference, Defendant Agrawal stated:

> Our cross-border platform is really what sits at the center of our global money transfer business and I really believe that's unrivalled [sic] in its capabilities . . . . Our strong regulatory and compliance capabilities: we've been investing in this area for quite some time and we continue to strengthen our capabilities here, and we believe it's going to be a long-term competitive advantage for us in this global and complex environment that we're operating in. . . .
>
> So the significant investment we've made in the compliance area is helping us stand apart from the rest of the market. And I believe that will be more and more the case. . . .
>
> And nobody really has the great technology and compliance engine in the middle that I talked about. That's very, very difficult to replicate for anybody. Very few players in the market have that kind of capability."

*Id.* ¶ 459.

12.    "On the earnings call for the third quarter of 2015, held on October 29, 2015, Defendant Ersek stated:

> We do see in some markets that competitors are finding it difficult to operate in the market because the regulatory environment is quite – asking a lot of questions and a lot of demands for them. And as you recall, we invested – started to invest about three years ago heavily into compliance. And obviously, we do see that pay back. And this year, investments will be about – it's currently running about 3.7% of our revenue.
>
> But it's kind of a competency now for us, running the transaction through our compliance programs in a way that's like an engine makes us definitely in way – a big competitive advantage. It means also that this regulatory environment will be in 200 countries. The compliance regulatory challenges won't be less in the future, that will continue. And we are committed to be in 200 countries where we operate and comply with the regulators. And it means also that we will be there, and that could be long-term a competitive advantage."

*Id.* ¶ 465.

13.    A year later, the 2015 10-K, filed on February 19, 2016, largely repeated the same

statements in the 2014 10-K, *see* § III.B.1.b.10., with the following pertinent additions/alterations:

> . . . Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to protect consumers, or detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition, results of operations, and cash flows. . . .
> ***
> . . . As of December 31, 2015, these programs included approximately 2,200 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. . . . In 2015, we spent approximately $200 million on our compliance and regulatory programs. . . .
> ***
> If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition, results of operations, and cash flows would be adversely affected. . . .

*Id.* ¶ 474.

14.    "[A]t th[e] March 10, 2016 Investor Day Conference, David Thompson, Western Union's Chief Technology Officer, stated:

> [W]e now have a state-of-the-art compliance platform both based on technology and people or compliance professionals. . . . And we built this technology to prevent fraud in our network, protect our customers. . . . And this is a very powerful capability for us in monitoring the suspicious activity and monitoring aggregation rules for our customers.
>
> These rules also prevent and help us detect human trafficking, terrorist financing, child exploitation, and other activities that may not be allowed, like Internet gambling and associated activities. These rules are also in place to allow us to screen against government sanctions lists, and politically exposed lists provided by various governments. Now these are our proprietary tools

that we've created that are a long-term competitive advantage for Western Union, and are very powerful capabilities that we provide to our partners and our customers.

So, in summary, at Western Union, we've created new technologies and platforms and processes to serve our customers. And we're now really at a state where we've transformed our capabilities. . . . And it's exciting to be a part of this transformation at Western Union and deliver technologies that move money for better."

*Id.* ¶ 480.

15. "At a May 25, 2016 J.P. Morgan Global Technology Media and Telecom Conference, Defendant Ersek stated:

We came forward and made a big announcement that we're going to upgrade our, significantly we were always very focused on compliance, but significantly upgrade our compliance environment because the world was changing. . . .

Western Union is, especially with the environment, helping the law enforcement governments to move good money. That's why we invested in the compliance. I think we don't want that money because the good money supports people, supports governments, supports law enforcement, helps law enforcement . . . in a very efficient way. Money will move anyway, but it should move in a regulated way.

*Id.* ¶ 486.

16. "[T]he Federal Trade Commission ("FTC") found that for many years, Western Union knew that it failed to implement effective anti-fraud and AML programs 'to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system.' The Company had knowledge of these inexcusable compliance deficiencies based on, among other things, '[i]nformation contained in Western Union's internal reports, communications, and other records demonstrat[ing] that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns.'" *Id.* ¶ 9.

17. "As the Class Period progressed and Western Union became further ensnared in the government investigations that led to the Joint Settlement, the Company claimed to have begun taking steps to improve its compliance practices. The Statement of Facts that Western Union negotiated with DOJ to reach the Joint Settlement states that by September 2012—over six months after the Class Period began—Western Union began taking certain steps to improve its anti-fraud and AML compliance

programs. But these efforts were too little, too late. As the DOJ Statement of Facts states, the Company did not significantly increase the number of compliance employees or its compliance budget until 2013 through 2015, well into the Class Period. Other remedial measures referenced in the Statement of Facts are not given specific dates, but rather, are described as 'continu[ing]' efforts. Western Union also admitted to DOJ that it willfully failed to implement an effective AML program and that it aided and abetted wire fraud through December 2012." *Id.* ¶ 144.

18.  "In addition, even if Western Union implemented certain compliance measures beginning in late 2012, those efforts failed to cure the most serious compliance deficiency that the Company experienced. The FTC determined that although Western Union improved certain aspects of its anti-fraud program since 2012 because of the FTC's ongoing investigation, the Company continued well past that time to fail 'to promptly suspend and terminate agent locations facilitating fraud. Instead, Western Union has continued to profit from the activities of these agents.' These failures extended to agent 'locations that appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures.'" *Id.* ¶ 148.

Plaintiffs argue that Defendants "falsely characterized the reason for Western Union's compliance expenditures during the Class Period." *Response* [#63] at 51. They state that "[a]ll of these statements were false and misleading because—contrary to the reasons that Defendants gave—Western Union's compliance expenditures were actually made in response to government investigations into the compliance failures that formed the basis for the Joint Settlement." *Id.* "When giving these reasons, Defendants left out the key reason for those efforts. Once Defendants chose to discuss Western Union's rationale for its increased compliance efforts, they had a duty to do so forthrightly and without omitting the most important reason." *Id.* at 52. They state that "Western Union's reason for its compliance expenditures is an objectively verifiable fact," and that "[t]he Joint Settlement makes clear that the actual reason for the Company's increased compliance costs was its reaction to the government investigations and its awareness of its significant compliance failures." *Id.*

In support, Plaintiffs cite to *Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015), in which the defendant had stated publicly that there was only one reason why something had occurred, i.e., that a deal to purchase a portion of the company had purportedly fell through because the potential buyer was unable to get financing, when the plaintiff had alleged facts clearly showing there was a different reason, i.e., that the investor's CEO had "unambiguous[ly]" stated that the deal fell through because the company was not worth what his company had initially thought. The Tenth Circuit held that the defendant had falsely "attributed the impasse to" financing difficulties rather than valuation concerns, and that even if the defendant's stated reason was one of several possible reasons for an event, "[t]he existence of multiple explanations is what made [the defendant's] statement misleading." *Nakkhumpun*, 782 F.3d at 1149.

However, in reading the allegations as a whole, the Court believes that Plaintiffs overstate the effect of Defendants' individual statements here. First, unlike *Nakkhumpun*, the statements here do not "unambigious[ly]" state, or even suggest, that there was only one reason for increased compliance expenditures. Second, there is no indication in these allegations that "global trends" and "increasingly complex regulatory requirements" were not or could not have been additional reasons for increased compliance expenditures. Third, as Defendants argue, the FTC statement cited by Plaintiffs ("[A]s a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012.") refers to improvements, rather than investments, refers only to anti-fraud programs and not to AML specifically or other compliance areas, and does not indicate that the FTC investigation was the only reason Western Union increased its compliance expenditures regarding anti-fraud programs. *Reply* [#70] at 63 (citing *Response* [#63] at 51).

Fourth, the Court is not convinced by the citations provided by Plaintiffs that Defendants characterized the Company's compliance difficulties and increased efforts as limited to issues raised by the SBA. *Am. Compl.* [#40] ¶¶ 361, 363, 447. The first statement cited by Plaintiffs discusses the transcript of a February 12, 2013 conference call, but there is no indication here that Defendants Ersek and Scheirman "continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the [SBA], rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements," as argued by Plaintiffs. *Id.* ¶ 361; *Defs.' Ex. 93* [#70-8] at 3.[12] The second statement cited by Plaintiffs discusses how pricing changes were related to issues raised by the SBA. *Id.* ¶ 363 (quoting *Defs.' Ex. 94* [#70-9] at 13). The third statement cited by Plaintiffs clearly shows that the SBA was only a partial reason for increased compliance expenditures: "In 2014, the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona . . . ." *Am. Compl.* [#40] ¶ 447.

In short, the Court finds that Plaintiffs have failed to adequately allege that the statements in this category regarding compliance expenditures were legally actionable

---

[12] "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018) (internal quotation marks and brackets omitted). Thus, the Court can examine this document (and others cited in this Order) as one that is centrally referred to in the Amended Complaint and whose authenticity is not disputed. Here, specifically, the Court notes that, although only one page of the transcript is provided by Defendants, Plaintiffs have not disputed the accuracy of the transcript or argued that a full transcript is required in order for the Court to accurately review its contents.

untrue or misleading statements of material fact, or that Defendants failed to state material fact necessary to make these statements not misleading. Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance expenditures, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### c. Compliance Practices

Plaintiffs argue that Defendants also made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding compliance practices. *Response* [#63] at 41-47. In addition to certain previously-quoted allegations which the Court has also reviewed,[13] Plaintiffs cite to the following allegations in support of this category of purportedly false/misleading statements. *Id.*

1.  "On March 13, 2012, [D]efendant Scheirman attended the Credit Suisse Global Services Conference. In response to a participant question about how the Company would maintain its pricing advantages in the face of competition from other companies offering similar services, Scheirman stated that Western Union's 'compliance programs' were 'really competitive strengths for us.'" *Am. Compl.* [#40] ¶ 311.

2.  "On May 9, 2012, Western Union hosted an Investor Day for analysts, media representatives and investors. Defendants Ersek and Scheirman made positive statements during their presentation about the Company's compliance and regulatory capabilities. For example, Defendant Ersek focused a portion of his prepared remarks on describing the supposed strengths of Western Union's compliance and regulatory capabilities. He stated:

    These strengths separate us from the competitors. I believe they are a huge competitive advantage. Our global network, our strong brand, our global

---

[13] *Am. Compl.* [#40] ¶ 360 (*see* § III.B.1.a.ii.), ¶ 363 (*see* § III.B.1.b.4.), ¶¶ 374-75 (*see* § III.B.1.a.i.8.), ¶ 381 (*see* § III.B.1.a.ii.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 398 (*see* § III.B.1.b.7.), ¶ 417 (*see* § III.B.1.a.ii.), ¶ 447 (*see* § III.B.1.b.10.), and ¶ 459 (*see* § III.B.1.b.11.).

organization and resources and our regulatory and anti-money laundering capabilities, there are not many companies worldwide which could show these capabilities to you. . . .

Our fourth competitive advantage is our global anti-money launder[ing] and regulatory capabilities. The regulations around our business are really highly complex, and we have regulatory complexity in all our markets. We have to comply with various Acts and interdictions lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities.

It sounds complex, and indeed it is complex, but we see that as a competitive advantage, as we comply with various Act and interdictions lists around the world in 200 countries. . . .

To protect our customers, our brand, to comply with rules and regulations, globally we dedicate about 600 employees around the globe to these efforts, and we spend nearly about $60 million on anti-money laundering and regulatory environment."

*Id.* ¶ 321. "Later during this May 9, 2012 Investor Day conference, Defendant Ersek stated that Western Union had an advantage over technology companies because 'it's important to remember Western Union is today['s] market leader in money transfer business. We have built an incredible network over the years, now with 500,000 retail locations in 200 countries and territories. Our brand is well known and trusted around the globe. We have the regulatory and anti-money laundering capabilities to operate in all countries.' Ersek subsequently closed the conference by stating that the complexity of the business, including the 'regulatory environment' was good because although '[i]t scares to death, the competitors to enter this market,' Western Union has 'the competencies' to address these issues." *Id.* ¶ 322. "Also during this Investor Day conference, Defendant Scheirman stated in his prepared remarks that Western Union's 'compliance and regulatory capabilities' were among its 'strengths' that would allow the Company to 'deliver strong returns' for shareholders in the coming years." *Id.* ¶ 323.

3.     "On May 16, 2012, Defendants Scheirman and Stockdale attended the J.P. Morgan Global Technology, Media and Telecom Conference. In response to an analyst's questions as to how Western Union could compete with technology startups, Scheirman responded that 'clearly just our compliance capabilities' were one of the Company's main advantages over other companies." *Id.* ¶ 328.

4.     "On June 12, 2012, Western Union attended a William Blair & Co LLC Growth Stock Conference call for analysts, media representatives and investors. During his opening remarks, Defendant Ersek continued to represent that the Company's compliance efforts were a competitive 'strength.' He specifically touted the

Company's AML program as a way of enabling customers to 'trust' in the Company. Ersek stated:

> Before I discuss about our future strategies, let me talk about the core strengths of Western Union . . . . And **the fourth one is the regulatory and anti-money laundering capabilities of Western Union. All this combination gives us a unique opportunity and unique fundamentals for Western Union** . . . .
>
> **One of our very strong competitive advantages is our regulatory environment, our regulatory and anti-money laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment. And I always say, I know it's sometimes tough, but I always say it's good that the regulatory environment and we, as Western Union, have these capabilities to serve the customers and give the trust to the customers they believe at Western Union. . . .**
>
> It's not that easy to have a money license in Gabon and Brazil or other states I'm talking about, **so it's a competitive advantage for Western Union and we are very proud of that**. (Emphasis added)."

*Id.* ¶ 333. "Later during this June 12, 2012 conference call, when an analyst asked about competition for sending money cross-border from companies such as PayPal, Defendant Ersek responded by again claiming that the Company's regulatory compliance efforts provided it with a competitive advantage. He stated, 'You have to get the regulatory environment, somebody has to do that. It's not easy to do that. You have to build the anti-money laundering [program], somebody has to do that. . . . So that has been definitely something we are very proud [that] we buil[t].'" *Id.* ¶ 334.

5.  "On July 24, 2012, Western Union issued a press release announcing its financial results from the second quarter of 2012. During the conference call that Western Union hosted that day after releasing these results, Defendant Ersek began his prepared remarks at the outset of the call by reiterating his message that the Company's 'global compliance capabilities' gave it a 'strong' foundation and 'competitive strength.'" *Id.* ¶ 336. "Later during the July 24, 2012 conference call, Defendant Scheirman described the effect of the Company's compliance efforts as part of the Southwest Border Agreement. He stated that '[w]e expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity of requirements and sustainability around the globe continues to expand, but we view our ability to adapt to this environment as a long-term competitive advantage.'" *Id.* ¶ 337. "In response to an analyst's question later during this July 24, 2012 conference call concerning compliance costs, Defendant Ersek responded that the Company was 'very focused

here and we are very serious' about 'upgrading our compliance.' He continued: '[I]t's a competitive advantage, long term. I think we are investing heavily here to be, really acting as an industry leader. We are setting the tone here. And I think we are very focused here and I see that there is definitely a competitive advantage.'" Defendant Ersek subsequently repeated this message when he stated that '[a]s an industry leader, obviously, we are very active here upgrading, investing heavily' in order to address new regulatory and compliance issues." *Id.* ¶ 338.

6.      "On September 18, 2012, Western Union issued a press release announcing that it was hosting the 7th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in Denver, Colorado, near its headquarters, on September 18-20. The Company described this conference as 'one of the biggest events of its kind' with the purpose of 'teaching best practices in identifying and preventing fraud and money laundering.' Western Union's Chief Compliance Officer stated that '[o]ur conference started in 2006 and we had one goal at that time: educate Agents on [AML] best practices, regulations, and law-enforcement trends. It's now one of North America's largest [AML]/anti-fraud conferences that helps professionals from a wide variety of industries better identify and protect their organizations, and consumers, from fraud.' The Company also stated in its press release that it is 'dedicated to fighting fraud and helps consumers protect themselves from scammers.'" *Id.* ¶ 347.

7.      "On October 30, 2012, the Company held a conference call in connection with the release of its earnings for the third quarter of 2012. During this call, Defendant Ersek stated during that conference call that 'we are investing more in being an industry leader, putting some compliance requirements [in place] for our customers, which are tougher and higher than it was in the past. . . . We are the industry leader, we are leading that and I think we are protecting our customer.' He also stated that '[w]e have made and will continue to make compliance-related enhancements and changes around the world to meet new and evolving requirements. . . . [W]e believe it is our responsibility to maintain our industry leadership by implementing rigorous compliance practices to protect our customers and agents around the world.' Defendant Ersek also reassured investors by representing that the Company could maintain its price premium in part because of the advantage that its 'great compliance' program gave it. Defendant Ersek also noted certain 'compliances changes' [sic] limited to issues 'related to our Southwest border agreement,' and did not address the Company's more comprehensive compliance deficiencies that would not become known until January 19, 2017." *Id.* ¶ 351.

8.      "On November 7, 2012, at the Citi Financial Technology Conference, Defendant Ersek described Western Union's compliance efforts in response to the Southwest Border Agreement as going above and beyond the Company's minimum legal requirements. He characterized Western Union 'as an industry leader[] in this sector,' where the Company 'set[s] the standards hopefully.' Ersek also described

the Company's compliance with the Southwest Border Agreement as meeting a 'quite high' and 'industry lead[ing]' standard. According to Ersek, the 'southwest border issue is unique to Western Union. It's an agreement which has been signed in 2010 and we are implementing the actions and I am very confident that the team is doing the right thing. . . . [A]s an industry leader, in this sector, obviously we set the standards hopefully.'" *Id.* ¶ 357.

9.      "At a June 13, 2013 William Blair & Company Growth Stock Conference, Defendant Scheirman stated:

> [W]e have a strong brand. Our brand resonates very well with our target customer. Again, it stands for speed, trust, convenience, reliability and value. . . . And we have robust compliance and regulatory capabilities. And any time you move money cross-border, you need to be very good at operations and very good at the compliance and the regulatory environment. So it's very complex and it's hard to do. And we've got those capabilities. . . .
>
> We very much can leverage our brand, our global operations and our compliance capabilities to [expand the online business]. . . .
>
> Western Union has strong foundational assets. A brand that is very much trusted by our customers around the globe and that trust is so important when you're dealing with financial services. . . . And we talked about global operations and our regulatory and compliance capabilities. And any time you're moving money cross-border, in 200 countries, 16,000 corridors, 135 currencies, it is so important to have strong regulatory and compliance capabilities and operational abilities."

*Id.* ¶ 385. "Specifically addressing the regulatory environment, Scheirman stated at this June 13, 2013 William Blair conference that 'the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth.'" *Id.* ¶ 386.

10.     Defendant Ersek "stated on [a] July 30, 2013 earnings call, in response to a question about the Company's pricing, '[w]e, as Western Union, I believe deserve the premium pricing. Our brand is very valuable. Our compliance programs are very valuable. We are protecting the customers. The customers trust us.' Toward the end of this call, Defendant Scheirman explained, in response to an analyst's question about a particular compliance practice, that 'the important point is we very much have a culture of compliance and want to have best-in-class compliance programs, that's very important for our brand, protecting our customers, our agents and so forth.'" *Id.* ¶ 389.

11.     "On September 17, 2013, Western Union issued a press release announcing that

it was hosting the 8th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in its hometown of Engelwood, Colorado on September 17-18. The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud who share best practices with some of Western Union's largest agents.' The Company's Chief Compliance Officer said in the press release that '[t]ogether with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud.' Western Union also took this opportunity to advertise that it 'invests millions each year to run compliance programs. The company continues to increase its headcount of employees who are dedicated to compliance, fighting fraud and helping to protect and empower consumers around the globe. This dedication expands to those who are on the frontlines at approximately 520,000 Agent locations around the globe.'" *Id.* ¶ 395.

12.    "On Western Union's earnings conference call for the fourth quarter and full year of 2013, held on February 11, 2014, Defendant Ersek continued to represent that "we are very much focused on our compliance activities. We are the industry leader; we are focused on that; we are driving it.' He also stated that 'the regulator[y] environment is . . . changing very fast, evolving and we are on – I believe as a industry leader, we are setting your best practices. We are driving it. We have the great Compliance Officer. He hired very great people. We do invest – our CIO, David Thompson, is very focused on the . . . technology, how we can involve – activate the technology to be more effective on the compliance making. The most focus is on the know your agent and know your customer. And so there is some diligence activities and I believe, as we gave – we were anticipating that in Q3.' Ersek later explained that the increased compliance costs were 'mainly also know your agent and know your customer activities. We have to do more questions on your customers, ask the customer, register the customers, doing diligence on the customers. But, also on the agent side with the frontline associates, we are doing more diligence, understanding who is serving our customers. They trust us and they want to trust also to the front-line associates. We do some diligences there. And I think that's the main investment [that is] going to continue to happen in the future.'" *Id.* ¶ 408.

13.    "At the Jefferies Global Technology, Media & Telecom Conference on May 7, 2014, Defendant Ersek stated that the Western Union's recent substantial compliance costs were now 'a competitive advantage . . . [because] law enforcement are really looking up to us [and] saying that, hey, it will be great as the leader, you are leading the market and be [sic] the best practice.'" *Id.* ¶ 423.

14.    "At a June 11, 2014 William Blair Growth Stock Conference, Defendant Agrawal stated that '[w]e also have compliance and regularity capabilities that are strong and continue to get even better in this increasingly complex global environment.' Toward the end of his prepared remarks, he then stated that 'in summary, we have very

strong foundational assets in place. Our global brand, our global operational and compliance capabilities and our presence in 200 countries and territories around the world gives us a strong position from which to operate.'" *Id.* ¶ 425. He further stated that "one of the five reasons that Western Union was 'well positioned' to strengthen its consumer money transfer business was because of its '[c]ompliance and regulatory capabilities.'" *Id.* ¶ 426.

15. "On July 31, 2014, the Company filed its quarterly Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2013, which ended on June 30, 2014 (the "Q2 2014 10-Q")." *Id.* ¶ 428. "The Q2 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q . . . ." *Id.* ¶ 429. "The Q2 2014 10-Q contained signed certifications pursuant to [the Sarbanes-Oxley Act ("SOX")] by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 430.

16. "Western Union's pricing challenges that SunTrust['s Robinson Humphrey] discussed [in an August 1, 2014 report] were also a result of its compliance failures. As explained above, Defendants stated during the Class Period that the Company would maintain its pricing advantages in the face of competition from other companies because Western Union's 'compliance programs' were 'really competitive strengths for us.' Because the Company was now forced to substantially increase its compliance expenditures because of its severely deficient compliance program, it could no longer justify its premium pricing." *Id.* ¶ 516 (internal citation omitted).

17. "At a September 11, 2014 Deutsche Bank dbAccess Technology Conference, Defendant Agrawal stated:

> We believe that compliance can be a competitive advantage for us. It already is a competitive advantage, and I believe it can be a bigger competitive advantage for us as we operate because it's very difficult for most other organizations to spend at the level that we are, and we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time. . . .

> [W]e've been making a tremendous amount of progress [with complying with the amended Southwest Border Agreement]. The state has assigned a monitor to be able to monitor the activities and to assess progress around our progress in making these changes. And we've been making great progress.

In response to a question about competition from other companies, including Apple's announcement that it was moving into the payments business, Defendant Agrawal promoted Western Union's compliance capabilities as giving it an advantage over

other companies:

> And so, I think, we're really well-positioned . . . . And it's about the global compliance capability that we have, that's not easy to replicate, the global operational capabilities.  So we have a lot of advantages that will keep us well-positioned I believe. . . .  So I really believe that we are extremely well positioned.  Nobody else has the global compliance capabilities that we have, the global operational capabilities.  We operate in every country of the world and that's not an easy infrastructure to replicate.  And so that's why I feel good about where we are."

*Id.* ¶ 432.

18.     "On September 17, 2014, Western Union issued a press release announcing its 9th Annual Consumer Protection Compliance Conference.  The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud and human trafficking to share best practices with some of Western Union's largest Agents.'  Defendant Ersek delivered a keynote address at this conference 'emphasizing the importance of compliance.'  The Company's Chief Compliance Officer said in the press release that 'Western Union is committed to helping protect its customers against fraud and other financial crimes.  It's the right thing to do for our customers and for our business.'" *Id.* ¶ 436.

19.     "On October 30, 2014, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the third quarter of 2013, which ended on September 30, 2014 (the "Q3 2014 10-Q")." *Id.* ¶ 438.  "The Q3 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q . . . ." *Id.* ¶ 439.  "The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting."  *Id.* ¶ 440.

20.     "In the conference call for earnings from the third quarter of 2014, held on October 30, 2014, Defendant Agrawal stated that '[w]e've been able to accomplish our key objectives on the compliance side, and we've also done it more efficiently.'  In addition, Defendant Ersek stated that the Company had an advantage over smaller competitors who were 'having more trouble to compete in the market because they can't comply with the anti-money laundering requirements.'  Defendant Ersek then stated that although the Company did not give guidance for the following year, he was 'excited about compliance investments, and that gives us a long-term competitive advantage and that helps us.'" *Id.* ¶ 434.

21.     "On January 21, 2015, Western Union hosted the European Business Forum and

Compliance Conference in Brussels for the second time. As was publicly reported, including by Western Union and major news publications, over 200 financial industry and regulatory experts attended this conference to discuss 'how to enable innovation in the payments industry to better meet consumer and business financial service needs in Europe, while meeting regulatory compliance.' The Company stated that this conference 'reflects the company's commitment as a leader in the payments industry to ensure customer needs are understood, while meeting regulatory compliance.' The forum was 'followed by a compliance conference attended by Western Union agents and partners from across Europe to focus on best practice[s] in anti-money laundering measures and fraud protection.' Ersek stated in connection with this conference that '[i]t's vital that consumers and businesses are protected when using financial services, especially payments and remittances, and that's why Western Union is committed to regulation to prevent financial crime. To meet this commitment, we continue to focus on our compliance efforts as a priority for our business.'" *Id.* ¶ 442.

22.   "In its presentation from its February 10, 2015 earnings call for the fourth quarter and fiscal year 2014, the Defendant Ersek represented that one of Western Union's four 'key results' that it delivered in 2014 was '[e]nhanced global compliance programs.'" *Id.* ¶ 444.

23.   "On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K")." *Id.* ¶ 446. "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.'" *Id.* ¶ 448. "The 2014 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 449. "The 2014 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 450.

24.   "On April 30, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2015, which ended on March 31, 2015 (the "Q1 2015 10-Q")." *Id.* ¶ 452. "The Q1 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q . . . ." *Id.* ¶ 453. "The

Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 454.

25.     "At a May 19, 2015 JPMorgan Global Technology, Media and Telecom Conference, Defendant Ersek stated that even though the Company had to lower prices in Mexico, 'overall, I will say that our brand, our locations, our compliance programs, our trust does deserve a premium and the customers pay for that. So, they are happy with that.' Ersek also stated that 'our investment in the technology over the last three years, and our investment in compliance, . . . it's good to invest in the compliance, it's a competitive advantage. Being regulated in 200 countries, it's a tough environment, it's good. We are investing there, it's a competitive advantage. We know how to do that, and that is also kind of a barrier for many to come and to operate in that corridor. . . . Being an industry leader, we are doing the first attempt, and you are always setting the standards, but long-term, it will be done.'" *Id.* ¶ 456.

In short, Plaintiffs argue that Defendants "had a duty to disclose those serious current compliance failures, as well as ones from the recent past that subjected the Company to the material risk of substantial monetary sanctions." *Response* [#63] at 41.

In *SEB Asset Management S.A.*, 2014 WL 5708522, the Court considered some statements which were essentially identical in substance to some mentioned here. Those statements included the "frequent talking point" for Western Union that its "operations in 200 countries and territories" involved compliance expenses and burdens that its competitors would find difficult to match. The Court found that Western Union's "decision to embrace the benefits of strict regulatory compliance may have been sudden and opportunistic, but the Complaint has not alleged any facts to suggest that it was misleading" because the statements about Western Union being an industry leader were limited to predictions of how Western Union "would be a leader or trend-setter in the future." The Court noted that the "statements are patently true on their face – compliance with hundreds of discrete national and international regulations is difficult and costly, and those difficulties

and costs also serve to discourage competitors from attempting to match the breadth of [Western Union's] market."

The parties also discuss the impact of *In re Level 3 Communications Securities Litigation*, 667 F.3d 1331, 1339 (10th Cir. 2012), on the issue of compliance practice statements. *Response* [#63] at 45 n.16; *Reply* [#70] at 50-51. The Tenth Circuit there held that statements such as "[a] majority of the physical network interconnections are completed" and "[m]ost of the physical integration of WilTel is now complete" were not puffery, because they had "some basis in objective and verifiable fact." *In re Level 3*, 667 F.3d at 1340-41. However, statements concerning "integration efforts and the customer experience" and "general, forward-looking expressions of confidence" regarding integration efforts were deemed insufficiently concrete or specific to be actionable, even though they were made during a time when the company knew that integration was not going well. *Id.* at 1340.

The Court agrees with Defendants' assessment of these statements. They are all either "forward-looking statements predicting competitive advantages eventually to be gained from large, ongoing compliance investments" or "present-tense statements of opinions regarding the competitive advantages of having already established compliance infrastructure in more than 200 countries." *Reply* [#70] at 42. As such, the Court finds that these statements lack a demonstrable false basis and, in many cases, are mere puffery. *See Grossman*, 120 F.3d at 1119-20 ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

For example, Plaintiffs point to the September 11, 2014 statements by Defendant Agrawal that compliance "already is a competitive advantage . . . we've been doing this for

many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time" and that "[n]obody else has the global compliance capabilities that we have." *Am. Compl.* [#40] ¶ 432; *see also Response* [#63] at 46 n.17 (discussing statements where Defendants "characterized the Company as the *current* and best industry and market leader"). Especially when read in context, *see Defs.' Ex. 102* [#70-17], these statements are materially similar to those discussed in *SEB Asset Management S.A.*, 2014 WL 5708522, and Plaintiffs have provided no allegations from which the Court can reasonably infer that these statements were false, such as allegations showing that Western Union had *not* been investing in compliance prior to 2014 or that other competitors *did* indeed have similar global compliance capabilities at that time, or that Western Union was not a market leader, despite any issues that Western Union may also have been experiencing. *See, e.g., Am. Compl.* [#40] ¶ 205 (stating that Western Union only had one main competitor, MoneyGram International, Inc., without sufficiently elaborating on comparative allegations that could show some of Defendants' statements were false or misleading).

Further, as Defendants argue, many of these statements mention the competitive advantages held by Western Union based on the global scope of its compliance infrastructure and continuing investments. *Reply* [#70] at 46. At most, the statements merely compare Western Union to its competitors and are not "absolute assurances" regarding compliance practices. *Id.* at 46-47. As one of many examples, this applies to the statement that, "longer term we believe [our increased compliance spending is] going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory [sic]." *Am. Compl.* [#40] ¶ 388; *see also, e.g., id.* ¶¶ 333

(discussing "competitive advantage"), 334 (discussing the difficulty of navigating the regulatory environment for both Western Union and competitors), 336 (discussing "global compliance capabilities" as a competitive strength), 363 (discussing the "advantage" held by Western Union when compared to competitors with respect to its digital presence); *see also Defs.' Exs. 29, 88, 89, 94* [#57-29, #70-3, #70-4, #70-9].

Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance practices, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### 2.    Scienter

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding legal compliance. *Response* [#63] at 36-41. Specifically, they argue:

> Defendants' statements of legal compliance were false and misleading because, as Western Union admitted to DOJ, and as the FTC determined, the Company did not comply with its AML and anti-fraud obligations during the Class Period. Western Union's legal violations included admitted criminal liability for willfully failing to maintain an effective AML program as required by the BSA and willfully "failing to suspend and/or terminate complicit Agents" and "allowing them to continue to process fraud-induced monetary transactions" through 2012; as well as civil liability for violating the FTC Act by failing to detect and prevent consumer fraud and violating the Telemarketing Sales Rule by providing substantial assistance to parties that engaged in consumer fraud through the date of the Joint Settlement.

*Response* [#63] at 37-38. They further argue that "Defendants' statements touting Western Union's legal compliance gave investors the impression that the Company's compliance practices were up to par. It was therefore misleading for Defendants to fail to disclose the many ways that Western Union engaged in activities that gave rise to the high probability

of substantial government sanctions." *Id.* at 38. In other words, Plaintiffs assert that Defendants "did not disclose that Western Union *already* failed to comply with AML and anti-fraud laws and *already* faced the high risk of substantial monetary sanctions when they made those statements throughout the Class Period." *Id.* at 39 (emphasis in original).

Defendants essentially concede that the statements regarding actual legal compliance were technically false or misleading *except* that they were couched in terms of the truthful opinions of the speakers according to the information they had at the time when the statements were made. *Motion* [#54] at 40 (citing *Omnicare*, 135 S. Ct. at 1326-27 (holding that statements such as believing that the company's marketing practices were lawful were not false simply because the belief later turned out to be incorrect). Thus, in order to succeed here, Plaintiffs must provide allegations that (1) the speakers did not subjectively hold the stated beliefs at the times when the statements were made or (2) objectively, the speakers did not undertake any reasonable inquiry into the grounds underlying the statements before making the statements. *Omnicare*, S. Ct. at 1327, 1332. Based primarily on *Omnicare*, Defendants argue that "in order adequately to allege that the statements of opinion were false, Plaintiff[s] must plead with particularity facts that create a strong inference—at least as compelling as any competing innocent inferences—that each [Defendant] did not believe what he said but, instead, that each believed throughout the Class Period that the Company was engaged in ongoing violations of applicable legal requirements and believed that its compliance systems were fundamentally ineffectual." *Motion* [#54] at 42-43. Defendants assert that Plaintiffs have failed to provide adequate allegations demonstrating this. *Id.* at 43.

The pleading requirements for scienter under the PSLRA have attracted special

attention from the courts. "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness." *Adams*, 340 F.3d at 1105. The Tenth Circuit has made clear that adequately pleading scienter requires the plaintiffs to plead "facts with particularity giving rise to a strong inference that defendants acted with the requisite [state of mind]," and the trial court is instructed to "look to the totality of the pleadings" to determine whether the plaintiffs' allegations permit such an inference. *Pirraglia*, 339 F.3d at 1190. In addition, "an inference is a logical conclusion drawn from the facts." *Adams*, 340 F.3d at 1105. "A strong inference of scienter" means "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.*

> To establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate:(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. . . . We also take into account evidence of motive and opportunity, for, while these factors are typically insufficient in themselves to show scienter, they may be important to the totality of the pleadings.

*Pirraglia*, 339 F.3d at 1191 (internal quotation marks and brackets omitted). Moreover:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favorable to plaintiff.

*Tellabs*, 551 U.S. at 323-24.

As noted above, the state of mind necessary to sustain allegations of securities fraud is either intent or recklessness. "[P]laintiffs can adequately plead scienter by setting forth facts raising a strong inference of intentional *or* reckless misconduct." *City of*

*Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001) (emphasis in original).

> Recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it, can also satisfy the scienter requirement for Section 10b-5. Simple negligence, however, does not satisfy the scienter requirement.

*Id.* at 1258 (internal citations and quotations omitted). Recklessness is "something akin to conscious disregard." *In re Level 3*, 667 F.3d at 1343 n.12. "Negligence, and even gross negligence, fall 'below the high threshold for liability under Section 10(b) of the Exchange Act.'" *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 719 (10th Cir. 2016) (quoting *Dronsejko v. Thornton*, 632 F.2d 658, 668 (10th Cir. 2011)).

Regarding the adequacy of a complaint's allegations of scienter, the court has made clear that at the 12(b)(6) stage, the court's role "is simply to determine whether the plaintiff raises a strong inference of scienter. . . ." *Pirraglia,* 339 F.3d at 1188. Courts have refused "to draw inferences in the plaintiff's favor when doing so would allow [him] to make allegations on information and belief without satisfying the particularity requirements of the [PSLRA]." *Id.*

In addition, the Tenth Circuit has provided other guidance about the sufficiency of a complaint alleging securities fraud that is useful here. Regarding allegations of reckless misconduct, the Court has concluded that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Fleming*, 264 F.3d at 1260 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)). Further, "allegations that the defendant

possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld these facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud." *Fleming*, 264 F.3d at 1260. In order to sufficiently allege recklessness, plaintiffs must present facts to show the "defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.* at 1261. Moreover, vague statements of corporate optimism are not actionable under the securities laws. *Pirraglia*, 339 F.3d at 1189. But "violation of a corporation's internal policies can support a claim of scienter when coupled with other evidence of intent to defraud, such as motive and opportunity." *Id.* at 1192.

Also worth nothing is that the Tenth Circuit has rejected the notion that knowledge may be imputed to a high-ranking corporate officer because of his position alone:

> [A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.[14] Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company.

*Fleming*, 264 F.3d at 1264 (citing *In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). Nevertheless, the seniority of management officials who are alleged to have engaged in fraudulent conduct "is a fact relevant in [the court's] weighing of the totality of the allegations." *Adams*, 340 F.3d at 1106. The cases have been careful to emphasize

---

[14] As pointed out by the Court in *Fleming*, "the scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases." 264 F.3d at 1255 n.13.

that "the important issue . . . is not whether [d]efendants knew the underlying facts, but whether [d]efendants knew that not disclosing [them] posed substantial likelihood of misleading a reasonable investor." *Fleming*, 264 F.3d at 1264 (citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) ("[I]t is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing." (emphasis in original)). Finally, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Adams*, 340 F.3d at 1006.

In assessing whether allegations of a defendant's motives to mislead are sufficient to support a finding of the requisite scienter under the PSLRA, the Tenth Circuit has addressed only motives specifically and directly related to the alleged non-disclosure, finding that other alleged motives are not relevant to the inquiry. *See Fleming*, 264 F.3d at 1268 (noting five asserted motives for the defendants' alleged fraudulent conduct, but concluding that only one arguably supported the plaintiffs' allegations because it was "specifically and directly related to the underlying facts" of the alleged non-disclosure). Moreover, it is also clear that "generalized motives shared by all companies and which are not specifically and uniquely related" to the defendant in particular, are "unavailing." *Id.* at 1269. Examples of such "shared business motives" are that the defendants desired to protect their own positions with the company, or that they wanted to protect the value of their own stock, or that they wanted to further the interests of the company. "Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. . . . Similarly

insufficient are allegations that corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation." *Id.* at 1270 (quoting *Philips v. LCI Int'l, Inc.*, 190 F.3d 609, 622 (4th Cir. 1999)); *see also Level 3*, 667 F.3d at 1346 ("Nor does plaintiff's assertion that defendants' compensation hinged on the performance of Level 3's stock price and the successful integration of WilTel lead us to infer scienter."). In addition, when the complaint "includes nothing in the allegations of the defendants' motives to indicate that they are anything more than pure speculation," the court should not accord them much weight. *Adams*, 340 F.3d at 1104-05.

Thus, in order to pass muster under the PSLRA, the Amended Complaint [#40] must state with particularity facts giving rise to a strong inference of scienter. "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Level 3*, 667 F.3d at 1343. Here, taken as a whole, the Court finds that the Amended Complaint [#40] does not create an inference of scienter that is at least as strong as any opposing inference. For the reasons stated below, the Court concludes that Plaintiffs have failed to adequately allege the scienter necessary to state claims for securities fraud.

At the heart of the scienter inquiry in a case like this are the allegations about what information the individual Defendants knew and failed to report, and whether they knew or should have known that their non-disclosures were substantially likely to mislead a reasonable investor. *See Fleming*, 264 F.3d at 1264. In order to adequately plead scienter, Plaintiffs must allege that Defendants Ersek, Scheirman, and Agrawal each acted *either* knowingly or recklessly. To show knowledge, Plaintiffs must sufficiently allege that Defendants Ersek, Scheirman, and Agrawal knew about certain material information and

that they knew that failure to disclose this information would likely mislead investors, thus showing intent. In the alternative, Plaintiffs must allege that the misrepresentation or omitted information was so obviously material that Defendants Ersek, Scheirman, and Agrawal must have been aware that non-disclosure would likely mislead investors, thus showing recklessness. *See generally Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1202 (10th Cir. 2015). Although recklessness may be established where a defendant ignores obvious signs of fraud, "an unseen red flag cannot be heeded." *Sanchez*, 667 F. App'x at 720-722 (citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012); *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011)). "Possession of documents and other information which . . . should have revealed red flags at most . . . raises an inference of gross negligence, but not fraud." *Id.* (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (internal quotations omitted)). Indeed, in order for recklessness to be adequately pled in a case asserting securities fraud claims against auditors, the Tenth Circuit has indicated that plaintiffs must cite "highly suspicious in-your-face facts that would cry out" that the company's financial status was fraudulently misrepresented. *Sanchez*, 667 F. App'x at 723 (citing *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011)).

The crux of Plaintiffs' theory is that "Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded" the following, as summarized by Plaintiffs:

> (i) Western Union's AML and anti-fraud efforts during the Class Period did not comply with applicable laws and regulations, including the BSA, the FTC Act, the [Telemarketing Sales Rules], the Telemarketing Act, the criminal wire fraud statute, the Dodd-Frank Act, and/or state or international AML or anti-fraud laws;

(ii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with best practices and/or industry standard practices;

(iii) during the Class Period, Western Union failed to discipline or take corrective action against its agents or subagents that Defendants knew violated (or likely violated), and in some cases were complicit (or likely complicit) in violating, the laws described in (i) above and/or Company anti-fraud or AML policies, including by processing vast amounts of transactions that defrauded (or likely defrauded) Western Union's customers and/or by structuring (or likely structuring) vast amounts of transactions;

(iv) Defendants failed to disclose Western Union's AML and anti-fraud compliance failures and certain related government enforcement actions that took place prior to the Class Period;

(v) government investigations and enforcement actions that were ongoing during the Class Period were nearly certain—based on Western Union's compliance failures before and during the Class Period—to result in severe monetary penalties and Western Union being required to undertake comprehensive and costly remedial actions;

(vi) Western Union could not maintain its competitive premium pricing during the Class Period while implementing effective compliance policies; and

(vii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with agreements that Western Union reached to resolve government investigations and enforcement actions that were disclosed prior to the Class Period.

*Am. Compl.* [#40] ¶ 539 (incorporating ¶ 303). However, a careful reading of the cleverly-drafted Amended Complaint makes clear that the overwhelming majority of allegations of fraud depend on assertions that Defendants did not believe that compliance efforts were legally sufficient in making significant progress against major problems such as money laundering in light of the large and ever-mutating problem the Company faced from fraudsters from around the world. It goes without saying that the Amended Complaint cannot create a strong inference of the state of mind necessary to show securities fraud without sufficiently alleging that Defendants knew or recklessly disregarded these

problems, i.e., that compliance efforts were dramatically failing. But behind the Amended Complaint's dense curtain of allegations relating to what was said when and about unresolved government investigations, Plaintiffs make very few particularized allegations about what the executives themselves knew at any given time. At best, the totality of the allegations regarding Defendants' conduct which bear on their state of mind leaves more questions about their intent than answers, and such allegations do not demonstrate more than, at most, gross negligence, which is insufficient to state a claim under Section 10(b). *See Sanchez*, 667 F. App'x at 719.

With a pleading as lengthy and repetitive as the Amended Complaint, the risks of attempting to list the allegations related to scienter are manifest and recognized by the Court. By sheer volume alone, one might conclude that the document must sufficiently allege Defendants' intent to commit fraud or their recklessness in doing so. Nevertheless, after an extremely careful review of the 176-page, 580-paragraph Amended Complaint, the Court cannot conclude that Plaintiffs have provided sufficient allegations to meet the high bar of pleading scienter here.

In addition to certain previously-quoted allegations which the Court has reviewed,[15] Plaintiffs also cite to the following allegations which, either alone or in combination with others, bear on the scienter issue in connection with legal compliance:

1.  "Throughout the Class Period, Western Union represented to investors that it complied with its AML and anti-fraud legal obligations. For example, in each 10-K that the Company filed during the Class Period, Defendants represented, with minor

---

[15] *Am. Compl.* [#40] ¶¶ 321-22 (*see* § III.B.1.c.2.), ¶ 366 (*see* § III.B.1.b.5.), ¶¶ 374-75 (*see* III.B.1.a.i.8.), ¶¶ 385-86 (*see* § III.B.1.c.9.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 411 (*see* § III.B.1.b.9.), ¶ 425 (*see* § III.B.1.c.14.), ¶ 447 (*see* § III.B.1.b.10.), ¶ 448 (*see* § III.B.1.c.23.), ¶ 456 (*see* § III.B.1.c.25.), ¶ 465 (*see* § III.B.1.b.12.), and ¶ 474 (*see* § III.B.1.b.13.).

variations, that 'we believe our fraud prevention efforts are effective and comply with applicable law' and that 'that Western Union is compliant with its [AML and other] regulatory responsibilities.'" *Am. Compl.* [#40] ¶ 76 (internal footnotes omitted). "Western Union also acknowledged in these annual filings that failing to comply with AML and anti-fraud laws and regulations posed one of the most significant risks that the Company faced. In each of these filings, Defendants stated that '[o]ur business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations'—or made substantially similar statements to the same effect." *Id.* ¶ 77.

2.    In the 2011 10-K, filed on February 24, 2012, the Company stated in pertinent part:

> Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations. . . .
>
> . . . While we believe our fraud prevention efforts are effective and comply with applicable law and best practices, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. . . .
> ***
> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices. . . .
> ***
> . . . While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.
> ***
> Our agents' or subagents' failure to comply with federal and [state] laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id.* ¶ 305. "In addition, in describing the 'wide range of laws and regulations enacted

by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the 2011 10-K specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.'" *Id.* ¶ 306.

3. "[A]t [a] May 16, 2012 J.P. Morgan Global Technology, Media and Telecom Conference, [Stewart] Stockdale stated that regulatory and compliance worldwide is something 'that obviously – it's a huge competency for Western Union to deal with[]in 200 countries. So, regulations in Europe, in Australia, in Asia Pacific and across the world is something that we deal with across every single region and country.'" *Id.* ¶ 329.

4. "On October 16, 2012, [Stewart] Stockdale spoke on behalf of Western Union at the University of Denver's Voices of Experience program. This speech was published online the following day, on October 17, 2012. Stockdale stated:

> Western Union is uniquely positioned at going after that underserved 2-billion person market worldwide. What makes us unique that allow[s] us to have these relationships and really our core competencies to reach consumers in 200 countries and territories is really these four pillars of our strategy . . . . Three is the regulatory and AML capabilities of the Company in almost every jurisdiction around the world.
>
> ***
>
> What really is more difficult is to make sure that you're complying with all the laws around the world. And we spend a ton of money. And we have over 600 people on an ongoing basis monitoring the system on an ongoing basis. And you have to do that. One of the core capabilities is to being able to work with governments not only the U.S. government but the governments of Vietnam, the governments of India, the governments of China to make sure that this cash movement which is in the billions of dollars is all being monitored on an ongoing basis.

Stockdale then stated, in the context of discussion [sic] the Dodd-Frank regulations, that 'all regulation' 'becomes a competitive advantage for us . . . because if you're in front and you have the resources to implement and do it well.'" *Id.* ¶ 349.

5. In connection with the 2012 10-K (filed on February 22, 2013), the Company stated, in part: "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements

intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA.  The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.'"  *Id.* ¶ 367.

6.      "At a May 16, 2013 JPMorgan Global Technology, Media and Telecom Conference, Defendant Scheirman stated that in the first quarter of the year, in 'a few of the markets, we continued to enhance our compliance programs.  And our goal is to be best-in-class with compliance.  Live to the letter and the spirit of the law.  And so, we're doing things around fraud prevention, real-time risk assessment at the point of sale, customer callbacks and high principal.'  Scheirman also stated that 'the depth and extent of our compliance practices' allows the Company to succeed in the online market because 'sometimes folks might underestimate' how important that is for cross-border money transfers '[b]ut we're very good at that.'"  *Id.* ¶ 383.

7.      In the 2013 10-K (filed February 24, 2014), the Company stated, in part: "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA.  The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.'"  *Id.* ¶ 412.

8.      "On the earnings conference call for the fourth quarter and fiscal year 2015, held on February 9, 2016, Defendant Ersek stated that Western Union's money transfer system 'is unique' and its success 'is that it works in 200 countries, it can pay out in 121 currencies, it can adapt to regulatory systems of 200 countries and make anti-money laundering, and process 22 transactions . . . per second.'  He later explained that 'most of the agents are choosing the exclusivity because they know they have a quite stable partner, financially stable, good, anti-money laundering system, good settlement system, long run capability, great brand and they can drop money in 200 countries immediately.'"  *Id.* ¶ 471.

9.      In connection with the 2015 10-K (filed February 19, 2016), the Company stated, in part: "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA.  The Company also noted that '[m]any other countries and states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.'"  *Id.* ¶ 475.

10.    "DOJ's and FTC's actions against Western Union were based on the Company's violations of the following AML and anti-fraud laws and regulations:

a. Aiding and abetting wire fraud, pursuant to 18 U.S.C. §§ 2, 1343, from 2004 through December 2012 'by failing to suspend and/or terminate complicit Agents [including subagents] and by allowing them to continue to process fraud-induced monetary transactions.'  Western Union admitted it was guilty of this charge.

b. Willfully failing to maintain an effective program as required by the BSA, pursuant to 31 U.S.C. §§ 5318(g), 5322, and related regulations, from 2004 through December 2012. Western Union admitted it was guilty of this charge.

c. Engaging in unfair acts or practices in violation of Section 5 of the FTC Act by failing to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers through the Company's system.

d. Engaging in deceptive telemarketing in violation of the Telemarketing Sales Rule by Western Union, its agents, or subagents providing substantial assistance or support to sellers or telemarketers who the Company or its agents or subagents knew or consciously avoided knowing (a) induced consumers to pay for goods and services through the use of false or misleading statements and (b) requested or received payment in advance of consumers obtaining a loan."

Id. ¶ 139.

The Court notes with respect to this final allegation that any admitted wrong-doing only covers the first fraction of the Class Period (i.e., February 24, 2012 through December 2012), that the admitted wrong-doing does not directly involve securities laws, and that Plaintiffs have not adequately tied any admitted wrong-doing to the scienter of Defendants.

As explained above, the Court finds that not only are many of these allegations inadequately particularized and merely conclusory, but taken as a whole, they do not create a strong inference that Defendants acted intentionally or recklessly.  The Court is hard-pressed to draw any inference from these allegations that Defendants knew of or recklessly disregarded the full scope and extent of the alleged illicit behavior at Western Union, much

less that they condoned it and defrauded investors despite it. Needless to say, in the absence of such an inference, not to mention the strong inference required by the PSLRA, Plaintiffs' claims cannot proceed.

Nor are Plaintiffs' claims rescued by sufficient allegations regarding Defendants' motive and opportunity. For example, Plaintiffs allege that Defendant Ersek sold approximately 600,000 shares of Western Union stock during the Class Period for more than $12 million. *Am. Compl.* [#40] at 285. However, Plaintiffs fail to provide adequate context for these numbers, such as the price Defendant Ersek initially paid for that stock, so the Court can reach any conclusion as to what kind of financial gain is actually at issue here. *See Motion* [#54] at 85. Further, there are no allegations regarding what percentage of Defendant Ersek's total shares these stock sales consisted of, or whether he was buying other types of shares at the same time. *See id.*; *see, e.g.*, *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007), aff'd, 312 F. App'x 400 (2d Cir. 2009) (finding no inference of fraud in the fact that a "[d]efendant . . . decreased his holdings by 30.84%," and noting that "[c]ourts have found no inference of scienter in cases involving similar and even greater percentages of sales"). Without these kinds of additional allegations, the mere allegation that Defendant Ersek sold 600,000 shares of Western Stock over a five year period for $12 million tells the Court very little and adds nothing material to the scienter analysis. The same goes for Plaintiffs' allegations regarding other Defendants and company executives' sales of shares during the class period. *Am. Compl.* [#40] ¶¶ 290-95. While "personal financial gain may weigh heavily in favor of a scienter inference," *Level 3*, 667 F.3d at 1345, the absence of any cogent allegation of a financial benefit from the alleged fraud cuts the other way. *In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103,

1117 n.8 (10th Cir. 2015).

In short, Plaintiffs produce no convincing allegations of a motive for Defendants to engage in fraud beyond the standard financial motives common to all for-profit businesses. Under these circumstances, it is more probable that the Western Union executives "were overly optimistic and failed to give weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism." *Spirit Aerosystems*, 827 F.3d at 1238. "The absence of a motive allegation . . . is not dispositive, but it is relevant, and in this case it counts against scienter." *Level 3*, 667 F.3d at 1347; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

At the end of the day, the court must decide if a reasonable person construing the allegations as a whole would deem the inference of scienter cogent *and* at least as compelling as any plausible opposing inference one could draw from the facts alleged. *Tellabs*, 551 U.S. at 324 (emphasis added). In other words, the court must "compare the parties' dual explanations" for the alleged failures to disclose and decide which is more cogent and compelling. *See, e.g.*, *Spirit Aerosystems*, 827 F.3d at 1248. Defendants argue that "[t]he far more 'cogent and compelling' inference with respect to each of these Individual Defendants is that they genuinely believed what they said when they made the challenged statements." *Motion* [#54] at 16 (citing *Tellabs, Inc.*, 551 U.S. at 324). Taken as a whole, Defendants appear to assert that the inference to be drawn from the failures to disclose alleged by Plaintiffs is that Defendants may have made errors in business judgment, but

they did not commit fraud against investors. In the Court's view, this inference is equally strong as any inference regarding fraud.

A final word about recklessness under the PSLRA. Plaintiffs assert that even if the facts alleged do not show that Defendants knew, at the time when the omissions occurred, that their statements would likely mislead investors, there is enough to conclude that they "acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). They contend that the danger of misleading investors by not disclosing these facts was so obvious that Defendants must have been aware. But recklessness "is a particularly high standard" under the PSLRA. *Dronsejko*, 632 F.3d at 668. The Tenth Circuit has noted that it is "something closer to a state of mind approximating actual intent." *Zagg*, 797 F.3d at 1206. And Plaintiffs' allegations about recklessness are overwhelmingly conclusory. *See, e.g.*, *Am. Compl.* [#40] ¶¶ 539, 544, 547, 559, 566, 568, 570, 573. These conclusory allegations of recklessness do nothing to advance facts demonstrating that conduct. Plaintiffs' statements made specifically about Defendants' conduct are equally weak. For example, the closest Plaintiffs come to discussing recklessness in connection with Defendants' specific conduct is as follows:

> Defendants['] knowledge or reckless disregard of the deficiencies in Western Union's compliance program that contradicted their public statements is further supported by their knowledge, as disclosed in the Company's periodic SEC filings throughout the Class Period, of the several federal and state government investigations, including by EDPA, MDPA, CDCA, SDFL, the FTC, and state attorneys general, that ultimately resulted in the Joint Settlement and the settlement with the state attorneys general that were announced in January 2017. As part of these investigations, Western Union produced many documents and witnesses to these regulatory authorities and claimed to have cooperated in these investigations. These investigations provided the basis for DOJ's and FTC's findings that Western Union's own

-70-

internal reports, analyses and communications showed that the Company failed to maintain an effective compliance program, that it knew its agents were complicit in money laundering and consumer fraud, and that it failed to discipline its agents for those violations. These investigations also found that agents' rampant involvement in money laundering and consumer fraud were discussed by senior managers within the Company. Defendants thus had knowledge of the Company's compliance violations based on both a) the mass of underlying information showing those deficiencies as they occurred (including the Company's own internal reports, analyses, and communications) and b) that information having been reviewed in the course of the Company's producing it during the various lengthy government investigations that led to the Joint Settlement.

*Id.* ¶ 543. These and other statements and allegations of fact made in connection with those statements simply do not provide the necessary detail to show the level of recklessness required to adequately allege scienter on the part of each Defendant. Simply stated, even if the Amended Complaint gives rise to *some* plausible inference of scienter, it is not the strong inference required by the PSLRA. *Tellabs*, 551 U.S. at 314. Hence, Claim One is **dismissed** in full to the extent it is asserted against Defendants Ersek, Scheirman, Agrawal, and Western Union.[16]

## C. Claim Two: Defendants Ersek, Scheirman, Agrawal, and Koch

Section 20 of the PSLRA provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . [s]hall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. §

---

[16] The Court reiterates once more that it is well aware that Western Union has been the subject of various investigations and has sometimes even admitted to misdeeds of varying levels occurring, in part, throughout the class period, as discussed throughout this Order and as explained at length in the Amended Complaint [#40]. However, while certainly informative, the legal standards under which those investigations occurred and by which Western Union's actions were measured are not the same as the standards for the securities law claims made here under the PSLRA. In other words, as the Court has found, simply because Western Union may have legally erred in some ways in no way automatically means that Western Union has also violated the PSLRA as claimed here.

78t(a). To state a prima facie case of control person liability, plaintiffs must allege: (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). To make a showing that a person is a "control person," plaintiffs must "point to facts which indicate that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Adams*, 340 F.3d at 1108. Allegations that a person is the chief executive officer of a company likely satisfy the control person test, and allegations that a person is the chief financial officer of a company may also do so when a plaintiff brings claims of securities fraud relating to official reports of the company's financial performance. *Id.* "Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind."[17] *Id.* at 1109.

Because Plaintiffs have failed to allege "a primary violation of the securities laws" as asserted under Claim One, the Court finds that their Section 20(a) claim asserted under Claim Two is also not viable. *See Maher*, 144 F.3d at 1305. Hence, Claim Two is **dismissed** with respect to Defendants Ersek, Scheirman, Agrawal, and Koch.

## D. Amendment

Finally, the Court notes that Plaintiffs failed to make an argument that their Amended Complaint could be further amended yet again to correct any deficiencies. *See generally*

---

[17] "Section 20 does state that a controlling person is not liable if he acted in good faith and did not induce the acts on which the liability of the controlled person is founded. However, courts have held that these are affirmative defenses, to be pleaded and proved by defendants." *Adams*, 340 F.3d at 1109 n.5 (citing *Kaplan v. Rose*, 49 F.3d 1363, 1382-83 (9th Cir. 1994); *Gould v. Am.-Haw. S.S. Co.*, 535 F.2d 761, 779 (3d Cir. 1976)).

*Response* [#63].  Consequently, the Court is not inclined to permit further leave to amend. *See, e.g.*, *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1118-19 (stating that "[t]he district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint").

## IV.  Conclusion

For the reasons set forth above, the Motions [#53, #55] are **GRANTED.**  The claims are **dismissed with prejudice** and the Clerk of Court is directed to **enter** Final Judgment in favor of Defendants and **close** this case.

Dated:  March 27, 2019

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge