**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 25, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

LAWRENCE HENRY SMALLEN AND
LAURA ANNE SMALLEN
REVOCABLE LIVING TRUST,
individually and on behalf of all others
similarly situated,

      Plaintiff - Appellant,

and

UA LOCAL 13 PENSION FUND,
individually and on behalf of all others
similarly situated,

      Plaintiff,

v.

THE WESTERN UNION COMPANY;
HIKMET ERSEK; SCOTT T.
SCHEIRMAN; RAJESH K. AGRAWAL,

      Defendants - Appellees,

and

BARRY KOCH,

      Defendant.

No. 19-1154

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-00474-KLM)**
_____

Michael Grunfeld (Jeremy A. Lieberman, Emma Gilmore, and Jonathan D. Lindenfeld with him on the brief) of Pomerantz LLP, New York, New York, for Plaintiff-Appellant.

Hille R. Sheppard of Sidley Austin LLP, Chicago, Illinois (David F. Graham of Sidley Austin LLP, Chicago, Illinois; and Holly Stein Sollod and Christina Gomez of Holland & Hart LLP, Denver, Colorado, with her on the brief) for Defendants-Appellees.

_____

Before **HARTZ**, **BALDOCK**, and **EID**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

This appeal arises from the district court's dismissal of Plaintiff–Appellant Lawrence Henry Smallen and Laura Anne Smallen Revocable Living Trust's securities-fraud class action against Defendant–Appellee The Western Union Company and several of its current and former executive officers (collectively, "Defendants"). Following the announcements of Western Union's settlements with regulators in January 2017 and the subsequent drop in the price of the company's stock shares, Plaintiff filed this lawsuit on behalf of itself and other similarly situated shareholders. In its complaint, Plaintiff alleges Defendants committed securities fraud by making false or materially misleading public statements between February 24, 2012, and May 2, 2017 (the "Class Period") regarding, among other things, Western Union's compliance with anti-money laundering ("AML") and anti-fraud laws.

With respect to Defendants' alleged misstatements concerning Western Union's legal compliance, the district court dismissed the complaint because Plaintiff failed to adequately plead scienter under the heightened standard imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. Plaintiff

appeals this determination.  Although the complaint may give rise to some plausible inference of culpability on the part of Defendants, Plaintiff has failed to plead particularized facts giving rise to the strong inference of scienter required to state a claim under the PSLRA.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

The actors involved in this case are many, and the allegations in Plaintiff's complaint are legion.[1]  Because the parties are well-acquainted with the record, we need not provide a comprehensive recitation of the full factual background underlying Plaintiff's claims.  Rather, we set forth only the facts and procedural history necessary for our analysis and then turn to the merits of the arguments on appeal.

Western Union is the world's largest provider of money-transfer services, operating through an international network of over 500,000 agent locations in more than 200 countries and territories worldwide.  As a major player in the money-transmitter industry, which is heavily regulated, Western Union is no stranger to dealing with compliance issues and government investigations.[2]  On January 19, 2017,

---

[1] Plaintiff's complaint is 176 pages long, consists of 580 paragraphs, and includes a three-page table of contents.  Because plaintiffs must carry a heavy burden in private securities-fraud actions to survive a motion to dismiss, we understand complaints in such cases will require more detail than in other contexts.  But packing a complaint with excessive and redundant allegations, as Plaintiff does here, merely adds unnecessary length to an already long pleading, taxes judicial economy, and therefore should be avoided.

[2] A more detailed account of the regulatory investigations into Western Union's compliance with AML and anti-fraud laws can be found in *City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912 (10th Cir. 2019), which involved many of the same facts and

Western Union reached a joint settlement ("Joint Settlement") with several federal regulators, including the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), in which it agreed to pay $586 million to resolve investigations into the company's AML and anti-fraud programs. As part of the settlement with DOJ, Western Union entered into a deferred prosecution agreement ("DPA") wherein the company admitted to willfully failing to implement an effective AML compliance program from 2004 through December 2012. Less than two weeks later, Western Union also agreed to pay $5 million to settle charges arising out of the same compliance issues with the attorney generals of 49 states and the District of Columbia.

Following the announcement of the Joint Settlement, the price of Western Union stock shares declined. And shortly thereafter, Plaintiff filed its Consolidated Amended Class Action Complaint, on behalf of itself and other similarly situated shareholders, against Western Union and a select group of its senior executives. These senior officers (collectively, the "Individual Defendants") include:

- Mr. Hikmet Ersek, who has served as Western Union's Chief Executive Officer and President since September 2010, and as a member of the company's Board of Directors since April 2010. He held each of these positions throughout the Class Period.

- Mr. Scott T. Scheirman, who was Western Union's Chief Financial Officer and an Executive Vice President from September 2006 until December 31, 2013. He then served as a "Senior Advisor" until February 28, 2014. Mr. Scheirman was also responsible for "Global Operations" at Western Union from January 2012 through November 2012.

---

allegations as the instant appeal. *Id.* at 914–17 (affirming dismissal of shareholder derivative action alleging breach of fiduciary duties).

- Mr. Rajesh K. Agrawal, who has served as Western Union's Chief Financial Officer since July 2014 and as Executive Vice President since November 2011. He was the company's interim CFO from January 2014 to July 2014. Before that, Mr. Agrawal served as President of Western Union Business Solutions from August 2011 through December 2013.

In the complaint, Plaintiff alleges Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, by making false and materially misleading statements during the five-year Class Period. As relevant here, these misrepresentations include Defendants' statements in public and in SEC filings that Western Union's then-current compliance efforts were legally sufficient and effectively combating the significant AML and fraud problems the company faced around the world. Count II of Plaintiff's complaint also asserts claims against the Individual Defendants under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which creates joint and several liability for "control persons" of entities found liable for violations of securities laws.

Defendants filed a motion to dismiss Plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA. As for the misstatements concerning Western Union's compliance with AML and anti-fraud laws, which is the only category of statements at issue, the district court held that the complaint failed to create a strong inference of scienter as required to state a claim under the PSLRA.[3]

---

[3] The district court determined Defendants' statements regarding government investigations into Western Union, the company's compliance expenditures, and competitive advantages gained from Western Union's compliance program were

Accordingly, the court dismissed Plaintiff's claims of securities fraud under Section 10(b) and Rule 10b–5.  Because Plaintiff failed to plead a primary violation of the securities laws—a required element for control-person liability—the district court also held Plaintiff's Section 20(a) claims could not proceed.  The court therefore dismissed the complaint with prejudice, and this appeal followed.

## II.

On appeal, Plaintiff argues the district court erred in concluding the complaint does not create a strong inference of scienter with respect to Defendants' misstatements concerning Western Union's compliance with AML and anti-fraud laws.  We disagree. To be sure, the complaint contains a plethora of allegations regarding unresolved compliance problems and government investigations into Western Union.  But Plaintiff pleads very few particularized allegations, if any, showing Defendants made their statements with either intent to defraud investors or conscious disregard of a risk shareholders would be misled.  Without such allegations, the complaint flounders on the PSLRA's heightened pleading standard.

## A.

Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder "prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*,

---

neither false nor misleading and thus dismissed Plaintiff's claims to the extent they relied on these statements.  Plaintiff has not appealed this aspect of the court's ruling.

573 U.S. 258, 267 (2014); *accord* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To establish a violation under Section 10(b) and Rule 10b–5, a plaintiff must prove:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) *the defendant acted with scienter, that is, with intent to defraud or recklessness*; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200 (10th Cir. 2015) (quoting *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012)). Only the element of scienter is at issue here.

Scienter is "'a mental state embracing [1] intent to deceive, manipulate, or defraud,' or [2] recklessness." *Anderson v. Spirit Aerosystems Holdings*, Inc., 827 F.3d 1229, 1236–37 (10th Cir. 2016) (quoting *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003)). "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Recklessness, on the other hand, is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Zagg*, 797 F.3d at 1201 (quoting *Fleming*, 264 F.3d at 1258). In the securities-fraud context, recklessness is akin to conscious disregard—allegations of negligence or even gross negligence fall "below the high

threshold for liability under Section 10(b) of the Exchange Act." *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011).

## B.

We review de novo the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Anderson*, 827 F.3d at 1237. In conducting our review, we accept the complaint's well-pleaded factual allegations as true. *Id.* Generally, we only consider facts alleged in the complaint itself in evaluating the sufficiency of the complaint. *Employees' Ret. Sys. of Rhode Island v. Williams Companies, Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018). Notwithstanding this general rule, we may consider documents "the complaint incorporates by reference," "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," and "matters of which a court may take judicial notice." *Id.* (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).[4]

A plaintiff asserting a claim under Section 10(b) bears a heavy burden at the pleading stage because such claims are governed by the PSLRA, which imposes a heightened standard for pleading the element of scienter. *In re Zagg*, 797 F.3d at 1201; *accord* 15 U.S.C. § 78u–4(b)(2). The PSLRA requires a plaintiff to, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a *strong*

---

[4] Consistent with this principle, we consider the DPA, FTC Complaint, Western Union's SEC filings, and Western Union's board and committee meeting materials in conducting our de novo review. Plaintiff did not object to the district court's consideration of these documents, which Defendants submitted in support of their motion to dismiss. Nor does Plaintiff argue we should refrain from considering these materials in resolving this appeal.

inference that the defendant[s] acted with the required state of mind" in violating the securities laws. *In re Level 3*, 667 F.3d at 1333 (emphasis added) (quoting 15 U.S.C. § 78u–4(b)(2)). In assessing the sufficiency of a plaintiff's allegations under the PSLRA, a court "must consider the complaint in its entirety" and decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

Although an inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre," it "must be more than merely plausible or reasonable." *Id.* at 324. Because the inference must be "powerful or cogent" not only in its own right but "strong in light of other explanations[,]" we must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. Under this standard, a complaint survives dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

## C.

To survive dismissal, Plaintiff must have pleaded particularized facts giving rise to a strong inference Defendants made their misstatements regarding Western Union's AML and anti-fraud compliance systems with either knowledge or reckless disregard of their falsity. Plaintiff argues (1) it sufficiently alleges the Individual Defendants acted with scienter, and their culpable state of mind is imputed to Western Union; and, alternatively, (2) the complaint adequately pleads corporate scienter on behalf of

Western Union.  Because neither argument succeeds, we affirm the district court's dismissal of Plaintiff's complaint.[5]

1.

Turning first to the alleged scienter of the Individual Defendants, the complaint identifies facts in five categories Plaintiff argues collectively give rise to a strong inference the Western Union executives intended to defraud investors or acted recklessly in making false statements.  Plaintiff relies on: (1) various "red flags" regarding fraud and compliance violations; (2) discussions about compliance issues at Western Union board and committee meetings; (3) Western Union's interactions with government regulators and pending investigations; (4) the company's admissions in the DPA and the FTC's conclusions in the Joint Settlement; and (5) Western Union executives' motive to defraud investors.  We examine each category of facts in turn

---

[5] Plaintiff also argues the district court "botched the standard for pleading scienter" under the PSLRA by resolving a tie of competing inferences in favor of Defendants.  Because we review de novo the sufficiency of Plaintiff's scienter allegations, whether the district court stumbled in some regard in applying the appropriate legal standard would be of little, if any, importance in our resolution of this appeal.  Nevertheless, the district court clearly posed the correct question mandated under Supreme Court precedent and unequivocally answered that question in the negative: "Simply stated, even if the Amended Complaint gives rise to some plausible inference of scienter, it is not the strong inference required by the PSLRA." *See* Aplt. App. Vol. V at 1341 (citing *Tellabs*, 551 U.S. at 314); *id.* at 1330 ("Here, taken as a whole, the Court finds that the Amended Complaint [#40] does not create an inference of scienter that is at least as strong as any opposing inference."); *see also id.* at 1337–38 ("The Court is hard-pressed to draw any inference from these allegations that Defendants knew of or recklessly disregarded the full scope and extent of the alleged illicit behavior at Western Union, much less that they condoned it and defrauded investors despite it.").

and then "assess all the allegations holistically" to determine whether they satisfy the PSLRA. *Tellabs*, 551 U.S. at 326.

a.

First, Plaintiff contends various red flags alerted the Individual Defendants to ongoing regulatory compliance violations. These red flags include the following allegations: (1) Western Union received at least 550,928 consumer complaints between January 1, 2004, and August 29, 2015, concerning at least $632,721,044 in fraud transactions; (2) fraudulent transfers involved Western Union's agents in several countries; and (3) several third-party agents, reaching as far back as 2007, were arrested for fraud and money laundering. Because of the serious and pervasive nature of the fraud involving Western Union's money-transfer system, Plaintiff argues the Individual Defendants must have known the company's compliance programs were ineffective at the time they made their alleged misstatements.

There are two problems with this argument. For one thing, although surely a noteworthy sum, the $632,721,044 in fraudulent transactions—which occurred over a twelve-year period—represents less than 1% of the dollars transferred through Western Union's system in 2014 alone, which amounted to $85 billion. This is not a case where allegedly fraudulent transactions amounted to an overwhelming percentage of the company's business. *Compare Adams*, 340 F.3d at 1106 (considering fact that fraudulent dollars "represented more than one quarter of the $22.4 million in net income reported by the [c]ompany" contributed to an inference of fraudulent intent), *and In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 278–79 (3d Cir. 2006),

11

*abrogated on other grounds by Tellabs*, 551 U.S. at 322–23 (concluding allegation that "fictitious transactions . . . constituted 'more than two-thirds of the company's revenue'" supported inference of scienter), *with Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1251 (11th Cir. 2008) (declining to consider $1 billion in alleged fraud as evidence of scienter where the cited figure was less than 2% of the corporate defendant's annual sales).

More importantly, Plaintiff does not plead any particularized facts either tying the Individual Defendants to the consumer complaints or the agent arrests, or otherwise demonstrating the Individual Defendants were aware Western Union's compliance program had failed to redress these issues. These allegations demonstrate fraudsters, including Western Union's agents, used the company's system to commit fraud both before and during the Class Period. But the issue here is not simply whether bad actors used Western Union's money-transfer system to perpetrate widespread fraud. Rather, Plaintiff must show the Individual Defendants knew this fraud was occurring (or were severely reckless in not knowing about it) and were also aware Western Union's compliance program was not effectively addressing these issues. This is where this category of allegations falls short. Thus, we are not persuaded these "red flags" support any inference the Individual Defendants knew about or consciously disregarded ongoing illegality at the time they made their misstatements regarding Western Union's compliance programs.

Plaintiff also argues materials from Western Union's board and committee meetings, which the Individual Defendants allegedly attended, evidences their

knowledge of flaws in the company's compliance programs.  These materials derive from meetings which took place between May 2010 and October 2013.  The relevant discussions at these meetings concerned regulators' increased attention to Western Union's agents, the need for improvement in compliance programs to mitigate AML and fraud in high-risk regions, and a competitor's settlement agreement with DOJ.

Even assuming the Individual Defendants were briefed on these compliance matters while attending the identified meetings, "mere attendance at meetings does not contribute to an inference of scienter."  *Anderson*, 827 F.3d at 1246; *see also In re Level 3*, 667 F.3d at 1344 (concluding the fact the defendants "monitored [a contested program] through regular meetings and reports" did not give rise to a "strong inference" of scienter).  We fail to see how either government regulators' increased attention to certain regions or discussions about the need for improving Western Union's compliance controls equates to knowledge of ongoing, unaddressed compliance violations.  Additionally, Plaintiff's allegations concerning the terms of a 2012 settlement agreement Moneygram—Western Union's main competitor—reached with DOJ for compliance failures like those at issue here amount to "allegations of 'fraud by hindsight,' which does not constitute securities fraud."  *See Anderson*, 827 F.3d at 1247.  These allegations therefore also fail to suggest any inference of scienter.

Turning to the third category of scienter-related allegations, Plaintiff's complaint is replete with facts concerning government investigations into Western Union's legal compliance, interactions with regulators, and the company's disclosures in SEC filings regarding these matters.  Defendants do not dispute the notion that

13

governmental investigations into a company can contribute to an inference of scienter. *See In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 307, 309–10 (S.D.N.Y. 2014) (attaching relevance to the existence of government investigations but noting its insufficiency, standing alone, to support a strong inference of scienter).   Nor do Defendants argue they were unaware of the government investigations into Western Union's legal compliance.   Although the existence of government investigations into Western Union, standing alone, is insufficient to support a cogent and compelling inference of scienter, we will consider it as one piece of the puzzle in our holistic analysis of Plaintiff's allegations.

Dovetailing with the existence of the governmental investigations, Plaintiff argues the Individual Defendants knew about Western Union's compliance violations because the company produced, among other things, internal reports and records analyzing consumer fraud complaints and suspicious agents to the investigators.   These investigations, Plaintiff alleges, revealed the deficiencies in Western Union's compliance programs and provided the basis for DOJ's and FTC's conclusions that Western Union turned a blind eye to third-party agents complicit in money laundering and consumer fraud.   Defendants, on the other hand, contend Plaintiff fails to provide any particularized allegations showing the Individual Defendants themselves dealt with the government regulators, reviewed the underlying documents submitted as part of the investigations, or were otherwise informed legal noncompliance existed within the company during the Class Period.   We agree with Defendants.

Plaintiff's argument is strongest against Mr. Ersek, the CEO of Western Union during the Class Period.  Confidential Witness ("CW") 4, who worked as a former high-level compliance officer at Western Union between late 2011 and April 2013, "regularly briefed Ersek on relevant compliance-related issues, including the status of the Southwest Border Agreement and system and compliance changes."  CW4's statements demonstrate Mr. Ersek was a hands-on chief executive, which is "a fact relevant in our weighing of the totality of the allegations."  *Adams*, 340 F.3d at 1106.  But we "cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."  *Anderson*, 827 F.3d at 1245; *see also Adams*, 340 F.3d at 1106 (explaining the defendant's status as chief executive of the company was a relevant fact but direct knowledge of the chief financial officer was "an important link in the inferential chain").  Neither CW4's account nor the accounts of the other confidential sources cited in the complaint establish that Mr. Ersek reviewed the documents submitted as part of the investigations or was informed about ongoing, unaddressed compliance violations during the Class Period.[6]

---

[6] CW1, a senior AML compliance manager at Western Union, explained that consumer complaints were aggregated and distilled into composite reports distributed to senior managers at the company.  CW2, who served as a Western Union vice president and senior Global Customer Care of Operations manager from December 2012 to January 2015, stated that the company "chose not to implement the stronger AML protocol that Moneygram adopted as part of its 2012 agreement with DOJ."  CW3 served as a senior compliance employee at Western Union from June 2013 to November 2015, worked in other AML positions before that time, and reported to the company's chief compliance officer.  According to CW3, there is "no way [the Individual Defendants] were not informed about the on-going investigations that resulted in the Joint Settlement because the [c]ompany made upper managers available to investigators and spent years cooperating with the investigation."  There are no

The link between Mr. Scheirman and Mr. Agrawal and their alleged knowledge of ongoing illegality at Western Union is more speculative than that of Mr. Ersek. There are no allegations either Mr. Scheirman or Mr. Agrawal, in their role as CFO, had any responsibility for compliance matters at Western Union, and Plaintiff does not allege any employees reported to them on compliance issues. Such an omission weighs against inferring fraudulent intent on the part of these executives. *See Adams*, 340 F.3d at 1088–89, 1106 (finding inference of scienter where a GAAP violation was paired with particularized facts demonstrating the CFO knew the company's profit was being falsely reported, including allegations that the company's assistant treasurer informed the CFO of unprofitable ventures and the CFO himself complained of the financial losses). The facts Plaintiff advances provide little reason to believe either of these executives reviewed the documents submitted as part of the governmental investigations or were otherwise informed of Western Union's failure to maintain an effective compliance program at the time of their alleged misstatements.[7]

---

allegations either CW1, CW2, or CW3 directly reported to any of the Individual Defendants or even had any form of contact with them, much less informed them Western Union's compliance systems were failing. Nor do any of the confidential witnesses indicate the Individual Defendants ever discussed the ongoing illegality or knew the fraudulent transactions analyzed in the internal reports were not being properly addressed by Western Union's compliance systems. The accounts of the CWs cited in the complaint add little, if any weight, to Plaintiff's side of the scienter scale.

[7] Plaintiff also points to a July 2013 report the Individual Defendants allegedly received concerning suspicious fraudulent activity, occurring since March 2013, by an agent in India. The report indicates the matter was escalated to Regional Compliance, but there are no allegations regarding what happened after the escalation or how Western Union resolved this issue. Even assuming the Individual Defendants read this

Plaintiff also points to Western Union's admissions in the DPA and the FTC's conclusions in the Joint Settlement regarding the company's awareness of serious compliance problems as evidence of scienter.  In the DPA, Western Union admitted to willfully failing to implement an effective AML compliance program from 2004 through December 2012.  Similarly, the FTC Complaint, the underlying allegations of which Western Union did not admit to, concluded the company ignored compliance violations through October 2015.  Based on these admissions and conclusions in January 2017, Plaintiff argues the Individual Defendants must have been aware of these ongoing legal violations when they made their alleged misstatements.

The problem with Plaintiff's argument is the PSLRA does not permit allegations of "fraud by hindsight."  *See Anderson*, 827 F.3d at 1247.  Put another way, Plaintiff may not rely on a subsequent event triggering a decrease in stock price "to say that the later, sobering revelations make the earlier, cheerier statement a falsehood." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (citation omitted).  Rather, Plaintiff must provide particularized allegations showing the Individual Defendants, before the announcement of the Joint Settlement, knew of or recklessly disregarded the falsity of the challenged statements *at the time* they made the statements.  *See In re Level 3*, 667 F.3d at 1347 ("[H]indsight review . . . contributes nothing to an inference of scienter.").

---

report, we fail to see how it demonstrates the Western Union executives' knowledge of widespread failures to discipline agents engaging in fraudulent transactions.

No such allegations exist here.  While the DPA and FTC Complaint highlight the wrongdoing of Western Union's agents and indicate some of the company's executives knew about ongoing violations, neither document provides particularized facts tying the Individual Defendants to these violations or otherwise showing they were aware of ongoing illegality and widespread disciplinary failures during the Class Period.  In the absence of such allegations, Plaintiff's argument is simply another variation of fraud by hindsight, which fails to support an inference of scienter.[8]

Finally, Plaintiff argues the Individual Defendants had motive to defraud investors because they, along with other Western Union executives, used nonpublic information to sell company stock at artificially inflated prices during the Class Period. Specifically, Plaintiff alleges Mr. Ersek sold approximately 600,000 shares of Western Union common stock for proceeds of more than $12 million between 2013 and August 2016.  Plaintiff also avers Mr. Agrawal sold over 9,000 shares for proceeds of approximately $200,000 in August 2016.  The complaint contains additional allegations regarding other non-defendant executives who allegedly profited by selling Western Union stock during the Class Period.

---

[8] We recently rejected a similar attempt to impute knowledge of wrongdoing in the DPA to Western Union's board of directors, which included Mr. Ersek, who has been on the board since 2010.  *Ersek*, 921 F.3d at 925 & n.20 (affirming dismissal of shareholder derivative action alleging breach of fiduciary duties).  There, we explained "[t]he DPA doesn't attribute knowledge of this criminal misconduct either to the Board or to any individual Director.  Nor does it support an inference that the Board consciously disregarded the misconduct." *Id.*  Neither Mr. Scheirman nor Mr. Agrawal are mentioned in the DPA.  Additionally, Western Union's admissions in the DPA refers to conduct that occurred before Mr. Agrawal became CFO and made his first allegedly misleading statement.

"Motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference," *Tellabs*, 551 U.S. at 325, but these factors are "typically insufficient in themselves" to give rise to a strong inference of scienter. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003).   While suspicious insider stock trading is evidence of motive and weighs in favor of inferring fraudulent intent, the amount of profit realized through executive stock sales, standing alone, is insufficient to support an inference of scienter.  *See In re Level 3*, 667 F.3d at 1346–47 (considering various factors in concluding corporate executives' stock sales did not establish a motive).   To determine whether trading activity is suspicious, courts consider several factors, including "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

Even assuming the timing of Mr. Ersek's and Mr. Agrawal's stock sales is suspicious—notwithstanding the fact these transactions were made in connection with an exercise of expiring options—the sales are not unusual when viewed in context. Both Mr. Ersek and Mr. Agrawal increased their aggregate holdings during the Class Period, and their respective sales yield from the identified transactions constituted only a fraction of their respective holdings.[9]   These factors militate against an inference of scienter.  *See Level 3*, 667 F.3d at 1346–47 (noting that increased holdings weakens an

---

[9] These facts are derived from Plaintiff's complaint and proxy statements Western Union publicly filed with the SEC, of which this court can take judicial notice. *See Employees' Ret. Sys. of Rhode Island*, 889 F.3d at 1158 (noting it is not unusual to consider public documents filed with the SEC in securities cases).

inference of scienter); *Ronconi v. Larkin*, 253 F.3d 423, 435–36 (9th Cir. 2001) (considering stock options in calculations and finding sales of 10% and 17% of holdings were not unusual in amount but sales of 69% to 98% of holdings were suspicious in amount).

Critically, Plaintiff does not allege Mr. Scheirman sold any Western Union stock during the Class Period. While suspicious stock sales are not necessary to adequately plead scienter, *see In re Level 3*, 667 F.3d at 1346, "the failure of other defendants to sell their stock undermine[s] [Plaintiff's] theor[y] that negative information was withheld to obtain a higher sell price." *In re Scholastic*, 252 F.3d at 75; *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 369 (5th Cir. 2004) (same). Because the complaint does not allege Mr. Scheirman sold any Western Union stock, we view Plaintiff's argument regarding Mr. Ersek's and Mr. Agrawal's motive to defraud investors with greater skepticism based on the record before us.

As for the stock sales of other Western Union executives identified in the complaint, Plaintiff fails to provide adequate context for these transactions. There are no allegations concerning the price initially paid for the stock, what percentage of total shares these sales consisted of, or whether they were buying other types of shares at the same time. Without such information, it is hard to reach any conclusion as to what kind of financial gain is at issue and whether these sales are unusual or suspicious.

In sum, we are not persuaded the stock sales of Mr. Ersek, Mr. Agrawal, or the other Western Union executives identified in the complaint demonstrate the Individual Defendants had motive to defraud investors. Plaintiff has therefore failed to plead facts

showing any of the Individual Defendants had a particularized motive to engage in wrongful conduct.  Although the absence of an alleged motive is not fatal to Plaintiff's claims, it does weigh against a finding of scienter.  *See Employees' Ret. Sys. of Rhode Island*, 889 F.3d at 1173.[10]

b.

Viewing all of Plaintiff's allegations holistically, we must decide "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Two inferences compete for credence here.  The culpable inference is the Individual Defendants were aware, at some point during the Class Period, of ongoing illegality not being redressed by Western Union's compliance programs and yet continued to assure investors the company complied with applicable AML and anti-fraud laws.  The innocent inference, on the other hand, is the Individual Defendants neither knew about nor consciously disregarded the ongoing illicit behavior at Western Union when they made their alleged misstatements but rather were overly optimistic about the effectiveness of the company's compliance systems.

---

[10] "We likewise find the presence of the SOX certifications unpersuasive because they are not accompanied by any 'particularized facts to support an inference that [the Individual Defendant] knew [their] sworn SOX statements were false at the time they were made.'"  *In re Zagg*, 797 F.3d at 1205 (quoting *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015)).  Plaintiff's bare assertion regarding the Individual Defendants' execution of the SOX certifications "adds nothing substantial to the scienter calculus" and, at best, "support[s] an inference of negligence." *Id.*

21

Based on the totality of the allegations, the inference of scienter arising from Plaintiff's complaint is neither cogent nor as compelling as the competing inference of nonfraudulent intent.  Plaintiff supplies few, if any, particularized facts giving rise to a strong inference any of the Individual Defendants intentionally mispresented when they made their alleged misstatements regarding Western Union's then-current legal compliance.  In the absence of such allegations, the complaint does not adequately allege the Individual Defendants' misstatements were made with the knowledge of a danger of misleading investors.

Even if the complaint fails to raise a strong inference of intent to deceive, manipulate, or defraud, Plaintiff argues it at least raises a strong inference the Individual Defendants "acted with a reckless disregard of a substantial likelihood of misleading investors."  *See Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015).  The allegations Plaintiff advances demonstrate the Individual Defendants were too optimistic about Western Union's compliance systems and failed to give adequate weight to certain red flags, such as pending government investigations, at the time they made their alleged misstatements.  But as we explained above, "recklessness in this context is a particularly high standard, something closer to a state of mind approximating actual intent."  *In re Zagg*, 797 F.3d at 1206 (quotation marks and citations omitted).  The more compelling inference to be drawn from Plaintiff's complaint is, at most, one of negligence or possibly even gross negligence.

In sum, after evaluating all of Plaintiff's allegations with respect to the alleged misstatements regarding Western Union's legal compliance and considering the

competing inference of nonfraudulent intent, we conclude the complaint fails to raise a strong inference any of the Individual Defendants acted with scienter.  The district court, therefore, did not err in dismissing Plaintiff's Section 10(b) claims against the Individual Defendants.

2.

Although Plaintiff fails to adequately plead scienter for any of the Individual Defendants, the complaint could, in theory, still give rise to a strong inference Western Union acted with the requisite state of mind.  Corporations, of course, do not have their own state of mind.  Rather, the scienter of a corporation's agents must be imputed to it.  *See Adams*, 340 F.3d at 1106.  The question remains, however: Whose state of mind matters?

The appropriate standard for evaluating whether a non-defendant corporate agent's state of mind can be imputed to a corporate defendant under the PSLRA appears to be an open question in this circuit.  We have recognized "[t]he scienter of the *senior controlling officers* of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those *senior officials* were acting within the scope of their apparent authority."  *Id.* (emphasis added).  Applying this principle in *Adams*, we determined the complaint adequately alleged scienter on behalf of Kinder–Morgan, the corporate defendant, because the allegations gave rise to a strong inference the company's CEO and CFO, who also were named defendants and parties on appeal, acted with scienter when they signed the company's misleading financial statements.  *Id.* at 1105–07.

23

Plaintiff suggests the scienter of *any* Western Union agent, including lower-level corporate officers who played no role in the misstatement, can be imputed to the company for purposes of liability under the PSLRA.  We disagree.  If the scienter of any agent is imputable to a corporation, "then it is possible that a company could be liable for a statement made [ ] so long as a low-level employee, perhaps in another country, knew something to the contrary."  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).  Such a result runs afoul of the PSLRA's heightened standard for pleading scienter.  *Id.* (noting Congress "increased the scienter pleading requirements to prevent strike suits").  Because the allegations here concern allegedly fraudulent public statements, we will look to the state of mind of "the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[.]"  *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (quoting *Southland*, 365 F.3d at 366); *see also Mizzaro*, 544 F.3d at 1254 (same); *Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (same).

Here, Plaintiff argues the alleged scienter of other Western Union executives—including Mr. Barry Koch, Mr. Stewart Stockdale, and "the Company's counsel and/or the Company's compliance officer" responsible for responding to the government's investigative inquiries—is attributable to the company.[11]   Most of the allegations

---

[11] Both Mr. Koch and Mr. Stockdale were named as defendants in Plaintiff's complaint.  Plaintiff voluntarily dismissed Mr. Stockdale from the lawsuit before Defendants filed their motion to dismiss.  Because Plaintiff only appeals the district court's ruling on the alleged misstatements regarding Western Union's legal

regarding these executives' state of mind, such as the pervasive nature of AML violations at Western Union identified in the Joint Settlement, are identical to Plaintiff's insufficient allegations against the Individual Defendants. Even assuming, for the sake of argument, the state of mind of all these individuals can be imputed to Western Union, Plaintiff's argument fails because the complaint does not raise a strong inference any of these individuals acted with scienter.

Plaintiff contends Mr. Koch "had every reason to know in the ordinary course of his job the information described in the Joint Settlement" because he was Western Union's Chief Compliance Officer from May 2013 to November 2015. Mr. Koch's position would help establish whether he should have known about deficiencies in Western Union's compliance systems. "But additional particularized facts are necessary for an inference of scienter." *See Anderson*, 827 F.3d at 1245.

The only additional particularized fact allegedly revealing Mr. Koch's scienter is a September 2013 report he received concerning a master agent's failure to properly record transactions. Western Union did not terminate this agent, but the report indicates the company had already implemented remedial measures to address the issue. Although Plaintiff argues this action was insufficient, as the FTC concluded in the Joint Settlement, it fails to show Mr. Koch knew or consciously disregarded widespread failures by Western Union to address compliance issues. Plaintiff's

---

compliance, it has also abandoned its claims against Mr. Koch, whose statements fall under other categories the district court dismissed as neither false nor misleading. Thus, neither Mr. Koch nor Mr. Stockdale are a party in this appeal.

argument here falters for the same reason as its contentions regarding the Individual Defendants: the complaint lacks particularized allegations giving rise to a strong inference Mr. Koch ignored ongoing, unremedied illegality or was otherwise aware Western Union's compliance systems were failing during the Class Period.

Plaintiff also points to the alleged scienter of Mr. Stockdale, who was an executive in several different capacities at Western Union until October 2012. According to the complaint, Mr. Stockdale communicated in June 2010 that efforts were being made to "save" an agent engaging in fraudulent transactions, which demonstrates the executive's culpable state of mind at that time.   But this communication took place nearly two years before the start of the Class Period in February 2012, as well as before any of the identified misstatements concerning Western Union's then-current legal compliance.  Moreover, Western Union terminated this agent in December 2011—months before the Class Period began.  This fact, taken with all of Plaintiff's other allegations, fails to support the inference Mr. Stockdale knew about or consciously disregarded ongoing legal violations during the Class Period. *See id.* at 1240 (concluding admissions regarding a company's problems made months before the class period did not support an inference of scienter).

Plaintiff's argument regarding the scienter of "the Company's counsel and/or the Company's compliance officer" who oversaw Western Union's responses to governmental investigations is also without merit.  The only particularized allegation supporting Plaintiff's contention is CW4's account, which provides "the Company's General Counsel w[as] always briefed on the discipline or shutdown of agents and any

related investigations." This fact, even when considered with all the other allegations Plaintiff advances, clearly falls short of giving rise to an inference—must less a strong inference—Western Union's General Counsel or some unnamed compliance officer was aware of ongoing, unaddressed illegality within the company.

Notwithstanding the complaint's failure to give rise to a strong inference of scienter as to any identifiable Western Union officer, Plaintiff contends the company is nonetheless subject to § 10(b) liability under the doctrine of "corporate scienter," alternatively referred to as "collective scienter." This doctrine—which several of our sister circuits have addressed, but few have adopted, and even less have applied to find scienter—allows a plaintiff to plead scienter against a corporate defendant without doing so for a specific individual. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) ("[T]here could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication.") (quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008)).

We have neither accepted nor rejected this theory of corporate scienter, and we need not do so now. Although the compliance violations at Western Union were serious and long-lasting, the facts pleaded are a far cry from the hypothetical situation our sister courts have provided as to when the doctrine would apply:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *see also In re NVIDIA*, 768 F.3d at 1063 & n.13 (using the same example); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008) (same). Even if we deemed it possible to plead scienter against a corporation without pleading scienter against an individual, the facts alleged here would not give rise to corporate scienter under any recognized theory of the doctrine. Thus, Plaintiff has failed to adequately plead scienter with respect to Western Union, and the district court correctly determined the § 10(b) claim against the company could not proceed.

III.

Finally, we conclude Plaintiff has failed to state a control-person claim against the Individual Defendants. Control-person claims under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(b), are predicated on some underlying primary violation of the securities laws. *Adams*, 340 F.3d at 1107. Because the complaint does not allege a primary violation of the securities laws, Plaintiff's Section 20(a) claims necessarily fail. Therefore, the district court did not err in dismissing the complaint.

\* \* \*

For the foregoing reasons, we AFFIRM the judgment of the district court.

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Christopher M. Wolpert                                                    Jane K. Castro
Clerk of Court                  February 25, 2020              Chief Deputy Clerk

Ms. Emma Gilmore
Mr. Michael Grunfeld
Mr. Jeremy Alan Lieberman
Pomerantz
600 Third Avenue, 20th Floor
New York, NY 10016

Mr. Jonathan David Lindenfeld
Fegan Scott
140 Broadway, 46th Floor
New York, NY 10016

RE:        **19-1154, Smallen Revocable Living Trust, et al v. Western Union
           Company, et al**
           Dist/Ag docket: 1:17-CV-00474-KLM

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. If
requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk,
in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P.
Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions
for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of the Court


cc:      Rusty Glenn
         Christina F. Gomez
         David F. Graham
         Henry Rosen
         Hille R. Sheppard
         Kip Brian Shuman
         Holly Stein Sollod
         Claire Elizabeth Wells Hanson

CMW/na